# EXHIBIT
# 6

RUSH MOORE LLP
A Limited Liability Law Partnership

SUSAN TIUS  2873-0
737 Bishop Street, Suite 2400
Honolulu, Hawaii  96813-3862
Tel. No. 521-0406
Fax No. 521-0497
E-mail: Stius@rmhawaii.com

SHEPPARD MULLIN RICHTER & HAMPTON LLP

CARREN B. SHULMAN
30 Rockefeller Plaza
New York, NY 10112-0015
Tel. No. (212) 634-3040
Fax No. (212) 655-1740;
E-mail: CShulman@sheppardmullin.com

Attorneys for MARRIOTT INTERNATIONAL, INC.
and MARRIOTT HOTEL SERVICES, INC.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

| | |
|---|---|
| In Re | Case No. 11-02371 |
| | (Chapter 11) |
| M WAIKIKI LLC | |
| | Date:  September 7, 2011 |
| Debtor. | Time:  2:00 p.m. |
| | Judge:  Honorable Robert J. Faris |
| | Related DKT Nos. 11 and 17 |

OPPOSITION MEMORANDUM TO DEBTOR'S
MOTION TO REJECT MANAGEMENT AGREEMENT; EXHIBITS "A" – "G"

MARRIOTT HOTEL SERVICES, INC. ("Marriott") submits this

memorandum in opposition to the motion of debtor M Waikiki LLC (the "Debtor") to

reject a management agreement with Marriott [DKT. # 11] (the "Motion") for the

Waikiki Edition Hotel located at 1775 Ala Moana Boulevard, Honolulu (the "Hotel").

1   The motion to reject, filed on the first day of Debtor's bankruptcy, is entirely premature.

2   This case is a gross misuse by Debtor of the bankruptcy process for the sole purpose of

3   terminating a management agreement that a state court of Debtor's choosing already ruled

4   was not terminated prepetition.  Debtor is now shopping for a new forum for a more

5   favorable decision without regard to the best interest of creditors or whether a

6   reorganization is viable.

7                                    ***Preliminary Statement***

8          In May, 2011, Debtor filed a complaint against Marriott for breach of the

9   management agreement in the New York State Supreme Court (the "State Court Action").

10  As explained below, because the State Court Action was commenced by the Debtor, it is

11  not subject to the automatic stay of 11 U.S.C. §362.

12         On August 1, 2011, Marriott filed a motion to dismiss the complaint.

13  Debtor's response has yet to be filed.  Rather than respond to the motion to dismiss, last

14  Sunday, August 28, 2011, Debtor engaged in unlawful self-help.  Specifically, the Debtor

15  purported to terminate the Management Agreement by entering the Hotel after 2:00 a.m.,

16  marching Marriott's employees off the premises, requiring them to leave everything behind

17  and locking them out of the Hotel.  On August 31, 2011, the State Court issued a

18  temporary restraining order ("TRO") (Ex. A) compelling Debtor to allow Marriott back in

19  and to return Marriott's property.  In response, Debtor filed its Chapter 11 petition to stay

20  the TRO.  Rather than comply with the state court's injunction, the Debtor filed its chapter

21  11 petition, commencing this action, and separately filed the pending rejection motion.

22         The issue of whether rejection of Debtor's most significant contract is in the

23  best interest of creditors and shows good business judgment cannot be decided without the

24  benefit of input from key creditor constituencies, and there is no harm in waiting for them

25  to weigh in since Debtor has sought retroactive relief.  For example, the Debtor appears to

26  be rushing this Court to make a decision on the Motion before a creditors committee is

27  appointed.  It would be highly unjust to burden unsecured creditors with an outsized

28  rejection damages claim of more than $65 Million –which will likely dwarf all other

2

1   unsecured claims – without the unsecured creditors having any voice in the process.  In

2   addition, Debtor's secured lenders, who consented prepetition to assuming Marriott's

3   management agreement if the property is sold or foreclosed upon, will need to decide how

4   they intend to proceed in this case.  Finally, Debtor must establish that this is a real

5   Chapter 11 case filed in good faith for a proper purpose.  However, in that regard, Debtor

6   filed no first day motions to maintain bank accounts for the revenue generated daily by the

7   Hotel since the petition date, no request to use cash collateral of its secured lenders –

8   though one has a $114 Million loan in default – and none of the typical motions filed to

9   commence a bankruptcy.  Surely, to establish sound business judgment Debtor must say

10  more than that it invoked this Court's jurisdiction because it was unhappy with an adverse

11  State court ruling and now seeks a second bite at the apple in this Court.  Forum shopping

12  for a different ruling is an illegitimate basis for invoking this Court's powers, and does not

13  change the fact that Debtor flouted a State court TRO.

14          Debtor's request for this Court to hold that the management agreement was

15  terminated prepetition also is improper.  The State court (Debtor selected) is handling

16  prepetition issues regarding the management agreement, and already determined, by

17  entering the TRO, that the agreement was not terminated.

18          Debtor's comical additional demand for an order requiring Marriott to assist

19  in an orderly transition of services must also be denied.  Marriott has no obligation to do so

20  here, where Debtor is clearly in default under the management agreement, and will do no

21  more than comply with its obligations under the agreement and the Bankruptcy Code.

22

23                          PROCEDURAL POSTURE

24          This case was commenced by the filing of a voluntary petition for relief (the

25  "Petition") under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") on

26  August 31, 2011 (the "Petition Date") admittedly for the sole purpose of staying the TRO

27

28

3

1   (Ex. A), entered by the State Court in *M Waikiki LLC v Marriott Hotel Services, Inc., et al.*,

2   Index No. 651457/2011, i.e , the State Court Action.  *See* Declaration of Damian

3   McKinney, dated 9/2/11, submitted by Debtor in support of the Motion [DKT. # 17

4   paragraphs 28-29].

5           No creditors committee has been appointed.  No schedules have been filed.

6   Debtor is in control of the Hotel but has not filed motions, *inter alia,* to manage daily cash

7   receipts, open debtor-in-possession accounts, or use cash collateral.   Debtor appears to be

8   operating the Hotel without any authority to use revenues being generated by its operation.

9   The very first document filed by Debtor after the filing of the bare boned Petition – and the

10  only apparent focus of this Chapter 11 proceeding -- was the Motion

11                              **FACTS**

12      **A.    Background**

13          1.    The State Court Action

14          On or about May, 2011, Debtor commenced the State Court Action seeking

15  to terminate the Management Agreement, dated July 9, 2008 between Debtor and Marriott,

16  a 30-year branding and management contract (the "Management Agreement").  Marriott

17  vigorously opposed the allegations in the State Court Action and filed a motion to dismiss

18  on August 1, 2011.[1]  Debtor's response to the dismissal motion has not yet been filed.

19          2.    Debtor Purports to Terminate the Management Agreement And
               Conducts A Pre-dawn Illegal Raid of the Hotel

20

21          On or about August 8, 2011, Debtor requested the right to enter the premises

22  and review the Debtor's books and records at the Hotel, which was conducted from August

23  10-12, 2011.  *See* Email dated 8/8/11, Ex. C.  The Debtor was given access to, among

24  other things, the Hotel's monthly general ledgers, monthly disbursement journals, monthly

25  ─────────────────────
    [1] The Management Agreement included the period in which the Hotel was under construction.
26  The Hotel was plagued by construction cost overruns and a fire.  The Hotel was completed and
    open for business September 28, 2010.  In August, 2011, prior to Debtor's coup, the Hotel was
27  expected to reach capacity and meet revenue projections, with a positive outlook as the high
    season approaches.  ***In addition, on November 16, 2010, the Debtor sent Marriott an estoppel***
28  ***certificate certifying that there were no defaults***.  *See* Ex.B.

detailed accounts receivable and payable listings, booking reports, and employment staffing reports.

Despite its access to books and records and notwithstanding the pending litigation in New York, after 2:00 a.m. Sunday, August 28, 2011, Debtor exercised illegal and wrongful self help, physically and under cover of darkness, marching Marriott's Hotel employees off the Hotel premises, requiring them to leave everything behind, locking them out, and unlawfully taking Marriott's confidential and proprietary property.

        3.    <u>Debtor Installs Marriott's Competitor At the Hotel, And Provides It With Unfettered Access to Marriott Confidential Information</u>

In Marriott's place, Debtor installed a competitor, Aqua Hotels & Resorts ("Aqua"). Incredibly, the Debtor allowed Aqua access to computers with Marriott's proprietary software and to Marriott's confidential documents, including payroll and customer information and other proprietary data detailed in Marriott's emergency Motion for Relief from Stay to Enforce Specific Provision in Temporary Restraining Order, and attachments thereto [DKT. # 13].

        4.    <u>The New York Court Grants a TRO Requiring Debtor To Reinstate Marriott and Protect Marriott's Confidential Information</u>

In response to the Debtor's wrongful, covert actions, Marriott immediately sought a TRO in the State Court Action to return Marriott to the Hotel as manager, and to protect, from the Debtor and Aqua, its valuable intellectual property and proprietary information, including, but not limited to, customer lists, standard operating manuals, trademarks, secure financial data of Marriott, and other similar information (the "Confidential and Proprietary Information").

On August 31, 2011, the State Court granted the TRO, compelling Debtor to allow Marriott to return to the Hotel as manager, restraining Debtor from using, and compelling Debtor to return, Marriot's Confidential and Proprietary Information.

5.      Debtor Ignores The TRO and Commences These Proceedings Despite the New York Court's TRO

Debtor failed and refused to return the Confidential and Proprietary Information to Marriott, physically blocked the entrance to the Hotel from Marriott personnel while it filed this case, and touted to the local press, through its counsel, that its actions were intended to avoid complying with the TRO. *See* Declaration of Michael L. Rock, submitted in support of Marriott's emergency motion for stay relief, dated September 1, 2011 [DKT. # 13].

Marriott confirmed the misuse of its property this weekend when certain employees returned to the Hotel (with Marriott's counsel), followed closely by Debtor's team of security guards, to photograph and recover certain material.  Marriott was allowed to recover less than 20 percent of its documents.  With regard to more than 80 percent unilaterally withheld, Marriott was told to mark documents as "disputed" and leave them behind either to be boxed, taped and maintained by Debtor, or to be used by Debtor since Debtor refuses to stop using contested information. *See* Declaration of Lindsay Harrison, Esq., and the photographs annexed thereto, Ex. D.  Certain materials appear to have been shredded or photographed by Debtor and/or Aqua, and computers containing Marriott's proprietary information appear to have been "cracked and inventoried" by Debtor and/or Aqua. *Id.*

## LEGAL ARGUMENT

**A.      Debtor's Request To Reject The Management Agreement is Premature And May Be Harmful to Creditors**

The issue of whether rejection of Debtor's most significant contract is in the best interest of creditors and shows good business judgment cannot be decided at the outset of the case.

Rejection must be in the best interest of the estate and its creditors.[2]

Rejection of a prepetition executory contract before its term expires is a breach that gives

rise to an unsecured claim for damages by the contract counterparty.  11 U.S.C. §365(g).

The Management Agreement is a thirty year contract in its infancy; therefore, rejection

damages will be substantial, and as set forth in testimony submitted in the State Court

Action, the present value of just the loss of revenue to Marriott from the Hotel is

$65,471,668.  *See* Affidavit of Catherine Young, submitted in the State Court Action in

support of the TRO, Ex. E, paragraph 4.  Even if Debtor were to dispute Marriott's

damages calculation, it is hardly evident that rejection is necessary or appropriate at least

at this stage of this case.  The unsecured creditors would undoubtedly face the greatest

impact of such a large rejection damages claim in this case.  Yet, without the formation of

a creditors committee and no voice in this Chapter 11 case at this very early stage, the

unsecured creditors group are helpless to raise any concern over rejection of the

Management Agreement.  Certainly, the Court should allow the Office of the US Trustee

to meet its statutory obligation to first appoint an Official Committee of Unsecured

Creditors, which once appointed should have the opportunity to review the Debtor's

business judgment and make its position on the Motion known to the Court.  If the Debtor

were to succeed in rushing through a premature decision on the Motion, the creditors

committee would face a daunting rejection damages claim that might have been avoided if

a decision is deferred until the committee's formation.

---

[2] *In re Chi-Feng Huang*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) ("The primary issue is whether rejection would benefit the general unsecured creditors.").

1   Additionally, Debtor and its secured lenders executed Subordination, Non-

2   Disturbance and Attornment Agreements with Marriott, dated November 15, 2010 (the

3   "SNDAs"),  which, *inter alia*, obligates a buyer of the Hotel (including the lenders, either

4   through a sale or foreclosure in or out of bankruptcy) to buy the Hotel with the

5   Management Agreement.  The SNDAs are recorded on the land records of the State of

6   Hawaii, Doc. No. 4020386, Cert. 813,270, and Doc No. 3838881, Cert 813,270.  Even if

7   this Court were to authorize rejection despite the terms of the SNDAs, the secured lenders,

8   who are not debtors, are still bound by the SNDAs.  Thus, without clarity as to who will

9   own the Hotel in this case, it would be nonsensical to reject the Management Agreement,

10  creating huge rejection damages, only to have the secured lenders re-enter the

11  Management Agreement outside of bankruptcy.  At a very minimum, it would be prudent

12  to allow sufficient time for these important issues to be sorted out before rushing a

13  decision on the Motion.

14          Moreover, the Debtor has failed to demonstrate any emergency necessitating

15  rejection of the Management Agreement on an emergency basis.  In fact, there is no such

16  emergency because Debtor has, through its own self-help methods, put a new manager in

17  place.  Accordingly, any claim that a swift rejection is critical to the estate is completely

18  disingenuous.

19          Finally, the Debtor offers no facts to support its assertion that rejection is an

20  exercise of good business judgment.  Debtor merely reasserts the allegations in the

21  complaint filed in the State Court Action, and is using this Court to forum shop for a more

22  favorable decision to replace the TRO.  Indeed, the Debtor's actions confirm that this case

23

24

25

26

27

28

8

is focused solely on the Debtor extricating itself from the Management Agreement and avoiding the mounting debt to Marriott for fees owed to Marriott and Marriott's payment of Hotel expenses since April 2011, and not on attempting to reorganize.  Significantly, none of the usual first day motions have been filed.  Debtor has been collecting revenue daily without approval to open or maintain bank accounts, and without authority to use the cash collateral of its secured lenders to fund ongoing operations.[3]  There is also no evidence of a motion for debtor-in-possession financing order, which is likely needed to fund payables, since Marriott had been funding payable since April 2011 when Debtor refused to meet its obligation to fund capital calls.

The foregoing begs the question:  "Why is the Debtor asking the Court to waste its time on a rejection motion when it may not have the funds to sustain a chapter 11 reorganization?"  Debtor also has not filed schedules, a request for an extension to file schedules, a true creditors matrix, a list of its 20 largest unsecured creditors, or any documents that would give sufficient notice to its creditors of this case or its intentions.[4] And, of course, if the Motion is granted, and the Management Agreement rejected, Marriott will go from being a $7 Million creditor (for the funds Marriott loaned to the Hotel under the Management Agreement from April through August 28, 2011), to the

---

[3] One of the Debtor's lenders is an equity holder, the Davidson Family Trust, therefore presumably the Debtor has the Trust's consent to use cash, though Debtor has not disclosed whether the Trust has authority to authorize the use of cash while the senior loan is in default.

[4] To the extent Debtor intends to claim that Marriott has the necessary documents to make these filings, such claim would be false.  All documents relating to the Hotel are on site and have been rifled through already, and apparently also shredded.  (*See* Harrison Declaration regarding the empty filing cabinets in the accounting office).  Moreover, although nearly all vendor contracts for the Hotel are on site, Marriott sent the Debtor a payables list through 9/1/11.

9

estate's largest unsecured creditor with a claim of over $72 Million.  Debtor should be prepared to disclose how it can achieve a reorganization plan given the above facts.

**B.    Prepetition Issues Regarding the Management Agreement Must Be Decided by the State Court**

Last Monday's raid of the Hotel did not result in a termination of the Management Agreement.  The State court rejected that claim by entering the TRO in the State Court Action.  Debtor's actions in contempt of the TRO, i.e. creating a security line that physically held Marriott's employees back while it filed for bankruptcy, did not change the determination of the State court that the Management Agreement was not terminated.  The Debtor cannot use this Court as a forum to relitigate issues already decided in the State Court Action.[5]  Nor can Debtor continue to withhold what is undisputedly Marriott's property – the Confidential and Proprietary Information – under the guise of bankruptcy protection.

The Debtor not only concededly filed its Petition for the improper purpose of staying the TRO,[6] it is now forum shopping for a more favorable decision on the issue of

---

[5] "Bankruptcy court is not an appellate court for disappointed litigants to attack decisions by state court judges." *In re Pedro*, 2011 Bankr. LEXIS 3259, at *19 (Bankr. E.D. Pa. 2011).  *See also In re Heghmann*, 316 B.R. 395 (B.A.P. 1st Cir. 2004) (finding that bankruptcy court was bound by state judgment and prohibited from modifying the state court's order terminating the debtor's property rights in real property); *In re Smith*, 105 B.R. 50 (Bankr. S.D. Cal. 1989) (finding that termination of a lease under state law prior to the tenant's filing bankruptcy petition has a preclusive effect in the bankruptcy).

[6] "[A]n entity may not file a petition for reorganization which is solely designed to attack a judgment collaterally."  *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1310 (2d Cir. 1997).

1  whether it has the right to terminate the Management Agreement, which this Court should

2  not tolerate.[7]

3       Indeed, Debtor's claims in the State Court Action remain pending and are not

4  stayed.  Section 362(a)(1) stays enforcement of a case filed against a debtor in bankruptcy.

5  "The automatic stay is inapplicable to suits *by* the bankrupt." *In re Merrick*, 175 B.R. 333,

6  357 (BAP 9th Cir. 1994).[8]  "There is simply no language in Section 362(a) designed to

7  stay actions initiated by the debtor." *Rett White Motor Sales Co. v. Wells Fargo Bank*, 99

8  B.R. 12, 15 (N.D. Cal. 1989).  Thus, the State Court Action is not stayed and the Debtor

9  should be preparing to respond to Marriott's motion to dismiss that case.[9]  This Court

10 should defer to the rulings of the State Court, in which these very issues of termination of

11 the Management Agreement already were litigated in the proceedings leading up to the

12 entry of the TRO.

13               **CONCLUSION**

14      Debtor clearly has not thought beyond filing its petition to stay the TRO.

15 Being singularly focused on terminating the Management Agreement is insufficient to

---

[7] "'Forum shopping has never been favored by federal courts, and courts are quick to discern the evil in all its disguises.'" *In re Archangel Diamond Corp.*, No. 09-22621 HRT. 2010 WL 4386808 (Bankr. D. Colo. Oct. 28, 2010) (quoting *In re Abacus Broadcasting Corp.*, 154 B.R. 682, 686 (Bankr. W.D. Tex. 1993)).  *See also In re Silberkraus*, 336 F.3d 864 (9th Cir. 2003) (noting that "it was bad faith for [the Debtor] to seek to use bankruptcy to alter whatever result would have been achieved by continuing to litigate the state court action with [Defendants]").

[8] (quoting *Martin-Trigona v. Champion Fed. Sav. and Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *see also Morfin v. Accredited Home Lenders, Inc.*, 2009 U.S. Dist. LEXIS 108159 (S.D. Cal. 2009) (a defendant is not prohibited from defending itself in an action brought by a debtor/plaintiff); *In re White*, 186 B.R. 700, 703 (9th Cir. B.A.P. 1995).

[9] This objection does not address the many reasons why the Management Agreement could not be terminated prepetition, which are set forth in Marriott's motion to dismiss in the State Court Action, Marriott's Memorandum in Support of its Motion for TRO and the transcript of the argument at the TRO hearing on August 31, 2011.  Exs. F and G.

11

1   establish business judgment as to why rejecting the Management Agreement is in the best

2   interest of the estate and its creditors.  For the reasons set forth herein, at this point in the

3   case, it is far too early to determine whether rejection is appropriate.  Thus, the Court

4   should deny the Motion without prejudice or continue the hearing on the Motion until a

5   reasonable time after an unsecured creditors committee is appointed, with a reasonable

6   opportunity afforded all parties in interest to take discovery and object to the relief

7   requested in the Motion.  Thus, the Court should deny the Motion.

8

9                    DATED:  Honolulu, Hawaii, September 6, 2011.

10

11

12                                /s/Susan Tius
                                  SUSAN TIUS
13                                Attorney for MARRIOTT INTERNATIONAL,
                                    INC. and MARRIOTT HOTEL SERVICES, INC.
14

15            DATED: New York, New York, September 6, 2011.

16

17                                /s/Carren B. Shulman
                                  CARREN B. SHULMAN
18                                Attorney for MARRIOTT INTERNATIONAL, INC. and
                                    MARRIOTT HOTEL SERVICES, INC.
19

20

21

22

23

24

25

26

27

28

12

**Exhibit A**

**TRO**

At a Commercial Division Part 5 of the
Supreme Court of the State of New York, held
in and for the County of New York at the
Courthouse, 60 Centre Street, Room 442 New
York, New York 10007 on the 31 day of
August, 2011

PRESENT:

     HON.    HON. EILEEN BRANSTEN
                            J.S.C

                    Justice

---

M WAIKIKI LLC,

               Plaintiff,

  - against -

MARRIOTT HOTEL SERVICES, INC., I.S.
INTERNATIONAL, LLC and IAN
SCHRAGER,

               Defendants,

---

MARRIOTT HOTEL SERVICES, INC.,

               Counterclaim-Plaintiff,

  - against -

M WAIKIKI LLC,

               Counterclaim-Defendant.

Index No.: 651457/2011
IAS Part 3
Justice Bransten

**ORDER TO SHOW CAUSE,
TEMPORARY RESTRAINING ORDER,
AND PRELIMINARY INJUNCTION**

Upon the Counterclaim Complaint, dated August 30, 2011, the exhibits annexed thereto,

and the accompanying Memorandum of Law In Support of Marriott Hotel Services, Inc.'s Order

to Show Cause Concerning a Temporary Restraining Order and Preliminary Injunction Against

M Waikiki LLC and its supporting affidavits submitted herewith;

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*        Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                Page 2 of 3

Now, upon motion of Jenner & Block LLP, attorneys for Defendant and Counterclaim-Plaintiff Marriott Hotel Services, Inc. ("Marriott");

Let the Plaintiff and Counterclaim-Defendant M Waikiki LLC ("Owner"), through its officers or agents show cause before this Court at the Courthouse, 60 Centre Street, Room 442, New York, New York 10007 on the ⧫ day of September 2011, at 9:30 a.m. or as soon thereafter as counsel can be heard, why an order should not be granted:

(1) Restraining and enjoining Owner from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; and

(2) Directing Owner to allow Marriott to, and restraining and enjoining Owner from, taking any actions that in any way interfere with Marriott's ability to: (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott; and

(3) Restraining Owner from using, and directing Owner to return to Marriott, any and all copies of Marriott proprietary or confidential information or data.

*AND SUBJECT TO THE INTERLINEATED PARAGRAPH BELOW*

ORDERED, that pending the hearing of this motion: (1) Owner is restrained and enjoined from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; (2) Owner must allow Marriott to, and is restrained and enjoined from taking any actions that in any way interfere with Marriott's ability to, (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott; and (3) Owner is restrained from using, and must return to Marriott, any and all copies of Marriott proprietary or confidential information or data; and it is further

ORDERED, that a copy of this Order and the papers upon which it is granted shall be served upon counsel for Owner, *hand to counsel in court* _____, by email on or before the ⧫ day of August 2011, and

*ORDERED THAT MARRIOTT SHALL BE ALLOWED TO RETURN TO ITS MANAGEMENT ROLE AT THE HOTEL ON Wednesday, AUGUST 31, 2011 BY 2:30 P.M. (HAWAII TIME; 8:30 P.M. EDT)*

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*
*I.S. International, LLC and Ian Schrager*

Index No. 61457/2011
Page 3 of 3

that such service shall constitute good and proper service hereunder and shall be deemed due and

sufficient notice of this application; and it is further

ORDERED, that opposition papers, if any, shall be served upon counsel for Marriott such

that they are received no later than the close of business on September 6, 2011

Dated: New York, New York
       August 31, 2011

ENTER,

Justice of the Supreme Court

**HON. EILEEN BRANSTEN**
**J.S.C**

## **Exhibit B**

**Estoppel Certificate**

## OWNER'S ESTOPPEL CERTIFICATE

November 16, 2010

Marriott Hotel Services, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817

Re:    Management Agreement, dated as of July 9, 2008, between M Waikiki LLC ("Owner") and Marriott Hotel Services, Inc. ("Manager"), as amended by (i) that certain Side Letter to the Management Agreement between Owner and Manager dated July 9, 2008, (ii) that certain First Amendment to Management Agreement, dated as of March 13, 2009, (iii) that certain side letter to Owner from Manager and I.S. International, LLC ("Schrager") dated as of March 13, 2009 with respect to the branding of the Hotel as an Edition Hotel (the "3/13/09 Letter"), (iv) that certain letter agreement to Owner from Manager and Schrager dated April 7, 2009 regarding the approval of certain design documents (the "4/7/09 Letter"), and (v) that certain Second Amendment to Management Agreement, dated as of the date hereof (collectively, the "Management Agreement"); and Design and Technical Services and Pre-Opening Agreement, executed by and among Owner, Manager, and Schrager, dated as of July 9, 2008, as amended by (i) that certain First Amendment to Design and Technical Services and Pre-Opening Agreement dated as March 13, 2009, (ii) the 3/13/09 Letter, and (iii) the 4/7/09 Letter (collectively, the "TSA" and collectively with the Management Agreement the "Hotel Agreements"), with respect to the hotel to be located at 1775 Ala Moana Boulevard in Honolulu, Hawaii (the "Property"), as more particularly described in the Hotel Agreements

Ladies and Gentlemen:

In connection with that certain mortgage loan made by Wells Fargo Bank, National Association, as Trustee for Nomura CRE CDO Grantor Trust, Series 2007-2 ("Senior Lender"), to Owner in the principal amount of $114,900,000, and that certain junior mortgage loan to be made by The Davidson Family Trust dated December 22, 1999 ("Junior Lender"), to Owner in the principal amount of up to $15,000,000, in each case secured by, among other things, the Property, Owner does hereby certify as of the date hereof to Manager and its respective successors and assigns as follows:

1.     The Hotel Agreements are in full force and effect; and

Owner's Estoppel Certificate
(Waikiki EDITION)

548842v2

2.   To the actual knowledge of Owner, there is no continuing Default (as defined in the Hotel Agreements) by Manager in the performance or observance of any covenant, agreement or condition contained in the Hotel Agreements and no event has occurred that, with the giving of notice or passage of time or both, would become such a Default.

The foregoing statements are binding upon Owner and Owner acknowledges and agrees that Manager and its successors and assigns shall be entitled to rely on Owner's certifications set forth herein.

Owner has executed this certificate as of the day and year first written above.

M WAIKIKI LLC, a Hawaii limited liability company

By:   eRealty Fund, LLC, a California limited liability company, its Manager

By:

Print Name:   Damian McKinney

Title:   Manager

- 2 -

**<u>Exhibit C</u>**

**Email Dated 8/8/2011**

**From:** Harrison, Lindsay C. [mailto:LHarrison@jenner.com]
**Sent:** Saturday, September 03, 2011 6:24 PM
**To:** Carren Shulman; Alan Feld
**Subject:** FW: Waikiki Books and Records

**From:** Alexander Widell [mailto:ADW@bickelbrewer.com]
**Sent:** Monday, August 08, 2011 8:22 PM
**To:** Handzo, David A
**Subject:** Waikiki Books and Records

Dave,

Attached please find a list of documents we request be made available to facilitate our review.

Regards,

Alex

The information contained in this e-mail message, including any attachments, is attorney privileged and/or confidential information intended only for the use of the individual or entity named as addressee. The review, dissemination, distribution, or copying of this communication by or to anyone other than the intended addressee is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and destroy all copies of the original message. Thank you.

**Lindsay C. Harrison**
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
Tel (202) 639-6865
Fax (202) 661-4956
LHarrison@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

9/6/2011

## Review of the Waikiki Edition Annual Operating Statement
## 2010 Operations

1.  October & November Smith Travel STR Reports

2.  Monthly General Ledgers

3.  Monthly Disbursement Journals

4.  Monthly Detailed Accounts Receivable and Payable Listings.

5.  All Marriott Hotel Services and related entities invoice/billings to the Waikiki Edition with supporting documents

6.  All Executive Committee meeting agendas and minutes

7.  All Marketing meeting agendas and minutes

8.  Payroll Registers

9.  Employee Staffing Reports

10. Marketing Plans

11. Booking Pace Reports, Group Booking Reports, Advance Deposit Ledgers and any similar reports identifying and reflecting sales efforts

12. 2010 Sales & Marketing Plan

13. Group Booking contracts

14. Wholesale Tour contracts

15. Contracts with internet and other booking merchants

16. Lease Agreements

17. Lost Business Reports for calendar 2010

**Exhibit D**

**Harrison Declaration**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF HAWAII

In Re

M WAIKIKI LLC

Debtor.

Case No. 11-02371
(Chapter 11)

DECLARATION OF LINDSAY C.
HARRISON

1. My name is Lindsay C. Harrison and I am a partner in the law firm of Jenner & Block L.L.P.  My office is located at 1099 New York Avenue, N.W., Suite 900, Washington, D.C. 20001.

2. Since June 2011, I have represented Marriott Hotel Services in connection with state court litigation initiated by M Waikiki LLC in the Commercial Division of the New York Supreme Court (which is New York's trial court).

3. On August 8, 2011, counsel for M Waikiki LLC requested to review certain Books and Records of the Hotel on behalf of M Waikiki LLC.  On August 10, 2011, a gentleman named Paul Guccini, who serves as Chief Financial Officer of M Waikiki LLC's asset management firm, came to the Hotel accompanied by an accountant with the law firm of Bickel & Brewer named David Matthiesen.  They reviewed Books and Records of the Hotel, including but not limited to monthly general ledgers, monthly disbursement journals, monthly detailed accounts receivable and payable listings, booking reports, and employee staffing reports.  Several of the items they requested to see

were proprietary and confidential information belonging to Marriott Hotel

Services, and as was its contractual right under the parties' Managmeent

Agreement, Marriott declined to permit representatives of M Waikiki LLC to

copy or retain such materials.

4. I was at the hotel on Wednesday, August 31, 2011, when Marriott employees

attempted to carry out the temporary restraining order issued in the State

Court Action, and were blockaded by Debtor's security guards.  Debtor's

bankruptcy counsel arrived at about 2:40 pm, asserted that a bankruptcy

petition had been filed and refused to let us past the security office into the

Hotel.  I asked him whether he would agree to agree to let us in to obtain our

documents.  He refused.  I asked whether he would agree to an expedited

hearing on recovering our documents, and after reportedly consulting with

Debtor's litigation counsel, he refused.

5. For the first time on Saturday, September 3, 2011, the Debtor's counsel agreed

to allow us into the Hotel to retrieve certain of Marriott's documents and

information.  We returned on Monday, September 5, 2011 to continue our

work.  We have only been able to recover approximately 20 percent of

Marriott's proprietary information because the Debtor is asserting it is theirs,

notwithstanding that the Management Agreement clearly says it is not

property of the Debtor.

6. On September 3, 2011, I accompanied representatives of Marriott Hotel Services to the Hotel in order to retrieve Marriott's proprietary and confidential information from the Hotel.  I attempted to reach agreement with counsel for M Waikiki LLC that Marriott would take away from the Hotel all materials that were accepted by M Waikiki LLC as proprietary and confidential, and that the parties would box up any materials that were disputed.  Over the course of the day, over 80% of the materials Marriott considered to be proprietary and confidential were disputed by M Waikiki LLC.

7. Representatives of M Waikiki LLC refused to box up any information relating to current, future, or potential customers of the Hotel, claiming they were "currently being used" by Aqua Hotels in managing the Hotel.

8. When we arrived in the accounting office, I observed that someone from M Waikiki LLC or Aqua had already removed most of the files from the filing cabinets.  It was not apparent how they had been removed or to where they had been relocated.

9. I observed several shredding machines in the accounting office that had clearly been recently used.  There were remnants of shredded paper all over the floor and at least one large plastic bag filled with shredded materials.  I asked counsel for M Waikiki LLC to explain the purpose of the shredder and what materials had been shred, and he said he would look into it.

10. In one of the empty filing cabinets, I observed a post-it note directing someone, "To be copied." I interpreted the note to be direction to photocopy whatever files had once resided in the cabinet.

11. In the office of the payroll administrator, I observed a post-it note on the desktop computer residing in that office which stated, "Cracked and inventory." I interpreted that note to mean that the hard drive had been broken into to and inventoried by representatives of M Waikiki LLC or Aqua.

12. Late in the day, we observed a storage room filled with over 30 boxes seemingly taken from the accounting office. No representative of M Waikiki LLC could explain how the boxes had been organized, who had organized them, whether the materials in them had been photocopied, or what materials if any were still missing from the accounting office.

I declare under penalty of perjury that the foregoing is true and correct.

Lindsay C. Harrison

Dated: September 6, 2011

**Exhibit 1**

**Photographs**

















**<u>Exhibit E</u>**

**Young Declaration**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| M WAIKIKI LLC, | |
| Plaintiff, | Index No.: 651457/2011 |
| - against - | IAS Part 3 |
| | Justice Bransten |
| MARRIOTT HOTEL SERVICES, INC., I.S. INTERNATIONAL, LLC and IAN SCHRAGER, | **AFFIDAVIT OF CATHERINE YOUNG** |
| Defendants, | |
| MARRIOTT HOTEL SERVICES, INC., | |
| Counterclaim-Plaintiff, | |
| - against - | |
| M WAIKIKI LLC, | |
| Counterclaim-Defendant. | |

Catherine L. Young, being duly sworn, deposes and says as follows:

1.  My name is Catherine L. Young, and I am Senior Vice President for Global Asset Management at Marriott International, Inc. ("Marriott"), an affiliate of Marriott Hotel Services, Inc.  I have worked for Marriott since 1994, initially as a financial analyst with Marriott Distribution Services, then as a senior manager in the Financial Planning and Analysis Group, then as Senior Director of Project Finance. I briefly left Marriott to work for AOL/Time-Warner for approximately three years. I returned to Marriott in 2003 as Vice President of Mergers and Acquisitions, and became Senior Vice President for Global Asset Management in 2006. Before

1

joining Marriott, I worked as a financial analyst for Ford Motor Company. I have worked in finance for approximately 19 years and in hotel finance for approximately 11 years.

2.   As Senior Vice President for Global Asset Management, I am responsible for representing Marriott's interests in contract negotiations with Owners of Marriott International branded hotels. I am familiar with the dispute between Marriott and M Waikiki LLC concerning the Hotel, and I understand that M Waikiki LLC attempted self-help to evict Marriott as operator of the Hotel on August 28, 2011.

3.   I understand that Kenneth R. Rehmann is submitting an affidavit describing the irreparable injuries that Marriott will suffer if the status quo of Marriott operating the Hotel is not restored.  In addition to the unquantifiable injuries to Marriott's reputation, brand identity, loss of goodwill, loss of customers, and losses stemming from the Owners' disclosure of Marriott's proprietary information to Marriott's competitors, Marriott would also lose substantial revenue and suffer other monetary damages that for reasons discussed below I do not believe the Owners are now or will ever be in a position to pay.  This affidavit quantifies some of those economic damages, uncollectible though they likely are.

4.   The Management Agreement between Marriott and M Waikiki has an initial term of 30 years from the date that the Hotel opened for business, and may be renewed by Marriott for two additional ten-year periods, for a total of 50 years.  Wrongful termination of the Management Agreement and expulsion of Marriott from the property would result in Marriott being deprived of the revenues it would have earned during the initial term and extensions. With the help of employees in the Corporate and Development Finance department at Marriott, I have conducted an analysis of the amount of revenue that Marriott would earn during that period, and I have

2

discounted that revenue to present value. The present value of that revenue stream is $65,471,668.

5.   Marriott's Management Fees for operating the property are calculated based on the Gross Revenues of the Hotel.  Accordingly, Marriott would earn these amounts even if the Hotel suffers operating losses.  However, Marriott strongly anticipates that the Hotel's financial performance will improve, as it has done continuously over its first year of operation.  The Hotel has been open for not even one year yet.  Hotels are not expected to perform competitively for at least five years after opening, which is precisely why under the parties' Management Agreement the Hotel is not to be measured against its Competitive Set until the sixth full year of operation. *See* M.A. §2.02.  I have calculated my estimated damages using conservative estimates of how the Hotel's revenues will grow over time as the Hotel becomes more of a known commodity in its market.

6.   In addition, the Owner has refused to fund the working capital required to meet the Hotel's 2011 operating expenses, and Marriott has done so in the Owner's place.  Marriott to date has paid $5,599,082 for Hotel expenses that the Owner has refused to fund.  Owner has refused to repay Marriott these amounts.

7.   Thus if M Waikiki's actions are allowed to stand, M Waikiki would owe Marriott $71,070,750 in the event of a wrongful termination and expulsion (calculated as the sum of the lost revenue stream plus the repayment of other amounts owed to Marriott).

8.   There are other economic damages Marriott would suffer in the event that the Owner's actions are not reversed.  For instance, Marriott will need to remove proprietary information and relocate its employees on an expedited basis, which is an expensive undertaking, particularly when dealing with Hawaii.  While I have not attempted to calculate these damages with

3

precision, based on my experience, I would expect these damages to amount to at least $3,600,000.

9.   Again, the amounts I discuss above do not include any consideration of unquantifiable damages for Marriott's reputational harm, loss of goodwill, loss of customers, of any compensation for any disclosure of Marriott's proprietary information to a competitor.

10. However, the Owner appears incapable of compensating Marriott for the quantifiable harm that its actions will cause.  Owner has refused to fund requested working capital for the Hotel, and Marriott has done so in the Owner's place.  Based on the Owner's refusal and/or inability to fund the Hotel, Marriott has every reason to believe that M Waikiki LLC has no liquid assets from which to pay a judgment of any significant amount.  It is my understanding that M Waikiki LLC is a special-purpose corporation whose only significant non-liquid asset is the Hotel itself.  It is difficult to know whether the Hotel's actual market value exceeds by any significant amount the substantial debt that encumbers the property. But in the current economic climate, it is not at all clear that M Waikiki could find a buyer for the Hotel.  Accordingly, even if Marriott's reputational injury could be remedied with monetary damages, and even if those damages could be calculated with reasonable certainty, it does not appear that M Waikiki has the present ability to pay those damages, much less the substantial economic damages described herein.

11. For all of the aforementioned reasons, I am confident that Marriott will suffer irreparable harm in the absence of an injunction restoring the status quo of the Management Agreement.

4

Catherine L. Young

Sworn to before me this
29th day of August, 2011

Notary Public

```
ROBERTA PEARSON-WARK
Notary Public-Maryland
Montgomery County
My Commission Expires
January 19, 2014
```

## Exhibit F

**Marriott's Motion to Dismiss**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

M WAIKIKI LLC, : 
 : 
                        Plaintiff, :        Index No. 651457/2011
 : 
          - against – :        (Hon. Eileen Bransten)
 : 
MARRIOTT HOTEL SERVICES, INC., I.S. :       **Oral Argument Requested**
INTERNATIONAL, LLC, and IAN SCHRAGER, : 
 : 
                  Defendants. : 
 : 

------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MARRIOTT HOTEL SERVICES, INC.'S MOTION TO DISMISS THE COMPLAINT

JENNER & BLOCK LLP
Richard F. Ziegler
Brian J. Fischer
Colleen A. Harrison
919 Third Avenue, 37th Floor
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699

David A. Handzo (pro hac application
    forthcoming)
Michael B. DeSanctis
Lindsay C. Harrison (pro hac application
    forthcoming)
Kelly D. Gardner
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 661-4956

*Attorneys for Defendant Marriott
Hotel Services, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

I.   THE DEVELOPMENT AND OPERATION OF THE WAIKIKI EDITION ........................3

     A. The Parties' Agreements.........................................................................................3

          1.  The TSA...........................................................................................................3

          2.  The Management Agreement ..........................................................................4

     B.  The Opening of the Waikiki EDITION ..................................................................6

II.  PLAINTIFF'S LAWSUIT ..................................................................................................6

LEGAL STANDARD.............................................................................................................6

ARGUMENT .........................................................................................................................7

I.   THE COURT SHOULD DISMISS PLAINTIFF'S BREACH OF CONTRACT CLAIMS.....7

     A.  Plaintiff's Allegations Do Not Derive from Actual Contractual Obligations....................8

     B.  Plaintiff's Claims Are Barred by Its November 16, 2010 Estoppel Certificate................10

     C.  Plaintiff's Claims Are Barred by Plaintiff's Failure To Provide Marriott with
         Contractually-Required Notice and Opportunity To Cure...................................13

II.  PLAINTIFF'S CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY IS
     FORECLOSED BY THE TERMS OF THE PARTIES' AGREEMENTS............................15

III. PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM FAILS AS A MATTER
     OF LAW. ......................................................................................................................19

     A.  Plaintiff's Negligent Misrepresentation Claim Is Duplicative of Its Breach of
         Contract Claims and Should Therefore Be Dismissed. ....................................20

     B.  Plaintiff Has Not Adequately Alleged a Special Relationship Between the Parties..........21

     C.  Plaintiff's Negligent Misrepresentation Claim Arising from Statements of Future
         Expectation Should Be Dismissed. ....................................................................22

     D.  Any Reliance By Plaintiff on Marriott's Projections of Future Performance Was
         Unreasonable as a Matter of Law. .....................................................................24

CONCLUSION.....................................................................................................................25

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

## <u>TABLE OF AUTHORITIES</u>

<small>**CASES**</small>

*88 Blue Corp. v. Staten Builders Co.*, 176 A.D.2d 536, 575 N.Y.S.2d 11 (1st Dep't 1991).........22

*Abiele Contracting, Inc. v. New York City School Construction Authority*, 91 N.Y.2d 1,
    689 N.E.2d 864, 666 N.Y.S.2d 970 (1997)..............................................................................14

*AJW Partners, LLC v. Cyberlux Corp.*, 873 N.Y.S.2d 231, 2008 WL 4514171 (N.Y. Sup.
    Ct. 2008) (unpublished table decision) ..................................................................................18

*Bed 'N Bath of Spring Valley Inc. v. Spring Valley Partnership*, 185 A.D.2d 584, 586
    N.Y.S.2d 416 (3d Dep't 1992)...............................................................................................11

*Casano v. New 19 W. LLC*, 920 N.Y.S.2d 240, 2010 WL 4630269 (N.Y. Sup. Ct.)
    (unpublished table decision) ...................................................................................................24

*Castillo Grand LLC v. Sheraton Operating Corp.*, No. 06 Civ. 5526, 2009 WL 2001441
    (S.D.N.Y. July 9, 2009) .........................................................................................................18

*CIBC Bank & Trust Co. (Cayman) Ltd. v. Credit Lyonnais*, 270 A.D.2d 138, 704
    N.Y.S.2d 574 (1st Dep't 2000) ..............................................................................................18

*EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 832 N.E.2d 26, 799 N.Y.S.2d 170
    (2005).......................................................................................................................................15

*Fleet Bank v. Pine Knoll Corp.*, 290 A.D.2d 792, 736 N.Y.S.2d 737 (3d Dep't 2002) ...............21

*Greater New York Mutual Insurance Co. v. White Knight Restoration, Ltd.*, 7 A.D.3d
    292, 776 N.Y.S.2d 257 (1st Dep't 2004) ...............................................................................25

*H&R Project Associates, Inc. v. City of Syracuse*, 289 A.D.2d 967, 737 N.Y.S.2d 712
    (4th Dep't 2001).......................................................................................................................22

*HCP Laguna Creek CA, LP v. Sunrise Senior Living Management, Inc.*, 737 F. Supp. 2d
    533 (E.D. Va. 2010).................................................................................................................18

*Hudson River Club v. Consolidated Edison Co. of New York, Inc.*, 275 A.D.2d 218, 712
    N.Y.S.2d 104 (1st Dep't 2000) ..............................................................................................21

*Jorjill Holding Ltd. v. Grieco Associates, Inc.*, 6 A.D.3d 500, 775 N.Y.S.2d 75 (2d Dep't
    2004) .........................................................................................................................................7

*JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 920
    N.Y.S.2d 241, 2010 WL 4868142 (N.Y. Sup. Ct. 2010) (unpublished table decision)...........18

*M Waikiki v. Marriott Hotel Services,*                          Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

*JRK Franklin, LLC v. 164 E. 87th Street LLC,* 27 A.D.3d 392, 812 N.Y.S.2d 506 (1st
    Dep't 2006) ...................................................................................................11, 12, 13

*K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 835 N.E.2d 965 (Ill. App. Ct.
    2005) .....................................................................................................................11

*Kraus v. Vista International Service Ass'n*, 304 A.D.2d 408, 756 N.Y.S.2d 853 (1st Dep't
    2003) .......................................................................................................................8

*L.H.P. Realty Co. v. Rich*, No. 601537/00, 2001 WL 1537744 (N.Y. Sup. Ct. Aug. 28,
    2001) .....................................................................................................................22

*Lasker-Goldman Corp. v. City of New York*, 221 A.D.2d 153, 633 N.Y.S.2d 771 (1st
    Dep't 1995) ............................................................................................................14

*Linsky v. NYNEX Corp.*, No. 6003300/95, 1997 WL 1048597 (N.Y. Sup. Ct. Jan. 9, 1997)..........7

*Madison 92nd Street Associates, LLC v. Courtyard Management Corp.*, No. 602762/09
    (N.Y. Sup. Ct. July 13, 2010) ...................................................................... 18-19, 25

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 944 N.E.2d 1104, 919 N.Y.S.2d
    465 (2011) ..............................................................................................................21

*Manfro v. McGivney*, 11 A.D.3d 662, 783 N.Y.S.2d 288 (2d Dep't 2004)....................................7

*Moustakis v. Christie's, Inc.*, 68 A.D.3d 637, 892 N.Y.S.2d 83 (1st Dep't 2009) .......................20

*New Image Construction, Inc. v. TDR Enterprises, Inc.*, 74 A.D.3d 680, 905 N.Y.S.2d 56
    (1st Dep't 2010) ......................................................................................................14

*New York Community Bank v. Snug Harbor Square Venture*, 299 A.D.2d 329, 749
    N.Y.S.2d 170 (1st Dep't 1991) ..................................................................................7

*New York Marine & General Insurance Co. v. Tradeline (L.L.C.)*, 266 F.3d 112 (2d Cir.
    2001) .....................................................................................................................16

*Northeast General Corp. v. Wellington Advertising, Inc.*, 82 N.Y.2d 158, 624 N.E.2d
    129, 604 N.Y.S.2d 1 (1993)..........................................................................15, 16, 19

*Olympia Hotels Corp. v. Johnson Wax Develop Corp.*, 908 F.2d 1363 (7th Cir. 1990) ..............17

*OP Solutions, Inc. v. Crowell & Moring, LLP*, 72 A.D.3d 622, 900 N.Y.S.2d 48 (1st
    Dep't 2010) ............................................................................................................20

*Pacnet Network Ltd. v. KDDI Corp.*, 78 A.D.3d 478, 912 N.Y.S.2d 178 (1st Dep't
    2010) .....................................................................................................................23

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 57-1   Filed  09/06/11   Page 35 of 62

M Waikiki v. Marriott Hotel Services,                                Index No. 651457/2011
I.S. International, LLC, & Ian Schrager

*Pacnet Network Ltd. v. KDDI Corp.*, 901 N.Y.S.2d 908, 2009 WL 2999200 (N.Y. Sup. Ct. 2009) (unpublished table decision), *aff'd*, 78 A.D.3d 478, 912 N.Y.S.2d 178 (1st Dep't 2010) ...........................................................................................................21

*Pensee Associates, Ltd. v. Quon Industries, Ltd.*, 241 A.D.2d 354, 660 N.Y.S.2d 563 (1st Dep't 1997) ...........................................................................................................16

*Piggly Wiggly of Mansfield, Inc. v. Wolpert Associates*, 519 So. 2d 371 (La. Ct. App. 1988) ...........................................................................................................12

*Point Productions A.G. v. Phonomatic Group, A.G.*, No. 93 Civ. 4001, 2000 WL 1006236 (S.D.N.Y. July 20, 2000) ...........................................................................14, 15

*Prestige Foods, Inc. v. Whale Security Co.*, 243 A.D.2d 281, 663 N.Y.S.2d 14 (1st Dep't 1997) ...........................................................................................................25

*Quantum Corporate Funding Ltd. v. L.P.G. Associates, Inc.*, 246 A.D.2d 320, 667 N.Y.S.2d 702 (1st Dep't 1998) ...........................................................................................11

*Quatrochi v. Citibank, N.A.*, 210 A.D.2d 53, 618 N.Y.S.2d 820 (1st Dep't 1994) .......................7

*ReliaStar Life Insurance Co. of New York v. Home Depot U.S.A., Inc.*, 570 F.3d 513 (2d Cir. 2009) ...........................................................................................................11

*Republic National Bank v. Hales*, 75 F. Supp. 2d 300 (S.D.N.Y. 1999), *aff'd*, 4 F. App'x 15 (2d Cir. 2001) ...........................................................................................................24

*Retail Brand Alliance, Inc. v. Rockvale Outlet Center, LP*, No. 06 Civ. 01857, 2007 WL 403885 (E.D. Pa. Jan. 31, 2007) ...........................................................................11, 12, 13

*Rivera v. JRJ Land Property Corp.*, 27 A.D.3d 361, 812 N.Y.S.2d 63 (1st Dep't 2006) ..............8

*Sauer v. Xerox Corp.*, 17 F. Supp. 2d 193 (W.D.N.Y. 1998), *aff'd*, 5 F. App'x 52 (2d Cir. 2001) ...........................................................................................................14

*Sauer v. Xerox Corp.*, 5 F. App'x 52 (2d Cir. 2001) .............................................................14, 15

*Schonfeld v. Thompson*, 243 A.D.2d 343, 663 N.Y.S.2d 166 (1st Dep't 1997) ...........................22

*Sheth v. New York Life Insurance Co.*, 273 A.D.2d 72, 709 N.Y.S.2d 74 (1st Dep't 2000) ...........................................................................................................22, 25

*Silletti v. Display Workshop, Inc.*, 791 N.Y.S.2d 874, 2004 WL 1433185 (N.Y. Sup. Ct. 2004) (unpublished table decision)...........................................................................20

*Sterling Fifth Associates v. Carpentille Corp.*, 9 A.D.3d 261, 779 N.Y.S.2d 485 (1st Dep't 2004) ...........................................................................................................7

iv

*M Waikiki v. Marriott Hotel Services,*    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

*Stewart v. Maitland*, 39 A.D.3d 319, 835 N.Y.S.2d 39 (1st Dep't 2007).....................................20

*Stoller v. Factor*, 272 A.D.2d 83, 714 N.Y.S.2d 667 (1st Dep't 2000).........................................19

*Town Park Hotel Corp. v. Priskos Investments, Inc.*, No. 02 Civ. 164, 2006 WL 658896
    (D. Utah Mar. 14, 2006).........................................................................................................18

*Trump v. Corcoran Group, Inc.*, 240 A.D.2d 159, 657 N.Y.S.2d 701 (1st Dep't 1997)..............17

*United States for Use and Benefit of Evergreen Pipeline Construction Co. v. Merritt
    Meridian Construction Corp.*, 95 F.3d 153 (2d Cir. 1996)....................................................20

*Virginia Highlands Associates v. Allen*, 330 S.E.2d 892 (Ga. Ct. App. 1985)............................12

*Vanderbilt Holdings, LLC v. Greenpoint-Goldman Corp.*, No. 0107408/2005, 2007 WL
    3234922 (N.Y. Sup. Ct. July 17, 2007) ...............................................................................12

*Woodhill Electric v. Jeffrey Beamish, Inc.*, 73 A.D.3d 1421, 904 N.Y.S.2d 232 (3d Dep't
    2010) ..........................................................................................................................................8

*Yee v. Weiss*, 877 P.2d 510 (Nev. 1994) .....................................................................................13

## STATUTES

CPLR 3211(a)(1) ...................................................................................................... *passim*

CPLR 3211(a)(7) ...................................................................................................... *passim*

## OTHER AUTHORITIES

*Black's Law Dictionary* (9th ed. 2009)..........................................................................11

*Restatement (Second) of Agency* (1958) ......................................................................16

v

*M Waikiki v. Marriott Hotel Services,*                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Defendant Marriott Hotel Services, Inc., respectfully submits this memorandum of law in support of its motion pursuant to CPLR 3211(a)(1) and (7) to dismiss the Complaint.  In further support of this memorandum of law, Defendants submit the affirmation of Kelly D. Gardner, Esq., dated August 1, 2011 ("Gardner Aff."), which attaches documents relevant to this motion.[1]

## PRELIMINARY STATEMENT

This lawsuit arises out of the development, design, and operation of a luxury hotel property in Honolulu, Hawaii known as the Waikiki EDITION ("Hotel").  The Waikiki EDITION is owned by Plaintiff M Waikiki LLC ("Plaintiff" or "Owner"), a sophisticated business entity that had bad timing, investing more than $100 million in a complete redesign and renovation of the Hotel just as the Nation was about to enter the worst recession since the Great Depression.

As is common in the hospitality industry, Owner contracted with other companies to assist with the redesign of the Hotel, and to manage the Hotel after re-opening.  Here, Owner engaged Defendants Marriott Hotel Services, Inc. ("Marriott") and I.S. International, LLC ("I.S. International") to provide design advice and technical services during the renovation.  Owner also contracted with Marriott to manage the Hotel, and Marriott has done so since the Hotel re-opened in October 2010.

Owner chose to re-open the Hotel as an EDITION brand hotel.  EDITION is a new brand of "boutique" hotels jointly created by Marriott and I.S. International.  The Hotel was the first EDITION hotel to open and has done so to great acclaim.[2]  A second EDITION has since opened in Istanbul, Turkey.

---

[1] The Summons and Complaint is attached as Exhibit ("Ex.") A to the Gardner Affirmation.

[2] *See, e.g.*, Jocelyn Fujii, *36 Hours in Honolulu*, NEW YORK TIMES, July 7, 2011, *available at* http://travel.nytimes.com/2011/07/10/travel/36-hours-in-honolulu.html (naming the Hotel as the "style-centric"

1

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

A mere eight months after the Hotel re-opened, before the Hotel had a chance to ramp up and establish itself, Plaintiff commenced this action. While Plaintiff asserts a variety of claims sounding in contract, tort and breach of common law duties, at bottom this case represents an effort by Plaintiff to saddle others with current operating losses that result from opening a new luxury hotel in a bad economy.

While Marriott vigorously disputes Plaintiff's factual allegations, even when taken as true, all counts of the Complaint should be dismissed as a matter of law. In its first and second causes of action, Plaintiff contends that Defendants breached the terms of the contracts by which Marriott and I.S. International provided design and technical services, and the contract under which Marriott now manages the Hotel. These contract claims suffer from multiple defects: Plaintiff pleads contractual obligations that do not exist in the contracts; Plaintiff simply ignores the legally dispositive effect of the Estoppel Certificate executed on November 16, 2010, in which Plaintiff certified to Marriott that no breach of the contract had occurred during the same period of time for which the Complaint now claims just the opposite; and the claims are barred by Plaintiff's failure to provide notice and an opportunity to cure in accordance with the parties' contract. Because the contract claims are invalid, Plaintiff's fifth cause of action seeking a declaration of its right to terminate the Management Agreement also fails.

Plaintiff's third cause of action alleges that Defendants breached certain fiduciary duties owed to Plaintiff. The parties' agreements expressly disclaim a fiduciary relationship, however, and this claim therefore must be dismissed.

---

place to stay on a trip to Honolulu) [last accessed August 1, 2011]; *It List:  The Best New Hotels 2011*, TRAVEL + LEISURE, June 2011, *available at* http://www.travelandleisure.com/articles/it-list-the-best-new-hotels/23 [last accessed August 1, 2011].

U.S. Bankruptcy Court - Hawaii   #11-02371   Dkt # 57-1   Filed  09/06/11   Page 39 of 62

Plaintiff's fourth cause of action alleges negligent misrepresentation and is equally unavailing.  Not only is this claim unduly duplicative of Plaintiff's breach of contract claims, but it also fails to allege the requisite special relationship between the parties, arises from non-actionable statements of future expectation, and cannot support a claim of reasonable reliance.

## STATEMENT OF FACTS

### I.      THE DEVELOPMENT AND OPERATION OF THE WAIKIKI EDITION

#### A.      The Parties' Agreements

The terms of the parties' relationships are reflected in a series of contracts, including a Design and Technical Services and Pre-Opening Agreement ("TSA") and a Management Agreement ("M.A.").

1.      *The TSA.*  In a July 9, 2008 Design and Technical Services and Pre-Opening Agreement, Plaintiff engaged Marriott and I.S. International to provide services in connection with Plaintiff's renovation of the Hotel.[3]  Under the terms of the TSA, Marriott and/or I.S. International were responsible for developing a preliminary vision and concept for the design of the Hotel, *see* TSA at 8-9, § 2.1.2, preparing detailed plans and specifications for implementing the Hotel design, *see id.* at 10, §§ 2.2.1-2.2.2., and creating technical standards, *see id.* at 8, § 2.1.1.  In addition, Marriott – in consultation and collaboration with I.S. International – was obligated to "recruit, train and employ the staff required for the Hotel"; "undertake pre-opening promotion and advertising, including opening celebrations and related activities"; and "design and implement a marketing, public-relations and sales strategy for the Hotel."  *Id.* at 19-20, § 5.2.  For its part, Plaintiff was responsible for "construct[ing], furnish[ing] and fully equip[ping] the Hotel . . . ."  *Id.* at 12, § 2.4.1.

---

[3] The TSA, including all amendments, is attached as Exhibit B to the Gardner Affirmation.

3

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Relationship.  In Section 9.4 of the TSA, the parties agreed that Marriott and I.S.

International "shall each act solely as an independent contractor"; that none of the parties'

agreements "shall in any respect be interpreted, deemed or construed as making any party a

partner, joint venturer with, or agent of, any other party"; and that no party would argue

otherwise  *Id.* at 27, § 9.4.

Opening Date.  Although the TSA "*projected*" an opening date of July 1, 2009, *id.* at 19,

§ 5.1 (emphasis added), the parties mutually agreed to extend that date to January 1, 2010.  *See*

First Amendment to TSA, at 2 (Mar. 13, 2009).

2.       *The Management Agreement.*  The same day the parties signed the TSA, Plaintiff

and Marriott signed a Management Agreement.[4]  Subject to its terms, the Management

Agreement provides Marriott with "discretion and control in all matters relating to management

and operation of the Hotel."  M.A. at 2, § 1.02.  In exercising that discretion and control,

Marriott is obligated to "act as a reasonable and prudent operator of the Hotel" and to "operate

the Hotel with the goal of achieving long-term profitability."  *Id.*

Branding as an EDITION.  Although the Management Agreement provides "that the

Hotel be managed, operated and maintained as part of the EDITION Hotel System," *id.*, the

Management Agreement initially contemplated that upon opening, Marriott would *not* brand the

Hotel as an EDITION property.  *See id.* § 1.03(B) (providing that Marriott "shall not be

obligated to brand the Hotel as an EDITION hotel, use EDITION Trademarks in the name of the

Hotel, [or] identify the Hotel as a member of the EDITION Hotel System"); TSA at 15, § 2.5.4

("The parties have agreed that the Hotel will initially open without the EDITION brand name.").

Instead, the Hotel's "Flagging Date" was to "occur after [Marriott] ha[d] opened for business one

---

[4] The Management Agreement, including all Amendments, is attached as Exhibit C to the Gardner Affirmation.

4

(1) other EDITION Hotel operating as a branded hotel using EDITION Trademarks in the name

of the Hotel and as a part of the EDITION Hotel System."  M.A. at 64, § 12.01.

Notwithstanding these provisions, on March 13, 2009, the parties executed a Letter

Agreement in which Marriott agreed to open the Hotel as an EDITION Hotel in consideration of

Owner's fulfillment of certain specified conditions.[5]  *See* Gardner Aff., Ex. D at 1.

Financial Performance.  The Management Agreement contemplates that Marriott will

provide Plaintiff with projections and pro formas related to the Hotel's performance, but such

projections are provided "for information purposes only," and Marriott "do[es] not guarantee that

the Hotel will achieve the results set forth in any such projections, pro formas, or other similar

information."  M.A. at 47, § 11.10.  The Management Agreement states that "the actual results

achieved by the Hotel are likely to vary from the estimates contained in any such projections, pro

formas, or other similar information and such variations might be material."  *Id*.

Notice and Cure Rights.  The Management Agreement requires a party to provide notice

and an opportunity to cure any breach of contract at least thirty days prior to instituting any

lawsuit or attempting to terminate the contract.  *See* M.A. at 38-39, §§ 9.01(G) & 9.02.

Relationship.  Like the TSA, the Management Agreement provides that Marriott "shall

act solely as an independent contractor" and that Marriott "shall be deemed to be a fiduciary

*solely* with respect to any funds held by it in the Operating Accounts, the FF&E Reserve or any

other funds held by [Marriott] or its Affiliates for Owner."   M.A. at 43-44, § 11.03 (emphasis

added).  It further states that none of the parties' agreements "shall in any respect be interpreted,

deemed or construed as making [Marriott] a partner, joint venture with, or agent of, Owner," and

---

[5] The March 13, 2009 Letter Agreement is attached as Exhibit D to the Gardner Affirmation.

that Owner and Marriott specifically "agree that neither party will make any contrary assertion,
claim or counterclaim in any action, suit, . . . or other legal proceedings." *Id.*

### B.  The Opening of the Waikiki EDITION

The Waikiki EDITION opened for business in October 2010.  *See* Complaint ¶ 30.  On
November 16, 2010, Plaintiff executed an Estoppel Certificate to Marriott in which Plaintiff
certified that: (1) "there [was] no continuing Default (as defined in the Hotel Agreements) by
[Marriott] in the performance or observance of any covenant, agreement or condition contained
in the Hotel Agreements," and (2) "no event ha[d] occurred that, with the giving of notice or
passage of time or both, would become such a Default."[6]  Gardner Aff., Ex. E at 1-2.  Plaintiff
acknowledged that it would be bound by its certifications, all of which Marriott was entitled to
rely upon.  *See id.* at 2.  This acknowledgment comports with Section 11.18 of the Management
Agreement, which provides that from time to time the parties shall issue such estoppel
certificates and that the certificates "shall be binding upon the certifying party and may be relied
upon by the non-certifying party." M.A. at 54, § 11.18.

In reliance on the Estoppel Certificate, the parties executed subsequent amendments to
the Management Agreement.  *See* Gardner Aff., Ex. C (2d Amend.).

## II.  PLAINTIFF'S LAWSUIT

Plaintiff commenced the instant proceedings on May 26, 2011.  Plaintiff sent Defendants
a Notice of Default the same day, and that notice was received on May 27, 2011.[7]

## LEGAL STANDARD

On a motion to dismiss pursuant to CPLR 3211(a)(7), factual averments of the complaint
must be accepted as true, and the plaintiff must be accorded all favorable inferences; however,

---

[6] The Estoppel Certificate is attached as Exhibit E to the Gardner Affirmation.

[7] The Notice of Default is attached as Exhibit F to the Gardner Affirmation.

*M Waikiki v. Marriott Hotel Services,*                            Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

dismissal is required if the plaintiff nevertheless fails to state a claim. *See Manfro v. McGivney*, 11 A.D.3d 662, 663, 783 N.Y.S.2d 288, 288-89 (2d Dep't 2004). "[A]llegations consisting of bare legal conclusions" do not state a cause of action. *Quatrochi v. Citibank, N.A.*, 210 A.D.2d 53, 53, 618 N.Y.S.2d 820, 820 (1st Dep't 1994).

On a motion to dismiss pursuant to CPLR 3211(a)(1), a plaintiff's "allegations . . . are not presumed to be true or granted every favorable inference" if they are "contradicted by documentary evidence." *Sterling Fifth Assocs. v. Carpentille Corp.*, 9 A.D.3d 261, 261-62, 779 N.Y.S.2d 485, 486 (1st Dep't 2004). "Documentary evidence" includes contracts and other records of out-of-court transactions. *See New York Cmty. Bank v. Snug Harbor Square Venture*, 299 A.D.2d 329, 329-30, 749 N.Y.S.2d 170, 171 (1st Dep't 1991) (dismissing complaint under CPLR 3211(a)(1) based on a lease and a letter); *Linsky v. NYNEX Corp.*, No. 6003300/95, 1997 WL 1048597, at *2 (N.Y. Sup. Ct. Jan. 9, 1997) (dismissing claim under CPLR 3211(a)(1) based in part on defendant's "business record[s]"). Where such evidence "resolves all factual issues as a matter of law, [that] conclusively disposes of the plaintiff's claim." *Jorjill Holding Ltd. v. Grieco Assocs., Inc.*, 6 A.D.3d 500, 501, 775 N.Y.S.2d 75, 76 (2d Dep't 2004) (quotation marks omitted). "The interpretation of an unambiguous contract," for example, "is a question of law for the court, and the provisions of the contract delineating the rights of the parties prevail over the allegations set forth in the complaint." *Sterling Fifth Assocs.*, 9 A.D.3d at 262, 779 N.Y.S.2d at 486 (quotation marks omitted).

## **ARGUMENT**

## I.    **THE COURT SHOULD DISMISS PLAINTIFF'S BREACH OF CONTRACT CLAIMS.**

In its first and second claims, Plaintiff alleges that the Defendants breached their contractual obligations under the TSA and Management Agreement, respectively. *See*

7

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Complaint ¶¶ 61-70.  Plaintiff does not enumerate which provisions of the TSA and Management

Agreement were allegedly breached, nor does Plaintiff attempt to tie its hodge-podge of factual

allegations to any of its specific causes of action.  For this reason alone, Plaintiff's claims should

be dismissed.  *See Woodhill Elec. v. Jeffrey Beamish, Inc.*, 73 A.D.3d 1421, 1422, 904 N.Y.S.2d

232, 233 (3d Dep't 2010) (dismissing complaint for failure to identify which contract provisions

were breached); *Kraus v. Vista Int'l Serv. Ass'n*, 304 A.D.2d 408, 408, 756 N.Y.S.2d 853, 854

(1st Dep't 2003) (same).

    Plaintiff's breach of contract allegations fall into five general categories:  (1) Defendants

failed to operate the Hotel as part of a "chain" of EDITION hotels, *id.* at 2, ¶¶ 38, 40-41; (2)

Defendants failed to perform their duties in a manner intended to achieve an opening date of July

1, 2009, *id.* ¶¶ 30, 48; (3) Marriott failed to act as a reasonable and prudent operator – *i.e.*,

operate the hotel in an efficient manner with the goal of achieving long-term profitability, *id.* at

2-3, ¶¶ 28, 32-33, 50-51, 54, 56-60; (4) Defendants failed to perform pre-opening marketing,

reservation, and sales activities, *id.* at 2, ¶¶ 28, 49, 54; and (5) Defendants failed to provide

adequate design and development assistance during the renovation of the Waikiki EDITION, *id.*

at 2, ¶¶ 27, 43-47, 51.  Because none of these allegations raises a cognizable claim for breach of

contract, Counts One and Two should be dismissed.  Moreover, because Count Five – Plaintiff's

claim for a declaration of an event of default and right to terminate the Management Agreement

– is predicated on these breach allegations, *id.* ¶¶ 84, 86, that claim should also be dismissed.

## A.    Plaintiff's Allegations Do Not Derive from Actual Contractual Obligations.

    The first three categories of Plaintiff's allegations should be dismissed because they do

not describe a breach of any actual contractual obligation.  *See Rivera v. JRJ Land Prop. Corp.*,

27 A.D.3d 361, 364, 812 N.Y.S.2d 63, 65 (1st Dep't 2006) ("Since plaintiff has failed to identify

an obligation set forth in the lease agreement which defendant breached, the breach of contract claims must be dismissed.").

First, although Plaintiff asserts that Defendants breached a contractual obligation "to operate the [Waikiki EDITION] 'as part of the EDITION Hotel System,'" Complaint ¶ 38, Plaintiff does not and cannot allege that Marriott is not operating the Hotel as an EDITION Hotel.  Instead, Plaintiff's argument appears to be that Defendants must open some unspecified number of additional EDITION hotels in order to qualify as a "chain."  Plaintiff does not, however, point to any contractual provision requiring Defendants to open a specified number of EDITION hotels.  In fact, no contract obligates Defendants to ensure that the "System" contains a minimum number of hotels in a certain period of time.

Although the parties' initial agreement contemplated that the Hotel would open unbranded and be flagged an EDITION hotel only after Marriott opened the first EDITION-branded hotel, *see* M.A. at 2, 64, §§ 1.03(B), 12.01, the parties amended their agreement to permit the Hotel to open under the EDITION brand.  *See* Gardner Aff., Ex. D at 1.  This amendment imposed no obligation on Marriott to open another EDITION-branded hotel prior to the opening of the Waikiki EDITION.  And, in any event, Plaintiff concedes that Marriott operates the Hotel in addition to the Istanbul EDITION, and that both properties are part of the EDITION Hotel System.  *See* Complaint ¶ 41.  For these reasons, even if Plaintiff's allegations are true, Plaintiff has not articulated any breach of a contractual obligation.

Second, Plaintiff's allegation that Defendants failed to perform their duties in a manner intended to achieve an opening date of July 1, 2009 should be dismissed because the parties *mutually* agreed to extend the projected opening date from July 1, 2009, to January 1, 2010.  *See*

9

Gardner Aff., Ex. B (1st Amend. at 2).  This mutual agreement extinguished any obligation for Defendants to assist Plaintiff in achieving a July 2009 opening.

Third, Plaintiff's allegation that the Hotel has not achieved performance results consistent with financial projections (Complaint ¶ 60) is expressly contradicted by the contract.  There is no contractual provision guaranteeing that the Hotel will achieve a particular level of profitability (particularly less than a year after the Hotel has opened).  To the contrary, the contract states that "Marriott . . . do[es] not guarantee that the Hotel will achieve the results set forth in any . . . projections, pro formas, or other similar information" that Marriott provides to Plaintiff.  M.A. at 47, § 11.10.  Plaintiff expressed its understanding of the lack of any such guarantee by specifically "acknowledg[ing] that . . . the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, pro formas, or other similar information and such variations might be material."  *Id.*  Furthermore, although Section 2.02 of the Management Agreement permits Plaintiff to terminate the Agreement if the Hotel Operating Profit fails to meet certain thresholds, that provision does not take effect until the end of the fifth full fiscal year after the Hotel's opening.  *See id.* at 11, § 2.02(A).  Because the hotel has not been in operation even one full year, the provision is of no effect.

**B.      Plaintiff's Claims Are Barred by Its November 16, 2010 Estoppel Certificate.**

Four of Plaintiff's five breach allegations should be dismissed because they arise from facts and circumstances demonstrably known to Plaintiff on or before its execution of the November 16, 2010 estoppel certificate.[8]  There, Plaintiff certified to Marriott that there was no continuing Default by Marriott under the TSA or Management Agreement and that no event had

---

[8] The estoppel certificate bars all of Plaintiff's allegations predating the opening of the Hotel, *i.e.*, Categories 1, 2, 4, and 5 as enumerated *supra* at page 8.

occurred that, with the giving of notice or passage of time or both, would become a Default.  *See*

Gardner Aff., Ex. E at 1-2.  These certifications bar Plaintiff's claims.

An estoppel certificate is "[a] signed statement by a party . . . certifying for another's

benefit that certain facts are correct, [such as] that there are no defaults."  Black's Law

Dictionary 631 (9th ed. 2009).  The purpose of these certificates is to "prevent the assertion of

different facts at a later date."  *ReliaStar Life Ins. Co. of N.Y. v. Home Depot U.S.A., Inc.*, 570

F.3d 513, 519 (2d Cir. 2009) (quotation marks omitted); *see also K's Merch. Mart, Inc. v.*

*Northgate Ltd. P'ship*, 835 N.E.2d 965, 972 (Ill. App. Ct. 2005) ("A party who executes an

estoppel certificate should not be allowed to raise claims of which it knew or should have known

at the time the certificate was executed.  A party who executes an estoppel certificate that there

are no defaults is under a duty to inquire and determine, insofar as reasonably possible, what

claims exist.").  Where an estoppel certificate is unambiguous, courts construe the certificate's

meaning and effect as a matter of law.  *See Retail Brand Alliance, Inc. v. Rockvale Outlet Ctr.,*

*LP*, No. 06 Civ. 01857, 2007 WL 403885, at *3 (E.D. Pa. Jan. 31, 2007).

Consistent with the foregoing, under New York law, a party that executes an estoppel

certificate is precluded from taking any position contrary to the certificate's terms.  *See JRK*

*Franklin, LLC v. 164 E. 87th Street LLC,* 27 A.D.3d 392, 392-93, 812 N.Y.S.2d 506, 506-07 (1st

Dep't 2006); *Quantum Corporate Funding Ltd. v. L.P.G. Assocs., Inc.*, 246 A.D.2d 320, 323-24,

667 N.Y.S.2d 702, 705 (1st Dep't 1998) (defendant's representation in estoppel certificate that

there would be no claims against certain accounts receivable precluded any assertion to the

contrary); *Bed 'N Bath of Spring Valley Inc. v. Spring Valley P'ship*, 185 A.D.2d 584, 585-87,

586 N.Y.S.2d 416, 417-18 (3d Dep't 1992) (plaintiff precluded from seeking fees in conflict with

*M Waikiki v. Marriott Hotel Services,*                          Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

amounts acknowledged in estoppel certificate); *Vanderbilt Holdings, LLC v. Greenpoint-*

*Goldman Corp.*, No. 0107408/2005, 2007 WL 3234922 (N.Y. Sup. Ct. July 17, 2007).

    *JRK Franklin, LLC v. 164 East 87th Street LLC* is instructive.  There, the First

Department examined an estoppel certificate that stated, "[t]o the best knowledge of Ground

Lessor, there is no existing default by Ground Lessee in the performance and observance of

Ground Lessee's obligations under the Ground Lease," and "[t]o the best knowledge of Ground

Lessor, no event has occurred which, with the giving of notice or passage of time, or both, would

constitute a default by Ground Lessee under the Ground Lease." *JRK Franklin, LLC*, 27 A.D.3d

at 392-93, 812 N.Y.S.2d at 507 (quotation marks omitted).  Reversing the Supreme Court's

decision not to enforce the certificate, the First Department explained that, as a matter of law, the

Lessor "had a duty and the ability (right of entry) to investigate before voluntarily certifying an

absence of any tenant lease defaults."  *Id.* at 393, 812 N.Y.S.2d at 507.  Having made such

voluntary certifications and having agreed that the tenant was entitled to rely on those

certifications, the Lessor was precluded from asserting that activity pre-existing the execution of

the estoppel certificate placed the tenant in default.  *See id.*  The First Department therefore held

that the tenant was entitled to a declaration that it was not in default under the lease.  *See id.* at

392, 812 N.Y.S.2d at 506-07; *see also Vanderbilt Holdings*, 2007 WL 3234922 (holding that

defendant's "execution of the Estoppel Certificate, in June 2004, bars any claim that the pre-

existing violations constitute a default under the lease").[9]

---

[9] *See also Retail Brand Alliance*, 2007 WL 403885, at *3 (granting motion to dismiss counterclaim because "[t]he estoppel certification . . . bars [the counter-claimant] from attempting to collect these expenses now, since it represented that there [were] no uncured defaults by [the counter-defendant] when executing the assignment"); *Va. Highlands Assocs. v. Allen*, 330 S.E.2d 892, 896 (Ga. Ct. App. 1985) (enforcing estoppel certificate and holding "that public policy, good faith, equity and justice require that the unqualified writing executed by appellees . . . estop them from raising their novation defense"); *Piggly Wiggly of Mansfield, Inc. v. Wolpert Assocs.*, 519 So. 2d 371, 372-73 (La. Ct. App. 1988) (tenant bound by statement in estoppel certificate that there were no defaults under lease

12

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Here, the language of Plaintiff's estoppel certificate is plain and unambiguous and should be enforced by this Court as a matter of law.  Plaintiff certified one month after the Hotel opened that there had been no Default by Marriott, nor any event that could become a Default by the giving of notice or the passage of time.  As the First Department found in *JRK Franklin*, Plaintiff had an *affirmative duty* to investigate any potential claims against Marriott before signing its estoppel letter.  *See* 27 A.D.3d at 393, 812 N.Y.S.2d at 507.  Plaintiff thus cannot state a claim for breach of contract based on an act or omission occurring prior to November 16, 2010.  As of that date, the pre-opening design and development was, by definition, complete; the period for pre-opening marketing, sales, and reservations activities was, by definition, over; the original opening date of July 1, 2009 had long-since passed; and Plaintiff plainly would have known whether its own EDITION-branded hotel was or was not then part of a "chain" to its satisfaction. By their very definition, these alleged omissions occurred or existed prior to the October 2010 opening of the Waikiki EDITION and thus prior to the November 16, 2010 execution of the Estoppel Certificate.  Plaintiff never identified any of these claims, and indeed affirmatively represented that there were no defaults.  The claims arising from these alleged omissions should therefore be dismissed.[10]

###   C.   Plaintiff's Claims Are Barred by Plaintiff's Failure To Provide Marriott with Contractually-Required Notice and Opportunity To Cure.

Plaintiff's failure to afford Marriott contractually-required notice and an opportunity to cure independently renders all of Plaintiff's breach of contract claims legally deficient.  It is

---

agreement); *Yee v. Weiss*, 877 P.2d 510, 512-13 (Nev. 1994) (tenant estopped from claiming constructive eviction based upon parking conditions that existed before tenant certified that there were no defaults under the lease).

[10] The specific allegations barred by the Estoppel Certificate include Plaintiff's assertions that:  (1) Defendants failed to establish a chain of EDITION Hotels, Complaint ¶¶ 38, 40-41; (2) Defendants failed to provide Plaintiff with design and development assistance, *id.* at 2, failed to provide Plaintiff with final technical standards, *id.* ¶ 47, and failed to involve Ian Schrager personally in the design of the hotel, *id.* ¶¶ 27, 42-44; (3) Defendants failed to perform their contractual duties to achieve an opening date of July 1, 2009, *id.* ¶¶ 30, 48; and (4) Defendants failed to perform pre-opening marketing, reservation, and sales activities, *id.* ¶¶ 28, 49, 54.

13

well-established that "the terms of a written agreement define the rights and obligations of the

parties to the agreement." *Abiele Contracting, Inc. v. N.Y. City Sch. Constr. Auth.*, 91 N.Y.2d 1,

9, 689 N.E.2d 864, 867, 666 N.Y.S.2d 970, 973 (1997). Accordingly, "[w]here, as here, . . .

parties have agreed to provide notice and an opportunity to cure prior to suing for performance or

asserting termination rights under a contract, those covenants must be adhered to." *Sauer v.*

*Xerox Corp.*, 17 F. Supp. 2d 193, 197 (W.D.N.Y. 1998), *aff'd* 5 F. App'x 52, 55 (2d Cir. 2001)

("When a party to a contract seeks to enforce its provisions, it must abide by the contract's

preconditions to bringing suit."); *see also Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93

Civ. 4001, 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000). The failure to do so vitiates the

parties' rights to pursue such remedies. *See New Image Constr., Inc. v. TDR Enters., Inc.*, 74

A.D.3d 680, 681, 905 N.Y.S.2d 56, 58 (1st Dep't 2010) (concluding that contract termination

was ineffective due to lack of contractually-mandated notice to cure).[11]

In this case, the parties agreed in their contract that notice and an opportunity to cure

would be preconditions not only to an Event of Default, but also to the parties' rights to sue. *See*

M.A. at 38, § 9.01(G) (requiring 30 days' notice for a "Default"); *id.* (predicating an "Event of

Default" on the failure to cure after receiving 30 days' notice). Only *after* an Event of Default

has occurred does the Management Agreement recognize a party's right to file suit or terminate

the contract. *See id.* § 9.02(A). Accordingly, neither party may institute any claims against the

other without providing notice and an opportunity to cure.

Here, Plaintiff filed suit on May 26, 2011. It sent its notice of default to Marriott that

same day, and Marriott received the notice on May 27, 2011. *See* Gardner Aff., Ex. F. Marriott

---

[11] *See also Lasker-Goldman Corp. v. City of New York*, 221 A.D.2d 153, 154, 633 N.Y.S.2d 771, 771-72 (1st Dep't
1995) (dismissing breach claims for failure to provide contractually-required notice); *Point Prods. A.G.*, 2000 WL
1006236, at *3-4; *Sauer*, 5 F. App'x at 55.

was given *no* opportunity to cure.  Because notice and an opportunity to cure are preconditions to

suit under the parties' agreement, Plaintiff's breach of contract claims fail as a matter of law.

*See, e.g., Sauer*, 5 F. App'x at 55.[12]

## II.   PLAINTIFF'S CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY IS FORECLOSED BY THE TERMS OF THE PARTIES' AGREEMENTS.

In its Third Cause of Action, Plaintiff alleges that the Defendants breached certain

fiduciary duties owed to Plaintiff.  *See* Complaint ¶¶ 71-76.  This cause of action should be

dismissed because the parties' contracts expressly disclaim a fiduciary relationship.

Under New York law, "[a] fiduciary relationship exists between two persons when one of

them is under a duty to act for or to give advice for the benefit of another upon matters within the

scope of the relation."  *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19, 832 N.E.2d 26,

31, 799 N.Y.S.2d 170, 175 (2005) (quotation marks omitted).  The Court of Appeals has made

clear that this type of relationship "must spring from the parties themselves, who *agree to and*

*accept* the responsibilities that flow from such a contractual fiduciary bond."  *Northeast Gen.*

*Corp. v. Wellington Advertising, Inc.*, 82 N.Y.2d 158, 160, 624 N.E.2d 129, 130, 604 N.Y.S.2d

1, 2 (1993) (emphasis added).  In assessing whether the relationship between parties to a contract

is fiduciary in nature, courts look to the terms of the contractual agreement.  *See EBC I, Inc.*, 5

N.Y.3d at 19-20, 832 N.E.2d at 31, 799 N.Y.S.2d at 175; *Northeast Gen. Corp.*, 82 N.Y.2d at

160, 162, 624 N.E.2d at 130, 131, 604 N.Y.S.2d at 3 (describing "cognizable fiduciary terms" as

those indicating that a party is an "agent, partner or coventurer" of another).  As the Court of

---

[12] While a party need not provide notice and opportunity to cure where doing so would be futile, that exceedingly narrow exception is reserved for instances "where the non-performing party (1) expressly repudiates the parties' contract, . . . or (2) abandons performance thereunder."  *Point Prods. A.G.*, 2000 WL 1006236, at *4 (internal citations omitted).  As Marriott is continuing to operate the Hotel, any such argument fails as a matter of law.  *See id.* (rejecting futility claim where defendant "proffered no evidence upon which to find that [plaintiff] deliberately abandoned or repudiated the Agreement").

*M Waikiki v. Marriott Hotel Services,*                             Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Appeals has cautioned, if parties "do not create their own relationship of higher trust, courts

should not ordinarily transport them to the higher realm of relationship and fashion the stricter

duty for them." *Northeast Gen. Corp.*, 82 N.Y.2d at 162, 624 N.E.2d at 131, 604 N.Y.S.2d at 3.

Here, Plaintiff alleges that Defendants' fiduciary obligations flow from an agency and/or

confidential relationship. *See* Complaint ¶ 72. To prove such a relationship, Plaintiff must

demonstrate that there has been a "manifestation of consent by [it] to [Defendants] that

[Defendants] shall act on [its] behalf and subject to [its] control, and the consent by [Defendants]

to act." *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir.

2001) (quotation marks omitted); *see also Pensee Assocs., Ltd. v. Quon Indus., Ltd.*, 241 A.D.2d

354, 359, 660 N.Y.S.2d 563, 566-67 (1st Dep't 1997); *Restatement (Second) of Agency* § 1 cmt.

b (1958) (observing that an "agency relation results if, but only if, there is an understanding

between the parties which, as interpreted by the court, creates a fiduciary relation in which the

fiduciary is subject to the directions of the one on whose account he acts"). Given the terms of

the parties' contracts, Plaintiff is unable to make such a showing as a matter of law.

In Section 9.4 of the TSA, the parties agreed that the Defendants "shall each act *solely* as

an independent contractor." TSA at 27, § 9.4 (emphasis added). The parties further agreed that

"[n]either th[e TSA] nor any agreements, instruments, documents, or transactions contemplated

[t]hereby shall in any respect be interpreted, deemed or construed as making any party a partner,

joint venturer with, or agent of, any other party." *Id.* Finally, all parties agreed that they would

not argue otherwise. *Id.*

The parties made similar covenants in Section 11.03 of the Management Agreement. *See*

M.A. at 43-44, § 11.03. That provision states that Marriott will act *solely* as an independent

contractor in its performance of the Agreement; that the Agreement *will not* be interpreted or

16

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

construed to make Marriott a partner, joint venturer with, or agent of the Plaintiff; and that *neither party* will argue otherwise in any legal proceeding in which the parties are involved.  *See id.*  The provision further provides that Marriott "shall be deemed a fiduciary *solely* with respect to any funds held by it in the Operating Accounts, the FF&E Reserve or any other funds held by [it] or its affiliates for [Plaintiff]."  *Id.* (emphasis added).

Any doubt that the parties knew how to express the nature of their legal relationship is dispelled by their express agreement that Marriott would be a fiduciary "solely" with respect to certain funds held for Plaintiff.  Not only did the parties express their intent to establish a fiduciary relationship only in that one limited context, but their use of the word "solely" plainly establishes that they did not intend a fiduciary relationship in any other context.  A court should not impose extra-contractual fiduciary duties where the parties clearly knew how to contract for fiduciary duties and did so in only one limited respect.  *See, e.g.*, *Trump v. Corcoran Group, Inc.*, 240 A.D.2d 159, 159, 657 N.Y.S.2d 701, 702 (1st Dep't 1997) ("Had these sophisticated parties wanted a fiduciary-like relationship, they could have bargained for and spelled it out in their agreements."); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1374 (7th Cir. 1990) ("This provision made Olympia the agent of Racine, all right, but only with regard to the management of bank accounts.  The agency was a part of Olympia's contractual undertaking; it was not the whole of it. . . . We decline the invitation to recast hotel contract managers as trustees or guardians of hotel owners, other than in the performance of financial functions in which the manager is exercising a traditional fiduciary role, such as the management of bank accounts." (internal citation omitted)).

In light of the foregoing, the parties' contracts unambiguously disclaim any agency or other fiduciary relationship, except insofar as Marriott holds funds belonging to Plaintiff.

17

*M Waikiki v. Marriott Hotel Services,*                                  Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Because none of Plaintiff's allegations assert breach of a fiduciary obligation with respect to

those funds, Plaintiff's claim for breach of fiduciary duty should be dismissed.  *See CIBC Bank*

*& Trust Co. (Cayman) Ltd. v. Credit Lyonnais*, 270 A.D.2d 138, 139, 704 N.Y.S.2d 574, 575

(1st Dep't 2000) (dismissing breach of fiduciary duty claim because it was "flatly contradicted

by the parties' contracts in which each represented to the other that 'it is a sophisticated

institutional investor' that 'has acted in the capacity of an arm's-length contractual counterparty

and not as [the other's] financial advisor or fiduciary'" (alteration in original)); *Madison 92nd*

*Street Assocs., LLC v. Courtyard Mgmt. Corp.*, No. 602762/09, slip op. at 7-9 (N.Y. Sup. Ct.

July 13, 2010) (dismissing breach of fiduciary duty claim based on contractual language nearly

identical to the TSA and Management Agreement provisions at issue); *JPMorgan Chase Bank,*

*N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 920 N.Y.S.2d 241, 2010 WL

4868142, at *10 (N.Y. Sup. Ct. 2010) (unpublished table decision) (holding that "no defense of,

or claim for, breach of fiduciary duty will lie" where the contract "specifically disclaims a

fiduciary relationship"); *AJW Partners, LLC v. Cyberlux Corp.*, 873 N.Y.S.2d 231, 2008 WL

4514171, at *3 (N.Y. Sup. Ct. 2008) (unpublished table decision) (dismissing breach of fiduciary

duty claim where "the plain contractual language disavow[ed] a fiduciary relationship").[13]

     *Madison 92nd Street Associates, LLC v. Courtyard Management Corp.* is especially

illustrative.  In that case, Justice Kapnick parsed the effect of a disclaimer materially identical to

the disclaimers contained in the TSA and Management Agreement.  *See Madison 92nd Street*

---

[13] *See also HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.*, 737 F. Supp. 2d 533, 549-50 (E.D. Va. 2010) (holding that an operator owes no fiduciary duty to an owner where the controlling management agreement "makes no reference to a fiduciary duty" and "expressly limits [the operator's] relationship to [the owner] as one of an independent contractor and not one of agency"); *Castillo Grand LLC v. Sheraton Operating Corp.*, No. 06 Civ. 5526, 2009 WL 2001441, at *9 (S.D.N.Y. July 9, 2009) (finding that hotel operator owed no fiduciary duty to hotel owner where management contract stated that the parties were "not joint venturers, partners, or joint owners"); *Town Park Hotel Corp. v. Priskos Investments, Inc.*, No. 02 Civ. 164, 2006 WL 658896, at *6 (D. Utah Mar. 14, 2006) (concluding that hotel operator owed no fiduciary duty to hotel owner where parties "were commercial entities who engaged in an arm's length transaction").

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

*Assocs., LLC*, No. 602762/09, slip op. at 8.[14]  Although plaintiff argued that the parties' ongoing

course of conduct, plaintiff's "entrustment of the Hotel to defendant[,] and defendant's

supervision of the day-to-day executive, operational, and financial affairs of the Hotel render[ed]

[defendant] a fiduciary," Justice Kapnick concluded that "the Management Agreement was the

result of an arm's-length relationship between sophisticated business entities after negotiations

and the parties clearly chose not to contract for a fiduciary relationship." *Id.* at 9.  Accordingly,

Justice Kapnick dismissed plaintiff's breach of fiduciary duty claim.

No different outcome is warranted here.  The parties are sophisticated entities that entered

into an arm's length business transaction, and Plaintiff does not allege otherwise.  Although

Plaintiff could have bargained for an agency relationship, it chose not to do so.  Indeed, it

explicitly denied the existence of such a relationship and waived its right to make any argument

to the contrary.  Having failed to create a relationship of higher trust, Plaintiff cannot now look

to the courts to do so for it.  *See Northeast Gen. Corp.*, 82 N.Y.2d at 162, 624 N.E.2d at 131, 604

N.Y.S.2d 3.  Count Three for breach of fiduciary duty should therefore be dismissed.[15]

## III.   PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM FAILS AS A MATTER OF LAW.

In its fourth cause of action, Plaintiff alleges that Defendants are liable for negligent

misrepresentation because they made various statements that they should have known were false

and Plaintiff relied on those statements to its detriment.  *See* Complaint ¶¶ 77-82.  This claim

should be dismissed because (1) it is improperly duplicative of Plaintiff's breach of contract

claims; (2) Plaintiff has failed adequately to allege a special relationship between the parties; (3)

---

[14]  Justice Kapnick's order is attached as Exhibit H to the Gardner Affirmation

[15]  Even assuming a fiduciary duty exists, Plaintiff's claim should be dismissed because Plaintiff has failed to allege that Marriott *breached* a fiduciary duty owed to Plaintiff.  A conclusory allegation to that effect, with nothing more, fails to state a claim.  *See Stoller v. Factor*, 272 A.D.2d 83, 83, 714 N.Y.S.2d 667, 667 (1st Dep't 2000).

19

*M Waikiki v. Marriott Hotel Services,*                                   Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

the claim arises from non-actionable statements of future expectation; and (4) any reliance by

Plaintiff on the challenged representations was unreasonable as a matter of law.

> **A.     Plaintiff's Negligent Misrepresentation Claim Is Duplicative of Its Breach of Contract Claims and Should Therefore Be Dismissed.**

Plaintiff's fourth cause of action simply recasts its breach of contract claims as a tort.

New York courts have made clear that this practice is impermissible.  *See Silletti v. Display*

*Workshop, Inc.*, 791 N.Y.S.2d 874, 2004 WL 1433185, at *2 (N.Y. Sup. Ct. 2004) (unpublished

table decision) (denying leave to amend where plaintiff sought to assert a tort claim that

"appear[ed] part and parcel of the contract or at least traceable and related to the contract"); *see*

*also U.S. for Use and Benefit of Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr.*

*Corp.*, 95 F.3d 153, 162 (2d Cir. 1996) ("[W]e do not think that the restrictions upon damages

for breach of contract claims can be avoided merely by recasting the breach as a tort.").

Accordingly, a negligent misrepresentation claim "predicated upon precisely the same

purported wrongful conduct as . . . [a] claim for breach of contract" must be dismissed as

duplicative of the breach of contract claim.  *OP Solutions, Inc. v. Crowell & Moring, LLP*, 72

A.D.3d 622, 622, 900 N.Y.S.2d 48, 49 (1st Dep't 2010); *see also Moustakis v. Christie's, Inc.*,

68 A.D.3d 637, 637, 892 N.Y.S.2d 83, 84 (1st Dep't 2009) (affirming dismissal because "there is

no pleading of the breach of a duty separate and apart from the contractual obligation owed to

plaintiff" where "[t]he allegations of . . . negligent misrepresentation are virtually identical to

those upon which the causes of action for breach of contract and breach of warranty rest");

*Stewart v. Maitland*, 39 A.D.3d 319, 319, 835 N.Y.S.2d 39, 40 (1st Dep't 2007) (affirming

dismissal of duplicative negligent misrepresentation claim).

Here, there is no material difference between Plaintiff's allegations asserting breach of

contract and its allegations asserting negligent misrepresentation.  In its first and second causes

20

*M Waikiki v. Marriott Hotel Services,*                              Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

of action, Plaintiff alleges that Defendants breached their contractual obligations to establish a chain of luxury lifestyle hotels under the EDITION brand name, *see* Complaint ¶¶ 38, 40; to involve Ian Schrager personally in the design of the Waikiki EDITION, *see id.* ¶¶ 27, 43; and to perform in accordance with Defendants' projections, *see id.* ¶¶ 57, 58, 60.  In its fourth cause of action, Plaintiff asserts that Defendants made false statements concerning the development of the EDITION brand, *see, e.g.*, *id.* at 1-2, ¶¶ 18, 20, 24; misrepresented the extent to which Ian Schrager would be personally involved in the design of the Hotel, *id.* ¶ 25; and misrepresented the extent to which the Hotel would be profitable, *see, e.g., id.* ¶¶ 22, 59.  Because these allegations are duplicative, Count Four should be dismissed.

### B.   Plaintiff Has Not Adequately Alleged a Special Relationship Between the Parties.

"A claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given."  *Hudson River Club v. Consol. Edison Co. of N.Y., Inc.*, 275 A.D.2d 218, 220, 712 N.Y.S.2d 104, 106 (1st Dep't 2000); *see also Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180, 944 N.E.2d 1104, 1109, 919 N.Y.S.2d 465, 470 (2011).  As a general rule, "the requisite 'special relationship' does not exist between sophisticated commercial entities that enter into an agreement through an arm's-length business transaction."  *Pacnet Network Ltd. v. KDDI Corp.*, 901 N.Y.S.2d 908, 2009 WL 2999200, at *3 (N.Y. Sup. Ct. 2009) (unpublished table decision), *aff'd* 78 A.D.3d 478, 912 N.Y.S.2d 178 (1st Dep't 2010); *see also Fleet Bank v. Pine Knoll Corp.*, 290 A.D.2d 792, 795, 736 N.Y.S.2d 737, 741 (3d Dep't 2002) ("[A] special relationship requires a closer degree of trust than an ordinary business relationship." (quotation marks omitted)).

21

*M Waikiki v. Marriott Hotel Services,*                          Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Plaintiff does not allege that the parties enjoyed any special relationship other than the "confidential and/or agency relationship" that it contends also gives rise to a fiduciary duty. *E.g.*, Complaint ¶ 29.  For the reasons previously stated, that assertion fails as a matter of law. *See supra* Part II.  Plaintiff therefore fails to state a claim for negligent misrepresentation.  *See H&R Project Assocs., Inc.*, 289 A.D.2d at 968, 737 N.Y.S.2d at 715 (dismissing claim for lack of a special relationship where "nothing more than an ordinary business relationship existed between plaintiff and [defendants]"); *Schonfeld v. Thompson*, 243 A.D.2d 343, 343, 663 N.Y.S.2d 166, 167 (1st Dep't 1997) (dismissing claim "since there were no fiduciary or confidential relationships emanating from this arm's length business transaction.").

> **C.    Plaintiff's Negligent Misrepresentation Claim Arising from Statements of Future Expectation Should Be Dismissed.**

Plaintiff's negligent misrepresentation claim should also be dismissed because the alleged misrepresentations are nothing more than statements of future expectations that, as a matter of law, are not tortious.

Plaintiff alleges that Defendants made negligent misrepresentations by providing Plaintiff with financial projections for the Hotel.  *See, e.g.*, Complaint ¶ 22.  Under New York law, these are statements that express "opinions of value or future expectations," which cannot support a claim for negligent misrepresentation.  *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74, 709 N.Y.S.2d 74, 75 (1st Dep't 2000); *see also 88 Blue Corp. v. Staten Builders Co.*, 176 A.D.2d 536, 538, 575 N.Y.S.2d 11, 13 (1st Dep't 1991) (describing "expressions of future expectations," unlike statements of existing fact, as "non-actionable").  In particular, "promises as to anticipated profits are generally not actionable as fraud, since these statements are understood to be mere predictions and not statements to be relied upon."  *L.H.P. Realty Co. v. Rich*, No. 601537/00, 2001 WL 1537744, at *2 (N.Y. Sup. Ct. Aug. 28, 2001).  Furthermore, an "allegation that

22

*M Waikiki v. Marriott Hotel Services,*                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

defendant[s] knew [a] performance prediction was false is indefinite and conclusory, and

therefore not actionable, absent allegations that the prediction was contradicted by a concrete,

existing fact that defendant[s] either intentionally failed to disclose or negligently failed to

discover." *Pacnet Network Ltd. v. KDDI Corp.*, 78 A.D.3d 478, 479, 912 N.Y.S.2d 178, 180 (1st

Dep't 2010). Under these precedents, Plaintiff's allegations regarding future profitability are

non-actionable.

Nor has Plaintiff stated an actionable claim related to Defendants' representations about

the number of deals in place for EDITION hotels. *See, e.g.*, Complaint at 1-2; *id.* ¶¶ 18, 20, 24.

While Plaintiff alleges that Defendants represented at the time of contract that they had

agreements in place to open nine EDITION hotels, Complaint at 2, ¶ 20, and further alleges that

only two EDITION hotels have opened to date, *id.* ¶ 41, Plaintiff does not – and cannot – allege

that Defendants' statement about its then-existing agreements was "contradicted by a concrete,

existing fact that [Defendants] either intentionally failed to disclose or negligently failed to

discover." *Pacnet Network Ltd.*, 78 A.D.3d at 479, 912 N.Y.S.2d at 180.  Agreements to develop

hotels sometimes fall through, whether because of global economic conditions or an owner's

change of heart.  This turn of events does not render statements that were true when made

somehow tortious.  Accordingly, Plaintiff's allegation that Defendants made a negligent

misrepresentation about agreements to develop EDITION hotels is "indefinite and conclusory,

and therefore not actionable" under New York law.  *Id.*  Because Plaintiff has not alleged any

actionable facts constituting negligent misrepresentation, its claim should be dismissed.

D.    **Any Reliance By Plaintiff on Marriott's Projections of Future Performance Was Unreasonable as a Matter of Law.**

Even assuming Defendants' representations concerning the Hotel's future performance constitute actionable statements of existing fact, they cannot support Plaintiff's negligent misrepresentation claim because any reliance on them was unreasonable as a matter of law.

In Section 11.10 of the Management Agreement, Plaintiff "acknowledge[d]" that any financial projections or pro formas provided by Marriott are "for information purposes only" and that Marriott "*do[es] not guarantee that the Hotel will achieve the results* set forth in any such projections [or] pro formas . . . ." M.A. at 47, § 11.10 (emphasis added). Plaintiff "further acknowledge[d]" that because such projections are merely estimates, "*the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, pro formas, or other similar information and such variations might be material*." *Id.* (emphasis added). This provision not only establishes that Marriott's projections are provided for information purposes only, but also disclaims any guarantee that the Hotel will meet those projections.

Under these circumstances, any contention by Plaintiff – a sophisticated business entity – that it reasonably relied on Marriott's projections in executing and/or performing under the TSA and Management Agreement "is belied by the specific terms of the agreements." *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999) (concluding that defendant's claim of reasonable reliance was foreclosed by contractual provisions contradicting the oral representations upon which defendant purportedly relied), *aff'd* 4 F. App'x 15 (2d Cir. 2001); *see also Casano v. New 19 W. LLC*, 920 N.Y.S.2d 240, 2010 WL 4630269, at *5 (N.Y. Sup. Ct. 2010) (unpublished table decision) (finding reliance unjustifiable based on contract). As Justice Kapnick noted in *Madison 92nd Street Associates, LLC*, plaintiff "cannot establish reasonable reliance" upon allegedly false projections "since plaintiff acknowledged in § 11.10 of the

24

*M Waikiki v. Marriott Hotel Services,*                                    Index No. 651457/2011
*I.S. International, LLC, & Ian Schrager*

Management Agreement that 'any written or oral projections, . . . or other similar information . . .

provided by Marriott . . . is for information purposes only' and Marriott does 'not guarantee that

the Hotel will achieve the results set forth' therein." *Madison 92nd Street Assocs., LLC v.*

*Courtyard Mgmt. Corp.*, No. 602762/09, slip op. at 11.  Dismissal is therefore appropriate.[16]

## **CONCLUSION**

For the foregoing reasons, Marriott's motion to dismiss should be granted and Plaintiff's

Complaint should be dismissed in its entirety.

Respectfully submitted,

Dated:  New York, New York              JENNER & BLOCK LLP
        August 1, 2011
                                      By:

                                      Richard F. Ziegler
                                      Brian J. Fischer
                                      Colleen A. Harrison
                                      919 Third Avenue, 37th Floor
                                      New York, New York 10022
                                      Telephone:  (212) 891-1600
                                      Fax: (212) 891-1699

                                      David A. Handzo (pro hac application
                                            forthcoming)
                                      Michael B. DeSanctis
                                      Lindsay C. Harrison (pro hac application
                                              forthcoming)
                                    Kelly D. Gardner
                                      1099 New York Avenue, NW, Suite 900
                                      Washington, DC 20001
                                      Telephone: (202) 639-6000
                                      Fax: (202) 661-4956

---

[16] *See Greater N.Y. Mut. Ins. Co. v. White Knight Restoration, Ltd.*, 7 A.D.3d 292, 293, 776 N.Y.S.2d 257, 258 (1st Dep't 2004) (affirming dismissal where disclaimer rendered reliance unreasonable); *Prestige Foods, Inc. v. Whale Sec. Co., L.P.*, 243 A.D.2d 281, 282, 663 N.Y.S.2d 14, 15 (1st Dep't 1997) (affirming dismissal where contracts "[f]latly contradict[ed]" claim of reasonable reliance); *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d at 74, 709 N.Y.S.2d at 75 (dismissing claim where purported misrepresentations were "contradicted by the written agreement").

**Exhibit G**

**Transcript of TRO Hearing**

46

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK:    TRIAL TERM PART 3
3  - - - - - - - - - - - - - - - - - - - - - - X

4  M WAIKIKI LLC,

5                              Plaintiff,
                                              INDEX NO.
6           - against -                       651457/11

7  MARRIOTT HOTEL SERVICES, INC.,
   I.S. INTERNATIONAL, LLC and IAN SCHRAGER,
8
                              Defendant.
9
   - - - - - - - - - - - - - - - - - - - - - - X
10 MARRIOTT HOTEL SERVICES, INC.,

11                             Counterclaim-Plaintiff,

12          - against -

13 M WAIKIKI LLC,

14                             Counterclaim-Defendant.
   - - - - - - - - - - - - - - - - - - - - - - X
15                      60 Centre Street
                        New York, New York
16                      August 31, 2011
                        PROCEEDINGS
17

18 BEFORE:
        HONORABLE EILEEN BRANSTEN,
19                                      Justice

20 APPEARANCES:

21     BICKEL & BREWER
       Attorneys  for the Plaintiff
22     767 Fifth Avenue
       New York, New York   10153
23     BY:   ALEXANDER D. WIDELL, ESQ.
             JAMES S. RENARD, ESQ.
24           ANAND SAMBHWANI, ESQ.
       4800 Bank One Center
25     1717 Main Street
       Dallas, Texas   75201
26

            BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

```
 1

 2            JENNER & BLOCK
              Attorneys for Defendant Marriott
 3            919 Third Avenue - 27th Floor
              New York, New York  10022-3908
 4            BY:   BRIAN J. FISCHER, ESQ.
                      - and -
 5                  DAVID A. HANDZO, ESQ.
                    MICHAEL B. DeSANCTIS, ESQ.
 6                  1099 New York Avenue, NW
                    Suite 900
 7                  Washington, DC   20001

 8

              McDERMOTT WILL & EMERY
 9            Attorneys for Defendant I.S. International LLC
              and Ian Schrager
10            340 Madison Avenue
              New York, New York   10017-4613
11            BY:  ROBERT A. WEINER, ESQ.

12

13

14

15

16

17

18

19

20

21

22
                           Bonnie Piccirillo
23                      Official Court Reporter

24

25

26
```

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

<pre>
  1                          Proceedings

  2                 THE COURT:  All right, good morning, everyone.

  3         Please set up.

  4                 MR. RENARD:  Good morning, your Honor.

  5                 MR. HANDZO:  Good morning, your Honor.

  6                 THE COURT:  And, Mr. Renard, what's the good

  7         word?

  8                 MR. RENARD:  Your Honor, unfortunately, after

  9         prolonged discussions with our clients into the wee

 10         hours of the morning, our clients are not able to

 11         agree, your Honor, to simply reinstate Marriott as

 12         manager of the hotel for a number of reasons, your

 13         Honor, if I may.  This hotel under Marriott management

 14         was losing $800,000 a month?  Could not even meet its

 15         normal expenses and, certainly, can't meet --

 16                 THE COURT:  You have to speak up.

 17                 MR. RENARD:  Can't meet its debt service or

 18         even its normal costs.  It's losing $800,000 a month.

 19                 Your Honor, we're on the verge of losing this

 20         hotel unless we can get control of management, and

 21         that's certainly one of the key reasons that our

 22         clients at least believed in good faith that they

 23         exercised their right to revoke Marriott's agency, and,

 24         your Honor --

 25                 THE COURT:  You have to point to me, Mr.

 26         Renard, you're going to have to show me where in the
</pre>

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1               Proceedings

2       agreement there is any language allowing you to take

3       this action?

4               MR. RENARD:  Your Honor, it's not a

5       contractual right.  It's common-law right, your Honor,

6       and I don't know if the Court had the time to review

7       the brief that we put in yesterday, your Honor; but

8       that brief I think shows very clearly a principal's

9       common-law right to revoke an agent's authority, even

10      if their exercise of that right is in derogation of a

11      contractual provision.

12              Your Honor, the case law, the New York Court

13      of Appeals has held this.  This is in the restatement

14      of agency, that if in fact the revocation and

15      termination of an agent might be a breach of contract,

16      that gives the terminated party a claim for breach of

17      contract.

18              We don't believe and, your Honor, we'll show

19      at a preliminary injunction hearing, at a trial and

20      certainly, your Honor, we would agree to an accelerated

21      trial; we'll certainly agree to bring in live witnesses

22      at a preliminary injunction hearing that this power was

23      properly exercised, your Honor.

24              And, your Honor, I really do respectfully

25      request that the Court take a look at that brief,

26      because I think it shows, without doubt, that this was

                BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                           Proceedings

2        an agency contract merely because of the powers that

3        were given Marriott to act on the owner's behalf.  And

4        under New York law and the law, frankly, of practically

5        every jurisdiction in the United States, the power to

6        revoke that agency was properly exercised Sunday

7        morning.  And at that point in time, Marriott ceased

8        being our agent and operator of our hotel.

9                 We changed the status quo drastically by

10       bringing in a new management company hiring 215

11       employees --

12                 THE COURT:  From the Marriott employees.

13                 MR. RENARD:  Yes, your Honor, people who

14       willingly signed up, and they were not threatened they

15       were going to be fired.  These were people who signed

16       up.

17                 THE COURT:  I'd love to hear some testimony on

18       that.

19                 MR. RENARD:  Absolutely, your Honor, we'd be

20       glad to provide it to the Court.  Except we found out

21       yesterday that Marriott has been calling the hotel

22       vendors requesting and encouraging the vendors not to

23       do business with the hotel.  They're encouraging

24       setting up across the street from the hotel,

25       encouraging hotel employees not to come to work.  These

26       are people who signed up to work at the new modern

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

51

1                          Proceedings

2        hotel.

3                 THE COURT:  Let me ask you this question, Mr.

4        Renard.

5                 Where in the agreement are the words "this is

6        an agency?"

7                 MR. RENARD:  It's not there, your Honor, but

8        that's not controlling.

9                 And, in fact, your Honor, if I may point to

10       the Court in our brief yesterday, your Honor, Section

11       A, which is on pages 1 through 6, speaks

12       comprehensively about the inherent power to revoke an

13       agency.

14                Section B, your Honor, which is on pages 7

15       through 10, talks about the powers and cites specific

16       provisions in the Management Agreement that show in

17       numerous respects that Marriott had the power to bind

18       the owner, to spend the owner's money, to commit the

19       owner to business relationships.  All the things are

20       classic indicia of agency manager.

21                And, your Honor, then we point out --

22                THE COURT:  Of all the classic indicia of a

23       contract.

24                MR. RENARD:  Of an agency contract.

25                THE COURT:  Of a contract.

26                MR. RENARD:  Yes.

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                          Proceedings

2                    THE COURT:  And, therefore -- see, my problem

3         still remains that you come to court and you filed by

4         summons and complaint an action in this Court.  My

5         issue is not whether or not you prevail.  That's not

6         the issue here.

7                    The issue is you come to court and you file a

8         complaint, and that complaint, in a sense, opens you up

9         to the jurisdiction of this court.

10                   You asked, in fact, you say, I want to be in

11        the Commercial Division of this grand court, and you

12        are assigned to the Commercial Division.  And you come

13        and you never again, in a sense, appear.  They appear

14        in motion sequence number 2 and 3 with motions to

15        dismiss the complaint, right?

16                   MR. RENARD:  Yes, your Honor.

17                   THE COURT:  And I presume you're going to

18        answer those motions, you've proposed that, and I

19        assume reply and one day it will get up to me and we'll

20        have argument on it.

21                   My problem is that by coming in with the

22        complaint -- where is it?  My problem is that the

23        complaint -- there's a number of causes of action.  One

24        is breach of the agreement.

25                   Two, is -- and by the way there is one, as far

26        as I see -- I may be wrong, I have to find it again --

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                         Proceedings

2          there is one statement that as a result of the action

3          that was undertaken, they entered into an agency

4          relationship in the complaint.  There is one that I see

5          as of now.  I'm not saying there isn't others.

6                    It's just that I'm taking a very quick perusal

7          of it, but what point I'm making is that there is

8          twenty, nineteen-and-a-half pages of recitation of

9          facts leading to count one, a breach of the TSA; count

10         two, a breach of the Management Agreement; count three,

11         breach of fiduciary duty; count four, negligent

12         misrepresentation; count five, request for judicial

13         declaration regarding the occurrence of an event of

14         default and the owner's right to terminate the

15         Management Agreement.

16                   Now, that last count could very well have been

17         a basis for you, your client --

18                   MR. RENARD:  I understand.

19                   THE COURT:  To come to court to ask for

20         extraordinary relief on the grounds that, first place,

21         what has happened is irreparable harm; two, we have the

22         likelihood of success; three the equities go in your

23         favor and et cetera and et cetera; right?

24                   MR. RENARD:  Yes, your Honor.

25                   THE COURT:  And by doing so, you would be in

26         the position today of either being granted your request

```
1                        Proceedings
2        for relief or not, but certainly you'd be on the basis
3        of having come to court and done it in a, quote, legal
4        manner versus taking self-help.
5               Now, self-help is something that is not
6        condoned in the legal system; because if we believed in
7        self-help, we'd be back at the club days.  We'd have a
8        big club and you'd have a big club, and whoever clubs
9        first does better.  All right.
10              MR. RENARD:  Your Honor, the notion of
11       self-help -- and we did a considerable amount of
12       research last night.  The notion of self-help has, and
13       I think the Court pointed out, embedded in it a notion
14       of some wrongdoing or doing something you weren't
15       allowed to do.
16              Your Honor, again, respectfully, as pointed
17       out in the brief that we filed yesterday, we had the
18       right to do this.  And, your Honor, we can find no
19       authority for the fact -- and I tried to distinguish
20       this yesterday and, perhaps, I didn't do a good job of
21       it.
22              Count five, your Honor, was coming to Court
23       and saying we believe there's an event of default;
24       that's a clearly defined term under the contract.  And
25       a result of that, we would like a declaration that if
26       we terminate because of that, we do so impunity.  That
```

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                          Proceedings

2      means without having a counterclaim for wrongful

3      termination.  That's separate and apart, your Honor,

4      from the power to terminate.

5            Our client made the decision.  Now, the Court

6      may think it imprudent, but we believed it was allowed

7      by law to exercise that power to terminate the agency

8      and leave open for later consideration whether that was

9      wrongful in which case they might have a claim for

10     damages, or whether it was for cause, in which case we

11     would be able to recover damages against them for the

12     harm that they caused us prior to the termination.

13           But, your Honor, those are two separate

14     things.  But, respectfully, your Honor, the point is is

15     that if the right was appropriately exercised and we

16     could find no authority for the exercise of power

17     that's given to us as a matter of law within or outside

18     the context of litigation or whether or not litigation

19     even exists, that that power be rightfully and

20     effectively be exercised.

21           The problem then, your Honor -- and one of the

22     things -- we have to step back, if I may do this.

23           We have a request for a preliminary

24     injunction, but we also have a request for a TRO, which

25     under CPLR Section 6301 which requires a showing of

26     immediate and irreparable injury.

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                              Proceedings

2              Your Honor, the relief that they seek, and I

3       compared the proposed order that they gave the Court

4       and it's been modified slightly to add one thing; but

5       if I may, the proposed order given on the TRO, 6301

6       TRO, is among other things an order that owner must

7       allow Marriott to fully perform its role as the hotel's

8       manager in accordance with the Management Agreement.

9              In other words, a mandatory affirmative

10      temporary restraining order that changes the status

11      quo, forces us to fire our current manager Aqua, cancel

12      contracts with vendors that Aqua has entered into,

13      change the signage, change the computer systems that

14      have been put in by Aqua on a temporary restraining

15      order which is a mandatory and affirmative in nature.

16              THE COURT:  I know, but the problem -- I

17      understand your argument, but the problem I face is

18      that because of your client's actions, it is squarely

19      in the self-help category.

20              Had you come to court on an order to show

21      cause saying, We need immediate relief and a complete

22      turnover right now based on my complaint, based on

23      what's happening now, whatever new facts, whatever new

24      affidavits you come in with; then you would be in the

25      position of asking this Court for permission to do what

26      you ultimately did, by just doing it.  And that my

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                          Proceedings

2      problem is not whether or not you're going to prevail;

3      but rather that, indeed, the argument now is, Oh, we

4      went and did the self-help, and look what happened.  It

5      would be irreparable harm to us, because we changed the

6      signage.  We put our computers in, we did this, without

7      legal proceeding.

8                MR. RENARD:  But, your Honor, the presumption

9      in that is that we didn't have the power, and it was

10     somehow wrongful to exercise that power, your Honor.

11     And that's just not the case.

12               And, your Honor, if -- on a merits related --

13     and there ought to be some consideration on merits on a

14     TRO.  If they had no right to be reinstated and if we

15     had the right and power to do what we did; then the

16     underlying notion that there's some wrongdoing that

17     needs to be restrained or some status quo that needs to

18     be undone, your Honor, is just incorrect.

19               THE COURT:  But, I don't know, maybe I'm too

20     much of a judge.  Maybe, maybe, it just so appalls me

21     that all I have to do in life, is put out a complaint

22     and then I can do whatever I want all because I have

23     the right, I have the right.  I say it's an agency, so

24     never mind that the Court hasn't ruled on that.  Never

25     mind that we have a contract.  Never mind all of that.

26     But, since I say that it's an agency, I have the right

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

```
 1                         Proceedings
 2        to do whatever I want.  Come in with the big club, club
 3        people to death and then say, you know, if I have to go
 4        back to what it was before, Gee, I would be humiliated
 5        ed.
 6                    You shouldn't have done it to begin with.
 7                    MR. RENARD:  But, your Honor, and that's
 8        why -- and I'm sorry if I do this, but when I talk
 9        about what's in that brief, it's of critical
10        importance.
11                    THE COURT:  I read the brief.
12                    MR. RENARD:  Well, your Honor, the notion that
13        self-help and clubbing people, that's a little
14        different than when the New York Court of Appeals says,
15        you know, there is a policy of this state that if a
16        principal has lost trust and confidence or otherwise
17        doesn't want an agent out there, even if it's a 30-year
18        airtight, 70-year, 100-year contract, doesn't want that
19        agent out there binding that principal to legal and
20        financial responsibility; we're going to give that
21        principal the power, the unfettered power subject to a
22        potential claim for breach of contract to terminate
23        that agent.  And, you know, your Honor, that's not only
24        the policy of New York, but it's everywhere in this
25        country.
26                    THE COURT:  You know, I know you have a number
```

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                           Proceedings

2        of citations here.  One of them is interesting.  A Slip

3        opinion.  This is, I think, cited to GK Alan Associates

4        versus Lazzari at 44 A.D.3d 95, cited to page 102.

5                 A Second Department 2007 case and says here:

6                 "A principal is always free to terminate the

7        agency relationship subject to a claim of damages by

8        the agent.  The disloyalty of the agent entitles the

9        principal to avoid such claims, at least to the extent

10       that the claims involve future compensation."

11                Here, we talk about disloyalty.  I mean, none

12       of these cases mean anything without the facts.

13                MR. RENARD:  Your Honor, in fact, as the cases

14       we cite point out -- and we had cause here, your Honor,

15       but that's a separate thing to be adjudicated later.

16                The cases point out, your Honor, it's not a

17       cause right.  It's not a cause power.  A principal can

18       terminate and revoke an agent's authority at any time

19       and for any reason or no reason at all.

20                THE COURT:  You cite Smith versus Conway, 1950

21       Supreme Court case and cited in 198 Misc.886, which and

22       I have no idea who wrote this.  It doesn't say who

23       wrote it.

24                Quote:  "A principal, at least, generally is

25       permitted to revoke an agency when he pleases, even

26       though he has a contracted with agent for a definite

                       BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                           Proceedings

2          period of time."

3                    All of this is interesting, but you talk to

4          the Court of Appeals case.  Is that the Wilson case,

5          you're talking about?

6                    MR. RENARD:  Yes, your Honor, yes.

7                    THE COURT:  You have a copy of it, right?

8                    MR. RENARD:  No.  Yes, your Honor, we do, we

9          do.

10                    THE COURT:  Yes, you've been very silent for

11          very long.

12                    MR. HANDZO:  If I can just take a moment to

13          respond, your Honor.

14                    THE COURT:  I don't think he's quite through.

15                    MR. HANDZO:  If we're handing up cases, your

16          Honor, we have one, as well.

17                    THE COURT:  Yes, you have Barbara Kapnick's

18          case?

19                    MR. HANDZO:  Yes, your Honor.

20                    THE COURT:  And that one was issued on

21          July 13, 2010, on a case Madison 92nd Street Associates

22          versus Courtyard Management Corp..

23                    Let me ask you a question.  At what stage of

24          the appeal is it at?

25                    MR. HANDZO:  That I do not know, your Honor.

26                    MR. RENARD:  Your Honor, I'll also point out

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                             Proceedings

2        that in that case, the Court dealt with a claim -- and

3        this is what appears on the face of that opinion.  A

4        claim that there was some general fiduciary

5        relationship of trust and confidence.  It doesn't even

6        appear from that opinion that an argument of agency was

7        even brought to the Court, that the owner went through

8        the contract, argued that there was an agency by virtue

9        of the provisions in the contract and, therefore, that

10       there is -- it's not a termination question.  Its

11       whether or not a fiduciary relationship was created.

12       That's not even a termination case and doesn't apply to

13       this notion of revocation of agency.

14            Now, Marriott will say, well, there's a

15       disclaimer of fiduciary duty in that case, just as

16       there is in ours, your Honor.  We've pointed out, your

17       Honor, in Section B of our brief, that labels, such as

18       there is or there is not a fiduciary relationship,

19       labels such as there is an agency relationship or

20       disclaimers of an agency are not controlling.

21            And, your Honor, we also had a case that we

22       had before Justice Gammerman involving, by the way, Mr.

23       Schrager, who's also one of the defendants in this

24       case, where the Court went on at length and talked

25       about how labels disclaiming agency and disclaiming

26       fiduciary duty are not binding, your Honor.  And if I

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

62

| | |
|---|---|
| 1 | Proceedings |
| 2 | may present the Court with a copy of that case, as |
| 3 | well. |
| 4 | (Handed up to the Court) |
| 5 | THE COURT:  Yes, let me read this case.  Let |
| 6 | me read the Court of Appeals case, which I just want to |
| 7 | point out is 1954. |
| 8 | Well, I don't know, Mr. Renard, I don't know |
| 9 | if I agree with your interpretation of this case. |
| 10 | Let's go over it a little bit. |
| 11 | This is the Wilson Sullivan Company, Inc. |
| 12 | versus The International Paper Makers Realty Corp.  It |
| 13 | is cited at 307 NY 20.  It was argued on March 12th, |
| 14 | 1954.  Decided on April 23rd1954. |
| 15 | And just for interest sake, I wonder who was |
| 16 | our bench.  I don't know.  It was, the opinion was |
| 17 | written by Judge Froessel, and there is a dissent.  And |
| 18 | the bench was, the Chair was Judge Lewis, Conway, Fuld, |
| 19 | Froessel, and the dissent was Judge Dye.  And Judges |
| 20 | Desmond, Van Voorhis joined in Judge Dye's dissent. |
| 21 | But, taking the majority, first place, the |
| 22 | contract that you're dealing with -- and I think you |
| 23 | have to begin with -- is a contract that -- and the |
| 24 | issue that was there, is whether or not the trial judge |
| 25 | erred when he did not grant summary judgment and did |
| 26 | not say that there wasn't a cause for damages in this |

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

| | |
|---|---|
| 1 | Proceedings |
| 2 | particular instance. |
| 3 | And it goes on, first place, to explain that |
| 4 | the plaintiff had an exclusive, as exclusive renting |
| 5 | and managing agent for the building owned by the |
| 6 | defendant, was to receive a compensation for its |
| 7 | services at five percent of the total amount of rental |
| 8 | collections. |
| 9 | The duration and provisions for termination of |
| 10 | this agreement were provided for in the is 7th |
| 11 | paragraph which reads in part, and, of course, that's |
| 12 | the key element in this particular agreement, because |
| 13 | you don't have that. |
| 14 | "The agreement shall continue in full force |
| 15 | and effect until the last day of February 1948 and if |
| 16 | not terminated by either party, giving the other party |
| 17 | thirty days prior notice in writing, shall continue |
| 18 | from year to year until terminated by either party at |
| 19 | the end of an extended yearly term by the giving of a |
| 20 | like notice." |
| 21 | So it turns out that the defendant herein |
| 22 | wants to sell the building, and the issue that is |
| 23 | before the Court is whether or not they had the right |
| 24 | to terminate the plaintiff's right to collect the rent, |
| 25 | five percent of the rentals by just deciding to sell |
| 26 | the building unilaterally.  Because nowhere in the |

1                          Proceedings

2          contract or the agreement was there any provision made

3          for the defendants, the owner's right to sell the

4          building.

5                  So, as a result, the conclusion that the

6          majority came to, "We are, therefore, of the opinion

7          that the trial court erred in dismissing plaintiff's

8          complaint for legal insufficiency.  We are further of

9          the opinion that on the record before us, defendant has

10         failed to raise any triable issues of fact, except as

11         to the amount of damages.  Indeed, the parties agreed

12         that as a special term, that the problem is purely one

13         of law.  Consequently, plaintiff's motion for summary

14         judgment should have been granted."

15                 Now, you point -- you outline for me a

16         section -- well, first place, you outline a very

17         interesting section, but we have to do the sentence

18         that precedes it.

19                 "At the outset, we should sharply distinguish

20         between the parties' powers, rights and duties arising

21         out of the contract itself, and those arising under the

22         agency relationship created by the contract."

23                 So, you do have a distinction that has to be

24         made here.

25                 "It is well settled that with but a few

26         exceptions not pertinent to the facts of this case, a

1                              Proceedings

2        principal has the power to revoke at any time his

3        agent's authority to represent him.  This is not to

4        say, however, that in doing so, he is immune from

5        liability to the agent for the breach of the contract.

6        Thus, while defendant has the power to terminate at

7        will his agency relationship with the plaintiff; if in

8        so doing it violated his obligations under the

9        contract, it must respond to the plaintiff in damages."

10              So, that's what you're holding on, and that is

11       what you're saying to the Court allows you to take this

12       unilateral action.

13              MR. RENARD:  If I may, your Honor?  This case,

14       I think, proves the point that I've tried to articulate

15       to the Court.

16              That in this case, which is interesting

17       because it wasn't a hotel manager, but it was a manager

18       of a building who not only had property management

19       agency responsibilities, but also to enter into leases

20       on behalf of the owner's building so a classic agency.

21              The Court recognizes that when the owner of

22       the building said agent, you're no longer my agent,

23       that's effective immediately.

24              The question that arises was that revocation a

25       breach of contract?  Which I acknowledged yesterday and

26       I acknowledge today, that is an issue that remains to

1                              Proceedings

2          be determined in this case; and if they're able to say

3          oh, it was a wrongful termination because of X, Y and

4          Z, then I'm entitled to all my future compensation

5          under this agreement, I acknowledge that.  I think

6          we'll be able to defeat that claim and, in fact, have a

7          claim for damages back against them; but the underlying

8          principal, your Honor, and I think it's articulated

9          throughout here is that, yes, and you were right to

10         point out there's a difference between the common-law

11         power to revoke and terminate an agent's authority.

12              You can do that.  You might be rightful in

13         doing that in which case you can deal with impunity and

14         not be subject to a counterclaim for damages; or in

15         doing that in terminating your agent, you might have

16         violated the contract and subject yourself to a claim

17         for damages.

18              This Court acknowledged that the revocation

19         was effective, but it was incorrect to dismiss the

20         terminated agent's claim for damages because there was

21         a possibility that it had a claim because it was a

22         possibility of a wrongful termination.

23              And, your Honor, that's precisely the point.

24              And if I may, your Honor, go back to something

25         I had said before.  When I was reading to the Court the

26         relief that is requested here, not only to reinstate

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                              Proceedings

2        Marriott's so it can perform in accordance with the

3        contract which we believe was terminated or agency was

4        revoked under; to undo the harm and damage that

5        resulted from owner's purported ouster of Marriott,

6        whatever that means, to unilaterally -- not to

7        unilaterally install another hotel manager which, of

8        course, has already been done.

9             Your Honor, the reason I go through this, if

10       you go to the counterclaim that they filed yesterday,

11       the final and permanent injunctive relief that they ask

12       for is identical to what they ask for in a TRO; which

13       means not only in a preliminary injunction, which has

14       its own rules regarding affirmative mandatory

15       injunctions, at a TRO stage when they have to show

16       immediate and irreparable injury pending a hearing

17       which could happen next week subject to the Court's

18       availability or the week after, that they want to

19       reinstate and effectively get the final relief that

20       they seek which the courts are pretty clear, you can't

21       get by way of preliminary injunction, let alone a

22       temporary restraining order, the relief that they seek.

23       And here's the problem, your Honor.

24            If the Court were to enter a TRO staying

25       reinstate Marriott, then what are we really litigating

26       once we come to the preliminary injunction stage?

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                          Proceedings

2          Because Marriott is already in.  There's nothing -- the

3          Court can say, oh, preliminary injunction denied.

4          Well, if it was denied, then where are we?  The status

5          quo has changed.  Marriott is back in business

6          operating our hotel against our will.

7                My point is, forgetting whether or not they

8          could even get this relief by way of a preliminary

9          injunction after a hearing and full opportunity on our

10         part to respond with the factual affidavits, they want

11         their final relief by way of a temporary restraining

12         order.

13               THE COURT:  Well, they're attempting to get

14         back to where they were.

15               Let me hear from Mr. Handzo.

16               MR. RENARD:  Your Honor, one last point I need

17         to say this.

18               Wholly apart from this power to revoke an

19         agent's authority -- and we do address this in our

20         brief and I won't belabor it -- there's a separate and

21         independent reason why in hotel management contracts

22         that there should not be injunctive orders requiring

23         the two parties to continue to do business with one

24         another.

25               The courts have held that hotel management

26         agreements constitute --

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1      Proceedings

2           THE COURT:  You know what, I don't have any

3      disagreement with you.  Mr. Renard, it comes down to

4      the same thing.

5           You were already before this Court.  You

6      already had -- you already had the power of this Court

7      behind you, in a sense, by coming and filing a

8      complaint.  You now avail yourself of rather plenary

9      powers that the Court has; but not to come to this

10     Court and ask for such relief is really -- not only are

11     you kicking the Court's teeth, but really self-help

12     involvement that is, frankly, mind boggling.  And all

13     you had to do is, indeed, ask this court For that

14     power.

15          All you had to do is bring by order to show

16     cause an immediate declaration that you had the right

17     to take over the future -- the management and the

18     control of the this building, this hotel, sorry, based

19     on your agency relationship.  And putting aside whether

20     or not they had damages, all you had to do is come to

21     this Court and ask for it.  And that is the problem;

22     the problem is the self-help.  Not the problem that you

23     point out that we have a right to do it.

24          I don't know, once you come to the Court you,

25     in a sense, subject yourself to a different plane.  You

26     subject yourself to the magistery of this Court.  You

```
 1                        Proceedings

 2      don't go around, I mean, you know, you come to Court

 3      and you say, he's about to hit me and I'm asking this

 4      Court to protect me.  And you come up with proper

 5      things and you say, well, you know what, I'll hit him

 6      first.  Instead of coming into Court and saying you

 7      know, can I have the right to hit him, because he's

 8      about to hit me?

 9             MR. RENARD:  Your Honor, if I may address

10      that, because it's an observation the Court had

11      yesterday, and I do appreciate what your Honor is

12      saying.

13             I want to make sure, your Honor, in invoking

14      this right and power, we certainly didn't mean to

15      offend the Court.  I speak on behalf of my client --

16             THE COURT:  You're not offending me

17      personally.

18             MR. RENARD:  I speak to your Honor and I speak

19      to the Court as a system.  We weren't meaning to kick

20      the system in the teeth.  We didn't believe we were

21      doing something that, in effect, was a derogation of

22      the Court's authority or I think language used

23      yesterday was doing an end around the Court.  Your

24      Honor, I would never certainly do anything to offend

25      the Court or that I believe was an end around or doing

26      something that somehow meant to escape the Court's
```

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

```
 1                        Proceedings

 2      powers and things like that.  I find that abhorrent,

 3      and at least I can say this.  That wasn't the intention

 4      of either my client or this law firm in my client in

 5      pursuing this action or my law firm in making the

 6      arguments we make, your Honor.

 7               With that said, and I think our client even

 8      says that, your Honor, in an affidavit that we prepared

 9      last night.  I'm not sure if the Court received it.  We

10      have copies.

11               THE COURT:  No, I haven't read it, but I did

12      receive it.

13               MR. RENARD:  I just wanted to say that, your

14      Honor, because I understand the Court's observations

15      and I, certainly, don't want the record to reflect

16      anything other than if we offended the Court or the

17      powers of the Court, we apologize for that.  And,

18      certainly, your Honor, our actions and the actions of

19      our client were done in a good-faith belief that we had

20      the right and the power to exercise what we believe the

21      law gave us in that regard.

22               And so, your Honor, because this is really a

23      personal services contract, it's sought to be

24      specifically enforced; and given the fact that they

25      seek the final relief that they asked for in their

26      counterclaim yesterday; your Honor, at a minimum, we
```

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

Proceedings

1

2   would ask that we could roll this up and present all

3   the evidence and all the arguments in a preliminary

4   injunction hearing just as soon as the Court would have

5   us do so.  But I just believe that this temporary

6   restraining order, even given the Court's observation

7   about what has happened, is just inappropriate to do

8   this given the requirements of 6301 and I would say

9   this, your Honor, too, and I did mention this

10  yesterday.

11         Mr. Ken Rehmann, who did an affidavit, talks

12  about all this parade of horribles, that the damage to

13  the reputation of Marriott and the damage to the

14  Edition brand; it's very interesting, your Honor,

15  because Mr. Rehmann defines Marriott to be the parent

16  company, Marriott International, which we believe is

17  the one who owns the Edition brand, which we believe is

18  the one that owns all the intellectual property that

19  they so complained about.

20         Marriott International, your Honor, isn't even

21  a party to this lawsuit.  Catherine Young, another

22  person who did an affidavit for them, talks about all

23  the harm to Marriott, defined as Marriott

24  International.  They don't even have the right party in

25  here to complain about irreparable harm, that they

26  haven't even proved is immediate in the sense that this

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

73

|   |   |
|---|---|
| 1 | Proceedings |
| 2 | case wait till preliminary injunction hearing. |
| 3 | And furthermore, your Honor, the mandatory |
| 4 | injunctive relief that they request, reinstatement of |
| 5 | Marriott as manager would require us to fire Aqua -- I |
| 6 | understand what the Court says, perhaps that's an issue |
| 7 | of your own making.  But, your Honor, that implicates |
| 8 | contractual rights of a party that isn't even before |
| 9 | the Court, Aqua.  So we have a party, Marriott |
| 10 | International who's claiming the irreparable injury, |
| 11 | and one of the things they seek by way of temporary |
| 12 | restraining order is, essentially, to terminate |
| 13 | contractual rights of Aqua who's not before this Court. |
| 14 | There are all sorts of procedural problems |
| 15 | and they should -- |
| 16 | THE COURT:  Would you say that Aqua is an |
| 17 | agent of yours? |
| 18 | MR. RENARD:  It is, your Honor, but that |
| 19 | doesn't mean -- I mean, they are an agent pursuant to a |
| 20 | contractual relationship which we have with them.  We |
| 21 | have an interest in that contract, and they have a |
| 22 | separate interest in that contract. |
| 23 | So, my point, your Honor, is -- |
| 24 | THE COURT:  Yes, but if, indeed, I decide to |
| 25 | restrain you, then you, as the parent to Aqua, the |
| 26 | agent, the mere agent, can be dealt with in the same |

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                        Proceedings

2       way as you dealt with as the mere agent of Marriott.

3               MR. RENARD:  Well, your Honor, my only point

4       is Aqua is not before the Court.  You're talking about

5       terminating the contractual rights of a party.  We're a

6       counterparty to an agreement with Aqua.

7               The point being, your Honor, the relief that

8       they seek by way of -- again we're not at a preliminary

9       injunction stage.  We're at a temporary restraining

10      order stage.

11              THE COURT:  I think we are and I'm going to

12      have to close it up so I'm going to have to ask

13      Mr. Handzo to speak.

14              MR. RENARD:  Thank you for your time.

15              MR. HANDZO:  Thank you, your Honor.

16              Let me just take the points in the order that

17      Mr. Renard addressed; and first of all, he started off

18      talking about how the hotel was losing money.

19              I want to be clear about one thing.  To the

20      extent the hotel has operating losses, my client is

21      paying them, not them.  The contract requires them to

22      pay the operating expenses of the hotel.  However, they

23      have refused to fund working capital requests so

24      actually it's Marriott paying the money right now.

25              This claim of due and owing money, now it's

26      actually Marriott that's paying.

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                            Proceedings

2                    With respect to this agency issue that we've

3          debated so long.  We did file a motion to dismiss.  We

4          have an argument in there that addresses the agency

5          issue.

6                    I'm happy to provide that brief to the Court,

7          if you want it.  Obviously, the reason we addressed

8          that issue in our motion to dismiss is because it's

9          very much a part of their complaint.  They raised it in

10         the complaint.  So we address it in the motion to

11         dismiss, and we have a more fulsome discussion there.

12         If the Court wants to see it.

13                   Now, Mr. Renard's legal argument for the most

14         part assumes the conclusion that he wants to reach.

15         Basically, what he does is he gives you cases where an

16         agency relationship exists, and then he says the

17         following consequences flow from that agency

18         relationship.

19                   The problem is, he's assuming in this case

20         that there is an agency relationship to begin with, and

21         there isn't and you know there isn't for any number of

22         reasons.

23                   First of all, we have our contract.

24         Obviously, a good place to start, and there's a couple

25         of interesting things about the contract that I think

26         the Court mentioned yesterday, but bear repeating.

                   BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

76

1              Proceedings

2              The contract has a couple of places where it

3       says you can't terminate without a judicial finding.

4       In the provisions that deal with termination for

5       default, for example, it says, If one party claims a

6       default and the other party contests it, there cannot

7       be a termination until a Court has resolved that

8       dispute.

9              THE COURT:  Where is that?

10             MR. HANDZO:  That it 9.02, I believe, your

11      Honor.

12             MR. FISCHER:  9.03.

13             THE COURT:  Can you give me the page number?

14             MR. HANDZO:  Page 38.

15             It's at the bottom of page 38, your Honor.

16             Your Honor, we also quote it and deal with it

17      on pages 9 and 10 of our brief.

18             THE COURT:  Okay.  Good.

19             MR. HANDZO:  And the point here, your Honor,

20      is why in the world would we put a provision like that

21      in a contract that says it can't be terminated for

22      default without a judicial ruling if it could be

23      terminated at any time for any reason?  That just

24      doesn't make any sense.

25             Likewise, there's another provision in the

26      contract that I mentioned yesterday, 2.03, that says:

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                           Proceedings

2        Even if you have a basis to terminate, you can't

3        terminate where there is money owed to Marriott which

4        there currently is.

5              So, again, we've got all these provisions that

6        deal specifically with termination and make it clear

7        that there's simply no right to just decide that I want

8        to terminate.  You have to have a judicial

9        determination, and there are certain requirements

10       beyond that like making sure there's no money

11       outstanding which there is.

12             And I'm sort of glossing over maybe the most

13       important feature of the contract, which is that it

14       expressly says that Marriott is not the agent of

15       M Waikiki.

16             THE COURT:  Where is that?

17             MR. HANDZO:  That is in --

18             MR. FISCHER:  Pages 43 and 44, 11.03

19       Relationship.

20             THE COURT:  What I like is the people back

21       there that really know what they're talking about.

22             MR. FISCHER:  I'm just a spectator.

23             MR. HANDZO:  Further away from counsel table

24       they are, your Honor, the more they know, generally.

25             But, yes, it's pages 43 and 44, Section 11.03.

26             THE COURT:  All right, let me read that.

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

```
 1                         Proceedings

 2               MR. HANDZO:  Sure.

 3               THE COURT:  Okay.

 4               MR. HANDZO:  So as you can see, your Honor,

 5        the parties, two sophisticated parties got together,

 6        drafted a very complex and comprehensive agreement and

 7        expressly agreed that Marriott is not the agent of the

 8        owner; and, indeed, went further and expressly agreed

 9        that M Waikiki would not make that argument in Court

10        which, of course, Mr. Renard has now spent about an

11        hour doing exactly that, completely in contradiction to

12        what the contract expressly binds his client not to do.

13               THE COURT:  Well, what he's saying and

14        actually and produce a case to support his saying, is

15        that, yes, we had a contract; however, our entire

16        relationship was one of principal versus agent; and,

17        therefore based on agency rules, separate and apart

18        from the contract which could lead to you, Marriott,

19        receiving damages, substantial amount of damages, if

20        you, indeed, can prove that you fulfilled your portions

21        of the contract and they didn't and they, in fact,

22        impeded you from doing that.  But, separate and apart

23        from that, they have a principal and agency

24        relationship.

25               Now, I know it says in the contract you won't

26        mention agency, and Mr. Renard says to me it doesn't
```

1                              Proceedings

2        matter what it says in the contract.  In fact, the

3        relationship between Marriott and M Waikiki LLC was one

4        principal, being Waikiki, versus agent.  And so,

5        therefore, while maybe our actions are despicable, we

6        never had the right to do it because of the agency

7        relationship.

8                    MR. HANDZO:  And, your Honor, that argument

9        that Mr. Renard is making is exactly what was argued to

10       Justice Kapnick in the 92nd Street decision that we've

11       given to you.  They said exactly the same thing.

12                    The Court in that case had a contract with

13       virtually identical language.

14                    THE COURT:  But was this decision and order

15       made on a motion to dismiss?  Was it made on a -- see,

16       my problem now and, frankly, this is something you have

17       to address.  My problem is whether or not the plaintiff

18       acted in an appropriate manner.

19                    Certain actions have occurred, and what Mr.

20       Renard is telling me is that if I, in the sense

21       eradicated those actions, that it would eradicate the

22       principal's ability to do what it has the right because

23       they're the principal and you're the agent.

24                    MR. HANDZO:  No, I don't think it would.  What

25       it would do is it would preserve the status quo until

26       they could come back into Court and make the case to

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

Proceedings

1

2      you that they really do have a right to terminate.

3              I mean, that's what we're really saying here.

4      I mean that's what, despite Mr. Renard arguing that

5      we're really asking for some final irrevocable relief;

6      the reality what we want here is to have what we had at

7      one o'clock Sunday morning until somebody has a chance

8      to just come into this Court and have this all out and

9      have the Court make a decision, which is what the

10     contract, obviously, contemplates.

11             And Mr. Renard's argument on that point really

12     smacks us saying, you know, I shot my parents, and you

13     should have leniency on me, because I'm an orphan.

14             I mean --

15             THE COURT:  Hutzpah?

16             MR. HANDZO:  Yes, Mr. Renard is from Texas, so

17     we might have to translate that, but, exactly --

18             MR. RENARD:  I got it, David.  Thank you.

19             MR. HANDZO:  They have a New York office.  I

20     forgot.

21             You know, they put us in this situation; and

22     then to come in and say, oh, you have to overcome all

23     of these legal hurdles because we took this extra

24     judicial action without coming to Court and now you

25     have to, you know, overcome this huge legal burden;

26     he's completely got it backwards.

1                          Proceedings

2              They put us in this situation.  They have

3      nothing to complain about if we go back to where we

4      were a very short time ago.  And the status quo really

5      is that from the perspective of guests, people coming

6      to the hotel, people book parties.  This is a Marriott

7      property.  The guests who are coming in the future are

8      still expecting the Marriott property.  That's what

9      they're expecting.

10             The other thing I want to highlight, because

11     it is something that really concerns my client.  We do

12     have a lot of proprietary information on that property,

13     and we're getting reports that computers are -- they're

14     yanking out the hard drives.  There are post-it notes

15     on computers which say cracked, which in the computer

16     lingo means -- as I understand it -- that they have

17     broken the passwords.  They're circumventing security

18     devices.  That's ongoing now, and we need to stop that.

19             So, the equities here are clearly in favor of

20     putting Marriott back where we were just a little while

21     ago.  If they want to then come to Court and argue this

22     agency issue we think they're totally wrong.  We think

23     Justice Kapnick got it exactly right.  They are

24     basically saying if you look at the contract as a

25     whole, we have certain rights and responsibilities to

26     make us an agent.  That exact argument was made to

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                        Proceedings

2          Justice Kapnick.  She expressly rejected it.  If you

3          look at that decision she says, I'm looking at the

4          whole contract.  I'm seeing what you're saying, but I

5          don't buy it, and that's the best law we have and most

6          on-point law we have.

7                    In fact, the cases that they cited yesterday,

8          that they principally relied on, Woolley case from

9          California, is a case where the contract said exactly

10         the opposite.  It says, we are an agent and so on that

11         basis the Court found that they are an agent.

12                   This case is exactly the opposite.  Justice

13         Kapnick just says you have to follow that.

14                   MR. WEINER:  Your Honor, may I just add a

15         word?  I'm sitting her patiently.  I represent Ian

16         Schrager, the defendant.

17                   THE COURT:  This is Mr. Weiner.

18                   MR. WEINER:   My name is Robert Weiner.

19                   What has happened has had significant impact

20         on my client, as well.  There was a press release that

21         was issued by the plaintiff.  It was covered worldwide

22         in all the press, in particularly, the hospitality

23         press.  My client is already getting significant

24         questions from the press what happened, and my client's

25         reputation is very much involved here.

26                   So from our prospective, we think this needs

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

83

Proceedings

1

2     to be resolved very, very quickly, because we have

3     significant reputational issues that, again, I haven't

4     joined in because it's not my Management Agreement, but

5     I think your Honor should be aware of that.

6              THE COURT:  All right, thank you.  I want to

7     take a break.

8              (Short recess taken.)

9

10

11

12

13

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

26

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

84

1                          Proceedings

2

3

4

5              THE COURT:  First place, I want to

6       thank both sides, everyone for their excellent

7       presentation.  This is a very serious issue, without a

8       doubt, and I think that both sides have articulated

9       their positions very clearly and very expertly.

10              So, for that I commend both sides.

11              However, in the balancing of everything, the

12      Court has decided as follows:

13              The Court is going to grant the temporary

14      restraining order.  The Court understands that this is

15      obviously -- well, the Court believes -- I think I'll

16      put it this way.

17              The Court believes that in the balance of

18      everything, that the Waikiki actions by coming in at

19      two o'clock on a Sunday morning when there was no

20      preliminary attempt to give any kind of notice

21      whatsoever, has caused irreparable harm to the

22      defendants.  And the reason why it has caused

23      irreparable harm to the defendants is that, first

24      place, they were displaced as the manager of the hotel.

25              Second, their reputation has been harmed in

26      the hotel community.

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                                     Proceedings

2           Third, that their trade secrets have been put

3   in tremendous jeopardy by putting in a competitor of

4   Marriott's, competitor as the person in charge of

5   running the organization, it allows the competitor to

6   have access to all of Marriott's secrets in terms of

7   who they're trying to sell their rooms to, all the

8   future sales that are going on, all their past sales,

9   their current hotel guest lists.  Everything that is

10   proprietary interest of Marriott has been disturbed by

11   the actions that Waikiki undertook.

12           The equities also favor Marriott.  The

13   argument that this is an agency relationship, so well

14   put forward by Mr. Renard on behalf of the Waikiki --

15   and I have to commend him, certainly excellent attorney

16   -- are counteracted by the expressed agreement in a

17   contract that was entered into -- I assume between two

18   very sophisticated business people, with the help of, I

19   assume, excellent attorneys on both sides -- with I'm

20   sure a very careful deliberation as to the terms of

21   this contract, that this contract was entered into

22   where expressed provisions were made that Waikiki would

23   not, would not invoke the issue of agency relationship

24   at any time in any argument if they tried to displace

25   Marriott.  The agency issue was removed by contractual

26   agreement between the parties.

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

| | |
|---|---|
| 1 | Proceedings |
| 2 | Third, another point is, is third, the parties |
| 3 | had entered into a very specific mechanism on how to |
| 4 | terminate this agreement.  And the most important part |
| 5 | of this specific outline about how to terminate this |
| 6 | agreement was the statement made in the contract that |
| 7 | the two parties freely entered into, that the only way |
| 8 | that you could terminate this agreement was to come to |
| 9 | Court and get judiciously determined by a Court in New |
| 10 | York State as to whether or not the agreement should be |
| 11 | terminated. |
| 12 | The fact that -- which, in fact, Waikiki began |
| 13 | doing, by bringing the complaint and summoning Marriott |
| 14 | to this courthouse. |
| 15 | But, instead of allowing a judge to |
| 16 | judiciously determine whether or not the agreement |
| 17 | should be terminated or not, Waikiki then went forward |
| 18 | and took it upon themselves to achieve the final remedy |
| 19 | by, by self-helping themselves and throwing Marriott |
| 20 | out.  That was a direct contradiction of the mechanism |
| 21 | that was set up between the parties as to the ways of |
| 22 | going about to terminate this agreement. |
| 23 | Indeed, because of the way the contract is |
| 24 | written, the Court finds that the -- that first place, |
| 25 | the balance of the equities go in favor of the |
| 26 | Marriott; that the possibility of ultimate success also |

1                           Proceedings

2         weigh heavily in terms of Marriott -- although, of

3         course I have not heard the final case in this matter

4         -- but the possibility that the statements made in the

5         contract might, indeed, go to Marriott's argument that,

6         indeed, they have protection under the contract to such

7         a way that they cannot be disturbed by just unilateral

8         actions.

9                 Mr. Renard's argument that the agency

10        relationship overrides anything to do with the

11        contract, I think is clearly answered in language in

12        the contract, in which both parties agreed, where it

13        said, says at 11.03 at page 44 of the contract:

14                "Neither this agreement nor any agreements,

15        instruments, documents, or transactions contemplated

16        hereby, shall in any respect be interpreted, deemed or

17        construed as making manager a partner, joint venturer

18        with, or agent of, the owner."

19                "Owner and manager agree that neither party

20        will make any contrary assertions, claim or

21        counterclaim in any action, suit, expert resolution

22        pursuant to Section 11.20, arbitration or any other

23        legal proceeding involving the owner and the manager."

24                That forbids the agency argument.

25                Now, Mr. Renard goes on to tell me, well, but

26        that doesn't matter.  That doesn't matter, because it's

1                                    Proceedings

2          still an agency relationship; but I believe that,

3          indeed, you can, if you so wish, contract away any

4          agency relationship in a valid contract.

5                  And so, therefore, the arguments made by

6          Waikiki is a direct contradiction of the argument

7          that -- of the agreement that was freely and openly

8          entered into by the parties in the contract, in the

9          agreement that set forth their relationship.

10                 The Court, also, finds that there were

11         other -- I don't think I have to reach each and

12         everything -- but, also, wants to point out that the

13         issue about the remedies of 9.02 of the contract, it's

14         remedy is 9.02(A)(iii), it says that in order to

15         terminate this agreement, the Court -- the parties have

16         to come to Court and get a judicial resolution.

17                 Which is, as I stated just a few seconds ago,

18         indeed, Waikiki LLC has begun that process.  But

19         instead of waiting or even coming to Court saying

20         there's an emergency, Judge, there's an emergency that

21         we need to have this issue resolved immediately;

22         instead of doing that by appropriate means, which would

23         have been by order to show cause, they just went in at

24         two o'clock on Sunday morning to, indeed, self-help

25         themselves to the final resolution.

26                 And, as such, not only are they in breach of

| | |
|---|---|
| 1 | Proceedings |
| 2 | the agreement and in breach of their specific statement |
| 3 | that their disagreements will be resolved by a judicial |
| 4 | court, their actions have caused, as I stated a second |
| 5 | ago, irreparable harm to the defendants, Marriott Hotel |
| 6 | Services, Inc., I.S. International LLC, and Mr. |
| 7 | Schrager, himself, Ian Schrager. |
| 8 | And so, therefore, the Court is going to grant |
| 9 | for the reasons already stated a temporary restraining |
| 10 | order; and I'm going to order that, indeed, as part of |
| 11 | this temporary restraining order that the Marriott be |
| 12 | restored to the hotel as its manager with full duties |
| 13 | and full -- the panoply of everything that is stated in |
| 14 | the agreement until a preliminary injunction hearing is |
| 15 | held and a final resolution of this matter is |
| 16 | determined.  Because the Court is not ruling on the |
| 17 | ultimate merits, but the Court is ruling on the order |
| 18 | to show cause for a TRO. |
| 19 | And in terms of the preliminary injunction |
| 20 | hearing, we can be off the record right now. |
| 21 | (Whereupon, a discussion was then held off the |
| 22 | record.) |
| 23 | THE COURT:  Let me ask you a question.  In |
| 24 | terms of your estimate amount of time you're going to |
| 25 | need to present your various arguments in the |
| 26 | preliminary injunction hearing, what is your estimate? |

1                          Proceedings

2        Do you think can you get it done in a day, or do you

3        think you have too many witnesses for a day?  Do you

4        need two days?  What is your estimate?

5                MR. RENARD:  Your Honor, if the Court would

6        indulge us, it's probably a question we could answer

7        today, but I'm not sure right now.  It depends, for

8        instance, if you'd be interested in live witnesses or

9        you just want testimony by affidavit; but I wouldn't

10       mind conferring with clients and co-counsel.

11               THE COURT:  All right, so let's give it a day.

12       All right, let's give it Wednesday, so that we would

13       just delay it one day, the beginning of the Harch trial

14       and that means it's going to go -- who knows.  That

15       trial is taking up ten days of my life, but we'll put

16       it over one day.

17               I'd like you to meet and confer about exactly

18       who you're going to be -- how you're going to be

19       presenting it.

20               MR. RENARD:  Your Honor, we'll do that at the

21       appropriate time.  I just have some questions about the

22       form of the order that the Marriott has presented.

23               First of all, your Honor, as the Court well

24       knows, any injunction, including the TRO, has the

25       possibility of contempt of court for its violation even

26       if it's an inadvertent violation.  And, your Honor, a

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

|   |   |
|---|---|
| 1 | Proceedings |
| 2 | couple of things about that. |
| 3 | Number one, as you well know, because we've |
| 4 | described it to you, we have another company in there |
| 5 | presently executing contracts, new vendor |
| 6 | relationships, employees, signage, computer systems, |
| 7 | all of that.  Is there a timeframe that we can put |
| 8 | on -- |
| 9 | THE COURT:  Yes, the same timeframe that you |
| 10 | gave Marriott.  Since we're going to think about it as |
| 11 | eight hours ahead of us, we've got right now we're |
| 12 | practically at eight o'clock at night.  So I tell you |
| 13 | what, since two o'clock in the morning there was that |
| 14 | transfer, you have till two o'clock Thursday morning, |
| 15 | right? |
| 16 | MR. HANDZO:  Your Honor, it goes the other |
| 17 | way. |
| 18 | MR. DeSANCTIS:  It's five o'clock in the |
| 19 | morning there. |
| 20 | THE COURT:  All right, so we're already |
| 21 | three o'clock on Wednesday morning, am I correct? |
| 22 | MR. WEINER:  Three a.m.. |
| 23 | MR. DeSANCTIS:  They're six hours behind us. |
| 24 | It's 5:20 a.m.. |
| 25 | THE COURT:  It's 5:20 a.m. right now in |
| 26 | Waikiki. |

```
 1                         Proceedings

 2              MR. FISCHER:  Sunrise.

 3              MR. RENARD:  So, your Honor, by five in the

 4    morning Thursday morning?

 5              THE COURT:  No, I really don't -- I really

 6    want it to be quicker than that.  I really honestly

 7    want the transfer back, to be done in what I would

 8    consider to be reasonable in six hours.  Because why

 9    I'm saying something so quick is that, indeed, that is

10    exactly what happened in the Marriott; and since now

11    I've learned that transfers are easily done by just

12    transferring the security personnel and stepping into

13    the major desks that they have at the hotel, the

14    signage should come down and the Marriott signage I

15    hope hasn't been destroyed can go up and we can get

16    going with this TRO right away.

17              MR. RENARD:  Your Honor, second point.  And

18    there's a reference in the paragraph to we must undo

19    the harm and damage that resulted from owner's

20    purported ouster of Marriott.

21              I don't think, your Honor, that that would

22    meet muster in terms of a definitive obligation.  That

23    could amount to so much satellite litigation and

24    disputes back and forth.  I'm not sure it's needed.

25              MR. HANDZO:  Your Honor, may I just address

26    this, because I think Mr. Renard is not reading that
```

```
1                          Proceedings
2      correctly or it's not the way we intended it.
3            What we meant is they should not interfere
4      with Marriott's attempts to undo the damage.  We're not
5      asking them to do something affirmatively.  We're just
6      asking them to stay out of the way.
7            MR. RENARD:  I'm not sure what that means when
8      you're talking about someone who's operating in our
9      hotel.  It is so vague, is my point, what's there --
10           THE COURT:  No, what's going to happen is
11     Marriott is going to go back into the hotel and, also,
12     is asking for Marriott's ability to undo the harm and
13     damage that resulted from the owner's purported ouster
14     of Marriott.
15           So, I would think that that would mean another
16     press release going out the same way as Waikiki put out
17     a press release saying that we have put in new people
18     there.  We ousted Marriott for good reason.  Marriott
19     upon their return to the hotel, will probably put out a
20     press release equal to that.
21           I would make sure that it's equal, not more;
22     and I, also, would make sure that the, that the
23     relationships with the press, particularly in the
24     internal press.  We're not talking the New York Times.
25     We're talking the hotel management press situation.
26     That's what I'm talking about.  Whatever belongs there,
```

1                              Proceedings

2          et cetera, et cetera.

3                    I would wish that, indeed, accusations don't

4          go forth.  I would wish it to be very kind of like

5          neutral in that sense, because we don't know the final

6          outcome of this.

7                    So, it's just, it's really a statement that

8          Marriott is reinstated as Waikiki's manager pursuant to

9          the agreement.  And that really in the grand or extent

10         of things could be what it should be.

11                   MR. RENARD:  Your Honor, third point, if I

12         may.  Because we have a reinstatement by a TRO, and

13         this raises the problem I mentioned earlier.  That

14         makes them the manager until there's some court order

15         saying they're not the manager.

16                   THE COURT:  As it says in the agreement.

17                   MR. RENARD:  I understand, your Honor.  I'm

18         not -- all I'm saying is that I'm not sure what is to

19         be accomplished at a preliminary injunction stage,

20         because it seems then incumbent upon us -- I know I'm

21         talking out loud -- to come to the Court with some

22         motion saying throwing them off, because essentially

23         they have changed the status quo.  They're back in, and

24         it's not then as if losing at a preliminary injunction

25         stage necessarily means they're out.

26                   And my problem with that is -- you've heard

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1          Proceedings

2      the argument, I think it's final relief; but

3      respectfully, apart from that, I think we need a bond

4      or undertaking here, your Honor, because 6313 of the

5      CPLR provides for potential of a bond and certainly --

6              THE COURT:  Let me just say this.

7              If you agree that this particular argument

8      that we've had now for a series of hours and my

9      decision to grant the TRO; if you agree that, indeed,

10     this TRO will be in the same nature as a preliminary

11     injunction and that we will not go to a preliminary

12     injunction hearing, but rather that this will remain in

13     full force until it is properly litigated -- I'll grant

14     you, I will do my best to make this an expedited

15     undertaking on the part of the Court -- then, you're

16     entitled to a bond.  Because then, they will remain --

17     they being Marriott, the defendants -- will remain at

18     the place, at the hotel until there is a new

19     determination by the Court one way or the other.

20             And, so, if that is a preliminary injunction,

21     then we don't need to go to a hearing and, indeed, then

22     you're entitled to a bond because you may have been

23     hurt, and the bond has to be commensurate with that.  I

24     have to think about that for a second or two, but I'll

25     hear people on the bond.

26             First place, would you be agreeable that this

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                         Proceedings

2        is transformed into a preliminary injunction?

3                  MR. HANDZO:  I believe so, your Honor.  I'm

4        just trying to think on my feet, something I don't

5        always do very well; but, yes.  I mean, if we want to

6        do this as a preliminary injunction and do it

7        expedited, we will do that as quickly as we can.

8                  On the bond, let me just say that I don't

9        think a bond should be required because, essentially,

10       we're -- now, we're just getting back to where we

11       should have been, where we were Sunday morning.

12                 I mean, we're now in a position where they're

13       saying we have to post a bond because they did

14       something they shouldn't have done.  It doesn't really

15       make a lot of sense to require us to post a bond under

16       those circumstances, and I think it's safe to say that

17       Marriott is good for whatever damages could be assessed

18       in this case.

19                 MR. RENARD:  Your Honor, if it's a preliminary

20       injunction, certainly an undertaking is required; and

21       we can argue the merits, but the standard there is

22       enough to cover the potential damages if in fact it's

23       ultimately determined that the TRO or if we convert to

24       a preliminary injunction should not have been granted.

25       I mean, that's the standard, and those damages are

26       considerable; but if we can do this, your Honor,

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                              Proceedings

2          perhaps this, too, is something we can inform the Court

3          very quickly, whether we have an agreement to convert

4          this to a preliminary injunction.

5                    THE COURT:  Right.  Otherwise, we're still

6          under the TRO.

7                    MR. WEINER:  I think, as your Honor knows, the

8          bonds typically set by this Court are not set at a very

9          high amount, unless there is an actual showing of what

10         the damage is.  And I've reviewed the affidavits and

11         they have not made an actual showing of any real

12         immediate economic injury; and I think in order for you

13         to give a high bond, you would have to have that

14         information before you.

15                   MR. RENARD:  Well, we have Mr. --

16                   MR. WEINER:   The affidavit you submit simply

17         says they spent a lot of money on the property.

18         Doesn't say operating losses, those losses being

19         incurred by Marriott.  There has to be some real

20         showing of out-of-pocket, actual out-of-pocket loss

21         that will occur as a result from the injunction.

22                   MR. RENARD:  Marriott is not making our debt

23         service, your Honor.  We've been declared in default

24         just this past week.

25                   THE COURT:  Wait one second.  I am not going

26         to get into that, and you're not going to have a bond

                          BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

|   |   |
|---|---|
| 1 | Proceedings |
| 2 | equal to debt services.  The only kind of bond that you |
| 3 | could possibly ask this Court for is the kind of bond |
| 4 | that if, indeed, there was -- and I think, I think |
| 5 | that, indeed, it's well pointed out -- that in this |
| 6 | case, all we're doing is restoring the status quo ante |
| 7 | from really what was illegal actions done by your |
| 8 | client. |
| 9 | And, so, therefore, whether or not this |
| 10 | actually has the same quality as having the need to |
| 11 | have a bond, I'm not so sure.  And if I, indeed, I do |
| 12 | go with the CPLR and grant a bond, it's going to be |
| 13 | something much more reasonable, because the issue is |
| 14 | not the ultimate damages.  That we're going to have to |
| 15 | litigate.  But, rather, that during this interim period |
| 16 | that, indeed, the Marriott is restored as the manager |
| 17 | pursuant to the contract. |
| 18 | So, with that, and maybe that's something you |
| 19 | could meet and confer on.  I think that this should be |
| 20 | transferred into a preliminary injunction.  I think |
| 21 | that you should have a bond, but you can give me |
| 22 | respective letters I think the bond should be |
| 23 | $5 million, or I think the bond should be $20, and I'll |
| 24 | take it under consideration. |
| 25 | All right, I can have letters from everyone. |
| 26 | MR. RENARD:  So, your Honor, we will let the |

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

```
 1                        Proceedings

 2         Court know later today, certainly, whether we're in

 3         agreement and we'll confer.  If we are, we'll confer

 4         with Mr. Handzo; and if we have an agreement, we can

 5         then present that to your Honor.

 6                    THE COURT:  Good.

 7                    MR. HANDZO:  Your Honor, may I just hand up an

 8         order to the Court?  It's a little different than the

 9         one we filed with our papers.  That's been presented to

10         Mr. Renard.  And if I can hand it up, and I can point

11         out where the one change that was made.  There was one

12         paragraph added, Paragraph 3, on page 2.

13                    (Handed up to the Court.)

14                    THE COURT:  First place, have you seen this?

15                    MR. RENARD:  Mr. Handzo did hand it to me,

16         your Honor, before the hearing today.

17                    THE COURT:  Which one am I looking at?

18                    MR. HANDZO:  It should be the same, your

19         Honor.  There's two copies of the same thing.

20                    THE COURT:  Paragraph 3?

21                    MR. HANDZO:  On page 2, you'll see a

22         Subparagraph 3.

23                    THE COURT:  Right.

24                    MR. HANDZO:  And that is what we added,

25         addressing --

26                    THE COURT:  The potential theft of property.
```

```
 1                          Proceedings
 2              MR. HANDZO:  Right.
 3              THE COURT:  I do not see a problem with that,
 4        sir.
 5              I think that that actually is one of the
 6        reasons that the TRO is being granted, and that is of
 7        all the potential harm done to the Marriott, in
 8        addition to name and recognition and reputation, is the
 9        issue of the proprietary confidential information that
10        was on the property when it was so abruptly taken over
11        by your new managing agent.
12              So, with that, I think that I have to grant
13        that.
14              MR. RENARD:  Your Honor, can we also have --
15        I'm not sure how we resolved it in terms of the time to
16        make sure we don't have a dispute in terms of the
17        actual transition in order to comply with all this.
18        Can we have that delineated within the order?
19              THE COURT:  I think it can be delineated.  I
20        think that's a good thing.  I think we can add another
21        paragraph.
22              Let me just -- and I suggest you may want to
23        confer on this, another paragraph saying something
24        along the lines of the Marriott will return to its
25        managing capacity on or about whatever time and date,
26        which you'll calculate, because don't ask me to.
```

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                        Proceedings

2              I may get it a couple years wrong.  I'm not

3        very good at these things.

4              So, anyway, I suggest you do add that.  So I'm

5        going to give it back to you.

6              (Handed back)

7              MR. WEINER:  Your Honor, I think that simply

8        would be 2:30 p.m. Hawaii time using the difference in

9        times.  Six hours from now, well, three o'clock, but --

10             THE COURT:  Okay, 3:30.

11             MR. WEINER:  3:30.

12             THE COURT:  That would be sort of a good time,

13       because I understand all good hotel transitions should

14       happen around two o'clock in the morning.

15             MR. WEINER:  That would be in the afternoon.

16             MR. RENARD:  He said p.m. so maybe people are

17       at the beach at that time.  I'm not sure.

18             MR. WEINER:  They won't be in the hotel, so.

19             THE COURT:  If it's done appropriately, there

20       will be no knowledge of any guests that anything has

21       happened, and I'm sure it will be done appropriately.

22             MR. RENARD:  Your Honor, if we do decide to

23       agree to convert this to a preliminary injunction,

24       we'll need then to address the bond at some point.

25             THE COURT:  Yes, what you'll do is you'll put

26       down the language in an agreed-upon order.  You'll

                    BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

1                         Proceedings

2        leave blank, and then let me have it in writing, your

3        views of what it should be; and, remember, reasonable,

4        you know, is a good idea, and then I'll have his views

5        and I will make a decision.

6                MR. HANDZO:  Your Honor, if I may hand this

7        up.  We've agreed on the language to be delineated.

8                THE COURT:  All right.

9                (Handed up to the Court.)

10                MR. RENARD:  Just so I play my role

11        appropriately, that's agreed to in form, but not in

12        substance, I think they say.

13                THE COURT:  Well, service I think is not

14        needed because it's already handed in court.  Okay?

15                MR. RENARD:  Yes.

16                MR. HANDZO:  Yes.

17                THE COURT:  So that's taken care of.

18                All right, I have -- I'm putting down

19        September 7, 9:30 in the morning.  That will be for the

20        preliminary injunction hearing, unless we can come to

21        the other resolution that we talked about because I do

22        think that that's a better resolution.

23                Now, my question is, I do think I have

24        everybody's papers in hand already.  I don't think I

25        need anything new for a preliminary injunction hearing,

26        but do you think that you want --

| 1 | Proceedings |

2    MR. RENARD:  Your Honor, we'll certainly -- I

3 mean, it was a middle of the night to get that brief

4 done, which isn't nearly a full explanation of our

5 position; and the affidavits, as well, it's what we

6 could get together in the time we had.  So we

7 definitely would like an opportunity to say by Monday,

8 to put in --

9    THE COURT:  Well, Monday is a holiday.  I

10 realize that you're not going to be involved in

11 holidays; but, nevertheless, I do think if we get it by

12 the 6th, I'll have a chance to read it.  But, please,

13 get it to me no later than one o'clock on the 6th or

14 actually 12:30 that way I can begin reading it over

15 lunch.

16    So, again, if that's true, if you can give, in

17 a sense, rolling copies so that they know what you're

18 doing, maybe a preliminary preliminary, and that way if

19 you want to do a reply, you can do so.

20    MR. HANDZO:  Yes, I was just going to suggest

21 that that may be one of the things that Mr. Renard and

22 I should just confer about and come up with a schedule

23 for both sides to commit anything extra that they want

24 to submit.

25    THE COURT:  Right.

26    MR. WEINER:  Your Honor, I think defendants

1            Proceedings

2    may want to put a supplemental brief in because they

3    raised new authorities in their brief.

4            THE COURT:  Well, that's what I mean, about --

5    it's going to be a very expedited event, all right.

6    And I think it's only right that if I do a preliminary

7    injunction hearing, I do it an expedited manner because

8    I think that we'll hear a lot of what we already did.

9    But, nevertheless, it may be new issues that I have to

10   consider, and I don't want to in any way prohibit a

11   proper briefing.

12            So, if you tell me there's another way of

13   handling it and that is, that if you tell me I don't

14   want to do it on the 7th, but we'd like to do it in a

15   couple weeks from now, you know, et cetera, I am

16   occupied -- if I start this trial, I'm occupied all of

17   that week and all of the following week.  It's supposed

18   to end on that Friday, September 16th.

19            I know I'm not in court, I'm at conference on

20   the 19th, 20th and 21st.

21            So, now you're facing that kind of deadline.

22   I won't interrupt the trial once I start it.  I'll put

23   over the beginning of the trial; but, otherwise, I have

24   to go beyond it.  So all of that should be a part of

25   your consideration.

26            Signed and sealed.  All right, I want to thank

1                          Proceedings

2        you, again, for certainly very interesting arguments.

3                    MR. HANDZO:  Thank you, your Honor.

4                    MR. RENARD:  Thank you.

5                         -  -  -  -

6                         CERTIFIED TO BE A TRUE
                          AND CORRECT TRANSCRIPT
7

8

9                         _____
                          BONNIE PICCIRILLO
10                        OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                   BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

| $ | | |
|---|---|---|
| **$20** [1] - 98:23 | | |
| **$800,000** [2] - 48:14, 48:18 | | |

**1**

**1** [1] - 51:11
**10** [2] - 51:15, 76:17
**100-year** [1] - 58:18
**10017-4613** [1] - 47:10
**10022-3908** [1] - 47:3
**10153** [1] - 46:22
**102** [1] - 59:4
**1099** [1] - 47:6
**11.03** [3] - 77:18, 77:25, 87:13
**11.20** [1] - 87:22
**12:30** [1] - 103:14
**12th** [1] - 62:13
**13** [1] - 60:21
**16th** [1] - 104:18
**1717** [1] - 46:25
**1948** [1] - 63:15
**1950** [1] - 59:20
**1954** [2] - 62:7, 62:14
**198** [1] - 59:21
**19th** [1] - 104:20

**2**

**2** [3] - 52:14, 99:12, 99:21
**2.03** [1] - 76:26
**20** [1] - 62:13
**20001** [1] - 47:7
**2007** [1] - 59:5
**2010** [1] - 60:21
**2011** [1] - 46:16
**20th** [1] - 104:20
**215** [1] - 50:10
**21st** [1] - 104:20
**23rd1954** [1] - 62:14
**27th** [1] - 47:3
**2:30** [1] - 101:8

**3**

**3** [5] - 46:2, 52:14, 99:12, 99:20, 99:22
**30-year** [1] - 58:17
**307** [1] - 62:13
**31** [1] - 46:16
**340** [1] - 47:10
**38** [2] - 76:14, 76:15
**3:30** [2] - 101:10, 101:11

**4**

**43** [2] - 77:18, 77:25

**44** [4] - 59:4, 77:18, 77:25, 87:13
**4800** [1] - 46:24

**5**

**5** [1] - 98:23
**5:20** [1] - 91:24, 91:25

**6**

**6** [1] - 51:11
**60** [1] - 46:15
**6301** [3] - 55:25, 56:5, 72:8
**6313** [1] - 95:4
**651457/11** [1] - 46:6
**6th** [2] - 103:12, 103:13

**7**

**7** [2] - 51:14, 102:19
**70-year** [1] - 58:18
**75201** [1] - 46:25
**767** [1] - 46:22
**7th** [2] - 63:10, 104:14

**9**

**9** [1] - 76:17
**9.02** [2] - 76:10, 88:13
**9.02(A)(iii)** [1] - 88:14
**9.03** [1] - 76:12
**900** [1] - 47:6
**919** [1] - 47:3
**92nd** [2] - 60:21, 79:10
**95** [1] - 59:4
**9:30** [1] - 102:19

**A**

**A.D.3d** [1] - 59:4
**a.m** [1] - 91:25
**a.m.** [2] - 91:22, 91:24
**abhorrent** [1] - 71:2
**ability** [2] - 79:22, 93:12
**able** [4] - 48:10, 55:11, 66:2, 66:6
**abruptly** [1] - 100:10
**absolutely** [1] - 50:19
**accelerated** [1] - 49:20
**access** [1] - 85:6
**accomplished** [1] - 94:19
**accordance** [2] - 56:8, 67:2
**accusations** [1] - 94:3
**achieve** [1] - 86:18
**acknowledge** [2] - 65:26, 66:5
**acknowledged** [2] - 65:25, 66:18

**act** [1] - 50:3
**acted** [1] - 79:18
**action** [8] - 49:3, 52:4, 52:23, 53:2, 65:12, 71:5, 80:24, 87:21
**actions** [11] - 56:18, 71:18, 79:5, 79:19, 79:21, 84:18, 85:11, 87:8, 89:4, 98:7
**actual** [4] - 47:9, 97:11, 97:20, 100:17
**add** [4] - 56:4, 82:14, 100:20, 101:4
**added** [2] - 99:12, 99:24
**addition** [1] - 100:8
**address** [6] - 68:19, 70:9, 75:10, 79:17, 92:25, 101:24
**addressed** [2] - 74:17, 75:7
**addresses** [1] - 75:4
**addressing** [1] - 99:25
**adjudicated** [1] - 59:15
**affidavit** [5] - 71:8, 72:11, 72:22, 90:9, 97:16
**affidavits** [4] - 56:24, 68:10, 97:10, 103:5
**affirmatively** [1] - 93:5
**afternoon** [1] - 101:15
**agency** [43] - 48:23, 49:14, 50:2, 50:6, 51:6, 51:13, 51:20, 51:24, 53:3, 55:7, 57:23, 57:26, 59:7, 59:25, 61:6, 61:8, 61:13, 61:19, 61:20, 61:25, 64:22, 65:7, 65:19, 65:20, 67:3, 69:19, 75:2, 75:4, 75:16, 75:17, 75:20, 78:17, 78:23, 78:26, 79:6, 81:22, 85:13, 85:23, 85:25, 87:9, 87:24, 88:2, 88:4
**agent** [28] - 49:15, 50:8, 58:17, 58:19, 58:23, 59:8, 59:26, 63:5, 65:5, 65:22, 66:15, 73:17, 73:19, 73:26, 74:2, 77:14, 78:7, 78:16, 79:4, 79:23, 81:26, 82:10, 82:11, 87:18, 100:11
**agent's** [4] - 49:9, 59:18, 65:3, 66:11, 66:20, 68:19
**ago** [4] - 81:4, 81:21, 88:17, 89:5
**agree** [8] - 48:11, 49:20, 49:21, 62:9, 87:19, 95:7, 95:9, 101:23
**agreeable** [1] - 95:26
**agreed** [7] - 64:11, 78:7, 78:8, 87:12, 101:26, 102:7, 102:11
**agreed-upon** [1] - 101:26
**agreement** [29] - 49:2, 51:5, 52:24, 63:10, 63:12, 63:14, 64:2, 66:5, 74:6, 78:6, 85:16, 85:26, 86:4, 86:6, 86:8, 86:10, 86:16, 86:22, 87:14, 88:7, 88:9, 88:15, 89:2,

**89**:14, 94:9, 94:16, 97:3, 99:3, 99:4
**Agreement** [5] - 51:16, 53:10, 53:15, 56:8, 83:4
**agreements** [2] - 68:26, 87:14
**ahead** [1] - 91:11
**airtight** [1] - 58:18
**Alan** [1] - 59:3
**ALEXANDER** [1] - 46:23
**allow** [2] - 54:15, 55:6
**allowed** [2] - 49:2, 86:15
**allowing** [2] - 65:11, 85:5
**allows** [1] - 67:21
**alone** [1] - 67:21
**amount** [7] - 54:11, 63:7, 64:11, 78:19, 89:24, 92:23, 97:9
**ANAND** [1] - 46:24
**AND** [1] - 105:6
**answer** [2] - 52:18, 90:6
**answered** [1] - 87:16
**ante** [1] - 98:6
**anyway** [1] - 101:4
**apart** [5] - 55:3, 68:18, 78:17, 78:22, 95:3
**apologize** [1] - 71:17
**appalls** [1] - 57:20
**appeal** [1] - 60:24
**Appeals** [4] - 49:13, 58:14, 60:4, 62:6
**appear** [3] - 52:13, 61:6
**APPEARANCES** [1] - 46:20
**apply** [1] - 61:12
**appreciate** [1] - 70:11
**appropriate** [3] - 79:18, 88:22, 90:21
**appropriately** [4] - 55:15, 101:19, 101:21, 102:11
**April** [1] - 62:14
**Aqua** [10] - 56:11, 56:12, 56:14, 73:5, 73:9, 73:13, 73:16, 73:25, 74:4, 74:6
**arbitration** [1] - 87:22
**argue** [2] - 81:21, 96:21
**argued** [3] - 61:8, 62:13, 79:9
**arguing** [1] - 80:4
**argument** [18] - 52:20, 56:17, 57:3, 61:6, 75:4, 75:13, 78:9, 79:8, 80:11, 81:26, 85:13, 85:24, 87:5, 87:9, 87:24, 88:6, 95:2, 95:7
**arguments** [5] - 71:6, 72:3, 88:5, 89:25, 105:2
**arises** [1] - 65:24
**arising** [2] - 64:20, 64:21
**articulate** [1] - 65:14
**articulated** [2] - 66:8, 84:8
**aside** [1] - 69:19
**assertions** [1] - 87:20
**assessed** [1] - 96:17

assigned [1] - 52:12
Associates [2] - 59:3, 60:21
assume [3] - 52:19, 85:17, 85:19
assumes [1] - 75:14
assuming [1] - 75:19
attempt [1] - 84:20
attempting [1] - 68:13
attempts [1] - 93:4
attorney [1] - 85:15
Attorneys [3] - 46:21, 47:2, 47:9
attorneys [1] - 85:19
August [1] - 46:16
authorities [1] - 104:3
authority [4] - 49:9, 54:19, 55:16, 59:18, 65:3, 66:11, 68:19, 70:22
avail [1] - 69:8
availability [1] - 67:18
Avenue [4] - 46:22, 47:3, 47:6, 47:10
avoid [1] - 59:9
aware [1] - 83:5

**B**

backwards [1] - 80:26
balance [2] - 84:17, 86:25
balancing [1] - 84:11
Bank [1] - 46:24
Barbara [1] - 60:17
based [4] - 56:22, 69:18, 78:17
basis [3] - 53:17, 54:2, 77:2, 82:11
BE [1] - 105:6
beach [1] - 101:17
bear [1] - 75:26
BEFORE [1] - 46:18
began [1] - 86:12
begin [4] - 58:6, 62:23, 75:20, 103:14
beginning [2] - 90:13, 104:23
begun [1] - 88:18
behalf [4] - 50:3, 65:20, 70:15, 85:14
behind [2] - 69:7, 91:23
belabor [1] - 68:20
belief [1] - 71:19
believes [2] - 84:15, 84:17
belongs [1] - 93:26
bench [2] - 62:16, 62:18
best [2] - 82:5, 95:14
better [2] - 54:9, 102:22
between [6] - 64:20, 66:10, 79:3, 85:17, 85:26, 86:21
beyond [2] - 77:10, 104:24
BICKEL [1] - 46:21
big [3] - 54:8, 58:2

bind [1] - 51:17
binding [2] - 58:19, 61:26
binds [1] - 78:12
bit [1] - 62:10
blank [1] - 102:2
BLOCK [1] - 47:2
boggling [1] - 69:12
bond [20] - 95:3, 95:5, 95:16, 95:22, 95:23, 95:25, 96:8, 96:9, 96:13, 96:15, 97:13, 97:26, 98:2, 98:3, 98:11, 98:12, 98:21, 98:22, 98:23, 101:24
bonds [1] - 97:8
Bonnie [1] - 47:22
BONNIE [1] - 105:9
book [1] - 81:6
bottom [1] - 76:15
brand [2] - 72:14, 72:17
BRANSTEN [1] - 46:18
breach [3] - 49:15, 49:16, 52:24, 53:9, 53:10, 53:11, 58:22, 65:5, 65:25, 88:26, 89:2
break [1] - 83:7
BREWER [1] - 46:21
BRIAN [1] - 47:4
brief [14] - 49:7, 49:8, 49:25, 51:10, 54:17, 58:9, 58:11, 61:17, 68:20, 75:6, 76:17, 103:3, 104:2, 104:3
briefing [1] - 104:11
bring [2] - 49:21, 69:15
bringing [2] - 50:10, 86:13
broken [1] - 81:17
brought [1] - 61:7
building [3] - 63:5, 63:22, 63:26, 64:4, 65:18, 65:20, 65:22, 69:18
burden [1] - 80:25
business [5] - 50:23, 51:19, 68:5, 68:23, 85:18
buy [1] - 82:5
BY [3] - 46:23, 47:4, 47:11

**C**

calculate [1] - 100:26
California [1] - 82:9
cancel [1] - 56:11
cannot [2] - 76:6, 87:7
capacity [1] - 100:25
capital [1] - 74:23
care [1] - 102:17
careful [1] - 85:20
case [35] - 49:12, 55:9, 55:10, 57:11, 59:5, 59:21, 60:4, 60:18, 60:21, 61:2, 61:12, 61:15, 61:21, 61:24, 62:2, 62:5, 62:6, 62:9, 64:26, 65:13, 65:16, 66:2, 66:13, 73:2, 75:19, 78:14, 79:12,

79:26, 82:8, 82:9, 82:12, 87:3, 96:18, 98:6
cases [6] - 59:12, 59:13, 59:16, 60:15, 75:15, 82:7
category [1] - 56:19
Catherine [1] - 72:21
caused [4] - 55:12, 84:21, 84:22, 89:4
causes [1] - 52:23
ceased [1] - 50:7
Center [1] - 46:24
Centre [1] - 46:15
certain [3] - 77:9, 79:19, 81:25
certainly [15] - 48:15, 48:21, 49:20, 49:21, 54:2, 70:14, 70:24, 71:15, 71:18, 85:15, 95:5, 96:20, 99:2, 103:2, 105:2
CERTIFIED [1] - 105:6
cetera [3] - 53:23, 94:2, 104:15
Chair [1] - 62:18
chance [2] - 80:7, 103:12
change [3] - 56:13, 99:11
changed [4] - 50:9, 57:5, 68:5, 94:23
changes [1] - 56:10
charge [1] - 85:4
circumstances [1] - 96:16
circumventing [1] - 81:17
citations [1] - 59:2
cite [2] - 59:14, 59:20
cited [5] - 59:3, 59:4, 59:21, 62:13, 82:7
cites [1] - 51:15
claim [13] - 49:16, 55:9, 58:22, 59:7, 61:2, 61:4, 66:6, 66:7, 66:16, 66:20, 66:21, 74:25, 87:20
claiming [1] - 73:10
claims [3] - 59:9, 59:10, 76:5
classic [3] - 51:20, 51:22, 65:20
clear [3] - 67:20, 74:19, 77:6
clearly [5] - 49:8, 54:24, 81:19, 84:9, 87:11
client [13] - 53:17, 55:5, 70:15, 71:4, 71:7, 71:19, 74:20, 78:12, 81:11, 82:20, 82:23, 98:8
client's [2] - 56:18, 82:24
clients [4] - 48:9, 48:10, 48:22, 90:10
close [1] - 74:12
club [5] - 54:7, 54:8, 58:2
clubbing [1] - 58:13
clubs [1] - 54:8
co [1] - 90:10
co-counsel [1] - 90:10

collect [1] - 63:24
collections [1] - 63:8
coming [9] - 52:21, 54:22, 69:7, 70:6, 80:24, 81:5, 81:7, 84:18, 88:19
commend [2] - 84:10, 85:15
commensurate [1] - 95:23
Commercial [3] - 52:11, 52:12
commit [2] - 51:18, 103:23
common [3] - 49:5, 49:9, 66:10
common-law [3] - 49:5, 49:9, 66:10
community [1] - 84:26
company [3] - 50:10, 72:16, 91:4
Company [1] - 62:11
compared [1] - 56:3
compensation [3] - 59:10, 63:6, 66:4
competitor [3] - 85:3, 85:4, 85:5
complain [2] - 72:25, 81:3
complained [1] - 72:19
complaint [14] - 52:4, 52:8, 52:15, 52:22, 52:23, 53:4, 56:22, 57:21, 64:8, 69:8, 75:9, 75:10, 86:13
complete [1] - 56:21
completely [2] - 78:11, 80:26
complex [1] - 78:6
comply [1] - 100:7
comprehensive [1] - 78:6
comprehensively [1] - 51:12
computer [3] - 56:13, 81:15, 91:6
computers [3] - 57:6, 81:13, 81:15
concerns [1] - 81:11
conclusion [2] - 64:5, 75:14
condoned [1] - 54:6
confer [6] - 90:17, 98:19, 99:3, 100:23, 103:22
conference [1] - 104:19
conferring [1] - 90:10
confidence [2] - 58:16, 61:5
confidential [1] - 100:9
consequences [1] - 75:17
consequently [1] - 64:13
consider [2] - 92:8, 104:10
considerable [3] - 54:11, 96:26
consideration [4] - 55:8, 57:13, 98:24, 104:25
constitute [1] - 68:26
construed [1] - 87:17

contemplated [1] - 87:15
contemplates [1] - 80:10
contempt [1] - 90:25
contests [1] - 76:6
context [1] - 55:18
continue [3] - 63:14, 63:17, 68:23
Continued [1] - 83:14
contract [58] - 49:15, 49:17, 50:2, 51:23, 51:24, 51:25, 54:24, 57:25, 58:18, 58:22, 61:8, 61:9, 62:22, 62:23, 64:2, 64:21, 64:22, 65:5, 65:9, 65:25, 66:16, 67:3, 71:23, 73:21, 73:22, 74:21, 75:23, 75:25, 76:2, 76:21, 76:26, 77:13, 78:12, 78:15, 78:18, 78:21, 78:25, 79:2, 79:12, 80:10, 81:24, 82:4, 82:9, 85:17, 85:21, 86:6, 86:23, 87:5, 87:6, 87:11, 87:12, 87:13, 88:3, 88:4, 88:8, 88:13, 98:17
contracted [1] - 59:26
contracts [3] - 56:12, 68:21, 91:5
contractual [7] - 49:5, 49:11, 73:8, 73:13, 73:20, 74:5, 85:25
contradiction [3] - 78:11, 86:20, 88:6
contrary [1] - 87:20
control [1] - 48:20, 69:18
controlling [2] - 51:8, 61:20
convert [3] - 96:23, 97:3, 101:23
Conway [2] - 59:20, 62:18
copies [3] - 71:10, 99:19, 103:17
copy [2] - 60:7, 62:2
Corp [1] - 62:12
Corp. [1] - 60:22
CORRECT [1] - 105:6
correct [1] - 91:21
correctly [1] - 93:2
costs [1] - 48:18
counsel [2] - 77:23, 90:10
count [7] - 53:9, 53:10, 53:11, 53:12, 53:16, 54:22
counteracted [1] - 85:16
counterclaim [5] - 55:2, 66:14, 67:10, 71:26, 87:21
Counterclaim [2] - 46:11, 46:14
Counterclaim-Defendant [1] - 46:14
Counterclaim-Plaintiff [1] - 46:11
counterparty [1] - 74:6
country [1] - 58:25
COUNTY [1] - 46:2
couple [5] - 75:24, 76:2,

91:2, 101:2, 104:15
course [4] - 63:11, 67:8, 78:10, 87:3
Court [92] - 47:23, 49:6, 49:12, 49:25, 50:20, 51:10, 52:4, 54:13, 54:22, 55:5, 56:3, 56:25, 57:24, 58:14, 59:21, 60:4, 61:2, 61:7, 61:24, 62:2, 62:4, 62:6, 63:23, 65:11, 65:15, 65:21, 66:18, 66:25, 67:24, 68:3, 69:5, 69:6, 69:9, 69:10, 69:21, 69:24, 69:26, 70:2, 70:4, 70:6, 70:10, 70:15, 70:19, 70:23, 70:25, 71:9, 71:16, 71:17, 72:4, 73:6, 73:9, 73:13, 74:4, 75:6, 75:12, 75:26, 76:7, 78:9, 79:12, 79:26, 80:8, 80:9, 80:24, 81:21, 82:11, 84:12, 84:13, 84:14, 84:15, 84:17, 86:9, 86:24, 88:10, 88:15, 88:16, 88:19, 89:8, 89:16, 89:17, 90:5, 90:23, 94:21, 95:15, 95:19, 97:2, 97:8, 98:3, 99:2, 99:8, 99:13, 102:9
court [14] - 52:3, 52:7, 52:9, 52:11, 53:19, 54:3, 56:20, 64:7, 69:13, 89:4, 90:25, 94:14, 102:14, 104:19
COURT [75] - 46:2, 48:2, 48:6, 48:16, 48:25, 50:12, 50:17, 51:3, 51:22, 51:25, 52:2, 52:17, 53:19, 53:25, 56:16, 57:19, 58:11, 58:26, 59:20, 60:7, 60:10, 60:14, 60:17, 60:20, 62:5, 68:13, 69:2, 70:16, 71:11, 73:16, 73:24, 74:11, 76:9, 76:13, 76:18, 77:16, 77:20, 77:26, 78:3, 78:13, 79:14, 80:15, 82:17, 83:6, 84:5, 89:23, 90:11, 91:9, 91:20, 91:25, 92:5, 93:10, 94:16, 95:6, 97:5, 97:25, 99:6, 99:14, 99:17, 99:20, 99:23, 99:26, 100:3, 100:19, 101:10, 101:12, 101:19, 101:25, 102:8, 102:13, 102:17, 103:9, 103:25, 104:4, 105:9
Court's [6] - 67:17, 69:11, 70:22, 70:26, 71:14, 72:6
courthouse [1] - 86:14
courts [2] - 67:20, 68:25
Courtyard [1] - 60:22
cover [1] - 96:22
covered [1] - 82:21
CPLR [3] - 55:25, 95:5, 98:12
cracked [1] - 81:15
created [2] - 61:11, 64:22
critical [1] - 58:9

current [2] - 56:11, 85:9

D

Dallas [1] - 46:25
damage [7] - 67:4, 72:12, 72:13, 92:19, 93:4, 93:13, 97:10
damages [17] - 55:10, 55:11, 59:7, 62:26, 64:11, 65:9, 66:7, 66:14, 66:17, 66:20, 69:20, 78:19, 96:17, 96:22, 96:25, 98:14
date [1] - 100:25
David [1] - 80:18
DAVID [1] - 47:5
days [4] - 54:7, 63:17, 90:4, 90:15
DC [1] - 47:7
deadline [1] - 104:21
deal [4] - 66:13, 76:4, 76:16, 77:6
dealing [1] - 62:22
dealt [3] - 61:2, 73:26, 74:2
death [1] - 58:3
debated [1] - 75:3
debt [3] - 48:17, 97:22, 98:2
decide [3] - 73:24, 77:7, 101:22
decided [2] - 62:14, 84:12
deciding [1] - 63:25
decision [7] - 55:5, 79:10, 79:14, 80:9, 82:3, 95:9, 102:5
declaration [3] - 53:13, 54:25, 69:16
declared [1] - 97:23
deemed [1] - 87:16
default [6] - 53:14, 54:23, 76:5, 76:6, 76:22, 97:23
defeat [1] - 66:6
defendant [5] - 63:6, 63:21, 64:9, 65:6, 82:16
Defendant [4] - 46:8, 46:14, 47:2, 47:9
defendants [7] - 61:23, 64:3, 84:22, 84:23, 89:5, 95:17, 103:26
defined [2] - 54:24, 72:23
defines [1] - 72:15
definite [1] - 59:26
definitely [1] - 103:7
definitive [1] - 92:22
delay [1] - 90:13
deliberation [1] - 85:20
delineated [3] - 100:18, 100:19, 102:7
denied [2] - 68:3, 68:4
Department [1] - 59:5
derogation [2] - 49:10, 70:21
DeSANCTIS [3] - 47:5,

91:18, 91:23
described [1] - 91:4
desks [1] - 92:13
Desmond [1] - 62:20
despicable [1] - 79:5
despite [1] - 80:4
destroyed [1] - 92:15
determination [2] - 77:9, 95:19
determine [1] - 86:16
determined [4] - 66:2, 86:9, 89:16, 96:23
devices [1] - 81:18
difference [1] - 66:10, 101:8
different [3] - 58:14, 69:25, 99:8
direct [2] - 86:20, 88:6
disagreement [1] - 69:3
disagreements [1] - 89:3
disclaimer [1] - 61:15
disclaimers [1] - 61:20
disclaiming [1] - 61:25
discussion [2] - 75:11, 89:21
discussions [1] - 48:9
disloyalty [2] - 59:8, 59:11
dismiss [6] - 52:15, 66:19, 75:3, 75:8, 75:11, 79:15
dismissing [1] - 64:7
displace [1] - 85:24
displaced [1] - 84:24
dispute [2] - 76:8, 100:16
disputes [1] - 92:24
dissent [2] - 62:17, 62:19, 62:20
distinction [1] - 64:23
distinguish [2] - 54:19, 64:19
disturbed [2] - 85:10, 87:7
Division [2] - 52:11, 52:12
documents [1] - 87:15
done [13] - 54:3, 58:6, 67:8, 71:19, 90:2, 92:7, 92:11, 96:14, 98:7, 100:7, 101:19, 101:21, 103:4
doubt [2] - 49:26, 84:8
down [4] - 69:3, 92:14, 101:26, 102:18
drafted [1] - 78:6
drastically [1] - 50:9
drives [1] - 81:14
due [1] - 74:25
duration [1] - 63:9
during [1] - 98:15
duties [2] - 64:20, 89:12
duty [3] - 53:11, 61:15, 61:26
Dye [1] - 62:19
Dye's [1] - 62:20

## E

**easily** [1] - 92:11
**economic** [1] - 97:12
**ed** [1] - 58:5
**Edition** [2] - 72:14, 72:17
**effect** [2] - 63:15, 70:21
**effective** [2] - 65:23, 66:19
**effectively** [2] - 55:20, 67:19
**eight** [2] - 91:11, 91:12
**EILEEN** [1] - 46:18
**either** [4] - 53:26, 63:16, 63:18, 71:4
**element** [1] - 63:12
**embedded** [1] - 54:13
**emergency** [2] - 88:20
**EMERY** [1] - 47:8
**employees** [4] - 50:11, 50:12, 50:25, 91:6
**encouraging** [3] - 50:22, 50:23, 50:25
**end** [4] - 63:19, 70:23, 70:25, 104:18
**enforced** [1] - 71:24
**enter** [2] - 65:19, 67:24
**entered** [7] - 53:3, 56:12, 85:17, 85:21, 86:3, 86:7, 88:8
**entire** [1] - 78:15
**entitled** [3] - 66:4, 95:16, 95:22
**entitles** [1] - 59:8
**equal** [3] - 93:20, 93:21, 98:2
**equities** [4] - 53:22, 81:19, 85:12, 86:25
**eradicate** [1] - 79:21
**eradicated** [1] - 79:21
**erred** [2] - 62:25, 64:7
**escape** [1] - 70:26
**ESQ** [7] - 46:23, 46:23, 46:24, 47:4, 47:5, 47:5, 47:11
**essentially** [3] - 73:12, 94:22, 96:9
**estimate** [3] - 89:24, 89:26, 90:4
**et** [5] - 53:23, 94:2, 104:15
**event** [3] - 53:13, 54:23, 104:5
**everywhere** [1] - 58:24
**evidence** [1] - 72:3
**exact** [1] - 81:26
**exactly** [9] - 78:11, 79:9, 79:11, 80:17, 81:23, 82:9, 82:12, 90:17, 92:10
**example** [1] - 76:5
**excellent** [3] - 84:6, 85:15, 85:19
**except** [2] - 50:20, 64:10

**exceptions** [1] - 64:26
**exclusive** [2] - 63:4
**executing** [1] - 91:5
**exercise** [5] - 49:10, 55:7, 55:16, 57:10, 71:20
**exercised** [4] - 48:23, 49:23, 50:6, 55:15, 55:20
**exists** [2] - 55:19, 75:16
**expecting** [2] - 81:8, 81:9
**expedited** [4] - 95:14, 96:7, 104:5, 104:7
**expenses** [2] - 48:15, 74:22
**expert** [1] - 87:21
**expertly** [1] - 84:9
**explain** [1] - 63:3
**explanation** [1] - 103:4
**expressed** [2] - 85:16, 85:22
**expressly** [5] - 77:14, 78:7, 78:8, 78:12, 82:2
**extended** [1] - 63:19
**extent** [3] - 59:9, 74:20, 94:9
**extra** [2] - 80:23, 103:23
**extraordinary** [1] - 53:20

## F

**face** [2] - 56:17, 61:3
**facing** [1] - 104:21
**fact** [14] - 49:14, 51:9, 52:10, 54:19, 59:13, 64:10, 66:6, 71:24, 78:21, 79:2, 82:7, 86:12, 96:22
**facts** [4] - 53:9, 56:23, 59:12, 64:26
**factual** [1] - 64:10
**failed** [1] - 64:10
**faith** [2] - 48:22, 71:19
**far** [1] - 52:25
**favor** [5] - 53:23, 81:19, 85:12, 86:25
**feature** [1] - 77:13
**February** [1] - 63:15
**feet** [1] - 96:4
**few** [2] - 64:25, 88:17
**fiduciary** [6] - 53:11, 61:4, 61:11, 61:15, 61:18, 61:26
**Fifth** [1] - 46:22
**file** [2] - 52:7, 75:3
**filed** [4] - 52:3, 54:17, 67:10, 99:9
**filing** [1] - 69:7
**final** [11] - 67:11, 67:19, 68:11, 71:25, 80:5, 86:18, 87:3, 88:25, 89:15, 94:5, 95:2
**financial** [1] - 58:20
**fire** [2] - 56:11, 73:5
**fired** [1] - 50:15
**firm** [2] - 71:4, 71:5
**first** [14] - 53:20, 54:9,

62:21, 63:3, 64:16, 70:6, 74:17, 75:23, 84:5, 84:23, 86:24, 90:23, 95:26, 99:14
**FISCHER** [5] - 47:4, 76:12, 77:18, 77:22, 92:2
**five** [6] - 53:12, 54:22, 63:7, 63:25, 91:18, 92:3
**Floor** [1] - 47:3
**flow** [1] - 75:17
**follow** [1] - 82:13
**following** [2] - 75:17, 104:17
**follows** [1] - 84:12
**forbids** [1] - 87:24
**force** [2] - 63:14, 95:13
**forces** [1] - 56:11
**forgetting** [1] - 68:7
**forgot** [1] - 80:20
**form** [2] - 90:22, 102:11
**forth** [3] - 88:9, 92:24, 94:4
**forward** [2] - 85:14, 86:17
**four** [1] - 53:11
**frankly** [3] - 50:4, 69:12, 79:16
**free** [1] - 59:6
**freely** [2] - 86:7, 88:7
**Friday** [1] - 104:18
**Froessel** [2] - 62:17, 62:19
**Fuld** [1] - 62:18
**fulfilled** [1] - 78:20
**full** [6] - 63:14, 68:9, 89:12, 89:13, 95:13, 103:4
**fully** [1] - 56:7
**fulsome** [1] - 75:11
**fund** [1] - 74:23
**furthermore** [1] - 73:3
**future** [5] - 59:10, 66:4, 69:17, 81:7, 85:8

## G

**Gammerman** [1] - 61:22
**Gee** [1] - 58:4
**general** [1] - 61:4
**generally** [2] - 59:24, 77:24
**given** [7] - 50:3, 55:17, 56:5, 71:24, 72:6, 72:8, 79:11
**GK** [1] - 59:3
**glad** [1] - 50:20
**glossing** [1] - 77:12
**good-faith** [1] - 71:19
**grand** [2] - 52:11, 94:9
**grant** [7] - 62:25, 84:13, 89:8, 95:9, 95:13, 98:12, 100:12
**granted** [4] - 53:26, 64:14, 96:24, 100:6
**grounds** [1] - 53:20
**guest** [1] - 85:9
**guests** [3] - 81:5, 81:7, 101:20

## H

**half** [1] - 53:8
**hand** [5] - 99:7, 99:10, 99:15, 102:6, 102:24
**Handed** [1] - 62:4
**handed** [4] - 99:13, 101:6, 102:9, 102:14
**handing** [1] - 60:15
**handling** [1] - 104:13
**HANDZO** [30] - 47:5, 48:5, 60:12, 60:15, 60:19, 60:25, 74:15, 76:10, 76:14, 76:19, 77:17, 77:23, 78:2, 78:4, 79:8, 79:24, 80:16, 80:19, 91:16, 92:25, 96:3, 99:7, 99:18, 99:21, 99:24, 100:2, 102:6, 102:16, 103:20, 105:3
**Handzo** [4] - 68:15, 74:13, 99:4, 99:15
**happy** [1] - 75:6
**Harch** [1] - 90:13
**hard** [1] - 81:14
**harm** [12] - 53:21, 55:12, 57:5, 67:4, 72:23, 72:25, 84:21, 84:23, 89:5, 92:19, 93:12, 100:7
**harmed** [1] - 84:25
**Hawaii** [1] - 101:8
**hear** [4] - 50:17, 68:15, 95:25, 104:8
**heard** [2] - 87:3, 94:26
**hearing** [15] - 49:19, 49:22, 67:16, 68:9, 72:4, 73:2, 89:14, 89:20, 89:26, 95:12, 95:21, 99:16, 102:20, 102:25, 104:7
**heavily** [1] - 87:2
**held** [4] - 49:13, 68:25, 89:15, 89:21
**help** [12] - 54:4, 54:5, 54:7, 54:11, 54:12, 56:19, 57:4, 58:13, 69:11, 69:22, 85:18, 88:24
**helping** [1] - 86:19
**hereby** [1] - 87:16
**herein** [1] - 63:21
**high** [2] - 97:9, 97:13
**highlight** [1] - 81:10
**himself** [1] - 89:7
**hiring** [1] - 50:10
**hit** [4] - 70:3, 70:5, 70:7, 70:8
**holding** [1] - 65:10
**holiday** [1] - 103:9
**holidays** [1] - 103:11
**honestly** [1] - 92:6
**Honor** [120] - 48:4, 48:5, 48:8, 48:11, 48:13, 48:19, 48:24, 49:4, 49:5, 49:7, 49:12, 49:18, 49:20, 49:23, 49:24, 50:13, 50:19, 51:7,

51:9, 51:10, 51:14, 51:21, 52:16, 53:24, 54:10, 54:16, 54:18, 54:22, 55:3, 55:13, 55:14, 55:21, 56:2, 57:8, 57:10, 57:12, 57:18, 58:7, 58:12, 58:23, 59:13, 59:14, 59:16, 60:6, 60:8, 60:13, 60:16, 60:19, 60:25, 60:26, 61:16, 61:17, 61:21, 61:26, 65:13, 66:8, 66:23, 66:24, 67:9, 67:23, 68:16, 70:9, 70:11, 70:13, 70:18, 70:24, 71:6, 71:8, 71:14, 71:18, 71:22, 71:26, 72:9, 72:14, 72:20, 73:3, 73:7, 73:18, 73:23, 74:3, 74:7, 74:15, 76:11, 76:15, 76:16, 76:19, 77:24, 78:4, 79:8, 82:14, 83:5, 90:5, 90:20, 90:23, 90:26, 91:16, 92:3, 92:17, 92:21, 92:25, 94:11, 94:17, 95:4, 96:3, 96:19, 96:26, 97:7, 97:23, 98:26, 99:5, 99:7, 99:16, 99:19, 100:14, 101:7, 101:22, 102:6, 103:2, 103:26, 105:3

**HONORABLE** [1] - 46:18
**hope** [1] - 92:15
**horribles** [1] - 72:12
**hospitality** [1] - 82:22
**hotel** [31] - 48:12, 48:13, 48:20, 50:8, 50:21, 50:23, 50:24, 50:25, 51:2, 65:17, 67:7, 68:6, 68:21, 68:25, 69:18, 74:18, 74:20, 74:22, 81:6, 84:24, 84:26, 85:9, 89:12, 92:13, 93:9, 93:11, 93:19, 93:25, 95:18, 101:13, 101:18
**HOTEL** [2] - 46:7, 46:10
**Hotel** [1] - 89:5
**hotel's** [1] - 56:7
**hour** [1] - 78:11
**hours** [6] - 48:10, 91:11, 91:23, 92:8, 95:8, 101:9
**huge** [1] - 80:25
**humiliated** [1] - 58:4
**hurdles** [1] - 80:23
**hurt** [1] - 95:23
**hutzpah** [1] - 80:15

**I**

**I.S** [3] - 46:7, 47:9, 89:6
**Ian** [3] - 47:9, 82:15, 89:7
**IAN** [1] - 46:7
**idea** [2] - 59:22, 102:4
**identical** [2] - 67:12, 79:13
**illegal** [1] - 98:7
**immediate** [6] - 55:26, 56:21, 67:16, 69:16, 72:26, 97:12

**immediately** [2] - 65:23, 88:21
**immune** [1] - 65:4
**impact** [1] - 82:19
**impeded** [1] - 78:22
**implicates** [1] - 73:7
**importance** [1] - 58:10
**important** [2] - 77:13, 86:4
**imprudent** [1] - 55:6
**impunity** [2] - 54:26, 66:13
**inadvertent** [1] - 90:26
**inappropriate** [1] - 72:7
**Inc** [2] - 62:11, 89:6
**INC** [1] - 46:7, 46:10
**including** [1] - 90:24
**incorrect** [1] - 57:18, 66:19
**incumbent** [1] - 94:20
**incurred** [1] - 97:19
**indeed** [21] - 57:3, 64:11, 69:13, 73:24, 78:8, 78:20, 86:23, 87:5, 87:6, 88:3, 88:18, 88:24, 89:10, 92:9, 94:3, 95:9, 95:21, 98:4, 98:5, 98:11, 98:16
**independent** [1] - 68:21
**INDEX** [1] - 46:5
**indicia** [2] - 51:20, 51:22
**indulge** [1] - 90:6
**inform** [1] - 97:2
**information** [3] - 81:12, 97:14, 100:9
**inherent** [1] - 51:12
**injunction** [31] - 49:19, 49:22, 55:24, 67:13, 67:21, 67:26, 68:3, 68:9, 72:4, 73:2, 74:9, 89:14, 89:19, 89:26, 90:24, 94:19, 94:24, 95:11, 95:12, 95:20, 96:2, 96:6, 96:20, 96:24, 97:4, 97:21, 98:20, 101:23, 102:20, 102:25, 104:7
**injunctions** [1] - 67:15
**injunctive** [3] - 67:11, 68:22, 73:4
**injury** [4] - 55:26, 67:16, 73:10, 97:12
**install** [1] - 67:7
**instance** [1] - 63:2, 90:8
**instead** [4] - 70:6, 86:15, 88:19, 88:22
**instruments** [1] - 87:15
**insufficiency** [1] - 64:8
**intellectual** [1] - 72:18
**intended** [1] - 93:2
**intention** [1] - 71:3
**interest** [4] - 62:15, 73:21, 73:22, 85:10
**interested** [1] - 90:8
**interesting** [5] - 59:2, 60:3, 64:17, 65:16, 72:14, 75:25, 105:2
**interfere** [1] - 93:3

**interim** [1] - 98:15
**internal** [1] - 93:24
**International** [7] - 47:9, 62:12, 72:16, 72:20, 72:24, 73:10, 89:6
**INTERNATIONAL** [1] - 46:7
**interpretation** [1] - 62:9
**interpreted** [1] - 87:16
**interrupt** [1] - 104:22
**invoke** [1] - 85:23
**invoking** [1] - 70:13
**involve** [1] - 59:10
**involved** [2] - 82:25, 103:10
**involvement** [1] - 69:12
**involving** [1] - 61:22, 87:23
**irreparable** [9] - 53:21, 55:26, 57:5, 67:16, 72:25, 73:10, 84:21, 84:23, 89:5
**irrevocable** [1] - 80:5
**issue** [18] - 52:5, 52:6, 52:7, 62:24, 63:22, 65:26, 73:6, 75:2, 75:5, 75:8, 81:22, 84:7, 85:23, 85:25, 88:13, 88:21, 98:13, 100:9
**issued** [2] - 60:20, 82:21
**issues** [3] - 64:10, 83:3, 104:9
**itself** [1] - 64:21

**J**

**JAMES** [1] - 46:23
**JENNER** [1] - 47:2
**jeopardy** [1] - 85:3
**job** [1] - 54:20
**joined** [2] - 62:20, 83:4
**joint** [1] - 87:17
**judge** [3] - 57:20, 62:24, 86:15
**Judge** [5] - 62:17, 62:18, 62:19, 62:20, 88:20
**Judges** [1] - 62:19
**judgment** [2] - 62:25, 64:14
**judicial** [7] - 53:12, 76:3, 76:22, 77:8, 80:24, 88:16, 89:3
**judiciously** [2] - 86:9, 86:16
**July** [1] - 60:21
**jurisdiction** [2] - 50:5, 52:9
**justice** [1] - 82:12
**Justice** [5] - 46:19, 61:22, 79:10, 81:23, 82:2

**K**

**Kapnick** [4] - 79:10, 81:23, 82:2, 82:13
**Kapnick's** [1] - 60:17
**Ken** [1] - 72:11
**key** [2] - 48:21, 63:12
**kick** [1] - 70:19

**kicking** [1] - 69:11
**kind** [5] - 84:20, 94:4, 98:2, 98:3, 104:21
**knowledge** [1] - 101:20
**knows** [3] - 90:14, 90:24, 97:7

**L**

**labels** [3] - 61:17, 61:19, 61:25
**language** [6] - 49:2, 70:22, 79:13, 87:11, 101:26, 102:7
**last** [5] - 53:16, 54:12, 63:15, 68:16, 71:9
**law** [14] - 49:5, 49:9, 49:12, 50:4, 55:7, 55:17, 64:13, 66:10, 71:4, 71:5, 71:21, 82:5, 82:6
**lawsuit** [1] - 72:21
**Lazzari** [1] - 59:4
**lead** [1] - 78:18
**leading** [1] - 53:9
**learned** [1] - 92:11
**leases** [1] - 65:19
**least** [4] - 48:22, 59:9, 59:24, 71:3
**leave** [2] - 55:8, 102:2
**legal** [9] - 54:3, 54:6, 57:7, 58:19, 64:8, 75:13, 80:23, 80:25, 87:23
**length** [1] - 61:24
**leniency** [1] - 80:13
**letters** [2] - 98:22, 98:25
**Lewis** [1] - 62:18
**liability** [1] - 65:5
**life** [2] - 57:21, 90:15
**likelihood** [1] - 53:22
**likewise** [1] - 76:25
**lines** [1] - 100:24
**lingo** [1] - 81:16
**lists** [1] - 85:9
**litigate** [1] - 98:15
**litigated** [1] - 95:13
**litigating** [1] - 67:25
**litigation** [3] - 55:18, 92:23
**live** [2] - 49:21, 90:8
**LLC** [7] - 46:4, 46:7, 46:13, 47:9, 79:3, 88:18, 89:6
**look** [4] - 49:25, 57:4, 81:24, 82:3
**looking** [2] - 82:3, 99:17
**losing** [5] - 48:14, 48:18, 48:19, 74:18, 94:24
**loss** [1] - 97:20
**losses** [3] - 74:20, 97:18
**lost** [1] - 58:16
**loud** [1] - 94:21
**love** [1] - 50:17
**lunch** [1] - 103:15

# M

**Madison** [2] - 47:10, 60:21
**magistery** [1] - 69:26
**Main** [1] - 46:25
**major** [1] - 92:13
**majority** [2] - 62:21, 64:6
**Makers** [1] - 62:12
**Management** [6] - 51:16, 53:10, 53:15, 56:8, 60:22, 83:4
**management** [8] - 48:13, 48:20, 50:10, 65:18, 68:21, 68:25, 69:17, 93:25
**manager** [17] - 48:12, 51:20, 56:8, 56:11, 65:17, 67:7, 73:5, 84:24, 87:17, 87:19, 87:23, 89:12, 94:8, 94:14, 94:15, 98:16
**managing** [3] - 63:5, 100:11, 100:25
**mandatory** [4] - 56:9, 56:15, 67:14, 73:3
**manner** [3] - 54:4, 79:18, 104:7
**March** [1] - 62:13
**MARRIOTT** [2] - 46:7, 46:10
**Marriott** [59] - 47:2, 48:11, 48:13, 50:3, 50:7, 50:12, 50:21, 51:17, 56:7, 61:14, 67:5, 67:25, 68:2, 68:5, 72:13, 72:15, 72:16, 72:20, 72:23, 73:5, 73:9, 74:2, 74:24, 74:26, 77:3, 77:14, 78:7, 78:18, 79:3, 81:6, 81:8, 81:20, 85:10, 85:12, 85:25, 86:13, 86:19, 86:26, 87:2, 89:5, 89:11, 90:22, 91:10, 92:10, 92:14, 92:20, 93:11, 93:14, 93:18, 94:8, 95:17, 96:17, 97:19, 97:22, 98:16, 100:7, 100:24
**Marriott's** [7] - 48:23, 67:2, 85:4, 85:6, 87:5, 93:4, 93:12
**matter** [6] - 55:17, 79:2, 87:3, 87:26, 89:15
**McDERMOTT** [1] - 47:8
**mean** [15] - 59:11, 59:12, 70:2, 70:14, 73:19, 80:3, 80:4, 80:14, 93:15, 96:5, 96:12, 96:25, 103:3, 104:4
**meaning** [1] - 70:19
**means** [8] - 55:2, 67:6, 67:13, 81:16, 88:22, 90:14, 93:7, 94:25
**meant** [2] - 70:26, 93:3
**mechanism** [2] - 86:3, 86:20
**meet** [6] - 48:14, 48:15, 48:17, 90:17, 92:22, 98:19
**mention** [2] - 72:9, 78:26
**mentioned** [3] - 75:26,

76:26, 94:13
**mere** [2] - 73:26, 74:2
**merely** [1] - 50:2
**merits** [4] - 57:12, 57:13, 89:17, 96:21
**MICHAEL** [1] - 47:5
**middle** [1] - 103:3
**might** [6] - 49:15, 55:9, 66:12, 66:15, 80:17, 87:5
**million** [1] - 98:23
**mind** [5] - 57:24, 57:25, 69:12, 90:10
**minimum** [1] - 71:26
**Misc.886** [1] - 59:21
**misrepresentation** [1] - 53:12
**modern** [1] - 50:26
**modified** [1] - 56:4
**moment** [1] - 60:12
**Monday** [1] - 103:7, 103:9
**money** [7] - 51:18, 74:18, 74:24, 74:25, 77:3, 77:10, 97:17
**month** [2] - 48:14, 48:18
**morning** [17] - 48:2, 48:4, 48:5, 48:10, 50:7, 80:7, 84:19, 88:24, 91:13, 91:14, 91:19, 91:21, 92:4, 96:11, 101:14, 102:19
**most** [4] - 75:13, 77:12, 82:5, 86:4
**motion** [7] - 52:14, 64:13, 75:3, 75:8, 75:10, 79:15, 94:22
**motions** [2] - 52:14, 52:18
**MR** [93] - 48:4, 48:5, 48:8, 48:17, 49:4, 50:13, 50:19, 51:7, 51:24, 51:26, 52:16, 53:18, 53:24, 54:10, 57:8, 58:7, 58:12, 59:13, 60:6, 60:8, 60:12, 60:15, 60:19, 60:25, 60:26, 65:13, 68:16, 70:9, 70:18, 71:13, 73:18, 74:3, 74:14, 74:15, 76:10, 76:12, 76:14, 76:19, 77:17, 77:18, 77:22, 77:23, 78:2, 78:4, 79:8, 79:24, 80:16, 80:18, 80:19, 82:14, 82:18, 90:5, 90:20, 91:16, 91:18, 91:22, 91:23, 92:2, 92:3, 92:17, 92:25, 93:7, 94:11, 94:17, 96:3, 96:19, 97:7, 97:15, 97:16, 97:22, 98:26, 99:7, 99:15, 99:18, 99:21, 99:24, 100:2, 100:14, 101:7, 101:11, 101:15, 101:16, 101:18, 101:22, 102:6, 102:10, 102:15, 102:16, 103:2, 103:20, 103:26, 105:3, 105:4
**must** [3] - 56:6, 65:9, 92:18
**muster** [1] - 92:22

# N

**name** [2] - 82:18, 100:8
**nature** [2] - 56:15, 95:10
**nearly** [1] - 103:4
**necessarily** [1] - 94:25
**need** [11] - 56:21, 68:16, 81:18, 88:21, 89:25, 90:4, 95:3, 95:21, 98:10, 101:24, 102:25
**needed** [2] - 92:24, 102:14
**needs** [3] - 57:17, 82:26
**negligent** [1] - 53:11
**neutral** [1] - 94:5
**never** [5] - 52:13, 57:24, 57:25, 70:24, 79:6
**nevertheless** [2] - 103:11, 104:9
**new** [1] - 50:10, 50:26, 56:23, 91:5, 93:17, 95:18, 100:11, 102:25, 104:3, 104:9
**NEW** [2] - 46:2, 46:2
**New** [16] - 46:15, 46:22, 47:3, 47:6, 47:10, 49:12, 50:4, 58:14, 58:24, 80:19, 86:9, 93:24
**next** [2] - 67:17, 83:14
**night** [4] - 54:12, 71:9, 91:12, 103:3
**nineteen** [1] - 53:8
**nineteen-and-a-half** [1] - 53:8
**NO** [1] - 46:5
**none** [1] - 59:11
**normal** [2] - 48:15, 48:18
**notes** [1] - 81:14
**nothing** [2] - 68:2, 81:3
**notice** [3] - 63:17, 63:20, 84:20
**notion** [6] - 54:10, 54:12, 54:13, 57:16, 58:12, 61:13
**nowhere** [1] - 63:26
**number** [12] - 48:12, 52:14, 52:23, 58:26, 75:21, 76:13, 91:3
**numerous** [1] - 51:17
**NW** [1] - 47:6
**NY** [1] - 62:13

# O

**o'clock** [11] - 80:7, 84:19, 88:24, 91:12, 91:13, 91:14, 91:18, 91:21, 101:9, 101:14, 103:13
**obligation** [1] - 92:22
**obligations** [1] - 65:8
**observation** [2] - 70:10, 72:6
**observations** [1] - 71:14
**obviously** [4] - 75:7, 75:24,

80:10, 84:15
**occupied** [2] - 104:16
**occur** [1] - 97:21
**occurred** [1] - 79:19
**occurrence** [1] - 53:13
**OF** [2] - 46:2, 46:2
**offend** [2] - 70:15, 70:24
**offended** [1] - 71:16
**offending** [1] - 70:16
**office** [1] - 80:19
**Official** [1] - 47:23
**OFFICIAL** [1] - 105:9
**on-point** [1] - 82:6
**once** [3] - 67:26, 69:24, 104:22
**one** [36] - 48:21, 52:19, 52:23, 52:25, 53:2, 53:4, 53:9, 55:21, 56:4, 59:2, 60:16, 60:20, 61:23, 64:12, 68:16, 68:23, 72:17, 72:18, 73:11, 74:19, 76:5, 78:16, 79:3, 80:7, 90:13, 90:16, 91:3, 95:19, 97:25, 99:9, 99:11, 99:17, 100:5, 103:13, 103:21
**One** [1] - 46:24
**ongoing** [1] - 81:18
**open** [1] - 55:8
**openly** [1] - 88:7
**opens** [1] - 52:8
**operating** [5] - 68:6, 74:20, 74:22, 93:8, 97:18
**operator** [1] - 50:8
**opinion** [6] - 59:3, 61:3, 61:6, 62:16, 64:6, 64:9
**opportunity** [2] - 68:9, 103:7
**opposite** [2] - 82:10, 82:12
**order** [28] - 56:3, 56:5, 56:6, 56:10, 56:15, 56:20, 67:22, 68:12, 69:15, 72:6, 73:12, 74:10, 74:16, 79:14, 84:14, 88:14, 88:23, 89:10, 89:11, 89:17, 90:22, 94:14, 97:12, 99:8, 100:17, 100:18, 101:26
**orders** [1] - 68:22
**organization** [1] - 85:5
**orphan** [1] - 80:13
**otherwise** [3] - 58:16, 97:5, 104:23
**ought** [1] - 57:13
**ousted** [1] - 93:18
**ouster** [3] - 67:5, 92:20, 93:13
**out-of-pocket** [2] - 97:20
**outcome** [1] - 94:6
**outline** [3] - 64:15, 64:16, 86:5
**outset** [1] - 64:19
**outside** [1] - 55:17
**outstanding** [1] - 77:11
**overcome** [1] - 80:22,

80:25
  **overrides** [1] - 87:10
  **owed** [1] - 77:3
  **owing** [1] - 74:25
  **own** [2] - 67:14, 73:7
  **owned** [1] - 63:5
  **owner** [9] - 51:18, 51:19, 56:6, 61:7, 65:21, 78:8, 87:18, 87:19, 87:23
  **owner's** [8] - 50:3, 51:18, 53:14, 64:3, 65:20, 67:5, 92:19, 93:13
  **owns** [2] - 72:17, 72:18

**P**

  **p.m** [2] - 101:8, 101:16
  **page** [8] - 59:4, 76:13, 76:14, 76:15, 83:14, 87:13, 99:12, 99:21
  **pages** [6] - 51:11, 51:14, 53:8, 76:17, 77:18, 77:25
  **panoply** [1] - 89:13
  **Paper** [1] - 62:12
  **papers** [2] - 99:9, 102:24
  **parade** [1] - 72:12
  **Paragraph** [1] - 99:12
  **paragraph** [6] - 63:11, 92:18, 99:12, 99:20, 100:21, 100:23
  **parent** [2] - 72:15, 73:25
  **parents** [1] - 80:12
  **PART** [1] - 46:2
  **part** [8] - 63:11, 68:10, 75:9, 75:14, 86:4, 89:10, 95:15, 104:24
  **particular** [3] - 63:2, 63:12, 95:7
  **particularly** [2] - 82:22, 93:23
  **parties** [12] - 64:11, 68:23, 78:5, 81:6, 85:26, 86:2, 86:7, 86:21, 87:12, 88:8, 88:15
  **parties'** [1] - 64:20
  **partner** [1] - 87:17
  **party** [2] - 49:16, 63:16, 63:18, 72:21, 72:24, 73:8, 73:9, 74:5, 76:5, 76:6, 87:19
  **passwords** [1] - 81:17
  **past** [2] - 85:8, 97:24
  **patiently** [1] - 82:15
  **pay** [1] - 74:22
  **paying** [3] - 74:21, 74:24, 74:26
  **pending** [1] - 67:16
  **people** [12] - 50:13, 50:15, 50:26, 58:3, 58:13, 77:20, 81:5, 81:6, 85:18, 93:17, 95:25, 101:16
  **percent** [2] - 63:7, 63:25
  **perform** [2] - 56:7, 67:2
  **perhaps** [3] - 54:20, 73:6,

97:2
  **period** [2] - 60:2, 98:15
  **permanent** [1] - 67:11
  **permission** [1] - 56:25
  **permitted** [1] - 59:25
  **person** [2] - 72:22, 85:4
  **personal** [1] - 71:23
  **personally** [1] - 70:17
  **personnel** [1] - 92:12
  **perspective** [1] - 81:5
  **pertinent** [1] - 64:26
  **perusal** [1] - 53:6
  **PICCIRILLO** [1] - 105:9
  **Piccirillo** [1] - 47:22
  **place** [11] - 53:20, 62:21, 63:3, 64:16, 75:24, 84:5, 84:24, 86:24, 95:18, 95:26, 99:14
  **places** [1] - 76:2
  **Plaintiff** [3] - 46:5, 46:11, 46:21
  **plaintiff** [5] - 63:4, 65:7, 65:9, 79:17, 82:21
  **plaintiff's** [3] - 63:24, 64:7, 64:13
  **plane** [1] - 69:25
  **play** [1] - 102:10
  **pleases** [1] - 59:25
  **plenary** [1] - 69:8
  **pocket** [1] - 97:20
  **point** [30] - 48:25, 50:7, 51:9, 51:21, 53:7, 55:14, 59:14, 59:16, 60:26, 62:7, 64:15, 65:14, 66:10, 66:23, 68:7, 68:16, 69:23, 73:23, 74:3, 74:7, 76:19, 80:11, 82:6, 86:2, 88:12, 92:17, 93:9, 94:11, 99:10, 101:24
  **pointed** [4] - 54:13, 54:16, 61:16, 98:5
  **points** [1] - 74:16
  **policy** [2] - 58:15, 58:24
  **portions** [1] - 78:20
  **position** [2] - 53:26, 56:25, 96:12, 103:5
  **positions** [1] - 84:9
  **possibility** [5] - 66:21, 66:22, 86:26, 87:4, 90:25
  **possibly** [1] - 98:3
  **post** [3] - 81:14, 96:13, 96:15
  **post-it** [1] - 81:14
  **potential** [5] - 58:22, 95:5, 96:22, 99:26, 100:7
  **power** [22] - 49:22, 50:5, 51:12, 51:17, 55:4, 55:7, 55:16, 55:19, 57:9, 57:10, 57:15, 58:21, 59:17, 65:2, 65:6, 66:11, 68:18, 69:6, 69:14, 70:14, 71:20
  **powers** [6] - 50:2, 51:15, 64:20, 69:9, 71:2, 71:17

  **practically** [2] - 50:4, 91:12
  **precedes** [1] - 64:18
  **precisely** [1] - 66:23
  **preliminary** [32] - 49:19, 49:22, 55:23, 67:13, 67:21, 67:26, 68:3, 68:8, 72:3, 73:2, 74:8, 84:20, 89:14, 89:19, 89:26, 94:19, 94:24, 95:10, 95:11, 95:20, 96:2, 96:6, 96:19, 96:24, 97:4, 98:20, 101:23, 102:20, 102:25, 103:18, 104:6
  **prepared** [1] - 71:8
  **present** [4] - 62:2, 72:2, 89:25, 99:5
  **presentation** [1] - 84:7
  **presented** [2] - 90:22, 99:9
  **presenting** [1] - 90:19
  **presently** [1] - 91:5
  **preserve** [1] - 79:25
  **press** [10] - 82:20, 82:22, 82:23, 82:24, 93:16, 93:17, 93:20, 93:23, 93:24, 93:25
  **presume** [1] - 52:17
  **presumption** [1] - 57:8
  **pretty** [1] - 67:20
  **prevail** [2] - 52:5, 57:2
  **principal** [13] - 58:16, 58:19, 58:21, 59:6, 59:9, 59:17, 59:24, 65:2, 66:8, 78:16, 78:23, 79:4, 79:23
  **principal's** [2] - 49:8, 79:22
  **principally** [1] - 82:8
  **problem** [18] - 52:2, 52:21, 52:22, 55:21, 56:16, 56:17, 57:2, 64:12, 67:23, 69:21, 69:22, 75:19, 79:16, 79:17, 94:13, 94:26, 100:3
  **problems** [1] - 73:14
  **procedural** [1] - 73:14
  **proceeding** [2] - 57:7, 87:23
  **PROCEEDINGS** [1] - 46:16
  **process** [1] - 88:18
  **produce** [1] - 78:14
  **prohibit** [1] - 104:10
  **prolonged** [1] - 48:9
  **proper** [2] - 70:4, 104:11
  **properly** [3] - 49:23, 50:6, 95:13
  **property** [8] - 65:18, 72:18, 81:7, 81:8, 81:12, 97:17, 99:26, 100:10
  **proposed** [3] - 52:18, 56:3, 56:5
  **proprietary** [2] - 81:12, 85:10, 100:9
  **prospective** [1] - 82:26
  **protect** [1] - 70:4
  **protection** [1] - 87:6
  **prove** [1] - 78:20
  **proved** [1] - 72:26

  **proves** [1] - 65:14
  **provide** [2] - 50:20, 75:6
  **provided** [1] - 63:10
  **provides** [1] - 95:5
  **provision** [4] - 49:11, 64:2, 76:20, 76:25
  **provisions** [6] - 51:16, 61:9, 63:9, 76:4, 77:5, 85:22
  **purely** [1] - 64:12
  **purported** [2] - 67:5, 92:20, 93:13
  **pursuant** [4] - 73:19, 87:22, 94:8, 98:17
  **pursuing** [1] - 71:5
  **put** [19] - 49:7, 56:14, 57:6, 57:21, 76:20, 80:21, 81:2, 84:16, 85:2, 85:14, 90:15, 91:7, 93:16, 93:17, 93:19, 101:25, 103:8, 104:2, 104:22
  **putting** [4] - 69:19, 81:20, 85:3, 102:18

**Q**

  **quality** [1] - 98:10
  **questions** [2] - 82:24, 90:21
  **quick** [2] - 53:6, 92:9
  **quicker** [1] - 92:6
  **quickly** [3] - 83:2, 96:7, 97:3
  **quite** [1] - 60:14
  **quo** [8] - 50:9, 56:11, 57:17, 68:5, 79:25, 81:4, 94:23, 98:6
  **quote** [3] - 54:3, 59:24, 76:16

**R**

  **raise** [1] - 64:10
  **raised** [2] - 75:9, 104:3
  **raises** [1] - 94:13
  **rather** [4] - 57:3, 69:8, 95:12, 98:15
  **reach** [2] - 75:14, 88:11
  **read** [6] - 58:11, 62:5, 62:6, 71:11, 77:26, 103:12
  **reading** [2] - 66:25, 92:26, 103:14
  **reads** [1] - 63:11
  **real** [2] - 97:11, 97:19
  **reality** [1] - 80:6
  **realize** [1] - 103:10
  **really** [19] - 49:24, 67:25, 69:10, 69:11, 71:22, 77:21, 80:2, 80:3, 80:5, 80:11, 81:4, 81:11, 92:5, 92:6, 94:7, 94:9, 96:14, 98:7
  **Realty** [1] - 62:12
  **reason** [8] - 59:19, 67:9,

68:21, 75:7, 76:23, 84:22, 93:18
**reasonable** [3] - 92:8, 98:13, 102:3
**reasons** [5] - 48:12, 48:21, 75:22, 89:9, 100:6
**receive** [2] - 63:6, 71:12
**received** [1] - 71:9
**receiving** [1] - 78:19
**recess** [1] - 83:8
**recitation** [1] - 53:8
**recognition** [1] - 100:8
**recognizes** [1] - 65:21
**record** [4] - 64:9, 71:15, 89:20, 89:22
**recover** [1] - 55:11
**reference** [1] - 92:18
**reflect** [1] - 71:15
**refused** [1] - 74:23
**regard** [1] - 71:21
**regarding** [2] - 53:13, 67:14
**Rehmann** [2] - 72:11, 72:15
**reinstate** [4] - 48:11, 66:26, 67:19, 67:25
**reinstated** [1] - 57:14, 94:8
**reinstatement** [2] - 73:4, 94:12
**rejected** [1] - 82:2
**related** [1] - 57:12
**Relationship** [1] - 77:19
**relationship** [23] - 53:4, 59:7, 61:5, 61:11, 61:18, 61:19, 64:22, 65:7, 69:19, 73:20, 75:16, 75:18, 75:20, 78:16, 78:24, 79:3, 79:7, 85:13, 85:23, 87:10, 88:2, 88:4, 88:9
**relationships** [3] - 51:19, 91:6, 93:23
**release** [4] - 82:20, 93:16, 93:17, 93:20
**relied** [1] - 82:8
**relief** [16] - 53:20, 54:2, 56:2, 56:21, 66:26, 67:11, 67:19, 67:22, 68:8, 68:11, 69:10, 71:25, 73:4, 74:7, 80:5, 95:2
**remain** [3] - 95:12, 95:16, 95:17
**remains** [2] - 52:3, 65:26
**remedies** [1] - 88:13
**remedy** [2] - 86:18, 88:14
**remember** [1] - 102:3
**removed** [1] - 85:25
**RENARD** [49] - 46:23, 48:4, 48:8, 48:17, 49:4, 50:13, 50:19, 51:7, 51:24, 51:26, 52:16, 53:18, 53:24, 54:10, 57:8, 58:7, 58:12, 59:13, 60:6, 60:8, 60:26, 65:13, 68:16, 70:9, 70:18, 71:13, 73:18, 74:3, 74:14, 80:18,

90:5, 90:20, 92:3, 92:17, 93:7, 94:11, 94:17, 96:19, 97:15, 97:22, 98:26, 99:15, 100:14, 101:16, 101:22, 102:10, 102:15, 103:2, 105:4
**Renard** [7] - 48:6, 48:26, 51:4, 62:8, 69:3, 74:17, 78:10, 78:26, 79:9, 79:20, 80:4, 80:16, 85:14, 87:25, 92:26, 99:10, 103:21
**Renard's** [3] - 75:13, 80:11, 87:9
**rent** [1] - 63:24
**rental** [1] - 63:7
**rentals** [1] - 63:25
**renting** [1] - 63:4
**repeating** [1] - 75:26
**reply** [2] - 52:19, 103:19
**REPORTER** [1] - 105:9
**Reporter** [1] - 47:23
**reports** [1] - 81:13
**represent** [2] - 65:3, 82:15
**reputation** [4] - 72:13, 82:25, 84:25, 100:8
**reputational** [1] - 83:3
**request** [6] - 49:25, 53:12, 53:26, 55:23, 55:24, 73:4
**requested** [1] - 66:26
**requesting** [1] - 50:22
**requests** [1] - 74:23
**require** [2] - 73:5, 96:15
**required** [2] - 96:9, 96:20
**requirements** [2] - 72:8, 77:9
**requires** [1] - 55:25, 74:21
**requiring** [1] - 68:22
**research** [1] - 54:12
**resolution** [6] - 87:21, 88:16, 88:25, 89:15, 102:21, 102:22
**resolved** [5] - 76:7, 83:2, 88:21, 89:3, 100:15
**respect** [2] - 75:2, 87:16
**respectfully** [4] - 49:24, 54:16, 55:14, 95:3
**respective** [1] - 98:22
**respects** [1] - 51:17
**respond** [2] - 60:13, 65:9, 68:10
**responsibilities** [2] - 65:19, 81:25
**responsibility** [1] - 58:20
**restatement** [1] - 49:13
**restored** [2] - 89:12, 98:16
**restoring** [1] - 98:6
**restrain** [1] - 73:25
**restrained** [1] - 57:17
**restraining** [10] - 56:10, 56:14, 67:22, 68:11, 72:6, 73:12, 74:9, 84:14, 89:9, 89:11
**result** [4] - 53:2, 54:25,

64:5, 97:21
**resulted** [3] - 67:5, 92:19, 93:13
**return** [2] - 93:19, 100:24
**review** [1] - 49:6
**reviewed** [1] - 97:10
**revocation** [4] - 49:14, 61:13, 65:24, 66:18
**revoke** [9] - 48:23, 49:9, 50:6, 51:12, 59:18, 59:25, 65:2, 66:11, 68:18
**revoked** [1] - 67:4
**rightful** [1] - 66:12
**rightfully** [1] - 55:19
**rights** [5] - 64:20, 73:8, 73:13, 74:5, 81:25
**ROBERT** [1] - 47:11
**Robert** [1] - 82:18
**role** [2] - 56:7, 102:10
**roll** [1] - 72:2
**rolling** [1] - 103:17
**rooms** [1] - 85:7
**ruled** [1] - 57:24
**rules** [2] - 67:14, 78:17
**ruling** [3] - 76:22, 89:16, 89:17
**running** [1] - 85:5

## S

**safe** [1] - 96:16
**sake** [1] - 62:15
**sales** [1] - 85:8
**SAMBHWANI** [1] - 46:24
**satellite** [1] - 92:23
**schedule** [1] - 103:22
**Schrager** [5] - 47:9, 61:23, 82:16, 89:7
**SCHRAGER** [1] - 46:7
**sealed** [1] - 104:26
**Second** [1] - 59:5
**second** [5] - 84:25, 89:4, 92:17, 95:24, 97:25
**seconds** [1] - 88:17
**secrets** [2] - 85:2, 85:6
**Section** [5] - 51:10, 55:25, 61:17, 77:25, 87:22
**section** [5] - 51:14, 64:16, 64:17
**security** [2] - 81:17, 92:12
**see** [8] - 52:2, 52:26, 53:4, 75:12, 78:4, 79:15, 99:21, 100:3
**seeing** [1] - 82:4
**seek** [6] - 56:2, 67:20, 67:22, 71:25, 73:11, 74:8
**self** [12] - 54:4, 54:5, 54:7, 54:11, 54:12, 56:19, 57:4, 58:13, 69:11, 69:22, 86:19, 88:24
**self-help** [5] - 54:4, 54:5, 54:7, 54:11, 54:12, 56:19,

57:4, 58:13, 69:11, 69:22, 88:24
**self-helping** [1] - 86:19
**sell** [4] - 63:22, 63:25, 64:3, 85:7
**sense** [10] - 52:8, 52:13, 69:7, 69:25, 72:26, 76:24, 79:20, 94:5, 96:15, 103:17
**sentence** [1] - 64:17
**separate** [7] - 55:3, 55:13, 59:15, 68:20, 73:22, 78:17, 78:22
**September** [2] - 102:19, 104:18
**sequence** [1] - 52:14
**series** [1] - 95:8
**serious** [1] - 84:7
**service** [3] - 48:17, 97:23, 102:13
**Services** [1] - 89:6
**services** [3] - 63:7, 71:23, 98:2
**SERVICES** [2] - 46:7, 46:10
**set** [5] - 48:3, 86:21, 88:9, 97:8
**setting** [1] - 50:24
**settled** [1] - 64:25
**shall** [3] - 63:14, 63:17, 87:16
**sharply** [1] - 64:19
**short** [2] - 81:4, 83:8
**shot** [1] - 80:12
**show** [8] - 48:26, 49:18, 51:16, 56:20, 67:15, 69:15, 88:23, 89:18
**showing** [4] - 55:25, 97:9, 97:11, 97:20
**shows** [2] - 49:8, 49:26
**sides** [5] - 84:6, 84:8, 84:10, 85:19, 103:23
**signage** [5] - 56:13, 57:6, 91:6, 92:14
**signed** [4] - 50:14, 50:15, 50:26, 104:26
**significant** [3] - 82:19, 82:23, 83:3
**silent** [1] - 60:10
**simply** [4] - 48:11, 77:7, 97:16, 101:7
**sitting** [1] - 82:15
**situation** [3] - 80:21, 81:2, 93:25
**six** [3] - 91:23, 92:8, 101:9
**slightly** [1] - 56:4
**Slip** [1] - 59:2
**smacks** [1] - 80:12
**Smith** [1] - 59:20
**someone** [1] - 93:8
**soon** [1] - 72:4
**sophisticated** [2] - 78:5, 85:18
**sorry** [2] - 58:8, 69:18

**sort** [2] - 77:12, 101:12
**sorts** [1] - 73:14
**sought** [1] - 71:23
**speaks** [1] - 51:11
**special** [1] - 64:12
**specific** [4] - 51:15, 86:3, 86:5, 89:2
**specifically** [2] - 71:24, 77:6
**spectator** [1] - 77:22
**spend** [1] - 51:18
**spent** [2] - 78:10, 97:17
**squarely** [1] - 56:18
**stage** [7] - 60:23, 67:15, 67:26, 74:9, 74:10, 94:19, 94:25
**standard** [2] - 96:21, 96:25
**start** [3] - 75:24, 104:16, 104:22
**started** [1] - 74:17
**state** [1] - 58:15
**State** [1] - 86:10
**STATE** [1] - 46:2
**statement** [4] - 53:2, 86:6, 89:2, 94:7
**statements** [1] - 87:4
**States** [1] - 50:5
**status** [8] - 50:9, 56:10, 57:17, 68:4, 79:25, 81:4, 94:23, 98:6
**stay** [1] - 93:6
**staying** [1] - 67:24
**step** [1] - 55:22
**stepping** [1] - 92:12
**still** [4] - 52:3, 81:8, 88:2, 97:5
**stop** [1] - 81:18
**street** [1] - 50:24
**Street** [4] - 46:15, 46:25, 60:21, 79:10
**subject** [7] - 58:21, 59:7, 66:14, 66:16, 66:17, 69:25, 69:26
**submit** [2] - 97:16, 103:24
**Subparagraph** [1] - 99:22
**substance** [1] - 102:12
**substantial** [1] - 78:19
**success** [2] - 53:22, 86:26
**suggest** [3] - 100:22, 101:4, 103:20
**suit** [1] - 87:21
**Suite** [1] - 47:6
**Sullivan** [1] - 62:11
**summary** [2] - 62:25, 64:13
**summoning** [1] - 86:13
**summons** [1] - 52:4
**Sunday** [5] - 50:6, 80:7, 84:19, 88:24, 96:11
**Sunrise** [1] - 92:2
**supplemental** [1] - 104:2
**support** [1] - 78:14
**supposed** [1] - 104:17

**Supreme** [1] - 59:21
**SUPREME** [1] - 46:2
**system** [3] - 54:6, 70:19, 70:20
**systems** [2] - 56:13, 91:6

**T**

**table** [1] - 77:23
**talks** [3] - 51:15, 72:11, 72:22
**teeth** [2] - 69:11, 70:20
**temporary** [10] - 56:10, 56:14, 67:22, 68:11, 72:5, 73:11, 74:9, 84:13, 89:9, 89:11
**ten** [1] - 90:15
**TERM** [1] - 46:2
**term** [3] - 54:24, 63:19, 64:12
**terminate** [21] - 53:14, 54:26, 55:4, 55:7, 58:22, 59:6, 59:18, 63:24, 65:6, 66:11, 73:12, 76:3, 77:2, 77:3, 77:8, 80:2, 86:4, 86:5, 86:8, 86:22, 88:15
**terminated** [9] - 49:16, 63:16, 63:18, 66:20, 67:3, 76:21, 76:23, 86:11, 86:17
**terminating** [2] - 66:15, 74:5
**termination** [11] - 49:15, 55:3, 55:12, 61:10, 61:12, 63:9, 66:3, 66:22, 76:4, 76:7, 77:6
**terms** [8] - 85:6, 85:20, 87:2, 89:19, 89:24, 92:22, 100:15, 100:16
**testimony** [2] - 51:17, 90:9
**Texas** [2] - 46:25, 80:16
**THE** [74] - 46:2, 48:2, 48:6, 48:16, 48:25, 50:12, 50:17, 51:3, 51:22, 51:25, 52:2, 52:17, 53:19, 53:25, 56:16, 57:19, 58:11, 58:26, 59:20, 60:7, 60:10, 60:14, 60:17, 60:20, 62:5, 68:13, 69:2, 70:16, 71:11, 73:16, 73:24, 74:11, 76:9, 76:13, 76:18, 77:16, 77:20, 77:26, 78:3, 78:13, 79:14, 80:15, 82:17, 83:6, 84:5, 89:23, 90:11, 91:9, 91:20, 91:25, 92:5, 93:10, 94:16, 95:6, 97:5, 97:25, 99:6, 99:14, 99:17, 99:20, 99:23, 99:26, 100:3, 100:19, 101:10, 101:12, 101:19, 101:25, 102:8, 102:13, 102:17, 103:9, 103:25, 104:4
**theft** [1] - 99:26
**themselves** [3] - 86:18,

86:19, 88:25
**therefore** [8] - 52:2, 61:9, 64:6, 78:17, 79:5, 88:5, 89:8, 98:9
**Third** [1] - 47:3
**third** [4] - 85:2, 86:2, 94:11
**thirty** [1] - 63:17
**threatened** [1] - 50:14
**three** [5] - 53:10, 53:22, 91:21, 91:22, 101:9
**throughout** [1] - 66:9
**throwing** [2] - 86:19, 94:22
**Thursday** [2] - 91:14, 92:4
**timeframe** [1] - 91:7, 91:9
**TO** [1] - 105:6
**today** [5] - 53:26, 65:26, 90:7, 99:2, 99:16
**together** [2] - 78:5, 103:6
**took** [2] - 80:23, 86:18
**total** [1] - 63:7
**totally** [1] - 81:22
**trade** [1] - 85:2
**transactions** [1] - 87:15
**TRANSCRIPT** [1] - 105:6
**transfer** [2] - 91:14, 92:7
**transferred** [1] - 98:20
**transferring** [1] - 92:12
**transfers** [1] - 92:11
**transformed** [1] - 96:2
**transition** [1] - 100:17
**transitions** [1] - 101:13
**translate** [1] - 80:17
**tremendous** [1] - 85:3
**triable** [1] - 64:10
**trial** [9] - 49:19, 49:21, 62:24, 64:7, 90:13, 90:15, 104:16, 104:22, 104:23
**TRIAL** [1] - 46:2
**tried** [3] - 54:19, 65:14, 85:24
**TRO** [16] - 55:24, 56:5, 56:6, 57:14, 67:12, 67:15, 67:24, 89:18, 90:24, 92:16, 94:12, 95:9, 95:10, 96:23, 97:6, 100:6
**true** [1] - 103:16
**TRUE** [1] - 105:6
**trust** [2] - 58:16, 61:5
**trying** [2] - 85:7, 96:4
**TSA** [1] - 53:9
**turnover** [1] - 56:22
**turns** [1] - 63:21
**twenty** [1] - 53:8
**two** [16] - 52:25, 53:10, 53:21, 55:13, 68:23, 78:5, 84:19, 85:17, 86:7, 88:24, 90:4, 91:13, 91:14, 95:24, 99:19, 101:14
**typically** [1] - 97:8

**U**

**ultimate** [3] - 86:26, 89:17, 98:14
**ultimately** [2] - 56:26, 96:23
**under** [12] - 48:13, 50:4, 54:24, 55:25, 64:21, 65:8, 66:5, 67:4, 87:6, 96:15, 97:6, 98:24
**underlying** [2] - 57:16, 66:7
**undertaken** [1] - 53:3
**undertaking** [3] - 95:4, 95:15, 96:20
**undertook** [1] - 85:11
**undo** [4] - 67:4, 92:18, 93:4, 93:12
**undone** [1] - 57:18
**unfettered** [1] - 58:21
**unfortunately** [1] - 44:8
**unilateral** [2] - 65:12, 87:7
**unilaterally** [3] - 63:26, 67:6, 67:7
**United** [1] - 50:5
**unless** [3] - 48:20, 97:9, 102:20
**up** [22] - 48:3, 48:16, 50:14, 50:16, 50:24, 50:26, 52:8, 52:19, 60:15, 62:4, 70:4, 72:2, 74:12, 86:21, 90:15, 92:15, 99:7, 99:10, 99:13, 102:7, 102:9, 103:22

**V**

**vague** [1] - 93:9
**valid** [1] - 88:4
**Van** [1] - 62:20
**various** [1] - 89:25
**vendor** [1] - 91:5
**vendors** [3] - 50:22, 56:12
**venturer** [1] - 87:17
**verge** [1] - 48:19
**versus** [7] - 54:4, 59:4, 59:20, 60:22, 62:12, 78:16, 79:4
**views** [2] - 102:3, 102:4
**violated** [2] - 65:8, 66:16
**violation** [2] - 90:25, 90:26
**virtually** [1] - 79:13
**virtue** [1] - 61:8
**Voorhis** [1] - 62:20

**W**

**Waikiki** [14] - 77:15, 78:9, 79:3, 79:4, 84:18, 85:11, 85:14, 85:22, 86:12, 86:17, 88:6, 88:18, 91:26, 93:16
**WAIKIKI** [2] - 46:4, 46:13
**Waikiki's** [1] - 94:8

**wait** [2] - 73:2, 97:25
**waiting** [1] - 88:19
**wants** [4] - 63:22, 75:12, 75:14, 88:12
**Washington** [1] - 47:7
**ways** [1] - 86:21
**Wednesday** [2] - 90:12, 91:21
**wee** [1] - 48:9
**week** [5] - 67:17, 67:18, 97:24, 104:17
**weeks** [1] - 104:15
**weigh** [1] - 87:2
**Weiner** [2] - 82:17, 82:18
**WEINER** [11] - 47:11, 82:14, 82:18, 91:22, 97:7, 97:16, 101:7, 101:11, 101:15, 101:18, 103:26
**whatsoever** [1] - 84:21
**whole** [2] - 81:25, 82:4
**wholly** [1] - 68:18
**WIDELL** [1] - 46:23
**WILL** [1] - 47:8
**willingly** [1] - 50:14
**Wilson** [2] - 60:4, 62:11
**wish** [3] - 88:3, 94:3, 94:4
**witnesses** [3] - 49:21, 90:3, 90:8
**wonder** [1] - 62:15
**Woolley** [1] - 82:8
**word** [2] - 48:7, 82:15
**words** [2] - 51:5, 56:9
**world** [1] - 76:20
**worldwide** [1] - 82:21
**writing** [2] - 63:17, 102:2
**written** [2] - 62:17, 86:24
**wrongdoing** [2] - 54:14, 57:16
**wrongful** [5] - 55:2, 55:9, 57:10, 66:3, 66:22
**wrote** [2] - 59:22, 59:23

## Y

**yanking** [1] - 81:14
**year** [2] - 63:18
**yearly** [1] - 63:19
**years** [1] - 101:2
**yesterday** [14] - 49:7, 50:21, 51:10, 54:17, 54:20, 65:25, 67:10, 70:11, 70:23, 71:26, 72:10, 75:26, 76:26, 82:7
**YORK** [2] - 46:2, 46:2
**York** [16] - 46:15, 46:22, 47:3, 47:6, 47:10, 49:12, 50:4, 58:14, 58:24, 80:19, 86:10, 93:24
**Young** [1] - 72:21
**yourself** [4] - 66:16, 69:8, 69:25, 69:26

BONNIE PICCIRILLO - OFFICIAL COURT REPORTER