# EXHIBIT 1

**FINAL**

**WAIKIKI EDITION**
**HONOLULU, HAWAII**

**DESIGN AND TECHNICAL SERVICES AND PRE-OPENING AGREEMENT**

between

**M WAIKIKI LLC**

("Owner")

and

**MARRIOTT HOTEL SERVICES, INC.**

("Manager")

and

**I.S. INTERNATIONAL, LLC**

("Schrager")

Dated as of July 9, 2008

407850v7



## ARTICLE 1      DEFINITIONS AND GENERAL MATTERS

1.1     Definitions..................................................................................1

1.2     Project Schedule, Owner Representative, Manager/Schrager Representative and Approval of Consultants ............................7

## ARTICLE 2      DESIGN AND TECHNICAL SERVICES

2.1     Conceptual and Schematic Design Phases ....................................8

     2.1.1    Preliminary Information...........................................8

     2.1.2    Response to Preliminary Information........................8

     2.1.3    Designers and Consultants ......................................9

     2.1.4    Schrager and Manager Oversight .............................9

     2.1.5    Schematic Design Phase...........................................9

     2.1.6    Project Milestones..................................................9

2.2     Design Development Phase .......................................................10

     2.2.1    Design Development Phase.....................................10

     2.2.2    Interior Design .....................................................10

     2.2.3    Approval of Design Development Package ................10

     2.2.4    Approval of FF&E Package ....................................11

     2.2.5    Approval of Third-Party Operators ........................11

2.3     Construction Document Phase ..................................................11

     2.3.1    Final Design Phase................................................11

     2.3.2    Systems ...............................................................11

     2.3.3    Decorative Items ..................................................12

     2.3.4    Approvals.............................................................12

2.4     Construction Phase .................................................................12

     2.4.1    Construction of Hotel, Observations .......................12

     2.4.2    Permits ................................................................13

     2.4.3    Documents Upon Completion of Construction ..........13

     2.4.4    Budget ................................................................13

2.5     Post-Completion Period ...........................................................14

     2.5.1    Documentation .....................................................14

     2.5.2    Punchlist .............................................................15

     2.5.3    Defaults...............................................................15

     2.5.4    EDITION Flagging ...............................................15

## ARTICLE 3      FIXED ASSET SUPPLIES, INVENTORIES AND EQUIPMENT LEASES

3.1     Fixed Asset Supplies and Inventories .......................................15



# TABLE OF CONTENTS

**Page**

**ARTICLE 4        TIMETABLE; TECHNICAL SERVICES FEE**

4.1    CONSTRUCTION OF HOTEL AND PROJECT AREAS .................................................16
4.2    TECHNICAL SERVICES FEE ..............................................................................................17
4.3    CONCEPT DEVELOPMENT FEE .......................................................................................18
4.4    REIMBURSABLE EXPENSES ..............................................................................................18
4.5    FUNDING TECHNICAL SERVICES ...................................................................................19

**ARTICLE 5        PRE-OPENING ACTIVITIES**

5.1    PROJECTED OPENING DATE; TURNOVER SCHEDULE ................................................19
5.2    PRE-OPENING ACTIVITIES ..............................................................................................19
5.3    PRE-OPENING EXPENSES ..................................................................................................20
5.4    FUNDING OF PRE-OPENING EXPENSES .......................................................................20
5.5    USE OF FUNDS IN PRE-OPENING ACCOUNT; ACCOUNTING.....................................21

**ARTICLE 6        OPENING DATE**

6.1    OPENING DATE ....................................................................................................................21
6.2    NOTIFICATION ....................................................................................................................21
6.3    CONDITIONS FOR OPENING HOTEL ...............................................................................22
6.4    INITIAL FUNDING OF WORKING CAPITAL; FIXED ASSET SUPPLIES ....................22
6.5    HOTEL ACCESS ...................................................................................................................22

**ARTICLE 7        INTERIM INSURANCE**

7.1    INSURANCE REQUIRED .....................................................................................................22
7.2    GENERAL PROVISIONS .....................................................................................................24

**ARTICLE 8        REPRESENTATIONS, WARRANTIES AND COVENANTS OF
                  OWNER**

8.1    REPRESENTATIONS AND WARRANTIES OF OWNER ...................................................24
       8.1.1        TITLE ........................................................................................................24
       8.1.2        NO BREACH .............................................................................................25
       8.1.3        LITIGATION .............................................................................................25
       8.1.4        ACCESS AND UTILITIES ......................................................................25
8.2    COVENANTS OF OWNER ..................................................................................................25

ii



## TABLE OF CONTENTS

Page

8.2.1 CONSTRUCTION ........................................................................................25
8.2.2 PUBLICITY ..............................................................................................25
8.2.3 USE OF LOGOS ........................................................................................25
8.2.4 ENVIRONMENTAL ....................................................................................25
8.3 SURVIVAL; INDEMNITY ...................................................................................26

**ARTICLE 9      MISCELLANEOUS**

9.1 DEFAULTS ......................................................................................................26
9.2 TERM ............................................................................................................26
9.3 SUCCESSORS AND ASSIGNS ..............................................................................26
9.4 RELATIONSHIP ................................................................................................27
9.5 DOCUMENTS ..................................................................................................27
9.6 THIRD-PARTY RIGHTS .....................................................................................27
9.7 HEADINGS .....................................................................................................27
9.8 COUNTERPARTS ..............................................................................................27
9.9 EFFECT OF APPROVAL OF PLANS AND SPECIFICATIONS ........................................27
9.10 APPLICABLE LAW ............................................................................................28
9.11 NOTICES ........................................................................................................28
9.12 CONFIDENTIALITY ..........................................................................................29
9.13 WAIVER OF JURY TRIAL AND CONSEQUENTIAL AND PUNITIVE DAMAGES ..............30
9.14 INDEMNIFICATION ..........................................................................................30
9.15 ENTIRE AGREEMENT .......................................................................................30
9.16 CONSENTS AND APPROVALS ............................................................................30

Exhibit 1  -   Milestone Events
Exhibit 2  -   Pre-Opening Budget & Initial Working Capital

iii



## DESIGN AND TECHNICAL SERVICES AND PRE-OPENING AGREEMENT

**THIS DESIGN AND TECHNICAL SERVICES AND PRE-OPENING AGREEMENT** ("Agreement") is entered into this 9th day of July, 2008 ("Effective Date"), by and among **M WAIKIKI LLC** ("Owner"); **MARRIOTT HOTEL SERVICES, INC.** ("Manager"); and **I.S. INTERNATIONAL, LLC** ("Schrager").

### RECITALS

A.      Owner and Manager have entered into and executed that certain management agreement dated as of the date hereof (the "Management Agreement") pursuant to which Owner has engaged Manager as the manager of an EDITION hotel containing approximately three hundred fifty-three (353) Guest Rooms in an existing hotel currently under renovation in Waikiki, Honolulu, Hawaii;

B.      Owner acknowledges that an EDITION hotel will be a first-class, boutique hotel as to (i) design, appearance and quality of the Hotel and related improvements, (ii) the appearance, quality and function of the furniture, fixtures, systems and equipment, and (iii) the staffing and operation of the Hotel itself;

C.      Owner, Manager and Schrager have agreed upon certain design services and technical services to be provided by Manager and/or Schrager with regard to:  (i) the design and construction of the renovation of the Hotel by Owner; and (ii) the design and procurement of the furniture, fixtures, systems and equipment for the Hotel by Owner so that the Hotel, when open for business, shall in all respects meet the requirements and standards of an EDITION hotel; and

D.      Owner, Manager and Schrager have agreed upon certain pre-opening services to be provided by Manager and/or Schrager with regard to Manager's and Schrager's recruiting and training of the initial operating staff and the provision of other pre-opening services so that the Hotel, when opened for business on the Flagging Date, shall in all respects meet the requirements and standards of an EDITION hotel.

NOW, THEREFORE, Owner, Manager and Schrager, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

### ARTICLE 1
### DEFINITIONS AND GENERAL MATTERS

1.1      Definitions.  All terms not defined in this Agreement shall have the meanings ascribed to them in the Management Agreement.



"Agreement" shall mean this Design and Technical Services and Pre-Opening Agreement, including the exhibits attached hereto, as it may be amended, restated or supplemented from time to time.

"Audio/Video Systems" shall include, but not be limited to, the following Hotel systems: general audio and video systems (audio/video) for the Hotel, entertainment audio/video systems, video information systems, public address systems and the master antenna television distribution system.

"Case Goods" shall mean furniture and furnishings used in the Hotel, including, without limitation: chairs, beds, chests, headboards, desks, tables, decorative lighting fixtures, and similar items.

"Concept Development Fee" shall have the meaning ascribed to it in Section 4.3.

"Conceptual Plans" shall mean, collectively, the plans and specifications and other materials set forth in Sections 2.1.5, 2.2.1, 2.2.2, 2.2.3 and 2.2.4.

"Decorative Items" shall include, but not be limited to, artifacts, artwork, banquettes, carpeting, decorative lighting fixtures, etched glass, furniture, graphics, interior landscaping, radios, interior signage, televisions and window treatments.

"Designer" shall have the meaning ascribed to it in Section 1.02(a).

"Design Schedule" shall have the meaning ascribed to it in Section 1.02(b).

"EDITION Technical Standards" shall mean, as of the Effective Date, the "JW Marriott Hotels & Resorts Design Standards" dated January 2005, as revised from time to time, published by Manager's Architecture and Construction Division.  The parties acknowledge that the EDITION Technical Standards are preliminary in nature and under revision and refinement by Manger and Schrager, which revisions and refinements shall, at the request of Manager, be incorporated into the Hotel.

"EDITION Hotel System" shall mean the chain of full-service boutique hotels operated and managed by Marriott (or one or more of its Affiliates) that is, as of the Effective Date, operated under the Trade Name or mark "EDITION Hotels."

"Effective Date" shall have the meaning ascribed to it in the Preamble.

2



"Exterior Identity Signage" shall mean exterior illuminated or non-illuminated signs for identification of the Hotel, such as wall-mounted building signs, pylon signs and ground-mounted monument signs.

"Extraordinary Event" shall mean any of the following events, regardless of where it occurs or its duration:  acts of nature (including hurricanes, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war or armed conflict; riots or other civil commotion; terrorism; strikes or similar labor disturbances; embargoes or blockades; shortage of critical materials or supplies; action or inaction of governmental authorities which have an impact upon the Hotel; the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused for reasons of the Extraordinary Event; and any other events beyond the reasonable control of Owner, Manager or Schrager, as appropriate.

"Facilities Program" shall have the meaning ascribed to it in Section 2.1.1.

"FF&E" shall mean furniture, furnishings, fixtures, Soft Goods, Case Goods, Decorative Items, signage, Audio/Video Systems, kitchen appliances, refrigerators, minibars and equipment, including front desk and back-of-the-house computer equipment, but shall not include Fixed Asset Supplies or Software.

"Fixed Asset Supplies" shall mean items included within "Property and Equipment" under the Uniform System of Accounts which may be consumed in the operation of the Hotel or are not capitalized including, but not limited to, linen, china, glassware, tableware, uniforms, and similar items, used in the operation of the Hotel.

"Flagging Renovation" shall have the meaning ascribed to it in Section 2.5.4.

"Food/Kitchen Equipment" shall mean all food preparation, cooking and holding equipment; exhaust hoods and hood fire protection systems; general storage layout, refrigerators and freezers (including coils, condensers and compressors); ice-making, beverage dispensing and other food and beverage equipment; dishwashing equipment (except any glass washer included in Housekeeping Equipment); and all other similar items required for a complete food and beverage service of the Hotel.

"Graphics" shall mean food and beverage logos; name signs for suites, meeting rooms, board rooms, conference suites, and ballrooms; Guest Room numbers; all directional signs; exterior signs except Exterior Identity Signage; Guest Room evacuation signs; elevator, handicapped, fire stair, and elevator restriction signs; miscellaneous directional and loss prevention/safety signs; and all signs required by or for municipal, department of transportation, fire safety, or other jurisdictional authority for the operation of the Hotel.



"Guest Room" shall mean a separately-keyed lodging unit in the Hotel.

"Hotel Systems" shall include, but not be limited to, software, hardware, cabling and all other items necessary for a computer; rooms management systems; front office, back office and accounting management systems; sales and reservations systems; timekeeping and Manager's automated payroll systems; point-of-sale systems, including food, beverage and retail functions; food and beverage inventories systems; engineering software; and word processing and other personal computer applications.

"Housekeeping Equipment" shall mean equipment items (including glass washer) to be used by Hotel employees for cleaning the Hotel on a regular basis.

"Inventories" shall mean "Inventories" as defined in the Uniform System of Accounts, such as, but not limited to, provisions in storerooms, refrigerators, pantries and kitchens; beverages in wine cellars and bars; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"Laundry Equipment" shall mean washers, washer/extractors, dryers, chest-type ironers, steam boiler, thermal fluid heater for ironer, lint control devices, linen folders, linen carts, dry cleaning equipment (if required), laundry sinks, air compressors, laundry scales and all other similar items required for a complete laundry with ironing capacity.

"Management Agreement" shall have the meaning ascribed to it in the Recitals.

"Manager" shall have the meaning ascribed to it in the Preamble.

"Manager/Schrager Rep" shall have the meaning ascribed to it in Section 1.2(c).

"Opening Date" shall mean the first (1st) day on which the Hotel is open for business to paying overnight guests.

"Owner" shall have the meaning ascribed to it in the Preamble.

"Owner Rep" shall have the meaning ascribed to it in Section 1.2(c).

"Plans" shall have the meaning ascribed to it in Section 2.3.1.

"Pre-Opening Account" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a bank or trust company designated by Manager.

4



"Pre-Opening Expenses" shall mean those expenses incurred prior to and after the Opening Date pursuant to Section 5.3 that are necessary for the preparation of the Hotel for operation, including, but not limited to, salaries and wages, costs of interim office space, furniture, equipment and systems, professional fees, telephone expenses, staff hiring and training costs, travel and moving expenses, costs of entertainment, opening celebrations and functions (including food, beverage, labor and room accounts of invitees), the cost of heat, light, power and clean-up expenses not chargeable to the cost of acquiring or constructing the Hotel, advertising, public relations and promotion expenses, employee benefits and meals prior to opening, classified advertising, agency fees and recruitment costs, pro rata costs of Manager or its Affiliates in performing such services including personnel costs and expenses allocated in a reasonable manner, and other associated and miscellaneous expenses.

"Project" shall mean an existing three hundred fifty three room hotel and related meeting and public spaces and support facilities and shall include the design, construction, furnishing and equipping of the Hotel, including, without limitation, the design, construction, furnishing and equipping of the porte cochere, lobby, elevator interiors, ballroom and meeting spaces, pool decks, public areas, guest rooms and corridors and other interior areas of the Hotel as may be agreed upon between Owner, Manager and Schrager (the "Project Areas") and all related infrastructure that is used in connection with the Hotel or is incidental to the use thereof.

"Project Areas" shall have the meaning ascribed to it in the definition of Project.

"Punchlist Items" shall have the meaning ascribed to it in Section 2.5.2.

"Reimbursable Expenses" shall mean the reasonable actual expenses incurred by Manager, Schrager  or their respective Affiliates, directly or indirectly, in connection with providing design and technical services pursuant to Article 2 and Article 3, whether before or after the execution of this Agreement, including, but not limited to:  transportation (including airfare) and lodging and meals incidental thereto; telephone calls, telegrams, facsimile transmissions, computer line charges, postage and use of courier services; photocopying and reproduction by other means of reports, drawings, specifications and similar Project-related documents; the use of highly specialized equipment; and fees paid by Manager and/or Schrager to independent consultants for their services and expenses.

"Schrager" shall have the meaning ascribed to it in the Preamble.

"Security Systems" shall mean video surveillance equipment; two way radio systems; inspection tour recording systems; security alarm systems; access control systems (pedestrian and vehicular); and other special security systems required for the Project.

"Soft Goods" shall mean all fabric, textile and flexible plastic products (not including items which are classified as "Fixed Asset Supplies") which are used in furnishing the Hotel, including,

5



without limitation:  corner guards, carpet, carpet base, fabric or vinyl wall covering, graphics, lamps, window treatments, artwork, upholstered furniture, task chairs, bed skirts, bed scarfs, shower curtain/liner, shower rod, artifacts, bedspreads, mirrors and similar items.

"Software" shall mean all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is generally commercially available, which are used by Manager in connection with operating or otherwise providing services to the Hotel and/or the EDITION Hotel System, including without limitation the property management system, the reservation system and the other electronic systems used by Manager in connection with operating or otherwise providing services to the Hotel and/or the EDITION Hotel System.

"Substantial Completion" shall mean (i) substantial completion of the Project in conformance, in all material respects, with the Plans, the EDITION Technical Standards, the System Standards and the requirements of this Agreement (other than minor Punchlist Items, which will not individually or in the aggregate impair the use of the Hotel for its intended purpose, or impair the guest experience at the Hotel) and free of all liens; (ii) making available to Manager all Fixed Asset Supplies and Inventories, and installing all FF&E and Hotel Systems, as required for the operation of the Hotel in accordance with the Management Agreement and this Agreement and for the Hotel to conform with clause (i) above; (iii) Owner and Manager, as applicable, have obtained required permits as set forth in Section 2.4.2 required for the opening of the Hotel; and (iv) Owner has funded the initial Working Capital described in Section 6.4.

"System Standards" shall mean any one or more (as the context requires) of the following three (3) categories of standards:  (i) operational standards (for example, services offered to guests, quality of food and beverages, cleanliness, staffing and employee compensation and benefits, Chain Services, frequent traveler programs such as the Marriott Rewards Program and other similar programs, etc.); (ii) physical standards (for example, quality of the Hotel Improvements, FF&E, and Fixed Asset Supplies, frequency of FF&E replacements, etc.); and (iii) technology standards (for example, those relating to software, hardware, telecommunications, high speed internet access, systems security and information technology); each of such standards shall be the standard which is generally prevailing or in the process of being implemented at all or substantially all other hotels in the EDITION Hotel System, including all services and facilities in connection therewith that are customary and usual at all or substantially all hotels in the EDITION Hotel System.

"Technical Services Fee" shall have the meaning ascribed to it in Section 4.2.

"Telecommunications Systems" shall mean PBX, phone systems, and call accounting and pocket paging systems, and high speed Internet access.

"Termination" shall mean the expiration or sooner cessation of this Agreement.



1.2     Project Schedule, Owner Representative, Manager/Schrager Representative and Approval of Consultants.

(a)     Manager and Schrager have proposed that Owner engage Calvin Tsao and Tsao & McKown Architects ("Designer") as the designer for the Project Areas.  Owner has agreed to engage Designer, subject to the negotiation and execution of a design services agreement between Owner and Designer acceptable to Owner in all respects including a scope of work, fees and payment structure.

(b)     As soon as reasonably possible after the Effective Date, but in no event later than thirty (30) days after the Effective Date, Manager and Schrager shall provide Owner with a schedule (the "Design Schedule") for the completion of the design of the Project Areas, including an estimate of the time necessary for the preparation of all related construction drawings and the issuance of related permits by the local building authority; provided, however, Owner acknowledges that Manager, Schrager and Designer shall not be responsible for obtaining such permits.  On a monthly basis during the course of the design development process, Manager and Schrager shall, and Schrager shall cause Designer to, update such schedule and present the revised design schedule to Owner for its review and approval.

(c)     Owner shall designate a representative (the "Owner Rep") through whom Manager and Schrager may coordinate their activities pursuant to this Agreement, which representative may be changed by Owner upon written notice to Manager.  Manager and Schrager shall designate a joint representative (the "Manager/Schrager Rep") through whom Owner may coordinate its activities pursuant to this Agreement, which representative may be changed by Manager and Schrager with written notice to Owner.

(d)     Manager and Schrager shall provide Owner with the names of, and other information reasonably requested by Owner with respect to other Project consultants proposed by Manager and Schrager for Owner's reasonable review and approval.

(e)     Owner shall provide Manager with the names of, and other information reasonably requested by Manager and Schrager with respect to Owner's architect of record and existing Project consultants, in each case for Manager and Schrager's review and approval.  In the event Owner desires to replace the architect of record or existing Project consultants, or to engage additional Project consultants, Owner shall first obtain Manager's and Schrager's review and approval with respect to such persons.  In the event Owner desires to replace the architect of record or existing Project consultants, or to engage additional Project consultants, Owner shall first obtain Manager's and Schrager's review and approval with respect to the proposed new persons. Manager and Schrager hereby approve the existing Project consultants set forth on Exhibit 3.

**ARTICLE 2**

7

## DESIGN AND TECHNICAL SERVICES

2.1     Conceptual and Schematic Design Phases.

      2.1.1    Preliminary Information.  Owner has previously delivered to Manager and Schrager a complete set of architectural and design drawings and specifications, including a detailed facilities program reflecting Owner's architectural and design plans for the Hotel and the existing conditions of the Hotel.  Manager has provided to Owner the preliminary EDITION Technical Standards and is currently working with Schrager to develop the final EDITION Technical Standards.  Until the completion and issuance of the final EDITION Technical Standards, Manager and Schrager shall provide to Owner such information as may be necessary with respect to Manager's requirements for the design, specification, scheduling and installation of the Hotel Systems to assist Owner in the completion of the procurement of the Hotel Systems as soon as practicable after such request by Owner.  Owner has previously worked with Manager to develop and assemble information about the Hotel and the Waikiki market including: (i) a competitive set analysis, containing such information as is available regarding occupancy, average daily rate, room sizes, facilities, services and amenities of competitive hotels in the market; and (ii) other general information about the market.

      Schrager, in conjunction with Designer and based upon the detailed facilities program reflecting Owner's existing architectural and design plans for the Hotel, shall prepare for Owners' approval, a proposed new detailed facilities program (the "Facilities Program") describing the space requirements for the Project Areas which shall take into account the EDITION Technical Standards and the System Standards.

      The parties acknowledge and agree that with respect to the redevelopment, repositioning, renovation, design and construction of the Hotel as contemplated by this Agreement, the parties shall work together in good faith to resolve any disputes regarding such matters and to reach a resolution acceptable to all parties.  In the event that, despite such good faith efforts, the parties are unable to reach a mutually acceptable resolution (a) Schrager shall have final approval, in its reasonable discretion, over the interior design of the Hotel and the overall theme and feel of the Hotel, notwithstanding any Owner approval rights set forth in this Agreement; (b) Owner shall have final approval, in its reasonable discretion, over structural matters, the uses of the Project Areas, and the configuration of all other areas of the Hotel, notwithstanding any approval rights of Manager or Schrager set forth in this Agreement; and (c) Manager shall have final approval, in its reasonable discretion, over all matters concerning EDITION Technical Standards and Hotel Systems notwithstanding any approval rights of Owner or Schrager set forth in this Agreement; provided, however, that Manager's approval rights with respect to fire and life safety matters shall be in Manager's sole discretion.

      2.1.2    Response to Preliminary Information.  Within the timeframe set forth in the Design Schedule Schrager will (i) meet with Designer to present Schrager's preliminary design

8



vision and concept for the Hotel, (ii) in conjunction with Designer provide feedback to Owner on the Facilities Program and proposed layouts for the public areas of the Hotel provided by Owner, (iii) discuss and provide input to Owner with respect to the food and beverage concepts for the Hotel, and (iv) discuss and provide input to Owner with respect to the design schedule and key construction and development milestones.

2.1.3    <u>Designers and Consultants</u>.  Owner shall be solely responsible to pay all costs and expenses of the architects, engineers, designers and consultants retained in connection with the design and development of the Project, all of whom shall be subject to the approval of Manager and Schrager.

2.1.4    <u>Schrager and Manager Oversight</u>.  Schrager shall direct all of the design consultants and the artwork consultant throughout the term of this Agreement.  The Hotel shall comply with Manager's fire and life safety standards.  Manager shall review and approve the operational, fire and life-safety and back-of-house plans as necessary throughout the term of this Agreement.

2.1.5    <u>Schematic Design Phase</u>.  Schrager shall cause Designer, with input from Manager and Schrager, and based upon and incorporating the information provided in the materials described in Sections 2.1.1 and 2.1.2, to prepare or cause to be prepared for delivery to Owner:  (i) a detailed listing of each operating function of the Hotel and the as-designed areas, and any other documents required to describe the size, layout and quality of the Hotel; (ii) colored floor plans, showing all spaces listed in the Facilities Program (at a scale of 1/8"=1'); and (iii) Guest Room layouts, indicating all bath fixtures, kitchen equipment, closets, balconies and other major features (at a scale in ¼" scale).  Such materials shall also include a rendering and preliminary architectural plans of the Project Areas, if any.

2.1.6    <u>Project Milestones</u>.  Owner, Designer, Manager and Schrager shall prepare a milestone schedule that will include, without limitation, the following:

(a)    conceptual design review

(b)    fire and life safety review(s)

(c)    schematic design review

(d)    design development reviews - as agreed upon between Owner, Manager and Schrager

(e)    construction document review - as agreed upon between Owner, Manager and Schrager

9



(f)     value engineering review(s)

(g)     FF&E review(s)

(h)     signage review(s)

(i)     graphics review(s)

(j)     web site review(s)

(k)     Fixed Asset Supplies and Inventories review(s)

(l)     Any change in the agreed milestone schedule must be approved by Owner, Manager and Schrager.

2.2     <u>Design Development Phase.</u>

2.2.1     <u>Design Development Phase</u>.  Schrager shall cause Designer, with direction from Manager and Schrager, based upon the approvals described in Section 2.1, to prepare or cause to be prepared: (i) the detailed development of plans and specifications for each of the Project Areas; (ii) furniture layouts, reflected ceiling plans, interior elevations, wall sections, materials, lighting and color schemes; (iii) design of HVAC distribution – coordinated with mechanical engineer and other consultants as appropriate;  (iv) design for lighting and emergency lighting and alarm systems; (v) review of lighting layouts for all such areas including specific fixture selection in catalog reference or design form, and recommendations on and specifications of dimmer equipment.

2.2.2     <u>Interior Design</u>.  Prior to submission, or as part of the plans submitted pursuant to Section 2.2.1 to Owner, Designer, Manager and Schrager shall submit to Owner for review and approval (i) interior design plans, including color-rendered floor plans, reflected ceiling plans, elevations, sections and renderings that are reasonably necessary, in Designer's or Schrager's opinion, to adequately explain the design intent for the Hotel's public areas and Guest Room and Guest Room corridors (which, upon approval, shall become part of the Plans); and (ii) display boards of fabrics, carpets, furnishings, finishes, paints, lighting design guidelines (e.g., fixtures, chandeliers, sconces, etc.) and other materials for each Project Area designated by Schrager.  Schrager shall cause Designer, with direction from Manager and Schrager as appropriate, to revise and amend such presentation materials as required to obtain final approval of the interior design by Owner.

2.2.3     <u>Approval of Design Development Package</u>.  Owner, Manager and Schrager shall review and approve the design development package at interim levels of completion to be



agreed upon between Manager, Schrager and Owner and at one hundred percent (100%) completion.

        2.2.4    <u>Approval of FF&E Package</u>.  Schrager shall cause Designer, with input and oversight from Schrager and Manager to prepare the proposed FF&E package for presentation to Owner.  The final FF&E package shall meet the quality standards set forth in the specification book provided to Owner by Manager and Schrager  and shall be subject to approval by Manager, Schrager and Owner from durability, aesthetic and cost perspectives.

        2.2.5    <u>Approval of Third-Party Operators</u>.  Owner, Manager and Schrager shall mutually approve all third-party operators of food and beverage outlets, the spa, and any other amenities at the Hotel.  Owner has engaged Morimoto as the operator of the primary restaurant space and Manager and Schrager agree to work together with Owner and Morimoto to maximize the operation of the restaurant and integrate the primary restaurant space with the rest of the Hotel.

      2.3    <u>Construction Document Phase</u>.

        2.3.1    <u>Final Design Phase</u>.  Upon the approval of Owner, Manager and Schrager of the items detailed in Section 2.2, and based upon the designs therein approved by Owner, Manager and Schrager, Owner shall cause Owner's architect to produce final plans, specifications and complete construction drawings (including, without limitation, architectural, electrical, plumbing, HVAC, structural, civil engineering, life safety, and landscape drawings for the Project) (collectively, the "Plans") which shall be properly sealed by Owner's architect.  The Plans shall (i) adapt the standards and specifications approved by Manager and Schrager to the Hotel and to the legal requirements applicable to the design, construction and operation of the Hotel, and (ii) incorporate the Conceptual Plans, EDITION Technical Standards and the System Standards.  The Plans shall be submitted to Manager and Schrager for approval at intervals to be agreed upon by Owner, Manager and Schrager,  which shall be at least thirty (30) days prior to commencement of construction of the Project.  The Plans shall clearly indicate items which vary from or are inconsistent with the Conceptual Plans previously approved by the parties.  Following Manager's and Schrager's approval of each stage of the Plans, no change in such Plans shall be made that materially affects the design, construction, operation, cost or aesthetics of the Hotel or any of the Project Areas without the prior approval of Manager and Schrager.

        2.3.2    <u>Systems</u>.  In accordance with the approved schedule for the Project, Manager and Schrager shall provide to Owner:  (i) on background drawings provided by Owner, the locations of security devices, and their specifications, installation details, cable distribution, power and space requirements; (ii) on background drawings provided by Owner, the locations and types of telephone equipment, paging and call accounting equipment; (iii) a cabling document and general information for the Hotel Systems; and (iv) guidelines for conduit sizing, cable distribution, power and space requirements for Telecommunications Systems.



2.3.3   <u>Decorative Items</u>.  Upon Owner's approval  of the interior design materials submitted pursuant to Section 2.2.2, Manager and Schrager shall prepare or cause to be prepared for Owner's review and approval documents reasonably describing the Decorative Items to be installed in the Hotel and the installation locations or details therefore.  Such information shall include the description, quantity, recommended manufacturer and model number, product specification, photograph (when appropriate), installed location and other pertinent information about the Decorative Items.

2.3.4   <u>Approvals</u>.  Manager and Schrager shall provide to Owner for review and approval documents specifying the Audio/Video Systems, Exterior Identity Signage, Food/Kitchen Equipment, Graphics, Housekeeping Equipment, Laundry Equipment, Security Systems and Telecommunications Systems to be installed in the Hotel.  Such information shall include the description, quantity, recommended manufacturer and model number, product specification, photograph (when appropriate), installed location and other pertinent information about the FF&E and other equipment and systems.  Upon approval by Owner, such documents shall become part of the Plans.

2.4   <u>Construction Phase</u>.

2.4.1   <u>Construction of Hotel, Observations</u>.  Owner shall construct, furnish and fully equip the Hotel and the Project Areas in accordance with the Plans that have been previously approved by Owner, Manager and Schrager and the EDITION Technical Standards and Systems Standards in existence as of the commencement of construction (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3).  During the course of construction, Owner shall cooperate with Manager and Schrager for the purpose of permitting Manager and Schrager to observe from time to time the construction of the renovations to the Project as construction proceeds, and to determine whether construction is proceeding in accordance with the approved Plans.  In particular, Owner shall permit Manager and Schrager to visit the Site at such intervals as they deem reasonably necessary (which intervals shall include, without limitation, the milestone events described on <u>Exhibit 1</u> attached hereto as agreed upon by Owner, Manager and Schrager).  Owner shall give Manager and Schrager at least fifteen (15) days' notice prior to each of the events described in <u>Exhibit 1</u> in order to enable Manager and Schrager to schedule their visit(s).  However, the parties agree that despite their right to observe the construction pursuant to this Section 2.4.1, neither Manager nor Schrager shall be obligated to observe the construction of the Project.  It is understood and agreed that neither Manager nor Schrager is providing construction management services, and that construction management shall be the sole responsibility of Owner.  To the extent that Manager or Schrager reasonably determines that the Project, as constructed, furnished or equipped do not conform to the approved Plans, Owner shall promptly correct such nonconforming work.  Any nonconforming work discovered prior to the opening of the Hotel shall be corrected by Owner prior to the Opening Date.

12



2.4.2   <u>Permits</u>.  Owner shall be responsible for obtaining all permits and other approvals required for construction and opening of the Hotel, such as the building permit, occupancy permit and elevator permits for the Hotel.  Manager shall be responsible for obtaining all permits and licenses required for the operation of the Hotel, such as the hotel operating license, liquor licenses and other miscellaneous licenses.  In connection therewith, Owner agrees to sign promptly and without charge applications for any such licenses, permits and other documents pertaining to the initial operation of the Hotel as may be required by the applicable authority.

2.4.3   <u>Documents Upon Completion of Construction</u>.  Upon completion of the Hotel, Owner shall submit to Manager and Schrager (i) an architect's certification that the Plans comply with all applicable legal requirements and that the Hotel has been constructed and completed materially in accordance with the Plans approved by Manager and Schrager, and (ii) a copy of the temporary or, if available, permanent certificate of occupancy for the Hotel.  Owner shall use reasonable efforts to provide to Manager a copy of the permanent certificate of occupancy for the Hotel by no later than sixty (60) days after the date of Substantial Completion.

2.4.4   <u>Budget</u>.  No later than fifteen (15) days after the Effective Date Owner shall prepare and furnish a master budget to Manager and Schrager for their approval, which approval shall be limited to determining that such master budget contemplates sufficient funds for all of its intended purposes.  Such budget may be amended and refined within fifteen (15) days after the beginning of each design phase and the start of construction.  The master budget for the Project shall specify dollar amounts for at least the following items:

(a)   Predevelopment costs with reasonable specificity;

(b)   Design fees, including special design presentations scheduled by Manager and Schrager;

(c)   Construction costs, specifically identifying but not limited to:

(i)   Landscaping, hardscaping and site amenities;

(ii)   Public space marble;

(iii)   Guest Room marble;

(iv)   Public space millwork; and

(v)   Guest Room millwork;

(d)   FF&E specifically identifying arts and antiques, kitchen and laundry;

13



(e)    Costs related to interior design;

(f)    Interior and exterior signage;

(g)    Warehouse staging for FF&E;

(h)    Art allowances, antique allowances and decorative lighting for Guest Rooms, Guest Room corridors, public areas, restaurant(s), bar(s), ballroom(s), meeting rooms and boardrooms, and private dining room(s);

(i)    Administrative offices furnishings;

(j)    Equipment and furnishings for main kitchen, remote kitchens, food and beverage outlets, main laundry facility, housekeeping offices, and central and remote shelving;

(k)    Equipment for plant maintenance and groundskeeping;

(l)    Equipment and supplies for recreational facilities;

(m)    Supplies for Guest Rooms, public areas, food and beverage facilities, and front desk;

(n)    Uniforms;

(o)    Other Development Fees and Costs; and

(p)    Contingency.

2.5    Post-Completion Period.

2.5.1    Documentation.  Upon Substantial Completion, Owner shall provide to Manager:  (i) all documents, including an electronic copy (AutoCAD.dwg format) and two (2) full size print sets of record drawings and specifications prepared with respect to the Hotel and the Project Areas for Owner by its architects, engineers, interior designers, electrical engineering consultants, plumbing consultants, mechanical consultants, lighting consultants, graphic designers, and all other design team consultants, as the case may be, with the inclusion therein of all documented changes (including the architect's supplemental instructions, requests for information (RFIs), submittal revisions, etc.) and all "as-built" information; and (ii) all management manuals, drawings, technical information, warranties and guaranties relating to the equipment and systems installed in the Hotel or the Project Areas.

14



2.5.2    Punchlist.  Within thirty (30) days after the Opening Date, Manager shall furnish to Owner (with a copy to Schrager) the completed punchlist ("Punchlist Items") delineating the specific areas of the Project disapproved or rejected by Manager and/or Schrager and setting forth the grounds for such disapproval or rejection.  Owner shall use commercially reasonable efforts to complete any of the Punchlist Items within one hundred twenty (120) days after Owner's receipt of the list of Punchlist Items pursuant to this Section 2.5.2., and in the event Owner fails to do so, Manager shall be entitled to complete the remaining Punchlist Items at the sole cost and expense of Owner.   If, following one hundred twenty (120) days after the Opening Date, Owner has failed to reimburse Manager for any amounts for which Owner is liable pursuant to this Section 2.5.2, Manager shall have the option to reimburse itself such amounts from distributions otherwise payable to Owner pursuant to the Management Agreement.

2.5.3    Defaults.  Notwithstanding any other provisions of this Agreement, to the extent that Manager reasonably determines that the Hotel as constructed, furnished or equipped, does not conform to the approved Plans in any material respect, Manager shall provide written notice thereof to Owner in accordance with Section 9.11.  Owner shall use commercially reasonable efforts to correct such nonconforming work within thirty (30) days after receipt of written notice from Manager, and in the event Owner fails to do so, Manager shall be entitled to correct such non-conforming work at the sole cost and expense of Owner.  If, following one hundred twenty (120) days after the Opening Date, Owner has failed to reimburse Manager for any amounts for which Owner is liable pursuant to this Section 2.5.3, Manager shall have the option to reimburse itself such amounts from distributions otherwise payable to Owner pursuant to the Management Agreement.

2.5.4    EDITION Flagging.  The parties have agreed that the  Hotel will initially open without the EDITION brand name.  The parties agree that the Conceptual Plans will set forth those items that are required for the Opening Date to occur and those additional items that are required solely for the Flagging Date to occur.  Based upon the Conceptual Plans, Manager shall prepare a schedule specifying those items within the Conceptual Plans (the "Flagging Renovation") that must be completed in order for the Flagging Date to occur.  Owner shall complete those items required for the Opening Date to occur and those items required for the Flagging Date to occur.  Manager shall advise Owner as early as possible as to the date Manager desires the Hotel to open as an EDITION Hotel so that the Flagging Date may be achieved in a timely manner and to minimize any delays associated with the completion of construction or other work required for the Hotel to operate within the EDITION Hotel System.

## ARTICLE 3
## FIXED ASSET SUPPLIES, INVENTORIES AND EQUIPMENT LEASES

3.1    Fixed Asset Supplies and Inventories.  Owner shall ensure that, on or prior to the date of Substantial Completion, the Hotel is equipped with the required Fixed Asset Supplies, Inventories and Hotel Systems required for the operation of the Hotel and Project Areas in

15

