# EXHIBIT 2

1.09   System Standards and Criteria for Approvals

Subject to Section 1.03.B, Owner and Manager agree that it is their mutual intent that the Hotel be operated as part of the EDITION Hotel System in compliance with System Standards. Owner and Manager agree that, subject to the terms and conditions of this Agreement, Manager shall have reasonable discretion in operating the Hotel in order that the Hotel will comply with System Standards, and that, in exercising their respective rights of approval herein, they will do so consistent with the requirements of System Standards.

1.10   Central Office Services

As part of its management services provided hereunder, Manager shall provide, at its own cost and not as a Deduction, the Central Office Services that are described on Exhibit B attached hereto.

1.11   Chain Services

A.   Manager shall cause to be furnished to the Hotel certain services ("Chain Services") that are furnished on a comparable basis to all or substantially all other hotels in the Boutique System. Chain Services shall include: (i) the general categories of services listed in Exhibit C attached hereto, and (ii) such additional central programs or services as may, from time to time, be furnished for the benefit of all or substantially all, to the extent reasonably applicable, hotels in the Boutique System or in substitution for services now performed at individual hotels which Manager determines can be provided more efficiently and economically on a system basis; provided, however, that services shall only be added to "Chain Services" pursuant to clause (ii) above if, and to the extent that, such services: (a) are not Central Office Services; and (b) are either (x) new services (i.e., not previously performed at the Hotel), or (y) services that theretofore had been performed at the Hotel, but that can be performed more efficiently and economically for the Boutique System as a whole. Chain Services shall not include Marketing Fee Services.

B.   Costs and expenses incurred in the providing of Chain Services shall be allocated on a fair and consistent basis among all hotels in the Boutique System. The charges for Chain Services shall include, as applicable, an allocation of salaries, wages, development costs and overhead related to the employees of Manager, Marriott or any Affiliate of Manager or Marriott involved in providing any of the Chain Services. The costs associated with any Chain Services that are used by hotels in the Boutique System and that are also provided to other hotel brands owned by Marriott shall be allocated to such other brands on a fair and consistent basis, taking into account the level of such Chain Services being provided to each of such other brands. All charges classified as Chain Services shall be treated and charged as Cost Transactions and Manager shall not earn nor be entitled to earn a profit on such charges.

C.   Pursuant to the provisions of Section 4.07, Manager shall provide to Owner the Chain Services Report, as such document is described in Section 4.07.

7



1.12    Related Party Transactions

Subject to Manager's compliance with the provisions of Section 1.13, Manager shall have the right to enter into or implement transactions with one or more Related Parties to purchase, sell, lease, procure or provide goods and/or services for or to the Hotel.

1.13    Profit and Cost Transactions Relating to the Hotel

A.    A "Profit Transaction" shall mean any transaction entered into or implemented by Manager or a Related Party involving the purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel, which is structured for Manager or a Related Party to receive a direct economic benefit (including receipt of an equity interest) as a result of such transaction, other than through Management Fees, that is in excess of the costs of such transaction.

B.    Manager and the Related Parties may implement any Profit Transaction without Owner's approval, provided that (i) the Profit Transaction satisfies the Competitive Terms Standard, and (ii) Manager notifies Owner of such Profit Transaction as part of the Annual Profit Transactions Report.

C.    Any dispute as to whether a Profit Transaction satisfies the Competitive Terms Standard shall be resolved by a panel of Experts in accordance with Section 11.20. If the Experts determine that the Competitive Terms Standard was not satisfied, Manager shall elect either to (i) incorporate, or cause the applicable Related Party to incorporate, modifications into the Profit Transaction that the Experts may require to satisfy the Competitive Terms Standard, in which event the Profit Transaction, as so modified, may be implemented; or (ii) cease, not undertake, or cause the applicable Related Party to cease or not undertake, the transaction as a Profit Transaction; provided, however, that (x) Manager and the Related Parties shall nevertheless have the right to undertake such transaction for other parties, entities or hotels, and (y) as Owner's sole and exclusive remedy for Manager's actions, Manager shall return to the Hotel the excess of the amount paid by the Hotel to the Related Party with respect to such Profit Transaction less the amount that would have been paid had the Profit Transaction met the Competitive Terms Standard and shall pay the reasonable costs of the Experts, if any. If such reimbursement to the Hotel relates to a matter that was treated as a Deduction, appropriate adjustments shall be made to the calculation of Operating Profit and to all other related calculations to reflect the reimbursement to the Hotel. A Profit Transaction shall be deemed to satisfy the Competitive Terms Standard if Manager elects to obtain approval of such Profit Transaction from owners of a majority of the then-existing rooms in the EDITION Hotel System, and obtains such approval from the owners of a majority of the then-existing rooms in the EDITION Hotel System.

D.    The parties agree that the utilization of Avendra, LLC, for procurement purposes pursuant to its contract terms as of the Effective Date and the utilization of STSN, Inc. for



high-speed internet access service pursuant to its contract terms as of the Effective Date, are Profit Transactions that satisfy the Competitive Terms Standard.

E.  A "Cost Transaction" shall mean any transaction involving the purchase, sale, lease or other procurement or provision of goods or services that (i) when provided for or to the Hotel, is implemented utilizing a cost reimbursement or cost allocation methodology to price such goods or services (which costs may include a reasonable allocation of development, start-up and operational costs incurred by the provider in connection with providing such goods or services), as opposed to a methodology designed to yield a profit on such goods or services (other than profits that Manager earns through Management Fees); and/or (ii) when provided for or to any third party, is implemented on any terms and conditions (including the utilization of either a cost or a profit methodology). Consistent with the other terms and conditions of this Agreement, Manager and the Related Parties may implement any Cost Transaction for or to the Hotel without Owner's approval.

F.  If Manager or a Related Party implements a Cost Transaction for both the Hotel and any third party, then Manager or the Related Party may earn a profit from implementing such Cost Transaction to such third party, provided that the costs associated with such Cost Transaction (including development and start-up costs, if any) shall be allocated on a fair and consistent basis among all the parties (including the Hotel) utilizing such Cost Transaction, taking into account the level of services provided under such Cost Transaction to each of the parties (including the Hotel) utilizing such Cost Transaction. Any disputes between Owner and Manager concerning the allocation of such costs under this Section 1.13.F shall be resolved by a panel of Experts in accordance with Section 11.20 hereof.

G.  Manager's collection of the Marketing Fee and use of the funds so collected shall not be deemed to be either a Profit Transaction or a Cost Transaction. Manager shall not, however, earn a profit with respect to the Marketing Fee, the parties' intention being that the funds collected from the Marketing Fee and retained by Manager shall be expended in their entirety, over time, on Marketing Fee Services.

1.14   Marriott Rewards Program

Manager, in its discretion, shall have the right to include the Hotel, and to cause the Hotel to participate, in the Marriott Rewards Program from and after the Opening Date. Charges and reimbursements to the Hotel resulting from the Marriott Rewards Program shall be consistent with charges and reimbursements to all other hotels in the Boutique System participating in the Marriott Rewards Program, which charges and reimbursements shall be subject to change from time to time. All expenses charged to the Hotel in connection with the Marriott Rewards Program shall be treated as Deductions. Manager and the Related Parties shall not earn a profit from the Hotel with respect to its participation in the Marriott Rewards Program; provided, however, that Manager and the Related Parties shall nevertheless have the right to earn a profit by utilizing the systems and infrastructure of the Marriott Rewards Program for third parties in accordance with and subject to the terms and conditions of Section 1.13.F.



1.15    Procurement Rebates and Fees

A.    In any instance in which Manager receives an Unrestricted Rebate with respect to any purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel, such Unrestricted Rebate (or allocable portion thereof, based on a reasonable allocation formula, to the extent that such Unrestricted Rebate also applies to the purchase, sale, lease or other procurement or provision of goods or services for or to other hotels or third parties) shall be treated as follows: (i) first, the amount of such Unrestricted Rebate shall be applied against any costs incurred in connection with the purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel (which costs shall be allocated to the Hotel on a reasonable basis to the extent such costs also apply to the purchase, sale, lease or other procurement or provision of goods or services for or to other hotels or third parties), and (ii) second, any remaining amount of such Unrestricted Rebate shall be reimbursed to the Hotel (which reimbursement shall be treated as a reduction of the Deductions for the applicable period). Manager shall have the right, at its reasonable discretion, to modify the above procedure to (x) pay the entire amount of the costs described in clause (i) above as a Deduction, and (y) reimburse to the Hotel the entire amount of such Unrestricted Rebate (i.e., without netting the two amounts as described in the immediately preceding sentence).

B.    For purposes hereof, the term "Unrestricted Rebate" shall mean a rebate, payment or other enrichment received by Manager with respect to the purchase, sale, lease or other procurement or provision of goods or services specifically for or to the Hotel, where Manager is entitled to return such rebate, payment or enrichment to each of the hotels for or to which the goods or services were purchased, sold, leased, procured or provided. The term "Unrestricted Rebate" shall not include (i) any allowances, payments or other enrichments received by Manager with respect to the purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel, where Manager is not entitled to return such allowances, payments or enrichments to the hotels for or to which the goods or services were purchased, sold, leased, procured or provided or is required by a third party to utilize or allocate such allowances, payments or enrichments in a specific manner, or (ii) any conference sponsorship payments received by Manager that are used to defray conference costs. If Manager receives an allowance, payment or enrichment pursuant to Section 1.15.B(i) or Section 1.15.B(ii), Manager shall utilize or allocate such allowance, payment or enrichment in the manner required by the third party and shall not directly profit from such allowance, payment or enrichment.

1.16    Limitations on Manager's Authority

Notwithstanding anything herein to the contrary, Manager shall not, without Owner's prior approval:

A.    Enter into, renew or extend any (y) lease or sublease with any Affiliate of Manager, or (z) equipment lease, other lease, sublease, license, concession or service contract with any non-Affiliate of Manager at the Hotel if either (i) with respect to such lease, sublease, license, concession or service contract, the total term or renewal term thereof will exceed three (3) years; (ii) the annual rent, payment or fee required to be paid by the lessee, sublessee, licensee or third party under such lease, sublease, license, concession or service contract, will



exceed Fifty Thousand Dollars ($50,000), as adjusted annually by the GDP Deflator; (iii) the total square footage covered by such lease, sublease, license or concession will exceed two hundred fifty (250) square feet; or (iv) the term of such lease, sublease, license, concession or service contract extends beyond the Term; provided that the foregoing limitation shall not apply if such license, concession or service contract (but in no event a lease or sublease) arises from or is related to a master or national contract or agreement entered into by Manager or any of its Affiliates. For the avoidance of doubt, this Section 1.16 shall not apply to any contracts entered into by Manager pursuant to Section 1.06.D. Any leases, subleases, licenses or concessions at the Hotel with any Affiliate of Manager will also be subject to Sections 1.12 and 1.13 hereof. Further, any agreement between Manager and any Affiliate of Manager, whether a Cost Transaction or a Profit Transaction, shall be terminable without penalty to Owner upon Termination.

B.      Adjust any claim or settle any Litigation involving the operations of the Hotel that (a) is not fully covered (except with respect to a reasonable deductible) by any of the insurance policies described in Article VI and is not an Employee Claim, and (b) would result in a Deduction or payment in excess of One Hundred Thousand Dollars ($100,000), as adjusted annually by the GDP Deflator, in any Fiscal Year.

## ARTICLE II

## TERM

2.01    Term

The "Term" of this Agreement shall consist of an "Initial Term" and the "Renewal Term(s)." The "Initial Term" shall begin on the Effective Date and shall continue until the expiration of the thirtieth (30th) full Fiscal Year after the expiration of the Fiscal Year in which the Opening Date occurs. Thereafter, this Agreement shall automatically, and with no further action required by Owner or Manager, be renewed on the same terms and conditions for each of two (2) successive periods of ten (10) full Fiscal Years each ("Renewal Term(s)"), unless Manager shall have given prior written notice to Owner of its election not to renew at least three hundred (300) days prior to the expiration of the then-current Initial Term or Renewal Term, as the case may be.

2.02    Performance Termination

A.      Subject to the provisions of Section 2.02.B, Owner shall have the option to terminate this Agreement if, with respect to any two (2) consecutive Fiscal Years (not including any portion of any Fiscal Year prior to the expiration of the fifth (5th) full Fiscal Year after the Opening Date):

1.      Operating Profit for each such Fiscal Year is less than the Performance Termination Threshold for such Fiscal Year; provided that, for purposes of this Section 2.02.A.1 only, Operating Profit shall be computed by deducting an amount for Impositions equal to the



actual amount of Impositions imposed on the Hotel for the first full Fiscal Year after the Opening Date provided that such amount does not exceed One Million Six Hundred Fifty Thousand Dollars ($1,650,000), which amount shall increase by (i) two percent (2%) each Fiscal Year commencing with the second (2nd) full Fiscal Year after the Opening Date, and (ii) the amount of any incremental increase in Impositions allocable solely to an expansion or addition to the Hotel; and

        2.      The Revenue Index of the Hotel during each such Fiscal Year is less than the Revenue Index Threshold for such Fiscal Year; and

        3.      The fact that the Hotel has not met the tests set forth in Section 2.02.A.1 and Section 2.02.A.2 is not the result of (i) an Extraordinary Event, (ii) any major renovation of the Hotel, (iii) any Event of Default by Owner, or (iv) the failure of the Hotel to comply with System Standards of which Manager has previously informed Owner in writing (unless such failure is caused by a default by Manager of its obligations under this Agreement).

Owner shall exercise such option to terminate by serving written notice ("Termination Notice") thereof on Manager no later than ninety (90) days after Owner's receipt of the annual accounting under Section 4.02 for the second (2nd) of the two (2) Fiscal Years referred to in this Section 2.02.A. If Manager does not elect to avoid such Termination pursuant to Section 2.02.B, this Agreement shall terminate as of the end of the fourth (4th) full Accounting Period following the date on which Manager receives the Termination Notice; provided that such period of time shall be extended as required by applicable Legal Requirements pertaining to the termination of the employment of the employees at the Hotel. Owner's failure to exercise its right to terminate this Agreement pursuant to this Section 2.02.A with respect to any given Fiscal Year shall not be deemed an estoppel or waiver of Owner's right to terminate this Agreement with respect to subsequent Fiscal Years to which this Section 2.02.A may apply. Prior to serving on Manager the Termination Notice, Owner shall, as applicable, (x) satisfy in full all repayment and other obligations to Manager and its Affiliates under any Marriott Funding Obligations, and (y) release or cause the release of all obligations of Manager and its Affiliates under such Marriott Funding Obligations); provided that if Owner fails to complete all such actions prior to the date on which Owner is required to send such Termination Notice, (x) the foregoing Owner's election to terminate this Agreement under this Section 2.02.A shall be canceled and of no force or effect and this Agreement shall not terminate, and (y) the first (1st) of the two (2) Fiscal Years to which such Termination Notice would have applied shall no longer be treated as a Fiscal Year for the purposes of Section 2.02.A.1.

    B.    Upon receipt of Owner's Termination Notice pursuant to Section 2.02.A, Manager shall have the option, to be exercised by written notice to Owner (the "Shortfall Notice") within sixty (60) days after receipt of such Termination Notice, to avoid such Termination by making a Shortfall Payment. The term "Shortfall Payment" shall mean the payment to Owner of the amount by which Operating Profit for both of the two (2) Fiscal Years referenced in Section 2.02.A was less than the Performance Termination Threshold for such Fiscal Years (such amount, the "Shortfall Amount"), which payment shall be made within five (5) Business Days after the date on which Owner receives the Shortfall Notice.



If Manager makes a Shortfall Payment pursuant to this Section 2.02.B, the Fiscal Years with respect to which such Shortfall Payment was made shall thereafter not be treated, for purposes of subsequent elections by Owner pursuant to Section 2.02.A, as Fiscal Years in which the circumstances described in Section 2.02.A.1 have occurred. If Manager makes such Shortfall Payment, then the foregoing Owner's election to terminate this Agreement under Section 2.02.A shall be canceled and of no force or effect with respect to the two (2) Fiscal Years in question, and this Agreement shall not terminate. Such cancellation, however, shall not affect the right of Owner, as to each subsequent Fiscal Year to which Section 2.02.A applies, to again elect to terminate this Agreement pursuant to the provisions of Section 2.02.A (which subsequent election shall again be subject to Manager's rights under this Section 2.02.B). If Manager does not exercise its option to make a Shortfall Payment as aforesaid, then this Agreement shall be terminated as of the date set forth in Section 2.02.A. Manager shall not be entitled to avoid termination by making Shortfall Payments pursuant to this Section 2.02.B more than two (2) times in any fifteen (15) year period during the Term.

C.   Any disputes between Owner and Manager under this Section 2.02 (including, without limitation, with respect to (i) the calculation of Operating Profit, the Performance Termination Threshold or the Revenue Index; or (ii) the applicability, duration or extent of impact of any of the items specified in Section 2.02.A.3 shall be resolved by a panel of Experts in accordance with Section 11.20. The sixty (60) day period described in Section 2.02.B shall be tolled until the panel of Experts issues its determination.

2.03   Limitation on Termination by Owner

Notwithstanding anything in this Agreement to the contrary, without the express written consent of Manager (which consent may be withheld in Manager's sole and absolute discretion), Owner covenants and agrees that it may not terminate this Agreement for any reason whatsoever (including, without limitation, any Event of Default caused by Manager) at any time that (i) Manager or any of its Affiliates are providing (or are obligated to provide) any credit enhancement, guarantee, or loan (collectively, the "Marriott Funding Obligations") to Owner, an Affiliate of Owner or a lender of Owner with respect to the Hotel; or (ii) any amounts funded by Manager or its Affiliate pursuant to any Marriott Funding Obligation remain outstanding and payable to Manager or its Affiliate. Owner agrees that during any period of time described in clause (i) or clause (ii), Owner's sole remedy for an Event of Default caused by Manager shall be to sue Manager for monetary damages incurred by Owner as a result of such Event of Default. However, nothing herein shall preclude Owner from (x) satisfying in full all repayment and other obligations to Manager and its Affiliates under such Marriott Funding Obligations, and (y) releasing or causing the release of all obligations of Manager and its Affiliates under such Marriott Funding Obligations in order to exercise its termination rights in accordance with this Agreement. As used herein, "Marriott Funding Obligations" shall not include the Key Money.



## ARTICLE III

## COMPENSATION OF MANAGER

3.01   Management Fees

Manager shall be paid the sum of the following as its management fees:

A.   the Base Management Fee, which shall be retained by Manager from Gross Revenues; plus

B.   the Incentive Management Fee, which shall be retained by Manager from Operating Profit in accordance with Section 3.02 and Section 4.01.

3.02   Distribution of Operating Profit

With respect to each Fiscal Year during the Term, Operating Profit for such Fiscal Year (to the extent available) shall be distributed to Owner and to Manager in the following order of priority:

A.   first, an amount equal to Owner's Priority shall be paid to Owner;

B.   second, any Incentive Management Fee shall be paid to Manager; and

C.   third, any remaining balance of Operating Profit shall be paid to Owner.

Such distributions shall be made on an interim basis in accordance with Section 4.01.B.

## ARTICLE IV

## ACCOUNTING AND REPORTING MATTERS

4.01   Accounting and Interim Distributions

A.   Within twenty (20) days after the close of each Accounting Period, Manager shall deliver an interim accounting (the "Accounting Period Statement") to Owner showing Gross Revenues, Deductions, Operating Profit, and applications and distributions thereof for the preceding Accounting Period. At the time that Manager delivers each Accounting Period Statement, Manager shall transfer to Owner any interim amounts due Owner, subject to Working Capital needs, and shall retain any interim Management Fees due Manager.

B.   Calculations and payments of the Incentive Management Fee, the Base Management Fee, and Owner's Priority shall be accounted for cumulatively within a Fiscal Year, but shall not be cumulative from one Fiscal Year to the next. Interim distributions of Incentive

14



Management Fees shall be calculated, earned and distributed based on prorating the full Fiscal Year Owner's Priority equally over thirteen (13) Accounting Periods. Calculations of such distributions shall be made on a cumulative basis using cumulative year-to-date Operating Profit and cumulative year-to-date prorated Owner's Priority, and applying the percentage calculations set forth in the definition of Incentive Management Fee. Such amounts shall be adjusted each Accounting Period, and may, in the event of a significant negative change in performance, require Manager to return previously distributed Incentive Management Fees for such Fiscal Year.

        C.     Within seventy-five (75) days after the close of each Fiscal Year, Manager shall furnish Owner a statement (the "Annual Operating Statement") in reasonable detail summarizing the Hotel's operations for such Fiscal Year and a certificate executed by a senior vice president of Manager with accounting oversight responsibility for the region in which the Hotel is located, certifying that such Annual Operating Statement is true and correct. Within ten (10) days after Owner's receipt of such Annual Operating Statement, the parties shall make any adjustments, by cash payment, in the amounts paid or retained for such Fiscal Year as are required based on the final figures set forth in such Annual Operating Statement. Such Annual Operating Statement shall be controlling over the Accounting Period Statements for the applicable Fiscal Year. No adjustments shall be made for any Operating Loss or Operating Profit in any preceding Fiscal Year.

        D.     To the extent that Manager projects an Operating Loss for any Accounting Period, additional funds in the amount of any such Operating Loss shall be provided by Owner within thirty (30) days after Manager has delivered written notice thereof to Owner. If Owner does not so fund such Operating Loss within the thirty (30) day time period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount to cover such Operating Loss from distributions of funds otherwise due to Owner.

        4.02    <u>Books and Records; Annual Operating Statement</u>

        A.     Books of control and account pertaining to the operations of the Hotel shall be kept on the accrual basis and in material respects in accordance with the Uniform System of Accounts and with generally accepted accounting principles applied on a consistent basis (provided that, to the extent of a conflict between the two, the generally accepted accounting principles shall control over the Uniform System of Accounts) with the exceptions provided in this Agreement. Owner may at reasonable intervals during Manager's normal business hours examine the Books and Records. Owner shall have one hundred eighty (180) days after delivery of the Annual Operating Statement to examine or review (at Owner's sole expense, and not as a Deduction) such Annual Operating Statement. If Owner does not request an audit of the Books and Records within such one hundred eighty (180) day period, such Annual Operating Statement shall be deemed to have been accepted by Owner as true and correct, and Owner shall have no further right to question its accuracy except in the event of fraud by Manager or manifest error (provided that Manager is not prejudiced by any delay in Owner asserting a manifest error and, in no event may Owner claim a manifest error later than the end of the second (2nd) Fiscal Year after the Fiscal Year to which the error relates). Owner may, during such one hundred

15



eighty (180) day period, but not thereafter (except in the event of fraud by Manager), request an independent audit of the Books and Records ("Audit") which shall be arranged for by Owner and commenced and completed not later than one hundred eighty (180) days after the date of delivery of such Annual Operating Statement. No extension of such one hundred eighty (180) day period shall be permitted without the approval of Manager, except in the event of fraud by Manager or manifest error (provided that Manager is not prejudiced by any delay in Owner asserting a manifest error and, in no event may Owner claim a manifest error later than the end of the second (2nd) Fiscal Year after the Fiscal Year to which the error relates). Owner shall pay all costs and expenses of the Audit at its sole expense (and not as a Deduction); provided, however, that if such audit establishes that Manager has underpaid Owner for the applicable Fiscal Year by five percent (5%) or more, the reasonable costs and expenses of the Audit shall be paid solely by Manager. If any such audit discloses an underpayment of any amounts due to Owner pursuant to the provisions hereof, Manager shall promptly pay Owner such amounts found to be due. If any audit discloses that Manager has not received any amounts due to Manager pursuant to the provisions hereof, Owner shall promptly pay Manager such amounts found to be due. Manager shall reasonably cooperate with Owner and its representatives in connection with any Audit. Any dispute concerning the correctness of an Audit shall be settled by a panel of Experts in accordance with Section 11.20. All information regarding the operation of the Hotel which is obtained by Owner through an Audit shall be considered confidential information and Owner agrees not to disclose such information except as necessary to its advisors, attorneys and consultants participating in the Audit process, who shall likewise be informed of the confidential nature of the information and of the duty not to disclose such information to third parties, except as required by law; provided, however, that Owner shall be permitted to disclose such information to a third party in connection with a prospective Sale of the Hotel or financing related to the Hotel if such third party has executed a confidentiality agreement reasonably satisfactory to Manager regarding such information.

  B. Manager shall have the right, at its option, to provide Owner with automated delivery, in electronic format, of the data required under Section 4.02.A and Section 4.08.A (consistent with the then-current standard operating procedures generally employed by Manager with respect to other hotels in the Boutique System). The parties shall cooperate reasonably with each other in order to adapt to new technologies that may be available with respect to the transmission of such data.

  C. Manager shall cooperate reasonably with Owner (including providing reasonable information, if applicable) in order to assist Owner to understand the reports, statements and other information that Manager submits to Owner pursuant to the provisions hereof; provided, however, that the foregoing provisions of this Section 4.02.C shall not be construed to provide Owner with any audit or similar rights with respect to such reports, statements and information that are not otherwise expressly described in this Agreement.

  4.03 Hotel Accounts and Expenditures

  A. Except as may be required in connection with MBS Systems, all funds derived from operation of the Hotel shall be deposited by Manager in accounts in Manager's name, established by Manager in a bank or banks designated by Manager and approved by Owner.

16



Owner hereby approves the Operating Accounts of the Hotel (if any) existing as of the Effective Date. The bank accounts into which such funds are deposited (other than MBS Systems accounts, if any) are referred to herein as "Operating Accounts."

B. Withdrawals from the Operating Accounts shall be made only by representatives of Manager whose signatures have been authorized. Reasonable petty cash funds shall be maintained at the Hotel.

C. Except as otherwise specifically provided hereunder and as may be required in connection with the MBS Systems, all payments made by Manager hereunder shall be made from the Operating Accounts, petty cash funds, or from the FF&E Reserve (in accordance with Section 5.02). Manager shall not be required to make any advance or payment with respect to the Hotel except out of such funds, and Manager shall not be obligated to incur any liability or obligation with respect to the Hotel. In any event, if any such liability or obligation is incurred by Manager with respect to the Hotel, Manager shall have the option to deduct such amounts from Owner's share of Operating Profit if Owner has not fully reimbursed Manager for said amounts within ten (10) days after Owner's receipt of notice from Manager that said amounts are due. As part of Manager's cash management procedures, certain accruals and advance payments shall be made to Manager for paid time off, pension and other corporate charges in advance of actual payment of such expenses, without interest or imputed interest accruing on such funds for the benefit of Hotel. Any and all accruals shall be reasonable, based on historical experience (where appropriate), and shall be applied to the Hotel in a manner consistent with the rest of the Boutique System.

D. Debts and liabilities incurred by Manager as a result of its operation and management of the Hotel pursuant to the terms hereof, whether asserted before or after Termination, will be paid by Owner to the extent funds are not available for that purpose from Gross Revenues. The provisions of this Section 4.03.D shall survive Termination.

4.04   MBS Systems

Manager shall have the right, in its discretion, to manage certain aspects of the Hotel's finances through the MBS Systems. The scope, features and functions of the MBS Systems are subject to modification from time to time as Manager shall, in its reasonable discretion, determine to be most efficient and economical for the Boutique System. Costs and expenses (collectively, the "MBS Charges") incurred by Manager or its Affiliates in providing the MBS Systems, which shall include both MBS Systems development costs and current operating costs and expenses, shall be allocated on a fair and consistent basis among all participating hotels in the Boutique System. If the MBS Systems used by hotels in the Boutique System are also provided to other hotel brands owned by Marriott or its Affiliates, the costs and expenses incurred by Manager or its Affiliates in providing such MBS Systems shall be allocated to such other brands on a fair and consistent basis, taking into account the level of MBS Systems being provided to each of such other brands. MBS Charges allocated to the Hotel shall not be included in Chain Services or Central Office Services, but instead shall be Direct Deductions.

17



4.05    Direct Deductions and Direct Deductions Report

A.    Owner hereby approves the current categories of Direct Deductions, which are set forth in Exhibit D attached hereto, and their treatment as Deductions. Within ninety (90) days after the end of each Fiscal Year, Manager shall furnish to Owner, for Owner's review, an updated list (the "Direct Deductions Report") of all then-current categories of Direct Deductions.

B.    Manager may, in its reasonable discretion, modify, add or subtract categories of services that are or will be provided as Direct Deductions provided Manager does so for all or substantially all of the other hotels in the Boutique System. In the event Manager provides a new system or program to the Hotel that is not listed in either Exhibit C or Exhibit D, Manager shall make the determination of whether such new system or program should be classified as a Direct Deduction rather than a Chain Service based upon whether such new system or program (i) supports only a subgroup of hotels in the Boutique System, or selected or individual hotels, or (ii) is a system or program for which the cost is more appropriately recovered based on property usage. If either clause (i) or clause (ii) in the immediately preceding sentence applies, the new system or program shall be classified as a Direct Deduction as opposed to a Chain Service.

4.06    Annual Profit Transactions Report

Within ninety (90) days after the end of each Fiscal Year, Manager shall deliver to Owner a report (the "Annual Profit Transactions Report") containing a list of all Profit Transactions relating to the Hotel to which Manager or any Related Party was a party, or which Manager or any Related Party implemented, during such Fiscal Year, together with a certification by a vice president of Manager that such list is true and accurate and that, in Manager's reasonable judgment, the Profit Transactions listed therein satisfy the Competitive Terms Standard.

4.07    Chain Services Report

Within ninety (90) days after the end of each Fiscal Year, Manager shall deliver to Owner for its review a report (the "Chain Services Report"): (i) identifying the general categories (e.g., National Sales Office Services) and subcategories (e.g., International sales offices) of Chain Services provided for or to the Hotel during such Fiscal Year; (ii) setting forth the total cost paid by the Hotel for each general category of Chain Services, and the methodologies for allocating such costs to the Hotel, with respect to such Fiscal Year; and (iii) containing a certification by a vice president of Manager that each of the allocations of Chain Services costs to the Hotel for such Fiscal Year was made in accordance with this Agreement.

4.08    Business Plan

A.    Manager shall deliver to Owner for its review and approval, at least forty-five (45) days prior to the beginning of each Fiscal Year that begins after the Opening Date, a preliminary business plan showing the estimated Gross Revenues, departmental profits, Deductions (including, without limitation, compensation and benefits for all persons employed at the Hotel), and Operating Profit for the forthcoming Fiscal Year, in comparison to the forecasted



Gross Revenues, departmental profits, Deductions, and Operating Profit for the current Fiscal Year. Such preliminary business plan shall also include a projection of the amount of Working Capital anticipated to be required to be maintained during each Accounting Period throughout each Fiscal Year. Such comparison will include the estimated percentage changes in such items for the forthcoming Fiscal Year compared to the current Fiscal Year. Manager shall prepare the preliminary business plan in accordance with the System Standards and the general standards of the hotel industry for similar properties. Owner shall have thirty (30) days after receipt of the preliminary business plan to review and approve such business plan and Manager shall make itself reasonably available during such period to discuss the preliminary business plan and respond to Owner's questions with respect thereto. In the event that Owner disapproves any category in the preliminary business plan, Owner will provide Manager with the specific reasons for its disapproval by category within such thirty (30) day period. Upon Owner's request after such disapproval, Manager shall meet with Owner as soon as reasonably practical to discuss the preliminary business plan and to explain to Owner how the preliminary business plan was developed (including all underlying assumptions then available). Thereafter, in the twenty-five (25) day period following receipt of Owner's disapproval, the parties shall attempt to resolve in good faith any objections by Owner. Notwithstanding the foregoing, Owner shall not be entitled to withhold its approval based on its objection to: (1) Manager's reasonable projections of either Gross Revenues or the components thereof; (2) projected costs and expenses that are "system charges" (that is, costs and expenses that are generally uniform throughout the Boutique System, such as the costs of Chain Services, Marriott Rewards Program, other system-wide marketing programs, employee salaries, benefits and other compensation programs) that are authorized or permitted under this Agreement; (3) the amount of the Marketing Fee, or of expenditures on Marketing Fee Services; (4) costs and expenses that are not within the control of Owner and/or Manager, such as Impositions and the costs of utilities; or (5) increases in projected costs and expenses of operating the Hotel, which increases are primarily caused by projected increases in occupancy or use of the Hotel resulting in increases in Gross Revenues. In the event that the parties are unable to resolve a disagreement with respect to any item to which Owner has objected, all such unresolved matters shall be determined by the panel of Experts in accordance with the provisions of Section 11.20. Pending such Expert determination, Manager shall operate the Hotel with respect to those categories that are in dispute based on the previous Fiscal Year's approved Business Plan, adjusted in accordance with changes in the GDP Deflator over the Fiscal Year just ended and anticipated changes in Gross Revenues. If Owner fails to provide any objection within such thirty (30) day period, the preliminary business plan as submitted by Manager shall be deemed approved. As of approximately forty-five (45) days after the beginning of each Fiscal Year following the Opening Date, Manager shall deliver to Owner the final business plan, in which the above-mentioned percentage changes are applied to the actual final numbers for the preceding Fiscal Year. Such final business plan, as delivered to Owner, is herein referred to as the "Business Plan."

B. Manager shall diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan. It is understood, however, that the Business Plan is an estimate only and that unforeseen circumstances outside the reasonable control of Manager such as, but not limited to, the costs of labor, material, services and supplies, casualty, operation of law, or economic and market conditions, as well as the requirement that the Hotel be operated in

