# EXHIBIT 2

|  |  |
|---|---|
| To Owner: | M Waikiki LLC<br>c/o eRealty Fund, LLC<br>12780 High Bluff Drive, Suite 160<br>San Diego, California 92130<br>Attn:   Ed Bushor and Gary Stougaard<br>Phone: (858) 350-5599<br>Fax:    (858) 350-5585 |
| with copy to: | Michael S. Kosmas, Esq.<br>Squire, Sanders & Dempsey L.L.P.<br>1201 Pennsylvania Avenue, N.W., Suite 500<br>Washington, D.C. 20004<br>Phone: (202) 626-6600<br>Fax: (202) 626-6780 |
| To Manager: | Marriott Hotel Services, Inc.<br>c/o Marriott International, Inc.<br>10400 Fernwood Road<br>Bethesda, Maryland 20817<br>Attn:   Law Department 52/923 - Hotel Operations<br>Phone: (301) 380-9555<br>Fax:    (301) 380-6727 |
| with copy to: | Marriott Hotel Services, Inc.<br>c/o Marriott International, Inc.<br>10400 Fernwood Road<br>Bethesda, Maryland 20817<br>Attn:   Senior Vice President, Finance & Accounting<br>            Dept. 51/918.04<br>Phone: (301) 380-6577<br>Fax:    (301) 380-5577 |

or at such other address as is from time to time designated by the party receiving the notice. Any such notice that is mailed in accordance herewith shall be deemed received when delivery is received or refused, as the case may be. Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery service by no later than the second (2nd) business day following such transmission. Telephone facsimiles shall be deemed delivered on the date of such transmission, if received during the receiving party's normal business hours or, if not received during the receiving party's normal business hours, then on the next succeeding date on which the receiving party is open for normal business.

  11.08 Environmental Matters

    A. Owner hereby represents and warrants to Manager that, to Owner's actual knowledge, as of the Effective Date, there are no Hazardous Materials (as defined below) on any



portion of the Site or the Hotel, nor have any Hazardous Materials been released or discharged on any portion of the Site or the Hotel in either instance in violation of any Environmental Law. Owner's actual knowledge shall mean the actual knowledge of Ed Bushor and Gary Stougaard, who Owner represents and warrants are the individuals affiliated with Owner who are most knowledgeable about the environmental condition of the Site. In addition, Owner hereby represents and warrants that it has previously delivered to Manager copies of all reports concerning environmental conditions which have been received by Owner or any of its Affiliates. In the event of the discovery of Hazardous Materials on any portion of the Site or in the Hotel during the Term, if and to the extent required by Environmental Laws, Owner shall promptly remove such Hazardous Materials, together with all contaminated soil and containers, and shall otherwise remedy the problem in accordance with: (1) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as amended; (2) the regulations promulgated thereunder, from time to time; (3) all federal, state and local laws, rules and regulations (now or hereafter in effect) dealing with the use, generation, treatment, storage, disposal or abatement of Hazardous Materials; and (4) the regulations promulgated thereunder, from time to time (collectively referred to as "Environmental Laws"). Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including, without limitation, reasonable engineers' and attorneys' fees and expenses, and the cost of litigation) arising from the presence of Hazardous Materials on the Site or in the Hotel, except to the extent the same arise from a violation of Environmental Laws by Manager in the course of its management of the Hotel and which violation constitutes (a) willful misconduct or gross negligence on the part of a member of the Hotels' executive team or a corporate employee of Marriott International, Inc. or its Affiliates based at Marriott International, Inc. or its Affiliates' headquarters or regional offices, or any other management level employees of Marriott International, Inc. or any of its Affiliates, wherever located, or (b) is a direct result of any actions of a member of the Hotel's executive team following a corporate policy of Manager. The foregoing obligation of Owner shall survive Termination. "Hazardous Materials" shall mean and include any substance or material containing one or more of any of the following: "hazardous material," "hazardous waste," "hazardous substance," "regulated substance," "petroleum," "pollutant," "contaminant," "polychlorinated biphenyls," "lead or lead-based paint" or "asbestos" as such terms are defined in any applicable Environmental Law in such concentration(s) or amount(s) as may impose clean-up, removal, monitoring or other responsibility under the Environmental Laws, as the same may be amended from time to time, or which may present a significant risk of harm to guests, invitees or employees of the Hotel. Manager shall indemnify, defend and hold Owner harmless from and against all loss, costs, liability and damage (including, without limitation, reasonable engineers' and attorneys' fees and expenses, and the cost of litigation) arising from the presence of Hazardous Materials on the Site or in the Hotel to the extent the same arise from a violation of Environmental Laws by Manager in the course of its management of the Hotel and which violation (a) constitutes willful misconduct or gross negligence on the part of a member of the Hotel's executive team or a corporate employee of Marriott International, Inc. or its Affiliates based at Marriott International, Inc. or its Affiliates' headquarters or regional offices, or any other management level employees of Marriott International, Inc. or any of its Affiliates, wherever located, or (b) is a direct result of any actions of a member of the Hotel's executive team following a corporate policy of Manager. The foregoing obligation of Manager shall survive Termination.



B. All costs and expenses of the aforesaid removal of Hazardous Materials from the Site or the Hotel, and of the aforesaid compliance with all Environmental Laws, and any amounts paid to Manager pursuant to the indemnity set forth in Section 11.08.A (but in any event excluding any amounts for which Manager has an indemnification obligation pursuant to the indemnity set forth in Section 11.08.A), shall be paid by Owner from its own funds, and not from Gross Revenues or from the FF&E Reserve.

11.09  Confidentiality

Owner and Manager agree that the terms of this Agreement are strictly confidential and will use their reasonable efforts to ensure that such matters and information are not disclosed to any outside person or entities without the prior consent of the other party, except (but in all events subject to the provisions of Section 11.12.B) as required by law or, to the extent necessary, (i) to obtain licenses, permits and other public approvals, (ii) in connection with a Sale of the Hotel or seeking to obtain a Qualified Mortgage with respect to the Hotel, or (iii) in connection with a financing or sale of Manager or Marriott or its or their corporate assets. Owner acknowledges that competitive information regarding brands, customers, marketing, operating or other strategies (including information related to other hotels) is confidential and proprietary to Manager and shall not be disclosed to Owner.

11.10  Projections

Owner acknowledges that any written or oral projections, pro formas, or other similar information that has been (prior to execution of this Agreement) or will (during the Term) be provided by Manager or Marriott (or any Affiliate of either) to Owner is for information purposes only, and that Manager, Marriott, and any such Affiliate do not guarantee that the Hotel will achieve the results set forth in any such projections, pro formas, or other similar information. Owner further acknowledges that (i) any such projections, pro formas, or other similar information are based on assumptions and estimates, and (ii) unanticipated events may occur subsequent to the date of preparation of such projections, pro formas, and other similar information which impact the performance of the Hotel, and (iii) the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, pro formas, or other similar information and such variations might be material. In providing any assumptions and/or estimates to Manager, Owner does not guaranty that such assumptions are correct, and Manager acknowledges such fact and that such assumptions and/or estimates may vary from the actual results and such variation may be material.

11.11  Actions to be Taken Upon Termination

Upon a Termination, the following shall be applicable:

A. Manager shall, within ninety (90) days after Termination, prepare and deliver to Owner a final accounting statement with respect to the Hotel, as more particularly described in Section 4.02 hereof, along with a statement of any sums due from Owner to Manager pursuant



hereto, dated as of the date of Termination. Within thirty (30) days of the receipt by Owner of such final accounting statement, the parties will make whatever cash adjustments are necessary pursuant to such final statement. The cost of preparing such final accounting statement shall be a Deduction, unless the Termination occurs as a result of a Default by either party, in which case the defaulting party shall pay such cost. Manager and Owner acknowledge that there may be certain adjustments for which the information will not be available at the time of the final accounting and the parties agree to readjust such amounts and make the necessary cash adjustments when such information becomes available; provided, however, that all accounts shall be deemed final as of the first (1st) anniversary of the effective date of Termination.

      B.      Upon delivery to Owner of the final accounting statement, Manager shall release and transfer to Owner any of Owner's funds which are held or controlled by Manager with respect to the Hotel with the exception of funds to be held in accordance with Section 6.02.B.5, Section 11.11.G and Section 11.11.I and otherwise in accordance herewith.

      C.      Manager shall make available to Owner such Books and Records (including those from prior years, subject to Manager's reasonable records retention policies) as will be needed by Owner to prepare the accounting statements, in accordance with the Uniform System of Accounts, for the Hotel for the year in which the Termination occurs and for any subsequent year. Manager shall also provide to Owner all information in Manager's possession or control with respect to future bookings.

      D.      Manager shall (to the extent permitted by law) assign to Owner or to the new manager all operating licenses and permits for the Hotel which have been issued in Manager's name (including liquor and restaurant licenses, if any); provided that if Manager has expended any of its own funds in the acquisition of any of such licenses or permits, Owner shall reimburse Manager therefor if it has not done so already.

      E.      Manager shall have the option, to be exercised within thirty (30) days after Termination, to purchase, at their then fair market value, any items of the Hotel's Inventories and Fixed Asset Supplies as may be marked with any EDITION Trademarks or Boutique Trademarks. Upon Termination, all use of or right to use the EDITION Trademarks and Boutique Trademarks at or in connection with the Hotel shall cease forthwith, and Owner shall: (i) immediately, as of the date of such Termination, place coverings over any signs or similar identification which contain any of the EDITION Trademarks or Boutique Trademarks, or shall otherwise render such signs or other similar identification not visible to the public; (ii) remove any such signs or similar identification from the Hotel by no later than ten (10) days after the date of Termination; and (iii) immediately, as of the date of such Termination, remove from the Hotel all Fixed Asset Supplies, Inventories and other items bearing any EDITION Trademark or Boutique Trademark or remove all EDITION Trademarks and Boutique Trademarks from such items. If Owner has not removed such signs or other items bearing EDITION Trademarks or Boutique Trademarks within ten (10) days after Termination, Manager shall have the right to do so at Owner's expense; and if Owner fails to reimburse Manager for such expense within ten (10) days after receipt of written notice thereof from Manager to Owner, then Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw



the amount of such expenses from the Operating Accounts, the FF&E Reserve, or any other funds of Owner held by or under the control of Manager. Manager shall have the right to seek injunctive or other relief in a court of competent jurisdiction to enforce the foregoing provisions, and if such enforcement shall be necessary, Owner shall bear all of Manager's costs of such enforcement, including attorneys' fees.

      F.    All Software used at the Hotel which is owned by any of the Marriott Companies or the licensor of any of them is proprietary to such Marriott Company or the licensor of any of them, and shall in all events remain the exclusive property of such Marriott Company or the licensor of any of them, as the case may be, and nothing contained in this Agreement shall confer on Owner the right to use any of such Software. Manager shall have the right to remove from the Hotel without compensation to Owner any Software (including upgrades and replacements). Furthermore, upon Termination, notwithstanding Section 5.04 hereof, Manager shall be entitled to remove from the Hotel any computer equipment which is: (i) owned by a party other than Owner (without reimbursement to Owner); or (ii) owned by Owner, but utilized as part of a centralized reservation or property management system (with reimbursement to Owner of all previous expenditures made by Owner with respect to such equipment, subject to a reasonable allowance for depreciation). Notwithstanding the foregoing, provided that Owner and new manager execute Manager's then-current license agreement, for ninety (90) days following the Termination, Manager shall, subject to its rights and obligations under third-party license agreements, provide a limited, non-transferable, non-exclusive license to use, on an "as is" basis with no warranties of any kind, those items of the Software located at the Hotel that consist of the components of the property management system (to be mutually identified) that are directly necessary for the ongoing operation of the Hotel (such as checking guests in and out and preparing guest folios, but specifically excluding Manager's reservations and yield management systems). Such use shall be for the sole purpose of allowing an orderly transition of Hotel management to a new manager.

      G.    A reserve shall be established from Gross Revenues to reimburse Manager for all costs and expenses incurred by Manager (a) that may accrue after Termination, but that result or relate to Manager's operation and management of the Hotel prior to Termination (including, without limitation, costs and expenses relating to sales, use and occupancy tax liability), and (b) in terminating its employees at the Hotel, such as severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of Manager's employees at the Hotel. If Gross Revenues are insufficient to meet the requirements of such reserve, then Owner shall deliver to Manager, within ten (10) days after receipt of Manager's written request therefor, the sums necessary to establish such reserve; and if Owner fails to timely deliver such sums to Manager, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the Operating Accounts, the FF&E Reserve, or any other funds of Owner held by or under the control of Manager. The reserve described in this Section 11.11.G shall be in addition to the reserve described in Section 6.02.B.5.

      H.    Owner shall cause the entity which shall succeed Manager as the operator of the Hotel to hire a sufficient number of the employees at the Hotel to avoid the occurrence, in



connection with such Termination, of a "plant closing" or "mass layoff" under the WARN Act or an equivalent occurrence under any comparable state law.

  I. Prior to such Termination, Owner shall repay to Manager the amounts, if any, that Manager has funded through such date pursuant to the provisions of Section 4.09(ii) and that remain outstanding and payable to Manager (plus any interest due thereon). If Owner does not make such repayment, Manager shall have the right to withhold and retain such amounts from any Working Capital or other funds held or controlled by Manager with respect to the Hotel.

  J. Various other actions shall be taken, as described in this Agreement, including, but not limited to, the actions described in Section 4.09 and Section 6.02.B.5.

  K. Manager shall peacefully vacate and surrender the Hotel to Owner.

The provisions of this Section 11.11 shall survive Termination.

11.12 <u>Trademarks and Intellectual Property</u>

  A. From the Opening Date until the Flagging Date, the Hotel shall be known by such name as Owner and Manager reasonably agree (the "Pre-Flagging Name"). Subject to the agreement of Owner and Manager as to the Pre-Flagging Name in accordance with the preceding sentence, Manager will not object to Owner's use or ownership of the Pre-Flagging Name at the Hotel, provided that the Pre-Flagging Name or any non-generic element thereof, when selected, is not owned or used by Manager, its Affiliates or any other third party. From and after the Flagging Date and during the remainder of the Term, the Hotel shall be known as the "Waikiki EDITION Hotel," or such other name as the parties may reasonably agree, with such alternative identification determined by Manager from time to time to be necessary to provide local or specific geographic definition to the name of the Hotel. However, if the name of the EDITION Hotel System is changed on a system-wide, regional or country-specific basis, Manager will have the right to change the name of the Hotel to conform thereto.

  B. Manager represents and warrants that Marriott owns the trademark applications or registrations for the mark EDITION listed on Exhibit I (the "Registered Marks"), and that the Registered Marks are valid and subsisting as of the date of this Agreement. Manager shall indemnify and defend Owner against any and all claims by third parties against Owner arising out of Manager's breach of the foregoing representation and warranty, provided, however that Owner gives prompt written notice of any such claim to Manager, permits Manager and its Affiliates to have sole control over the defense and settlement of the claim (at Manager's and its Affiliates' sole cost and expense), and cooperates fully with Manager and its Affiliates in defending or settling the claim. Manager will not be obligated to indemnify or defend Owner (i) if there is a material Event of Default by Owner under this Agreement when a claim is made, or a material Event of Default by Owner under this Agreement occurs prior to the resolution of a claim; or (ii) if the claim is based on Owner's use of the Registered Marks outside the scope of or otherwise not authorized by this Agreement. Owner acknowledges that Manager and its Affiliates are or will be the sole and exclusive owners of all rights, title and interest to the



EDITION Trademarks and the other Boutique Trademarks, which shall in all events remain the exclusive property of Manager (or one of its Affiliates). All use of the EDITION Trademarks and the other Boutique Trademarks at or in connection with the Hotel, or as otherwise contemplated by this Agreement, shall be made solely by and inure solely to the benefit of Manager and its Affiliates. Nothing in this Agreement shall be construed to grant Owner any right of ownership in or right to use or license others to use the EDITION Trademarks or the other Boutique Trademarks. Owner may not use the EDITION Trademarks or the Boutique Trademarks without the prior written consent of Manager, which may be withheld in Manager's sole and absolute discretion, in any manner whatsoever, including, without limitation, the following:

    1.    No reference to Manager, any Affiliate of Manager, or any EDITION Trademark or other Boutique Trademark will be made in any prospectus, private placement memorandum, offering circular or offering documentation related thereto (collectively referred to as the "Prospectus"), issued by Owner or by one of Owner's Affiliates or by one or more Mortgagees, which is designed to interest potential investors in debt or equity securities related to the Hotel, unless Manager has given its prior written approval to each such reference, which Manager may withhold in its sole and absolute discretion, provided, however, Owner shall have the right to reference in the Prospectus the name of the Hotel and the fact that Manager operates the Hotel pursuant to this Agreement. However, regardless of whether Manager has approved all such references, neither Manager nor any Affiliate of Manager will be deemed a sponsor of the offering described in the Prospectus, nor will it have any responsibility for the Prospectus, and the Prospectus will so state. Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including attorneys' fees and expenses, and the cost of Litigation) arising out of any Prospectus or the offering described therein.

    2.    No reference to Manager, any Affiliate of Manager, or any EDITION Trademark or other Boutique Trademark will be made in any material prepared for the purpose of a Sale of the Hotel, unless Manager has given its prior written approval to each such reference.

    3.    No Trade Name adopted by Owner or its Affiliates may include any EDITION Trademark or other Boutique Trademark or a term that is confusingly similar to an EDITION Trademark or other Boutique Trademark. Owner shall not apply for registration of any EDITION Trademark or other Boutique Trademark in any jurisdiction.

    C.    All right, title and interest (including copyright and patent rights) to Intellectual Property shall at all times be the exclusive property of Manager (or any other Marriott Company), and all benefits obtained directly or indirectly from the use, sale or commercial exploitation of Intellectual Property shall belong exclusively to Manager and its Affiliates. Neither Manager nor any other Marriott Company shall be restricted in disclosing or using any Intellectual Property directly or indirectly by this Agreement, and Manager and any other Marriott Company shall have the right to use it for any purpose. Owner shall not have any rights to any Intellectual Property, shall treat as confidential any Intellectual Property in its possession, and shall not disclose to any third party any Intellectual Property or use any Intellectual Property



for any purpose whatsoever. Upon Termination, all Intellectual Property shall be removed from the Hotel by Manager, without compensation to Owner, subject to the provisions of Section 11.11.E regarding EDITION Trademarks and Boutique Trademarks.

D. Manager and/or its Affiliates shall be entitled, in case of any breach by Owner of any of the covenants of this Section 11.12, to injunctive relief and to any other right or remedy available at law or in equity.

E. The provisions of this Section 11.12 shall survive Termination.

11.13 Trade Area Restriction and Competing Facilities

A. Neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any Restricted Hotel within Restricted Area One during the period from the Effective Date to the earlier to occur of (i) the tenth (10th) anniversary of the Flagging Date, or (ii) July 1, 2020.

B. Within Restricted Area One, during the period from the Effective Date to the earlier of (i) the fifth (5th) anniversary of the Flagging Date, or (ii) July 1, 2015:

1. neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any hotel that is operated, owned, licensed or franchised by Manager or its Affiliates in which Schrager (or any entity in which Schrager has a controlling interest) has direct control or involvement over material aspects of hotel operations or hotel marketing; and

2. neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any hotel that is operated, owned, licensed or franchised by Manager or its Affiliates that contains Schrager in the name of the hotel.

C. Neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any Restricted Hotel within Restricted Area Two during the period from the Effective Date to the earlier to occur of (i) the third (3rd) anniversary of the Flagging Date, or (ii) July 1, 2013.

D. If Manager or any of its Affiliates opens for business, or permits any other Person to open for business The Kahala Hotel & Resort located at 5000 Kahala Avenue, Honolulu, HI as a hotel that is operated, owned, licensed or franchised by Manager or any of its Affiliates (i) that uses EDITION Trademarks in the name of such hotel and as a part of the EDITION Hotel System; (ii) in which Schrager (or any entity in which Schrager has a controlling interest) has direct control or involvement over material aspects of hotel operations or hotel marketing; or (iii) that contains Schrager in the name of such hotel (each, a "Kahala Converted Hotel") during the period from the Effective Date to the earlier to occur of the tenth (10th) anniversary of the Opening Date or July 1, 2020, then the Base Management Fee and Incentive Management Fee paid to Manager pursuant to this Agreement shall be reduced to three percent (3%) of Gross



Revenues, and twenty percent (20%) of Available Cash Flow, respectively, during the period that Manager or any of its Affiliates operates, owns, licenses or franchises a Kahala Converted Hotel.

      E.      Except as expressly provided in Sections 11.13.A through D, neither this Agreement nor anything implied by the relationship between Manager and Owner shall prohibit Manager or any of the Marriott Companies from developing, constructing, owning, operating, promoting, and/or authorizing others to develop, construct, operate, or promote one or more hotels, or any other lodging products, Vacation Club Products, restaurants, or other business operations of any type, using any brand name available to the Marriott Companies, at any location, including a location proximate to the Site, and Owner hereby acknowledges and agrees that Manager and any of the Marriott Companies have the unconditional right to engage in such activities, regardless of any competitive effect such activities may have on Owner.

    11.14   <u>Waiver</u>

The failure of either party to insist upon a strict performance of any of the terms or provisions of this Agreement, or to exercise any option, right or remedy contained in this Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

    11.15   <u>Partial Invalidity</u>

If any portion of any term or provision of this Agreement, or the application thereof to any person or circumstance shall be invalid or unenforceable, at any time or to any extent, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

    11.16   <u>Survival</u>

Except as otherwise specifically provided in this Agreement, the rights and obligations of the parties herein shall not survive any Termination.

    11.17   <u>Negotiation of Agreement</u>

Owner and Manager are both business entities having substantial experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to the rule that ambiguities in a document are to be construed against the draftsman. No inferences shall be drawn from the fact that the final, duly executed Agreement differs in any respect from any previous draft hereof.



11.18  Estoppel Certificates

Each party to this Agreement shall at any time and from time to time, upon not less than thirty (30) days' prior notice from the other party, execute, acknowledge and deliver to such other party, or to any third party specified by such other party, a statement in writing: (a) certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications), and (b) stating whether or not to the best knowledge of the certifying party (i) there is a continuing Default or Event of Default by the non-certifying party in the performance or observance of any covenant, agreement or condition contained in this Agreement, or (ii) there shall have occurred any event which, with the giving of notice or passage of time or both, would become a Default or Event of Default, and, if so, specifying each such Default or Event of Default or occurrence of which the certifying party may have knowledge. Such statement shall be binding upon the certifying party and may be relied upon by the non-certifying party and/or such third party specified by the non-certifying party as aforesaid. In addition, upon written request after a Termination, each party agrees to execute and deliver to the non-certifying party and to any such third party a statement certifying that this Agreement has been terminated.

11.19  Restrictions on Operating the Hotel in Accordance with System Standards

In the event of either (i) a Legal Requirement, including an order, judgment or directive by a court or administrative body which is issued in connection with any Litigation involving Owner, or (ii) any action taken by a Mortgagee in connection with a Foreclosure, which in either case restricts or prevents Manager, in a material and adverse manner, from operating the Hotel in accordance with System Standards (including without limitation, any restrictions on expenditures by Manager from the Operating Accounts or from the FF&E Reserve, other than restrictions which are set forth in this Agreement) for more than one hundred eighty (180) days, Manager shall be entitled, at its option, to terminate this Agreement upon sixty (60) days' written notice to Owner. The foregoing shall not reduce or otherwise affect the rights of the parties under Article IX.

11.20  Decision by Experts

Where this Agreement calls for a matter to be referred to a panel of Experts for determination, the following provisions shall apply:

A.   With respect to any referred matter, the matter shall be decided by a majority vote of a panel of Experts. In the event that either party calls for a determination by Experts pursuant to the terms hereof, each party shall have ten (10) days from the date of such request to select one Expert and, within ten (10) days after such respective selections, the two (2) respective firms and/or individuals so selected shall select the third (3rd) Expert. If a party fails to make its respective selection of a firm or individual within the ten (10) day period provided for above, then the Expert selected by the other party shall select two (2) Experts to serve on the Experts panel. Also, if the two (2) respective Experts selected by the parties shall fail to select a



third (3rd) firm or individual (satisfying the requirements set forth in the definition of "Expert" in Section 12.01) to be an Expert, then such third (3rd) Expert shall be appointed by the American Arbitration Association. With respect to any issue hereunder to be referred to a panel of Experts for determination, the use of the Experts shall be the exclusive remedy of the parties and neither party shall attempt to adjudicate any dispute in any other forum. The decision of the Experts shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration, in court or otherwise;

        B.     Each party shall be entitled to make written submissions to the Experts, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission (all within the time periods established pursuant to Section 11.20.D). The parties shall make available to the Experts all books and records relating to the issue in dispute and shall render to the Experts any assistance requested of the parties. The costs of the Experts and the proceedings shall be borne as directed by the Experts unless otherwise provided for herein. The Experts may direct that such costs be treated as Deductions;

        C.     The Experts shall make their decision with respect to the matter referred for determination by applying the standard set forth in this Agreement regarding such matter. If this Agreement does not contain a specific standard regarding such matter, then the Experts shall apply the standards applicable to first-class boutique hotels in accordance with the System Standards, taking into consideration the long-term profitability of the Hotel and the requirement that the Hotel be managed, operated and maintained in accordance with System Standards; and

        D.     The terms of engagement of the Experts shall include an obligation on the part of the Experts to: (i) notify the parties in writing of their decision within forty-five (45) days from the date on which the last Expert has been selected (or such other period as the parties may agree or as set forth herein); and (ii) establish a timetable for the making of submissions and replies.

11.21    Waiver of Jury Trial and Consequential and Punitive Damages

Owner and Manager each hereby absolutely, irrevocably and unconditionally waive trial by jury and the right to claim or receive consequential, incidental, special or punitive damages in any litigation, action, claim, suit or proceeding, at law or in equity, arising out of, pertaining to or in any way associated with the covenants, undertakings, representations or warranties set forth herein, the relationships of the parties hereto, whether as "Owner" or "Manager" or otherwise, this Agreement or any other agreement, instrument or document entered into in connection herewith, or any actions or omissions in connection with any of the foregoing.

11.22    Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart. The



submission of an unsigned copy of this Agreement or an electronic instrument with or without electronic signature to either party shall not constitute an offer or acceptance. This Agreement shall become effective and binding only upon execution and delivery of the Agreement in non-electronic form by both parties in accordance with this Section 11.22.

### 11.23  Extraordinary Events

If either Owner's or Manager's failure to conform to, keep, perform, fulfill, or satisfy any representation, warranty, covenant, undertaking, obligation, standard, test, or condition set forth in this Agreement, other than an obligation to make monetary payments or provide monetary funding, is caused in whole or in part by one or more Extraordinary Events, such failure shall not constitute a failure or an Event of Default or Default under this Agreement, and such failure shall be excused to the extent that the failure is caused in whole or in part by such Extraordinary Event(s).

### 11.24  Entire Agreement

This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a written non-electronic instrument that has been duly executed by the non-electronic signatures of authorized representatives of the parties hereto.

### 11.25  Non-Hotel Marketing Activities

Owner and Manager agree that the performance of the Hotel is dependent upon exclusive brand affiliation with Manager and its Affiliates, and that Manager shall have no obligation to allow Owner or any third party to utilize any portion of the Hotel or the Site for any activities relating to the sale, promotion or marketing of any Vacation Club Products developed, marketed, sold or operated by Owner or any third party. Manager further agrees that it will not utilize any portion of the Hotel or the Site for any activities relating to the sale, promotion or marketing of any Vacation Club Products developed, marketed, sold or operated by Manager or its Affiliates.

### 11.26  Key Money

A.  In consideration for Owner's execution of this Agreement, Manager shall pay to Owner the following amounts (collectively, the "Key Money"):

1.  Three Million Dollars ($3,000,000) within ten (10) Business Days after the Opening Date; and

2.  If Owner has satisfied all the conditions to the Flagging Date set forth in the Technical Services Agreement, but Manager has not branded the Hotel as an EDITION hotel on or before July 1, 2010, then commencing on July 1, 2010, Manager shall pay to Owner the

