# EXHIBIT 2

sum of One Hundred Ten Thousand Dollars ($110,000) on the first (1st) day of each month until the Flagging Date occurs (pro rated for any partial month); provided, however, that the amounts paid by Manager pursuant to this Section 11.26.A.2 shall not exceed Two Million Dollars ($2,000,000). For the avoidance of doubt, if the Flagging Date occurs on or before July 1, 2010, Manager shall have no obligation to make any payments pursuant to this Section 11.26.A.2.

Payment of the Key Money shall be subject to the following conditions: (i) there is no Event of Default by Owner under this Agreement; (ii) Owner has satisfied all other covenants, undertakings, obligations and conditions set forth in this Agreement and the Technical Services Agreement (including, without limitation, payment of Pre-Opening Expenses and initial Working Capital); and (iii) the Opening Date shall have occurred.

B. If this Agreement terminates for any reason, other than an Event of Default by Manager under this Agreement, during the Initial Term, Owner shall pay to Manager (prior to and as a condition of such Termination) an amount equal to the product of (i) the Key Money that was paid to Owner, multiplied by (ii) a fraction, the numerator of which equals the number of full Fiscal Years then remaining in the Term, and the denominator of which equals thirty (30). Except as otherwise provided in this Section 11.26, Manager acknowledges and agrees that Owner shall have no obligation to repay any or all of the Key Money to Manager.

11.27 Adjustment to Owner's Priority and Performance Termination Threshold

The parties acknowledge and agree that the Owner's Priority amount and the Performance Termination Threshold set forth in this Agreement are based on the assumption that Manager will manage and operate all of the food and beverage outlets at the Hotel. Therefore, if any food or beverage outlet at the Hotel will be leased to, licensed to or otherwise operated by a third party, the Owner's Priority amount and the Performance Termination Threshold will be equitably reduced to account for the fact that Gross Revenues, Operating Profit and Available Cash Flow will not include some or all of the revenues generated by such food or beverage outlet.

## ARTICLE XII

## DEFINITION OF TERMS

12.01 Definition of Terms

The following terms when used in this Agreement shall have the meanings indicated:

"Accounting Period" shall mean the four (4) week accounting periods having the same beginning and ending dates as Manager's four (4) week accounting periods, except that an Accounting Period may occasionally contain five (5) weeks when necessary to conform Manager's accounting system to the calendar. Manager shall have the right, at its discretion, to modify the definition of Accounting Period to mean a calendar month or such other period of



time as is consistent with the accounting periods that Manager may implement, from time to time, with respect to the EDITION Hotel System.

"Accounting Period Statement" shall have the meaning ascribed to it in Section 4.01.A.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power: (i) to vote more than fifty percent (50%) of the voting stock or equity interests of such Person; or (ii) to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock or equity interests, by contract or otherwise.

"Agreement" shall mean this Management Agreement between Owner and Manager, including the exhibits attached hereto, as it may be amended, restated or supplemented from time to time.

"Annual Operating Statement(s)" shall have the meaning ascribed to it in Section 4.01.C.

"Annual Profit Transactions Report" shall have the meaning ascribed to it in Section 4.06.

"Audio/Video Systems" shall include, but not be limited to, the following Hotel systems: general audio and video systems (audio/video) for the Hotel, entertainment audio/video systems, video information systems, public address systems, and the master antenna television distribution system.

"Audit" shall have the meaning ascribed to it in Section 4.02.

"Available Cash Flow" shall mean an amount, with respect to each Fiscal Year or portion thereof during the Term, equal to the excess, if any, of the Operating Profit for such Fiscal Year over the Owner's Priority for such Fiscal Year or portion thereof.

"Base Management Fee" shall mean an amount payable to Manager as a Deduction from Gross Revenues equal to four percent (4%) of Gross Revenues for each Fiscal Year or portion thereof, except as otherwise provided in Section 1.03.B and Section 11.13.D.

"Books and Records" shall mean books of control and account pertaining to the operations of the Hotel that are maintained at the Hotel.

"Boutique System" shall mean the EDITION Hotel System and all other chains and single locations of full-service boutique hotels located in the continental United States and Canada and managed by Marriott (or one or more Affiliates) that are, as of the Effective Date or at any time during the Term, operated under the Trade Name or mark "EDITION Hotels and Resorts" or any other Trade Name or mark designated by Marriott.



"Boutique Trademarks" shall mean the EDITION Trademarks and any other name, mark, logo, word, device, symbol, slogan, design, brand, service mark, Trade Name, other distinctive feature or any combination of the foregoing, whether registered or unregistered, that is used in connection with any of the hotels in the Boutique System or by reason of extent of usage is associated with hotels in the Boutique System.

"Building Estimate(s)" shall have the meaning ascribed to it in Section 5.03.A.

"Business Plan" shall have the meaning ascribed to it in Section 4.08.

"Capital Expenditure(s)" shall mean the expenses necessary for non-routine, major repairs, alterations, improvements, renewals, replacements, and additions to the Hotel including, without limitation, to the structure, the exterior facade and all of the mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation elements of the Hotel building, together with all other expenditures which are classified as "capital expenditures" under generally-accepted accounting principles. Capital Expenditures shall not include Routine Capital Expenditures.

"Case Goods" shall mean furniture and furnishings used in the Hotel, including, without limitation: chairs, beds, chests, headboards, desks, tables, decorative lighting fixtures and similar items.

"CC&R(s)" shall have the meaning ascribed to it in Section 8.04.

"Central Office Services" are those services described in Exhibit B attached hereto.

"Chain Services" shall have the meaning ascribed to it in Section 1.11.

"Chain Services Report" shall have the meaning ascribed to it in Section 4.07.

"Competitive Set" shall mean the group of full-service hotels that are generally within the same hotel market and market segment as the Hotel. As of the Effective Date, the parties agree that the Competitive Set shall consist of: The Royal Hawaiian, Waikiki Beach; Halekulani; The Kahala Hotel & Resort; W Honolulu – Diamond Head; and Moana Surfrider. If any of such hotels identified in this definition, subsequent to the Effective Date, either changes its chain affiliation or ceases to operate or otherwise ceases to reflect the general criteria set forth in the first (1st) sentence of this definition, Owner and Manager agree to mutually, reasonably and in good faith, discuss appropriate changes to the foregoing list of the hotels that shall comprise the Competitive Set. Disputes regarding such changes to the Competitive Set will be resolved by the panel of Experts in accordance with the provisions of Section 11.20.

"Competitive Terms Standard" shall mean the standard to be employed in determining whether a Profit Transaction can be implemented with respect to the Hotel. The Competitive Terms Standard shall be deemed satisfied if the terms of the Profit Transaction are consistent with commercially competitive terms available to parties contracting for similar goods or



services in the marketplace relevant to the Hotel, taking into account price, quality, reputation and reliability of the vendor, the reasonable needs of the Hotel and the Boutique System for reliability in performance and/or quality to satisfy guest needs, the scale of the purchase, and such other factors reasonably appropriate to determine whether particular terms reflect competitive terms in the marketplace. In determining, pursuant to the foregoing, whether such terms are competitive, the goods and/or services that are being purchased shall be grouped in reasonable categories, rather than being compared item by item.

"Cost Transaction" shall have the meaning ascribed to it in Section 1.13.F.

"Customer Information" shall mean customer data, customer lists and personal guest profiles and data regarding guest preferences, including, without limitation, any data derived from or contained in any database controlled by Manager or its Affiliates (including, without limitation, the Marriott Rewards Program).

"Decorative Items" shall include, but not be limited to, artifacts, artwork, banquettes, carpeting, decorative lighting fixtures, etched glass, furniture, graphics, interior landscaping, radios, interior signage, televisions and window treatments.

"Deductions" shall mean the following expenses incurred by Manager in operating the Hotel(it being understood that any individual expenditure shall not be deducted more than one time even if such expense could reasonably fall within more than one of the expenses described below):

    1.    the cost of sales, including, without limitation, compensation, benefits and related administration costs, payroll taxes, charges related to employee benefit plans, relocation costs and other costs related to employees of Manager (or one of its Affiliates) who are working for the benefit of the Hotel (regardless of whether such employees are located at the Hotel or elsewhere); provided that the foregoing costs shall not include the salary and other employee costs of Manager's corporate executive staff who are located at Manager's corporate headquarters;

    2.    departmental expenses incurred at departments within the Hotel; administrative and general expenses; the cost of marketing incurred by the Hotel; advertising and business promotion incurred by the Hotel; heat, light, and power; computer line charges; and routine repairs, maintenance and minor alterations treated as Deductions under Section 5.01;

    3.    the cost of Inventories and Fixed Asset Supplies used or consumed in the operation of the Hotel;

    4.    a reasonable reserve for uncollectible accounts receivable as determined by Manager;

    5.    all costs and fees of independent professionals or other third parties who are retained by Manager or Owner to perform services required or permitted hereunder;



6. all costs and fees of technical consultants, professionals and operational experts who are retained or employed by Manager, a Marriott Company, and their Affiliates for specialized services (including, without limitation, quality assurance inspectors, personnel providing architectural, technical or procurement services for the Hotel, tax consultants, and, except with respect to Central Office Services or as described in Section 8.02.D or Section 10.02.I, personnel providing legal services in connection with matters involving the Hotel) and the cost of attendance by employees of the Hotel at training and manpower development programs designated by Manager;

7. the Base Management Fee paid to or retained by Manager;

8. insurance costs and expenses as provided in Article VI;

9. taxes, if any, payable by or assessed against Manager related to this Agreement or to Manager's operation of the Hotel, including general excise taxes or similar taxes (exclusive of Manager's income taxes or franchise taxes);

10. all Impositions;

11. the amount of any transfers into the FF&E Reserve required pursuant to Section 5.02;

12. the Hotel's share of costs and expenses incurred in connection with sales, advertising, promotion and marketing programs for the Boutique System, including guest loyalty and recognition programs and the Marriott Rewards Program, where such expenses are not deducted as departmental expenses under paragraph 2 above or as Chain Services pursuant to paragraph 13 below;

13. the Hotel's share of the charges for Chain Services;

14. the Hotel's Marketing Fee payments;

15. all costs and expenses of compliance by Manager with applicable Legal Requirements pertaining to the operation of the Hotel;

16. the Hotel's pro rata share of costs and expenses (including those relating to development and implementation) incurred in connection with providing services to multiple hotels and/or other facilities in substitution for or in association with services that are or would have been performed or procured by individual hotels, which may be more effectively performed on a shared or group basis;

17. travel, living, and other out-of-pocket costs and expenses of corporate and regional personnel of Manager and any of its Affiliates visiting the Hotel on specific Hotel business; provided, however, that if any such travel involves more than one hotel in the



EDITION Hotel System during any one continuous trip, such costs and expenses shall be fairly allocated between the Hotel and any other hotel visited and only the portion allocated to the Hotel shall be a Deduction; and

    18. such other costs and expenses incurred by Manager (either at the Hotel or elsewhere) as are specifically provided for elsewhere in this Agreement or are otherwise reasonably necessary for the proper and efficient operation of the Hotel.

The term "Deductions" shall not include: (a) debt service payments pursuant to any Mortgage on the Hotel; (b) payments pursuant to equipment leases or other forms of financing obtained for the FF&E located in or connected with the Hotel, unless Manager has previously given its consent to such equipment lease and/or financing; (c) rental payments pursuant to any ground lease of the Site; or (d) depreciation on the Hotel or any of its contents. All of the foregoing items listed in this paragraph shall be paid by Owner from its own funds. In no event shall the costs or expenses of providing the Central Office Services be treated as Deductions, or otherwise be reimbursed out of Gross Revenues; it being the intent of the parties that all such costs and expenses are to be paid by Manager (or its Affiliates) from its own funds.

"Default" shall have the meaning ascribed to it in Section 9.01.

"Direct Deduction" shall mean a Deduction relating to a system or program performed for the Hotel by or through Manager or one of the Related Parties that is described in the listing of Direct Deductions attached hereto as Exhibit D, plus such additional systems and programs that may be added after the date hereof in accordance with this Agreement. The term Direct Deduction shall not include Chain Services or Central Office Services.

"Direct Deductions Report" shall have the meaning ascribed to it in Section 4.05.A.

"EDITION Hotel System" shall mean the chain of full-service boutique hotels operated and managed by Marriott (or one or more of its Affiliates) that is, as of the Effective Date, operated under the Trade Name or mark "EDITION Hotels."

"EDITION Trademark" shall mean (i) the name and mark "EDITION"; (ii) the "EDITION" logo; and (iii) any word, name, device, symbol, logo, slogan, design, brand, service mark, Trade Name, other distinctive feature or any combination of the foregoing, whether registered or unregistered, and whether or not such term contains the "EDITION" mark, that is used in connection with the Hotel or by reason of extent of usage is associated with hotels in the EDITION Hotel System.

"Effective Date" shall have the meaning ascribed to it in the Preamble.

"Employee Claims" shall mean any and all claims (including all fines, judgments, penalties, costs, Litigation and/or arbitration expenses, attorneys' fees and expenses, and costs of settlement with respect to any such claim) by any employee or employees of Manager against Owner or Manager with respect to the employment at the Hotel of such employee or employees.

62



"Employee Claims" shall include, without limitation, the following: (i) claims that are eventually resolved by arbitration, by Litigation or by settlement; (ii) claims that also involve allegations that any applicable employment-related contracts affecting the employees at the Hotel have been breached; and (iii) claims that involve allegations that one or more of the Employment Laws has been violated; provided, however, that "Employee Claims" shall not include claims for worker compensation benefits or for unemployment benefits.

"Employment Laws" shall mean any federal, state or local law (including the common law), statute, ordinance, rule, regulation, order or directive with respect to employment, conditions of employment, benefits, compensation, or termination of employment that currently exists or may exist at any time during the Term, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Workers Adjustment and Retraining Act, the Occupational Safety and Health Act, the Immigration Reform and Control Act of 1986, the Polygraph Protection Act of 1988 and the Americans With Disabilities Act of 1990.

"Environmental Laws" shall have the meaning ascribed to it in Section 11.08.

"Event of Default" shall have the meaning ascribed to it in Section 9.01.

"Expert" shall mean an independent, nationally recognized consulting firm or individual with a minimum of ten (10) years of experience in the lodging industry and qualified to resolve the issue in question, provided that an Expert shall not include any individual who is, as of the date of appointment or within six (6) months prior to such date, employed, either directly or indirectly as a consultant in connection with any other matter, by a party attempting to appoint such person.

"Extraordinary Event" shall mean any of the following events, regardless of where they occur or their duration to the extent the effects of which are beyond the reasonable control of Owner or Manager, as applicable: acts of nature (including hurricanes, typhoons, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war or armed conflict; riots or other civil commotion; terrorism (including hijacking, sabotage, chemical or biological events, nuclear events, disease-related events, bombing, murder, assault and kidnapping), or the threat thereof; strikes or similar labor disturbances; embargoes or blockades; shortage of critical materials or supplies; action or inaction of governmental authorities which have an impact upon the Hotel (including restrictions on room rates or wages or other material aspects of operation; restrictions on financial, transportation or information distribution systems; or the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused to the extent of such Extraordinary Event); and any other events beyond the reasonable control of Owner or Manager, excluding, however, general economic and/or market conditions not caused by any of the events described herein.



"FF&E" shall mean furniture, furnishings, fixtures, Soft Goods, Case Goods, Decorative Items, signage, Audio/Video Systems, kitchen appliances, refrigerators, minibars, and equipment, including front desk and back-of-the-house computer equipment, but shall not include Fixed Asset Supplies or Software.

"FF&E Estimate" shall have the meaning ascribed to it in Section 5.02.C.

"FF&E Reserve" shall have the meaning ascribed to it in Section 5.02.A.

"Fiscal Year" shall mean Manager's Fiscal Year which, as of the Effective Date, ends at midnight on the Friday closest to December 31st in each calendar year; the new Fiscal Year begins on the Saturday immediately following said Friday. Any partial Fiscal Year between the Opening Date and the commencement of the first (1st) full Fiscal Year shall constitute a separate Fiscal Year. A partial Fiscal Year between the end of the last full Fiscal Year and the Termination of this Agreement shall also constitute a separate Fiscal Year. If Manager's Fiscal Year is changed in the future, appropriate adjustment to this Agreement's reporting and accounting procedures shall be made; provided, however, that no such change or adjustment shall alter the Term or in any way reduce the distributions of Operating Profit or other payments due hereunder.

"Fixed Asset Supplies" shall mean items included within "Property and Equipment" under the Uniform System of Accounts that may be consumed in the operation of the Hotel or are not capitalized, including, but not limited to, linen, china, glassware, tableware, uniforms, and similar items, used in the operation of the Hotel.

"Flagging Date" shall mean the date on which the Hotel begins operation as a branded hotel using EDITION Trademarks in the name of the Hotel and as a part of the EDITION Hotel System, which date shall (i) be established and certified by Manager, and (ii) occur after Manager has opened for business one (1) other EDITION Hotel operating as a branded hotel using EDITION Trademarks in the name of the Hotel and as a part of the EDITION Hotel System; provided, however, the Flagging Date shall occur no later than thirty (30) days after the first (1st) EDITION Hotel opens for business operating as a branded hotel using EDITION Trademarks in the name of the Hotel and as part of the EDITION Hotel System, so long as all conditions to the Opening Date and the Flagging Date set forth in the Technical Services Agreement have been satisfied.

"Flagging Renovation" shall have the meaning ascribed to it in the Technical Services Agreement.

"Foreclosure" shall mean any exercise of the remedies available to a Mortgagee, upon a default under the Mortgage held by such Mortgagee, which results in a transfer of title to or control or possession of the Hotel. The term "Foreclosure" shall include, without limitation, any one or more of the following events, if they occur in connection with a default under a Mortgage: (i) a transfer by judicial foreclosure; (ii) a transfer by deed in lieu of foreclosure; (iii) the appointment by a court of a receiver to assume possession of the Hotel; (iv) a transfer of either



ownership or control of the Owner, by exercise of a stock pledge or otherwise; (v) a transfer resulting from an order given in a bankruptcy, reorganization, insolvency or similar proceeding; (vi) if title to the Hotel is held by a tenant under a ground lease, an assignment of the tenant's interest in such ground lease; or (vii) a transfer through any similar judicial or non-judicial exercise of the remedies held by the Mortgagee.

"GDP Deflator" shall mean the "Gross Domestic Product Implicit Price Deflator" issued from time to time by the United States Bureau of Economic Analysis of the Department of Commerce, or if the aforesaid GDP Deflator is not at such time so prepared and published, any comparable index selected by Owner and reasonably satisfactory to Manager (a "Substitute Index") then prepared and published by an agency of the Government of the United States, appropriately adjusted for changes in the manner in which such index is prepared and/or year upon which such index is based. Any dispute regarding the selection of the Substitute Index or the adjustments to be made thereto shall be settled by the panel of Experts in accordance with Section 11.20. Except as otherwise expressly stated herein, whenever a number or amount is required to be "adjusted by the GDP Deflator," or similar terminology, such adjustment shall be equal to the percentage increase or decrease in the GDP Deflator which is issued for the month in which such adjustment is to be made (or, if the GDP Deflator for such month is not yet publicly available, the GDP Deflator for the most recent month for which the GDP Deflator is publicly available) as compared to the GDP Deflator which was issued for the month in which the Effective Date occurred.

"Gross Revenues" shall mean all revenues and receipts of every kind derived from operating the Hotel and all departments and parts thereof, including, but not limited to: income (from both cash and credit transactions) from rental of Guest Rooms, telephone charges, stores, offices, exhibit or sales space of every kind; license, lease and concession fees and rentals (not including gross receipts of licensees, lessees and concessionaires; income from vending machines; income from parking; health club membership fees; food and beverage sales, provided, however, that with respect to any restaurant on the site, Gross Revenues will include either (i) the rental for such restaurant if such restaurant is leased to a third party, or (ii) the gross receipts from the operation of such restaurant if Manager operates such restaurant; wholesale and retail sales of merchandise; service charges; and proceeds, if any, from business interruption or other loss of income insurance (but excluding any amounts paid directly to Manager by the insurer for loss of the Management Fees or any other amounts payable to Manager under this Agreement); provided, however, that Gross Revenues shall not include the following: gratuities to employees of the Hotel; federal, state or municipal excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; proceeds from the sale of FF&E; interest received or accrued with respect to the funds in the FF&E Reserve; any refunds, rebates, discounts and credits of a similar nature, given, paid or returned in the course of obtaining Gross Revenues or components thereof; insurance proceeds (other than proceeds from business interruption or other loss of income insurance); condemnation proceeds (other than for a temporary taking); or any proceeds from any Sale of the Hotel or from the refinancing of any debt encumbering the Hotel.

"Guest Room" shall mean a separately-keyed lodging unit in the Hotel.



"Hazardous Materials" shall have the meaning ascribed to it in Section 11.08.

"Hotel" shall mean the Site together with the following: (i) the Hotel Improvements and all other improvements constructed or to be constructed on the Site pursuant to this Agreement; (ii) all FF&E, Fixed Asset Supplies and Inventories installed or located on the Site or in the Hotel Improvements; and (iii) all easements or other appurtenant rights thereto. For the avoidance of doubt, the definition of "Hotel" shall include all restaurants located on the Site, including any leased restaurants.

"Hotel Improvements" shall have the meaning ascribed to it in the Recitals.

"Impositions" shall have the meaning ascribed to it in Section 4.11.

"Incentive Management Fee" shall mean, with respect to each Fiscal Year or portion thereof, an amount payable to Manager that is equal to twenty-five percent (25%) of Available Cash Flow for such Fiscal Year or portion thereof, except as otherwise provided in Section 1.03.B and Section 11.13.D.

"Initial Term" shall have the meaning ascribed to it in Section 2.01.

"Institutional Lender" shall mean a foreign or domestic commercial bank, trust company, savings bank, savings and loan association, life insurance company, real estate investment trust, pension trust, pension plan or pension fund, a public or privately-held fund engaged in real estate and/or corporate lending, or any other financial institution commonly known as an institutional lender (or any Affiliate thereof) having a minimum paid up capital (or net assets in the case of a pension fund) of One Hundred Million Dollars ($100,000,000); provided further that a Person may not be an "Institutional Lender" if such Person, or any of its Affiliates or any other Person related to such Person that is proscribed by applicable law, is a Specially Designated National or Blocked Person.

"Insurance Retentions" shall have the meaning ascribed to it in Section 6.02.B.1.

"Intellectual Property" shall mean: (i) all Software, including the data and information processed or stored thereby; (ii) all manuals, brochures, directives, policies, programs and other information issued by Manager to its employees at the Hotel or otherwise used in the operation of the Hotel or any other hotel in the EDITION Hotel System or any other hotel in the Boutique System; (iii) Customer Information; (iv) all EDITION Trademarks and Boutique Trademarks; and (v) all Marriott, EDITION Hotel System (or other Marriott Company) trade secrets, confidential information and all other information, materials, and copyrightable or patentable subject matter developed, acquired, licensed or used by any Marriott Company in the operation of the Hotel or in any other hotel in the EDITION Hotel System or the Boutique System, including, without limitation, materials relating to sales and marketing programs, revenue and inventory management programs, processes or systems, brand and pricing strategies, business



and technology plans, and research and development reports. The foregoing shall apply regardless of the form or medium involved (e.g., paper, electronic, tape, tangible or intangible).

"Inventories" shall mean "Inventories" as defined in the Uniform System of Accounts, such as, but not limited to, provisions in storerooms, refrigerators, pantries and kitchens; beverages in wine cellars and bars; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"Key Money" shall have the meaning ascribed to it in Section 11.26.

"Legal Requirement(s)" shall mean any federal, state or local law, code, rule, ordinance, regulation or order of any governmental authority or agency having jurisdiction over the business or operation of the Hotel or the matters which are the subject of this Agreement, including, without limitation, the following: (i) any building, zoning or use laws, ordinances, regulations or orders; and (ii) Environmental Laws.

"Litigation" shall mean: (i) any cause of action (including, without limitation, bankruptcy or other debtor/creditor proceedings) commenced in a federal, state or local court; or (ii) any claim brought before an administrative agency or body (for example, without limitation, employment discrimination claims).

"Management Fees" shall mean the Base Management Fee and the Incentive Management Fee.

"Manager" shall have the meaning ascribed to it in the Preamble hereto or shall mean any successor or permitted assign, as applicable.

"Marketing Fee" shall mean a fee payable by the Hotel to Manager or one of its Affiliates, the proceeds of which shall be used by Manager to pay for Marketing Fee Services. Manager may use the funds collected from the Marketing Fee that it retains to pay for expenditures on such Marketing Fee Services as it may select in its reasonable discretion, and funds collected from the Marketing Fee may be carried over from year to year in Manager's reasonable discretion. To the extent that any cost otherwise meeting the definition of Marketing Fee Services is, in Manager's reasonable discretion, paid for directly by the Hotel rather than out of funds collected from the Marketing Fee, such cost shall be treated as a Deduction. The Marketing Fee will be one and five-tenths percent (1.5%) of Gross Revenues. The Marketing Fee may be increased from the amount set forth above only upon written consent by Owner, provided, however, that Owner may not withhold such consent in the event that the owners of a majority of the then-existing rooms in the EDITION Hotel System consent to such increase.

"Marketing Fee Services" shall mean (a) general marketing of the EDITION Hotel System, which shall commence upon the Flagging Date; and (b) the marketing services specific to the Hotel, which shall be for the period prior to the Flagging Date and shall be reasonably determined by Manager. The Marketing Fee Services shall include those services listed in Exhibit C-1 attached hereto.



"Marriott" shall mean Marriott International, Inc., a Delaware corporation, and its successors and assigns.

"Marriott Company(ies)" shall mean Manager, Marriott, and any Affiliate of Manager or Marriott.

"Marriott Funding Obligations" shall have the meaning ascribed to it in Section 2.03.

"Marriott Rewards Program" shall mean the frequent-guest affinity program of Marriott known as "Marriott Rewards," together with any similar or successor program or other affinity program instituted in conjunction with "Marriott Rewards" or any similar or successor program thereof.

"MBS Charges" shall have the meaning ascribed to it in Section 4.04.

"MBS Systems" shall mean the processes developed by Marriott that consolidate, on a system-wide basis in the Boutique System, into one or more shared services centers, certain accounts payable, billing and accounts receivable, revenue capture subsidiary ledger, human resources management systems and related functions and procedures, or any similar or successor systems thereof.

"Minor Casualty" shall mean any fire or other casualty which results in damage to the Hotel and/or its contents, to the extent that the total cost of repairing and/or replacing of the damaged portion of the Hotel to the same condition as existed previously does not exceed an amount equal to ten percent (10%) of the total insured value of the Hotel (which amount shall in no event be less than Five Million Dollars ($5,000,000), as adjusted by the GDP Deflator).

"Mortgage(s)" shall mean any mortgage, deed of trust, or security document encumbering the Hotel and/or the Site.

"Mortgagee(s)" shall mean the holder of any Mortgage.

"Notice of Proposed Sale" shall have the meaning ascribed to it in Section 10.02.B.

"Opening Date" shall mean the first day on which paying overnight guests are first admitted to the Hotel by Manager, which date shall (i) be established and certified by Manager, (ii) in no event be earlier than thirty (30) days after the date of Substantial Completion (as such term is defined in the Technical Services Agreement), and (iii) otherwise be determined in accordance with Section 6.1 of the Technical Services Agreement.

"Operating Accounts" shall have the meaning ascribed to it in Section 4.03.A.

"Operating Loss" shall mean a negative Operating Profit.



"Operating Profit" shall mean, with respect to any given period of time, the excess of Gross Revenues over Deductions (each calculated in accordance with this Agreement and the Uniform System of Accounts).

"Owner" shall have the meaning ascribed to it in the Preamble or shall mean any successor or permitted assign, as applicable.

"Owner's Priority" shall mean, with respect to each Fiscal Year (pro rated for any partial Fiscal Year), a dollar amount equal to the sum of (i) Nineteen Million Four Hundred Twenty-Five Thousand Dollars ($19,425,000) (as the same may be adjusted in accordance with Section 11.27) plus (ii) ten and five-tenths percent (10.5%) of the amount of Capital Expenditures funded by Owner pursuant to Section 5.03 (excluding all costs related to the correction of errors, omissions or defects in the design, construction or renovation of the Hotel). With respect to Capital Expenditures funded by Owner and added to the calculation of Owner's Priority pursuant to clause (ii) above, such amount shall be added to the amount described in clause (ii) above (i.e., the amount that will be multiplied by ten and five-tenths percent (10.5%) as set forth above) commencing with the first (1st) day of the first (1st) fiscal quarter after the fiscal quarter in which the project for which such Capital Expenditure was made is completed. In the event that the Hotel does not open as an EDITION Hotel on the Opening Date and as a result the Hotel has a second "opening" in connection with the Flagging Date, the Owner's Priority shall be increased by a dollar amount equal to ten and five-tenths percent (10.5%) of the amount of the pre-opening expenses paid by Owner in connection with such second opening.

"Performance Termination Threshold" shall mean, with respect to each Fiscal Year, an amount equal to ninety percent (90%) of the Owner's Priority for such Fiscal Year, as the same may be adjusted in accordance with Section 11.27.

"Permitted Exceptions" shall have the meaning ascribed to it in Section 8.01.A.

"Person" shall mean an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, limited liability company, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

"Pre-Flagging Name" shall have the meaning ascribed to it in Section 11.12.A.

"Prime Rate" shall mean the "prime rate" of interest announced from time to time in the "Money Rates" section of the *Wall Street Journal* (Eastern Edition).

"Profit Transaction" shall have the meaning ascribed to it in Section 1.13.

"Property Insurance Premiums" shall have the meaning ascribed to it in Section 6.01.B.7.

"Prospectus" shall have the meaning ascribed to it in Section 11.12.B.

