accordance with System Standards and Section 6.3 and Section 6.4. Manager shall provide guidance to Owner relating to the quantities of Fixed Asset Supplies and Inventories, and the specifications of the Hotel Systems, necessary for the operation of the Hotel. Manager shall provide Owner with documents identifying such Fixed Asset Supplies, Inventories and Hotel Systems (which documents shall be in a form suitable for bidding the procurement of the Fixed Asset Supplies and Inventories, but which may not specify the prices or quantities of such items). In the event that Owner desires to substitute another item for one specified by Manager, each such substitution must be submitted to and approved by Manager.

## ARTICLE 4
## TIMETABLE; TECHNICAL SERVICES FEE

4.1     Construction of Hotel and Project Areas. Owner agrees that construction, furnishing and equipping of the Hotel and Project Areas shall be completed materially in accordance with the Plans approved by Owner, Manager and Schrager pursuant to Article 2, the EDITION Technical Standards and Systems Standards in existence as of the commencement of construction (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3). Owner shall be solely responsible for any cost over-runs arising from the design, construction, equipping or furnishing of the Hotel and the Project Areas. Owner shall comply with the following obligations:

(a)     within thirty (30) days after the Effective Date, Owner shall submit to Manager evidence reasonably satisfactory to Manager that debt and other financing required to construct the Hotel and Project Areas has been obtained by Owner. Upon request of Manager, Owner shall promptly provide to Manager updates of the Project budget and Owner's sources of Project funds;

(b)     within thirty (30) days after the Effective Date, Schrager shall cause Designer, Manager and Schrager to submit to Owner the Design Schedule described in Section 1.2(b) hereof;

(c)     commence construction of the Project in accordance with the Design Schedule approved by the parties pursuant to Section 1.2(b), with construction being deemed to have commenced upon the issuance of a building permit;

(d)     construction of the Project, having commenced, shall not be interrupted or stopped for a period in excess of thirty (30) days for reasons other than an Extraordinary Event;

(e)     Owner shall complete construction and other renovation activities related to the Project materially in accordance with the Plans approved by Manager and Schrager, the EDITION Technical Standards and Systems Standards in existence as of the commencement of

16



construction (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3), such that the date of Substantial Completion occurs no later than May 31, 2009. Owner shall provide Manager written notice as soon as reasonably practicable if Owner determines that the date of Substantial Completion is not projected to occur by such date; and

(f) provide Manager written confirmation of the projected date of Substantial Completion in accordance with Section 5.1 and Section 6.2 so that Manager and Schrager may undertake their pre-opening activities based on such projected date.

The foregoing deadlines shall be extended for delays caused by an Extraordinary Event, provided, however, for any such Extraordinary Event, no such extension shall exceed 365 days.

It shall be a Default by Owner hereunder if Owner fails to meet the foregoing deadlines set forth in Section 4.1(c) through Section 4.1(f) (as may be extended by an Extraordinary Event pursuant to the previous paragraph); provided, however, that if Owner's failure to meet the foregoing deadlines (as extended by an Extraordinary Event pursuant to the previous paragraph) is caused solely by reasons of an Extraordinary Event, then (i) such failure shall not be considered a Default by Owner under the Management Agreement, (ii) Manager may terminate the Management Agreement and this Agreement upon written notice to Owner, and (iii) Manager shall only be entitled to payment of those portions of the Technical Services Fee, Reimbursable Expenses and Pre-Opening Expenses to which Manager is entitled pursuant to the terms of this Agreement and Schrager shall only be entitled to payment of that portion of the Concept Development Fee to which Schrager is entitled pursuant to the terms of this Agreement through the date of such Termination, plus reasonable post-Termination expenses.

4.2 <u>Technical Services Fee</u>. Owner shall pay to Manager and Schrager a fee for services rendered pursuant to Article 2 and Article 3 (including, without limitation, the services of Aaron Richter, Debra French and a project manager) (the "Technical Services Fee"). The services to be provided by Schrager hereunder shall be provided by an executive vice president of architecture and design, an executive vice president of interior design and FF&E, a brand manager-visual and a project manager who will not be responsible for more than a total four (4) projects. Ian Schrager shall be personally involved in the design, concepting and direction of the Hotel and shall be available for key design meetings in connection therewith. The Technical Services Fee shall be Fifty-Five Thousand Five Hundred Fifty-Six Dollars ($55,556) per month with the first such monthly payment to be paid on July 20, 2008, and subsequent monthly payments to be paid on the twentieth (20th) day of each calendar month thereafter until the Opening Date. Manager shall pay to Schrager such portion of the Technical Services Fee as they shall mutually agree. Manager and Schrager shall not earn a profit with respect to the Technical Services Fee. Any portion of the Technical Services Fee which relates to services rendered by Schrager shall include only the actual costs incurred by Schrager for any person employed or engaged by Schrager

17



who devotes his or her full time and attention to the Hotel (or the allocable portion of such costs, if such person performs work on behalf of more than one EDITION hotel), such costs to include compensation of such person (but not out-of-pocket expenses incurred by such person, which shall be paid as Reimbursable Expenses).

      4.3    <u>Concept Development Fee</u>.  Owner shall pay to Schrager a fee for services rendered pursuant to this Agreement and in connection with the design of the Hotel equal to Two Million Nine Hundred Thirty Eight Thousand Dollars ($2,938,000) (the "Concept Development Fee"). Eighty percent (80%) of the Concept Development Fee shall be paid in monthly installments of One Hundred Thirty Thousand Six Hundred Thirteen Dollars ($130,613), with the first installment to be paid within five (5) Business Days after the Effective Date, subsequent monthly installments to be paid on the twentieth (20th) day of each calendar month thereafter, and the balance to be paid within thirty (30) days after Substantial Completion as set forth in Section 4.1(f).  Promptly following the date of Substantial Completion, Owner, Manager and Schrager shall determine the final, total development costs for the Project.  If the actual total hard costs for the room and common area improvements, exterior, and capital improvements for the Project (the "Actual Hard Costs") exceed Thirty Five Million Two Hundred Thirty One Thousand Dollars ($35,231,000) (which represents the hard costs for the Project upon which the above Concept Development Fee was calculated) (the "Budgeted Hard Costs") by more than Five Million Dollars ($5,000,000), then the Concept Development Fee shall be increased by an amount equal to two percent (2%) of the difference between the Actual Hard Costs and the Budgeted Hard Costs, and Owner shall pay such amount to Schrager within fifteen (15) days after such determination.  If either party disputes the determination of the Actual Hard Costs and the parties are unable to resolve the dispute, either party may refer the matter to a panel of Experts in accordance with the provisions of Section 11.20 of the Management Agreement.

      4.4    <u>Reimbursable Expenses</u>.  In addition to the Technical Services Fee and the Concept Development Fee, Owner shall pay to each of Manager and Schrager their respective Reimbursable Expenses within thirty (30) days of the date of Manager's and Schrager's invoices therefor.  Manager shall invoice Owner for the Reimbursable Expenses incurred by Manager, and Schrager shall invoice Owner for the Reimbursable Expenses incurred by Schrager on a monthly basis and Owner shall pay such invoices on the paid on the twentieth (20th) day of each calendar month thereafter.  Manager shall provide Owner with system-generated information from Manager's automated expense reporting system to substantiate Manager's Reimbursable Expenses and Schrager shall provide Owner with reasonable written substantiation for Schrager's Reimbursable Expenses.  Manager and Schrager shall, within fifteen (15) days after the Effective Date, each provide Owner with a good faith estimate of their respective total Reimbursable Expenses for Owner's review and approval and each of Manager and Schrager shall use commercially reasonable efforts not to exceed the amounts set forth in such estimates.  Manager and Schrager shall notify Owner if at any time actual their respective Reimbursable Expenses are projected to exceed such estimated amount and the reasons there for, and in no event shall



Reimbursable Expenses in the aggregate exceed the aggregate amount approved by Owner without the prior approval of Owner, provided, however, that such advance approval shall not be required with respect to non-budgeted travel expenses which are otherwise reasonably required.

    4.5    Funding Technical Services. If, following one hundred twenty (120) days after the Opening Date, Owner has failed to make payment on account of the Technical Services Fee, the Concept Development Fee or Reimbursable Expenses detailed in Sections 4.2, 4.3 and 4.4, Manager shall have the option to pay itself and Schrager such amounts from distributions otherwise payable to Owner pursuant to the Management Agreement.

## ARTICLE 5
## PRE-OPENING ACTIVITIES

    5.1    Projected Opening Date; Turnover Schedule. Owner and Manager agree that the Opening Date is projected to occur on July 1, 2009. However, the Opening Date shall not occur sooner than fifteen (15) days after Substantial Completion and in accordance with the provisions of Section 6.1. Owner, Schrager and Manager each agree to direct their actions hereunder in a manner that is intended to achieve the Opening Date on such date. Owner acknowledges that based upon Owner's commitment to work toward such Opening Date, Manager shall begin hiring and training staff and booking reservations for the Hotel, unless Manager is otherwise notified pursuant to Section 4.1(f) that the date of Substantial Completion has been modified. Owner, Manager and Schrager shall agree on a turnover schedule for the Hotel based on the projected Opening Date.

    5.2    Pre-Opening Activities. Owner, Schrager and Manager recognize that Manager must undertake certain activities in advance of the Opening Date so that the Hotel can function in an appropriate and orderly manner on the Opening Date and during the first (1st) Fiscal Year. Accordingly, Manager shall, subject in each instance to the limitations and constraints set forth in the Management Agreement:

    (a)    In consultation and collaboration with Schrager, recruit, train and employ the staff required for the Hotel;

    (b)    In consultation and collaboration with Schrager, undertake pre-opening promotion and advertising, including opening celebrations and related activities;

    (c)    Test and, if necessary, implement modifications of the Hotel operations;

    (d)    For a period ending not later than sixty (60) days after the Opening Date, make provisions to provide a task force of personnel to supervise and assist the pre-opening and opening operations;



(e)   Apply for the initial licenses and permits required for the operation of the Hotel as contemplated by the Management Agreement and Section 2.4.2;

(f)   In consultation and collaboration with Schrager, design and implement a marketing, public-relations and sales strategy for the Hotel; and

(g)   In general, render such other miscellaneous services incidental to the preparation and organization of the Hotel's operations as may be reasonably required for the Hotel to be adequately staffed and capable of management on the Opening Date and during the first (1st) Fiscal Year, including development and implementation of marketing and sales programs, accounting and budgeting controls and similar operational items.

5.3   Pre-Opening Expenses. Attached hereto as Exhibit 2 is a budget containing an estimate of the total Pre-Opening Expenses. Proposed increases to the Pre-Opening Expenses shall require the approval of Owner if such increases shall, individually exceed the line item in question by greater than ten percent (10%) of such line item, or if in the aggregate, such modifications increase the aggregate of such budget by greater than five percent (5%). In the event the Opening Date is delayed or postponed from the original date established therefor, such estimates shall be subject to revision to reflect any increases in Pre-Opening Expenses occasioned by such delay or postponement. Owner shall notify Manager in advance of any impending delay or postponement of the date of Substantial Completion as required by Section 4.1(f) to enable Manager (to the extent reasonably practicable) to reduce the increases in Pre-Opening Expenses occasioned thereby. It is understood, however, that to the extent that any delay or postponement of the Opening Date causes increased Pre-Opening Expenses that cannot reasonably be avoided, Owner shall promptly pay such increased Pre-Opening Expenses pursuant to Section 5.4, regardless of the fact that such delay or postponement may be the result of an Extraordinary Event. For purposes of the preceding sentence, the term "increased Pre-Opening Expenses" shall include all out-of-pocket cancellation penalties and the cost of other contractual obligations, as well as all relocation costs and expenses, in the event Manager reasonably determines that it must cancel reservations made for Guest Rooms, meeting rooms and other Hotel facilities as a result of any delay or postponement of the Opening Date. Manager shall use reasonable efforts to implement all pre-opening activities in an efficient, business-like manner so as to maximize the effectiveness of such activities and the spending of the budget for the Pre-Opening Expenses.

5.4   Funding of Pre-Opening Expenses. Pre-Opening Expenses shall be borne solely by Owner. Owner shall furnish Manager with funds required by Manager for Pre-Opening Expenses (i) in the amounts and on the dates required, as shown in the projections contained in or furnished by Manager in conjunction with the Pre-Opening Expenses budget, and (ii) in such other amounts and on such other dates as may be specified by Manager in any amendments to the Pre-Opening Expenses budget. Such amounts shall be deposited in the Pre-Opening Account. In order to ensure the timely payment of Pre-Opening Expenses when they are incurred, Owner acknowledges and agrees that Manager may bill Owner for Pre-Opening Expenses, and that Owner shall be required



to pay such Pre-Opening Expenses before Manager actually incurs the costs for such Pre-Opening Expenses.

    5.5    <u>Use of Funds in Pre-Opening Account; Accounting</u>. Manager shall use the funds in the Pre-Opening Account to pay subsequent Pre-Opening Expenses and to reimburse itself for previously incurred Pre-Opening Expenses. At the time of delivering to Owner any revised estimate of Pre-Opening Expenses, Manager shall also deliver an accounting of any funds expended to date for Pre-Opening Expenses. Within one hundred twenty (120) days after the final expenditure of funds for Pre-Opening Expenses, Manager shall deliver to Owner an itemized accounting of funds so expended along with payment to Owner of all remaining amounts in the Pre-Opening Account that have not been spent by Manager. If, following one hundred twenty (120) days after the Opening Date, Owner has failed to make payment on account of the Pre-Opening Expenses, Manager shall have the option to reimburse itself such amounts together with interest at the Prime Rate plus three percent (3%) from distributions otherwise payable to Owner pursuant to the Management Agreement.

### ARTICLE 6
### OPENING DATE

    6.1    <u>Opening Date</u>. The projected Opening Date shall be as set forth in Section 5.1. However, the actual Opening Date shall be agreed upon by Manager and shall in no event be earlier than the date upon which (i) all elements of the Hotel and Project Areas have been substantially completed materially in accordance with the approved Plans and the EDITION Technical Standards and System Standards that were not incorporated in the approved Plans (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3) and in compliance with the provisions of Section 6.3, and are ready for their intended use and occupancy, other than minor Punchlist Items, which will not individually or in the aggregate impair the operation and use of the Hotel for its intended purpose, or impair the guest experience at the Hotel; and (ii) all licenses, permits and other approvals and instruments necessary for operation of the Hotel by Manager have been obtained. Any decision by Manager to delay the Opening Date based on failure of the Hotel or Project Areas to satisfy the requirements set forth in the preceding sentence shall not prejudice Manager's rights under Section 4.1. Owner shall promptly notify Manager of any changes in the projected Opening Date.

    6.2    <u>Notification</u>. Owner shall use reasonable efforts to give Manager notice of the approximate anticipated date of Substantial Completion for the Hotel no later than three (3) months before the date thereof, and to advise Manager from time to time of changes to such anticipated date. Owner shall give Manager written notice at least six (6) weeks in advance before the Substantial Completion date for the Hotel if such date is anticipated to move by more than five (5) days of the last date of Substantial Completion of which Owner advised Manager.

21



6.3     Conditions for Opening Hotel. Consistent with Section 6.1, Owner agrees that on the Opening Date, there will be no ongoing construction on any portion of the Hotel that would materially adversely affect access to the Hotel or that would otherwise materially adversely limit, restrict, disturb or interfere with Manager's management and operation of the Hotel in accordance with System Standards or that would adversely affect the guest experience at the Hotel. If, as of the Opening Date, there remain to be completed minor unfinished Punchlist Items or installation of incidental FF&E and Fixed Asset Supplies in the common areas, lobby, administrative offices or any Guest Rooms to be opened on the Opening Date, none of which preclude Manager, in Manager's judgment, from operating the Hotel in accordance with System Standards, the Opening Date shall not be delayed for such reasons; however, Owner shall be obligated to promptly finish such items.

6.4     Initial Funding of Working Capital; Fixed Asset Supplies. At least thirty (30) days prior to the projected Opening Date, Owner shall provide to Manager the initial Working Capital (cash component) for the Hotel in the amount set forth on Exhibit 2. Additionally, Owner shall ensure that the Hotel is equipped by the date of Substantial Completion with the initial Fixed Asset Supplies and Inventories for the Hotel (or that Owner has provided to Manager the funds necessary to supply the Hotel with the initial Fixed Asset Supplies and Inventories) in accordance with Section 3.1.

6.5     Hotel Access. The parties acknowledge that certain areas of the Hotel will need to be made available to Manager and Schrager prior to Substantial Completion in order to allow Manager and Schrager to undertake certain activities in anticipation of the Opening Date. The parties agree to work together in good faith to identify such areas and determine a schedule for making such areas available to Manager and Schrager.

## ARTICLE 7
## INTERIM INSURANCE

7.1     Insurance Required. At all times during the construction of the Project through the Opening Date, Owner shall, at its expense, procure and maintain (or cause its general contractor to procure and maintain) insurance fully protecting Owner, Manager and Schrager against all loss or damage arising out of or in connection with the construction of the Project. Such insurance shall, at minimum include:

(a)     Commercial general liability insurance with combined single limits for bodily injury or property damage in an amount not less than One Million Dollars ($1,000,000) per each occurrence with a general aggregate limit of not less than Two Million Dollars ($2,000,000) and such aggregate shall apply, in total, to the Hotel. Such insurance shall include, but is not limited to, the following coverages or endorsements:

- Independent Contractors Liability

22



- Products/Completed Operations Liability (construction defect) to be maintained for (i) ten (10) years after the date of Substantial Completion of the Project or close of escrow date, or (ii) such greater time frame as may be required to cover the statutory time frame for construction defects in the state where the project is developed. If such coverage is provided by the general contractor, evidence of insurance shall be provided for the entire statutory time frame
- Explosion, Collapse and Underground Coverage
- Broad Form Property Damage Liability, including Completed Operations

(b)    Business auto liability including owned, non-owned and hired vehicles, with combined single limits for bodily injury and property damage in an amount not less than One Million Dollars ($1,000,000) per each occurrence.

(c)    Umbrella excess liability, on a following form, in an amount not less than:

(i)    Twenty-Five Million Dollars ($25,000,000) per occurrence for projects where the total Project construction costs are valued at Fifty Million Dollars ($50,000,000) or less,

(ii)   Fifty Million Dollars ($50,000,000) per occurrence for projects where the total Project construction costs are greater than Fifty Million Dollars ($50,000,000) but less than or equal to One Hundred Million Dollars ($100,000,000),

(iii)  One Hundred Million Dollars ($100,000,000) per occurrence for projects where the total Project construction costs are greater than One Hundred Million Dollars ($100,000,000) but less than or equal to One Hundred Fifty Million Dollars ($150,000,000), or

(iv)   such greater amount as reasonably determined by an insurance consultant and agreed to in writing by Manager for projects where the total Project construction costs are greater than One Hundred Fifty Million Dollars ($150,000,000).

Such coverage shall be in excess of the insurance required under Section 7.1(a), Section 7.1(b), and the employers liability coverage required under 7.1(e). The general aggregate shall apply in total to the Hotel only and shall be reinstated annually during construction. Upon the close of escrow or Substantial Completion of the Hotel, the coverage shall specifically include the completed operations liability (construction defects) coverage in the amounts required under this Section and the general aggregate shall apply in total to the Hotel only for the timeframe required in Section 7.1(a).



(d) Builders risk insuring such risks as commonly covered by an "all risk of physical loss" form on a replacement cost basis covering equipment and the Hotel and Project Areas, including contractors' supplies, tools and equipment. Such coverage shall include business interruption insurance covering at least 18 months of loss of profits, including Manager's management fees, other amounts due to Manager under the Management Agreement, necessary continuing expenses, and if applicable, rent, for interruptions at the Project insured under said builders risk policy.

(e) Workers' compensation insurance covering all of Owner's, its general contractors', its subcontractors' and its consultants' employees, in statutory amounts and employers' liability of not less than One Million Dollars ($1,000,000) each accident.

(f) Professional liability insurance in an amount not less than the greater of Two Million Dollars ($2,000,000) or five percent (5%) of the total construction cost of the renovation of the Project, covering claims resulting from negligent errors, omissions, or acts of the architect and any and all engineers and other consultants hired by the architect. Any deductible shall be subject to Manager's prior approval. For purposes of this Agreement, the architect shall maintain professional liability insurance for at least three (3) years from the date of receipt of the final certificate of occupancy for the Project.

7.2   General Provisions. All insurance policies required under Section 7.1 (excluding workers compensation) shall include Manager and Schrager as an additional insured thereunder. Owner shall deliver to Manager and Schrager, upon execution of this Agreement, certificates of insurance, and if requested, copies of the insurance policies, with respect to all policies required pursuant to Section 7.1 and, in the case of insurance policies about to expire, shall deliver certificates with respect to renewals thereof. All such certificates of insurance shall state that the insurance shall not be canceled or materially reduced without at least thirty (30) days' prior written notice to the certificate holder or other comparable industry acceptable language. For all the above coverages, Owner shall, and shall cause the general contractor and all subcontractors to, waive their respective rights of recover and its insurers' rights of subrogation against Manager and Schrager and such coverage shall be primary and non-contributory to any other coverages Manager and/or Schrager may carry.

## ARTICLE 8
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

8.1   Representations and Warranties of Owner. Owner hereby represents and warrants to Manager and Schrager as follows:

8.1.1   Title. Owner has good, indefeasible and merchantable title to and ownership of the Hotel and the Project (including without limitation the Site) subject to no liens or



encumbrances which might materially adversely affect the construction or operation of the Hotel or Manager's rights hereunder or under the Management Agreement.

        8.1.2   No Breach. The execution, delivery and/or performance by Owner of this Agreement and the Management Agreement will not result in a breach of any provision contained in any agreement, instrument, document, order, judgment, decree or other material arrangement which Owner is a party or by which it or any of its assets is bound.

        8.1.3   Litigation. There is no pending or threatened suit, action or litigation or administrative, arbitration or other proceeding relating to Owner or the Hotel or the Project which might materially adversely affect the construction or operation of the Hotel or Manager's or Schrager's rights hereunder or Manager's rights under the Management Agreement.

        8.1.4   Access and Utilities. Suitable vehicular and pedestrian access and complete utility services (including water, sewer, storm drainage electricity, gas, telephone and cable television) are available to the Hotel for its intended purposes or can be made available without extraordinary expense.

   8.2   Covenants of Owner. Owner covenants and agrees, in addition to the other covenants of Owner herein and in the Management Agreement, to:

        8.2.1   Construction. Construct, furnish and equip the Hotel so that same may open for business on or prior to the projected Opening Date as set forth in Section 5.1 (subject to delays caused by Extraordinary Events) in full compliance with this Agreement and the Management Agreement, at Owner's sole expense, free of liens for labor, services or materials and in full compliance with the requirements of all governmental authorities.

        8.2.2   Publicity. To furnish to Manager and Schrager for their prior approval all announcements to news media regarding the Hotel and to cooperate with Schrager and Manager to obtain such publicity in connection with the Hotel as Manager and Schrager desire.

        8.2.3   Use of Logos. Owner shall request Manager's approval, which Manager may withhold in its sole discretion, for any use of the "EDITION" name and logos in all publications, announcements or articles, and Owner shall not permit and shall use all available means to prevent its vendors and Contractors from advertising their contracts in connection with the Hotel and from making any unauthorized use of the EDITION trademarks.

        8.2.4   Environmental. Owner agrees to provide to Manager evidence satisfactory to Manager that no Hazardous Materials are present on the Site of the Hotel and that no Hazardous Materials will be incorporated into the construction of the Hotel, and that any Hazardous Materials previously located on the Site have been completely removed to the satisfaction, and in compliance with the rules, regulations and orders, of all governmental authorities having jurisdiction thereof.

