# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- -- -- -- -- -- -- -- -- -- -- -- --x

M WAIKIKI LLC,

     **Plaintiff,**

     **vs.**

MARRIOTT HOTEL SERVICES, INC., I.S.
INTERNATIONAL, LLC, and IAN SCHRAGER,

     **Defendants.**

- -- -- -- -- -- -- -- -- -- -- -- --x

Index No.:
Date Purchased: May 26, 2011

**SUMMONS**

Venue is proper in New York County
pursuant to CPLR § 503

**TO THE ABOVE-NAMED DEFENDANTS:**

     You are hereby summoned and required to serve upon Plaintiff's attorney an answer to

the complaint in this action within twenty (20) days after the service of this summons, exclusive

of the day of service, or within thirty (30) days after service is complete if this summons is not

personally delivered to you within the State of New York. In case of your failure to answer,

judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
     May 26, 2011

                 William A. Brewer III
                 Alexander D. Widell
                 **BICKEL & BREWER**
                 767 Fifth Avenue, 50th Floor
                 New York, New York 10153
                 (212) 489-1400

                 **ATTORNEYS FOR PLAINTIFF**
                 **M WAIKIKI, LLC**

TO:    MARRIOTT HOTEL SERVICES, INC.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland  20817

I.S. INTERNATIONAL, LLC
c/o Ian Schrager Company
818 Greenwich Street
New York NY 10014
(212) 212 796 8400

IAN SCHRAGER
c/o Ian Schrager Company
818 Greenwich Street
New York NY 10014
(212) 212 796 8400

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- -- -- -- -- -- -- -- -- -- -- -- --x
M WAIKIKI LLC,                              :
                                           :
     Plaintiff,               :      Index No.:
                                           :
     vs.                       :
                                           :
MARRIOTT HOTEL SERVICES, INC., I.S.         :
INTERNATIONAL, LLC, AND IAN SCHRAGER,       :
                                           :
     Defendants.               :
                                           :
- -- -- -- -- -- -- -- -- -- -- -- --x

## COMPLAINT

     Plaintiff M Waikiki, LLC ("M Waikiki" or "Owner"), by and through its undersigned

counsel, files this Complaint against Defendants Marriott Hotel Services, Inc. ("Marriott"), I.S.

International, LLC ("Schrager LLC"), and Ian Schrager, on personal knowledge concerning its

own actions and on information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

     This case concerns the misrepresentations made by Defendants to induce Plaintiff to flag

its luxury hotel with the Edition brand.  What Defendants represented would be a fully supported

new lifestyle hotel brand in the Marriott family of brands has turned out to be a nonexistent hotel

chain.

     In 2007, Marriott, the largest hotel company in the world, and Ian Schrager, the well-

known hotel innovator and designer, joined forces to "create" a new hotel brand – "Edition

Hotels" – to compete in the white-hot "lifestyle" or "boutique" hotel market.  When Defendants

announced their new venture to the public, they bragged that Edition Hotels had agreements in

place to open nine hotels in major cities worldwide within a year.  They proclaimed that they would have more than 100 hotels in the foreseeable future.

Based on those and other representations, in 2008, Owner put the fate of its 353-room, $250 million Honolulu hotel property (the "Hotel") in the hands of Defendants.  Specifically, Defendants promised to provide Owner design services in connection with the renovation of the Hotel as well as marketing and booking services during the pre-opening period – and, thereafter, to operate the Hotel as a member of the "Edition" hotels brand.  Having induced Owner into the contracts and fiduciary relationships that are the subject of this lawsuit, Defendants then failed to provide the design and development assistance to Owner in a timely, competent, and professional manner.  In fact, the person responsible for the "Edition" design, Defendant Ian Schrager, abandoned the venture before Plaintiff's Hotel even opened in order to launch a competing hotel chain.  Indeed, Ian Schrager has been engaged in a public relations campaign in connection with the launch of his new lifestyle hotel brand call "Public."

Defendants' failure to perform its obligations, including the lack of any meaningful pre-opening marketing, reservations, and sales activities by Marriott, has resulted in outrageously-low occupancy levels and average daily room rates for the Hotel.  Since its opening in September 2010, not only has Marriott all but given up on generating sufficient business and revenues for the Hotel, it has refused to manage operating costs in such a way as to ensure any profit to Owner.  Finally, there is no "Edition" brand of hotels.

When the "Edition" brand of boutique hotels was publicly announced, Marriott's President and Chief Operating Officer, Arne Sorenson, stated that its "[s]uccess will be determined by one thing only:  how many of these we can open, and how well they perform." Given Defendants' failure to deliver on its promise to create a chain – the poor performance of

2

Plaintiff's Hotel is predictable.  Yet, Marriott has compounded Plaintiff's economic problems by its gross mismanagement of the Hotel since opening.  Defendants' venture is a complete failure. Having fallen victim to Defendants' breaches of duty, Owner initiates this action to obtain the compensation and other relief to which it is entitled for the substantial and ongoing injuries that it has sustained.

## II.

### PARTIES

1.      M Waikiki is a Hawaii limited liability company with its principal place of business located in San Diego, California.  It is a special purpose entity, having approximately 75 indirect investors, which was formed to acquire the Hotel that is the subject of this action.  M Waikiki is the current owner of the Hotel.

2.      Marriott is a Delaware corporation with its principal place of business located in Bethesda, Maryland.  Pursuant to contracts with Owner, Marriott provided technical and pre-opening services for the Hotel and currently manages and operates the Hotel under the "Edition" brand.

3.      Schrager LLC is a Delaware limited liability company with its principal place of business located in New York, New York.  Schrager LLC was engaged by Owner to provide pre-opening and design services for the Hotel.

4.      Ian Schrager is the President of Schrager LLC and undertook to provide pre-opening services for the Hotel.

## III.

### JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Defendants because:  (1) Marriott does substantial business in the State of New York in the form of managing, operating, and licensing

various hotels located in New York and providing marketing, sales, and reservations services in New York for hotels located within this State and throughout the world, and Edition Hotels' corporate offices are located in New York; (2) Schrager LLC has its principal place of business is in the State of New York; and (3) Ian Schrager is a resident of the State of New York.

6.      Venue is proper in New York County pursuant to N.Y. C.P.L.R § 503 because Marriott, Schrager LLC, and Ian Schrager reside in this county.

**IV.**

**FACTUAL BACKGROUND**

**A.      M Waikiki Acquires The Hotel And Seeks A Combination Of Design Expertise And Professional Management To Ensure Its Financial Success.**

7.      In July 2006, Owner acquired the Hotel, which is part of the Ikikai hotel-condominium project and was previously known as the Yacht Harbor Tower, for a purchase price of approximately $112 million.  Owner thereafter expended another $138 million to renovate the property.

8.      The Hotel is a world-class property in a spectacular location close to Waikiki Beach, offering stunning views of the Pacific Ocean.  Its eighteen stories include 353 rooms (including 31 suites) and 22,200 square feet of meeting space.  The Hotel's penthouse is featured prominently in the opening credits of the famous television series, "Hawaii Five-O."

9.      Following its acquisition of a crown jewel property, Owner appropriately sought experienced, competent, and recognized experts to provide critical pre-opening assistance in the form of design, technical, and marketing services, as well as long-term post-opening services in the form of day-to-day operational management and revenue-generating reservations, sales, and advertising programs.  Owner also undertook an investigation to determine whether to affiliate

4

the Hotel with a name-brand chain or to operate it as an "independent."   That is how Marriott and Schrager came into the picture.

**B.     Marriott:   The World's Largest Hotel Company Lags Behind In The Emerging Boutique Hotel Market.**

10.     Led by 75-year-old Chairman and Chief Executive Officer, J.W. "Bill" Marriott Jr., Marriott and its affiliates, including Marriott International, Inc., comprise the world's largest hotel company.   The Marriott organization manages or franchises over 3,500 hotels, and its revenues in 2010 were approximately $11.6 billion.   Marriott's portfolio of brands includes Marriott, Ritz-Carlton, Renaissance, Residence Inn, Fairfield Inn, and Courtyard.

11.     Marriott is well-known for its traditional approach to hotel design and concepts, which is largely a reflection of the conservative Marriott family which has run the company for over five decades.   That philosophy has served it well in the run-of-the-mill business class of hotels.   Its conservatism, however, has contributed to its inability to penetrate the lucrative and growing "lifestyle" – or "boutique" – hotel market.

12.     According to industry experts, chic upscale "boutiques" will comprise nearly a third of all hotels opening in Manhattan this year and as much as 10% of all hotels opening in other major urban markets.   The boutique hotel market grew 14.5% in 2009, 10.2% last year, and is expected to grow by 4.4% this year.   In 10 years, lifestyle hotels are expected to account for 6% of all hotels in the United States, and as much as 10% in the largest urban markets.

13.     Much to the chagrin of its shareholders, Marriott sat on the sidelines and watched its competitors grab significant market shares in that growing segment over the past decade. Since 1998, the lifestyle brand of Starwood Hotels & Resorts Worldwide, Inc. – "W Hotels" – has flourished.   W Hotels now has 38 hotels totaling over 11,000 rooms.   In addition, InterContinental Hotels Group opened its lifestyle brand, "Hotel Indigo," which has over 45

locations worldwide.  Even Hyatt Hotels, which entered the lifestyle hotels segment at the same time as Marriott, now has 5 "Andaz" hotels.

14.    Jealous of the success of its competitors' boutique brands, given its typical dominance in other market segments, Marriott was desperate to create a lifestyle product to appeal to a younger, affluent demographic.  Marriott's path to that objective ran to Ian Schrager.

## C.    Ian Schrager:  A Trendsetter In Hotel Design.

15.    In an effort to compete in the lifestyle market, Marriott took on an unlikely partner, high-profile design guru and hotelier Ian Schrager.  In stark contrast to Mr. Marriott, Ian Schrager is known for his trendy, hip, and cutting-edge hotel concepts.  Schrager owned and operated the famed Studio 54 which, from its opening in 1977, was the hottest night club in Manhattan – known for its celebrity clientele and prolific cocaine scene.  Schrager rode the Studio 54 wave until 1980, when he pled guilty to federal tax evasion charges following a raid on the club – which reportedly uncovered $600,000 in cash stuffed into garbage bags hidden in the rafters of the ceiling and a safety deposit box containing close to another $1 million.

16.    After his release from prison, Schrager reinvented himself – with the help of his long-time partner and sometime cellmate, Steve Rubell (now deceased), and designer Philippe Stark – as a hotelier.  Schrager became known as the developer of the "lifestyle hotel" concept.  Schrager-designed hotels became known for their ultra-hip and fashion-conscious feel, including dark corridors, lively bars, imaginative artwork, and house music throughout.  Among the hotels Schrager designed and developed are the Delano in Miami, Mondrian in Los Angeles, and Grammercy Park Hotel in New York.

17.    Although credited with inventing the "lifestyle" or "boutique" hotel, Schrager failed to capitalize on the concept to the same extent as others.  Indeed, Schrager was quoted in 2007 as saying that his financial reward "is not commensurate with the number of [his] ideas that

have influenced the industry," adding that, "It has always been a nightmare of mine that I would have an idea and somebody would come and make the money off of it." Later, commenting upon the growing presence of boutique, lifestyle hotels throughout the United States and beyond, Schrager lamented: "[T]hey could have been mine." Needless to say, Schrager was looking to grab a piece of the action.

**D.   Strange Bedfellows:   Marriott And Schrager Join Forces And Conceive The "Edition" Brand Of Boutique Hotels.**

18.   In June 2007, Marriott announced that it had entered into an agreement with Schrager to develop a new boutique hotel brand – "Edition." They identified twenty-two "gateway cities" worldwide which, they announced, would be the first locations of Edition hotels. Honolulu was not among the cities listed as inaugural members of the Edition hotel chain. Marriott also announced that it expected to have five Edition hotel deals by the end of that year, and 100 Edition hotels in operation globally within ten years. The venture was designed to make Marriott competitive with W Hotels and other popular emerging boutique chains. To Schrager, it was seen as his opportunity to make a lot of money.

19.   However, for the Marriott-Schrager venture to be a financial success – for Defendants and for hotel owners – there needed to be a sufficiently large and growing "chain" of Edition hotels. In fact, Arne Sorenson, Marriott's then-CFO (and current President and Chief Operating Officer), stated in August 2007, that "Success will be determined by one thing only: how many of these we can open, and how well they perform." He then added, "We're absolutely sure we can do this with [Ian Schrager]."

20.   In January 2008, Bill Marriott and Ian Schrager threw a party in Beverly Hills celebrating the kickoff of their new venture. Bill Marriott publicly represented that the venture had agreements in place with developers for the first nine Edition hotels which were to be

7

located in Paris, Madrid, Costa Rica, Miami, Chicago, Washington D.C., Los Angeles (2), and Scottsdale.  In his internet blog, Bill Marriott boasted that, "Our new Edition brand is the talk of the lodging industry."

21.    Bill Marriott and Ian Schrager made strange bedfellows indeed.  Regrettably, their partnership has turned out to be as unsuccessful as it was improbable.

**E.    The Pitch:  Marriott And Schrager Court Owner To Jump On The "Edition" Bandwagon.**

22.    Once Marriott learned of Owner's acquisition and planned renovation of the Hotel, Marriott turned its attention to convincing Owner to affiliate the Hotel with Edition.  In addition to informing Owner of the brand's developments set forth above, Marriott promised Owner that it would bring to bear all of Marriott's considerable resources and decades of experience to make the Hotel a success from the day its doors opened.  Marriott prepared and presented financial projections to Owner to support that optimistic outlook.

23.    Specifically, in March 2008, Marriott provided Owner with projections for the first year of Hotel operations (the "March 2008 Projections"), in which Marriott foretold a bright future for the Hotel as a member of the Edition chain.  For example, Marriott forecast that Owner's net operating profit for the first year of operation would be in excess of $14 million on $53.5 million in total revenue.  Marriott also estimated that the Hotel, as an Edition, would achieve an occupancy rate of 68%, an average daily rate ("ADR") of $400, and revenue per available room ("RevPAR") of $272 during its first year.

24.    Marriott assured Owner that it had assembled an elite team of talented and experienced senior executives dedicated to the development and promotion of the new brand and the oversight of Owner's Hotel operations.  Importantly, Marriott represented to Owner that several Edition hotels would open prior to the Hotel (thereby giving birth to the Edition "chain"

of hotels), and that the momentum created from those openings and the accompanying media blitz would make the Hotel a great success. Owner was convinced.

25.     For his part, Schrager promised Owner that he would be personally involved in the physical design and operational development of the Hotel. Schrager promised Owner that his personal involvement, including his attendance at key design meetings, would ensure that the Hotel had all the elements of style necessary for the success of the Hotel, and for which Schrager had become known. Schrager's personal involvement was critical to Owner and, absent his commitment regarding his personal involvement, Owner would not have agreed to brand the Hotel as an Edition.

**F.     In Reliance On Marriott's And Schrager's Representations, Owner <u>Agrees To Affiliate Its Hotel With The "Edition" Brand.</u>**

26.     In reliance on the foregoing representations, as well as other promises and undertakings by Defendants, Owner entered into two separate agreements dated as of July 9, 2008: (a) a Design and Technical Services and Pre-Opening Agreement among Owner, Marriott, and Schrager LLC (the "TSA"); and (b) a Management Agreement between Marriott and Owner (the "Management Agreement").

**i.     <u>The TSA</u>**

27.     Pursuant to the TSA, and in anticipation of the Hotel being opened and operated under the Edition name as a member of the Edition chain, Marriott and Schrager LLC undertook to perform a number of design-related duties and were granted a number of related powers. By virtue of the right of ultimate design and concept approval (and, thus, "veto power") accorded them under the TSA, Marriott and Schrager LLC controlled the design process – and, hence, essentially determined the Owner's costs of renovating, furnishing, and equipping the Hotel to comply with their design standards and demands. Significantly, the TSA (which was signed by

Ian Schrager himself) provided that "Ian Schrager shall be personally involved in the design, concepting and direction of the Hotel and shall be available for key design meetings in connection therewith."

28.     In addition to the design-related responsibilities assumed by Marriott and Schrager LLC in connection with the renovation of the Hotel in conformance with the standards purportedly applicable to all Edition-branded hotels, Marriott undertook, during the pre-opening period, to "begin hiring and training staff and booking reservations for the Hotel," and agreed to "undertake pre-opening promotion and advertising" and "design and implement a marketing, public-relations and sales strategy for the Hotel." To that end, Owner funded a "Pre-Opening Account" to be controlled by Marriott, as its agent, for purposes of paying various pre-opening expenses (including reimbursing itself) – for which Marriott was obligated to provide an accounting.

29.     As a result of the extraordinary powers provided to Marriott and Schrager LLC under the TSA, including, but not limited to, their design decision-making authority, their control over the selection and pricing of materials, furniture, fixtures, and equipment, their control over the Hotel's pre-opening reservations and booking activities, their control over the Pre-Opening Account (comprised of Owner's funds), and the exercise of the other rights and powers granted to them by the TSA, Marriott and Schrager LLC became Owner's fiduciaries (pursuant to a confidential and/or agency relationship). As a result, Marriott and Schrager LLC owed Owner the highest duties recognized in law, including obligations of loyalty, full disclosure, due care, and good faith and fair dealing – notwithstanding any contrary provision in the TSA purporting to disclaim such duties or relationship.

30.     Marriott and Schrager LLC agreed in the TSA to perform their duties and exercise their rights in a manner intended to achieve an opening date of July 1, 2009.  Because of their breaches of the TSA and violations of their fiduciary duties, however, the Hotel did not actually open until fifteen months later.

31.     In return for the anticipated full and faithful performance of their duties under the TSA, Schrager LLC and Schrager were to receive a multi-million dollar Concept Development Fee – which, because of cost escalations attributable to the Schrager organization's breaches of duty, escalated by nearly 20%.  In addition, Schrager LLC and Marriott were to receive and share a monthly Technical Services Fee until the Hotel's opening.  Due to the considerable delays caused by Schrager LLC's and Marriott's breaches of duty, the Technical Services Fee paid to those entities was approximately $1.5 million.

### ii.     The Management Agreement

32.     Owner entrusted Marriott with the responsibility for the operational performance and financial success of its Hotel.  Pursuant to the Management Agreement, Owner engaged Marriott to supervise and direct the management and operation of the Hotel under Marriott's exclusive supervision and control.  Significantly, the Management Agreement imposes upon Marriott responsibility for the "proper and efficient operation of the Hotel" and the duty to "act as a reasonable and prudent operator."  Applying the industry-recognized definitions of those terms (which also happen to be the commonly-accepted understandings), Marriott is obligated to competently manage Owner's Hotel, in accordance with the standards of care generally applicable to hotel operators, and with a minimum of waste and expense.

33.     The Management Agreement also requires Marriott to operate the Hotel "with the goal of achieving long-term profitability."  In addition, Marriott is obligated to "diligently pursue

11

feasible measures to operate the Hotel in accordance with the Business Plan" prepared by Marriott and approved by Owner.

34.     In the Management Agreement, Marriott expressly undertook "fiduciary" duties to Owner in connection with its receipt, handling, expenditure, and accounting for Owner's funds (including the revenues generated by Hotel operations).   In other ways, the Management Agreement imposes fiduciary duties on Marriott by virtue of the inherent agency powers accorded Marriott thereunder.   For example, the Management Agreement authorizes and empowers Marriott to enter into various contracts on behalf of Owner and Owner's Hotel; to procure necessary goods, supplies, and equipment utilizing Owner's funds; and otherwise bind Owner in commercial transactions.   Moreover, the Management Agreement requires Marriott to perform agency-related, revenue-generating services by soliciting and booking business for the Hotel on behalf of Owner through the provision of sales and reservations services.

35.     As a result of its explicit undertaking of fiduciary duties to Owner, and its acceptance and exercise of a variety of agency powers, Marriott entered into an agency relationship with Owner, as its principal, with respect to such matters.   By virtue of that principal-agent relationship, Marriott undertook fiduciary duties to Owner of loyalty, full disclosure, the utmost good faith and fair dealing, and due care as a matter of law – notwithstanding any contrary provision of the Management Agreement purporting to disclaim any such duty or relationship.

36.     In consideration of Marriott's promised full and faithful performance of the foregoing contractual obligations and fiduciary duties, Owner agreed to provide Marriott specified compensation.   More particularly, Owner agreed to pay Marriott a base management fee expressed as a percentage of the Hotel's gross revenues and, if applicable, an incentive fee

expressed as a function of the Hotel's operating profit. Those fees are essentially "pure profit" to Marriott, because the Management Agreement also requires Owner to pay for all operating expenses of the Hotel, fund all capital costs, cover the Hotel's payroll (notwithstanding the fact that all Hotel workers are deemed to be employees of Marriott), and pay Marriott various fees and charges for so-called "chain services," including central reservations, national sales office, and national advertising and promotion services. By any standard, the terms of the Management Agreement relating to Marriott's compensation and expense reimbursement are lucrative. However, there is one prerequisite to Marriott's entitlement to those fees and payments – namely, compliance with its contractual obligations and performance of its common law duties that arise therefrom.

37.     The initial term of the Management Agreement, which is governed by the laws of the State of New York, is thirty years, extending through 2038. Thereafter, the Management Agreement automatically renews on the same terms and conditions for two successive periods of ten fiscal years each (through 2058), provided that Marriott is not in default thereunder or elects not to renew.

38.     A fundamental requirement underlying the entirety of Marriott's duties and responsibilities under the Management Agreement is, from the inception of the parties' contractual relationship, the existence of a "chain" of Edition Hotels. Indeed, the Management Agreement specifically requires Marriott to operate the Hotel "as part of the Edition Hotel System" – defined as the "chain of full-service boutique hotels operated and managed by Marriott" or its affiliates under the "Edition Hotels" name.

**G.     Failure To Launch:  The Edition Chain Fails To Attract Owners.**

39.     When the Edition-branded boutique hotel concept was announced in 2007, Schrager said that Edition was going to be "the anti-chain" – in obvious reference to its

anticipated uniqueness and aversion to tradition.  As it turned out, however, the reference to "anti-chain" was appropriate for a different reason – namely, the absence of multiple hotels bearing the "Edition" name.

40.     Contrary to the promises set forth in the TSA and Management Agreement, there is no Edition chain of hotels.  In June 2010, it was reported that:

> Bill Marriott and Ian Schrager have remained largely mum about the [Edition] brand since February 2009 . . . [P]lanned debut projects in Washington DC and Miami had stalled due to dried-up financing . . . It seemed a bit odd to some hotel industry watchdogs that Waikiki – which didn't even warrant a place on Edition's initial 2008 list of dream cities for its properties – was suddenly a front runner for the brand's first hotel.

41.     In fact, since the opening of the Hotel in late 2010 – the first Edition hotel – the only other Edition property to open is a small hotel located in Istanbul, Turkey, which did not commence operation until April 2011.

**H.     Ian Schrager Abandons "Edition" To Start His Own Competing Hotel Brands.**

42.     Rather than intensifying their efforts to make the Hotel's opening a success in the face of Edition's challenges, Defendants did little to manage the deteriorating situation. Incredibly, Ian Schrager, who had committed to being personally involved under the TSA, was nowhere to be found.  Owner's repeated requests for Schrager's attention went unanswered.

43.     For example, in a letter dated October 20, 2008, Edward Bushor, a representative of Owner's managing member, eRealty Fund LLC, wrote to Ian Schrager to express a "major concern" that "[m]ajor concepts and themes of 'Ian' are just not felt in these designs."  Because he believed the Hotel lacked what he referred to as the "Ian edge or character" found in Schrager's other hotels – and which was a key reason Owner chose Edition – Mr. Bushor requested Schrager's immediate attention and offered to get on a "plane tonight" to meet with

14

Schrager about the Hotel's design elements.  Schrager did not make himself available and the Hotel's design and theme materially suffered as a result.

44.     Sadly for Owner, a year later, Ian Schrager had still not made the Hotel a priority. Predictably, this affected not only the theme and feel of the property, but Owner's ability to complete the renovation in time for the scheduled opening.  In another effort to secure Schrager's compliance with his contractual and fiduciary obligations, by letter dated September 22, 2009, Mr. Buschor again wrote Schrager complaining of design flaws and budget issues as a result of Schrager's lack of attention to the project.  Mr. Bushor once more requested a face-to-face meeting with Ian Schrager and told him that "[i]f we do not meet next week and finalize all issues, the opening of the Edition Waikiki on our schedule will be jeopardized.  We can no longer afford such risk of delay . . . [a]s you stated when we started this process, we need to consider ourselves as 'co-developers,' which frankly isn't happening if we are not meeting face-to-face."  Ian Schrager again ignored Mr. Bushor's pleas.

45.     Unbeknownst to Owner, Schrager had privately resigned himself to the fact that Edition Hotels was a failure.  Accordingly, Schrager abandoned Edition (and Owner) to create his own lifestyle hotel brands, one or more of which is expected to compete directly with Edition Hotels.  In fact, as early as April 2010, Schrager was purchasing hotels to launch two new hotel brands.  In fact, Schrager has recently announced the launch of his new lifestyle hotel brand called "Public," and is engaged in a public relations blitz related thereto.  Sadly, to boost Public's profile, Schrager is publicly criticizing Edition.  For example, Ian Schrager recently said in a television interview that, "Some of the largest hotel companies in the world are trying to be hip, and, to me, by definition, hip is something alternative.  It's time to move on to something else." That, despite his obligations to Owner, is precisely what Ian Schrager has done.

46.    Clearly, during the time that Schrager LLC and Schrager should have been diligently engaged in ensuring the timely completion of design activities and ensuring a successful Hotel opening, they were preoccupied with developing competing brands. Yet, despite their fiduciary obligations to do so, they never disclosed that conflict of interest to Owner.

**I.    Defendants Breached Their Contractual And Fiduciary Obligations With Respect To Their Design-Related Services And Pre-Opening Activities.**

47.    Under the TSA, Marriott and Schrager LLC were to develop Edition Technical Standards and provide them to Owner to ensure the Hotel's compliance therewith. However, they never provided Owner with the final standards. That led to confusion and uncertainty with respect to Owner's renovation activities, which not only delayed the opening of the Hotel but also increased the renovation and pre-opening costs.

48.    Moreover, Defendants failed to direct their actions in a manner intended to achieve the original planned opening date – July 1, 2009. As a result, the Hotel did not open for business until over a year later, in September 2010. Not only did Defendants' failure to adhere to their commitments increase the Owner's design, renovation, and pre-opening expenses, but it also resulted in a delayed opening and foregone revenues.

49.    Furthermore, Defendants failed to comply with their obligations to undertake pre-opening promotion and advertising, and to formulate effective marketing, public relations, and sales strategies for the Hotel. As a result, the Hotel opened with precious few bookings – a "standing start" that has plagued the Hotel ever since.

50.    In addition, so inadequate were Marriott's efforts to appropriately staff the Hotel at its opening, and thereafter, that the Hotel's bottom-line has suffered from significant overstaffing and, the out-of-control variable labor expenses.

16

51.     Finally, Marriott and Schrager LLC failed to use reasonable efforts to perform their pre-opening obligations in an efficient and business-like manner.  As a result, Defendants incurred over $8.7 million in Pre-Opening Expenses, which more than doubled the initial budget of $3.8 million (and represented a 50% increase over the Owner-approved budget of $5.1 million).   Merely by example, Marriott and the Schrager organization spent a staggering $472,000 for the Hotel's opening party alone, despite initially budgeting only $150,000.   The foregoing, coupled with Schrager's abandonment of the Hotel and the Edition concept, constitute breaches of the TSA and Defendants' fiduciary duties thereunder.

**J.      The Hotel Opens Amid A Crisis In The Marriott-Schrager Relationship.**

52.     Nevertheless, Owner pushed on with the renovation and on September 28, 2010, the Hotel had its "soft opening" and, on October 15, 2010, the Hotel had its grand opening. Although Ian Schrager made a cameo appearance at the grand opening, it was so brief that many of Owner's senior executives did not even meet the man.

53.     Since then, Edition's key executives have been jumping from Marriott like rats off a sinking ship.  Specifically, in March 2011, the two principal Marriott-employed Edition executives – Dan Flannery, the Managing Director since Edition's inception, and Youv Gery, Head of Development and Owner Relations – left Edition to work for a competing hotel management company.

54.     Obviously, a dark cloud hangs over the Marriott-Schrager venture, spelling the demise of any legitimate hope for a viable Edition-branded chain of boutique hotels.  That sense of impending doom has no doubt affected Marriott's management and operation of the Hotel.  As demonstrated below, Marriott has not only breached its contractual obligations with respect to promoting and booking business, generating revenues, providing services, and managing costs

for the Hotel, but its approach to those critical operational activities constitutes a culpable indifference to the Owner's interests therein.

**K.      Marriott Has Breached Its Contractual And Fiduciary Obligations With Respect To The Management Of The Hotel.**

55.      The Management Agreement recognizes that "the performance of the Hotel is dependent upon exclusive brand affiliation" with Marriott-operated "Edition" hotels.  Ironically, time has confirmed the truth of that statement – but in the opposite way in which Marriott intended it.  The abysmal performance of the Hotel is attributable in large part to the failed "Edition" brand and concept.

56.      In addition, far from operating Owner's Hotel in an economically "reasonable and prudent" manner, Marriott has failed in its obligations to Owner.  Pursuant to the Management Agreement, Marriott is required to prepare a Business Plan setting forth, among other things, estimated Gross Revenues, departmental profits, and Operating Profit for the forthcoming Fiscal Year. In addition, it is required to "diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan."  In its March 2008 Projections provided to Owner, Marriott projected a profitable first year of operations for the Hotel.  Then, in August 2009, Marriott submitted a new first-year projection (the "August 2009 Projection").   The August 2009 Projection, which was issued after Owner signed on to affiliate the Hotel with the Edition brand, foretold a less-optimistic, but still quite profitable, first-year for the Hotel.  Marriott projected that Owner's net operating profit would be $6.5 million on projected total revenue of $37.5 million – with an estimated average occupancy of 62%, ADR of $319, and RevPAR of $198.

57.      Finally, in anticipation of an opening date of September 21, 2010, Marriott submitted a partial Business Plan for the fourth quarter of 2010 (the "2010 Q4 Business Plan"). Marriott's 2010 Q4 Business Plan did not include a net operating profit line item, but projected

total revenue for those three months in the amount of $6.9 million, average occupancy of 39%, ADR of $231, and RevPAR of $90. Remarkably, despite the colossal slide in its projected revenue and profits since the March 2008 Projection, Marriott's actual performance as Hotel manager for the fourth quarter of 2010 was dramatically worse than predicted in its 2010 Q4 Business Plan. Specifically, Marriott lost nearly $3.9 million of Owner's money in a mere three months of operation. The actual revenue generated by Marriott in Q4 2010 was $3.7 million, average occupancy was 29.5%, ADR was $220, and RevPAR a mere $65.

58.    Marriott not only failed to diligently pursue measures to generate business in accordance with the 2010 Q4 Business Plan (generating only 54% of budgeted revenue), it also failed to manage and control expenses. For example, in its March 2008 Projection, Marriott predicted that it would cost $77 to prepare a room and register a guest. In its 2010 Q4 budget, however, Marriott estimated that task would cost $115 per occupied room. In actuality, however, in the fourth quarter of 2010, Marriott spent a whopping $148 to turn a room.

59.    On January 27, 2011, Marriott took another stab at projecting its anticipated performance and prepared a 2011 Business Plan, which estimated a net operating profit for the Owner in the amount of only $1.1 million. Once again, however, Marriott overestimated its ability to perform. Through the first quarter of 2011 alone, Owner has already suffered a staggering net operating loss of nearly $2.2 million. In sum, under Marriott's management, Owner's Hotel has sustained a net operating loss of $6 million. Notably, since opening, the Hotel has performed at only 37% of its "competitive set" – the six hotels against which the Hotel's performance is compared for benchmarking purposes pursuant to the Management Agreement, as amended.

60.     Marriott has breached its obligation to properly and efficiently operate the Hotel. In Marriott's own words, "the Waikiki Edition is an unknown hotel."  In connection with its projections and budgets, and its responsibility to manage to the budget, Marriott has failed miserably in its duty to act as a reasonable and prudent operator of the Hotel.  Moreover, Marriott has failed to operate the Hotel with a goal towards achieving long-term profitability. Indeed, Marriott has demonstrated a wholesale inability to understand the fundamentals of the budgeting, planning, revenue-management, and cost control processes.  Put simply, Marriott's acts and omissions constitute breaches of the Management Agreement and its common law fiduciary duties arising therefrom.

## V.

## CLAIMS

**A.     Count One:   Breach Of The TSA (Against Marriott, Schrager LLC, And Ian Schrager)**

61.     Owner realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

62.     At all relevant times pertinent hereto, Owner, Marriott, and Schrager LLC were parties to the valid and binding TSA.  In addition, by executing the TSA and personally undertaking duties pursuant thereto, Ian Schrager assumed contractual obligations to Owner.

63.     Owner has satisfied all conditions precedent to the assertion of its claims against Defendants.  Owner has performed all of its obligations under the TSA or, in the alternative, such performance has been excused, prevented, or hindered by the wrongful acts and material breaches of contract by Marriott, Schrager LLC, and Ian Schrager.

64.     Defendants materially breached the TSA in multiple respects, including, but not limited to, engaging in the acts and omissions described above.

65.     As a proximate result of Defendants' breaches of the TSA, Owner has sustained economic injury, for which it seeks damages in an amount to be determined by the trier of fact.

**B.      Count Two:  Breach Of Management Agreement (Against Marriott)**

66.     Owner realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

67.     Owner and Marriott are parties to the valid and binding Management Agreement.

68.     Owner has satisfied all conditions precedent to the assertion of its claim against Marriott for breach of the Management Agreement.  Owner has performed all of its obligations under the Management Agreement or, in the alternative, such performance has been excused, prevented, or hindered by the wrongful acts and material breaches of contract by Marriott.

69.     Marriott has materially breached the Management Agreement in multiple respects, including, but not limited to, engaging in the acts and omissions described above.

70.     As a proximate result of Marriott's breaches of the Management Agreement, Owner has sustained economic injury, for which it seeks monetary damages in an amount to be determined by the trier of fact.

**C.      Count Three:  Breach Of Fiduciary Duty (Against Marriott, Schrager LLC, And Ian Schrager)**

71.     Owner realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

72.     As set forth above, the TSA and Management Agreement invested Defendants with the authority to act on behalf of Owner in multiple respects and granted Defendants the power to control the design and development of Owner's renovated Hotel – together with the cost thereof.  As a result of that authority and those powers, an agency relationship and/or

confidential relationship arose between Marriott, Schrager, LLC, and Ian Schrager, on the one hand (as fiduciaries), and Owner, on the other hand (as the beneficiary).

73.    Accordingly, Defendants owed Owner fiduciary duties in connection with their design, pre-opening, and management-related activities with respect to Owner's Hotel.  Those duties included obligations of loyalty, due care, professional competence, full disclosure, fair dealing, and utmost good faith.

74.    Defendants breached those fiduciary duties to Owner by engaging in, among other misconduct and wrongdoing, the acts and omissions described above.

75.    As a proximate result of Defendants' breaches of fiduciary duty, Owner has sustained economic injury, for which it seeks monetary damages in an amount to be determined by the trier of fact.

76.    In addition, as the result of Defendants' material breaches of their fiduciary duties to Owner, Owner seeks an order of disgorgement, forfeiture, and restitution, pursuant to which Defendants shall be required to return or otherwise turn over to Owner all fees, payments, profits, or other things of value which Defendants wrongfully or unjustly received, retained, took, or paid themselves in breach of their fiduciary duties to Owner.

**D.    Count Four:  Negligent Misrepresentation (Against Marriott. Schrager LLC, And Ian Schrager)**

77.    Owner realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

78.    Both prior to and following Owner's execution of the TSA and Management Agreement, Defendants made a number of representations to Owner regarding purported matters of fact and their then-present intentions.

22

79.    Those representations were made by Defendants in the course of their professional activities and for the purpose of inducing reliance on the part of Owner and thereby obtaining financial gain.

80.    Defendants' representations to Owner were false, and the falsity of those representations was known to – or, alternatively, should have been known to – Defendants. Thus, at a minimum, Defendants' representations were made negligently.

81.    Owner intended to rely and act upon and did, in fact, rely and act upon the negligent representations made by Defendants in connection with its execution of the TSA and Management Agreement and its subsequent performance thereunder and conduct with respect thereto.

82.    As a proximate result of Defendants' misrepresentations, Owner has sustained economic injury, for which it seeks monetary damages in an amount to be determined by the trier of fact.

**E.    Count Five: Request For Judicial Declaration Regarding The Occurrence Of An Event Of Default And Owner's Right To Terminate The Management Agreement With Impunity**

83.    Owner realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

84.    As a result of Marriott's material breach(es) of the Management Agreement, an Event of Default has arisen under the terms thereof.

85.    Because Marriott has not cured those defaults despite Owner's notice of default to Marriott and the expiration of all applicable cure periods – or, in the alternative, those defaults are incurable as a matter of law – Owner has the contractual right to terminate the Management Agreement with impunity and without liability to Marriott.

86.     In addition, Owner has the present right to terminate the Management Agreement with impunity and without liability to Marriott pursuant to common law, due to Marriott's material breach(es) of the Management Agreement.

87.     Accordingly, Owner requests that the Court issue a declaratory judgment setting forth Owner's termination of rights as described above.

## VI.

## REQUEST FOR RELIEF

88.     In light of the foregoing, Owner respectfully requests that the Court issue a judgment in favor of Owner and against Marriott, Schrager LLC, and Ian Schrager, granting Owner the following relief:

    a.     Monetary damages in an amount sufficient to fully compensate Owner for the injuries that it has sustained;

    b.     An order of disgorgement, forfeiture, and restitution, requiring Marriott, Schrager LLC, and Ian Schrager to return or otherwise turn over to Owner all fees, profits, monies, payments, and other things of value which they wrongfully or unjustly received, retained, took, or paid themselves in breach of their obligations to Owner;

    c.     Prejudgment and post-judgment interest at the maximum rates permitted by law;

    d.     A judicial declaration that a material Event of Default has occurred under the Management Agreement due to Marriott's breach(es) of contract, entitling Owner to immediately terminate the Management Agreement with impunity and without liability to Marriott;

    e.     Costs of Court;

f.  To the extent permitted by law, reasonable and necessary attorneys' fees and experts' fees incurred by Owner in connection with the prosecution of its claims; and

g.  Such other relief, at law and in equity, to which Owner may be entitled and which the Court deems just and proper.

Respectfully submitted,

**BICKEL & BREWER**

By: _____
William A. Brewer III
Alexander D. Widell
767 Fifth Avenue, 50th Floor
New York, New York  10153
Telephone:  (212) 489-1400
Facsimile:  (212) 489-2384

**ATTORNEYS FOR PLAINTIFF
M WAIKIKI, LLC**

25