# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| M WAIKIKI LLC,<br><br>             Plaintiff,<br><br>- against -<br><br>MARRIOTT HOTEL SERVICES, INC., I.S. INTERNATIONAL, LLC and IAN SCHRAGER,<br><br>             Defendants,<br><br>MARRIOTT HOTEL SERVICES, INC.,<br><br>             Counterclaim-Plaintiff,<br><br>- against -<br><br>M WAIKIKI LLC,<br><br>             Counterclaim-Defendant. | Index No.: 651457/20011<br>IAS Part 3<br>Justice Bransten<br><br>**COMPLAINT OF COUNTERCLAIM-PLAINTIFF MARRIOTT HOTEL SERVICES, INC. AGAINST COUNTERCLAIM-DEFENDANT M WAIKIKI LLC** |

Counterclaim-Plaintiffs Marriott Hotel Services, Inc. ("Marriott"), by and through its undersigned counsel Jenner & Block LLP, for its Complaint against Counterclaim-Defendant M Waikiki LLC ("Owner"), alleges upon knowledge with respect to itself and its own acts, and information and belief with respect to all other matters, as follows:

### NATURE OF MARRIOTT'S COUNTERCLAIMS

1. Despite the fact that Marriott and Owner have a thirty-year contract which grants Marriott the exclusive right to operate the Waikiki EDITION Hotel (the "Hotel"), Owner has attempted to unilaterally terminate that contract through self-help. Owner has not even contended that its actions are consistent with the parties' contract, instead relying on purported

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 3 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                        Page 2 of 18

"common law" rights that the parties' contract expressly disclaims.  If Owner indeed had such a common law right, Owner had an easy legal option at its disposal: having initiated litigation three months earlier, which was already pending before this Court (the "Underlying Action"), Owner could easily have sought an injunction ejecting Marriott as operator of the Hotel.  Instead, Owner elected to evade legal process, and under cover of darkness, Owner stormed the Hotel, supported by over fifty hired security personnel.  The Owner's actions have caused and are causing Marriott severe damages.  Marriott's relationship with guests, employees, owners, developers, and other business partners are severely imperiled.  The survival of its EDITION brand is at risk.  Owner's actions are lawless and unprecedented, and through these counterclaims, Marriott seeks redress.

2. First, Owner's actions constitute a breach of the July 9, 2008 Management Agreement between parties (the "Management Agreement").  That Agreement provides Marriott with the exclusive right to operate the Hotel for an initial term of thirty (30) years, followed by two ten-year extensions.  Owner's actions are depriving Marriott of compensation to which it is contractually entitled and entitle Marriott to money damages.  In addition, Owner's actions are causing Marriott immediate harm that is irreparable.  Owner's breach is devastating to Marriott's reputation as a hotel manager.  This reputational harm exists with guests, with employees, with existing hotel owners, with prospective hotel owners and developers, and with all of Marriott's other business partners.  Owner's actions threaten the trust which Marriott has spent years building.  It is impossible to capture this damage with a financial figure.  Only an injunction restoring Marriott as rightful manager of the Hotel can remedy this damage.

3. Second, Owner has converted Marriott's property.  Marriott's proprietary and confidential information is housed at the Hotel, as the parties' contract expressly recognizes.

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 4 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*　　　　　　　　　　　　　　　　　　　Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*　　　　　　　　　　　　　　　　　　　　　　　Page 3 of 18

Because Owner evaded legal process and brought in a new manager in the middle of the night, both Owner and its new manager now possess this information, which includes Marriott's proprietary and confidential information. Owner's actions are theft, plain and simple, and they too entitle Marriott to money damages as well as injunction requiring Owner and its representatives and agents to return Marriott's property.

## JURISDICTION AND VENUE

4.　　This Court has personal jurisdiction over Owner because: (a) Owner performs substantial business within the State of New York; (b) Owner has committed tortious acts causing injury within the State of New York; and (c) Owner has already submitted to this Court's jurisdiction in the Underlying Action that Owner instituted.

5.　　Venue is proper before this Court because: (a) the Underlying Action is and has been before this Court since May of 2011; and (b) Marriott resides in New York County.

## THE PARTIES

6.　　Marriott is a Delaware corporation with its principal place of business located in Bethesda, Maryland. Under two contracts with Owner, Marriott has provided technical, pre-opening, management, and operational services to Owner for a Honolulu hotel property under Marriott's EDITION brand.

7.　　Owner is a Hawaii limited liability company with its principal place of business located in San Diego, California.

## THE FACTS

**I.　　THE HOTEL, MARRIOTT'S EDITION BRAND, AND THE TWO CONTRACTS**

8.　　As a background matter, Marriott is in the business of managing hotel properties. It is not in the business of owning hotel properties. Accordingly, Marriott's two primary assets are: (a) its long-term management agreements; and (b) its brands.

3

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 5 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*  Page 4 of 18

A. The Hotel

9. In or around July 2006, Owner acquired the Hotel, which is located in the Waikiki neighborhood of Honolulu.

10. As is common in the hospitality industry, Owner contracted with other companies to assist with the redesign of the Hotel, and to manage the Hotel after re-opening.

11. Here, Owner engaged Marriott and I.S. International, LLC ("I.S. International," which is not a party to this Counterclaim Complaint) to provide design advice and technical services during the Hotel's renovation under an agreement known as the Design and Technical Services and Pre-Opening Agreement (the "TSA").

12. Owner also contracted with Marriott to manage the Hotel, and Marriott has done so since the Hotel re-opened in October 2010, under the Management Agreement.

B. Marriott's EDITION Brand

13. Owner re-opened the Hotel as an EDITION brand hotel. EDITION is a new brand of "boutique" hotels jointly created by Marriott and I.S. International.

14. The Hotel was the first EDITION hotel to open and has done so to great acclaim from the traveling public and the travel press alike.

15. A second EDITION hotel has since opened in Istanbul.

C. The TSA

16. Under the TSA, which is dated as of July 9, 2008, Marriott and/or I.S. International were responsible for, *inter alia*: (a) developing a preliminary vision and concept for the design of the Hotel; (b) preparing detailed plans and specifications for implementing the Hotel design; (c) creating technical standards; (d) recruiting, training, and employing the Hotel's

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 6 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                         Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                                    Page 5 of 18

staff; (e) pre-opening marketing and advertising; and (f) design and implementation of a marketing, public relations, and sales strategy.

17. Under the TSA, Owner was responsible for constructing, furnishing, and fully equipping the Hotel.

18. The TSA makes clear the non-fiduciary, non-agency relationship between Marriott and Owner, specifying that Marriott "act[s] solely as an independent contractor" under the TSA. TSA § 9.4. Moreover, Marriott and Owner agreed that "neither [the TSA] nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted or construed as making any party a partner, joint venture with, or agent of, any other party," and that neither Marriott nor Owner would "make any contrary assertion, claim or counterclaim in any action, suit, arbitration or other legal proceeding involving the parties." *Id.*

19. The TSA does not provide Owner the right to terminate the TSA, unilaterally, at-will, or otherwise.

### D. The Management Agreement

20. The Management Agreement, which like the TSA is dated as of July 9, 2008, is a thirty-year contract (subject to two ten-year terms of automatic renewal absent Marriott's election not to renew) that governs the management and operation of the Hotel. A copy of the Management Agreement is attached hereto as Exhibit A.

21. The Management Agreement vests Marriott with substantial operational and managerial – *e.g.*, employment; pricing; publicity and advertising; administrative policies; operating licenses and permits; etc. – authority over the Hotel.

22. For example, under Section 1.02 of the Management Agreement, captioned "Delegation of Authority," "[t]he operation of the Hotel shall be under the exclusive supervision

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 7 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                               Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                                     Page 6 of 18

and control of [Marriott] which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation of the Hotel." Likewise, under the same section, "[s]ubject to the terms [of the Management Agreement], [Marriott] shall have discretion and control in all matters relating to management and operation of the Hotel, free from interference, interruption or disturbance, but in all respects subject to the provisions of this [Management] Agreement."

23. Much as the TSA emphasized the parties' non-fiduciary, non-agency relationship, the Management Agreement expressly provides that Marriott "shall act solely as an independent contractor" and that Marriott "shall be deemed to be a fiduciary *solely* with respect to any funds held by it in the Operating Accounts, the FF&E Reserve or any other funds held by [Marriott] or its Affiliates for Owner." Management Agreement § 11.03 (emphasis added). It further states that none of the parties' agreements "shall in any respect be interpreted, deemed or construed as making [Marriott] a partner, joint venture with, or agent of, Owner," and that Owner and Marriott specifically "agree that neither party will make any contrary assertion, claim or counterclaim in any action, suit, . . . or other legal proceedings . . . ." *Id.*

24. Owner's right to terminate the Management Agreement is narrow and not currently exercisable.

25. Under the heading "Performance Termination" in Section 2.02 of the Management Agreement, Owner has a highly limited right to terminate the Management Agreement that: (a) does not vest until the Hotel has been opened for five years, a date which here will not be reached until October 2015 (Management Agreement § 2.02(A)); (b) requires sixty days notice before taking effect (*id.* § 2.02(B)); and (c) can be vetoed by Marriott through the making of a payment to Owner (*id.*).

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 8 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                    Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                            Page 7 of 18

26.    Additionally, although certain defined "Defaults" in the Management Agreement can give rise to Owner's right to terminate the Management Agreement, none of them are currently present. For example, thirty days of continuous "failure of either party to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in [the Management] Agreement" followed by the non-defaulting party's written notice and the defaulting party's failure to timely cure, creates an "Event of Default." Management Agreement § 9.01(G). However, that Event of Default cannot serve as the basis for terminating the Management Agreement unless and until, "the defaulting party contests the occurrence of the Event of Default or its effect on the non-defaulting party, a court of competent jurisdiction has issued a final, binding and non-appealable order finding that the Event of Default has occurred and that it has . . . a material adverse effect [on the non-defaulting party or the financial operations of the Hotel]." *Id*. § 9.02(A)(iii). No such finding has ever been made by a court.

27.    Moreover, under the heading "Limitation on Termination by Owner" in Section 2.03 of the Management Agreement, even if Owner is in possession of a termination right, that right cannot be exercised if Owner owes Marriott certain amounts. Specifically, Section 2.03 provides: "Notwithstanding anything in this Agreement to the contrary, without the express written consent of [Marriott] (which consent may be withheld in [Marriott's] sole and absolute discretion), Owner covenants and agrees that it may not terminate this Agreement for any reason whatsoever (including, without limitation, any Event of Default caused by [Marriott]) at any time that (i) [Marriott] . . . [is] providing (or [is] obligated to provide) any credit enhancement, guarantee, or loan (collectively, the "Marriott Funding Obligations") to Owner . . . or (ii) any amounts funded by [Marriott] . . . pursuant to any Marriott Funding Obligation remain outstanding and payable to [Marriott]." As of the date of this filing, over $5.4 million remains

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 9 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                    Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                            Page 8 of 18

outstanding and payable to Marriott under this provision, and thus under Section 2.03 of the Management Agreement, Owner has no current termination right whatsoever.

28. The Management Agreement is governed by New York law (Management Agreement § 11.04), and contains a broad integration clause under the heading "Entire Agreement" (*id.* § 11.24 ("This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a written non-electronic instrument that has been duly executed by the non-electronic signatures of authorized representatives of the parties hereto.")).  The TSA contains identical provisions.  TSA §§ 9.10, 9.15.

## II.   OWNER'S UNDERLYING LAWSUIT

29. On May 26, 2011 – a mere eight months after the Hotel's launch, and thus before the Hotel had an opportunity to ramp up and establish itself – Owner commenced the underlying suit against Marriott asserting a variety of claims sounding in contract, tort, and breach of common law duties.

30. In its complaint, Owner virtually admitted that it does not possess a unilateral right to terminate the Management Agreement by including among its request for relief the very right it now claims to have exercised – "[a] judicial declaration that a material Event of Default has occurred under the Management Agreement due to Marriott's breach(es) of contract, entitling Owner to immediately terminate the Management Agreement with impunity and without liability to Marriott."  Owner Compl. ¶ 88.d.

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 10 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                             Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                                    Page 9 of 18

31. On August 1, 2011, Marriott moved to dismiss Owner's complaint pursuant to N.Y. C.P.L.R. 3211(a)(1) (a defense is founded upon documentary evidence) and (7) (the pleading fails to state a cause of action)). That motion is not yet fully briefed; Owner's opposition filing is due September 19, 2011.

### III. OWNER'S WRONGFUL OUSTER OF MARRIOTT IN BREACH OF THE MANAGEMENT AGREEMENT

32. At approximately 2:00 a.m. in the pre-dawn hours of August 28, 2011, the Owner entered the Hotel with approximately fifty hired security personnel. The Owner advised a Marriott employee on duty that it was purporting to terminate the parties' Management Agreement based on its "common law" right to do so. Once in the Hotel, the Owner began printing proprietary information from the Hotel's computers. The Owner began removing all signage in the Hotel that used the EDITION name. After scattering its security guards throughout the Hotel, the Owner assembled Marriott's employees in the Hotel lobby and told them that the Hotel was under new management and was now to be called the Modern Honolulu Hotel and was to be managed by Aqua Hotels & Resorts. The Owner purported to fire many of Marriott's managerial employees, escorting them off of the property. The Owner advised Marriott's other employees that they would have to sign on with Owner's new manager or face termination. The Owner provided Marriott with no prior notice of any of these actions, instead electing a "sneak attack" under cover of darkness.

33. Based on information and belief, the Owner had been planning this takeover for many weeks. By the evening of August 28, 2011, Owner had already prepared a new website for the Hotel under its purported new name, the Modern Honolulu Hotel. Owner had already searched for and located a new manager in Aqua Hotels & Resorts and had negotiated terms under which Aqua would manage the Hotel. Owner sent representatives of its legal counsel to

the property under the auspices of a review of Books and Records, when upon information and belief, Owner was actually seeking information to hand over to its new manager. Finally, upon information and belief, Owner had advised at least two of Marriott's employees of its intentions, and persuaded them to assist Owner in its secret takeover effort.

34. Within twelve hours of the Owner's actions, the *Wall Street Journal* was already reporting that "Marriott Loses Trendy Waikiki Hotel as Owner Changes Locks Overnight." *See* http://online.wsj.com/article/SB10001424053111904199404576537140488961556.html. In addition, the Owners issued a press release in which they announce that Marriott has been terminated "amid allegations that the hotel has suffered from mismanagement by Marriott which were compounded by Marriott's failure to develop the Edition brand with which the property was previously affiliated." This release has been picked up by numerous news outlets, both in Hawaii and around the world.

35. According to various correspondence from Owner and their counsel, all of Owner's actions were accomplished not with authority of any contractual provision, but instead solely by virtue of Owner's "common law power to terminate the Management Agreement and Marriott's agency in connection therewith" (Email of M. Gardner, counsel to Owner, to L. Harrison, counsel to Marriott, Aug. 28, 2011, attached hereto as Exhibit B), Owner's "common law rights and powers," (Letter of D. McKinney to Marriott, Aug. 28, 2011, attached hereto as Exhibit C; Letter of D. McKinney to A. Sorenson, Aug. 28, 2011, attached hereto as Exhibit D), and the "absolute" "power of Owner to terminate Marriott as its agent" (Letter of D. McKinney to E. Ryan, Aug. 28, 2011, attached hereto as Exhibit E).

36. Marriott immediately responded to this correspondence with its own letter explaining the lawlessness of Owner's action. (Letter of E. Ryan to D. McKinney, Aug. 28,

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 12 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,* Index No. 61457/2011
*I.S. International, LLC and Ian Schrager* Page 11 of 18

2011, attached hereto as Exhibit F.)  As set forth above, the Management Agreement establishes the entirety of Owner's termination rights, and none of those rights are presently possessed or exercisable by Owner.  Additionally, the Management Agreement makes clear that Marriott is not Owner's agent, wholly negating the premise of Owner's termination of "Marriott's agency."

37. In fact, Owner's right to access the Hotel under the Management Agreement – let alone kick Marriott out of it mid-contract – is limited.  Under Section 1.07, "Owner and its agents shall have access to the Hotel at any and all reasonable times for the purpose of inspection or showing the Hotel."

38. Further, Owner recognized in Section 11.09 of the Management Agreement that Marriott's files related to the Hotel and the EDITION brand – files Owner now holds captive – are filled with confidential and proprietary information to which Owner should not have access: "Owner acknowledges that competitive information regarding brands, customers, marketing, operating or other strategies (including information related to other hotels) is confidential and proprietary to Manager and shall not be disclosed to Owner."  (The TSA contained an identical Owner acknowledgement.  TSA § 9.12.)

## IV. ONGOING INJURY TO MARRIOTT

39. As a result of Owner's actions, Marriott and its EDITION brand are now suffering severe damages.  This damage results from, among other things, anxiety among the group and leisure customers about their events and travel plans and unrest among employees at the Hotel who understandably are fearful about losing their jobs.  If the Owner's actions are not remedied with Marriott restored as the rightful Operator of the Hotel, the damage to Marriott and EDITION's brand and reputation will be severe and irreparable.

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 13 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*  Page 12 of 18

40. Marriott has spent decades building a reputation as a company that provides superb, first-class service to its guests. It is that reputation that attracts many if not most guests to Marriott's hotels. Generally, guests book reservations at a Marriott hotel because of the Marriott brand and because they expect Marriott standards of service. Group and leisure guests have longstanding relationships with Marriott.

41. The EDITION brand is Marriott's newest brand. Marriott founded the EDITION brand in 2008. The EDITION brand was conceived by Marriott in a partnership with Ian Schrager. It is what is known in the industry as a "lifestyle" hotel, which combines the personal, intimate, individualized and unique lodging experience that Ian Schrager is known for, with the global reach, operational expertise and scale of Marriott. The brand combines great design and true innovation with great personal, friendly, modern service as well as outstanding, one-of-a-kind food, beverage and entertainment offerings, all under one roof. The idea is that each highly stylized hotel functions as a "home away from home" for leisure and business travelers.

42. Within the past year, Marriott has purchased the historic Berner's Hotel in London and what was previously the Seville Hotel in Miami Beach. Marriott is investing hundreds of millions of dollars in purchasing and now renovating these properties, which will be operated as the London EDITION and the Miami Beach EDITION hotels. Marriott is also actively developing deals with other owners for new EDITION hotels around the world.

43. Owner's actions threaten the value and viability of the EDITION brand, as well as Marriott's investment in it. The brand is inextricably tied up with the Waikiki EDITION, which is the first and therefore the flagship EDITION hotel. Indeed, the Owner of the Waikiki EDITION repeatedly expressed its preference to be the first EDITION hotel. By its current

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 14 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*   Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*   Page 13 of 18

actions, Owner is not only sabotaging the Waikiki EDITION but is also attempting to undo the entire brand.

44. The EDITION brand is still in its early stages of development. Marriott generally earns money by entering into long-term management contracts with hotel owners. Indeed, the economic value of Marriott as a company is calculated based on the revenue stream from its management agreements with hotel owners. Marriott's goodwill and solid reputation are critical to its relationships with its owners. The Owner's actions will mean that countless deals may never be developed because prospective developers and owners will hesitate to invest in the brand. Consequently, particularly in this economy, the Owner's actions impair Marriott's business relationships with both existing and prospective owners in ways that may never be captured by monetary damages.

45. The Owner's actions are also causing irreparable damage with respect to guests. If the Owner's attempted takeover is permitted to stand, guests who expect to stay at the EDITION will unexpectedly find themselves in a hotel under different and unfamiliar management and will feel deceived by this abrupt change. As the Hotel is identified by its managers, not its owners, these guests will blame EDITION and Marriott, not the Owner. Furthermore, once a management company disappoints a guest, it is difficult and sometimes impossible to regain that guest's trust and business. Guests who feel they were misled by EDITION or Marriott will not only cease to return to the Hotel, but may cease to patronize other EDITION or Marriott properties, to the obvious detriment of both Marriott and owners of other Marriott operated hotels. It is impossible to quantify these damages, because it is impossible to know how many customers choose *not* to make a reservation.

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 15 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*  Page 14 of 18

46. What is true of individual guests is even more true of the travel agents and group travel managers who generate much of the business for the Hotel. One of Marriott's most valuable contributions to the Hotel and most valuable assets is its significant relationships with travel agencies and group accounts. The Hotel's group bookings are generated through relationships developed by Marriott and EDITION's sales teams. These relationships are built on trust. If the manager who books a large group into a Marriott hotel unexpectedly has to explain to the group members, who have invested significant resources in making arrangements for their meetings and conference, that they will not in fact be staying at a Marriott or EDITION or receiving the experience they expected, he or she will hesitate to book groups into other Marriott properties in the future. Similarly, travel agencies, which depend on customer satisfaction to sustain their business, are highly risk-averse. Accordingly, if Marriott is prematurely evicted, and on grounds perceived to be Marriott's fault, as the Owner is representing to the public, these agencies would look at Marriott differently in determining whether to book clientele at other Marriott and EDITION properties. Again, this damage is impossible to track and therefore to quantify.

47. Marriott is also suffering damages as a result of Owner's conversion of its property and exposure of Marriott's proprietary information to a competitor. Both the Owner and Aqua Hotels are currently in possession of Marriott's confidential and proprietary information. This includes a huge amount of written information about how to run a Marriott hotel, and in particular an EDITION hotel. These documents, especially when taken as a whole, represent an extremely valuable asset – Marriott's knowledge of how to manage hotels efficiently and profitably, with appropriate controls at the individual hotels and appropriate oversight by regional and corporate-level officials. This is confidential and proprietary

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 16 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*  Page 15 of 18

information that Marriott goes to great lengths to protect. Because Aqua Hotels & Resorts is a competitor of Marriott, Owner's actions have essentially handed to a competitor the blueprints for how to run a Marriott hotel. The harm to Marriott is irreparable, as it is impossible to remove such information from the minds of competitors. Once lost, no amount of money can remedy Marriott for the harm after Marriott has invested years and millions to develop these this confidential and proprietary information.

48.   Finally, the Owner appears incapable of compensating Marriott for the harm that its actions will cause. Under the Management Agreement, the Owner is responsible for funding the operation of the Hotel and, when the Hotel's income is not sufficient, is required to fund any shortfalls to keep the hotel in operation. On June 29, 2011, Marriott requested that the Owner fund a past and projected operating shortfall of approximately $5.4 million as required under the contract. The Owner refused, and Marriott has done so in the Owner's place as a loan. Based on the Owner's refusal and/or inability to fund the Hotel and upon information and belief, Owner has no liquid assets from which to pay a judgment of any significant amount. Upon information and belief, Owner is a special-purpose corporation whose only significant non-liquid asset is the Hotel itself. While it is difficult to know whether the Hotel's actual market value exceeds by any significant amount the substantial debt that encumbers the property, in the current economic climate, it is not at all clear that M Waikiki could find a buyer for the Hotel. Accordingly, even if Marriott's reputational injury could be remedied with monetary damages, and even if those damages could be calculated with reasonable certainty, it does not appear that M Waikiki has the present ability to pay those damages, much less the substantial economic damages incurred.

## FIRST CLAIM FOR RELIEF

### *BREACH OF CONTRACT*

49. Marriott repeats and realleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

50. Marriott and Owner are parties to the valid and binding Management Agreement.

51. Marriott has fulfilled all conditions precedent to the assertion of its claims against Owner, including the performance of all of its obligations under the Management Agreement. Alternatively, Marriott's performance has been excused by the wrongful acts and material breaches of the Management Agreement by Owner.

52. Owner has breached the Management Agreement, including by purporting to terminate the Management Agreement.

53. As a result of Owner's breach of the Management Agreement, Marriott has: (a) suffered irreparable harm that warrants an injunctive order issued immediately, temporarily, preliminarily, and permanently: (i) restraining and enjoining Owner from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; and (ii) directing Owner to allow Marriott to, and restraining and enjoining Owner from, taking any actions that in any way interfere with Marriott's ability to: (x) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (y) undo the harm and damage that resulted from Owner's purported ouster of Marriott; and (b) sustained economic injury for which it seeks damages in an amount to be determined by the trier of fact.

## SECOND CLAIM FOR RELIEF

### *CONVERSION*

54. Marriott repeats and realleges each and every allegation of each and every one of the preceding paragraphs as if fully set forth herein.

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 18 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*  Page 17 of 18

55. Marriott has legal ownership or an immediate superior right of possession to the Marriott Property seized by Owner in connection with the raid and ouster described above.

56. Owner has exercised and continues to exercise dominion over the Marriott Property to the exclusion of Marriott.

57. As a result of Owner's conversion of the Marriott Property, Marriott: (a) is entitled to an injunctive order requiring Owner to return to Marriott the Marriott Property, including any and all such Marriott Property that Owner conveyed, caused to be conveyed, or allowed to be conveyed to any third-party; and (b) has sustained economic injury for which it seeks damages in an amount to be determined by the trier of fact.

## **PRAYER FOR RELIEF**

WHEREFORE, Marriott respectfully prays for relief and judgment against Owner:

    a. Immediately, temporarily, preliminarily, and permanently:

        i. Restraining and enjoining Owner from unilaterally declaring and installing as the Hotel's manager a party other than Marriott; and

        ii. Directing Owner to allow Marriott to, and restraining and enjoining Owner from, taking any actions that in any way interfere with Marriott's ability to: (a) fully perform its role as the Hotel's Manager in accordance with the Management Agreement, and (b) undo the harm and damage that resulted from Owner's purported ouster of Marriott.

Case 1:11-cv-06488-BSJ   Document 18-2   Filed 10/14/11   Page 19 of 19

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*  Page 18 of 18

    b.    Requiring Owner to return to Marriott the Marriott Property, including any and all such Marriott Property Owner conveyed, caused to be conveyed, or allowed to be conveyed to any third-party.

    c.    Awarding Marriott any and all damages sustained by Marriott arising from the above-described wrongful acts of Owner, and all allowable interest, costs, attorneys' fees, and punitive damages.

    d.    Awarding Marriott any other relief this Court deems just and proper.

Respectfully submitted,

Dated: New York, New York  
       August 30, 2011

JENNER & BLOCK LLP

By: /s/ *[signature]*

Richard F. Ziegler  
Brian J. Fischer  
Colleen A. Harrison  
919 Third Avenue, 37th Floor  
New York, New York 10022  
Telephone: (212) 891-1600  
Fax: (212) 909-0815

David A. Handzo (pro hac application forthcoming)  
Michael B. DeSanctis  
Lindsay C. Harrison (pro hac application forthcoming)  
Kelly D. Gardner  
1099 New York Avenue, NW, Suite 900  
Washington, DC 20001  
Telephone: (202) 639-6000  
Fax: (202) 661-4956