# Exhibit D

**FINAL**

**EDITION**
**WAIKIKI, HAWAII**


### MANAGEMENT AGREEMENT

by and between


**MARRIOTT HOTEL SERVICES, INC.**

as "MANAGER"


and


**M WAIKIKI LLC**

as "OWNER"


Dated as of July 9, 2008

401502v9



# TABLE OF CONTENTS

**PAGE**

## ARTICLE I    MANAGEMENT OF THE HOTEL

1.01  Engagement ..................................................................................1
1.02  Delegation of Authority ........................................................2
1.03  Construction of the Hotel Improvements and Flagging of the Hotel ......2
1.04  Management Responsibilities ................................................3
1.05  Licenses, Permits and Agreements ......................................4
1.06  Employees ...............................................................................4
1.07  Owner's Right to Inspect .....................................................6
1.08  Regular Meetings ..................................................................6
1.09  System Standards and Criteria for Approvals ...................7
1.10  Central Office Services ........................................................7
1.11  Chain Services.......................................................................7
1.12  Related Party Transactions .................................................8
1.13  Profit and Cost Transactions Relating to the Hotel..................8
1.14  Marriott Rewards Program ..................................................9
1.15  Procurement Rebates and Fees ..........................................10
1.16  Limitations on Manager's Authority ...............................10

## ARTICLE II    TERM

2.01  Term .......................................................................................11
2.02  Performance Termination ...................................................11
2.03  Limitation on Termination by Owner...............................13

## ARTICLE III    COMPENSATION OF MANAGER

3.01  Management Fees ..................................................................14
3.02  Distribution of Operating Profit .......................................14

## ARTICLE IV    ACCOUNTING AND REPORTING MATTERS

4.01  Accounting and Interim Distributions..............................14
4.02  Books and Records; Annual Operating Statement .....................15
4.03  Hotel Accounts and Expenditures......................................16
4.04  MBS Systems..........................................................................17
4.05  Direct Deductions and Direct Deductions Report ....................18
4.06  Annual Profit Transactions Report ..................................18
4.07  Chain Services Report .........................................................18
4.08  Business Plan .......................................................................18
4.09  Working Capital....................................................................20

i



# TABLE OF CONTENTS

**PAGE**

4.10    FIXED ASSET SUPPLIES ....................................................................20
4.11    REAL ESTATE AND PERSONAL PROPERTY TAXES ...............................21

## ARTICLE V      REPAIRS, MAINTENANCE AND REPLACEMENTS

5.01    REPAIRS AND MAINTENANCE COSTS WHICH ARE EXPENSED ..................21
5.02    FF&E RESERVE ................................................................................22
5.03    CAPITAL EXPENDITURES ...................................................................25
5.04    OWNERSHIP OF REPLACEMENTS ........................................................26
5.05    MANAGEMENT OF HOTEL RENOVATION AND CONSTRUCTION PROJECTS ..............26

## ARTICLE VI      INSURANCE

6.01    PROPERTY INSURANCE ......................................................................27
6.02    OPERATIONAL INSURANCE ................................................................30
6.03    GENERAL CONDITIONS OF MANAGER'S INSURANCE PROGRAM ..............32

## ARTICLE VII      DAMAGE, REPAIR AND CONDEMNATION

7.01    DAMAGE AND REPAIR .....................................................................32
7.02    CONDEMNATION .............................................................................33

## ARTICLE VIII      OWNERSHIP OF THE HOTEL

8.01    OWNERSHIP OF THE HOTEL ...............................................................33
8.02    MORTGAGES ..................................................................................34
8.03    SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT .....................35
8.04    NO COVENANTS, CONDITIONS OR RESTRICTIONS .................................36
8.05    LIENS; CREDIT ...............................................................................36

## ARTICLE IX      DEFAULTS

9.01    EVENTS OF DEFAULT .......................................................................37
9.02    REMEDIES ......................................................................................38
9.03    ADDITIONAL REMEDIES ...................................................................39

## ARTICLE X      ASSIGNMENT AND SALE

10.01    ASSIGNMENT...................................................................................39
10.02    SALE OF THE HOTEL.........................................................................40



## TABLE OF CONTENTS

**PAGE**

### ARTICLE XI    MISCELLANEOUS

11.01 RIGHT TO MAKE AGREEMENT ...........................................................43
11.02 CONSENTS AND COOPERATION .........................................................43
11.03 RELATIONSHIP ...................................................................................43
11.04 APPLICABLE LAW AND VENUE ........................................................44
11.05 RECORDATION ...................................................................................44
11.06 HEADINGS ..........................................................................................44
11.07 NOTICES..............................................................................................44
11.08 ENVIRONMENTAL MATTERS .............................................................45
11.09 CONFIDENTIALITY .............................................................................47
11.10 PROJECTIONS .....................................................................................47
11.11 ACTIONS TO BE TAKEN UPON TERMINATION ..................................47
11.12 TRADEMARKS AND INTELLECTUAL PROPERTY ...............................50
11.13 TRADE AREA RESTRICTION AND COMPETING FACILITIES ...............52
11.14 WAIVER ..............................................................................................53
11.15 PARTIAL INVALIDITY ........................................................................53
11.16 SURVIVAL ..........................................................................................53
11.17 NEGOTIATION OF AGREEMENT..........................................................53
11.18 ESTOPPEL CERTIFICATES ...................................................................54
11.19 RESTRICTIONS ON OPERATING THE HOTEL IN ACCORDANCE WITH SYSTEM
        STANDARDS ........................................................................................54
11.20 DECISION BY EXPERTS ......................................................................54
11.21 WAIVER OF JURY TRIAL AND CONSEQUENTIAL AND PUNITIVE DAMAGES..............55
11.22 COUNTERPARTS ..................................................................................55
11.23 EXTRAORDINARY EVENTS .................................................................56
11.24 ENTIRE AGREEMENT...........................................................................56
11.25 NON-HOTEL MARKETING ACTIVITIES ...............................................56
11.26 KEY MONEY .......................................................................................56
11.27 ADJUSTMENT TO OWNER'S PRIORITY AND PERFORMANCE TERMINATION
        THRESHOLD ........................................................................................57

### ARTICLE XII    DEFINITION OF TERMS

12.01 DEFINITION OF TERMS .......................................................................57



# TABLE OF CONTENTS

**PAGE**

Exhibit A      -    Legal Description of the Site
Exhibit B      -    Listing of Central Office Services
Exhibit C      -    Listing of Current Chain Services
Exhibit C-1   -    Listing of Current Marketing Fee Services
Exhibit D      -    Listing of Current Direct Deductions
Exhibit E      -    Permitted Exceptions
Exhibit F      -    Equity Ownership of Owner
Exhibit G      -    Form of Memorandum of Management Agreement
Exhibit H-1   -    Description of Restricted Area One
Exhibit H-2   -    Map of Restricted Area One
Exhibit I       -    Registered Marks



## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** ("Agreement") is executed as of the 9th day of July, 2008 ("Effective Date"), between **M WAIKIKI LLC** ("Owner"), a Hawaii limited liability company, with offices at c/o eRealty Fund, LLC, 12780 High Bluff Drive, Suite 160, San Diego, California 92130, and **MARRIOTT HOTEL SERVICES, INC.** ("Manager"), a Delaware corporation, with a mailing address at c/o Marriott International, Inc., 10400 Fernwood Road, Bethesda, Maryland 20817.

### R E C I T A L S

A.      Owner is the owner of fee title to the parcel of real property (the "Site") described on Exhibit A, which is attached to this Agreement and incorporated by reference herein.  Owner will improve the Site with a building or buildings containing approximately 353 Guest Rooms, a lobby, restaurants, bars, lounges, meeting rooms, spa, administrative offices, parking, and certain other amenities and related facilities (collectively, the "Hotel Improvements").  The Site and the Hotel Improvements to be constructed thereon by Owner, in addition to certain other rights, improvements, and personal property as more particularly described in the definition of "Hotel" in Section 12.01 hereof, are collectively referred to as the "Hotel."

B.      All capitalized terms used in this Agreement shall have the meanings ascribed to such terms in Section 12.01 hereof.

C.      Owner desires to engage Manager to manage and operate the Hotel and Manager desires to accept such engagement upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Manager agree as follows:

### ARTICLE I

### MANAGEMENT OF THE HOTEL

1.01    Engagement

Owner hereby engages Manager to supervise, direct and control the management and operation of the Hotel for the Term.  Manager accepts said engagement and agrees to manage and operate the Hotel during the Term in accordance with the terms and conditions hereinafter set forth.



1.02    Delegation of Authority

The operation of the Hotel shall be under the exclusive supervision and control of Manager which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation of the Hotel. In fulfilling its obligations under this Agreement, Manager shall act as a reasonable and prudent operator of the Hotel, having regard for the status of the Hotel and maintaining the System Standards. Manager shall operate the Hotel with the goal of achieving long-term profitability, subject to the requirement that the Hotel be managed, operated and maintained as part of the EDITION Hotel System (except as otherwise set forth in Section 1.03.B) and in accordance with System Standards. Subject to the terms hereof, Manager shall have discretion and control in all matters relating to management and operation of the Hotel, free from interference, interruption or disturbance, but in all respects subject to the provisions of this Agreement.

1.03    Construction of the Hotel Improvements and Flagging of the Hotel

A.    Owner agrees to complete the construction and renovation of the Hotel, including the Flagging Renovation, in accordance with the Technical Services Agreement. Owner and Manager agree that their rights and obligations under this Agreement with respect to the construction and pre-opening stages of the Hotel shall be governed by the Technical Services Agreement, in addition to those provisions in this Agreement that are otherwise generally applicable during the Term.

B.    Beginning on the Effective Date and through the Flagging Date, Owner and Manager agree that Manager shall not be obligated to brand the Hotel as an EDITION hotel, use EDITION Trademarks in the name of the Hotel, identify the Hotel as a member of the EDITION Hotel System, or do any other thing that would indicate that the Hotel is affiliated with the EDITION Hotel System; however, the Hotel will otherwise be operated in accordance with System Standards, and otherwise incorporate the sales, marketing and operating philosophies, techniques and procedures (including the inclusion in any central reservation system and/or marketing system, all on an unbranded basis, utilized by Manager and its Affiliates for the EDITION Hotel System), which will be used by Manager in the operation of the EDITION Hotel System. Provided that Owner satisfies all the conditions to the Flagging Date set forth in the Technical Services Agreement, Manager shall cause the Hotel to be branded with EDITION Trademarks in the name of the Hotel by no later than December 31, 2011. Manager shall provide Owner with written notice approximately one hundred eighty (180) days prior to the Flagging Date, and from and after the date of such notice Owner shall diligently pursue efforts to cause the conditions to the Flagging Date set forth in the Technical Services Agreement to be achieved by the Flagging Date proposed in such notice. Notwithstanding anything in this Agreement to the contrary, during the period (the "Unbranded Period") from the Opening Date to the earlier of (i) the Flagging Date, or (ii) such time as Owner ceases to diligently pursue efforts to cause the conditions to the Flagging Date set forth in the Technical Services Agreement to be achieved as and when required pursuant to the immediately preceding sentence, the Base Management Fee shall be reduced to three percent (3%) of Gross Revenues, and the Incentive Management Fee shall be reduced to twenty percent (20%) of Available Cash Flow.



For the avoidance of doubt, upon expiration of the Unbranded Period, the Base Management Fee shall equal four percent (4%) of Gross Revenues and the Incentive Management Fee shall equal twenty-five percent (25%) of Available Cash Flow.

    1.04   <u>Management Responsibilities</u>

    A.    Manager shall manage the Hotel in accordance with the standards set forth in Section 1.02 and perform each of the following functions (the costs and expenses of which shall be Deductions) with respect to the Hotel:

    1.    Establish employment policies and recruit, employ (subject to Section 1.06.E), supervise, direct and discharge the employees at the Hotel.

    2.    Establish prices, rates and charges for services provided in the Hotel, including Guest Room rates and rates for commercial space and other space in the Hotel.

    3.    Establish and revise, as necessary, administrative policies and procedures, including policies and procedures for the control of revenue and expenditures, for the purchasing of supplies and services, for the control of credit, and for the scheduling of maintenance, and verify that the foregoing procedures are operating in a sound manner.

    4.    Receive, hold and disburse funds, maintain bank accounts and make payments on accounts payable and handle collections of accounts receivable.

    5.    Subject to Section 1.03.B, undertake publicity and promotion, arrange for and supervise public relations and advertising, prepare marketing plans, and make available to the Hotel the benefits of various marketing and guest loyalty and recognition programs in use in the EDITION Hotel System as they may exist from time to time, such as the Marriott Rewards Program.

    6.    Procure all Inventories and replacement Fixed Asset Supplies.

    7.    Prepare and deliver interim accountings, annual accountings, Annual Operating Statements, Building Estimates, FF&E Estimates, and such other information as is required by this Agreement and be available at reasonable times to discuss generally with Owner the above-listed items as well as the operations at the Hotel.

    8.    Plan, execute and supervise repairs, maintenance and FF&E purchases at the Hotel in accordance with the terms of Article V of this Agreement.

    9.    Provide, or cause to be provided, risk management services relating to the types of insurance required to be obtained or provided by Manager under this Agreement.

    10.    Provide food and beverage services.



11.    Except as provided in the Technical Services Agreement, use reasonable efforts to obtain and keep in full force and effect, either in Manager's name or in Owner's name, as may be approved by Manager or as required by applicable law, any and all operating licenses and permits.

12.    Subject to Section 1.16, enter into leases, licenses and concessions for the Hotel (including rooftops and all other spaces related to the Hotel), which Manager may execute on behalf of the Hotel or Owner.

B.    Manager will use its reasonable efforts to comply with and abide by all applicable Legal Requirements (except for certain Legal Requirements which are Owner's responsibility under Section 5.03 and Section 11.08 hereof) pertaining to its operation of the Hotel.  Owner will use its reasonable efforts to comply with and abide by all applicable Legal Requirements pertaining to the Hotel Improvements or to Owner's ownership interest in the Hotel (including, without limitation, Owner's obligations under Section 5.03 and Section 11.08 hereof).  Either Owner or Manager shall have the right, but not the obligation, in its reasonable discretion, to contest or oppose, by appropriate proceedings, any such Legal Requirements.  The reasonable expenses of any such contest of a Legal Requirement by Owner or Manager shall be paid from Gross Revenues as Deductions.

1.05    Licenses, Permits and Agreements

Upon request by Manager, Owner shall execute, without charge, (i) applications for licenses and permits necessary for operation of the Hotel, and (ii) any leases, agreements or contracts relating to the operation of the Hotel, provided that such leases, agreements and contracts comply with the applicable provisions of this Agreement.  Owner shall be responsible for obtaining all permits and other approvals required for construction and opening of the Hotel, such as the building permit, occupancy permit and elevator permits for the Hotel.  Manager shall be responsible for obtaining all permits and licenses required for the operation of the Hotel, such as the hotel operating license, liquor licenses and other miscellaneous licenses.

1.06    Employees

A.    All personnel employed at the Hotel shall, at all times from and after the Effective Date, be the employees of Manager (or one of its Affiliates).  Manager shall have absolute discretion with respect to all personnel employed at the Hotel, including, without limitation, decisions regarding hiring (except as set forth in Section 1.06.E below), promoting, transferring, compensating, supervising, terminating, directing and training all employees at the Hotel, and, generally, establishing and maintaining all policies relating to employment.  Manager will use reasonable due care and diligence in the selection, hiring, training, discharge and supervision of all employees at the Hotel, and Manager will ensure that its employment policies comply with all applicable Legal Requirements.  With respect to food and beverage operations at the Hotel, Manager shall engage persons to manage such operations who are qualified and have experience managing such operations consistent with System Standards.  All information regarding individual employees, such as employee records and individual compensation information, is

4



proprietary to Manager and confidential and shall not be disclosed to Owner except as required by law. Manager shall be permitted to provide free accommodations and amenities to its employees and representatives visiting the Hotel in connection with its management or operation, provided that Manager shall use reasonable efforts to avoid displacing paying guests of the Hotel, and implement policies to enforce the same. No person shall otherwise be given gratuitous accommodations or services without prior joint approval of Owner and Manager except in accordance with usual practices of the hotel and travel industry. If Manager shall be required to recognize a labor union, or to enter into collective bargaining with a labor union, with respect to the Hotel, it shall (i) promptly notify Owner, (ii) promptly meet with Owner to discuss a strategy for negotiating any collective bargaining agreement with a labor union, (iii) in good faith take into account Owner's suggestions and recommendations, and (iv) otherwise keep Owner apprised of the course of any such union negotiations. Subject to the foregoing, Manager shall have authority to negotiate and enter into such agreements and Owner shall have no right of approval or disapproval; provided that the term of any such agreement shall not extend beyond the Term without the prior written consent of Owner.

B.    All settlements or payments of Employee Claims (in excess of amounts covered by applicable insurance) shall be made by Manager exercising its reasonable discretion and shall be paid as Deductions, provided, however, that Manager shall obtain the approval of Owner to settle Employee Claims for amounts in excess of $300,000 if such Employee Claims are not fully covered by applicable insurance.

C.    With respect to all Litigation or arbitration involving Employee Claims in which both Manager and Owner are involved as actual or potential defendants, Manager shall have exclusive and complete responsibility for the resolution of such Employee Claims. In the event that any Employee Claim is made against Owner, but not against Manager, Owner shall give notice to Manager of the Employee Claim in a timely manner so as to avoid any prejudice to the defense of the Employee Claim, provided that Manager shall in all events be so notified within twenty (20) days after the date such Employee Claim is made against Owner. Manager will thereafter assume exclusive and complete responsibility for the resolution of such Employee Claim. Manager shall pay from its own funds, and not from Gross Revenues, any Employee Claim where the basis of such Employee Claim is conduct by Manager that: (i) is a violation of the standards of responsible labor relations as generally practiced by prudent owners or operators of similar hotel properties in the general geographic area of the Hotel; and (ii) is not the isolated act of individual employees, but rather is a direct result of corporate policies of Manager that either encourage or fail to discourage such conduct. Any dispute between Owner and Manager as to whether or not certain conduct by Manager is not in accordance with the aforesaid standards shall be resolved by a panel of Experts in accordance with Section 11.20.

D.    Manager shall have the right to allocate the services and time of a Hotel employee between the Hotel and (i) other hotels (including hotels under development) managed by Manager or its Affiliates, and/or (ii) local, regional or central office(s). The compensation and other costs (including, without limitation, termination costs, if any) of such Hotel employee (x) shall be allocated to the Hotel and such other hotels or regional or central office on a fair and consistent basis, and (y) shall not otherwise be financially disadvantageous to Owner or the Hotel. Manager shall disclose such allocation upon Owner's request.

5



E.      Manager shall have the authority to hire, dismiss or transfer the Hotel's general manager and director of marketing; provided, however, that Manager shall keep Owner reasonably informed with respect to such actions, including prior notification to Owner of Manager's desire to transfer the general manager and director of marketing, and shall give Owner the opportunity to participate in the initial hiring of and any replacement of the Hotel's general manager and director of marketing as follows:

1.      Manager shall provide Owner at least thirty (30) days' prior notice of any proposed hiring of the general manager or director of marketing.  Manager shall consult with Owner to obtain any suggestions by Owner as to the preferred background and specific expertise of candidates for such Hotel position, which suggestions, if any, Manager shall utilize in arriving at a preferred profile for candidates for such position.

2.      Manager shall submit to Owner for its approval a reasonably qualified candidate for such position.  Owner shall have a period of ten (10) days from its receipt of the applicable candidate's resume within which to interview and evaluate such candidate (provided that such candidate and the necessary representatives of Owner are reasonably available during such period of time for such interview or evaluation, and such candidate shall not be required to provide additional information or undertake testing of any sort as part of such process).  Owner shall be deemed to have approved such candidate unless Manager receives Owner's written disapproval of such candidate within such ten (10) day period.  If Owner disapproves the first (1st) candidate (based on the process described above), Manager shall submit a second (2nd) candidate, using the same process described above.  If such second (2nd) candidate is disapproved by Owner (based on the same process described above), Manager shall submit a third (3rd) candidate, using the same process as described above.  If Owner disapproves three (3) candidates for the position submitted by Manager pursuant to the provisions of this Section 1.06.E, Manager shall have the right to select the person to be offered the position of general manager or director of marketing, as applicable, in Manager's sole discretion, from the three (3) candidates proposed to Owner.

1.07    Owner's Right to Inspect

Owner and its agents shall have access to the Hotel at any and all reasonable times for the purpose of inspection or showing the Hotel.

1.08    Regular Meetings

At Owner's request, Owner and Manager shall have quarterly meetings at the Hotel and at mutually convenient times.  Manager shall be represented at such meetings by the general manager of the Hotel and such other members of the executive committee at the Hotel as the general manager may deem appropriate.  At Owner's request, Manager shall also cause to attend such meetings such regional personnel as may be necessary to address certain situations or issues.  The purpose of the meetings shall be to discuss the performance of the Hotel and other related issues, including any variations from the Business Plan for the preceding quarter.



1.09    System Standards and Criteria for Approvals

Subject to Section 1.03.B, Owner and Manager agree that it is their mutual intent that the Hotel be operated as part of the EDITION Hotel System in compliance with System Standards. Owner and Manager agree that, subject to the terms and conditions of this Agreement, Manager shall have reasonable discretion in operating the Hotel in order that the Hotel will comply with System Standards, and that, in exercising their respective rights of approval herein, they will do so consistent with the requirements of System Standards.

1.10    Central Office Services

As part of its management services provided hereunder, Manager shall provide, at its own cost and not as a Deduction, the Central Office Services that are described on Exhibit B attached hereto.

1.11    Chain Services

A.    Manager shall cause to be furnished to the Hotel certain services ("Chain Services") that are furnished on a comparable basis to all or substantially all other hotels in the Boutique System.  Chain Services shall include:  (i) the general categories of services listed in Exhibit C attached hereto, and (ii) such additional central programs or services as may, from time to time, be furnished for the benefit of all or substantially all, to the extent reasonably applicable, hotels in the Boutique System or in substitution for services now performed at individual hotels which Manager determines can be provided more efficiently and economically on a system basis; provided, however, that services shall only be added to "Chain Services" pursuant to clause (ii) above if, and to the extent that, such services: (a) are not Central Office Services; and (b) are either (x) new services (i.e., not previously performed at the Hotel), or (y) services that theretofore had been performed at the Hotel, but that can be performed more efficiently and economically for the Boutique System as a whole.  Chain Services shall not include Marketing Fee Services.

B.    Costs and expenses incurred in the providing of Chain Services shall be allocated on a fair and consistent basis among all hotels in the Boutique System.  The charges for Chain Services shall include, as applicable, an allocation of salaries, wages, development costs and overhead related to the employees of Manager, Marriott or any Affiliate of Manager or Marriott involved in providing any of the Chain Services.  The costs associated with any Chain Services that are used by hotels in the Boutique System and that are also provided to other hotel brands owned by Marriott shall be allocated to such other brands on a fair and consistent basis, taking into account the level of such Chain Services being provided to each of such other brands.  All charges classified as Chain Services shall be treated and charged as Cost Transactions and Manager shall not earn nor be entitled to earn a profit on such charges.

C.    Pursuant to the provisions of Section 4.07, Manager shall provide to Owner the Chain Services Report, as such document is described in Section 4.07.



1.12    Related Party Transactions

Subject to Manager's compliance with the provisions of Section 1.13, Manager shall have the right to enter into or implement transactions with one or more Related Parties to purchase, sell, lease, procure or provide goods and/or services for or to the Hotel.

1.13    Profit and Cost Transactions Relating to the Hotel

A.      A "Profit Transaction" shall mean any transaction entered into or implemented by Manager or a Related Party involving the purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel, which is structured for Manager or a Related Party to receive a direct economic benefit (including receipt of an equity interest) as a result of such transaction, other than through Management Fees, that is in excess of the costs of such transaction.

B.      Manager and the Related Parties may implement any Profit Transaction without Owner's approval, provided that (i) the Profit Transaction satisfies the Competitive Terms Standard, and (ii) Manager notifies Owner of such Profit Transaction as part of the Annual Profit Transactions Report.

C.      Any dispute as to whether a Profit Transaction satisfies the Competitive Terms Standard shall be resolved by a panel of Experts in accordance with Section 11.20.  If the Experts determine that the Competitive Terms Standard was not satisfied, Manager shall elect either to (i) incorporate, or cause the applicable Related Party to incorporate, modifications into the Profit Transaction that the Experts may require to satisfy the Competitive Terms Standard, in which event the Profit Transaction, as so modified, may be implemented; or (ii) cease, not undertake, or cause the applicable Related Party to cease or not undertake, the transaction as a Profit Transaction; provided, however, that (x) Manager and the Related Parties shall nevertheless have the right to undertake such transaction for other parties, entities or hotels, and (y) as Owner's sole and exclusive remedy for Manager's actions, Manager shall return to the Hotel the excess of the amount paid by the Hotel to the Related Party with respect to such Profit Transaction less the amount that would have been paid had the Profit Transaction met the Competitive Terms Standard and shall pay the reasonable costs of the Experts, if any.  If such reimbursement to the Hotel relates to a matter that was treated as a Deduction, appropriate adjustments shall be made to the calculation of Operating Profit and to all other related calculations to reflect the reimbursement to the Hotel.  A Profit Transaction shall be deemed to satisfy the Competitive Terms Standard if Manager elects to obtain approval of such Profit Transaction from owners of a majority of the then-existing rooms in the EDITION Hotel System, and obtains such approval from the owners of a majority of the then-existing rooms in the EDITION Hotel System.

D.      The parties agree that the utilization of Avendra, LLC, for procurement purposes pursuant to its contract terms as of the Effective Date and the utilization of STSN, Inc. for



high-speed internet access service pursuant to its contract terms as of the Effective Date, are Profit Transactions that satisfy the Competitive Terms Standard.

E.      A "Cost Transaction" shall mean any transaction involving the purchase, sale, lease or other procurement or provision of goods or services that (i) when provided for or to the Hotel, is implemented utilizing a cost reimbursement or cost allocation methodology to price such goods or services (which costs may include a reasonable allocation of development, start-up and operational costs incurred by the provider in connection with providing such goods or services), as opposed to a methodology designed to yield a profit on such goods or services (other than profits that Manager earns through Management Fees); and/or (ii) when provided for or to any third party, is implemented on any terms and conditions (including the utilization of either a cost or a profit methodology).  Consistent with the other terms and conditions of this Agreement, Manager and the Related Parties may implement any Cost Transaction for or to the Hotel without Owner's approval.

F.      If Manager or a Related Party implements a Cost Transaction for both the Hotel and any third party, then Manager or the Related Party may earn a profit from implementing such Cost Transaction to such third party, provided that the costs associated with such Cost Transaction (including development and start-up costs, if any) shall be allocated on a fair and consistent basis among all the parties (including the Hotel) utilizing such Cost Transaction, taking into account the level of services provided under such Cost Transaction to each of the parties (including the Hotel) utilizing such Cost Transaction.  Any disputes between Owner and Manager concerning the allocation of such costs under this Section 1.13.F shall be resolved by a panel of Experts in accordance with Section 11.20 hereof.

G.      Manager's collection of the Marketing Fee and use of the funds so collected shall not be deemed to be either a Profit Transaction or a Cost Transaction.  Manager shall not, however, earn a profit with respect to the Marketing Fee, the parties' intention being that the funds collected from the Marketing Fee and retained by Manager shall be expended in their entirety, over time, on Marketing Fee Services.

1.14    Marriott Rewards Program

Manager, in its discretion, shall have the right to include the Hotel, and to cause the Hotel to participate, in the Marriott Rewards Program from and after the Opening Date.  Charges and reimbursements to the Hotel resulting from the Marriott Rewards Program shall be consistent with charges and reimbursements to all other hotels in the Boutique System participating in the Marriott Rewards Program, which charges and reimbursements shall be subject to change from time to time.  All expenses charged to the Hotel in connection with the Marriott Rewards Program shall be treated as Deductions.  Manager and the Related Parties shall not earn a profit from the Hotel with respect to its participation in the Marriott Rewards Program; provided, however, that Manager and the Related Parties shall nevertheless have the right to earn a profit by utilizing the systems and infrastructure of the Marriott Rewards Program for third parties in accordance with and subject to the terms and conditions of Section 1.13.F.



1.15    Procurement Rebates and Fees

A.    In any instance in which Manager receives an Unrestricted Rebate with respect to any purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel, such Unrestricted Rebate (or allocable portion thereof, based on a reasonable allocation formula, to the extent that such Unrestricted Rebate also applies to the purchase, sale, lease or other procurement or provision of goods or services for or to other hotels or third parties) shall be treated as follows:  (i) first, the amount of such Unrestricted Rebate shall be applied against any costs incurred in connection with the purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel (which costs shall be allocated to the Hotel on a reasonable basis to the extent such costs also apply to the purchase, sale, lease or other procurement or provision of goods or services for or to other hotels or third parties), and (ii) second, any remaining amount of such Unrestricted Rebate shall be reimbursed to the Hotel (which reimbursement shall be treated as a reduction of the Deductions for the applicable period).  Manager shall have the right, at its reasonable discretion, to modify the above procedure to (x) pay the entire amount of the costs described in clause (i) above as a Deduction, and (y) reimburse to the Hotel the entire amount of such Unrestricted Rebate (i.e., without netting the two amounts as described in the immediately preceding sentence).

B.    For purposes hereof, the term "Unrestricted Rebate" shall mean a rebate, payment or other enrichment received by Manager with respect to the purchase, sale, lease or other procurement or provision of goods or services specifically for or to the Hotel, where Manager is entitled to return such rebate, payment or enrichment to each of the hotels for or to which the goods or services were purchased, sold, leased, procured or provided.  The term "Unrestricted Rebate" shall not include (i) any allowances, payments or other enrichments received by Manager with respect to the purchase, sale, lease or other procurement or provision of goods or services for or to the Hotel, where Manager is not entitled to return such allowances, payments or enrichments to the hotels for or to which the goods or services were purchased, sold, leased, procured or provided or is required by a third party to utilize or allocate such allowances, payments or enrichments in a specific manner, or (ii) any conference sponsorship payments received by Manager that are used to defray conference costs.  If Manager receives an allowance, payment or enrichment pursuant to Section 1.15.B(i) or Section 1.15.B(ii), Manager shall utilize or allocate such allowance, payment or enrichment in the manner required by the third party and shall not directly profit from such allowance, payment or enrichment.

1.16    Limitations on Manager's Authority

Notwithstanding anything herein to the contrary, Manager shall not, without Owner's prior approval:

A.    Enter into, renew or extend any (y) lease or sublease with any Affiliate of Manager, or (z) equipment lease, other lease, sublease, license, concession or service contract with any non-Affiliate of Manager at the Hotel if either (i) with respect to such lease, sublease, license, concession or service contract, the total term or renewal term thereof will exceed three (3) years; (ii) the annual rent, payment or fee required to be paid by the lessee, sublessee, licensee or third party under such lease, sublease, license, concession or service contract, will



exceed Fifty Thousand Dollars ($50,000), as adjusted annually by the GDP Deflator; (iii) the total square footage covered by such lease, sublease, license or concession will exceed two hundred fifty (250) square feet; or (iv) the term of such lease, sublease, license, concession or service contract extends beyond the Term; provided that the foregoing limitation shall not apply if such license, concession or service contract (but in no event a lease or sublease) arises from or is related to a master or national contract or agreement entered into by Manager or any of its Affiliates.  For the avoidance of doubt, this Section 1.16 shall not apply to any contracts entered into by Manager pursuant to Section 1.06.D.  Any leases, subleases, licenses or concessions at the Hotel with any Affiliate of Manager will also be subject to Sections 1.12 and 1.13 hereof. Further, any agreement between Manager and any Affiliate of Manager, whether a Cost Transaction or a Profit Transaction, shall be terminable without penalty to Owner upon Termination.

B.     Adjust any claim or settle any Litigation involving the operations of the Hotel that (a) is not fully covered (except with respect to a reasonable deductible) by any of the insurance policies described in Article VI and is not an Employee Claim, and (b) would result in a Deduction or payment in excess of One Hundred Thousand Dollars ($100,000), as adjusted annually by the GDP Deflator, in any Fiscal Year.

## ARTICLE II

### TERM

2.01    Term

The "Term" of this Agreement shall consist of an "Initial Term" and the "Renewal Term(s)."  The "Initial Term" shall begin on the Effective Date and shall continue until the expiration of the thirtieth (30th) full Fiscal Year after the expiration of the Fiscal Year in which the Opening Date occurs.  Thereafter, this Agreement shall automatically, and with no further action required by Owner or Manager, be renewed on the same terms and conditions for each of two (2) successive periods of ten (10) full Fiscal Years each ("Renewal Term(s)"), unless Manager shall have given prior written notice to Owner of its election not to renew at least three hundred (300) days prior to the expiration of the then-current Initial Term or Renewal Term, as the case may be.

2.02    Performance Termination

A.     Subject to the provisions of Section 2.02.B, Owner shall have the option to terminate this Agreement if, with respect to any two (2) consecutive Fiscal Years (not including any portion of any Fiscal Year prior to the expiration of the fifth (5th) full Fiscal Year after the Opening Date):

1.     Operating Profit for each such Fiscal Year is less than the Performance Termination Threshold for such Fiscal Year; provided that, for purposes of this Section 2.02.A.1 only, Operating Profit shall be computed by deducting an amount for Impositions equal to the

11



actual amount of Impositions imposed on the Hotel for the first full Fiscal Year after the Opening Date provided that such amount does not exceed One Million Six Hundred Fifty Thousand Dollars ($1,650,000), which amount shall increase by (i) two percent (2%) each Fiscal Year commencing with the second (2nd) full Fiscal Year after the Opening Date, and (ii) the amount of any incremental increase in Impositions allocable solely to an expansion or addition to the Hotel; and

        2.    The Revenue Index of the Hotel during each such Fiscal Year is less than the Revenue Index Threshold for such Fiscal Year; and

        3.    The fact that the Hotel has not met the tests set forth in Section 2.02.A.1 and Section 2.02.A.2 is not the result of (i) an Extraordinary Event, (ii) any major renovation of the Hotel, (iii) any Event of Default by Owner, or (iv) the failure of the Hotel to comply with System Standards of which Manager has previously informed Owner in writing (unless such failure is caused by a default by Manager of its obligations under this Agreement).

Owner shall exercise such option to terminate by serving written notice ("Termination Notice") thereof on Manager no later than ninety (90) days after Owner's receipt of the annual accounting under Section 4.02 for the second (2nd) of the two (2) Fiscal Years referred to in this Section 2.02.A. If Manager does not elect to avoid such Termination pursuant to Section 2.02.B, this Agreement shall terminate as of the end of the fourth (4th) full Accounting Period following the date on which Manager receives the Termination Notice; provided that such period of time shall be extended as required by applicable Legal Requirements pertaining to the termination of the employment of the employees at the Hotel. Owner's failure to exercise its right to terminate this Agreement pursuant to this Section 2.02.A with respect to any given Fiscal Year shall not be deemed an estoppel or waiver of Owner's right to terminate this Agreement with respect to subsequent Fiscal Years to which this Section 2.02.A may apply. Prior to serving on Manager the Termination Notice, Owner shall, as applicable, (x) satisfy in full all repayment and other obligations to Manager and its Affiliates under any Marriott Funding Obligations, and (y) release or cause the release of all obligations of Manager and its Affiliates under such Marriott Funding Obligations); provided that if Owner fails to complete all such actions prior to the date on which Owner is required to send such Termination Notice, (x) the foregoing Owner's election to terminate this Agreement under this Section 2.02.A shall be canceled and of no force or effect and this Agreement shall not terminate, and (y) the first (1st) of the two (2) Fiscal Years to which such Termination Notice would have applied shall no longer be treated as a Fiscal Year for the purposes of Section 2.02.A.1.

    B.    Upon receipt of Owner's Termination Notice pursuant to Section 2.02.A, Manager shall have the option, to be exercised by written notice to Owner (the "Shortfall Notice") within sixty (60) days after receipt of such Termination Notice, to avoid such Termination by making a Shortfall Payment. The term "Shortfall Payment" shall mean the payment to Owner of the amount by which Operating Profit for both of the two (2) Fiscal Years referenced in Section 2.02.A was less than the Performance Termination Threshold for such Fiscal Years (such amount, the "Shortfall Amount"), which payment shall be made within five (5) Business Days after the date on which Owner receives the Shortfall Notice.



If Manager makes a Shortfall Payment pursuant to this Section 2.02.B, the Fiscal Years with respect to which such Shortfall Payment was made shall thereafter not be treated, for purposes of subsequent elections by Owner pursuant to Section 2.02.A, as Fiscal Years in which the circumstances described in Section 2.02.A.1 have occurred. If Manager makes such Shortfall Payment, then the foregoing Owner's election to terminate this Agreement under Section 2.02.A shall be canceled and of no force or effect with respect to the two (2) Fiscal Years in question, and this Agreement shall not terminate. Such cancellation, however, shall not affect the right of Owner, as to each subsequent Fiscal Year to which Section 2.02.A applies, to again elect to terminate this Agreement pursuant to the provisions of Section 2.02.A (which subsequent election shall again be subject to Manager's rights under this Section 2.02.B). If Manager does not exercise its option to make a Shortfall Payment as aforesaid, then this Agreement shall be terminated as of the date set forth in Section 2.02.A. Manager shall not be entitled to avoid termination by making Shortfall Payments pursuant to this Section 2.02.B more than two (2) times in any fifteen (15) year period during the Term.

C.      Any disputes between Owner and Manager under this Section 2.02 (including, without limitation, with respect to (i) the calculation of Operating Profit, the Performance Termination Threshold or the Revenue Index; or (ii) the applicability, duration or extent of impact of any of the items specified in Section 2.02.A.3 shall be resolved by a panel of Experts in accordance with Section 11.20. The sixty (60) day period described in Section 2.02.B shall be tolled until the panel of Experts issues its determination.

2.03    <u>Limitation on Termination by Owner</u>

Notwithstanding anything in this Agreement to the contrary, without the express written consent of Manager (which consent may be withheld in Manager's sole and absolute discretion), Owner covenants and agrees that it may not terminate this Agreement for any reason whatsoever (including, without limitation, any Event of Default caused by Manager) at any time that (i) Manager or any of its Affiliates are providing (or are obligated to provide) any credit enhancement, guarantee, or loan (collectively, the "Marriott Funding Obligations") to Owner, an Affiliate of Owner or a lender of Owner with respect to the Hotel; or (ii) any amounts funded by Manager or its Affiliate pursuant to any Marriott Funding Obligation remain outstanding and payable to Manager or its Affiliate. Owner agrees that during any period of time described in clause (i) or clause (ii), Owner's sole remedy for an Event of Default caused by Manager shall be to sue Manager for monetary damages incurred by Owner as a result of such Event of Default. However, nothing herein shall preclude Owner from (x) satisfying in full all repayment and other obligations to Manager and its Affiliates under such Marriott Funding Obligations, and (y) releasing or causing the release of all obligations of Manager and its Affiliates under such Marriott Funding Obligations in order to exercise its termination rights in accordance with this Agreement. As used herein, "Marriott Funding Obligations" shall not include the Key Money.



## ARTICLE III

## COMPENSATION OF MANAGER

3.01    Management Fees

Manager shall be paid the sum of the following as its management fees:

A.    the Base Management Fee, which shall be retained by Manager from Gross Revenues; plus

B.    the Incentive Management Fee, which shall be retained by Manager from Operating Profit in accordance with Section 3.02 and Section 4.01.

3.02    Distribution of Operating Profit

With respect to each Fiscal Year during the Term, Operating Profit for such Fiscal Year (to the extent available) shall be distributed to Owner and to Manager in the following order of priority:

A.    first, an amount equal to Owner's Priority shall be paid to Owner;

B.    second, any Incentive Management Fee shall be paid to Manager; and

C.    third, any remaining balance of Operating Profit shall be paid to Owner.

Such distributions shall be made on an interim basis in accordance with Section 4.01.B.

## ARTICLE IV

## ACCOUNTING AND REPORTING MATTERS

4.01    Accounting and Interim Distributions

A.    Within twenty (20) days after the close of each Accounting Period, Manager shall deliver an interim accounting (the "Accounting Period Statement") to Owner showing Gross Revenues, Deductions, Operating Profit, and applications and distributions thereof for the preceding Accounting Period.  At the time that Manager delivers each Accounting Period Statement, Manager shall transfer to Owner any interim amounts due Owner, subject to Working Capital needs, and shall retain any interim Management Fees due Manager.

B.    Calculations and payments of the Incentive Management Fee, the Base Management Fee, and Owner's Priority shall be accounted for cumulatively within a Fiscal Year, but shall not be cumulative from one Fiscal Year to the next. Interim distributions of Incentive



Management Fees shall be calculated, earned and distributed based on prorating the full Fiscal Year Owner's Priority equally over thirteen (13) Accounting Periods. Calculations of such distributions shall be made on a cumulative basis using cumulative year-to-date Operating Profit and cumulative year-to-date prorated Owner's Priority, and applying the percentage calculations set forth in the definition of Incentive Management Fee. Such amounts shall be adjusted each Accounting Period, and may, in the event of a significant negative change in performance, require Manager to return previously distributed Incentive Management Fees for such Fiscal Year.

C.     Within seventy-five (75) days after the close of each Fiscal Year, Manager shall furnish Owner a statement (the "Annual Operating Statement") in reasonable detail summarizing the Hotel's operations for such Fiscal Year and a certificate executed by a senior vice president of Manager with accounting oversight responsibility for the region in which the Hotel is located, certifying that such Annual Operating Statement is true and correct. Within ten (10) days after Owner's receipt of such Annual Operating Statement, the parties shall make any adjustments, by cash payment, in the amounts paid or retained for such Fiscal Year as are required based on the final figures set forth in such Annual Operating Statement. Such Annual Operating Statement shall be controlling over the Accounting Period Statements for the applicable Fiscal Year. No adjustments shall be made for any Operating Loss or Operating Profit in any preceding Fiscal Year.

D.     To the extent that Manager projects an Operating Loss for any Accounting Period, additional funds in the amount of any such Operating Loss shall be provided by Owner within thirty (30) days after Manager has delivered written notice thereof to Owner. If Owner does not so fund such Operating Loss within the thirty (30) day time period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount to cover such Operating Loss from distributions of funds otherwise due to Owner.

4.02.   Books and Records; Annual Operating Statement

A.     Books of control and account pertaining to the operations of the Hotel shall be kept on the accrual basis and in material respects in accordance with the Uniform System of Accounts and with generally accepted accounting principles applied on a consistent basis (provided that, to the extent of a conflict between the two, the generally accepted accounting principles shall control over the Uniform System of Accounts) with the exceptions provided in this Agreement. Owner may at reasonable intervals during Manager's normal business hours examine the Books and Records. Owner shall have one hundred eighty (180) days after delivery of the Annual Operating Statement to examine or review (at Owner's sole expense, and not as a Deduction) such Annual Operating Statement. If Owner does not request an audit of the Books and Records within such one hundred eighty (180) day period, such Annual Operating Statement shall be deemed to have been accepted by Owner as true and correct, and Owner shall have no further right to question its accuracy except in the event of fraud by Manager or manifest error (provided that Manager is not prejudiced by any delay in Owner asserting a manifest error and, in no event may Owner claim a manifest error later than the end of the second (2nd) Fiscal Year after the Fiscal Year to which the error relates). Owner may, during such one hundred



eighty (180) day period, but not thereafter (except in the event of fraud by Manager), request an independent audit of the Books and Records ("Audit") which shall be arranged for by Owner and commenced and completed not later than one hundred eighty (180) days after the date of delivery of such Annual Operating Statement. No extension of such one hundred eighty (180) day period shall be permitted without the approval of Manager, except in the event of fraud by Manager or manifest error (provided that Manager is not prejudiced by any delay in Owner asserting a manifest error and, in no event may Owner claim a manifest error later than the end of the second (2nd) Fiscal Year after the Fiscal Year to which the error relates). Owner shall pay all costs and expenses of the Audit at its sole expense (and not as a Deduction); provided, however, that if such audit establishes that Manager has underpaid Owner for the applicable Fiscal Year by five percent (5%) or more, the reasonable costs and expenses of the Audit shall be paid solely by Manager. If any such audit discloses an underpayment of any amounts due to Owner pursuant to the provisions hereof, Manager shall promptly pay Owner such amounts found to be due. If any audit discloses that Manager has not received any amounts due to Manager pursuant to the provisions hereof, Owner shall promptly pay Manager such amounts found to be due. Manager shall reasonably cooperate with Owner and its representatives in connection with any Audit. Any dispute concerning the correctness of an Audit shall be settled by a panel of Experts in accordance with Section 11.20. All information regarding the operation of the Hotel which is obtained by Owner through an Audit shall be considered confidential information and Owner agrees not to disclose such information except as necessary to its advisors, attorneys and consultants participating in the Audit process, who shall likewise be informed of the confidential nature of the information and of the duty not to disclose such information to third parties, except as required by law; provided, however, that Owner shall be permitted to disclose such information to a third party in connection with a prospective Sale of the Hotel or financing related to the Hotel if such third party has executed a confidentiality agreement reasonably satisfactory to Manager regarding such information.

B.    Manager shall have the right, at its option, to provide Owner with automated delivery, in electronic format, of the data required under Section 4.02.A and Section 4.08.A (consistent with the then-current standard operating procedures generally employed by Manager with respect to other hotels in the Boutique System). The parties shall cooperate reasonably with each other in order to adapt to new technologies that may be available with respect to the transmission of such data.

C.    Manager shall cooperate reasonably with Owner (including providing reasonable information, if applicable) in order to assist Owner to understand the reports, statements and other information that Manager submits to Owner pursuant to the provisions hereof; provided, however, that the foregoing provisions of this Section 4.02.C shall not be construed to provide Owner with any audit or similar rights with respect to such reports, statements and information that are not otherwise expressly described in this Agreement.

4.03   Hotel Accounts and Expenditures

A.    Except as may be required in connection with MBS Systems, all funds derived from operation of the Hotel shall be deposited by Manager in accounts in Manager's name, established by Manager in a bank or banks designated by Manager and approved by Owner.



Owner hereby approves the Operating Accounts of the Hotel (if any) existing as of the Effective Date.  The bank accounts into which such funds are deposited (other than MBS Systems accounts, if any) are referred to herein as "Operating Accounts."

B.      Withdrawals from the Operating Accounts shall be made only by representatives of Manager whose signatures have been authorized.  Reasonable petty cash funds shall be maintained at the Hotel.

C.      Except as otherwise specifically provided hereunder and as may be required in connection with the MBS Systems, all payments made by Manager hereunder shall be made from the Operating Accounts, petty cash funds, or from the FF&E Reserve (in accordance with Section 5.02).  Manager shall not be required to make any advance or payment with respect to the Hotel except out of such funds, and Manager shall not be obligated to incur any liability or obligation with respect to the Hotel.  In any event, if any such liability or obligation is incurred by Manager with respect to the Hotel, Manager shall have the option to deduct such amounts from Owner's share of Operating Profit if Owner has not fully reimbursed Manager for said amounts within ten (10) days after Owner's receipt of notice from Manager that said amounts are due.  As part of Manager's cash management procedures, certain accruals and advance payments shall be made to Manager for paid time off, pension and other corporate charges in advance of actual payment of such expenses, without interest or imputed interest accruing on such funds for the benefit of Hotel.  Any and all accruals shall be reasonable, based on historical experience (where appropriate), and shall be applied to the Hotel in a manner consistent with the rest of the Boutique System.

D.      Debts and liabilities incurred by Manager as a result of its operation and management of the Hotel pursuant to the terms hereof, whether asserted before or after Termination, will be paid by Owner to the extent funds are not available for that purpose from Gross Revenues.  The provisions of this Section 4.03.D shall survive Termination.

4.04    MBS Systems

Manager shall have the right, in its discretion, to manage certain aspects of the Hotel's finances through the MBS Systems.  The scope, features and functions of the MBS Systems are subject to modification from time to time as Manager shall, in its reasonable discretion, determine to be most efficient and economical for the Boutique System.  Costs and expenses (collectively, the "MBS Charges") incurred by Manager or its Affiliates in providing the MBS Systems, which shall include both MBS Systems development costs and current operating costs and expenses, shall be allocated on a fair and consistent basis among all participating hotels in the Boutique System.  If the MBS Systems used by hotels in the Boutique System are also provided to other hotel brands owned by Marriott or its Affiliates, the costs and expenses incurred by Manager or its Affiliates in providing such MBS Systems shall be allocated to such other hotel brands on a fair and consistent basis, taking into account the level of MBS Systems being provided to each of such other brands.  MBS Charges allocated to the Hotel shall not be included in Chain Services or Central Office Services, but instead shall be Direct Deductions.

17



4.05    Direct Deductions and Direct Deductions Report

A.      Owner hereby approves the current categories of Direct Deductions, which are set forth in Exhibit D attached hereto, and their treatment as Deductions.  Within ninety (90) days after the end of each Fiscal Year, Manager shall furnish to Owner, for Owner's review, an updated list (the "Direct Deductions Report") of all then-current categories of Direct Deductions.

B.      Manager may, in its reasonable discretion, modify, add or subtract categories of services that are or will be provided as Direct Deductions provided Manager does so for all or substantially all of the other hotels in the Boutique System.  In the event Manager provides a new system or program to the Hotel that is not listed in either Exhibit C or Exhibit D, Manager shall make the determination of whether such new system or program should be classified as a Direct Deduction rather than a Chain Service based upon whether such new system or program (i) supports only a subgroup of hotels in the Boutique System, or selected or individual hotels, or (ii) is a system or program for which the cost is more appropriately recovered based on property usage.  If either clause (i) or clause (ii) in the immediately preceding sentence applies, the new system or program shall be classified as a Direct Deduction as opposed to a Chain Service.

4.06    Annual Profit Transactions Report

Within ninety (90) days after the end of each Fiscal Year, Manager shall deliver to Owner a report (the "Annual Profit Transactions Report") containing a list of all Profit Transactions relating to the Hotel to which Manager or any Related Party was a party, or which Manager or any Related Party implemented, during such Fiscal Year, together with a certification by a vice president of Manager that such list is true and accurate and that, in Manager's reasonable judgment, the Profit Transactions listed therein satisfy the Competitive Terms Standard.

4.07    Chain Services Report

Within ninety (90) days after the end of each Fiscal Year, Manager shall deliver to Owner for its review a report (the "Chain Services Report"):  (i) identifying the general categories (e.g., National Sales Office Services) and subcategories (e.g., International sales offices) of Chain Services provided for or to the Hotel during such Fiscal Year; (ii) setting forth the total cost paid by the Hotel for each general category of Chain Services, and the methodologies for allocating such costs to the Hotel, with respect to such Fiscal Year; and (iii) containing a certification by a vice president of Manager that each of the allocations of Chain Services costs to the Hotel for such Fiscal Year was made in accordance with this Agreement.

4.08    Business Plan

A.      Manager shall deliver to Owner for its review and approval, at least forty-five (45) days prior to the beginning of each Fiscal Year that begins after the Opening Date, a preliminary business plan showing the estimated Gross Revenues, departmental profits, Deductions (including, without limitation, compensation and benefits for all persons employed at the Hotel), and Operating Profit for the forthcoming Fiscal Year, in comparison to the forecasted



Gross Revenues, departmental profits, Deductions, and Operating Profit for the current Fiscal Year. Such preliminary business plan shall also include a projection of the amount of Working Capital anticipated to be required to be maintained during each Accounting Period throughout each Fiscal Year. Such comparison will include the estimated percentage changes in such items for the forthcoming Fiscal Year compared to the current Fiscal Year. Manager shall prepare the preliminary business plan in accordance with the System Standards and the general standards of the hotel industry for similar properties. Owner shall have thirty (30) days after receipt of the preliminary business plan to review and approve such business plan and Manager shall make itself reasonably available during such period to discuss the preliminary business plan and respond to Owner's questions with respect thereto. In the event that Owner disapproves any category in the preliminary business plan, Owner will provide Manager with the specific reasons for its disapproval by category within such thirty (30) day period. Upon Owner's request after such disapproval, Manager shall meet with Owner as soon as reasonably practical to discuss the preliminary business plan and to explain to Owner how the preliminary business plan was developed (including all underlying assumptions then available). Thereafter, in the twenty-five (25) day period following receipt of Owner's disapproval, the parties shall attempt to resolve in good faith any objections by Owner. Notwithstanding the foregoing, Owner shall not be entitled to withhold its approval based on its objection to: (1) Manager's reasonable projections of either Gross Revenues or the components thereof; (2) projected costs and expenses that are "system charges" (that is, costs and expenses that are generally uniform throughout the Boutique System, such as the costs of Chain Services, Marriott Rewards Program, other system-wide marketing programs, employee salaries, benefits and other compensation programs) that are authorized or permitted under this Agreement; (3) the amount of the Marketing Fee, or of expenditures on Marketing Fee Services; (4) costs and expenses that are not within the control of Owner and/or Manager, such as Impositions and the costs of utilities; or (5) increases in projected costs and expenses of operating the Hotel, which increases are primarily caused by projected increases in occupancy or use of the Hotel resulting in increases in Gross Revenues. In the event that the parties are unable to resolve a disagreement with respect to any item to which Owner has objected, all such unresolved matters shall be determined by the panel of Experts in accordance with the provisions of Section 11.20. Pending such Expert determination, Manager shall operate the Hotel with respect to those categories that are in dispute based on the previous Fiscal Year's approved Business Plan, adjusted in accordance with changes in the GDP Deflator over the Fiscal Year just ended and anticipated changes in Gross Revenues. If Owner fails to provide any objection within such thirty (30) day period, the preliminary business plan as submitted by Manager shall be deemed approved. As of approximately forty-five (45) days after the beginning of each Fiscal Year following the Opening Date, Manager shall deliver to Owner the final business plan, in which the above-mentioned percentage changes are applied to the actual final numbers for the preceding Fiscal Year. Such final business plan, as delivered to Owner, is herein referred to as the "Business Plan."

B.     Manager shall diligently pursue feasible measures to operate the Hotel in accordance with the Business Plan. It is understood, however, that the Business Plan is an estimate only and that unforeseen circumstances outside the reasonable control of Manager such as, but not limited to, the costs of labor, material, services and supplies, casualty, operation of law, or economic and market conditions, as well as the requirement that the Hotel be operated in



accordance with the System Standards, may make adherence to the Business Plan impractical, and Manager shall be entitled to depart therefrom due to causes of the foregoing nature. Manager shall notify Owner if Manager anticipates that any major Deduction category (major line item such as General and Administrative) will increase by more than ten percent (10%) from the Business Plan or if the aggregate Deductions will increase by more than five percent (5%) from the Business Plan. Owner shall have the right to approve or disapprove such increase, which right shall be subject to the same terms and conditions as set forth for approval of the Business Plan in Section 4.08.A (it being understood that Owner shall have no greater approval or disapproval rights for any such change than those set forth for the Business Plan in Section 4.08.A). If and when any such proposed increase is approved, the Business Plan, shall be so amended, and shall be the Business Plan for the remainder of the Fiscal Year to which it relates.

### 4.09    Working Capital

Owner shall, from time to time during the Term, promptly, but no later than ten (10) days after written request by Manager, advance any additional funds (over and above those required pursuant to the Technical Services Agreement) necessary to maintain Working Capital at levels reasonably determined by Manager to be necessary to satisfy the needs of the Hotel as its operation may from time to time require in accordance with System Standards. If Owner does not fund such additional Working Capital amounts within such ten (10) day period, Manager shall have the right, at its option and without affecting Manager's other remedies under this Agreement, to either (or both) (i) withdraw an amount equal to the additional Working Capital funds requested by Manager from distributions of funds otherwise due to Owner, and/or (ii) lend to Owner such amount from Manager's own funds (which loan shall (x) bear interest at an annual rate equal to the Prime Rate plus three (3) percentage points, and (y) be repaid from distributions of funds otherwise due to Owner or, if not fully repaid prior to Termination, pursuant to the provisions of Section 11.11.I). All funds advanced for Working Capital pursuant to the preceding sentences of this Section 4.09 shall be utilized by Manager for the purposes described in this Agreement pursuant to cash management policies established for the Boutique System. Upon Termination, Manager shall, except as otherwise provided in this Agreement, return the outstanding balance of the Working Capital to Owner.

### 4.10    Fixed Asset Supplies

Owner shall, within thirty (30) days after request by Manager, provide funds that are necessary to increase the level of Fixed Asset Supplies to levels determined by Manager, in its good faith judgment, to be necessary to satisfy the needs of the Hotel as its operation may, from time to time, require in accordance with System Standards. The cost of Fixed Asset Supplies consumed in the operation of the Hotel shall constitute a Deduction. Fixed Asset Supplies shall remain the property of Owner during the Term and upon Termination (except for those Fixed Asset Supplies which are purchased by Manager pursuant to Section 11.11.E).



4.11    Real Estate and Personal Property Taxes

A.    Except as specifically set forth in Section 4.11.B, all real estate and personal property taxes, levies, assessments and similar charges on or relating to the Hotel ("Impositions") during the Term shall be paid by Manager from Gross Revenues, unless (i) payment thereof is in good faith being contested and enforcement thereof is stayed, or (ii) available Gross Revenues are insufficient for the payment thereof. Any such payments shall be Deductions in determining Operating Profit. Owner shall, within ten (10) calendar days after receipt, furnish Manager with copies of official tax bills and assessments which it may receive with respect to the Hotel. Either Owner or Manager (in which case Owner agrees to sign the required applications and otherwise cooperate with Manager in expediting the matter) may initiate proceedings to contest any negotiations or proceedings with respect to any Imposition, and all reasonable costs of any such contest shall be paid from Gross Revenues and shall be a Deduction in determining Operating Profit. Manager shall, as part of its contest or negotiation of any Imposition, be entitled, on Owner's behalf, to waive any applicable statute of limitations in order to avoid paying the Imposition during the pendency of any proceedings or negotiations with applicable authorities.

B.    The word "Impositions" as used in this Agreement shall not include the following, all of which shall be paid solely by Owner, not from Gross Revenues nor from the FF&E Reserve:

1.    Any franchise, corporate, estate, inheritance, succession, capital levy or transfer tax imposed on Owner, or any income tax imposed on any income of Owner (including distributions to Owner pursuant to Article III hereof);

2.    Special assessments (regardless of when due or whether they are paid as a lump sum or in installments over time) imposed because of facilities which are constructed by or on behalf of the assessing jurisdiction (for example, roads, sidewalks, sewers, culverts, etc.) which may or may not benefit the Hotel (regardless of whether or not they also benefit other buildings); or

3.    "Impact fees" (regardless of when due or whether they are paid as a lump sum or in installments over time) which are required of Owner as a condition to the issuance of site plan approval, zoning variances or building permits.

## ARTICLE V

## REPAIRS, MAINTENANCE AND REPLACEMENTS

5.01    Repairs and Maintenance Costs Which Are Expensed

Manager shall maintain the Hotel in good repair and condition, and shall make or cause to be made such routine maintenance, repairs and minor alterations as it determines are necessary



for such purposes.  The phrase "routine maintenance, repairs, and minor alterations" as used in this Section 5.01 shall include only those which are normally expensed under generally accepted accounting principles.  The cost of such maintenance, repairs and alterations shall be paid from Gross Revenues (and not from the FF&E Reserve) and shall be treated as a Deduction.

5.02    FF&E Reserve

A.    Manager shall establish a reserve account (the "FF&E Reserve"), in a bank or similar institution reasonably acceptable to both Manager and Owner, to cover the cost of:

1.    Replacements, renewals and additions to the FF&E at the Hotel; and

2.    Routine Capital Expenditures.

B.    For each Accounting Period from the Opening Date to the expiration of the thirteenth (13th) full Accounting Period after the Opening Date, Manager shall transfer into the FF&E Reserve an amount equal to one percent (1%) of Gross Revenues for such period; for each Accounting Period from the beginning of the fourteenth (14th) full Accounting Period after the Opening Date to the expiration of the twenty-sixth (26th) full Accounting Period after the Opening Date, Manager shall transfer into the FF&E Reserve an amount equal to two percent (2%) of Gross Revenues for such period; for each Accounting Period from the beginning of the twenty-seventh (27th) full Accounting Period after the Opening Date to the expiration of the sixty-fifth (65th) full Accounting Period after the Opening Date, Manager shall transfer into the FF&E Reserve an amount equal to three percent (3%) of Gross Revenues for each such Accounting Period; for each Accounting Period from the beginning of the sixty-sixth (66th) full Accounting Period after the Opening Date to the expiration of the one hundred thirtieth (130th) full Accounting Period after the Opening Date, Manager shall transfer into the FF&E Reserve an amount equal to four percent (4%) of Gross Revenues for each such Accounting Period; commencing with the beginning of the one hundred thirty-first (131st) full Accounting Period after the Opening Date and for all Accounting Periods thereafter, subject to the provisions of Section 5.02.E, Manager shall transfer into the FF&E Reserve an amount equal to five percent (5%) of Gross Revenues for each such Accounting Period.  Transfers into the FF&E Reserve shall be made at the time of each interim accounting described in Section 4.01 hereof. All amounts transferred into the FF&E Reserve pursuant to this Section 5.02.B shall be paid from Gross Revenues as Deductions.

C.    1.    Manager shall prepare an annual estimate (the "FF&E Estimate") of the expenditures necessary for (1) replacements, renewals and additions to the FF&E of the Hotel, and (2) Routine Capital Expenditures, during the ensuing Fiscal Year and shall deliver the FF&E Estimate to Owner for its review and approval, at the same time as Manager submits the preliminary business plan described in Section 4.08.A.  The FF&E Estimate shall also indicate the estimated time schedule for making such replacements, renewals, and additions and Routine Capital Expenditures.  Owner shall have thirty (30) days after receipt of the applicable FF&E Estimate to review and approve such estimate and Manager shall make itself reasonably

22



available during such period to discuss the FF&E Estimate and respond to Owner's questions with respect thereto.

       2.     Owner acknowledges that, in connection with its right of approval over the FF&E Estimate, it is a requirement of this Agreement that the Hotel be maintained to System Standards, and that certain FF&E replacements and Routine Capital Expenditures occur at regular cycles for soft goods, case goods and Routine Capital Expenditures, which cycles are incorporated in Systems Standards.  Accordingly, Owner agrees that it shall not be entitled to withhold its approval of an FF&E Estimate based on its objection to (i) any item related to a periodic soft or hard goods renovation made in accordance with established cycles for such renovations as provided for in System Standards; or (ii) any item required to keep the Hotel in accordance with System Standards.

       3.     If Owner provides written notice of its disapproval as set forth in Section 5.02.C(1), then in the ten (10) Business Day period following Manager's receipt of Owner's disapproval, the parties shall attempt to resolve in good faith the objections so specified by Owner.  If one or more of such objections have not been resolved as of the end of such ten (10) Business Day period, any such matter may be referred by either party to the Expert panel for resolution in accordance with the provisions of Section 11.20.

      D.     In any Fiscal Year, Manager shall be entitled to make replacements, renewals and additions to the FF&E of the Hotel and Routine Capital Expenditures, that are authorized under the FF&E Estimate for such Fiscal Year (or that were previously authorized under the FF&E Estimate for a prior Fiscal Year) or which are otherwise authorized pursuant to Section 5.02.C.2., up to the balance in the FF&E Reserve.  No expenditures will be made in excess of said balance without the approval of Owner.  However, during each Fiscal Year, Manager shall also be authorized to take appropriate remedial action (including making any necessary expenditures on account of FF&E or Routine Capital Expenditures) outside of the FF&E Estimate without Owner's approval (but with notice to Owner as soon as reasonably possible in the event of any material expenditure) in the following circumstances: (i) if there is an emergency threatening the Hotel, or the life or property of its guests, invitees or employees; (ii) if such expenditures are necessary to satisfy a Legal Requirement in accordance with the time lines required by the Legal Requirement; or (iii) if the continuation of the given condition would subject Manager and/or Owner to civil or criminal liability.  At the end of each Fiscal Year, any amounts remaining in the FF&E Reserve shall be carried forward to the next Fiscal Year.  Proceeds from the sale of FF&E no longer necessary to the operation of the Hotel shall be added to the FF&E Reserve. The FF&E Reserve will be kept in an interest-bearing account, and any interest which accrues thereon shall be retained in the FF&E Reserve.  Neither (1) proceeds from the disposition of FF&E, nor (2) interest which accrues on amounts held in the FF&E Reserve, shall (a) result in any reduction in the required transfers to the FF&E Reserve set forth in Section 5.02.B above, or (b) be included in Gross Revenues.

      E.     As the Hotel ages, the percentages of Gross Revenues that are set forth in Section 5.02.B may not be sufficient to keep the FF&E Reserve at the levels necessary to make the alterations, improvements, replacements, renewals, and additions to the FF&E of the Hotel, or to make the Routine Capital Expenditures, that are required to operate or maintain the Hotel in



accordance with the System Standards.  If Manager reasonably believes that the funding of the FF&E Reserve (with respect to the following Fiscal Year or any subsequent Fiscal Year as specified) will not be adequate to operate or maintain the Hotel in accordance with System Standards, Manager shall so notify Owner.  Owner shall have thirty (30) days after receipt of such notification to review and approve Manager's assessment and recommendations concerning the funding of the FF&E Reserve and, in the event Owner disapproves any portion of Manager's recommendations, Owner will provide Manager in writing with the specific reasons for its disapproval within such thirty (30) day period.  Thereafter, in the twenty-five (25) day period following Manager's receipt of Owner's disapproval, the parties will attempt to resolve in good faith the objections so specified by Owner.  In the event that one or more of such objections have not been resolved as of the end of such twenty-five (25) day period, any such matter may be referred by either party to the Expert panel for resolution in accordance with the provisions of Section 11.20.  Pending a decision by the Expert panel, Manager may proceed with the implementation of any portion of its assessment and recommendations that is not subject to dispute.

With respect to increased fundings to which Owner does not object, or increased fundings to which it objected but the Expert determined were necessary, Owner shall elect in writing one of the following two (2) alternatives within thirty (30) days after receipt of Manager's notice or the Expert's decision, as appropriate:

1.    to increase the annual percentage of FF&E Reserve fundings under Section 5.02.B to provide the additional funds required for the specified Fiscal Year(s), which additional FF&E Reserve fundings shall be treated as Deductions; or

2.    to make a lump sum contribution to the FF&E Reserve in an amount necessary to increase the FF&E Reserve to a level sufficient to fund the items which necessitated Manager's request for additional FF&E Reserve fundings; such amount shall be fully repaid (without interest) to Owner from Gross Revenues in equal installments over the period of the next sixty-five (65) Accounting Periods, which installment payments shall be treated as Deductions.

If Owner fails to elect one of the above alternatives within such thirty (30) day period, Owner shall be deemed to have elected the alternative set forth in Section 5.02.E.1.  If Owner elects the alternative set forth in Section 5.02.E.2 and fails to provide the additional funds required thereunder within (i) thirty (30) days after making such election where such election follows a determination by the Expert pursuant to the foregoing provisions, or (ii) sixty (60) days after Owner's receipt of Manager's request for such additional funding where such election does not follow a determination by the Expert, such failure shall constitute an Event of Default by Owner.  In addition, the placing of any restrictions on the expenditure by Manager of funds from the FF&E Reserve other than as set forth in this Section 5.02 (including, without limitation, restrictions resulting from (a) any Litigation involving the Owner or the Hotel, or (b) a Foreclosure) shall constitute an Event of Default by Owner under Section 9.01.

24



5.03    Capital Expenditures

A.    Manager shall prepare an annual estimate (the "Building Estimate") of all Capital Expenditures for the Hotel, which shall include, for informational purposes only, a five (5) year forecast estimating proposed Capital Expenditures over such period.  Manager shall submit the Building Estimate to Owner for its approval at the same time as Manager submits the preliminary business plan described in Section 4.08.A.  Manager shall not make any Capital Expenditures without the prior approval of Owner, except as otherwise permitted herein.  Owner shall have thirty (30) days after receipt of such Building Estimate to review and approve such Building Estimate, it being agreed that Owner shall not withhold its approval with respect to Capital Expenditures as are required (i) to keep the Hotel in good condition and repair in accordance with System Standards, or (ii) otherwise required for the continued safe and orderly operation of the Hotel. In no event shall Owner be required to (a) make structural changes or any physical additions to the Hotel Improvements (including the building facade), or (b) make changes to the size of the guest rooms.   In the event Owner disapproves any portion of such Building Estimate, Owner shall provide Manager in writing with the specific reasons for its disapproval within such thirty (30) day period.  Thereafter, in the twenty-five (25) day period following Manager's receipt of Owner's disapproval, the parties shall attempt to resolve in good faith any objections so specified by Owner.  In the event that one or more of such objections have not been resolved as of the end of such twenty-five (25) day period, any such matter may be referred by either party for resolution by the Expert panel in accordance with the provisions of Section 11.20.  Pending a decision by the Expert panel, Manager may proceed with the implementation of any portion of such Building Estimate that is not subject to dispute.  It shall be an Event of Default by Owner if Owner fails to provide funding for any Capital Expenditure required to be implemented by Owner hereunder, within sixty (60) days, or such longer reasonable period required by Owner to procure the funds, but not later than one hundred eighty (180) days after issuance of the building permit therefore if necessary.

B.    Notwithstanding the provisions of Section 5.03.A, Manager shall be authorized to take appropriate remedial action (including making any necessary Capital Expenditures) without receiving Owner's prior approval in the following circumstances:  (i) if there is an emergency threatening the Hotel, or the life or property of its guests, invitees or employees; (ii) if the Capital Expenditures are necessary to satisfy a Legal Requirement; or (iii) if the continuation of the given condition would subject Manager and/or Owner to civil or criminal liability.  Manager shall cooperate with Owner in the pursuit of any such action and shall have the right to participate therein.  Owner shall, upon written request by Manager, promptly reimburse all expenditures made by Manager pursuant to this Section 5.03.B.

C.    The cost of all Capital Expenditures (including the expenses incurred by either Owner or Manager in connection with any civil or criminal proceeding described above) shall be borne solely by Owner, and shall not be paid from Gross Revenues or from the FF&E Reserve. The amount of Capital Expenditures funded by Owner pursuant to this Section 5.03 (excluding all costs related to the correction of errors, omissions or defects in the design, construction or renovation of the Hotel) shall be included in the calculation of Owner's Priority, as set forth in the definition of Owner's Priority.

25



5.04    Ownership of Replacements

All repairs, alterations, improvements, renewals or replacements made pursuant to this Article V, and all amounts kept in the FF&E Reserve, shall, except as otherwise provided in this Agreement, be the property of Owner.

5.05    Management of Hotel Renovation and Construction Projects

A.    Owner shall have the right to manage any Hotel renovation or construction project that exceeds a total budgeted cost of Five Hundred Thousand Dollars ($500,000), as adjusted by the GDP Deflator; provided, however, that (i) after the Opening Date, Marriott International Design & Construction Services, Inc. (and its successors and assigns) shall be allowed to bid on all such projects (other than the work required for the Flagging Renovation) (which bid may be as a Profit Transaction); (ii) prior to commencement of such project, Owner shall submit to the appropriate committee designated by Manager, for its approval, all project plans, drawings and specifications and shall ensure that the final plans, drawings and specifications pursuant to which such project is undertaken conform to those approved by such committee; (iii) all materials used in, and the quality of installation and finish with respect to, such project shall be equal to or better than those required by System Standards; (iv) the contractors, architects and other consultants utilized by Owner with respect to such project shall be fully insured and bonded to the reasonable satisfaction of Manager; (v) such project shall not be deemed completed until Manager, in its reasonable judgment, certifies that the project work conforms in all material respects with all project plans, drawings and specifications approved by Manager; and (vi) Owner shall (x) work cooperatively with Manager to minimize interruption to Hotel operations, and to the experience of the Hotel's guests, from such project, and (y) obtain Manager's approval prior to undertaking any activity with respect to such project that could affect the guest experience at the Hotel or Manager's operation and management of the Hotel. Any dispute between Owner and Manager pursuant to this Section 5.05 shall be resolved by a panel of Experts in accordance with Section 11.20.

B.    Manager shall have the right to manage any Hotel renovation or construction project that has a total budgeted cost of Five Hundred Thousand Dollars ($500,000) or less, as adjusted by the GDP Deflator, and shall have the right to contract with Marriott International Design & Construction Services, Inc. (and its successors and assigns) to perform the work related to any such project, provided that Owner shall be allowed to bid on all such projects and further provided that such contract will be subject to Section 1.12 and 1.13 hereof.

26



# ARTICLE VI

## INSURANCE

6.01    Property Insurance

A.    Commencing with the Opening Date, Owner shall procure and maintain the following (or Manager shall procure and maintain the following if (i) Owner requests in writing, at least sixty (60) days prior to the Opening Date, that Manager procure and maintain the following, (ii) the Hotel satisfies the then-current insurability criteria under Manager's insurance program, and (iii) Manager approves such request, in its sole and absolute discretion):

1.    Property insurance (and, to the extent applicable, builders risk insurance), including boiler and machinery coverage, on the Hotel building(s) and contents against loss or damage by risks generally covered by an "all risk of physical loss" form. Such coverage, to the extent available at commercially reasonable rates, terms and conditions, shall be for not less than one hundred percent (100%) of replacement cost thereof, less a reasonable deductible and subject to commercially reasonable sub-limits, and less excavation and foundation costs. Such coverage shall include (i) an agreed value provision, (ii) waiver of co-insurance, (iii) landscape improvements coverage in an amount equal to one hundred percent (100%) of the replacement value of the landscape improvements or Five Million Dollars ($5,000,000), whichever is greater, and (iv) law and ordinance coverage in an amount equal to twenty-five percent (25%) of the replacement value or Five Million Dollars ($5,000,000), whichever is greater.

2.    Flood insurance, to the extent such coverage is excluded or sub-limited from the property insurance required under Section 6.01.A.1 and to the extent the Hotel is located in whole or in part within an area identified by the insurer as having a special flood hazard. Such coverage, to the extent available at commercially reasonable rates, terms and conditions, shall be for not less than twenty-five percent (25%) of the replacement cost value of the Hotel, in excess of the application of a reasonable deductible. In no event shall flood insurance coverage be less than the maximum amount available under the National Flood Insurance Program (or successor program) for such coverage.

3.    Insurance for loss or damage caused by earth movement, to the extent such coverage is excluded from the property insurance required under Section 6.01.A.1 and to the extent the Hotel is located in an "earthquake prone zone" as determined by appropriate government authority or by the insurance industry. Such coverage, to the extent available at commercially reasonable rates, terms and conditions, shall be for not less than the probable maximum loss of the Hotel or the aggregate probable maximum loss if insured under a blanket program, less a reasonable deductible.

4.    Terrorism insurance, to the extent such coverage is excluded or sub-limited from the property insurance required under Section 6.01.A.1. Such coverage, to the extent available at commercially reasonable rates, terms and conditions, shall be for not less than the replacement cost value of the Hotel, less a reasonable deductible.

27



5.    Windstorm insurance, to the extent such coverage is excluded from the property insurance required under Section 6.01.A.1 and to the extent the Hotel is located in a "windstorm prone zone" as determined by an appropriate government authority or by the insurance industry.  Such coverage, to the extent available at commercially reasonable rates, terms and conditions, shall be for not less than the probable maximum loss of the Hotel or the aggregate probable maximum loss if insured under a blanket program, less a reasonable deductible.

6.    Business interruption insurance caused by any occurrence covered by the insurance described in Section 6.01.A.1 through Section 6.01.A.5.  Such coverage, to the extent available at commercially reasonable rates, terms and conditions, shall include (i) not less than two (2) years' loss of profits, (ii) necessary continuing expenses, including ordinary payroll expenses covering a period of not less than ninety (90) days, (iii) if applicable, loss of rental income, (iv) an extended period of indemnity of not less than three hundred sixty-five (365) days, and (v) any amounts that would be payable to Manager in respect of its Management Fees or any other amounts payable to Manager under this Agreement if the loss had not occurred, and Manager hereby reserves the right to make a claim directly to the insurer for any such Management Fees or other amounts payable to Manager under this Agreement.

7.    Such other property insurance as is customarily required by Manager at similar hotels.

B.    1.    All insurance procured in accordance with Section 6.01.A shall be obtained from reputable insurance companies of recognized responsibility and financial standing reasonably acceptable to Manager.  Any premiums and deductibles under said policies shall be subject to the reasonable approval of Manager.  Such premiums and deductibles (net of any credits, rebates and discounts) shall be paid as Deductions in accordance with this Agreement.

2.    If Owner procures the insurance described in Section 6.01.A, all policies of such insurance shall be carried in the name of Owner, with Manager as an additional insured.  If Manager procures such insurance, all policies of such insurance shall be carried in the name of Manager, with Owner as an additional insured.  Any property losses thereunder shall be payable to the respective parties as their interests may appear.  The documentation with respect to each Mortgage shall contain provisions to the effect that proceeds of the insurance policies described in Section 6.01.A shall be available for repair and restoration of the Hotel, to the extent required pursuant to Section 7.01.

3.    If Owner procures the insurance described in Section 6.01.A, Owner shall deliver to Manager (i) certificates of insurance for such insurance or, upon Manager's request, a certified copy of the policies so procured, and (ii) in the case of insurance policies about to expire, certificates with respect to renewal(s) thereof.  All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled, non-renewed or materially changed without at least thirty (30) days' prior written notice to the certificate holder.



4.      Each of Owner and Manager hereby waives its rights of recovery and its insurer rights of subrogation from the other party or any of its Affiliates (and their respective directors, officers, shareholders, agents and employees) for loss or damage to the Hotel, and any resultant interruption of business regardless of the cause of such property or business interruption loss.

5.      If (i) Owner is eligible to participate in Manager's property insurance program, (ii) Owner nevertheless elects to procure its own property insurance, and (iii) the costs of the premiums and/or deductibles for coverage under Owner's property insurance program to be paid as Deductions under Section 6.01 exceed the costs of the premiums and deductibles that would have been payable under Manager's property insurance program by more than ten percent (10%), then with respect to such excess amount Owner shall be solely responsible (i.e., such costs shall not be paid from Gross Revenues or treated as Deductions) for the amount by which such costs under Owner's program exceed such costs under Manager's program by more than ten percent (10%).

6.      In the event Owner elects to have the Hotel participate in Manager's property insurance program and Manager approves such participation pursuant to Section 6.01.A, the Hotel shall participate in Manager's property insurance program until such time as either Owner or Manager shall provide written notice to the other of its intent to discontinue such participation in accordance with the following:

a.      If Owner elects to remove the Hotel from Manager's property insurance program and to procure its own property insurance for the Hotel, Owner shall provide Manager written notice of such decision at least ninety (90) days prior to the next renewal date of coverage under Manager's property insurance program (which is currently April 1st of each calendar year).  If Owner fails to timely provide such notice, but Owner nevertheless procures its own property insurance for the Hotel, Owner shall pay (from its own funds and not from Gross Revenues) to Manager an amount equal to ten percent (10%) of the annual premium under Manager's property insurance program to cover all fixed costs and expenses incurred by Manager for the placement of such property insurance.  If Owner elects to exit Manager's property insurance program in the middle of a coverage year (i.e., prior to the end of a coverage year), (i) the premiums under Section 6.01.A.1 of Manager's property insurance program and Owner's replacement property insurance program will be prorated as of the date on which Manager receives and approves certificates of insurance evidencing Owner's replacement property insurance coverage and its compliance with the requirements of this Section 6.01, (ii) Owner shall pay to Manager the amount described in the immediately preceding sentence, and (iii) for all other policies under Section 6.01.A, the premium will be deemed fully earned and will not be prorated.  If Owner elects to exit Manager's property insurance program pursuant to the foregoing provisions, Owner may subsequently seek to have the Hotel participate in Manager's property insurance program; however such participation shall be subject to the following requirements:  (x) Owner requests in writing, at least sixty (60) days prior to the commencement of the proposed coverage year, that Manager procure and maintain the property insurance, (y) the Hotel satisfies the then-current insurability criteria under Manager's insurance program, and (z) Manager approves such request, in its sole and absolute discretion.



b.      If Manager elects to remove the Hotel from Manager's property insurance program, Manager shall provide Owner written notice of such decision at least ninety (90) days prior to the next renewal date of coverage under Manager's property insurance program (which is currently April 1st of each calendar year).  Following such notice, Owner shall proceed to procure insurance for the Hotel pursuant to this Section 6.01 effective as of the expiration date of the current coverage.  Owner may subsequently seek to have the Hotel participate in Manager's property insurance program; however such participation shall be subject to the following requirements:  (x) Owner requests in writing, at least sixty (60) days prior to the commencement of the proposed coverage year, that Manager procure and maintain the property insurance, (y) the Hotel satisfies the then-current insurability criteria under Manager's insurance program, and (z) Manager approves such request, in its sole and absolute discretion.

7.      If Owner procures insurance for the Hotel pursuant to this Section 6.01, Manager shall pay to Owner, as a Deduction and at the same time that Manager makes interim payments to Owner pursuant to Section 4.01.A, the amount of all reasonable insurance premiums relating to such insurance in accordance with this Section 6.01 (including Section 6.01.B.5) (the amount of such payments, collectively, the "Property Insurance Premiums").  The interim amount of Property Insurance Premiums to be paid by Manager to Owner shall be calculated by prorating the full Fiscal Year budgeted amount (or the actual amount, if available) of such Property Insurance Premiums equally over thirteen (13) Accounting Periods.  Owner shall, within five (5) days after Manager's request therefor, provide Manager with evidence (reasonably satisfactory to Manager) of Owner's payment of all premiums and the receipt of any credits, rebates and discounts under the insurance policies procured by Owner hereunder.  Manager shall reconcile prior payments of the Property Insurance Premiums to Owner for each Fiscal Year with the actual amount of the Property Insurance Premiums for such Fiscal Year, and the parties shall make any necessary adjustments with respect thereto following Owner's receipt of each Accounting Period Statement and/or Annual Operating Statement, as applicable.  The parties agree that Manager shall only be required to pay Property Insurance Premiums to the extent that Gross Revenues are available in accordance with this Agreement.  Owner shall be solely responsible for paying all premiums under insurance policies procured by Owner, before any fine, penalty or interest is added thereto.

6.02    Operational Insurance

A.      Commencing with the Opening Date and thereafter during the Term, Manager shall procure and maintain the following:

1.      Commercial general liability insurance against claims for bodily injury, death and property damage occurring in conjunction with the operations of the Hotel, and automobile liability insurance on vehicles operated in conjunction with the Hotel, with a combined single limit for each occurrence of not less than One Hundred Million Dollars ($100,000,000);

30



2.      Workers' compensation coverage as may be required under applicable laws covering all of Manager's employees at the Hotel, and employer's liability insurance of not less than One Million Dollars ($1,000,000) per accident/disease;

3.      Fidelity bond coverage in an amount not less than Two Million Dollars ($2,000,000) covering Manager's employees at the Hotel;

4.      Employment practices liability insurance covering Manager's employees at the Hotel, to the extent available at commercially reasonable rates and terms, in an amount not less than One Million Dollars ($1,000,000); and

5.      Such other insurance in amounts as Manager, in its reasonable judgment, deems advisable for protection against claims, liabilities and losses arising out of or connected with the operation of the Hotel.

B.    1.      The insurance procured pursuant to Section 6.02 may include "Insurance Retentions." Insurance Retentions shall mean the deductibles or risk retention levels; however, the Hotel's responsibility for such deductibles or risk retention levels shall be limited to the Hotel's per occurrence limit for any loss or reserve as established by Manager for the Hotel, which limit shall be the same as other similar hotels participating in the blanket insurance programs.

2.      All insurance procured in accordance with Section 6.02.A shall be carried in the name of Manager.  The insurance procured in accordance with Section 6.02.A.1 shall include Owner, and any Mortgagees specified by Owner, in writing, as additional insureds.

3.      Manager, upon request, shall deliver to Owner certificates of insurance evidencing the insurance coverages procured in accordance with Section 6.02.A.1 (and the insurance described in Section 6.01.A, if Manager procures such insurance) and any renewals thereof.  All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled or materially reduced without at least thirty (30) days' prior written notice to the certificate holder.

4.      All insurance premiums, costs and other expenses, including any Insurance Retentions, for insurance procured pursuant to this Section 6.02 shall be treated as Deductions.  All charges under the blanket programs shall be allocated to the Hotel and other similar participating hotels on a reasonable basis.  Any losses and associated costs and expenses that are uninsured shall be treated as a cost of insurance and shall also be treated as Deductions.

5.      Upon Termination or upon a sale of the Hotel, a reserve in an amount determined by Manager based on loss projections, shall be established from Gross Revenues to cover the amount of any Insurance Retentions and all other costs and expenses that will eventually have to be paid by either Owner or Manager with respect to pending or contingent claims, including those that arise after Termination for causes arising during the Term.  If Gross Revenues are insufficient to meet the requirements of such reserve, Owner shall deliver to



Manager, within ten (10) days after receipt of Manager's written request thereof, the sums necessary to establish such reserve; and if Owner fails to timely deliver such sums to Manager, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the Operating Accounts, the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager.

6.03    General Conditions of Manager's Insurance Program

All insurance procured by Manager pursuant to Section 6.01 (if Manager procures such insurance) and Section 6.02 may be obtained by Manager through blanket insurance programs, with shared aggregate coverage levels, sub-limits, deductibles, conditions, and exclusions based on industry conditions and based on what is available at commercially reasonable rates, terms and conditions. The blanket program may apply to one or more insured locations which may incur a loss for the same insured event, which could result in the exhaustion of coverage prior to the resolution of all claims arising from such event. In addition, industry conditions may cause policy terms, sub-limits, conditions or exclusions to result in coverage levels less than the amounts prescribed in Section 6.01 and Section 6.02. Such conditions and limitations shall not constitute a breach of Manager's insurance procurement obligations hereunder.

## ARTICLE VII

## DAMAGE, REPAIR AND CONDEMNATION

7.01    Damage and Repair

A.    If, during the Term, the Hotel is damaged by a Minor Casualty, Manager shall, with all reasonable diligence, proceed to process the claim with the applicable insurance carriers, including settling such claim, and to make the necessary arrangements with appropriate contractors and suppliers to repair and/or replace the damaged portion of the Hotel. Owner's consent shall not be needed for Manager to perform any of the foregoing, all of which shall be performed in accordance with Manager's reasonable judgment. Owner agrees to sign promptly any documents which are necessary to process and/or adjust the claim with the insurance carriers, as well as any contracts with such contractors and/or suppliers.

B.    If, during the Term, the Hotel suffers a Total Casualty, this Agreement shall be terminable at the option of either party upon ninety (90) days' written notice to the other party. Such notice must be sent within sixty (60) days after the date of the Total Casualty.

C.    If, during the Term, the Hotel is damaged by fire, casualty or other cause to a greater extent than a Minor Casualty, but not to the extent of a Total Casualty, or if the Hotel suffers a Total Casualty but neither party elects to terminate under Section 7.01.B, Owner shall, at its cost and expense and with all reasonable diligence, repair and/or replace the damaged portion of the Hotel to the same condition as existed previously. Manager shall have the right to discontinue operating the Hotel to the extent it deems necessary to comply with applicable Legal



Requirements or as necessary for the safe and orderly operation of the Hotel. To the extent available, proceeds from the insurance described in Section 6.01 of this Agreement shall be applied to such repairs and/or replacements. If Owner fails to so promptly commence and complete the repairing and/or replacement of the Hotel so that it shall be substantially the same as it was prior to such damage or destruction, such failure shall be an Event of Default by Owner.

7.02    Condemnation

A.      In the event all or substantially all of the Hotel shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Hotel shall be so taken, but the result is that it is unreasonable to continue to operate the Hotel in accordance with the standards required by this Agreement, this Agreement shall terminate. Owner and Manager shall each have the right to initiate such proceedings as they deem advisable to recover any compensation to which they may be entitled.

B.      In the event a portion of the Hotel shall be taken by the events described in Section 7.02.A, or the entire (or portion of the) Hotel is affected but on a temporary basis, and the result is not to make it unreasonable to continue to operate the Hotel, this Agreement shall not terminate. However, so much of any award for any such partial taking or condemnation as shall be necessary to render the Hotel equivalent to its condition prior to such event shall be used for such purpose; and Manager shall have the right to discontinue operating the Hotel to the extent it deems necessary for the safe and orderly operation of the Hotel.

## ARTICLE VIII

## OWNERSHIP OF THE HOTEL

8.01    Ownership of the Hotel

A.      Owner hereby covenants that it holds good and marketable fee title to the Site, subject to the exceptions set forth on Exhibit E (the "Permitted Exceptions"), and that, upon completion of the Hotel, it will have, keep, and maintain good and marketable fee title to the Hotel free and clear of any and all liens, encumbrances or other charges, except as follows:

1.      easements or other encumbrances (other than those described in Section 8.01.A.2 and Section 8.01.A.3 hereof) that do not adversely affect the operation of the Hotel by Manager and that are not prohibited pursuant to Section 8.04 of this Agreement or the Permitted Exceptions;

2.      Qualified Mortgages; or

3.      liens for taxes, assessments, levies or other public charges not yet due or due but not yet payable.

33



B.      Owner shall pay and discharge, on or before the due date, any and all payments due under any Mortgage that Owner has entered into with respect to the Hotel.  Owner shall indemnify, defend, and hold Manager harmless from and against all claims, litigation and damages arising from the failure to make any such payments as and when required; and this obligation of Owner shall survive Termination.  Manager shall have no responsibility for payment of debt service due with respect to the Hotel, from Gross Revenues or otherwise, and such responsibility shall be solely that of Owner.

C.      Owner covenants that Manager shall quietly hold, occupy and enjoy the Hotel in accordance with the terms of this Agreement throughout the Term hereof free from hindrance, ejection or molestation by Owner or any other party claiming under, through or by right of Owner.  Owner agrees to pay and discharge any payments and charges and, at its expense, to prosecute all appropriate actions, judicial or otherwise, necessary to assure such free and quiet occupation.

8.02    Mortgages

A.      Owner shall be permitted to encumber the Hotel and/or the Site with any Mortgage, provided that such Mortgage meets all of the following requirements:

1.      The proposed Mortgage is from an Institutional Lender and is on commercially reasonable terms and conditions;

2.      As of the date of the closing of the proposed financing, the aggregate principal balance of all Mortgages encumbering the Hotel, including the proposed Mortgage, shall be no greater than seventy-five percent (75%) of the fair market value of the Hotel;

3.      As of the date of the closing of the proposed financing, the ratio of (i) the total, aggregate Operating Profit for the thirteen (13) most recent full Accounting Periods immediately preceding such date (or in the event the Hotel has undergone a major renovation during such thirteen (13) Accounting Periods, the thirteen (13) most recent full Accounting Periods immediately preceding the commencement of the major renovation) to (ii) the annual debt service for all Mortgages encumbering the Hotel, including the proposed Mortgage, equals or exceeds one and one-quarter to one (1.25:1); and

4.      Owner, Manager and the holder of such Mortgage shall have entered into a Subordination Agreement (to be recorded in the real property records in the jurisdiction where the Site is located) as further described in Section 8.03.

B.      For purposes of this Section 8.02, the fair market value of the Hotel shall be reasonably determined by a licensed appraiser with a nationally recognized company.  If Owner and Manager do not agree on such fair market value, either party may request that a nationally recognized licensed appraiser (reasonably acceptable to both parties) shall determine the fair market value of the Hotel.  If the parties cannot agree on an appraiser within ten (10) days after



the date on which either party notifies the other that it wishes to have the fair market value of the Hotel be determined by an appraisal, either party may elect to have such fair market value determined by a panel of Experts pursuant to Section 11.20. Any Mortgage which meets all of the requirements set forth in this Section 8.02 shall be referred to in this Agreement as a "Qualified Mortgage."

C.      In the event Manager receives any reasonable request for information on the Hotel from the holder of any Qualified Mortgage (and including any Affiliate of Manager providing any financing in connection with the Hotel), Owner agrees that Manager is hereby authorized to provide or distribute such information directly to such lender.

D.      Prior to closing on any Mortgage, Owner shall pay to Manager, at Owner's sole cost, an amount equal to Manager's actual, reasonable out-of-pocket expenses for outside legal services incurred by Manager in connection with such Mortgage.

8.03    Subordination, Non-Disturbance and Attornment

A.      Owner shall obtain from any Mortgagee which holds a Mortgage as of the Effective Date or thereafter an agreement (the "Subordination Agreement"), which (i) is reasonably satisfactory in all respects to Manager and such Mortgagee, and (ii) shall be recordable in the jurisdiction where the Hotel is located, pursuant to which:

1.      The right, title and interest of Manager in and to the Hotel under this Agreement shall be subject and subordinate to the lien of the Mortgage;

2.      If there is a Foreclosure of such Mortgage, and Termination of this Agreement has not occurred, Manager shall be obligated to each Subsequent Owner to perform all of the terms and conditions of this Agreement for the balance of the remaining Term hereof, with the same force and effect as if such Subsequent Owner were the Owner; and

3.      If there is a Foreclosure of such Mortgage, (i) this Agreement shall not be terminated, (ii) Mortgagee and all Subsequent Owners shall recognize Manager's rights under this Agreement, (iii) Manager shall not be named as a party in any Foreclosure action or proceeding, and (iv) Manager shall not be disturbed in its right to manage and operate the Hotel pursuant to the provisions of this Agreement.

B.      In the event that the Subordination Agreement contains provisions requiring Manager (upon a default under the Mortgage, or upon various other stipulated conditions) to pay certain amounts which are otherwise due to Owner under this Agreement to the Mortgagee or its designee (rather than to Owner), Owner hereby gives its consent to such provisions, which consent shall be deemed to be irrevocable until the entire debt secured by the Mortgage has been discharged.

C.      Prior to encumbering the Hotel or the Site with any Mortgage, Owner shall obtain from the proposed Mortgagee an executed, recordable Subordination Agreement.  Manager

35



agrees to execute such Subordination Agreement for the benefit of such proposed Mortgagee.  If
Owner encumbers the Hotel or the Site with a Mortgage without first obtaining such a
Subordination Agreement from the Mortgagee:  (i) it shall constitute an Event of Default by
Owner; and (ii) in addition, Manager shall thereafter have a continuing right to terminate this
Agreement upon sixty (60) days' prior written notice to Owner, unless Owner obtains a
Subordination Agreement prior to Manager's exercise of such termination right.  In addition, any
Mortgage described in the preceding sentence shall be subject and subordinate to Manager's
rights under this Agreement.

      D.      Notwithstanding the subordination of this Agreement which is described in
Section 8.03.A.1, if, in connection with the exercise by any Mortgagee of its remedies under any
Mortgage which causes Owner to default under this Agreement shall constitute an Event of
Default by Owner.

      8.04   No Covenants, Conditions or Restrictions

      A.      Owner covenants that, as of the Effective Date and during the Term, there will not
be (unless Manager has given its prior consent thereto) any covenants, conditions or restrictions,
including reciprocal easement agreements or cost-sharing arrangements (individually or
collectively referred to as "CC&R(s)") affecting the Site or the Hotel, other than the Permitted
Exceptions, (i) which would prohibit or limit Manager from operating the Hotel in accordance
with the System Standards, including related amenities proposed for the Hotel; (ii) which would
allow the Hotel facilities (for example, parking spaces) to be used by persons other than guests,
invitees or employees of the Hotel; (iii) which would allow the Hotel facilities to be used for
specified charges or rates which have not been approved by Manager; or (iv) which would
subject the Hotel to exclusive arrangements regarding food and beverage operation or retail
merchandise.

      B.      Unless otherwise agreed by both Owner and Manager, all financial obligations
imposed on Owner or on the Hotel pursuant to any CC&Rs shall be paid by Owner from its own
funds, and not from Gross Revenues or from the FF&E Reserve unless any such financial
obligation would have been treated as a Deduction if such obligation had been a direct expense
related solely to the Hotel and not included in a CC&R expense.  Manager's consent to any such
CC&R shall be conditioned (among other things) on satisfactory evidence that:  (i) the CC&R in
question provides a reasonable benefit to the operation of the Hotel; (ii) the costs incurred
(including administrative expenses) pursuant to such CC&R will be both reasonable and
allocated to the Hotel on a reasonable basis; and (iii) no capital expenditures incurred pursuant to
said CC&R will be paid from Gross Revenues or from the FF&E Reserve (but rather, such
capital expenditures will be paid separately by Owner).

      8.05   Liens; Credit

      Manager and Owner shall use commercially reasonable efforts to prevent any liens from
being filed against the Hotel which arise from any maintenance, repairs, alterations,
improvements, renewals or replacements in or to the Hotel, and shall cooperate fully in obtaining



the release of any such liens. The cost of releasing any lien shall be treated the same as the cost of the matter to which it relates. In no event shall either party borrow money in the name of or pledge the credit of the other.

# ARTICLE IX

## DEFAULTS

### 9.01    Events of Default

Each of the following shall constitute a "Default" under this Agreement.

A.     The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by either party, or the admission by either party that it is unable to pay its debts as they become due. Upon the occurrence of any Default by either party (referred to as the "defaulting party") as described under this Section 9.01.A, said Default shall be deemed an "Event of Default" under this Agreement. The parties expressly agree that such Event of Default would have a material adverse effect on the non-defaulting party.

B.     The consent to an involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by either party. Upon the occurrence of any Default by either party as described under this Section 9.01.B, said Default shall be deemed an "Event of Default" under this Agreement. The parties expressly agree that such Event of Default would have a material adverse effect on the non-defaulting party.

C.     The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating either party as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree's continuing unstayed and in effect for an aggregate of sixty (60) days (whether or not consecutive). Upon the occurrence of any Default by either party as described under this Section 9.01.C, said Default shall be deemed an "Event of Default" under this Agreement. The parties expressly agree that such Event of Default would have a material adverse effect on the non-defaulting party.

D.     The failure of either party to make any payment required to be made in accordance with the terms of this Agreement, as of the due date as specified in this Agreement. Upon the occurrence of any Default by either party as described under this Section 9.01.D, said Default shall be deemed an "Event of Default" under this Agreement if the defaulting party fails to cure such Default within ten (10) days after receipt of written notice from the non-defaulting party demanding such cure.

E.     Subject to the provisions of Section 4.1 of the Technical Services Agreement, the failure of Owner to complete the design, construction, furnishing and equipping of the Hotel



Improvements, or cause the Flagging Date to occur, in the manner contemplated by the Technical Services Agreement on or before the dates set forth in the time schedules mutually approved by Owner and Manager in Section 4.1 of the Technical Services Agreement and in accordance with the time periods set forth in Section 4.1 of the Technical Services Agreement. Upon the occurrence of any Default by Owner as described under this Section 9.01.E, said Default shall be deemed an "Event of Default" under this Agreement if Owner fails to cure the Default within thirty (30) days after receipt of written notice from Manager demanding such cure.

F.      Owner or any of Owner's Affiliates is or becomes a Specially Designated National or Blocked Person. Upon the occurrence of any Default as described in this Section 9.01.F, said Default shall be deemed an "Event of Default" under this Agreement. The parties expressly agree that such Event of Default would have a material adverse effect on the non-defaulting party.

G.      The failure of either party to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after the defaulting party's receipt of written notice from the non-defaulting party of said failure. Upon the occurrence of any Default by either party as described under this Section 9.01.G, said Default shall be deemed an "Event of Default" under this Agreement if the defaulting party fails to cure the Default within thirty (30) days after receipt of written notice from the non-defaulting party demanding such cure, or, if the Default is such that it cannot reasonably be cured within said thirty (30) day period of time, if the defaulting party fails to commence the cure of such Default within said thirty (30) day period of time or thereafter fails to diligently pursue such efforts to completion.

9.02    Remedies

A.      Upon the occurrence of an Event of Default, the non-defaulting party shall have the right to pursue any one or more of the following courses of action:

(i)      To institute forthwith any and all proceedings permitted by law or equity with respect to such Event of Default, including, without limitation (but subject to the provisions of Section 11.20 and Section 11.21 hereof), actions for specific performance and/or damages;

(ii)     To avail itself of the remedies described in Section 9.03; and

(iii)    To terminate this Agreement, provided, however, that a non-defaulting party may not terminate this Agreement on the basis of an Event of Default unless and until (x) such Event of Default has a material adverse effect on the non-defaulting party or the operations or financial performance of the Hotel, and (y) if the defaulting party contests the occurrence of the Event of Default or its effect on the non-defaulting party, a court of competent jurisdiction has issued a final, binding and non-appealable order finding that the Event of Default has occurred and that it has such a material adverse effect. The cure periods described under Section 9.01.D and Section 9.01.G shall be tolled until such order is issued.



B.      A non-defaulting party that has the right to terminate this Agreement pursuant to Section 9.02.A(iii) shall do so by written notice to the defaulting party submitted after satisfaction of the provisions of Section 9.02.A(iii).  Such termination shall be effective as of the effective date set forth in such notice, provided that such effective date shall occur at least thirty (30) days after the date on which the defaulting party receives such notice and further provided that, if the defaulting party is Manager, such period of thirty (30) days shall be extended to seventy-five (75) days (or such longer period of time as may be necessary under Legal Requirements pertaining to termination of employment).

9.03    Additional Remedies

A.      Upon the occurrence of a Default by either party under the provisions of Section 9.01.D, the amount owed to the non-defaulting party shall accrue interest, at an annual rate equal to the Prime Rate plus three (3) percentage points, from and after the date on which the Default occurred.

B.      Upon the occurrence of a Default by Owner under the provisions of Section 9.01.D, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount (plus accrued interest as described in Section 9.03.A) owed to Manager by Owner from distributions otherwise payable to Owner pursuant to Section 3.02 and Section 4.01 of this Agreement.

C.      Manager and/or any Affiliate of Manager shall be entitled, in case of any breach of the covenants of Section 11.11.E, Section 11.11.F or Section 11.12 by Owner or others claiming through it, to injunctive relief and to any other right or remedy available at law or in equity.

D.      The remedies granted under Section 9.02 and Section 9.03 shall not be in substitution for, but shall be in addition to, any and all rights and remedies available to the non-defaulting party (including, without limitation, injunctive relief and damages) by reason of applicable provisions of law or equity and shall survive Termination.


# ARTICLE X

## ASSIGNMENT AND SALE

10.01   Assignment

A.      Manager shall not assign or transfer its interest in this Agreement without the prior consent of Owner; provided, however, that Manager shall have the right, without Owner's consent, to (1) assign its interest in this Agreement to Marriott or any Affiliate of Marriott, (2) assign its interest in this Agreement in connection with a merger or consolidation or a sale of all or substantially all of the assets of Manager or Marriott, and (3) assign its interest in this



Agreement in connection with a merger or consolidation or a sale of all or substantially all of the Boutique System assets owned by Manager, Marriott or any Affiliate of Manager or Marriott.

B.     Owner shall not assign or transfer its interest in this Agreement without the prior consent of Manager; provided, however, that Owner shall have the right, without such consent, to (1) conditionally assign this Agreement as security for a Mortgage encumbering the Hotel in accordance with this Agreement, and (2) assign its interest in this Agreement in connection with a Sale of the Hotel which complies with the provisions of Section 10.02 of this Agreement.

C.     In the event either party consents to an assignment or transfer of this Agreement by the other, no further assignment or transfer shall be made without the express consent in writing of such party, unless such assignment or transfer may otherwise be made without such consent pursuant to the terms of this Agreement.  An assignment or transfer by either Owner or Manager of its interest in this Agreement shall not relieve Owner or Manager, as the case may be, from its respective obligations under this Agreement, and shall inure to the benefit of, and be binding upon, its respective successors, heirs, legal representatives, or assigns. Notwithstanding the foregoing, a Sale of the Hotel made in compliance with the provisions of Section 10.02 below shall relieve Owner of its obligations and liabilities under this Agreement arising or accruing from and after the effective date of such Sale of the Hotel provided the purchaser assumes the obligations of Owner hereunder arising or accruing from and after such date in form and substance reasonably satisfactory to Manager.

10.02   Sale of the Hotel

A.     Owner shall not enter into any Sale of the Hotel to any Person (or any Affiliate of any Person) who:  (1) does not, in Manager's reasonable judgment, have sufficient financial resources and liquidity to fulfill Owner's obligations under this Agreement; (2) is known in the community as being of bad moral character, or has been convicted of a felony in any state or federal court, or is in control of or controlled by persons who have been convicted of felonies in any state or federal court(provided, however, the felony conviction in and of itself will not bar a person who has otherwise generally been deemed rehabilitated within the business community); (3) is engaged in the business of operating (as distinguished from owning or financing) a brand of hotels or other lodging facilities (or operating a group of hotels or other lodging facilities that are not affiliated with a brand but that are marketed and operated as a collective group) in competition with Manager, Marriott or any Affiliate of either; or (4) is, or any of its Affiliates or any other Person related to such Person that is proscribed by applicable law is, a Specially Designated National or Blocked Person.  For purposes hereof, a Person who, following the closing of a Sale of the Hotel would have a verifiable net worth, determined in accordance with generally accepted accounting principles, of at least ten percent (10%) of the purchase price of the Hotel shall be conclusively deemed to have sufficient financial resources and liquidity to fulfill Owner's obligations under this Agreement.

B.     If Owner decides to negotiate a Sale of the Hotel to a third party, then prior to offering the Hotel for sale or negotiating a Sale of the Hotel with any third party, Owner will give Manager notice of such decision, and both Owner and Manager will, during the period of



thirty (30) days after such notice, attempt in good faith to negotiate a mutually satisfactory agreement for the purchase of the Hotel at a price and on terms acceptable to Owner, in Owner's sole discretion.  For purposes of this Section 10.02.B, a sale to a third party shall not include any transfer, sale or assignment to a Mortgagee nor to a sale at Foreclosure under a Mortgage.  If, after the expiration of thirty (30) days following the date of Owner's notice of its desire to sell the Hotel, Owner and Manager have not entered into a mutually acceptable agreement for the purchase of the Hotel, Owner shall be free to process a Sale of the Hotel to a third party, provided that any such Sale of the Hotel shall be subject to the following further conditions:

      1.     Owner shall deliver a written notice (the "Notice of Proposed Sale") of the proposed Sale of the Hotel to Manager stating the name of the prospective purchaser or tenant, as the case may be together with all other information reasonably requested by Manager.

      2.     Within fifteen (15) Business Days after the date of receipt of such Notice of Proposed Sale from Owner and such other information, Manager shall elect, by written notice to Owner, one of the following two (2) alternatives:

      a.     To consent to such Sale of the Hotel and to the assignment of this Agreement to such purchaser or tenant, provided that concurrently with the closing thereof, the purchaser or tenant, as the case may be, shall, by appropriate instrument in form satisfactory to Manager, assume all of Owner's obligations under this Agreement.  An executed original of such assumption agreement shall be delivered to Manager; or

      b.     To not consent to such proposed Sale of the Hotel, which refusal to consent may only be based upon such Sale of the Hotel not being in compliance with Section 10.02.A, in which event such Sale of the Hotel shall not be permitted hereunder and it shall be an Event of Default for Owner to proceed with such Sale of the Hotel.

      C.     If Manager shall fail to elect one of the alternatives set forth in Section 10.02.B.2, within said fifteen (15) Business Day period, such failure shall be deemed to constitute an election to consent under Section 10.02.B.2.a, and the provisions thereof shall prevail as if Manager had consented in writing thereto.  Any proposed Sale of the Hotel with respect to which a Notice of Proposed Sale has been delivered by Owner to Manager hereunder must be finalized within two hundred seventy (270) days following the delivery of such Notice of Proposed Sale.  Failing such finalization, such Notice of Proposed Sale, and any response thereto given by Manager, shall be null and void and all of the provisions of Section 10.02.B and Section 10.02.C must again be complied with before Owner shall have the right to finalize a Sale of the Hotel upon the terms contained in said Notice of Proposed Sale, or otherwise.

      D.     If Manager consents (or is deemed to have consented) to the proposed Sale of the Hotel, then Manager shall have the option to require (in lieu of receipt of the assumption agreement described in Section 10.02.B.2.a) that such purchaser or tenant enter into a new management agreement with Manager, which new management agreement will be on all of the terms and conditions of this Agreement (except as otherwise agreed by Manager and such purchaser or tenant) except that the Initial Term and Renewal Term(s) of any such new



agreement shall consist only of the balance of the Initial Term and Renewal Term(s) remaining under this Agreement at the time of execution of any such new management agreement. Such new management agreement shall be executed by Manager and such new owner at the time of closing of the Sale of the Hotel, and a memorandum of such new management agreement shall be executed by the parties and recorded immediately following recording of the deed or memorandum of lease (or assignment) and prior to recordation of any other documents.

E.    Owner hereby represents and warrants to Manager that: (i) neither Owner nor any of Owner's Affiliates nor any other Person related to Owner that is proscribed by applicable law is a Specially Designated National or Blocked Person; and (ii) its equity is directly and (if applicable) indirectly owned as shown on Exhibit F. In connection with the possibility of a Sale of the Hotel achieved by means of a transfer of the controlling interest in Owner, Owner shall, from time to time, within thirty (30) days after written request by Manager, furnish Manager with a list of the names and addresses of the direct and indirect owners of capital stock, partnership interest, or other proprietary interest of Owner.

F.    It is understood that no Sale of the Hotel shall reduce or otherwise affect: (i) the current level of Working Capital; (ii) the outstanding balance deposited in the FF&E Reserve; (iii) the outstanding balance in any of the Operating Accounts maintained by Manager pursuant to this Agreement; or (iv) Owner's Priority. If, in connection with any Sale of the Hotel, the selling Owner intends to withdraw, for its own use, any of the cash deposits described in the preceding sentence, the selling Owner must obtain the contractual obligation of the buying Owner to replenish those deposits (in the identical amounts) simultaneously with such withdrawal. The selling Owner is hereby contractually obligated to Manager to ensure that such replenishment in fact occurs. The obligations described in this Section 10.02.F shall survive such Sale of the Hotel and shall survive Termination.

G.    The terms and provisions of this Agreement shall be binding upon all successors to Owner's interest in the Site and/or the Hotel. Each selling Owner shall be obligated to Manager to obtain from each buying Owner an assumption (reasonably satisfactory to Manager) of this Agreement with respect to all obligations accruing from and after the date such assignee takes title to the Hotel, and this obligation of the selling Owner (as well as all other obligations under this Agreement) shall survive any Sale of the Hotel and any Termination of this Agreement.

H.    Manager shall have the right (without prejudice to its rights to declare an Event of Default and seek damages or other compensation) to terminate this Agreement, on thirty (30) days' written notice, if title to or possession of the Hotel is transferred by judicial or administrative process (including, without limitation, a Foreclosure, or a sale pursuant to an order of a bankruptcy court, or a sale by a court-appointed receiver) to an individual or entity which would not qualify as a permitted transferee under Section 10.02.A, regardless of whether or not such transfer is the voluntary action of the transferring Owner, or whether (under applicable law) the Owner is in fact the transferor.



I.      Prior to closing on any Sale of the Hotel, Owner shall pay to Manager, at Owner's sole cost, an amount equal to Manager's actual, reasonable out-of-pocket expenses for outside legal services incurred by Manager in connection with such Sale of the Hotel (collectively, the "Transfer Fee"). Payment of the Transfer Fee is intended to cover costs incurred by Manager as a result of the Sale of the Hotel.

<h1 align="center">ARTICLE XI</h1>

<h2 align="center">MISCELLANEOUS</h2>

### 11.01   Right to Make Agreement

Each party warrants, with respect to itself, that neither the execution of this Agreement nor the finalization of the transactions contemplated hereby shall violate any provision of law or judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, other commitment or restriction to which it is a party or by which it is bound; or require any consent, vote or approval which has not been taken, or at the time of the transaction involved shall not have been given or taken. Each party covenants that it has and will continue to have throughout the Term and any extensions thereof, the full right to enter into this Agreement and perform its obligations hereunder.

### 11.02   Consents and Cooperation

Wherever in this Agreement the consent or approval of Owner or Manager is required, such consent or approval unless otherwise noted shall not be unreasonably withheld, delayed or conditioned, shall be in writing and shall be executed by a duly authorized officer or agent of the party granting such consent or approval. If either Owner or Manager fails to respond within thirty (30) days to a request by the other party for a consent or approval, such consent or approval shall be deemed to have been given, except (i) as otherwise expressly provided in this Agreement, or (ii) in the case of consents or approvals that may be granted or withheld in the sole discretion of a party, in which case a failure to respond shall be deemed to be a withholding of consent or approval. Additionally, subject to Section 1.16, Owner agrees to cooperate with Manager by executing such leases, subleases, licenses, concessions, equipment leases, service contracts and other agreements negotiated in good faith by Manager and pertaining to the Hotel that, in Manager's reasonable judgment, should be made in the name of the Owner. Each Owner shall be bound by the approvals and consents granted by any prior Owner.

### 11.03   Relationship

In the performance of this Agreement, Manager shall act solely as an independent contractor; provided, however, Manager shall be deemed to be a fiduciary solely with respect to any funds held by it in the Operating Accounts, the FF&E Reserve or any other funds held by Manager or its Affiliates for Owner (or as part of the MBS System, but not for any other purpose



or function or with respect to any other duty or function under this Agreement).  Neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted, deemed or construed as making Manager a partner, joint venture with, or agent of, Owner.  Owner and Manager agree that neither party will make any contrary assertion, claim or counterclaim in any action, suit, Expert resolution pursuant to Section 11.20, arbitration or other legal proceedings involving Owner and Manager.

11.04    Applicable Law and Venue

This Agreement is executed pursuant to, and shall be construed under and governed exclusively by, the laws of the State of New York applicable to contracts formed and to be performed entirely within the State of New York, without regard to New York choice of law rules.  Except for any determinations to be made by the panel of Experts pursuant to the terms and conditions of this Agreement, each party hereby expressly and irrevocably submits itself to the non-exclusive jurisdiction of the United States District Court for the District of Hawaii to the fullest extent that Court has subject matter jurisdiction, and otherwise to the non-exclusive jurisdiction of the Courts of the State of Hawaii in and for the jurisdiction or judicial district in which the Hotel is located.  This consent to personal jurisdiction shall be self operative.

11.05    Recordation

The terms and provisions of this Agreement shall run with the parcel of land designated as the Site, and with Owner's interest therein, and shall be binding upon all successors to such interest.  Simultaneously with the execution of this Agreement, the parties shall execute a recordable "Memorandum of Management Agreement," in the form which is attached hereto as Exhibit G.  Such memorandum shall be recorded or registered promptly following the Effective Date in the jurisdiction in which the Hotel is located.  Any cost of such recordation shall be reimbursed from Gross Revenues and treated as a Deduction.

11.06    Headings

Headings of articles and sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular articles or sections to which they refer.

11.07    Notices

Notices, statements and other communications to be given under the terms of this Agreement shall be in writing and delivered by hand against receipt or sent by certified or registered mail, postage prepaid, return receipt requested or by nationally utilized overnight delivery service, addressed to the parties as follows:



To Owner:        M Waikiki LLC
c/o eRealty Fund, LLC
12780 High Bluff Drive, Suite 160
San Diego, California 92130
Attn:   Ed Bushor and Gary Stougaard
Phone: (858) 350-5599
Fax:   (858) 350-5585

with copy to:     Michael S. Kosmas, Esq.
Squire, Sanders & Dempsey L.L.P.
1201 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20004
Phone: (202) 626-6600
Fax: (202) 626-6780

To Manager:     Marriott Hotel Services, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817
Attn:   Law Department 52/923 - Hotel Operations
Phone: (301) 380-9555
Fax:   (301) 380-6727

with copy to:     Marriott Hotel Services, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817
Attn:   Senior Vice President, Finance & Accounting
Dept. 51/918.04
Phone: (301) 380-6577
Fax:   (301) 380-5577

or at such other address as is from time to time designated by the party receiving the notice.  Any such notice that is mailed in accordance herewith shall be deemed received when delivery is received or refused, as the case may be.  Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery service by no later than the second (2nd) business day following such transmission.  Telephone facsimiles shall be deemed delivered on the date of such transmission, if received during the receiving party's normal business hours or, if not received during the receiving party's normal business hours, then on the next succeeding date on which the receiving party is open for normal business.

11.08   <u>Environmental Matters</u>

    A.   Owner hereby represents and warrants to Manager that, to Owner's actual knowledge, as of the Effective Date, there are no Hazardous Materials (as defined below) on any



portion of the Site or the Hotel, nor have any Hazardous Materials been released or discharged on any portion of the Site or the Hotel in either instance in violation of any Environmental Law. Owner's actual knowledge shall mean the actual knowledge of Ed Bushor and Gary Stougaard, who Owner represents and warrants are the individuals affiliated with Owner who are most knowledgeable about the environmental condition of the Site. In addition, Owner hereby represents and warrants that it has previously delivered to Manager copies of all reports concerning environmental conditions which have been received by Owner or any of its Affiliates. In the event of the discovery of Hazardous Materials on any portion of the Site or in the Hotel during the Term, if and to the extent required by Environmental Laws, Owner shall promptly remove such Hazardous Materials, together with all contaminated soil and containers, and shall otherwise remedy the problem in accordance with: (1) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as amended; (2) the regulations promulgated thereunder, from time to time; (3) all federal, state and local laws, rules and regulations (now or hereafter in effect) dealing with the use, generation, treatment, storage, disposal or abatement of Hazardous Materials; and (4) the regulations promulgated thereunder, from time to time (collectively referred to as "Environmental Laws"). Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including, without limitation, reasonable engineers' and attorneys' fees and expenses, and the cost of litigation) arising from the presence of Hazardous Materials on the Site or in the Hotel, except to the extent the same arise from a violation of Environmental Laws by Manager in the course of its management of the Hotel and which violation constitutes (a) willful misconduct or gross negligence on the part of a member of the Hotels' executive team or a corporate employee of Marriott International, Inc. or its Affiliates based at Marriott International, Inc. or its Affiliates' headquarters or regional offices, or any other management level employees of Marriott International, Inc. or any of its Affiliates, wherever located, or (b) is a direct result of any actions of a member of the Hotel's executive team following a corporate policy of Manager. The foregoing obligation of Owner shall survive Termination. "Hazardous Materials" shall mean and include any substance or material containing one or more of any of the following: "hazardous material," "hazardous waste," "hazardous substance," "regulated substance," "petroleum," "pollutant," "contaminant," "polychlorinated biphenyls," "lead or lead-based paint" or "asbestos" as such terms are defined in any applicable Environmental Law in such concentration(s) or amount(s) as may impose clean-up, removal, monitoring or other responsibility under the Environmental Laws, as the same may be amended from time to time, or which may present a significant risk of harm to guests, invitees or employees of the Hotel. Manager shall indemnify, defend and hold Owner harmless from and against all loss, costs, liability and damage (including, without limitation, reasonable engineers' and attorneys' fees and expenses, and the cost of litigation) arising from the presence of Hazardous Materials on the Site or in the Hotel to the extent the same arise from a violation of Environmental Laws by Manager in the course of its management of the Hotel and which violation (a) constitutes willful misconduct or gross negligence on the part of a member of the Hotel's executive team or a corporate employee of Marriott International, Inc. or its Affiliates based at Marriott International, Inc. or its Affiliates' headquarters or regional offices, or any other management level employees of Marriott International, Inc. or any of its Affiliates, wherever located, or (b) is a direct result of any actions of a member of the Hotel's executive team following a corporate policy of Manager. The foregoing obligation of Manager shall survive Termination.



B.     All costs and expenses of the aforesaid removal of Hazardous Materials from the Site or the Hotel, and of the aforesaid compliance with all Environmental Laws, and any amounts paid to Manager pursuant to the indemnity set forth in Section 11.08.A (but in any event excluding any amounts for which Manager has an indemnification obligation pursuant to the indemnity set forth in Section 11.08.A), shall be paid by Owner from its own funds, and not from Gross Revenues or from the FF&E Reserve.

11.09   Confidentiality

Owner and Manager agree that the terms of this Agreement are strictly confidential and will use their reasonable efforts to ensure that such matters and information are not disclosed to any outside person or entities without the prior consent of the other party, except (but in all events subject to the provisions of Section 11.12.B) as required by law or, to the extent necessary, (i) to obtain licenses, permits and other public approvals, (ii) in connection with a Sale of the Hotel or seeking to obtain a Qualified Mortgage with respect to the Hotel, or (iii) in connection with a financing or sale of Manager or Marriott or its or their corporate assets. Owner acknowledges that competitive information regarding brands, customers, marketing, operating or other strategies (including information related to other hotels) is confidential and proprietary to Manager and shall not be disclosed to Owner.

11.10   Projections

Owner acknowledges that any written or oral projections, pro formas, or other similar information that has been (prior to execution of this Agreement) or will (during the Term) be provided by Manager or Marriott (or any Affiliate of either) to Owner is for information purposes only, and that Manager, Marriott, and any such Affiliate do not guarantee that the Hotel will achieve the results set forth in any such projections, pro formas, or other similar information. Owner further acknowledges that (i) any such projections, pro formas, or other similar information are based on assumptions and estimates, and (ii) unanticipated events may occur subsequent to the date of preparation of such projections, pro formas, and other similar information which impact the performance of the Hotel, and (iii) the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, pro formas, or other similar information and such variations might be material.  In providing any assumptions and/or estimates to Manager, Owner does not guaranty that such assumptions are correct, and Manager acknowledges such fact and that such assumptions and/or estimates may vary from the actual results and such variation may be material.

11.11   Actions to be Taken Upon Termination

Upon a Termination, the following shall be applicable:

A.     Manager shall, within ninety (90) days after Termination, prepare and deliver to Owner a final accounting statement with respect to the Hotel, as more particularly described in Section 4.02 hereof, along with a statement of any sums due from Owner to Manager pursuant



hereto, dated as of the date of Termination. Within thirty (30) days of the receipt by Owner of such final accounting statement, the parties will make whatever cash adjustments are necessary pursuant to such final statement. The cost of preparing such final accounting statement shall be a Deduction, unless the Termination occurs as a result of a Default by either party, in which case the defaulting party shall pay such cost. Manager and Owner acknowledge that there may be certain adjustments for which the information will not be available at the time of the final accounting and the parties agree to readjust such amounts and make the necessary cash adjustments when such information becomes available; provided, however, that all accounts shall be deemed final as of the first (1st) anniversary of the effective date of Termination.

B.    Upon delivery to Owner of the final accounting statement, Manager shall release and transfer to Owner any of Owner's funds which are held or controlled by Manager with respect to the Hotel with the exception of funds to be held in accordance with Section 6.02.B.5, Section 11.11.G and Section 11.11.I and otherwise in accordance herewith.

C.    Manager shall make available to Owner such Books and Records (including those from prior years, subject to Manager's reasonable records retention policies) as will be needed by Owner to prepare the accounting statements, in accordance with the Uniform System of Accounts, for the Hotel for the year in which the Termination occurs and for any subsequent year. Manager shall also provide to Owner all information in Manager's possession or control with respect to future bookings.

D.    Manager shall (to the extent permitted by law) assign to Owner or to the new manager all operating licenses and permits for the Hotel which have been issued in Manager's name (including liquor and restaurant licenses, if any); provided that if Manager has expended any of its own funds in the acquisition of any of such licenses or permits, Owner shall reimburse Manager therefor if it has not done so already.

E.    Manager shall have the option, to be exercised within thirty (30) days after Termination, to purchase, at their then fair market value, any items of the Hotel's Inventories and Fixed Asset Supplies as may be marked with any EDITION Trademarks or Boutique Trademarks. Upon Termination, all use of or right to use the EDITION Trademarks and Boutique Trademarks at or in connection with the Hotel shall cease forthwith, and Owner shall: (i) immediately, as of the date of such Termination, place coverings over any signs or similar identification which contain any of the EDITION Trademarks or Boutique Trademarks, or shall otherwise render such signs or other similar identification not visible to the public; (ii) remove any such signs or similar identification from the Hotel by no later than ten (10) days after the date of Termination; and (iii) immediately, as of the date of such Termination, remove from the Hotel all Fixed Asset Supplies, Inventories and other items bearing any EDITION Trademark or Boutique Trademark or remove all EDITION Trademarks and Boutique Trademarks from such items. If Owner has not removed such signs or other items bearing EDITION Trademarks or Boutique Trademarks within ten (10) days after Termination, Manager shall have right to do so at Owner's expense; and if Owner fails to reimburse Manager for such expense within ten (10) days after receipt of written notice thereof from Manager to Owner, then Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw



the amount of such expenses from the Operating Accounts, the FF&E Reserve, or any other funds of Owner held by or under the control of Manager.  Manager shall have the right to seek injunctive or other relief in a court of competent jurisdiction to enforce the foregoing provisions, and if such enforcement shall be necessary, Owner shall bear all of Manager's costs of such enforcement, including attorneys' fees.

F.      All Software used at the Hotel which is owned by any of the Marriott Companies or the licensor of any of them is proprietary to such Marriott Company or the licensor of any of them, and shall in all events remain the exclusive property of such Marriott Company or the licensor of any of them, as the case may be, and nothing contained in this Agreement shall confer on Owner the right to use any of such Software.  Manager shall have the right to remove from the Hotel without compensation to Owner any Software (including upgrades and replacements).  Furthermore, upon Termination, notwithstanding Section 5.04 hereof, Manager shall be entitled to remove from the Hotel any computer equipment which is:  (i) owned by a party other than Owner (without reimbursement to Owner); or (ii) owned by Owner, but utilized as part of a centralized reservation or property management system (with reimbursement to Owner of all previous expenditures made by Owner with respect to such equipment, subject to a reasonable allowance for depreciation).  Notwithstanding the foregoing, provided that Owner and new manager execute Manager's then-current license agreement, for ninety (90) days following the Termination, Manager shall, subject to its rights and obligations under third-party license agreements, provide a limited, non-transferable, non-exclusive license to use, on an "as is" basis with no warranties of any kind, those items of the Software located at the Hotel that consist of the components of the property management system (to be mutually identified) that are directly necessary for the ongoing operation of the Hotel (such as checking guests in and out and preparing guest folios, but specifically excluding Manager's reservations and yield management systems).  Such use shall be for the sole purpose of allowing an orderly transition of Hotel management to a new manager.

G.      A reserve shall be established from Gross Revenues to reimburse Manager for all costs and expenses incurred by Manager (a) that may accrue after Termination, but that result or relate to Manager's operation and management of the Hotel prior to Termination (including, without limitation, costs and expenses relating to sales, use and occupancy tax liability), and (b) in terminating its employees at the Hotel, such as severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of Manager's employees at the Hotel.  If Gross Revenues are insufficient to meet the requirements of such reserve, then Owner shall deliver to Manager, within ten (10) days after receipt of Manager's written request therefor, the sums necessary to establish such reserve; and if Owner fails to timely deliver such sums to Manager, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the Operating Accounts, the FF&E Reserve, or any other funds of Owner held by or under the control of Manager.  The reserve described in this Section 11.11.G shall be in addition to the reserve described in Section 6.02.B.5.

H.      Owner shall cause the entity which shall succeed Manager as the operator of the Hotel to hire a sufficient number of the employees at the Hotel to avoid the occurrence, in



connection with such Termination, of a "plant closing" or "mass layoff" under the WARN Act or an equivalent occurrence under any comparable state law.

I.       Prior to such Termination, Owner shall repay to Manager the amounts, if any, that Manager has funded through such date pursuant to the provisions of Section 4.09(ii) and that remain outstanding and payable to Manager (plus any interest due thereon). If Owner does not make such repayment, Manager shall have the right to withhold and retain such amounts from any Working Capital or other funds held or controlled by Manager with respect to the Hotel.

J.       Various other actions shall be taken, as described in this Agreement, including, but not limited to, the actions described in Section 4.09 and Section 6.02.B.5.

K.       Manager shall peacefully vacate and surrender the Hotel to Owner.

The provisions of this Section 11.11 shall survive Termination.

11.12   <u>Trademarks and Intellectual Property</u>

A.       From the Opening Date until the Flagging Date, the Hotel shall be known by such name as Owner and Manager reasonably agree (the "Pre-Flagging Name"). Subject to the agreement of Owner and Manager as to the Pre-Flagging Name in accordance with the preceding sentence, Manager will not object to Owner's use or ownership of the Pre-Flagging Name at the Hotel, provided that the Pre-Flagging Name or any non-generic element thereof, when selected, is not owned or used by Manager, its Affiliates or any other third party. From and after the Flagging Date and during the remainder of the Term, the Hotel shall be known as the "Waikiki EDITION Hotel," or such other name as the parties may reasonably agree, with such alternative identification determined by Manager from time to time to be necessary to provide local or specific geographic definition to the name of the Hotel. However, if the name of the EDITION Hotel System is changed on a system-wide, regional or country-specific basis, Manager will have the right to change the name of the Hotel to conform thereto.

B.       Manager represents and warrants that Marriott owns the trademark applications or registrations for the mark EDITION listed on Exhibit I (the "Registered Marks"), and that the Registered Marks are valid and subsisting as of the date of this Agreement. Manager shall indemnify and defend Owner against any and all claims by third parties against Owner arising out of Manager's breach of the foregoing representation and warranty, provided, however that Owner gives prompt written notice of any such claim to Manager, permits Manager and its Affiliates to have sole control over the defense and settlement of the claim(at Manager's and its Affiliates' sole cost and expense), and cooperates fully with Manager and its Affiliates in defending or settling the claim. Manager will not be obligated to indemnify or defend Owner (i) if there is a material Event of Default by Owner under this Agreement when a claim is made, or a material Event of Default by Owner under this Agreement occurs prior to the resolution of a claim; or (ii) if the claim is based on Owner's use of the Registered Marks outside the scope of or otherwise not authorized by this Agreement. Owner acknowledges that Manager and its Affiliates are or will be the sole and exclusive owners of all rights, title and interest to the



EDITION Trademarks and the other Boutique Trademarks, which shall in all events remain the exclusive property of Manager (or one of its Affiliates). All use of the EDITION Trademarks and the other Boutique Trademarks at or in connection with the Hotel, or as otherwise contemplated by this Agreement, shall be made solely by and inure solely to the benefit of Manager and its Affiliates. Nothing in this Agreement shall be construed to grant Owner any right of ownership in or right to use or license others to use the EDITION Trademarks or the other Boutique Trademarks. Owner may not use the EDITION Trademarks or the Boutique Trademarks without the prior written consent of Manager, which may be withheld in Manager's sole and absolute discretion, in any manner whatsoever, including, without limitation, the following:

1.      No reference to Manager, any Affiliate of Manager, or any EDITION Trademark or other Boutique Trademark will be made in any prospectus, private placement memorandum, offering circular or offering documentation related thereto (collectively referred to as the "Prospectus"), issued by Owner or by one of Owner's Affiliates or by one or more Mortgagees, which is designed to interest potential investors in debt or equity securities related to the Hotel, unless Manager has given its prior written approval to each such reference, which Manager may withhold in its sole and absolute discretion, provided, however, Owner shall have the right to reference in the Prospectus the name of the Hotel and the fact that Manager operates the Hotel pursuant to this Agreement. However, regardless of whether Manager has approved all such references, neither Manager nor any Affiliate of Manager will be deemed a sponsor of the offering described in the Prospectus, nor will it have any responsibility for the Prospectus, and the Prospectus will so state. Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including attorneys' fees and expenses, and the cost of Litigation) arising out of any Prospectus or the offering described therein.

2.      No reference to Manager, any Affiliate of Manager, or any EDITION Trademark or other Boutique Trademark will be made in any material prepared for the purpose of a Sale of the Hotel, unless Manager has given its prior written approval to each such reference.

3.      No Trade Name adopted by Owner or its Affiliates may include any EDITION Trademark or other Boutique Trademark or a term that is confusingly similar to an EDITION Trademark or other Boutique Trademark. Owner shall not apply for registration of any EDITION Trademark or other Boutique Trademark in any jurisdiction.

C.      All right, title and interest (including copyright and patent rights) to Intellectual Property shall at all times be the exclusive property of Manager (or any other Marriott Company), and all benefits obtained directly or indirectly from the use, sale or commercial exploitation of Intellectual Property shall belong exclusively to Manager and its Affiliates. Neither Manager nor any other Marriott Company shall be restricted in disclosing or using any Intellectual Property directly or indirectly by this Agreement, and Manager and any other Marriott Company shall have the right to use it for any purpose. Owner shall not have any rights to any Intellectual Property, shall treat as confidential any Intellectual Property in its possession, and shall not disclose to any third party any Intellectual Property or use any Intellectual Property



for any purpose whatsoever.  Upon Termination, all Intellectual Property shall be removed from the Hotel by Manager, without compensation to Owner, subject to the provisions of Section 11.11.E regarding EDITION Trademarks and Boutique Trademarks.

D.     Manager and/or its Affiliates shall be entitled, in case of any breach by Owner of any of the covenants of this Section 11.12, to injunctive relief and to any other right or remedy available at law or in equity.

E.     The provisions of this Section 11.12 shall survive Termination.

11.13   <u>Trade Area Restriction and Competing Facilities</u>

A.     Neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any Restricted Hotel within Restricted Area One during the period from the Effective Date to the earlier to occur of (i) the tenth (10th) anniversary of the Flagging Date, or (ii) July 1, 2020.

B.     Within Restricted Area One, during the period from the Effective Date to the earlier of (i) the fifth (5th) anniversary of the Flagging Date, or (ii) July 1, 2015:

1.     neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any hotel that is operated, owned, licensed or franchised by Manager or its Affiliates in which Schrager (or any entity in which Schrager has a controlling interest) has direct control or involvement over material aspects of hotel operations or hotel marketing; and

2.     neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any hotel that is operated, owned, licensed or franchised by Manager or its Affiliates that contains Schrager in the name of the hotel.

C.     Neither Manager nor any of its Affiliates shall open for business, or permit any other Person to open for business, any Restricted Hotel within Restricted Area Two during the period from the Effective Date to the earlier to occur of (i) the third (3rd) anniversary of the Flagging Date, or (ii) July 1, 2013.

D.     If Manager or any of its Affiliates opens for business, or permits any other Person to open for business The Kahala Hotel & Resort located at 5000 Kahala Avenue, Honolulu, HI as a hotel that is operated, owned, licensed or franchised by Manager or any of its Affiliates (i) that uses EDITION Trademarks in the name of such hotel and as a part of the EDITION Hotel System; (ii) in which Schrager (or any entity in which Schrager has a controlling interest) has direct control or involvement over material aspects of hotel operations or hotel marketing; or (iii) that contains Schrager in the name of such hotel (each, a "Kahala Converted Hotel") during the period from the Effective Date to the earlier to occur of the tenth (10th) anniversary of the Opening Date or July 1, 2020, then the Base Management Fee and Incentive Management Fee paid to Manager pursuant to this Agreement shall be reduced to three percent (3%) of Gross



Revenues, and twenty percent (20%) of Available Cash Flow, respectively, during the period that Manager or any of its Affiliates operates, owns, licenses or franchises a Kahala Converted Hotel.

E.    Except as expressly provided in Sections 11.13.A through D, neither this Agreement nor anything implied by the relationship between Manager and Owner shall prohibit Manager or any of the Marriott Companies from developing, constructing, owning, operating, promoting, and/or authorizing others to develop, construct, operate, or promote one or more hotels, or any other lodging products, Vacation Club Products, restaurants, or other business operations of any type, using any brand name available to the Marriott Companies, at any location, including a location proximate to the Site, and Owner hereby acknowledges and agrees that Manager and any of the Marriott Companies have the unconditional right to engage in such activities, regardless of any competitive effect such activities may have on Owner.

11.14    Waiver

The failure of either party to insist upon a strict performance of any of the terms or provisions of this Agreement, or to exercise any option, right or remedy contained in this Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

11.15    Partial Invalidity

If any portion of any term or provision of this Agreement, or the application thereof to any person or circumstance shall be invalid or unenforceable, at any time or to any extent, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

11.16    Survival

Except as otherwise specifically provided in this Agreement, the rights and obligations of the parties herein shall not survive any Termination.

11.17    Negotiation of Agreement

Owner and Manager are both business entities having substantial experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to the rule that ambiguities in a document are to be construed against the draftsman. No inferences shall be drawn from the fact that the final, duly executed Agreement differs in any respect from any previous draft hereof.



11.18   Estoppel Certificates

Each party to this Agreement shall at any time and from time to time, upon not less than thirty (30) days' prior notice from the other party, execute, acknowledge and deliver to such other party, or to any third party specified by such other party, a statement in writing: (a) certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications), and (b) stating whether or not to the best knowledge of the certifying party (i) there is a continuing Default or Event of Default by the non-certifying party in the performance or observance of any covenant, agreement or condition contained in this Agreement, or (ii) there shall have occurred any event which, with the giving of notice or passage of time or both, would become a Default or Event of Default, and, if so, specifying each such Default or Event of Default or occurrence of which the certifying party may have knowledge.  Such statement shall be binding upon the certifying party and may be relied upon by the non-certifying party and/or such third party specified by the non-certifying party as aforesaid. In addition, upon written request after a Termination, each party agrees to execute and deliver to the non-certifying party and to any such third party a statement certifying that this Agreement has been terminated.

11.19   Restrictions on Operating the Hotel in Accordance with System Standards

In the event of either (i) a Legal Requirement, including an order, judgment or directive by a court or administrative body which is issued in connection with any Litigation involving Owner, or (ii) any action taken by a Mortgagee in connection with a Foreclosure, which in either case restricts or prevents Manager, in a material and adverse manner, from operating the Hotel in accordance with System Standards (including without limitation, any restrictions on expenditures by Manager from the Operating Accounts or from the FF&E Reserve, other than restrictions which are set forth in this Agreement) for more than one hundred eighty (180) days, Manager shall be entitled, at its option, to terminate this Agreement upon sixty (60) days' written notice to Owner.  The foregoing shall not reduce or otherwise affect the rights of the parties under Article IX.

11.20   Decision by Experts

Where this Agreement calls for a matter to be referred to a panel of Experts for determination, the following provisions shall apply:

A.      With respect to any referred matter, the matter shall be decided by a majority vote of a panel of Experts. In the event that either party calls for a determination by Experts pursuant to the terms hereof, each party shall have ten (10) days from the date of such request to select one Expert and, within ten (10) days after such respective selections, the two (2) respective firms and/or individuals so selected shall select the third (3rd) Expert.  If a party fails to make its respective selection of a firm or individual within the ten (10) day period provided for above, then the Expert selected by the other party shall select two (2) Experts to serve on the Experts panel. Also, if the two (2) respective Experts selected by the parties shall fail to select a



third (3rd) firm or individual (satisfying the requirements set forth in the definition of "Expert" in Section 12.01) to be an Expert, then such third (3rd) Expert shall be appointed by the American Arbitration Association.  With respect to any issue hereunder to be referred to a panel of Experts for determination, the use of the Experts shall be the exclusive remedy of the parties and neither party shall attempt to adjudicate any dispute in any other forum.  The decision of the Experts shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration, in court or otherwise;

       B.     Each party shall be entitled to make written submissions to the Experts, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission (all within the time periods established pursuant to Section 11.20.D).  The parties shall make available to the Experts all books and records relating to the issue in dispute and shall render to the Experts any assistance requested of the parties.  The costs of the Experts and the proceedings shall be borne as directed by the Experts unless otherwise provided for herein.  The Experts may direct that such costs be treated as Deductions;

       C.     The Experts shall make their decision with respect to the matter referred for determination by applying the standard set forth in this Agreement regarding such matter.  If this Agreement does not contain a specific standard regarding such matter, then the Experts shall apply the standards applicable to first-class boutique hotels in accordance with the System Standards, taking into consideration the long-term profitability of the Hotel and the requirement that the Hotel be managed, operated and maintained in accordance with System Standards; and

       D.     The terms of engagement of the Experts shall include an obligation on the part of the Experts to:  (i) notify the parties in writing of their decision within forty-five (45) days from the date on which the last Expert has been selected (or such other period as the parties may agree or as set forth herein); and (ii) establish a timetable for the making of submissions and replies.

11.21   Waiver of Jury Trial and Consequential and Punitive Damages

     Owner and Manager each hereby absolutely, irrevocably and unconditionally waive trial by jury and the right to claim or receive consequential, incidental, special or punitive damages in any litigation, action, claim, suit or proceeding, at law or in equity, arising out of, pertaining to or in any way associated with the covenants, undertakings, representations or warranties set forth herein, the relationships of the parties hereto, whether as "Owner" or "Manager" or otherwise, this Agreement or any other agreement, instrument or document entered into in connection herewith, or any actions or omissions in connection with any of the foregoing.

11.22   Counterparts

     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument.  Such executed counterparts may be delivered by facsimile which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart.  The



submission of an unsigned copy of this Agreement or an electronic instrument with or without electronic signature to either party shall not constitute an offer or acceptance. This Agreement shall become effective and binding only upon execution and delivery of the Agreement in non-electronic form by both parties in accordance with this Section 11.22.

11.23   Extraordinary Events

If either Owner's or Manager's failure to conform to, keep, perform, fulfill, or satisfy any representation, warranty, covenant, undertaking, obligation, standard, test, or condition set forth in this Agreement, other than an obligation to make monetary payments or provide monetary funding, is caused in whole or in part by one or more Extraordinary Events, such failure shall not constitute a failure or an Event of Default or Default under this Agreement, and such failure shall be excused to the extent that the failure is caused in whole or in part by such Extraordinary Event(s).

11.24   Entire Agreement

This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a written non-electronic instrument that has been duly executed by the non-electronic signatures of authorized representatives of the parties hereto.

11.25   Non-Hotel Marketing Activities

Owner and Manager agree that the performance of the Hotel is dependent upon exclusive brand affiliation with Manager and its Affiliates, and that Manager shall have no obligation to allow Owner or any third party to utilize any portion of the Hotel or the Site for any activities relating to the sale, promotion or marketing of any Vacation Club Products developed, marketed, sold or operated by Owner or any third party. Manager further agrees that it will not utilize any portion of the Hotel or the Site for any activities relating to the sale, promotion or marketing of any Vacation Club Products developed, marketed, sold or operated by Manager or its Affiliates.

11.26   Key Money

A.      In consideration for Owner's execution of this Agreement, Manager shall pay to Owner the following amounts (collectively, the "Key Money"):

1.      Three Million Dollars ($3,000,000) within ten (10) Business Days after the Opening Date; and

2.      If Owner has satisfied all the conditions to the Flagging Date set forth in the Technical Services Agreement, but Manager has not branded the Hotel as an EDITION hotel on or before July 1, 2010, then commencing on July 1, 2010, Manager shall pay to Owner the



sum of One Hundred Ten Thousand Dollars ($110,000) on the first (1st) day of each month until the Flagging Date occurs (pro rated for any partial month); provided, however, that the amounts paid by Manager pursuant to this Section 11.26.A.2 shall not exceed Two Million Dollars ($2,000,000).  For the avoidance of doubt, if the Flagging Date occurs on or before July 1, 2010, Manager shall have no obligation to make any payments pursuant to this Section 11.26.A.2.

Payment of the Key Money shall be subject to the following conditions:  (i) there is no Event of Default by Owner under this Agreement; (ii) Owner has satisfied all other covenants, undertakings, obligations and conditions set forth in this Agreement and the Technical Services Agreement (including, without limitation, payment of Pre-Opening Expenses and initial Working Capital); and (iii) the Opening Date shall have occurred.

B.     If this Agreement terminates for any reason, other than an Event of Default by Manager under this Agreement, during the Initial Term, Owner shall pay to Manager (prior to and as a condition of such Termination) an amount equal to the product of (i) the Key Money that was paid to Owner, multiplied by (ii) a fraction, the numerator of which equals the number of full Fiscal Years then remaining in the Term, and the denominator of which equals thirty (30). Except as otherwise provided in this Section 11.26, Manager acknowledges and agrees that Owner shall have no obligation to repay any or all of the Key Money to Manager.

11.27   Adjustment to Owner's Priority and Performance Termination Threshold

The parties acknowledge and agree that the Owner's Priority amount and the Performance Termination Threshold set forth in this Agreement are based on the assumption that Manager will manage and operate all of the food and beverage outlets at the Hotel.  Therefore, if any food or beverage outlet at the Hotel will be leased to, licensed to or otherwise operated by a third party, the Owner's Priority amount and the Performance Termination Threshold will be equitably reduced to account for the fact that Gross Revenues, Operating Profit and Available Cash Flow will not include some or all of the revenues generated by such food or beverage outlet.

## ARTICLE XII

## DEFINITION OF TERMS

12.01   Definition of Terms

The following terms when used in this Agreement shall have the meanings indicated:

"Accounting Period" shall mean the four (4) week accounting periods having the same beginning and ending dates as Manager's four (4) week accounting periods, except that an Accounting Period may occasionally contain five (5) weeks when necessary to conform Manager's accounting system to the calendar.  Manager shall have the right, at its discretion, to modify the definition of Accounting Period to mean a calendar month or such other period of

57



time as is consistent with the accounting periods that Manager may implement, from time to time, with respect to the EDITION Hotel System.

"Accounting Period Statement" shall have the meaning ascribed to it in Section 4.01.A.

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power: (i) to vote more than fifty percent (50%) of the voting stock or equity interests of such Person; or (ii) to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock or equity interests, by contract or otherwise.

"Agreement" shall mean this Management Agreement between Owner and Manager, including the exhibits attached hereto, as it may be amended, restated or supplemented from time to time.

"Annual Operating Statement(s)" shall have the meaning ascribed to it in Section 4.01.C.

"Annual Profit Transactions Report" shall have the meaning ascribed to it in Section 4.06.

"Audio/Video Systems" shall include, but not be limited to, the following Hotel systems: general audio and video systems (audio/video) for the Hotel, entertainment audio/video systems, video information systems, public address systems, and the master antenna television distribution system.

"Audit" shall have the meaning ascribed to it in Section 4.02.

"Available Cash Flow" shall mean an amount, with respect to each Fiscal Year or portion thereof during the Term, equal to the excess, if any, of the Operating Profit for such Fiscal Year over the Owner's Priority for such Fiscal Year or portion thereof.

"Base Management Fee" shall mean an amount payable to Manager as a Deduction from Gross Revenues equal to four percent (4%) of Gross Revenues for each Fiscal Year or portion thereof, except as otherwise provided in Section 1.03.B and Section 11.13.D.

"Books and Records" shall mean books of control and account pertaining to the operations of the Hotel that are maintained at the Hotel.

"Boutique System" shall mean the EDITION Hotel System and all other chains and single locations of full-service boutique hotels located in the continental United States and Canada and managed by Marriott (or one or more Affiliates) that are, as of the Effective Date or at any time during the Term, operated under the Trade Name or mark "EDITION Hotels and Resorts" or any other Trade Name or mark designated by Marriott.



"Boutique Trademarks" shall mean the EDITION Trademarks and any other name, mark, logo, word, device, symbol, slogan, design, brand, service mark, Trade Name, other distinctive feature or any combination of the foregoing, whether registered or unregistered, that is used in connection with any of the hotels in the Boutique System or by reason of extent of usage is associated with hotels in the Boutique System.

"Building Estimate(s)" shall have the meaning ascribed to it in Section 5.03.A.

"Business Plan" shall have the meaning ascribed to it in Section 4.08.

"Capital Expenditure(s)" shall mean the expenses necessary for non-routine, major repairs, alterations, improvements, renewals, replacements, and additions to the Hotel including, without limitation, to the structure, the exterior facade and all of the mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation elements of the Hotel building, together with all other expenditures which are classified as "capital expenditures" under generally-accepted accounting principles.  Capital Expenditures shall not include Routine Capital Expenditures.

"Case Goods" shall mean furniture and furnishings used in the Hotel, including, without limitation:  chairs, beds, chests, headboards, desks, tables, decorative lighting fixtures and similar items.

"CC&R(s)" shall have the meaning ascribed to it in Section 8.04.

"Central Office Services" are those services described in Exhibit B attached hereto.

"Chain Services" shall have the meaning ascribed to it in Section 1.11.

"Chain Services Report" shall have the meaning ascribed to it in Section 4.07.

"Competitive Set" shall mean the group of full-service hotels that are generally within the same hotel market and market segment as the Hotel.  As of the Effective Date, the parties agree that the Competitive Set shall consist of:  The Royal Hawaiian, Waikiki Beach; Halekulani;  The Kahala Hotel & Resort; W Honolulu – Diamond Head; and  Moana Surfrider.  If any of such hotels identified in this definition, subsequent to the Effective Date, either changes its chain affiliation or ceases to operate or otherwise ceases to reflect the general criteria set forth in the first (1st) sentence of this definition, Owner and Manager agree to mutually, reasonably and in good faith, discuss appropriate changes to the foregoing list of the hotels that shall comprise the Competitive Set.  Disputes regarding such changes to the Competitive Set will be resolved by the panel of Experts in accordance with the provisions of Section 11.20.

"Competitive Terms Standard" shall mean the standard to be employed in determining whether a Profit Transaction can be implemented with respect to the Hotel. The Competitive Terms Standard shall be deemed satisfied if the terms of the Profit Transaction are consistent with commercially competitive terms available to parties contracting for similar goods or



services in the marketplace relevant to the Hotel, taking into account price, quality, reputation and reliability of the vendor, the reasonable needs of the Hotel and the Boutique System for reliability in performance and/or quality to satisfy guest needs, the scale of the purchase, and such other factors reasonably appropriate to determine whether particular terms reflect competitive terms in the marketplace. In determining, pursuant to the foregoing, whether such terms are competitive, the goods and/or services that are being purchased shall be grouped in reasonable categories, rather than being compared item by item.

"Cost Transaction" shall have the meaning ascribed to it in Section 1.13.F.

"Customer Information" shall mean customer data, customer lists and personal guest profiles and data regarding guest preferences, including, without limitation, any data derived from or contained in any database controlled by Manager or its Affiliates (including, without limitation, the Marriott Rewards Program).

"Decorative Items" shall include, but not be limited to, artifacts, artwork, banquettes, carpeting, decorative lighting fixtures, etched glass, furniture, graphics, interior landscaping, radios, interior signage, televisions and window treatments.

"Deductions" shall mean the following expenses incurred by Manager in operating the Hotel(it being understood that any individual expenditure shall not be deducted more than one time even if such expense could reasonably fall within more than one of the expenses described below):

      1.    the cost of sales, including, without limitation, compensation, benefits and related administration costs, payroll taxes, charges related to employee benefit plans, relocation costs and other costs related to employees of Manager (or one of its Affiliates) who are working for the benefit of the Hotel (regardless of whether such employees are located at the Hotel or elsewhere); provided that the foregoing costs shall not include the salary and other employee costs of Manager's corporate executive staff who are located at Manager's corporate headquarters;

      2.    departmental expenses incurred at departments within the Hotel; administrative and general expenses; the cost of marketing incurred by the Hotel; advertising and business promotion incurred by the Hotel; heat, light, and power; computer line charges; and routine repairs, maintenance and minor alterations treated as Deductions under Section 5.01;

      3.    the cost of Inventories and Fixed Asset Supplies used or consumed in the operation of the Hotel;

      4.    a reasonable reserve for uncollectible accounts receivable as determined by Manager;

      5.    all costs and fees of independent professionals or other third parties who are retained by Manager or Owner to perform services required or permitted hereunder;



6.   all costs and fees of technical consultants, professionals and operational experts who are retained or employed by Manager, a Marriott Company, and their Affiliates for specialized services (including, without limitation, quality assurance inspectors, personnel providing architectural, technical or procurement services for the Hotel, tax consultants, and, except with respect to Central Office Services or as described in Section 8.02.D or Section 10.02.I, personnel providing legal services in connection with matters involving the Hotel) and the cost of attendance by employees of the Hotel at training and manpower development programs designated by Manager;

7.   the Base Management Fee paid to or retained by Manager;

8.   insurance costs and expenses as provided in Article VI;

9.   taxes, if any, payable by or assessed against Manager related to this Agreement or to Manager's operation of the Hotel, including general excise taxes or similar taxes (exclusive of Manager's income taxes or franchise taxes);

10.   all Impositions;

11.   the amount of any transfers into the FF&E Reserve required pursuant to Section 5.02;

12.   the Hotel's share of costs and expenses incurred in connection with sales, advertising, promotion and marketing programs for the Boutique System, including guest loyalty and recognition programs and the Marriott Rewards Program, where such expenses are not deducted as departmental expenses under paragraph 2 above or as Chain Services pursuant to paragraph 13 below;

13.   the Hotel's share of the charges for Chain Services;

14.   the Hotel's Marketing Fee payments;

15.   all costs and expenses of compliance by Manager with applicable Legal Requirements pertaining to the operation of the Hotel;

16.   the Hotel's pro rata share of costs and expenses (including those relating to development and implementation) incurred in connection with providing services to multiple hotels and/or other facilities in substitution for or in association with services that are or would have been performed or procured by individual hotels, which may be more effectively performed on a shared or group basis;

17.   travel, living, and other out-of-pocket costs and expenses of corporate and regional personnel of Manager and any of its Affiliates visiting the Hotel on specific Hotel business; provided, however, that if any such travel involves more than one hotel in the



EDITION Hotel System during any one continuous trip, such costs and expenses shall be fairly allocated between the Hotel and any other hotel visited and only the portion allocated to the Hotel shall be a Deduction; and

18.    such other costs and expenses incurred by Manager (either at the Hotel or elsewhere) as are specifically provided for elsewhere in this Agreement or are otherwise reasonably necessary for the proper and efficient operation of the Hotel.

The term "Deductions" shall not include: (a) debt service payments pursuant to any Mortgage on the Hotel; (b) payments pursuant to equipment leases or other forms of financing obtained for the FF&E located in or connected with the Hotel, unless Manager has previously given its consent to such equipment lease and/or financing; (c) rental payments pursuant to any ground lease of the Site; or (d) depreciation on the Hotel or any of its contents. All of the foregoing items listed in this paragraph shall be paid by Owner from its own funds. In no event shall the costs or expenses of providing the Central Office Services be treated as Deductions, or otherwise be reimbursed out of Gross Revenues; it being the intent of the parties that all such costs and expenses are to be paid by Manager (or its Affiliates) from its own funds.

"Default" shall have the meaning ascribed to it in Section 9.01.

"Direct Deduction" shall mean a Deduction relating to a system or program performed for the Hotel by or through Manager or one of the Related Parties that is described in the listing of Direct Deductions attached hereto as Exhibit D, plus such additional systems and programs that may be added after the date hereof in accordance with this Agreement. The term Direct Deduction shall not include Chain Services or Central Office Services.

"Direct Deductions Report" shall have the meaning ascribed to it in Section 4.05.A.

"EDITION Hotel System" shall mean the chain of full-service boutique hotels operated and managed by Marriott (or one or more of its Affiliates) that is, as of the Effective Date, operated under the Trade Name or mark "EDITION Hotels."

"EDITION Trademark" shall mean (i) the name and mark "EDITION"; (ii) the "EDITION" logo; and (iii) any word, name, device, symbol, logo, slogan, design, brand, service mark, Trade Name, other distinctive feature or any combination of the foregoing, whether registered or unregistered, and whether or not such term contains the "EDITION" mark, that is used in connection with the Hotel or by reason of extent of usage is associated with hotels in the EDITION Hotel System.

"Effective Date" shall have the meaning ascribed to it in the Preamble.

"Employee Claims" shall mean any and all claims (including all fines, judgments, penalties, costs, Litigation and/or arbitration expenses, attorneys' fees and expenses, and costs of settlement with respect to any such claim) by any employee or employees of Manager against Owner or Manager with respect to the employment at the Hotel of such employee or employees.



"Employee Claims" shall include, without limitation, the following:  (i) claims that are eventually resolved by arbitration, by Litigation or by settlement; (ii) claims that also involve allegations that any applicable employment-related contracts affecting the employees at the Hotel have been breached; and (iii) claims that involve allegations that one or more of the Employment Laws has been violated; provided, however, that "Employee Claims" shall not include claims for worker compensation benefits or for unemployment benefits.

"Employment Laws" shall mean any federal, state or local law (including the common law), statute, ordinance, rule, regulation, order or directive with respect to employment, conditions of employment, benefits, compensation, or termination of employment that currently exists or may exist at any time during the Term, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Workers Adjustment and Retraining Act, the Occupational Safety and Health Act, the Immigration Reform and Control Act of 1986, the Polygraph Protection Act of 1988 and the Americans With Disabilities Act of 1990.

"Environmental Laws" shall have the meaning ascribed to it in Section 11.08.

"Event of Default" shall have the meaning ascribed to it in Section 9.01.

"Expert" shall mean an independent, nationally recognized consulting firm or individual with a minimum of ten (10) years of experience in the lodging industry and qualified to resolve the issue in question, provided that an Expert shall not include any individual who is, as of the date of appointment or within six (6) months prior to such date, employed, either directly or indirectly as a consultant in connection with any other matter, by a party attempting to appoint such person.

"Extraordinary Event" shall mean any of the following events, regardless of where they occur or their duration to the extent the effects of which are beyond the reasonable control of Owner or Manager, as applicable:  acts of nature (including hurricanes, typhoons, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war or armed conflict; riots or other civil commotion; terrorism (including hijacking, sabotage, chemical or biological events, nuclear events, disease-related events, bombing, murder, assault and kidnapping), or the threat thereof; strikes or similar labor disturbances; embargoes or blockades; shortage of critical materials or supplies; action or inaction of governmental authorities which have an impact upon the Hotel (including restrictions on room rates or wages or other material aspects of operation; restrictions on financial, transportation or information distribution systems; or the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused to the extent of such Extraordinary Event); and any other events beyond the reasonable control of Owner or Manager, excluding, however, general economic and/or market conditions not caused by any of the events described herein.



"FF&E" shall mean furniture, furnishings, fixtures, Soft Goods, Case Goods, Decorative Items, signage, Audio/Video Systems, kitchen appliances, refrigerators, minibars, and equipment, including front desk and back-of-the-house computer equipment, but shall not include Fixed Asset Supplies or Software.

"FF&E Estimate" shall have the meaning ascribed to it in Section 5.02.C.

"FF&E Reserve" shall have the meaning ascribed to it in Section 5.02.A.

"Fiscal Year" shall mean Manager's Fiscal Year which, as of the Effective Date, ends at midnight on the Friday closest to December 31st in each calendar year; the new Fiscal Year begins on the Saturday immediately following said Friday. Any partial Fiscal Year between the Opening Date and the commencement of the first (1st) full Fiscal Year shall constitute a separate Fiscal Year. A partial Fiscal Year between the end of the last full Fiscal Year and the Termination of this Agreement shall also constitute a separate Fiscal Year. If Manager's Fiscal Year is changed in the future, appropriate adjustment to this Agreement's reporting and accounting procedures shall be made; provided, however, that no such change or adjustment shall alter the Term or in any way reduce the distributions of Operating Profit or other payments due hereunder.

"Fixed Asset Supplies" shall mean items included within "Property and Equipment" under the Uniform System of Accounts that may be consumed in the operation of the Hotel or are not capitalized, including, but not limited to, linen, china, glassware, tableware, uniforms, and similar items, used in the operation of the Hotel.

"Flagging Date" shall mean the date on which the Hotel begins operation as a branded hotel using EDITION Trademarks in the name of the Hotel and as a part of the EDITION Hotel System, which date shall (i) be established and certified by Manager, and (ii) occur after Manager has opened for business one (1) other EDITION Hotel operating as a branded hotel using EDITION Trademarks in the name of the Hotel and as a part of the EDITION Hotel System; provided, however, the Flagging Date shall occur no later than thirty (30) days after the first (1st) EDITION Hotel opens for business operating as a branded hotel using EDITION Trademarks in the name of the Hotel and as part of the EDITION Hotel System, so long as all conditions to the Opening Date and the Flagging Date set forth in the Technical Services Agreement have been satisfied.

"Flagging Renovation" shall have the meaning ascribed to it in the Technical Services Agreement.

"Foreclosure" shall mean any exercise of the remedies available to a Mortgagee, upon a default under the Mortgage held by such Mortgagee, which results in a transfer of title to or control or possession of the Hotel. The term "Foreclosure" shall include, without limitation, any one or more of the following events, if they occur in connection with a default under a Mortgage: (i) a transfer by judicial foreclosure; (ii) a transfer by deed in lieu of foreclosure; (iii) the appointment by a court of a receiver to assume possession of the Hotel; (iv) a transfer of either

64



ownership or control of the Owner, by exercise of a stock pledge or otherwise; (v) a transfer resulting from an order given in a bankruptcy, reorganization, insolvency or similar proceeding; (vi) if title to the Hotel is held by a tenant under a ground lease, an assignment of the tenant's interest in such ground lease; or (vii) a transfer through any similar judicial or non-judicial exercise of the remedies held by the Mortgagee.

"GDP Deflator" shall mean the "Gross Domestic Product Implicit Price Deflator" issued from time to time by the United States Bureau of Economic Analysis of the Department of Commerce, or if the aforesaid GDP Deflator is not at such time so prepared and published, any comparable index selected by Owner and reasonably satisfactory to Manager (a "Substitute Index") then prepared and published by an agency of the Government of the United States, appropriately adjusted for changes in the manner in which such index is prepared and/or year upon which such index is based. Any dispute regarding the selection of the Substitute Index or the adjustments to be made thereto shall be settled by the panel of Experts in accordance with Section 11.20. Except as otherwise expressly stated herein, whenever a number or amount is required to be "adjusted by the GDP Deflator," or similar terminology, such adjustment shall be equal to the percentage increase or decrease in the GDP Deflator which is issued for the month in which such adjustment is to be made (or, if the GDP Deflator for such month is not yet publicly available, the GDP Deflator for the most recent month for which the GDP Deflator is publicly available) as compared to the GDP Deflator which was issued for the month in which the Effective Date occurred.

"Gross Revenues" shall mean all revenues and receipts of every kind derived from operating the Hotel and all departments and parts thereof, including, but not limited to: income (from both cash and credit transactions) from rental of Guest Rooms, telephone charges, stores, offices, exhibit or sales space of every kind; license, lease and concession fees and rentals (not including gross receipts of licensees, lessees and concessionaires; income from vending machines; income from parking; health club membership fees; food and beverage sales, provided, however, that with respect to any restaurant on the site, Gross Revenues will include either (i) the rental for such restaurant if such restaurant is leased to a third party, or (ii) the gross receipts from the operation of such restaurant if Manager operates such restaurant; wholesale and retail sales of merchandise; service charges; and proceeds, if any, from business interruption or other loss of income insurance (but excluding any amounts paid directly to Manager by the insurer for loss of the Management Fees or any other amounts payable to Manager under this Agreement); provided, however, that Gross Revenues shall not include the following: gratuities to employees of the Hotel; federal, state or municipal excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; proceeds from the sale of FF&E; interest received or accrued with respect to the funds in the FF&E Reserve; any refunds, rebates, discounts and credits of a similar nature, given, paid or returned in the course of obtaining Gross Revenues or components thereof; insurance proceeds (other than proceeds from business interruption or other loss of income insurance); condemnation proceeds (other than for a temporary taking); or any proceeds from any Sale of the Hotel or from the refinancing of any debt encumbering the Hotel.

"Guest Room" shall mean a separately-keyed lodging unit in the Hotel.



"Hazardous Materials" shall have the meaning ascribed to it in Section 11.08.

"Hotel" shall mean the Site together with the following: (i) the Hotel Improvements and all other improvements constructed or to be constructed on the Site pursuant to this Agreement; (ii) all FF&E, Fixed Asset Supplies and Inventories installed or located on the Site or in the Hotel Improvements; and (iii) all easements or other appurtenant rights thereto. For the avoidance of doubt, the definition of "Hotel" shall include all restaurants located on the Site, including any leased restaurants.

"Hotel Improvements" shall have the meaning ascribed to it in the Recitals.

"Impositions" shall have the meaning ascribed to it in Section 4.11.

"Incentive Management Fee" shall mean, with respect to each Fiscal Year or portion thereof, an amount payable to Manager that is equal to twenty-five percent (25%) of Available Cash Flow for such Fiscal Year or portion thereof, except as otherwise provided in Section 1.03.B and Section 11.13.D.

"Initial Term" shall have the meaning ascribed to it in Section 2.01.

"Institutional Lender" shall mean a foreign or domestic commercial bank, trust company, savings bank, savings and loan association, life insurance company, real estate investment trust, pension trust, pension plan or pension fund, a public or privately-held fund engaged in real estate and/or corporate lending, or any other financial institution commonly known as an institutional lender (or any Affiliate thereof) having a minimum paid up capital (or net assets in the case of a pension fund) of One Hundred Million Dollars ($100,000,000); provided further that a Person may not be an "Institutional Lender" if such Person, or any of its Affiliates or any other Person related to such Person that is proscribed by applicable law, is a Specially Designated National or Blocked Person.

"Insurance Retentions" shall have the meaning ascribed to it in Section 6.02.B.1.

"Intellectual Property" shall mean: (i) all Software, including the data and information processed or stored thereby; (ii) all manuals, brochures, directives, policies, programs and other information issued by Manager to its employees at the Hotel or otherwise used in the operation of the Hotel or any other hotel in the EDITION Hotel System or any other hotel in the Boutique System; (iii) Customer Information; (iv) all EDITION Trademarks and Boutique Trademarks; and (v) all Marriott, EDITION Hotel System (or other Marriott Company) trade secrets, confidential information and all other information, materials, and copyrightable or patentable subject matter developed, acquired, licensed or used by any Marriott Company in the operation of the Hotel or in any other hotel in the EDITION Hotel System or the Boutique System, including, without limitation, materials relating to sales and marketing programs, revenue and inventory management programs, processes or systems, brand and pricing strategies, business

66



and technology plans, and research and development reports.  The foregoing shall apply regardless of the form or medium involved (e.g., paper, electronic, tape, tangible or intangible).

"Inventories" shall mean "Inventories" as defined in the Uniform System of Accounts, such as, but not limited to, provisions in storerooms, refrigerators, pantries and kitchens; beverages in wine cellars and bars; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"Key Money" shall have the meaning ascribed to it in Section 11.26.

"Legal Requirement(s)" shall mean any federal, state or local law, code, rule, ordinance, regulation or order of any governmental authority or agency having jurisdiction over the business or operation of the Hotel or the matters which are the subject of this Agreement, including, without limitation, the following:  (i) any building, zoning or use laws, ordinances, regulations or orders; and (ii) Environmental Laws.

"Litigation" shall mean:  (i) any cause of action (including, without limitation, bankruptcy or other debtor/creditor proceedings) commenced in a federal, state or local court; or (ii) any claim brought before an administrative agency or body (for example, without limitation, employment discrimination claims).

"Management Fees" shall mean the Base Management Fee and the Incentive Management Fee.

"Manager" shall have the meaning ascribed to it in the Preamble hereto or shall mean any successor or permitted assign, as applicable.

"Marketing Fee" shall mean a fee payable by the Hotel to Manager or one of its Affiliates, the proceeds of which shall be used by Manager to pay for Marketing Fee Services. Manager may use the funds collected from the Marketing Fee that it retains to pay for expenditures on such Marketing Fee Services as it may select in its reasonable discretion, and funds collected from the Marketing Fee may be carried over from year to year in Manager's reasonable discretion.  To the extent that any cost otherwise meeting the definition of Marketing Fee Services is, in Manager's reasonable discretion, paid for directly by the Hotel rather than out of funds collected from the Marketing Fee, such cost shall be treated as a Deduction.  The Marketing Fee will be one and five-tenths percent (1.5%) of Gross Revenues.  The Marketing Fee may be increased from the amount set forth above only upon written consent by Owner, provided, however, that Owner may not withhold such consent in the event that the owners of a majority of the then-existing rooms in the EDITION Hotel System consent to such increase.

"Marketing Fee Services" shall mean (a) general marketing of the EDITION Hotel System, which shall commence upon the Flagging Date; and (b) the marketing services specific to the Hotel, which shall be for the period prior to the Flagging Date and shall be reasonably determined by Manager.  The Marketing Fee Services shall include those services listed in Exhibit C-1 attached hereto.



"Marriott" shall mean Marriott International, Inc., a Delaware corporation, and its successors and assigns.

"Marriott Company(ies)" shall mean Manager, Marriott, and any Affiliate of Manager or Marriott.

"Marriott Funding Obligations" shall have the meaning ascribed to it in Section 2.03.

"Marriott Rewards Program" shall mean the frequent-guest affinity program of Marriott known as "Marriott Rewards," together with any similar or successor program or other affinity program instituted in conjunction with "Marriott Rewards" or any similar or successor program thereof.

"MBS Charges" shall have the meaning ascribed to it in Section 4.04.

"MBS Systems" shall mean the processes developed by Marriott that consolidate, on a system-wide basis in the Boutique System, into one or more shared services centers, certain accounts payable, billing and accounts receivable, revenue capture subsidiary ledger, human resources management systems and related functions and procedures, or any similar or successor systems thereof.

"Minor Casualty" shall mean any fire or other casualty which results in damage to the Hotel and/or its contents, to the extent that the total cost of repairing and/or replacing of the damaged portion of the Hotel to the same condition as existed previously does not exceed an amount equal to ten percent (10%) of the total insured value of the Hotel (which amount shall in no event be less than Five Million Dollars ($5,000,000), as adjusted by the GDP Deflator).

"Mortgage(s)" shall mean any mortgage, deed of trust, or security document encumbering the Hotel and/or the Site.

"Mortgagee(s)" shall mean the holder of any Mortgage.

"Notice of Proposed Sale" shall have the meaning ascribed to it in Section 10.02.B.

"Opening Date" shall mean the first day on which paying overnight guests are first admitted to the Hotel by Manager, which date shall (i) be established and certified by Manager, (ii) in no event be earlier than thirty (30) days after the date of Substantial Completion (as such term is defined in the Technical Services Agreement), and (iii) otherwise be determined in accordance with Section 6.1 of the Technical Services Agreement.

"Operating Accounts" shall have the meaning ascribed to it in Section 4.03.A.

"Operating Loss" shall mean a negative Operating Profit.



"Operating Profit" shall mean, with respect to any given period of time, the excess of Gross Revenues over Deductions (each calculated in accordance with this Agreement and the Uniform System of Accounts).

"Owner" shall have the meaning ascribed to it in the Preamble or shall mean any successor or permitted assign, as applicable.

"Owner's Priority" shall mean, with respect to each Fiscal Year (pro rated for any partial Fiscal Year), a dollar amount equal to the sum of (i) Nineteen Million Four Hundred Twenty-Five Thousand Dollars ($19,425,000) (as the same may be adjusted in accordance with Section 11.27) plus (ii) ten and five-tenths percent (10.5%) of the amount of Capital Expenditures funded by Owner pursuant to Section 5.03 (excluding all costs related to the correction of errors, omissions or defects in the design, construction or renovation of the Hotel). With respect to Capital Expenditures funded by Owner and added to the calculation of Owner's Priority pursuant to clause (ii) above, such amount shall be added to the amount described in clause (ii) above (i.e., the amount that will be multiplied by ten and five-tenths percent (10.5%) as set forth above) commencing with the first (1st) day of the first (1st) fiscal quarter after the fiscal quarter in which the project for which such Capital Expenditure was made is completed. In the event that the Hotel does not open as an EDITION Hotel on the Opening Date and as a result the Hotel has a second "opening" in connection with the Flagging Date, the Owner's Priority shall be increased by a dollar amount equal to ten and five-tenths percent (10.5%) of the amount of the pre-opening expenses paid by Owner in connection with such second opening.

"Performance Termination Threshold" shall mean, with respect to each Fiscal Year, an amount equal to ninety percent (90%) of the Owner's Priority for such Fiscal Year, as the same may be adjusted in accordance with Section 11.27.

"Permitted Exceptions" shall have the meaning ascribed to it in Section 8.01.A.

"Person" shall mean an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, limited liability company, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

"Pre-Flagging Name" shall have the meaning ascribed to it in Section 11.12.A.

"Prime Rate" shall mean the "prime rate" of interest announced from time to time in the "Money Rates" section of the **Wall Street Journal** (Eastern Edition).

"Profit Transaction" shall have the meaning ascribed to it in Section 1.13.

"Property Insurance Premiums" shall have the meaning ascribed to it in Section 6.01.B.7.

"Prospectus" shall have the meaning ascribed to it in Section 11.12.B.



"Qualified Mortgage" shall have the meaning ascribed to it in Section 8.02.

"Registered Marks" shall have the meaning ascribed to it in Section 11.12.B.

"Related Party(ies)" shall mean any Person that, directly or indirectly, is controlled by or is under common control with Marriott or Manager. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power: (i) to vote more than thirty-five percent (35%) of the voting stock or equity interests of such Person; or (ii) to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock or equity interests, by contract or otherwise.

"Renewal Term" shall have the meaning ascribed to it in Section 2.01.

"Restricted Area One" shall mean that area described in the narrative that is set forth in Exhibit H-1 and that is shown on the map attached hereto as Exhibit H-2. If there is any conflict between the narrative description in Exhibit H-1 and the map shown on Exhibit H-2, the narrative description shall govern.

"Restricted Area Two" shall mean the island of Oahu, Hawaii.

"Restricted Hotel" shall mean any hotel operating under the "EDITION" Trade Name or mark as a member of the EDITION Hotel System. The term "Restricted Hotel" shall not include any one or more of the following: (i) any Marriott hotel, JW Marriott hotel, RITZ-CARLTON hotel, Bvlgari hotel, Courtyard by Marriott hotel, Renaissance hotel, Renaissance ClubSport hotel, Nickelodeon Resorts by Marriott, Conference Center by Marriott, Residence Inn by Marriott, Fairfield Inn, Marriott Vacation Club, Grand Residences, RITZ-CARLTON Club, Horizons, SpringHill Suites, TownePlace Suites, any hotel operating as a member of the Boutique System that is not operating under the "EDITION" Trade Name or mark as a member of the EDITION Hotel System, or any other lodging product (including Vacation Club Products or residences) which is not operated as a boutique hotel under the "EDITION" Trade Name or mark and as a member of the EDITION Hotel System; (ii) any future lodging product developed by Manager or one of its Affiliates which is not included within the EDITION Hotel System; or (iii) any hotel or lodging product that is not flagged or named as an "EDITION" even if such hotel or lodging product is included in the "EDITION" directory or any of Manager's other brand directories, including using the tag line "Managed by "EDITION" " and/or is included in any central reservation system and/or marketing system utilized by Manager and its Affiliates, and operated by Manager or its Affiliates.

"Revenue Data Publication" shall mean Smith's STAR Report, a monthly publication distributed by Smith Travel Research, Inc. of Gallatin, Tennessee, or an alternative source, reasonably satisfactory to both parties, of data regarding the Revenue Per Available Room of hotels in the general trade area of the Hotel. If such Smith's STAR Report is discontinued in the future, or ceases (in the reasonable opinion of either Owner or Manager) to be a satisfactory



source of data regarding the Revenue Per Available Room of various hotels in the general trade area of the Hotel, Manager shall select an alternative source for such data, subject to Owner's approval. If the parties fail to agree on such alternative source within a reasonable period of time, the matter shall be resolved by the panel of Experts in accordance with the provisions of Section 11.20.

"Revenue Index" shall mean the number that is equal to (a) the Revenue Per Available Room for the Hotel divided by (b) the average Revenue Per Available Room for the hotels in the Competitive Set, as set forth in the Revenue Data Publication. Appropriate adjustments to the Revenue Index shall be made in the event of a major renovation of the Hotel.

"Revenue Index Threshold" shall mean the fraction equal to ninety (90) divided by one hundred (100), or .90 as a decimal. However, if the entry of a new hotel into the Competitive Set, the removal of a hotel from the Competitive Set, or a major renovation or re-positioning of a hotel in the Competitive Set causes significant variations in the Revenue Index that do not reflect the Hotel's true position in the relevant market, appropriate adjustments shall be made to the Revenue Index Threshold by mutual consent of Owner and Manager, and if the parties cannot agree on an appropriate adjustment, the matter shall be resolved by the panel of Experts in accordance with the provisions of Section 11.20.

"Revenue Per Available Room" shall mean (i) the term "revenue per available room" as defined by the Revenue Data Publication, or (ii) if the Revenue Data Publication is no longer being used (as more particularly set forth in the definition of "Revenue Data Publication"), the aggregate gross room revenues of the hotel in question for a given period of time divided by the total room nights for such period. If clause (ii) of the preceding sentence is being used, a "room" shall be an available hotel guestroom that is keyed as a single unit.

"Routine Capital Expenditures" shall mean certain routine, non-major expenditures which are classified as "capital expenditures" under generally accepted accounting principles, but which will be funded from the FF&E Reserve (pursuant to Section 5.02), rather than pursuant to the provisions of Section 5.03. Routine Capital Expenditures consist of the following types of expenditures: exterior and interior repainting; resurfacing building walls and floors; resurfacing parking areas; replacing folding walls; and miscellaneous similar expenditures (all such types of expenditures to be in accordance with Manager's policies as then generally implemented throughout the EDITION Hotel System).

"Sale of the Hotel" shall mean any sale, assignment, transfer or other disposition, for value or otherwise, voluntary or involuntary, of the fee simple or leasehold title to the Site and/or the Hotel excluding any such sale, assignment, transfer or other disposition to an Affiliate of Owner provided such Affiliate is a permitted transferee under Section 10.02.A and Owner promptly provides notice to Manager of such sale, assignment, transfer or other disposition to an Affiliate of Owner. For purposes of this Agreement, a Sale of the Hotel shall also include: (i) a lease (or sublease) of all or substantially all of the Hotel or Site; or (ii) any sale, assignment, transfer or other disposition, for value or otherwise, voluntary or involuntary, in a single transaction or a series of transactions, of the controlling interest in Owner. The phrase



"controlling interest," as used in the preceding sentence, shall mean either:  (x) the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the shares of Owner (through ownership of such shares or by contract); or (y) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of Owner.  Notwithstanding the foregoing, in no event shall the sale, transfer or other disposition of shares of stock traded on a public exchange constitute, in whole or in part, a Sale of the Hotel.

"Schrager" shall mean, collectively, Ian Schrager and I. S. International, LLC.

"Shortfall Amount" shall have the meaning ascribed to it in Section 2.02.B.1.

"Shortfall Notice" shall have the meaning ascribed to it in Section 2.02.B.

"Shortfall Payment" shall have the meaning ascribed to it in Section 2.02.B.

"Site" shall have the meaning ascribed to it in Section A of the Recitals.

"Soft Goods" shall mean all fabric, textile and flexible plastic products (not including items which are classified as "Fixed Asset Supplies") which are used in furnishing the Hotel, including, without limitation: corner guards, carpet, carpet base, fabric or vinyl wall covering, graphics, lamps, window treatments, artwork, upholstered furniture, task chairs, bed skirts, bed scarfs, shower curtain/liner, shower rod, artifacts, bedspreads, mirrors and similar items.

"Software" shall mean all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is generally commercially available, which are used by Manager in connection with operating or otherwise providing services to the Hotel and/or the EDITION Hotel System, including without limitation the property management system, the reservation system and the other electronic systems used by Manager in connection with operating or otherwise providing services to the Hotel and/or the EDITION Hotel System.

"Specially Designated National or Blocked Person" shall mean:  (i) persons designated by the U.S. Department of Treasury's Office of Foreign Assets Control, or other governmental entity, from time to time as a "specially designated national or blocked person" or similar status, (ii) a person described in Section 1 of U.S. Executive Order 13224 issued on September 23, 2001, or (iii) a person otherwise identified by government or legal authority as a person with whom Manager or its Affiliates are prohibited from transacting business.

"Subordination Agreement" shall have the meaning ascribed to it in Section 8.03.

"Subsequent Owner" shall mean any individual or entity that acquires title to or control or possession of the Hotel at or through a Foreclosure (together with any successors or assigns thereof), including, without limitation, (i) Mortgagee, (ii) any purchaser of the Hotel from Mortgagee, or any lessee of the Hotel from Mortgagee, or (iii) any purchaser of the Hotel at Foreclosure.



"System Standards" shall mean any one or more (as the context requires) of the following three (3) categories of standards: (i) operational standards (for example, services offered to guests, quality of food and beverages, cleanliness, staffing and employee compensation and benefits, Chain Services, frequent traveler programs such as the Marriott Rewards Program and other similar programs, etc.); (ii) physical standards (for example, quality of the Hotel Improvements, FF&E, and Fixed Asset Supplies, frequency of FF&E replacements, etc.); and (iii) technology standards (for example, those relating to software, hardware, telecommunications, high speed internet access, systems security and information technology); each of such standards shall be the standard which is generally prevailing or in the process of being implemented at all or substantially all other hotels in the EDITION Hotel System, including all services and facilities in connection therewith that are customary and usual at all or substantially all hotels in the EDITION Hotel System.

"Technical Services Agreement" shall mean that certain Design and Technical Services and Pre-Opening Agreement, executed by and among Owner, Manager and I.S. International, Inc. dated as of the date hereof, as the same may be amended, restated or supplemented from time to time.

"Term" shall have the meaning ascribed to it in Section 2.01.

"Termination" shall mean the expiration or sooner cessation of this Agreement.

"Termination Notice" shall have the meaning ascribed to it in Section 2.02.A.

"Total Casualty" shall mean any fire or other casualty which results in damage to the Hotel and its contents to the extent that the total cost of repairing and/or replacing the damaged portion of the Hotel to the same condition as existed previously would be sixty percent (60%) or more of the then total replacement cost of the Hotel.

"Trade Name" shall mean any name, whether informal (such as a fictitious name or d/b/a) or formal (such as the full legal name of a corporation or partnership) which is used to identify an entity.

"Transfer Fee" shall have the meaning ascribed to it in Section 10.02.I.

"Unbranded Period" shall have the meaning ascribed to it in Section 1.03.B.

"Uniform System of Accounts" shall mean the *Uniform System of Accounts for the Lodging Industry*, Tenth Revised Edition, 2006, as published by the American Hotel & Lodging Educational Institute, as revised from time to time to the extent such revision has been or is in the process of being generally implemented within the Boutique System.

"Unrestricted Rebate" shall have the meaning ascribed to it in Section 1.15.B.



"Vacation Club Products" shall mean timeshare, fractional, interval, vacation club, destination club, vacation membership, private membership club, private residence club, and points club products, programs and services and shall be broadly construed to include other forms of products, programs and services wherein purchasers acquire an ownership interest, use right or other entitlement to use certain determinable holiday villa or apartment units and associated facilities on a periodic basis and pay for such ownership interest, use right or other entitlement in advance.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, 29 U.S.C. 2101 *et seq*.

"Working Capital" shall mean funds that are used in the day-to-day operation of the business of the Hotel, including, without limitation, amounts sufficient for the maintenance of change and petty cash funds, amounts deposited in operating bank accounts, receivables, amounts deposited in payroll accounts, prepaid expenses and funds required to maintain Inventories, less accounts payable and accrued current liabilities.

<div align="center">[SIGNATURES FOLLOW ON NEXT PAGE]</div>



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first written above.

**OWNER:**

**M WAIKIKI LLC**, a Hawaii limited liability company

By: eBealy Fund, LLC, a California limited liability company, its Manager

By: _____
Print Name: _____
Title: _____

**MANAGER:**

**MARRIOTT HOTEL SERVICES, INC.**,
a Delaware corporation

By: _____
    Yoav K. Gery
    Authorized Signatory

75



## EXHIBIT A

## LEGAL DESCRIPTION OF THE SITE

All of that certain parcel of land situate at Kalia, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, described as follows:

LOT 1-B, area 71,516 square feet, as shown on Map 2, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Consolidation No. 64 of Ala Moana Properties, Limited;

Together with a perpetual easement appurtenant to said Lot 1-B for the construction, use and maintenance for storm drain purposes only over, across or under Lot 25, as shown on Map 4 of Land Court Consolidation No. 32 of Bishop Trust Company, Limited, Trustee for Hobron Land Trust;

Together also with a perpetual nonexclusive easement appurtenant to Lot 1-B for pedestrian and vehicular traffic over and across Lot 23, as shown on said Map 4;

Together with a perpetual overhead easement over and across Lot 1-C and a perpetual easement under, over and across said Lot 1-C for utility, communications, sewer and other like purposes; said easements shall be utilized by the owner of the above described premises in a manner which will not interfere with the free flowage of vehicular and pedestrian traffic on said lot;

Together also with the right to construct, repair, replace, maintain and improve for and on behalf of the State of Hawaii, the following:

(a)   An elevated pedestrian right-of-way over Lot 25, as shown on Map 4 of Land Court Consolidation No. 32;

(b)   One elevated public pedestrian overpass extending from said elevated public pedestrian right-of-way in (a) hereinabove, provided, however, the said overpass may be relocated with the approval of the State of Hawaii;

Together with the foundations and columns to support the structures in subparagraphs (a) and (b) hereinabove, and, also, together with the installation, repair, replacement, and maintenance of utilities and other similar appurtenances in conjunction with the structures mentioned in said subparagraphs (a) and (b);



As granted and reserved by Land Court Document No. 324984, and subject to the conditions contained in said Document.

Being land(s) described in Transfer Certificate of Title No. 813,270 issued to M WAIKIKI LLC, a Hawaii limited liability company.

BEING THE PREMISES ACQUIRED BY WARRANTY DEED

GRANTOR      :  ANEKONA ISLANDER, LLC, a Delaware limited liability company

GRANTEE      :  M WAIKIKI LLC, a Hawaii limited liability company

DATED        :  July 12, 2006
FILED        :  Land Court Document No. 3452194

**EXHIBIT B**

**LISTING OF CENTRAL OFFICE SERVICES**

"Central Office Services" shall mean the following services (other than those services that are contained within Chain Services or Marketing Fee Services) that are furnished on a central or regional basis to the Boutique System:

1.     Executive supervision of hotel operations.  As of the Effective Date, this is done by officers holding the title of Executive Vice President or above and (on a regional basis) by the most senior executive currently holding the title of Regional Senior Vice President or above (such regional executive, or the equivalent thereof as the organizational structure of Manager changes over time, the "Regional Executive").  Supervision of employees by officers below the level of Executive Vice President or (on a regional basis) the Regional Executive shall follow the function to which it relates:  that is, supervision below the level of Executive Vice President/Regional Executive that relates to a Chain Service or Marketing Fee Service shall be reimbursed as Chain Services or Marketing Fee Services, as appropriate; supervision below the level of Executive Vice President/Regional Executive that relates to a Central Office Service, such as Legal or Corporate Finance, shall be a Central Office Service.  In the event that these titles are modified in the future, executive supervision will mean supervision by persons holding comparable positions of authority.

2.     Planning and policy making, including corporate planning and policy making for Marriott International, Inc., strategic planning functions, brand policy or planning, and any other policy or planning functions not related to an area that is subject to reimbursement as a Chain Service, Marketing Fee Service or Direct Deduction.  Policy and planning functions relating to an area of Chain Services, Marketing Fee Services, or Direct Deduction (provided it is below the level of Executive Vice President or (on a regional basis) Regional Executive, or other levels of comparable authority in the future) shall be reimbursed as part of that Chain Service, Marketing Fee Service or Direct Deduction.

3.     Corporate Finance, including corporate treasury, financial planning and analysis and corporate accounting (but excluding accounting services that are provided to the hotels as part of Chain Services or the MBS Systems).

4.     Corporate personnel and employee relations, including human resources and employee relations applicable to Marriott International, Inc., and its subsidiaries as a whole.

5.     Legal services (whether provided by in-house counsel or, at the election of Manager, by outside counsel) performed (i) to protect the Boutique Trademarks, (ii) to represent Manager on issues relating to the relationship between Owner and Manager, except as described in Section 8.02.D and Section 10.02.I, and (iii) to benefit the Boutique System (for example, legal advice necessary to support benefits administration systemwide, and the drafting or



negotiating of national, corporate or regional contracts, form documents and system standards manuals, policies, or guidelines to be used in the Boutique System).

6.    Trademark protection relating to the Boutique Trademarks, which are used generally by the Boutique System.

7.    Product research and development costs, including new product research and development, the development of brand standards, and research and development of any type not relating to an area permitted to be reimbursed. Research and development costs relating to an area permitted to be reimbursed as a Chain Service, Marketing Fee Service, or Direct Deduction, such as sales and marketing research, shall be reimbursed as part of that Chain Service, Marketing Fee Service, or Direct Deduction, as appropriate.

8.    Certain technical and operational services. The services of technical and operational specialists of Marriott International, Inc., and its Affiliates making routine periodic visits to the Hotel. These services shall not include (i) personnel of the Architecture and Construction Division of Manager (or any of its Affiliates) providing architectural, technical or procurement services for the Hotel, or (ii) other non-routine services that may be provided as Direct Deductions.



# EXHIBIT C

## LISTING OF CURRENT CHAIN SERVICES

NOTE:  Chain Services are services that are furnished generally to the EDITION Hotel System hotels on a central basis and that fall into the following categories of services:  Marriott Worldwide Reservation System; and Computer, Payroll and Accounting Services.  As of December 31, 2007, these categories include the areas set forth below (and the supervision of such areas below the level of Executive Vice President and (on a regional basis) Regional Executive):

1.  Central Reservation Services, which includes the following subcategories:

- Voice (800 number) reservations booked through domestic and international central reservations centers
- Reservations booked through Marriott.com and other electronic reservations channels including the Global Distribution System (GDS)

2.  Computer Payroll and Accounting Services, which includes the following subcategories:

- Computer operating statement, analysis report and general ledger accounting system
- Marriott's automated payroll and benefits accounting system
- Operation and support of the computerized accounting reporting
- Operation and support of property computer systems including:
  - Point of sales system
  - Rooms operations, Food and Beverage and   Engineering systems support
  - Sales/Marketing systems
  - PC support and systems applications development
  - Global Field Services property systems support



**EXHIBIT C-1**

**LISTING OF CURRENT MARKETING FEE SERVICES**

1.  National Sales Office Services, which includes the following subcategories:

    - International sales offices
    - National sales offices
    - Distribution sales
    - Travel industry sales
    - Intermediary sales
    - E-commerce sales
    - Regional sales and marketing
    - Revenue management
    - Customer events

2.  National Advertising and Promotion Services, which includes the following subcategories:

    - Advertising administration, Advertising media and Advertising production
    - Advertising agencies
    - Public relations program support
    - Development of brochures, directories, and other marketing collateral
    - Production costs for promotional goods
    - Market research, including the GSS system



**EXHIBIT D**

**LISTING OF DIRECT DEDUCTIONS**

Marriott Rewards and Airline Frequency Programs

Hotel Excellence and Travel Industry Program

Intermediary Partner Care

Group Business Booking Fee and Lead Referral

Customer Event and Trade Shows

Brochures and Directories

Convention, Resort and Gateway Hotel Network Marketing

Travel/Vacation Card

Associate Opinion Survey

Central Benefits Administration

Room Sanitation, Food Safety and Brand Integrity Inspections/Audits

Loss Prevention, Asset Protection Services

Retail Shop Merchandise Handling

Marriott Visual Services (MVP)

Sales and other training programs

General Managers Meetings and other meetings

Centralized Commission Services

Reservation System (MARSHA)

Yield Management

Email/Voice Mailbox

PC Support/Help Desk

NGS System Help Desk

Property Operations Systems

Computer Systems Installations

eFolio

myHR Services

MCNII Domestic Network

Avendra Procurement Services

Payroll postage

Telecommunications – Installation/Evaluation/ Procurement

Personal Planning Services System

Property Management System

Mainframe Computer Access

On-Demand Report Viewing

Software/Hardware Maintenance

Telecommunication/Dial-up charges

OSCAR (Past Guest History)

Sales Force One

Cluster/Shared Services:

    Event Booking Centers

    Cluster Sales Offices

    Area Reservation Offices

    Cluster Revenue Management Offices

    Shared Local Advertising/Promotion

    Central Laundries

    Other Shared Positions/Property Functions

Marriott Business Services (MBS)

    Current Charges -

        HRMS - Mercury

        RCSL - Mercury

        MBS A/P - Mercury

        BAR - Billing and Accounts Receivable

        LMS - Labor Management

    Other MBS charges, as determined

Accident costs/Insurance

    Accident Charges up to deductible -

        Workmen's Comp



Property Internet Address (URL) Registration

Property Internet Site Design/Support

Welfare-to-Work/Work-Opportunity Tax Credit Program Support

General Liability

Employment Practices Liability

Premium allocation above deductible level



**EXHIBIT E**

**PERMITTED EXCEPTIONS**

1.     Reservation in favor of the State of Hawaii of all littoral rights of whatever nature or kind which are or may be thereunto appertaining, as reserved in Exchange Deed dated December 20, 1956, filed as Land Court Document No. 196551.

2.     Reservation of any and all littoral rights appurtenant to Lot 1-B in favor of the State of Hawaii, as set forth in instrument dated December 20, 1956, filed as Land Court Document No. 196552.

3.     The terms and provisions, including the failure to comply with any covenants, conditions and reservations, contained in Agreement dated December 23, 1963, filed as Land Court Document No. 324984, by and among the State of Hawaii, Ilikai, Incorporated and Makaha Valley Farms, Limited.  Consent by the State of Hawaii, by instrument filed as Land Court Document No. 345970.

4.     UNRECORDED RESTAURANT SPACE LEASE dated November 1, 1993, as amended, by and between JOWA HAWAII CO., LTD., a Hawaii corporation, doing business as The Ilikai Hotel Nikko Waikiki, as Lessor, and RICK'S RESTAURANTS LTD., a Hawaii corporation, as Lessee, leasing and demising that certain restaurant space consisting of approximately 4,000 square feet, located on the lobby level of The Ilikai Hotel Nikko Waikiki, Hawaii, for a term commencing on November 1, 1993 and ending on October 31, 2008.

A SHORT FORM LEASE is dated December 27, 1993, filed as Land Court Document No. 2165308.

Said Lease is subject to any matters arising from or affecting the same.

5.     MORTGAGE ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING

|  |  |
|---|---|
| MORTGAGOR: | M WAIKIKI LLC, a Hawaii limited liability company |
| MORTGAGEE: | NOMURA CREDIT & CAPITAL, INC., a Delaware corporation |
| DATED: | as of July 12, 2006 |
| FILED: | Land Court Document No. 3452195 |
| AMOUNT: | $114,900,000.00 |

6.     The terms and provisions contained in the following:

|  |  |
|---|---|
| INSTRUMENT: | ASSIGNMENT OF LEASES AND RENTS |
| DATED: | as of July 12, 2006 |
| FILED: | Land Court Document No. 3452196 |



PARTIES:          M WAIKIKI LLC, a Hawaii limited liability company, "Assignor", and NOMURA CREDIT & CAPITAL, INC., a Delaware corporation, "Assignee"

7.     FINANCING STATEMENT

DEBTOR:          M WAIKIKI LLC, a Hawaii limited liability company
SECURED PARTY:  NOMURA CREDIT & CAPITAL, INC.
RECORDED:     Document No. 2006-128035
RECORDED ON:  July 12, 2006

8.     FINANCING STATEMENT

DEBTOR:          M WAIKIKI LLC, a Hawaii limited liability company
SECURED PARTY:  NOMURA CREDIT & CAPITAL, INC.
RECORDED:     Document No. 2006-128036
RECORDED ON:  July 12, 2006



**EXHIBIT F**

**EQUITY OWNERSHIP OF OWNER**

| | |
|---|---|
| **Owner:** | M Waikiki LLC, a Hawaii LLC |
| **Capital Member:** | eRF Hawaii Hotel Partners II LLC, a California LLC – 60% |
| **Manager:** | eRealty Fund, LLC, a California LLC – 40% |
| | |
| **Entity:** | eRF Hawaii Hotel Partners II LLC, a California LLC |
| **Capital Members:** | Investment Partners - 100.00% |
| **Manager:** | eRealty Fund, LLC, a California LLC - 0.00% |
| | |
| **Entity:** | eRealty Fund, LLC, a California LLC |
| **Capital Members:** | eRealty Fund, Inc., a CA corp. - 50% (owned 100% by Ed Bushor) |
| | McKinney Enterprises, Inc., a CA corp. - 50% (owned 100% by Damian McKinney) |
| **Managers:** | Ed Bushor, Co-Manager |
| | Damian McKinney, Co-Manager |



EXHIBIT G

**FORM OF MEMORANDUM OF MANAGEMENT AGREEMENT**

AFTER RECORDATION, RETURN BY      MAIL  (X)      PICK UP ( )                          :
    Marriott Hotel Services, Inc.
    c/o Marriott International; Inc.
    10400 Fernwood Road
    Bethesda, Maryland  20817
    Attn:   Regina A. Nelson
    Law Department 52/923

      **THIS MEMORANDUM OF MANAGEMENT AGREEMENT** (the "Memorandum") is made and entered into as of this _____ day of _____, 2008, by **M WAIKIKI LLC** ("Owner"), a Hawaii limited liability company, with offices at c/o eRealty Fund, LLC, 12780 High Bluff Drive, Suite 160, San Diego, California 92130, and **MARRIOTT HOTEL SERVICES, INC.** ("Manager"), a Delaware corporation, with a mailing address at c/o Marriott International, Inc., 10400 Fernwood Road, Bethesda, Maryland 20817.

**W I T N E S S E T H**

      Owner and Manager have entered into that certain Management Agreement dated as of the date hereof (herein, the "Management Agreement") with respect to the operation of a hotel on the premises located in Waikiki, Hawaii as more particularly described in Exhibit A attached hereto (the "Site").



The Management Agreement is in effect.  The Initial Term of the Management Agreement expires at the expiration of the thirtieth (30th) full Fiscal Year after the expiration of the Fiscal Year in which the Opening Date occurs. Thereafter, the Management Agreement shall automatically, and with no further action required by Manager or Owner, be renewed on the same terms and conditions for each of two (2) successive periods of ten (10) full Fiscal Years each ("Renewal Term(s)"), unless Manager shall have given prior written notice to Owner of its election not to renew pursuant to the provisions of the Management Agreement.

The Management Agreement contains terms and restrictions relating to financing of the Hotel.  The Management Agreement also contains terms and conditions relating to Owner's ability to sell or transfer interests in itself or the Hotel or the Site.

This Memorandum is not intended to alter or modify in any way the terms and conditions of the Management Agreement.  Terms not specifically defined in this Memorandum are defined in the Management Agreement.

[SIGNATURES FOLLOW ON NEXT PAGE]



IN WITNESS WHEREOF, Owner and Manager have caused this Memorandum to be executed under seal by their duly authorized representatives as of the day first above written, for the purpose of providing an instrument for recording and giving notice of the Management Agreement and certain of the terms and conditions thereof.

**OWNER:**

**M WAIKIKI LLC**, a Hawaii limited liability company

By: _____
Print Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF _____ )
                         ) ss:
COUNTY OF _____ )

On the _____ day of _____, 20__, before me personally appeared _____, who acknowledged himself to be the _____ of **M WAIKIKI LLC**, a Hawaii limited liability company, to me personally known, who, being by me duly sworn or affirmed, did say that such person(s) executed the foregoing instrument as the free act and deed of such person(s), and if applicable, in the capacities shown, having been duly authorized to execute such instrument in such capacities.

_____
Print name:
Notary Public, State of _____
My commission expires: _____

3



**MANAGER:**

**MARRIOTT HOTEL SERVICES, INC.,**
a Delaware corporation

By: _____

       Yoav K. Gery
       Authorized Signatory

## ACKNOWLEDGMENT

STATE OF _____ )
                            )   ss:
COUNTY OF _____ )

On the _____ day of _____, 2008, before me personally appeared Yoav K. Gery, who acknowledged himself to be an Authorized Signatory of **MARRIOTT HOTEL SERVICES, INC.,** a Delaware corporation, to me personally known, who, being by me duly sworn or affirmed, did say that such person(s) executed the foregoing instrument as the free act and deed of such person(s), and if applicable, in the capacities shown, having been duly authorized to execute such instrument in such capacities.

_____
Print name:
Notary Public, State of _____
My commission expires: _____

4



**EXHIBIT A**
**TO**
**MEMORANDUM OF MANAGEMENT AGREEMENT**

**LEGAL DESCRIPTION**

**EXHIBIT H–1**

**DESCRIPTION OF RESTRICTED AREA ONE**

As used in this Agreement, the term "Restricted Area One" shall mean that certain geographic area, as it exists on the Effective Date, located in Oahu, Hawaii that is bounded by the perimeter that begins at the western end of Kapahulu Avenue, continues east on Kapahulu Avenue to the intersection with Ala Wai Boulevard, continues north on Ala Wai Boulevard, continues west on Ala Wai Boulevard until reaching Mamala Bay, continues south along the eastern shore of Mamala Bay to the western end of Kapahulu Avenue.

All references in the foregoing definition to streets, roads, avenues, boulevards, highways, interstates or other roadways shall mean the center lines of such streets, roads, avenues, boulevards, highways, interstates or other roadways.

### EXHIBIT H–2

### <u>MAP OF RESTRICTED AREA ONE</u>

**Territorial Restriction
Edition Waikiki Beach**







EXHIBIT I

**REGISTERED MARKS**

**United States**

| Trademark | Class | Application Number | Application Date |
|-----------|-------|--------------------|------------------|
| EDITION | 35 | 77/343878 | Dec. 4, 2007 |
| EDITION | 41 | 77/343881 | Dec. 4, 2007 |
| EDITION | 43 | 77/343882 | Dec. 4, 2007 |
| EDITION | 44 | 77/343885 | Dec. 4, 2007 |

**FINAL**

**EDITION**
**WAIKIKI, HAWAII**

## FIRST AMENDMENT TO MANAGEMENT AGREEMENT

**THIS FIRST AMENDMENT TO MANAGEMENT AGREEMENT** ("First Amendment") is made and entered into as of this _13th_ day of March 2009, by and between **M WAIKIKI LLC**, a Hawaii limited liability company ("Owner") and **MARRIOTT HOTEL SERVICES, INC.**, a Delaware corporation ("Manager").

## RECITALS:

A.      Owner and Manager entered into that certain Management Agreement ("Management Agreement"), dated as of July 9, 2008, pursuant to which Owner engaged Manager to manage and operate the Waikiki EDITION Hotel located in Waikiki, Hawaii; and

B.      Owner and Manager desire to amend the Management Agreement on the terms and conditions set forth in this First Amendment.

NOW, THEREFORE, in consideration of the mutual covenants contained in this First Amendment, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      All capitalized terms that are not defined in this First Amendment shall have the meanings ascribed to such terms in the Management Agreement.

2.      Section 1.03.B of the Management Agreement is hereby amended to delete the last two (2) sentences in such Section.

3.      Section 11.26.A of the Management Agreement is hereby deleted in its entirety and the following is substituted in lieu thereof:

"A.      In consideration for Owner's execution of this Agreement, Manager shall pay to Owner the following amounts (collectively, the "Key Money"):

1.      Three Million Dollars ($3,000,000) within ten (10) Business Days after the Opening Date; and

2.      One Million Nine Hundred Eighty Thousand Dollars ($1,980,000) upon the later to occur of (i) January 15, 2010 or (ii) ten (10) Business Days after the Opening Date.

427174-3

Payment of the Key Money shall be subject to the following conditions: (i) there is no Event of Default by Owner under this Agreement; (ii) Owner has satisfied all other covenants, undertakings, obligations and conditions set forth in this Agreement and the Technical Services Agreement (including, without limitation, payment of Pre-Opening Expenses and initial Working Capital); and (iii) the Opening Date shall have occurred."

4.    Section 12.01 of the Management Agreement is hereby amended to delete the definition of "Base Management Fee" in its entirety and substitute the following in lieu thereof:

"Base Management Fee" shall mean, except as otherwise provided in Section 11.13.D, an amount payable to Manager as a Deduction from Gross Revenues equal to (i) three percent (3%) of Gross Revenues from the Opening Date until the end of the fifty-second (52nd) full Accounting Period after the Opening Date; (ii) three and one-half percent (3½%) of Gross Revenues for the fifty-third (53rd) through the one hundred fourth (104th) full Accounting Periods after the Opening Date; and (iii) four percent (4%) of Gross Revenues for each Accounting Period or portion thereof thereafter. Notwithstanding the forgoing, the Base Management Fee shall be an amount equal to four percent (4%) of Gross Revenues for each applicable "Test Period" set forth below if Operating Profit for such "Test Period" equals or exceeds the "Threshold" set forth below.

| TEST PERIOD | THRESHOLD |
|---|---|
| Opening Date until the end of the 13th full Accounting Period after the Opening Date | $15,183,308 |
| 14th through 26th full Accounting Periods after the Opening Date | $17,463,385 |
| 27th through 39th full Accounting Periods after the Opening Date | $19,365,538 |
| 40th through 52nd Accounting Periods after the Opening Date | $20,397,615 |
| 53rd through 65th Accounting Periods after the Opening Date | $21,046,846 |
| 66th through 78th Accounting Periods after the Opening Date | $21,260,077 |
| 79th through 91st Accounting Periods after the Opening Date | $21,830,000 |
| 92nd through 104th Accounting Periods after the Opening Date | $22,828,769 |

5.    Pursuant to the provisions of Section 11.24 of the Management Agreement, Owner and Manager hereby expressly state that this First Amendment supplements, amends and modifies the Management Agreement, as expressly provided herein.

6.    As amended by this First Amendment, the Management Agreement is hereby ratified and confirmed and is in full force and effect. The Management Agreement as amended by this First Amendment and that certain letter agreement between Owner and Manager dated as of July 9, 2008 embody the entire agreement of Owner and Manager with respect to the subject matter therein and herein, and no representations, inducements or agreements, oral or otherwise, not contained in the Management Agreement, this First Amendment, or such letter agreement shall be of any force or effect.

2

7.     This First Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument.

(Signatures Appear on Following Page)

3

**IN WITNESS WHEREOF**, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

<u>**OWNER:**</u>

**M WAIKIKI LLC**, a Hawaii limited liability company

By:    eRealty Fund, LLC, a California limited
      liability company, its Manager

By:    _____
Print Name:    _____
Title:    _____


<u>**MANAGER:**</u>

**MARRIOTT HOTEL SERVICES, INC.,**
a Delaware corporation

By:    _____
Print Name:    _____
Title:    _____

S-1

**IN WITNESS WHEREOF**, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

<u>**OWNER:**</u>

**M WAIKIKI LLC**, a Hawaii limited liability company

By:     eRealty Fund, LLC, a California limited
          liability company, its Manager

By:          _____
Print Name:  _____
Title:        _____

<u>**MANAGER:**</u>

**MARRIOTT HOTEL SERVICES, INC.,**
a Delaware corporation

By:          _____
Print Name:  Horace E. Jordan
Title:        Vice President

S-1

**EDITION**
**WAIKIKI, HAWAII**

## SECOND AMENDMENT TO MANAGEMENT AGREEMENT

**THIS SECOND AMENDMENT TO MANAGEMENT AGREEMENT** ("Second Amendment") is made and entered into as of this 16th day of November 2010, by and between **M WAIKIKI LLC**, a Hawaii limited liability company ("Owner") and **MARRIOTT HOTEL SERVICES, INC.**, a Delaware corporation ("Manager").

## RECITALS:

A.      Owner and Manager entered into that certain Management Agreement, dated as of July 9, 2008, as amended by that certain First Amendment to Management Agreement, dated as of March 13, 2009 (collectively, the "Management Agreement") pursuant to which Owner engaged Manager to manage and operate the Waikiki EDITION Hotel located in Waikiki, Hawaii; and

B.      Owner and Manager desire to amend the Management Agreement on the terms and conditions set forth in this Second Amendment.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Second Amendment, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      All capitalized terms that are not defined in this Second Amendment shall have the meanings ascribed to such terms in the Management Agreement.

2.      Section 11.07 of the Management Agreement is hereby amended to delete the address for notices to Owner and the provision for copies of notices to Owner to be sent to Squire, Sanders & Dempsey L.L.P. and the following is substituted in lieu thereof:

<div style="margin-left:2em">

To Owner:   M Waikiki LLC
       c/o eRealty Fund, LLC
       909 Lomas Santa Fe Drive
       Solana Beach, CA 92075
       Attn: Attn: Damian McKinney
       Phone: (858) 350-5598
       Fax: (858) 350-5585

With Copy to:  Luce, Forward, Hamilton & Scripps LLP
       600 West Broadway, Suite 2600
       San Diego, CA 92101-3391
       Attn: Stephen T. Toohill, Esq.

</div>

542460v6

Phone:  (619) 699-2404
Fax:   (619) 645-5379

3.       Section 12.01 of the Management Agreement is hereby amended to delete the second sentence in the definition of "Competitive Set" in its entirety and substitute the following in lieu there of:

"As of the Opening Date, the parties agree that the Competitive Set shall consist of: the Hotel; The Royal Hawaiian, A Luxury Collection Resort; Moana Surfrider, A Westin Resort & Spa; Halekulani; JW Marriott Ihilani Ko Olina Resort & Spa; Waikiki Parc Hotel; and The Kahala Hotel & Resort."

4.       Exhibit F of the Management Agreement is hereby deleted in its entirety and Exhibit F attached to this Second Amendment is substituted in lieu.

5.       Pursuant to the provisions of Section 11.24 of the Management Agreement, Owner and Manager hereby expressly state that this Second Amendment supplements, amends and modifies the Management Agreement, as expressly provided herein.

6.       As amended by this Second Amendment, the Management Agreement is hereby ratified and confirmed and is in full force and effect.  The Management Agreement as amended by this Second Amendment and that certain letter agreement between Owner and Manager dated as of July 9, 2008 embody the entire agreement of Owner and Manager with respect to the subject matter therein and herein, and no representations, inducements or agreements, oral or otherwise, not contained in the Management Agreement, this Second Amendment, or such letter agreement shall be of any force or effect.

7.       This Second Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument.

(Signatures Appear on Following Page)

2

**IN WITNESS WHEREOF**, the parties have caused their duly authorized representatives to execute this Agreement as of the date first above written.

<div align="center">

**OWNER:**

</div>

**M WAIKIKI LLC**, a Hawaii limited liability company

By:     eRealty Fund, LLC, a California limited
        liability company, its Manager

By: _Damian M Kennedy_
Print Name: _____Damian McKinney_____
Title: _____Manager_____

<div align="center">

**MANAGER:**

</div>

**MARRIOTT HOTEL SERVICES, INC.,**
a Delaware corporation

By: _____
Print Name: _____Yoav K. Gery_____
Title: _____Authorized Signatory_____

## EXHIBIT F

## EQUITY OWNERSHIP OF OWNER

**Owner:**      M Waikiki LLC, a Hawaii LLC

**Class A Member:**      eRF Hawaii Hotel Partners II LLC, a California LLC – approximately 40%*

**Manager and**
**  Class B Member:**      eRealty Fund, LLC, a California LLC – 0.00%

**Class C Member:**      The Davidson Family Trust dated December 22, 1999, as amended – approximately 60%*


**Entity:**      eRF Hawaii Hotel Partners II LLC, a California LLC

**Capital Members:**      Investment Partners (including The Davidson Family Trust dated December 22, 1999, as amended) - 100.00%

**Manager:**      eRealty Fund, LLC, a California LLC - 0.00%


**Entity:**      eRealty Fund, LLC, a California LLC

**Capital Members:**      eRealty Fund, Inc., a CA corp. - 50% (owned 100% by Ed Bushor)
McKinney Enterprises, Inc., a CA corp. - 50% (owned 100% by Damian McKinney)

**Managers:**      Ed Bushor, Co-Manager
Damian McKinney, Co-Manager


*Approximation based upon capital contributions as of September 1, 2010