# Exhibit H

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

M WAIKIKI LLC,

               Plaintiff,

  - against -

MARRIOTT HOTEL SERVICES, INC., I.S.
INTERNATIONAL, LLC and IAN
SCHRAGER,

               Defendants,

_____

MARRIOTT HOTEL SERVICES, INC.,

               Counterclaim-Plaintiff,

  - against -

M WAIKIKI LLC,

               Counterclaim-Defendant.

Index No.: 651457/2011
IAS Part 3
Justice Bransten

**AFFIDAVIT OF
KENNETH R. REHMANN**

Kenneth R. Rehmann, being duly sworn, deposes and says as follows:

1. My name is Kenneth R. Rehmann, and I am Global Officer of Brand Management, Marketing & eCommerce at Marriott International, Inc. ("Marriott"). I have worked for Marriott and/or its subsidiary Ritz-Carlton since 1991, having served as Executive Vice President of Operations and Chief Financial Officer of Ritz-Carlton, among other positions. I have been working in the hotel business for over twenty-three years.

2. In my current role, I have accountability for global brand management, global marketing and e-commerce of all Marriott's brands, including the EDITION brand. This includes strategy, planning, and execution of major initiatives for the company, as well as overall oversight of

these major functional disciplines within Marriott.  Global brand management includes the formulation of brand strategy standards, as well as initiatives on behalf of all the brands.  My global marketing responsibilities include the management of global marketing funds in excess of $300 million, as well as the Marriott Rewards program (with over 33 million members).  My responsibilities for e-commerce include oversight of the brands' websites (including Marriott.com and Editionhotels.com), and relationships with third-party e-vendors.  In my capacity as Global Officer of Brand Management, Marketing, and E-Commerce, I am responsible for over 700 employees.

    3.   I am familiar with the operational history of the Waikiki EDITION Hotel (the "Hotel") and the dispute between Marriott and M Waikiki LLC, the Owner of the Hotel.

    4.   On August 28, 2011, I learned that, notwithstanding its long-term Management Agreement with Marriott, the Owner entered the Hotel at around 2:00 a.m. with security personnel and attempted to terminate the Management Agreement with Marriott and take over operation of the Hotel.  The Owner is now holding out the Hotel as the Modern Honolulu hotel and has advised us that it has brought in Aqua Hotels & Resorts to manage the property.

    5.   I received no prior notice of Owner's intention to terminate the Management Agreement and bring in a new management company.  As far as I know, no one at Marriott received any such notice.  To the contrary, we have been in active settlement talks with the Owner.  We met in-person just this month, and the parties have traded multiple drafts of potential amendments to the Agreement.  So, the Owner's actions were a complete surprise.  Apparently, throughout our negotiations, the Owner was seeking out a replacement Operator and planning to seize the Hotel. This was clearly intended as a "sneak attack," even though it was the Owner who initiated the lawsuit in this Court.

6.   Although it was a sneak attack to us, it is also clear now to me that the Owner has been planning this for some time.  For example, the Owner already has a new website up advertising the Hotel as the Modern Honolulu.  *See* http://www.themodernhonolulu.com/.  I also know from my experience in the hospitality business that negotiating a management contract with a new manager, such as Aqua Hotels and Resorts, does not happen overnight and can take weeks or months to complete.

7.   Marriott currently is being harmed irreparably by the Owner's actions.  Before the Owner attempted to take over operation of the Hotel, the parties were resolving their dispute in an orderly way.  Within twelve hours of the Owner's actions, the Wall Street Journal was already reporting that "Marriott Loses Trendy Waikiki Hotel as Owner Changes Locks Overnight."  *See* http://online.wsj.com/article/SB10001424053111904199404576537140488961556.html.  Within a few more hours, the story was picked up by other press, including HOTELS magazine.  In addition, the Owners issued a press release in which they announce that Marriott has been terminated "amid allegations that the hotel has suffered from mismanagement by Marriott which were compounded by Marriott's failure to develop the Edition brand with which the property was previously affiliated."  The press release repeatedly quotes the Owners' lawyers.  For instance, the lawyer states that "[t]he owner believes that Marriott has failed in its management of this resort as well as the delivery of the Edition brand concept," and "[a]s a result, our clients brought in new management in the belief that doing so would better protect their investment."  *See* Press Release, attached as Exhibit 1 to my affidavit.

8.   As a result of Owner's actions, Marriott and the EDITION brand are now suffering as a result of anxiety among the group and leisure customers about their events and travel plans and unrest among employees at the Hotel who understandably are fearful about losing their jobs.  If

the Owner's actions are not remedied with Marriott restored as the rightful Operator of the Hotel, the damage to Marriott and EDITION's brand and reputation will be severe and irreparable.

9.  By way of background, Marriott is in the business of managing hotel properties. It is not in the business of owning hotel properties. Consequently, Marriott owns little in the way of real estate or other "hard" assets. Instead, Marriott's two primary assets are its long-term management agreements and its brands.  Its brand value and identification as a leading operator of first-class hotels is created through its reputation and its relationships with guests, owners and potential owners.

10. Marriott has spent decades building a reputation as a company that provides superb, first-class service to its guests. It is that reputation that attracts many if not most guests to Marriott's hotels.  Generally, guests book reservations at a Marriott hotel because of the Marriott brand and because they expect Marriott standards of service. Group and leisure guests have longstanding relationships with Marriott.

11. The EDITION brand is Marriott's newest brand.  Marriott founded the EDITION brand in 2008.  The EDITION brand was conceived by Marriott in a partnership with Ian Schrager.  It is what is known in the industry as a "lifestyle" hotel, which combines the personal, intimate, individualized and unique lodging experience that Ian Schrager is known for, with the global reach, operational expertise and scale of Marriott.  The brand combines great design and true innovation with great personal, friendly, modern service as well as outstanding, one-of-a-kind food, beverage and entertainment offerings, all under one roof.   The idea is that each highly stylized hotel functions as a "home away from home" for leisure and business travelers.

12. Marriott is incredibly excited about and committed to the EDITION brand.  As I stated, Marriott is not traditionally in the business of owning hotels.  Yet within the past year, Marriott

has purchased the historic Berner's Hotel in London and what was previously the Seville Hotel in Miami Beach.  Marriott is investing in excess of $400 million in purchasing and now renovating these properties, which will be operated as the London EDITION and the Miami Beach EDITION hotels.  These acquisitions were well-publicized, and I have personally discussed them with the Owners of the Waikiki EDITION as evidence of Marriott's commitment to the EDITION brand.  We have already seen signs that the EDITION brand—and this hotel— are poised for success.  The Hotel has received a tremendous amount of positive coverage in the trade and luxury travel press, and has already won accolades such as being named to Travel + Leisure's "It List" of the Best New Hotels of 2011.  Most of these articles focus on the Hotel as the first example of Marriott's new EDITION brand.

13. If the long-term Management Agreement of the Waikiki EDITION is terminated without cause based on purported common law claims that no court has decided, Owner's actions will unquestionably threaten the value and viability of the EDITION brand, as well as Marriott's investment in it.  The Owner of the Waikiki EDITION repeatedly asked to be the first EDITION hotel to open.  Now, the brand is inextricably tied up with the Waikiki EDITION, which is the first and therefore the flagship EDITION hotel.  By sabotaging the Waikiki EDITION, the Owner is effectively attempting to undo the entire brand.

14. I am confident based on my years of experience that the vast majority of the public does not know who M Waikiki LLC is, but all could identify the Hotel as an EDITION and Marriott property.  EDITION and Marriott are the only public face of the Hotel.  If the Owner's attempted takeover is permitted to stand, guests who expect to stay at the EDITION will unexpectedly find themselves in a hotel under different and unfamiliar management and will feel deceived by this abrupt change.  They will blame EDITION and Marriott, not the owners.

15. Unfortunately, we are already receiving dozens and dozens of emails and phone calls from guests who are concerned about their reservations, their upcoming events, and so on.  This is clearly a matter of great concern to our guests, and the Owner's actions have caused considerable anxiety and disruption.  The company that the Owner has chosen to replace Marriott does not manage luxury lifestyle hotels and generally is not capable of delivering the customer service that our guests expect.  In fact, a number of high-end travel agents and intermediaries will not take hotels operated by this company into their reservation systems.  We have also already received complaints from customers at the Hotel during the past two days about chaotic and horrible experiences with customers' rooms, with the restaurants and rooms service, with customer service, and with their overall guest experience.  Customers are making these complaints directly to us because they hold us responsible for their experience, not the Owners.  Our reputation for peerless customer service is our lifeblood, and the Owner's substandard operation during the past few days does serious harm to that reputation.

16. In my experience, once you disappoint a guest, it is difficult and sometimes impossible to regain that guest's trust and business. Guests who feel they were misled by EDITION or Marriott will not only cease to return to the Hotel, but may cease to patronize other EDITION or Marriott properties, to the obvious detriment of both Marriott and owners of other Marriott operated hotels.

17. What is true of individual guests is even more true of the travel agents and group travel managers who generate much of the business for the Hotel. One of Marriott's most valuable contributions to the Hotel and most valuable assets is its significant relationships with travel agencies and group accounts, who currently have booked over 7,000 room nights for the balance of 2011 and well into 2012.  The Hotel's group bookings are generated through relationships

developed by Marriott and EDITION's sales teams.  These relationships are built on trust. If the manager who books a large group into a Marriott hotel unexpectedly has to explain to the group members, who have invested significant resources in making arrangements for their meetings and conference, that they will not in fact be staying at a Marriott or EDITION or receiving the experience they expected, he or she will hesitate to book groups into other Marriott properties in the future. Similarly, travel agencies, which depend on customer satisfaction to sustain their business, are highly risk-averse. Accordingly, if Marriott is prematurely evicted, and on grounds perceived to be Marriott's fault, as the Owner is representing to the public, these agencies would look at Marriott differently in determining whether to book clientele at other Marriott and EDITION properties.

18. Marriott's reputation is important for hotel owners as well as guests and guest representatives.  This is especially true for a nascent brand like EDITION, which is in its early stages of development as a brand.  Marriott generally earns money by entering into long-term management contracts with hotel owners. Indeed, the economic value of Marriott as a company is calculated based on the revenue stream from its management agreements with hotel owners. Marriott's goodwill and solid reputation are critical to its relationships with its owners. The ownership community is tight-knit, and if Marriott is prematurely evicted from the Hotel, owners would assume the eviction was justified, which at a minimum would raise questions for other owners and potentially put Marriott's relationships with owners at risk. For those real estate developers who are now or will be in the future building new hotels, the fact of Marriott's eviction would raise concerns about contracting with Marriott to operate the new properties. As a result, this harm is especially irreparable.  The owners themselves admit that the success of the EDITION brand will depend at least in part on Marriott's ability to develop new EDITION

hotels and grow the brand.  The Owner's actions, if not redressed by this Court, will mean that countless deals may never be developed because prospective developers and owners will hesitate to invest in the brand.  Consequently, particularly in this economy, the Owner's actions impair Marriott's business relationships with both existing and prospective owners in ways that may never be captured by monetary damages.

19. The harms I have described in the foregoing paragraphs would be irreparable. No amount of money can fully restore Marriott's reputation with these individuals and entities.  If this Court were later to find in Marriott's favor and conclude that no Event of Default had occurred, such a ruling could never undo the harm that Marriott's eviction from the premises will cause. Even if monetary damages could provide some measure of recompense for reputational injury, it would be difficult to measure with any reasonable degree of certainty.  Marriott would not be able to determine to what extent the key group accounts, travel agencies, leisure travelers, vendors, or other individuals and entities with whom Marriott does business would name Marriott's eviction from Waikiki as the cause of their decision to decline business with Marriott or the EDITION brand.  Accordingly, the losses would be immeasurable and irreparable.

20. In any event, the Owner appears incapable of compensating Marriott for the harm that its actions will cause.  Under the Management Agreement, the Owner is responsible for funding the operation of the Hotel and, when the Hotel's income is not sufficient, is required to fund any shortfalls to keep the hotel in operation.  On June 29, 2011, Marriott requested that the Owner fund a past and projected operating shortfall of approximately $5.4 million as required under the contract.  *See* Ex. 2.  The Owner refused, *see* Ex. 3, and Marriott has done so in the Owner's place as a loan.  Based on the Owner's refusal and/or inability to fund the Hotel, Marriott has every reason to believe that M Waikiki LLC has no liquid assets from which to pay a judgment

of any significant amount.  It is my understanding that M Waikiki LLC is a special-purpose corporation whose only significant non-liquid asset is the Hotel itself.  It is difficult to know whether the Hotel's actual market value exceeds by any significant amount the substantial debt that encumbers the property. But in the current economic climate, it is not at all clear that M Waikiki could find a buyer for the Hotel.  Accordingly, even if Marriott's reputational injury could be remedied with monetary damages, and even if those damages could be calculated with reasonable certainty, it does not appear that M Waikiki has the present ability to pay those damages, much less the substantial economic damages that are described in the affidavit of Catherine L. Young.

21. Finally, the Owner's actions are causing irreparable harm by exposing Marriott's proprietary information to a competitor.  The Owner provided no notice whatsoever of its takeover and attempted termination.  Both the Owner and Aqua Hotels are currently in possession of Marriott's trade secrets.  For example, I understand that representatives of Owners and Aqua attempted to copy onto their computers the proprietary computer programs we use at our properties.  They also have access to guest records, including information about future bookings, and to employees' personnel files.  Our guest and employees trust us with this sensitive information, and it could be quite damaging to our reputation when these people learn that someone else now has access to that data.  The Owners also have access to a lot of sensitive information about the new EDITION brand, including brand strategies, plans for operations, marketing, and development, and confidential information about other EDITION and Marriott hotels and their owners.  This would be sensitive information for any brand, but with a nascent brand like EDITION where early marketing and growth is particularly important, the public disclosure of our plans is likely to be particularly harmful.

22. Perhaps most distressingly, the Owners now have access to a huge amount of written information about how to run a Marriott hotel, and in particular an EDITION hotel.   This is primarily embodied in our Standard Operating Procedures, or "SOPs."   We at Marriott refer internally to these SOPs as the company's "secret sauce."   The SOPs cover virtually every aspect of hotel operations, including for example operations and guest services, human resources management, financial controls, revenue forecasting, and profitability analyses.   Marriott has decades of experience in the hotel industry, and this experience is embodied in our proprietary systems and methods, including the SOPs.   These documents, especially when taken as a whole, represent an extremely valuable asset – our knowledge of how to manage hotels efficiently and profitably, with appropriate controls at the individual hotels and appropriate oversight by regional and corporate-level officials.   These are a trade secrets, and we go to great lengths to guard this and other proprietary information.

23. It should be obvious that Aqua Hotels is a competitor of Marriott, indeed it is the competitor that the Owner has identified as the operator it would apparently like to replace Marriott. As a hotel management company, besides its long-term management agreements and brand, Marriott's greatest assets are its proprietary operational practices and guest and employee information.  If this information, the blueprints for how to run our hotels, were to fall into the hands of a competitor, the harm to Marriott would be irreparable, as it is impossible to remove such information from the minds of competitors.  Once lost, no amount of money can remedy Marriott for the harm after Marriott has invested years and millions to develop these trade secrets.

24. For all of the aforementioned reasons, I am confident that Marriott will suffer irreparable harm in the absence of an injunction restoring the status quo of the Management Agreement.

25. Finally, while the Owners have created considerable chaos and disruption through their actions, Marriott is well practiced at restoring order in a variety of situations.  The Marriott management team from the Hotel is standing by.  We are confident that we could return to the Hotel and restore operations within 24 hours of a court order.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Kenneth R. Rehmann

Sworn to before me this
29th day of August, 2011

_____
Notary Public

ANDRONIKI D. ALAHOUZOS
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires October 9, 2013

# Exhibit 1

# M WAIKIKI LLC

## *NEWS*
**For Immediate Release**

## The MODERN Honolulu:  Luxury Hotel Renamed; Marriott Terminated as Manager of Former Edition Property

HONOLULU (August 28, 2011) – M Waikiki LLC, a hotel investment group, today announced that it has selected Modern Management Services, LLC, an affiliate of Aqua Hotels & Resorts ("Aqua") as the new management company of the former Waikiki Edition Hotel (the "hotel"), a luxury property in Honolulu, Hawaii. The 353-room property, renamed The MODERN Honolulu, becomes a flagship property of Aqua, Hawaii's premier boutique hotel chain. Reservations can be made by visiting the hotel's new website at www.themodernhonolulu.com or by calling (808) 943-5800.

"We are extremely excited about this new opportunity," said Damian McKinney, principal of M Waikiki LLC, the owner of the hotel. "We believe that Aqua will realize the vision on which this hotel was developed – becoming the leading lifestyle hotel in Hawaii."

M Waikiki LLC (the "owner") announced Modern Management Services as the manager of the property following the termination of Marriott International Inc. ("Marriott") amid allegations that the hotel has suffered from mismanagement by Marriott which were compounded by Marriott's failure to develop the Edition brand with which the property was previously affiliated.

Modern Management Services plans to offer employment to current hotel staff members, who will maintain their current rate of pay, original start date and accrued vacation.  All current reservations and event bookings will be honored without any anticipated changes.

"Our primary focus is ensuring a smooth transition for employees and guests," said Benjamin Rafter, president and CEO of Aqua. "Based on our experience in the local hospitality community, we believe The MODERN Honolulu will become the lifestyle hotel in the Islands."

The announcement of new management comes more than three months after the owner filed a lawsuit against Marriott and boutique hotelier Ian Schrager. According to allegations in the lawsuit, the property opened as the first Edition hotel in late 2010 and, since that time, has suffered from poor occupancy, a brand with virtually no identity, and Marriott's unwillingness to control expenses. The complaint asserts, "What defendants represented would be a fully supported new lifestyle hotel brand in the Marriott family of brands has turned out to be a nonexistent hotel chain."

"The owner believes that Marriott has failed in its management of this resort as well as the delivery of the Edition brand concept," said William A. Brewer III, partner at Bickel & Brewer and lead counsel for the owner. "As a result, our clients brought in new management in the belief that doing so would better protect their investment."

According to the lawsuit, when the Edition brand of boutique hotels was publicly announced, Marriott's President and Chief Operating Officer, Arne Sorenson, stated, "Success will be determined by one thing only: how many of these we can open, and how well they perform."

The complaint alleges that despite Marriott's representation in 2007 that it had agreements in place to open nine hotels in major cities worldwide within the year, with up to 100 more coming soon thereafter, there is only one other Edition Hotel, a 77-room Istanbul, Turkey property that just recently opened. The lawsuit says that defendants' failure to perform their obligations have "resulted in outrageously low occupancy levels and average daily room rates for the Hotel."

Indeed, according to the owner, during the three-month period of May – July 2011, the hotel sustained staggering operating losses of $1.9 million. Approximately a week ago, an updated 2011 forecast prepared by Marriott increased the projected loss for the remainder of 2011 from $1.2 million to over $1.9 million – resulting in total projected operating losses for the year of almost $6.4 million.

Although Marriott has attempted to deflect responsibility for the hotel's poor performance, the hotel's competition has consistently outperformed the property. A recent report from Smith Travel Research indicates the hotel has a RevPAR (revenue per available room) Index of 47 percent year-to-date. Even in July 2011, as the local hospitality market flourished, the hotel had occupancy rates that were almost 20 percent below its competitive set and a RevPAR index of only 54 percent.

The MODERN Honolulu is a unique luxury hotel located on the Island of Oahu, within walking distance of world famous Waikiki Beach, the Hawaii Convention Center, Ala Moana Beach Park and Ala Moana Shopping Center. All hotel facilities, including world-renowned Morimoto Waikiki, the Lobby Bar, the Bar at Sunrise Pool and the nightclub remain open under the hotel's new management. Hotel guests also have uninterrupted access to the property's full-service spa, state-of-the-art fitness center and retail shop.

Visit The MODERN Honolulu at www.themodernhonolulu.com.

**About M Waikiki LLC:**
M. Waikiki is a Hawaii limited liability company with its principal place of business located in San Diego, California. It is a special purpose entity, having approximately 75 indirect investors, which was formed to acquire the Hotel.

**About Modern Management Services and Aqua Hotels & Resorts:**
Modern Management Services is an affiliate of Aqua Hotels & Resorts, a full-service management company founded in 2001 by Hawaii hotelier Mike Paulin. Currently representing contemporary hotels and resorts located on Oahu, Maui, Kauai, Molokai and Lanai, Aqua offers full-service resorts, stylish beach boutique hotels.

Headquartered in Waikiki, Aqua became Hawaii's first employee-owned hotel company in 2008 when it executed an Employee Stock Ownership Plan. For more information on the company and individual hotels, visit www.aquaresorts.com or call 1-808-943-9291.

**About Bickel & Brewer:**
Founded in 1984, Bickel & Brewer has earned a reputation as one of the most successful law firms in the United States practicing exclusively in the field of complex commercial litigation and dispute resolution. With offices in New York and Dallas, Bickel & Brewer represents a wide spectrum of industry leaders – from entrepreneurs to Fortune 500 corporations – facing the most challenging of legal issues. Visit Bickel & Brewer at www.bickelbrewer.com.

# # #

**Media Contacts:**

Russell Pang, Communications Pacific, on behalf of Aqua Hotels & Resorts
Office: 808.543.3591
Cell: 808.354.2115
rpang@commpac.com

Travis J. Carter on behalf of Bickel & Brewer and M Waikiki LLC
Office:  214.653.4856
Cell:  214.415.3729
tcarter@bickelbrewer.com

Case 1:11-cv-06488-BSJ   Document 18-9   Filed 10/14/11   Page 18 of 22

# Exhibit 2

**MARRIOTT HOTEL SERVICES, INC.**
c/o Marriott International Lodging
10400 Fernwood Road
Bethesda, MD 20817

June 29, 2011

<u>VIA FACSIMILE AND OVERNIGHT COURIER</u>

M Waikiki LLC
c/o eRealty Fund, LLC
12780 High Bluff Drive, Suite 160
San Diego, California 92130

Attn: Ed Bushor and Gary Stougard

Re:     Waikiki Edition Hotel (the "Hotel"): Request for Working Capital

Dear Gentleman,

As you know, the Hotel management team has been working with representatives of Owner to address the Hotel's current Working Capital needs. The Hotel management team has shared the attached cash flow projections for the Hotel with Owner's representatives, both for the period prior to the earthquake and tsunami in Japan and afterward. It is clear from these projections that a further infusion of Working Capital is required to continue to operate the Hotel.

As you also know, Owner still owes $1,977,740 to the Hotel to cover expenses incurred during the pre-opening period that are to be funded by Owner pursuant to Section 5.4 of the Design and Technical Services and Pre-Opening Agreement dated as of July 9, 2008 (the "Pre-Opening Agreement") by and between Marriott Hotel Services, Inc. ("Manager"), I.S. International, LLC and M Waikiki LLC ("Owner").

Section 4.09 of the Management Agreement dated as of July 9, 2008 (as amended, the "Management Agreement") by and between Manager and Owner provides that Owner shall advance Working Capital promptly, but no later than 10 days after written the request of Manager, to satisfy the needs of the Hotel as its operation may require from time to time in accordance with System Standards. Therefore, we hereby request that you provide Working Capital to the Hotel in the aggregate amount of five million three hundred eighty seven thousand five hundred and eighty five Dollars ($5,387,585) by July 1, 2011, which includes the outstanding pre-opening amounts due. Such funds will be used to meet existing financial obligations of the Hotel, as well as to support ongoing Hotel operations through August 2011. During this period, we will continue to work with the Owner's representatives on the projections for the remaining 2011 calendar year based on the unfolding events in Japan and Hawaii.

M Waikiki LLC
c/o eRealty Fund, LLC
Page 2 of 2

We appreciate your attention in this matter and look forward to making the Hotel a great success.

All capitalized terms not otherwise defined herein shall have the meanings set forth in the Management Agreement.

Sincerely yours,

**MARRIOTT HOTEL SERVICES, INC.**

By:      Kevin Kimball
Title:   Vice President

cc:     Squire, Sanders, & Dempsey L.L.P.
        1201 Pennsylvania Avenue N.W. Suite 500
        Washington, DC 20004
        Attention: Michael S. Kosmas, Esq.
        *(via facsimile: 202-626-6780)*

# Exhibit 3

## M WAIKIKI, LLC

July 25, 2011

**VIA FEDERAL EXPRESS**

Mr. James P. Connelly
Vice President
Marriott Hotel Services, Inc.
10400 Fernwood Road
Bethesda, MD  20817

Re:    **Notice of Default relating to Waikiki Edition Hotel**

Dear Mr. Connelly:

This responds to your Notice of Default relating to Waikiki Edition Hotel dated July 19, 2011.[1]

Owner denies that it has defaulted under the Management Agreement dated July 9, 2008, between Marriott Hotel Services, Inc. ("Manager") and M Waikiki, LLC ("Owner"), as amended ("Management Agreement") relating to the Waikiki Edition ("Hotel"), and/or the Design and Technical Services and Pre-Opening Agreement among Owner, Manager, and I.S. International, LLC ("Schrager LLC") dated July 9, 2008 (the "Pre-Opening Agreement"). As you know, Owner had previously provided Manager Notice of Default date May 26, 2011.

In your letter, you contend that Owner defaulted under the Management Agreement by its failure to provide Manager with: (1) $1,977,740 in Pre-Opening Expenses; (2) $2,225,301 in Working Capital shortfalls; and (3) $1,184,544 for forecasted Working Capital shortfalls through August 2011. First, with respect to the Pre-Opening Expenses, despite our requests, you have failed to provide Owner with an itemized accounting of the funds spent on Pre-Opening Expenses, as required by section 5.5 of the Pre-Opening Agreement. In addition, the alleged failure to pay Pre-Opening Expenses is not a default under the Management Agreement. The payment of Pre-Opening Expenses is addressed under the Pre-Opening Agreement and, contrary to your contention, sections 9.01 D and G of the Management Agreement do not apply to that issue.[2] Further, as set forth in Owner's Complaint filed in New York Supreme Court, Marriott and Schrager LLC materially breached the Pre-Opening Agreement by, among other things, failing to use reasonable efforts to perform their pre-opening obligations in an efficient and business-like manner. In fact, Marriott and Schrager LLC exceeded the initial pre-opening budget of $3.8 million by more than a factor of two and incurred over $8.7 million in Pre-Opening Expenses. Accordingly, Owner is not obligated to pay the Pre-Opening Expenses Manager seeks.

Your contention that Owner is in default under the Management Agreement for failure to fund past and future Working Capital shortfalls is also without merit. Manager is not entitled to recover such amounts as a result of its prior material breaches of the Management Agreement. In fact, the shortfalls of which Manager complains are a result of Manager's own breaches of its contractual and common law duties. Manager's prior material breaches of the Management Agreement (as detailed in Owner's notice of Manager's default dated May 26, 2011, and further

---

[1] Please note that you sent the Notice of Default to the wrong address. Pursuant to the Second Amendment of the Management Agreement, please direct future notices and correspondence to 909 Lomas Santa Fe Drive, Solana Beach, California 92075.

[2] You state in your letter at page 2 that Manager issued a notice of default under the Pre-Opening Agreement. Please be advised that Owner has not received such a notice.

detailed in the Complaint) have given rise to excessive expenses, which are inexplicable given Manager's failure to produce occupancy and usage of our Hotel's facilities.

Should you wish to discuss these matters, please feel free to call me.

Best regards,

M WAIKIKI LLC

By:      eRealty Fund, LLC, its Manager

By:

         Its:  Manager

cc:      William A. Brewer III