# Exhibit M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

M WAIKIKI LLC,

        Plaintiff,

- against -

MARRIOTT HOTEL SERVICES, INC., I.S. INTERNATIONAL, LLC and IAN SCHRAGER,

        Defendants,

---

MARRIOTT HOTEL SERVICES, INC.,

        Counterclaim-Plaintiff,

- against -

M WAIKIKI LLC,

        Counterclaim-Defendant.

Index No.: 651457/2011
IAS Part 3
Justice Bransten

**AFFIDAVIT OF MICHAEL ROCK**

Michael L. Rock, being duly sworn, deposes and says as follows:

1. My name is Michael L. Rock and I am the General Manager of the Waikiki EDITION Hotel in Honolulu, Hawaii (the "Hotel"). As General Manager, I am the highest-ranking employee of Marriott International, Inc. at the Hotel, overseeing all aspects of the Hotel, including the operational, human resources, financial, and sales and marketing departments. I direct the Hotel's guidance team, each of whom in turn leads up his or her own department. As General Manager, I am also the primary Marriott employee at the Hotel responsible for executing Marriott's responsibilities under the Management Agreement with the Hotel's Owner, M Waikiki LLC ("Owner").

1

2. I assumed my responsibilities as General Manager in July 2009. Prior to becoming General Manager of the Hotel, I was General Manager of the JW Marriott in Mexico City, Mexico. I have been employed by Marriott for over 25 years.

3. The Hotel opened on September 28, 2010. Eight months later, the Owner filed a lawsuit against Marriott asserting that Marriott breached its Management Agreement with the Owner by not making as much money as Owner would have liked. The Owner provided no notice prior to filing its lawsuit, and sent a notice of default the day after it filed its lawsuit.

4. Since the Owner's lawsuit, Marriott has continued to operate the Hotel with a "business as usual" approach. For example, when the Owner has requested to review Books and Records, we have given the Owner access to Books and Records for its review. We have continued to meet regularly with the Owner and to provide weekly reports on the Hotel's financial performance, on Marriott's sales and marketing efforts, and so on. We have also had ongoing telephone, email, and other communications with the Owner via its asset manager, Robert Watson. The Owner's asset manager visited the property for three days in July 2011 and we discussed all aspects of the Hotel's operation, including financial, performance, sales and marketing, plans and actions, year-end forecast information, profit improvement plans, and much more.

5. In July 2011, Marriott filed a Motion to Dismiss the Owner's lawsuit. Again, that filing did not change our approach to managing the Hotel, which has been business as usual. We have not yet received a response from the Owner to that Motion to Dismiss.

6. On August 28, 2011, I received a call at approximately 3:30 a.m. from Roula McCann, our Director of Finance, and Cristiano Buono, our Front Office Manager. McCann and Buono told me that the Owners had showed up at the Hotel in the middle of the night with a large group

of people, including security, to seize the Hotel from Marriott.  The Owners also apparently brought police with them because McCann told me that there was a police car parked in front the Hotel that arrived when the Owners showed up and a sheriff was present.  McCann told me that the Owners were escorting managers off the property, including Laura Modica (our director of nightlife) and Mark Aldridge (our director of sales and marketing).  I did not receive any notice from the Owners or their representatives before they showed up at the Hotel.

7.  At first, I was informed that Christian Oles, the Director of Security, was on property and was being detained by the Owners and not allowed out of his office.  McCann told me that Oles had passed keys and access to the Owners.  Oles left me a voicemail at 2:30 a.m., which I did not receive until later.  He said that the Owners were at the Hotel to "take control" and asked me to call him.  I later came to suspect that Oles was working with the Owners and the Owners later informed me that he and his security team have apparently signed on to work for Aqua Hotels & Resorts.  I have very strong suspicions that Oles had collaborated with the Owners in advance of this takeover for several reasons.  He does not normally work on Saturday nights and had scheduled himself ostensibly to cover the regular Saturday security supervisor's request for a night off.  McCann told me that when Oles was speaking with her, he was repeating everything she was saying loudly as though it was intended for someone else in the room to hear.  He also apparently told McCann that we had "been served" and that there was a court order requiring us to vacate the property even though he is has an experienced law enforcement and military background and, as he has professed knowledge to me many times of the legal system and legal documents, he would seem to know the difference between a court order and a letter.  I believe he was working with the Owners to facilitate this takeover.

8. After my initial call with McCann and Buono, I went to the Hotel. I noticed Paul Guccini, who works with the Owner's asset manager, standing by the employee entrance. I approached Paul and asked for a copy of the paperwork that was apparently "served" to Marriott and asked who it was presented to. He said that he would get us a copy and returned shortly with the two letters, one addressed to Arne Sorenson and one to the Hotel. There was no court order. When I asked who these had been presented to, he told me that they were presented to the security supervisor. When I started listing names, asking if it was a security supervisor named Tarrant, Paul said yes, it was him. I also Paul for an electronic copy of the letters, which he later provided via email. I asked Paul about to personal items inside the Hotel in case employees wished to receive them, and he said yes, but told me that if myself or McCann or other managers wanted to retrieve their things, they would need to contact him personally. I did not try to enter the Hotel.

9. Upon getting the documents from Paul, I gave them to Buono to fax to our lawyers. I then saw multiple employees of the Hotel arriving for work. Several of them shared with me that they had arrived and were being told by the owners and their representatives that they would need to be escorted to the Hotel's ballroom, which was now a "processing center." They were being told that they could either sign on with Aqua Hotels & Resorts, the new management company apparently selected by the Owner to operate the Hotel, or they would be immediately fired. Employees told me that they felt coerced and placed in a difficult or impossible position. Many of the employees were in tears and clearly emotionally distraught. They asked me over and over, "How can they do this? How can they treat us like this?"

10. Employees exiting the building shared with me that they had seen the Owner removing or covering up EDITION signage inside and outside of the Hotel. They appeared to be removing

4

all evidence of the EDITION brand.  I was informed that the Owners were even cutting the EDITION logo out of the Hotel's towels and bathrobes.  I also learned that the Owner had slipped a note under the door of every guest room that informed the guests that the hotel was no longer an EDITION and was now being operated by Aqua Hotels & Resorts.  I received a phone call about that letter from the key planner from MC&A, the destination management company handling a high-profile Fuji Xerox incentive group that was staying at the Hotel at the time in approximately 50 rooms.  The planner told me that she was scared and concerned and wanted to know what needed to be done so that her group could be adequately cared for over their two remaining days at the Hotel.  I agreed to meet with her and assured them of how important Fuji Xerox is to Marriott International.  I said I would do whatever I could to assist them.  I said that our options were limited at this point, but suggested that they make sure that the rest of their logistical planning could be implemented by the Owners.  We had made promises to them ranging from airport transportation to remaining events we were supposed to be planning for them off of the property; because of the Owner's actions, we could no longer coordinate these events or ensure their logistical success.  They expressed to me their concern that their program was in jeopardy based upon this hostile takeover.

11. At the Hotel right now, the Owner has access to an enormous amount of Marriott's proprietary and confidential information.  At some point in the late morning, I was told by an employee that the Owners were attempting to access Marriott's servers to download information onto laptops they brought with them into the Hotel.  I also learned they were trying to access all of Marriott's confidential and proprietary systems, such as Micros (our food & beverage point of sale system), Opera (our property management system), and Saflock (our key system).  The Owner also has access to a tremendous amount of additional proprietary and confidential

5

information, including but not limited to: all of our employee personnel files, which contain employee salary, social security, private family and beneficiary information, medical history, and other private information of a personal nature; Marriott Standard Operating Procedures and other business processes, which contain the operational strategy and trade secrets of the company; proprietary information about EDITION's brand strategy for operation, marketing, and development; confidential information about other EDITION and Marriott hotels and owners; confidential guest and customer information, including names, addresses, phone records, and credit card information. Employees have also expressed concern to me for other employee property that is housed in employee offices, such as passports. In addition, the Owners now have access to attorney-client privileged information sent to myself and Roula McCann in connection with the pending litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Michael L. Rock

Sworn to before me
this 29th day of August, 2011

Notary Public, State of Hawaii
TAMMY M. YOSHIMURA
My commission expires 09-22-2012

L.S.

Notary certificate on next page.

6

Doc. Date: _08/29/2011_     # Pages: _7_

Notary Name: _Tammy M. Yoshimura_     _First_ Circuit

Doc. Description: _Affidavit of Michael Cock_

_____

_Tammy M [signature]_     _08/29/2011_     L.S.
Notary Signature            Date            (Stamp or Seal)