# Exhibit N

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

M WAIKIKI LLC,

               Plaintiff,

   - against -

MARRIOTT HOTEL SERVICES, INC., I.S.
INTERNATIONAL, LLC and IAN
SCHRAGER,

               Defendants,

MARRIOTT HOTEL SERVICES, INC.,

               Counterclaim-Plaintiff,

   - against -

M WAIKIKI LLC,

               Counterclaim-Defendant.

Index No.: 651457/2011
IAS Part 3
Justice Bransten

## MEMORANDUM OF LAW IN SUPPORT OF MARRIOTT'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST M WAIKIKI LLC

JENNER & BLOCK LLP
Richard F. Ziegler
Brian J. Fischer
Colleen A. Harrison
919 Third Avenue, 37th Floor
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 909-0815

David A. Handzo (pro hac application
forthcoming)
Michael B. DeSanctis
Lindsay C. Harrison (pro hac application
forthcoming)
Kelly D. Gardner
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 661-4956

*Attorneys for Defendant Marriott Hotel Services, Inc.*

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                          Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                      Page i of iii

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

ARGUMENT ......................................................................................................................10

I.   MARRIOTT'S COUNTERCLAIMS ARE LIKELY TO SUCCEED ON THE MERITS.....11

II.  MARRIOTT IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT THE RELIEF
     SOUGHT. ...................................................................................................................14

     A.  The Ouster Harms Marriott's Business and Reputation. ....................................14

     B.  The Misappropriation of Marriott's Proprietary Materials Harms Marriott......17

III. THE BALANCE OF THE EQUITIES FAVORS MARRIOTT. ..........................................18

CONCLUSION...................................................................................................................20

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*
*I.S. International, LLC and Ian Schrager*

Index No. 61457/2011
Page ii of iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*2207 Pavilion Assocs., LLC v. Plato Foufas & Co.,*
  No. 604132/2005, 2007 WL 4616382 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 21, 2007).................11

*Axios Prods, Inc. v. Time Machine Software, Inc.,*
  No. 13825/10, 2010 WL 3974915 (N.Y. Sup. Ct. Comm. Div. Oct. 4, 2010) .......................14

*Concourse Rehab. & Nursing Ctr., Inc. v. Gracon Assocs.,*
  64 A.D.3d 405 (1st Dep't 2009) .........................................................................................11

*Credit Index, LLC v. RiskWise Int'l LLC,*
  282 A.D.2d 246 (1st Dep't 2001) .......................................................................................18

*Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.,*
  69 A.D.3d 212 (4th Dep't 2009).........................................................................................16

*DoubleClick, Inc. v. Henderson,*
  No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 7, 1997) .......................18

*J. Petrocelli Constr., Inc. v. Realm Elec. Contractors, Inc.,*
  15 A.D.3d 444 (2d Dep't 2005)..........................................................................................12

*John H. Rottkamp & Son, Inc. v. Wulfurst Farms, LLC,*
  17 Misc. 3d 382 (N.Y. Sup. Ct. Suffolk Cnty. 2007) .........................................................14

*JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.,*
  920 N.Y.S.2d 241, 2010 WL 4868142 (N.Y. Sup. Ct. 2010).................................................13

*Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.,*
  No. 602762/09, slip op. at 7-9 (N.Y. Sup. Ct. July 13, 2010) .................................................13

*Marcone APW, LLC v. Servall Co.,*
  85 A.D.3d 1693 (4th Dep't 2011).......................................................................................17

*Mr. Natural v. Unadulterated Food Prods.,*
  152 A.D.2d 729 (2nd Dep't 1989) ......................................................................................19

*People by Abrams v. Anderson,*
  137 A.D.2d 259 (4th Dep't 1988).......................................................................................14

*People v. Woodlawn Cemetery,*
  173 Misc. 2d 846 (N.Y. Sup. Ct. Albany Cnty. 1997).........................................................17

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*
*I.S. International, LLC and Ian Schrager*

Index No. 61457/2011
Page iii of iii

*Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.,*
    5 Misc.3d 285 (N.Y. Sup. Ct. N.Y. Cnty. 2004) ....................................................................17

*Szartmari v. Rosenbaum,*
    128 Misc. 2d 232 (N.Y. Just. Ct. Westchester Cnty. 1985).......................................................12

*U.S. Ice Cream Corp. v. Carvel Corp.,*
    136 A.D.2d 626 (2nd Dep't 1988) ...........................................................................................19

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,*
    1 N.Y.3d 470 (N.Y. 2004) ........................................................................................................12

*Wills of N.Y. v. DeFelice,*
    299 A.D.2d 240 (1st Dep't 2002) .............................................................................................17

**STATUTES**

C.P.L.R. 6301.............................................................................................................................11

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                          Page 1 of 20

Defendant and Counterclaim-Plaintiff Marriott Hotel Services, Inc. ("Marriott"), by and through its attorneys, Jenner & Block LLP, respectfully submits this Memorandum of Law in Support of Marriott's Motion for a Temporary Restraining Order and Preliminary Injunction Against Plaintiff and Counterclaim-Defendant M Waikiki LLC ("Owner").[1]

## PRELIMINARY STATEMENT

This emergency application arises from Owner's lawless middle-of-the-night ouster of Marriott as exclusive manager of the Waikiki EDITION Hotel (the "Hotel"). Just over forty-eight hours ago, in the pre-dawn hours of Sunday, August 28, 2011, Owner purported to unilaterally terminate its Management Agreement with Marriott by forcibly expelling Marriott management from the Hotel and replacing it with a new management company, Aqua Hotels & Resorts ("Aqua"). Owner did so not with any forewarning to Marriott but with approximately fifty hired security personnel, whom it scattered throughout the Hotel. Marriott's employees were told they must sign on with Aqua or face termination. Marriott's guests awoke to Owner's security force removing EDITION signage throughout the Hotel and scrambling to manage a facility that just hours before had been held out to the world as a Marriott hotel. Not surprisingly, Owner's actions have landed like a sucker punch: Marriott has been flooded with emails and phone calls from concerned and confused guests anxious about upcoming reservations and events; the Hotel's operations are in shambles, with high-end travel agents refusing to accept Hotel reservations amid the proliferating chaos; and customers are

---

[1] This Memorandum of Law is filed alongside Marriott's Counterclaims Complaint (for breach of contract and conversion) and is supported by the affidavits of six fact witnesses: (1) Ken R. Rehmann, Global Officer of Brand Management, Marketing & eCommerce at Marriott International Inc.; (2) Catherine L. Young, Senior Vice President for Global Asset Management at Marriott International Inc.; (3) Michael L. Rock, General Manager of the Waikiki EDITION Hotel; (4),Roula McCann, Director of Finance for the Waikiki EDITION Hotel; (5) Laura Modica, Director of Nightlife & Entertainment for the Waikiki EDITION Hotel; and (6) Gabriela Fontana, Assistant Food & Beverage Manager for the Waikiki EDITION Hotel.

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                    Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                            Page 2 of 20

complaining directly to Marriott about terrible customer service experiences under new

management.

Owner's actions are a flagrant violation of the clear and unambiguous terms of the

parties' Management Agreement, find no support whatsoever in any other contractual or

common law source, and have already caused irreparable harm to Marriott's reputation, brand

identity, and good will that promises to continue absent this Court's intervention.  Owner's

ejection of Marriott and self-declared termination of the Management Agreement are particularly

egregious given that Owner purposefully evaded the very legal process Owner itself initiated

three months ago.  In May, Owner filed a lawsuit against Marriott in this Court and sought the

precise relief – termination of the Management Agreement – that Owner helped itself to over the

weekend.[2]  Having initiated this litigation, Owner had an easy lawful option at its disposal: it

could have sought an injunction ejecting Marriott as operator of the Hotel.  To do so, however,

Owner would have had to show a likelihood of success on the merits, irreparable harm without

the injunction, and a lack of harm to Marriott; it also might have had to post a bond.  Unable and

unwilling to pursue this course of action, Owner opted to flout the law and take matters into its

own hands, raiding the Hotel under cover of darkness.

According to Owner, the Marriott relationship is now severed.  Owner is wrong, and

through a temporary restraining order and preliminary injunction, Marriott should be restored

immediately to the position it held literally days ago and the position it remains contractually

entitled to hold.

*First*, Owner has unmistakably breached the parties' Management Agreement, and thus

Marriott is likely to succeed on the merits of its breach of contract counterclaim.  Owner has no

---

[2] Earlier this month, Marriott moved to dismiss that entire lawsuit for failure to state a claim; Owner has yet to file
its opposition papers.

right to terminate the Management Agreement at will but has nevertheless purported to exercise such a right.  The termination rights identifiable in the parties' contract do not vest until five years after the Hotel's opening – a date which will not be reached until 2015 – or until Marriott has been found by the Court to be in breach of the Management Agreement – an event that obviously has not occurred.  So clear is the absence of any termination right that Owner asks the Court in its complaint for a declaration that Marriott is in default of the Management Agreement such that Owner is entitled to terminate.  Rather than wait for the Court to rule on its claim – and, perhaps more significantly, Marriott's motion to dismiss – Owner circumvented the process it initiated three months earlier.

*Second*, without the immediate relief sought, Marriott will continue to suffer irreparable harm at the hands of Owner.  Even though mere days have elapsed since Owner's actions, Owner's breach is already devastating Marriott's reputation as a hotel manager.  This reputational harm exists with guests, employees, existing hotel owners, prospective hotel owners, and developers, and all of Marriott's other business partners.  Owner's actions threaten the trust which Marriott has spent years building, as well as the entire business model on which the hospitality industry operates.  It is impossible to capture this damage with a financial figure. Only an injunction restoring Marriott as rightful manager of the Hotel will afford meaningful relief from the damage Marriott is suffering.  Moreover, as set out below, Marriott believes that Owner is in no position to pay the damages that would be due Marriott as a result of the breach of contract, even if those damages could be quantified (which they cannot be).  Accordingly, Owner cannot credibly represent to this Court that Marriott has an adequate legal remedy because Owner has neither the ability nor intention to pay even modest damages.  For all of these reasons, the harm Marriott is suffering is irreparable and warrants injunctive relief.

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                   Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                          Page 4 of 20

*Third*, the balance of the equities strongly favors Marriott, and in no way aligns with

Owner's cavalier actions.  In marked contrast to the harm Owner has caused, the relief sought by

Marriott would simply require Owner to honor and perform under the contract for which it

previously bargained.  To permit Owner's ungoverned tactics is to endanger the expectations of

all contracting parties.

## STATEMENT OF FACTS

At the heart of this dispute is the development, design, and operation of the Waikiki

EDITION Hotel, a luxury hotel property in Honolulu, Hawaii owned by Owner.  (Compl. ¶ 9.)[3]

Owner engaged Marriott and Defendant I.S. International, LLC ("I.S. International") to provide

design advice and technical services during the renovation and for Marriott to manage the Hotel,

which Marriott has done since the Hotel re-opened in October 2010.  (*See id.* ¶¶ 11-12.)  Owner

chose to re-open the Hotel as an EDITION brand hotel.  (*Id.* ¶ 14.)  EDITION is a new brand of

"boutique" hotels jointly created by Marriott and I.S. International.  (*Id.*)  The Hotel was the first

EDITION hotel to open and has done so to great acclaim.  (*Id.* ¶ 15.)

A.  *The Management Agreement Governs the Parties' Relationship.*

Two agreements between the parties govern the redesign and management relationship: a

July 9, 2008 Design and Technical Services and Pre-Opening Agreement ("TSA") and a July 9,

2008 Management Agreement ("Management Agreement" or "MA").[4]  The Management

Agreement is most relevant to Marriott's request for emergency relief.

The Management Agreement vests Marriott with substantial, unfettered operational and

managerial – *e.g.*, employment; pricing; publicity and advertising; administrative policies;

operating licenses and permits; etc. – authority over the Hotel.  For example, under Section 1.02

---

[3] References to Compl. refer to Marriott's Counterclaim Complaint filed concurrently with this Motion.
[4] The MA is Exhibit A to Marriott's Counterclaim Complaint.

of the Management Agreement, captioned "Delegation of Authority," "[t]he operation of the Hotel shall be under the exclusive supervision and control of [Marriott] which, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient operation of the Hotel."  (MA at 2, § 1.02.)  Likewise, under the same section, "[s]ubject to the terms [of the Management Agreement], [Marriott] shall have discretion and control in all matters relating to management and operation of the Hotel, free from interference, interruption or disturbance, but in all respects subject to the provisions of this [Management] Agreement."  (*Id.*)  Similarly, all Hotel employees are Marriott's employees, not Owner's employees, with the Management Agreement specifying that "[a]ll personnel employed at the Hotel shall, at all times from and after the Effective Date [of the Management Agreement, which was July 9, 2008], be the employees of [Marriott] (or one of its Affiliates)" and that Marriott "shall have absolute discretion with respect to" employee "hiring [with minimal Owner input], promoting, transferring, compensating, supervising, terminating, directing and training."  (*Id.* § 1.06.)

Moreover, the Management Agreement provides that "Owner acknowledges that competitive information regarding brands, customers, marketing, operating or other strategies (including information related to other hotels) is confidential and proprietary to Manager and shall not be disclosed to Owner."  (*Id.* at 47, § 11.09.)

>    B. *The Management Agreement Limits the Ability of Owner to Terminate the Relationship.*

Under the Management Agreement, the term of Marriott's management of the Hotel is thirty years.  (*Id.* at 11, § 2.01.)  The right to terminate that term earlier is limited to three circumstances, none of which are remotely present here.

*First*, under the heading "Performance Termination" in Section 2.02, Owner has a highly limited right to terminate the Management Agreement that: (a) does not vest until the Hotel has been opened for five years, a date that will not be reached until October 2015 (*see id.* at 11, § 2.02(A)); (b) requires sixty days notice before taking effect (*id.* at 12, § 2.02(B)); and (c) can be vetoed by Marriott through the making of a cure payment to Owner (*id.*).

*Second*, although certain defined "Defaults" in the Management Agreement can give rise to Owner's right to terminate the Management Agreement, none of them are currently present. For example, thirty days of continuous "failure of either party to perform, keep or fulfill any of the other covenants, obligations or conditions set forth in [the Management] Agreement" followed by the non-defaulting party's written notice and the defaulting party's failure to timely cure, creates an "Event of Default."  (*Id.* at 38 § 9.01(G).)  However, "if the defaulting party contests the occurrence of the Event of Default or its effect on the non-defaulting party," that Event of Default cannot serve as the basis for terminating the Management Agreement unless and until "a court of competent jurisdiction has issued a final, binding and non-appealable order finding that the Event of Default has occurred and that it has . . . a material adverse effect [on the non-defaulting party or the financial operations of the Hotel.]"  (*Id.* at 38, § 9.02(A)(iii).)  No such finding has ever been made by a court.

*Third*, under the heading "Limitation on Termination by Owner" in Section 2.03 of the Management Agreement, even if Owner is in possession of a termination right, that right cannot be exercised if Owner owes Marriott certain amounts.  Specifically, Section 2.03 provides: "Notwithstanding anything in this Agreement to the contrary, without the express written consent of [Marriott] (which consent may be withheld in [Marriott's] sole and absolute discretion), Owner covenants and agrees that it may not terminate this Agreement *for any reason*

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                    Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                           Page 7 of 20

*whatsoever* (including, without limitation, any Event of Default caused by [Marriott]) at any time

that (i) [Marriott] . . . [is] providing (or [is] obligated to provide) any credit enhancement,

guarantee, or loan (collectively, the "Marriott Funding Obligations") to Owner . . . or (ii) any

amounts funded by [Marriott] . . . pursuant to any Marriott Funding Obligation remain

outstanding and payable to [Marriott]."  (*Id.* at 13, § 2.03 (emphasis added).)   As of the date of

this filing, over $5.5 million remains outstanding and payable to Marriott under this provision

(Young Aff. ¶ 6), and thus under Section 2.03, Owner has no termination right whatsoever.

> ### C.  Marriott Is Not an Agent of Owner.

The Management Agreement provides that Marriott "shall act solely as an independent

contractor" and that Marriott "shall be deemed to be a fiduciary solely with respect to any funds

held by it in the Operating Accounts, the FF&E Reserve or any other funds held by [Marriott] or

its Affiliates for Owner."   (MA at 43-44, § 11.03.)  It further states that none of the parties'

agreements "shall in any respect be interpreted, deemed or construed as making [Marriott] a

partner, joint venture with, or agent of, Owner," and that Owner and Marriott specifically "agree

that neither party will make any contrary assertion, claim or counterclaim in any action, suit, . . .

or other legal proceedings."  (*Id.*)[5]

> ### D.  The Action.

The Waikiki EDITION opened for business in October 2010.  (*See* Compl. ¶ 12.)  On

November 16, 2010, Owner executed an Estoppel Certificate to Marriott in which Owner

certified that: (1) "there [was] no continuing Default (as defined in the Hotel Agreements) by

[Marriott] in the performance or observance of any covenant, agreement or condition contained

---

[5] A similar provision appears in the TSA. Under the TSA, Owner agreed that Marriott and I.S. International "shall each act solely as an independent contractor"; that none of the parties' agreements "shall in any respect be interpreted, deemed or construed as making any party a partner, joint venturer with, or agent of, any other party"; and that no party would argue otherwise.  (TSA at 27, § 9.4.)

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                          Page 8 of 20

in the Hotel Agreements," and (2) "no event ha[d] occurred that, with the giving of notice or

passage of time or both, would become such a Default."   (Aug. 1, 2011 Gardner Aff., Ex. E at 1-

2.)[6]  Despite its certification that no default had occurred, Owner brought its lawsuit against

Marriott on May 26, 2011, seeking damages and a declaration in essence to terminate the

Management Agreement.  Owner sent Marriott a Notice of Default the same day, and that notice

was received on May 27, 2011.  (Aug. 1, 2011 Gardner Aff., Ex. F.)  Marriott filed a motion to

dismiss on August 1, 2011.

> *E.   The Improper Ouster of Marriott as Manager.*

Without waiting for a determination on the merits of that motion, Owner took the law

into its own hands.  On Sunday, August 28, 2011, without providing any prior notice to Marriott,

Owner entered the Hotel at around 2:00 a.m. with approximately fifty security personnel.  (*See*

Rehmann Aff. ¶¶ 4-5; McCann Aff. ¶ 3.)  The Owner advised a Marriott employee on duty that it

was purporting to terminate the parties' Management Agreement based on its "common law"

right to do so.  (*See* McCann Aff. ¶ 3; Compl. Ex. B.)  Once in the Hotel, the Owner began

printing proprietary information from the Hotel's computers and removing all signage in the

Hotel that used the EDITION name.  (*See* Fontana Aff. ¶¶ 5, 14; Rock Aff. ¶ 10.)  After

scattering its security guards throughout the Hotel, the Owner assembled Marriott's employees in

the Hotel lobby and told them that the Hotel was under new management.  (*See* Fontana Aff. ¶¶

3, 8; Rock Aff. ¶ 9.)  The Owner purported to fire many of Marriott's managerial employees,

escorting them off of the property.  (*See* Modica Aff. ¶¶ 11-14; Rock Aff. ¶ 6.)  The Owner

advised Marriott's other employees that they would have to sign on with Owner's new manager

or face termination.  (*See* McCann Aff. ¶ 7; Rock Aff. ¶ 9.)  The Owner provided Marriott with

_____

[6] The Gardner Affidavit and exhibits were filed with Marriott's Motion to Dismiss on August 1, 2011.

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                    Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                  Page 9 of 20

no prior notice of any of these actions, instead electing a "sneak attack." (*See* McCann Aff. ¶ 6;

Rehmann Aff. ¶ 5.)  Owner is now holding out the Hotel as the "Modern Honolulu" hotel and

has advised Marriott that it has brought in Aqua Hotels & Resorts to manage the property.

(Rehmann Aff. ¶ 4.)  The resulting harm to Marriott, its guests, and its employees is described in

detail *infra* Part II.

　　　　Although Owner provided Marriott with no notice and declined to pursue termination in

court, it now appears that the Owner had been planning this takeover for many weeks, if not

months.  By the night of its takeover, Owner had already prepared a new website for the Hotel

under its purported new name.  (*See* Rehmann Aff. ¶ 6.)  Owner had already searched for and

located a new manager in Aqua and had negotiated terms under which Aqua would manage the

Hotel.  (*See id.*)  Weeks earlier, Owner sent representatives of its legal counsel to the property

under the auspices of a review of Books and Records, yet it now appears that Owner was actually

seeking information to hand over to its new manager.  (*See* McCann Aff. ¶ 9.)  Finally, it

appears that Owner had advised at least two of Marriott's employees of its takeover intentions,

and persuaded them to assist in Owner's coup.  (*See* McCann Aff. ¶ 5;  Rock Aff. ¶ 7; Fontana

Aff. ¶ 7.)

　　　　Moreover, during this time, Marriott was in active settlement talks with the Owner.  (*See*

Rehmann Aff. ¶ 5.)  Representatives of Marriott and Owner met just this month, and the parties

have traded multiple drafts of potential amendments to the Management Agreement.  (*Id.*)

Apparently, throughout these negotiations, Owner was seeking out a replacement manager and

was planning to seize the Hotel.  (*Id.*)

　　　　Following its takeover of the Hotel, the Owner has access to an enormous amount of

Marriott's proprietary and confidential information, including but not limited to: (a) all of the

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*          Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                 Page 10 of 20

Hotel's employee personnel files, which contain employee salary, social security, private family

and beneficiary information, medical history, and other private information of a personal nature;

(b) Marriott Standard Operating Procedures and other business processes, which contain the

operational strategy and secrets of the company; (c) proprietary information about EDITION's

brand strategy for operation, marketing, and development; (d) confidential information about

other EDITION and Marriott hotels and owners; and (e) confidential guest and customer

information, including names, addresses, phone records, and credit card information.  (*See*

Rehmann Aff. ¶¶ 21-23; Rock Aff. ¶ 11.)  In addition, the Owner now has access to attorney-

client privileged information sent to Marriott employees in connection with the pending

litigation.  (*See* Rock Aff. ¶ 11.)

Owner has justified its action in two letters and an email to Marriott which purport to

terminate the Management Agreement based on its common law rights to terminate a contract

and its common law right to terminate its agent.  (Compl. Exs. B-D.)

## **ARGUMENT**

A court may grant a preliminary injunction "where it appears that the defendant threatens

or is about to do, or is doing . . . an act in violation of the plaintiff's rights respecting the subject

of the action, and tending to render the judgment ineffectual . . . ."  N.Y. C.P.R.L. 6301.  A

preliminary injunction may also be granted where, as here, a plaintiff "has demanded or would

be entitled to a judgment restraining the defendant from the commission or continuance of an act,

which, if committed or continued during the pendency of the action, would produce injury to the

plaintiff."  *Id.*

To obtain a preliminary injunction, a party must demonstrate its "likelihood of success on

the merits, irreparable injury absent an injunction and [a] balance of the equities in [its] favor."

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                        Page 11 of 20

*Concourse Rehab. & Nursing Ctr., Inc. v. Gracon Assocs.*, 64 A.D.3d 405, 405 (1st Dep't 2009).

Courts may enter temporary restraining orders that have the effect of restoring the status quo and

granting the relief sought in the preliminary injunction. *See 2207 Pavilion Assocs., LLC v. Plato

Foufas & Co.*, No. 604132/2005, 2007 WL 4616382, at *1 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 21,

2007).  Similarly, a court may grant a "temporary restraining order . . . pending a hearing for a

preliminary injunction where it appears that immediate and irreparable injury, loss or damage

will result unless the defendant is restrained before the hearing can be had."  N.Y. C.P.L.R. 6301.

## I.      MARRIOTT'S COUNTERCLAIMS ARE LIKELY TO SUCCEED ON THE MERITS.

In its Counterclaims, Marriott alleges that Owner breached the Management Agreement,

including by purporting to terminate it, when it effected the ouster of Marriott as manager of the

Hotel.[7]  (*See* Compl. ¶ 53.)  Such ouster is a plain breach of numerous provisions of the

Management Agreement, including *inter alia*: (a) Sections 1.02 and 1.04, which delegate to

Marriott the many rights, obligations and responsibilities over the Hotel's management and

operation Owner claims to have stripped from Marriott; (b) Section 2.01, which sets out a thirty-

year term for the Management Agreement (subject to two subsequent ten-year terms renewed or

not at Marriott's election); (c) Sections 3.01 and 3.02, which specify the compensation to which

Marriott is entitled over the life of the Management Agreement; and (d) Sections 2.02, 2.03, and

9.02, which set forth the only conditions under which Owner may terminate the Management

Agreement, none of which are present here.

Indeed, Owner does not even claim that its termination is authorized by the Management

Agreement.  That is because it cannot, as the three circumstances affording Owner a termination

right have never come to fruition.  *See supra* Statement of Facts Part B.

---

[7] The Management Agreement is governed by New York law pursuant to § 11.04 of that Agreement.

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                       Page 12 of 20

Instead, in terse correspondence to Marriott, Owner sources its supposed termination powers to the "common law" right a party purportedly possesses to (a) terminate a contract and (b) terminate an agent.  (Compl. Exs. B-D.)  These so-called rights either do not exist or do not exist here.

*First*, where sophisticated parties to an integrated contract such as the Management Agreement painstakingly craft the terms and conditions under which unilateral termination may be exercised, the parties enjoy no extra-contractual rights, whether derived from the common law or someplace else, to unilaterally void a contract.  *See Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) (holding that "[w]hen interpreting contracts, we have repeatedly applied the familiar and eminently sensible proposition of law [ ] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms" (citations and quotation marks omitted, alterations in original)); *J. Petrocelli Constr., Inc. v. Realm Elec. Contractors, Inc.*, 15 A.D.3d 444, 446 (2d Dep't 2005) (holding that "where parties agree on a termination procedure, the clause must be enforced as written"); *Szartmari v. Rosenbaum*, 128 Misc. 2d 232, 233 (N.Y. Just. Ct. Westchester Cnty. 1985) (same).  This proposition is firmly rooted in common sense, as otherwise all contracts would stand merely as illusory "agreements" for which one party may at any time and for any reason (or not) pull the plug.[8]  Accordingly, while Owner may argue that it owns the Hotel and may therefore do whatever it wants with its property, its contract with Marriott plainly disproves that.  That contract entitles Marriott to operate the Hotel, even as it is owned by Owner.  Under New York law, Owner must be held to its bargain.

---

[8] Indeed, Counsel for Marriott has spent a portion of the past forty-eight hours since first being apprised of Owner's supposed common law right to terminate a contract searching in vain for such a concept under New York law.

    *Second*, the Management Agreement unambiguously contradicts Owner's theory that it may terminate Marriott as its agent by specifically and expressly stating that Marriott is *not* Owner's agent.  The parties agreed that Marriott, as Manager, "shall act solely as an independent contractor" and that nothing in the Management Agreement or anything contemplated by the Agreement "shall in any respect be interpreted, deemed or construed as making Manager a partner, joint venture with, *or agent of*, Owner."  (MA at 43-44, § 11.03 (emphasis added).)[9] New York courts have repeatedly enforced such provisions as a matter of law, and dismissed agency claims that are contradicted by this sort of contractual language.  *See, e.g.*, *Madison 92nd Street Assocs., LLC v. Courtyard Mgmt. Corp.*, No. 602762/09, slip op. at 7-9 (N.Y. Sup. Ct. July 13, 2010) (dismissing agency claim based on contractual language nearly identical to the TSA and Management Agreement provisions at issue); *JPMorgan Chase Bank, N.A. v. Controladora Comercial Mexicana S.A.B. De C.V.*, 920 N.Y.S.2d 241, 2010 WL 4868142, at *10 (N.Y. Sup. Ct. 2010) (unpublished table decision) (holding that "no defense of, or claim for, breach of fiduciary duty will lie" where the contract "specifically disclaims a fiduciary relationship").

    In short, the parties negotiated the relationship between them and unambiguously agreed to the specific conditions for termination.  Indeed, the Agreement's thirty-year term and extensive provisions on termination would make no sense if the parties contemplated that the Owner could terminate at-will based on unspecified common law grounds.  Any theory of the Owner's termination rights predicated on an illusory agency relationship must be rejected.

---

[9] The Management Agreement does recognize Marriott as a fiduciary "solely with respect to any funds held by it" in the Hotel's accounts, but there is no allegation or dispute here about those accounts.  (*See* MA at 43, § 11.03.)

## II.   MARRIOTT IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT THE RELIEF SOUGHT.

### A.   The Ouster Harms Marriott's Business and Reputation.

Irreparable harm is suffered where the moving party will lose "customer good will, sales, and market share." *See Axios Prods, Inc. v. Time Machine Software, Inc.*, No. 13825/10, 2010 WL 3974915 (N.Y. Sup. Ct. Comm. Div. Oct. 4, 2010); *see also People by Abrams v. Anderson*, 137 A.D.2d 259, 271  (4th Dep't 1988) (holding that "[p]laintiff should not be required to suffer further economic harm by loss of good will and patronage during the pendency of the action"). The prospect of such harm justifies preliminary injunctive relief because "[d]amage to business reputation and good will can be difficult or impossible to quantify and demonstrates irreparable harm, as opposed to injury that can be compensated with damages."  *John H. Rottkamp & Son, Inc. v. Wulfurst Farms, LLC*, 17 Misc. 3d 382, 388  (N.Y. Sup. Ct. Suffolk Cnty. 2007).  Marriott easily satisfies this standard.

Owner's "sneak attack" is clearly and irreparably harming the reputation of Marriott and its EDITION brand – indeed, based on its course of conduct, that harm appears to be one of Owner's main goals.  "Marriott has spent decades building a reputation as a company that provides superb, first-class service to its guests," and "[i]t is that reputation that attracts many if not most guests to Marriott's hotels." (Rehmann Aff. ¶ 10.)  Indeed, Marriott relies upon its stellar reputation with guests, travel agents and group travel managers, and other hotel owners to maintain its business.  As a result of Owner's actions, Marriott and the EDITION brand are now suffering as a result of anxiety among the group and leisure customers about their events and travel plans, confusion and concern among travel agents and group travel managers, and potential doubts about the continued viability of the brand and partnering with Marriott among hotel owners and real estate developers.  (*See id.* ¶¶ 14-18.)

If the Owner's actions are not remedied with Marriott restored as the rightful Manager of the Hotel, this damage to Marriott and EDITION's brand and reputation will be severe and irreparable.  (*See id.* ¶ 8.)  In fact, that damage started immediately.  Right after Owner's abrupt actions, Marriott began receiving scores of emails and phone calls from confused guests; high-end travel agents and intermediaries ceased taking Hotel reservations; horrendous customer service experiences under new management running the gamut from restaurants to room service have been reported to Marriott because those customers perceive Marriott to be responsible for their experiences.  (*See id.* ¶ 15.)

As guests experience poor service or are forced to re-book hotels at the last minute, it is Marriott they will blame, as it is Marriott with whom they originally bargained.  (*See id.* ¶ 14.) Guests who believed they were booking a stay with an EDITION brand hotel will feel they were misled and may cease to patronize other EDITION or Marriott properties, to the obvious detriment of both Marriott and owners of other Marriott operated hotels.  (*See id.* ¶ 16.) Similarly, travel agents and group travel managers who book a large group into a Marriott hotel and unexpectedly have to explain to the group members, who have invested significant resources in making arrangements for their meetings and conference, that they will not in fact be staying at a Marriott or EDITION or receiving the experience they expected, will hesitate to book groups into other Marriott properties in the future.  (*See id.* ¶ 17.)  This damage is impossible to quantify, as it is impossible to know or calculate how many guests decide *not* to book with Marriott.  (*See id.* ¶ 19).

Furthermore, the premature eviction of Marriott by Owner from the first EDITION hotel will compromise Marriott's relationships with other hotel owners and real estate developers, particularly those who are or might participate in the development of the nascent EDITION

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*                                  Index No. 61457/2011
*I.S. International, LLC and Ian Schrager*                                         Page 16 of 20

brand.  (*See id.* ¶ 18.)  Accordingly, Owner's actions also threaten the entire EDITION brand,

which "is inextricably tied up with the Waikiki EDITION, . . . the first and therefore flagship

EDITION hotel."  (*Id.* ¶ 13.)  Within the last year alone, Marriott has invested more than $400

million of its money to purchase and renovate hotels in London and Miami Beach as new

EDITION hotels, and is actively developing deals with other owners for new EDITION hotels

around the world.  (*Id.* ¶ 12.)  Owner's actions threaten to derail pending deals and prevent

countless others from coming into being by causing the market to lose confidence in the

EDITION brand.  (*See id.* ¶ 18.)  Marriott simply cannot calculate with certainty the resulting

financial harm.  *Id.*  Injunctive relief is therefore appropriate.  *See Destiny USA Holdings, LLC v.*

*Citigroup Global Mkts. Realty Corp.*, 69 A.D.3d 212, 222 (4th Dep't 2009) ("Harm to business

reputation is harm for which money damages are insufficient and for which injunctive relief may

be appropriate.").

      Critically, all of the foregoing harms are magnified by Owner's insinuation that the

eviction was Marriott's fault, as well as the publicity Owner has brazenly courted for its newly

renamed hotel.  (*See* Rehmann Aff. ¶¶ 7, 18.)  Within twelve hours of Owner's actions, the *Wall*

*Street Journal* was already reporting that "Marriott Loses Trendy Waikiki Hotel as Owner

Changes Locks Overnight."[10]  (Rehmann Aff. ¶ 7.)  In addition, Owner issued a press release in

which it announced that Marriott has been terminated "amid allegations that the hotel has

suffered from mismanagement by Marriott which were compounded by Marriott's failure to

develop the Edition brand with which the property was previously affiliated."  (*Id.*)  This release

has been picked up by numerous news outlets, both in Hawaii and around the world.  (*See id.*)

Absent injunctive relief, individual guests and travel agents are likely to perceive Owner's

---

[10] *See* http://online.wsj.com/article/SB10001424053111904199404576537140488961556.html.

actions – taken while a lawsuit brought by Owner is pending – to be Marriott's fault, and one that perhaps even has a judicial imprimatur.  (*See id.* ¶ 17.)  The public's opinion of Marriott's reputation for high quality service in the hospitality industry risks permanent scarring as a result. (*See id.* ¶¶ 9, 13-15; McCann Aff. ¶ 10 and Rock Aff. ¶ 10 (describing problems already experienced by guests at the Hotel under the new manager).)

Finally, even if the harm to Marriott could be quantified, it appears that Owner could never pay.  Owner's "present inability to pay current expenses, much less reimburse the funds" later, renders a potential judgment ineffectual and constitutes irreparable harm warranting injunctive relief.  *People v. Woodlawn Cemetery*, 173 Misc. 2d 846, 850  (N.Y. Sup. Ct. Albany Cnty. 1997).  Owner has refused to fund the Hotel, contrary to its commitments in the Management Agreement, strongly suggesting that it has no liquid assets available to pay its debts to Marriott now or in the future.  (Rehmann Aff. ¶ 20; Young Aff. ¶¶ 6, 10.).  Accordingly, injunctive relief is necessary to prevent harm that is irreparable both in nature and in fact.

### B.      The Misappropriation of Marriott's Proprietary Materials Harms Marriott.

If the moving party shows that "the use and disclosure of their confidential information by [the opposing party is] likely to occur, they satisf[y] the requirement of showing a likelihood of irreparable injury . . . ."  *Wills of N.Y. v. DeFelice*, 299 A.D.2d 240, 243  (1st Dep't 2002); *see also Marcone APW, LLC v. Servall Co.*, 85 A.D.3d 1693, 1696-97 (4th Dep't 2011) (finding irreparable harm when defendants misappropriated plaintiffs' non-public customer lists that contained compiled proprietary information and gave plaintiffs a competitive advantage).  "The loss of an industry leader's market, and the loss of the advantage of being a pioneer and a market leader, may constitute irreparable harm."  *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc.3d 285, 299 (N.Y. Sup. Ct. N.Y. Cnty. 2004).  Indeed, "[i]rreparable harm is presumed,

where, as here, trade secrets have been misappropriated." *DoubleClick, Inc. v. Henderson*, No. 116914/97, 1997 WL 731413, at *7 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 7, 1997).

Subsequent to the ouster, Owner has misappropriated Marriott's proprietary information. Inside the Hotel are non-public customer lists, marketing materials, financial statements, sales systems, employee personnel files, property management systems, and attorney-client communications that document every detail of managing an EDITION Hotel.  (*See* Rehmann Aff. ¶ 21; McCann Aff. ¶ 9; Rock Aff. ¶  11.)  The Management Agreement indisputably recognizes the confidential and proprietary nature of these items.  (MA at 47, § 11.09 ("Owner acknowledges that competitive information regarding brands, customers, marketing, operating or other strategies (including information related to other hotels) is confidential and proprietary to Manager and shall not be disclosed to Owner.").)  With its physical control of the property, Owner already has access to hard copy documents, and is apparently attempting to download electronic information from Marriott's servers.  (Rock Aff. ¶ 11.)

In addition, during their midnight coup, Owner and Aqua coerced Marriott's employees to sign on to work for the new management company.  (Rock Aff. ¶ 9; McCann Aff. ¶¶ 7-8.) The fact that former Marriott employees are continuing to work at the Hotel makes it more likely that Marriott's confidential and proprietary information will be disclosed to its competitor, Aqua. Injunctive relief is necessary to minimize the harm Marriott surely is suffering as a result.

## III.    THE BALANCE OF THE EQUITIES FAVORS MARRIOTT.

The balance of the equities weighs in favor of granting Marriott's request for injunctive relief.  This prong is satisfied when the moving party shows that "any injury [it] is likely to sustain will be more burdensome to it than the harm likely to be caused [to the opposing party] through the imposition of an injunction."  *Credit Index, LLC v. RiskWise Int'l LLC*, 282 A.D.2d

246, 246 (1st Dep't 2001).  When equity so requires, a court can exercise its discretion to enforce a contract even against the preferences of the non-moving party.  *See, e.g.*, *Mr. Natural v. Unadulterated Food Prods.*, 152 A.D.2d 729, 730-31 (2nd Dep't 1989) (granting preliminary injunction preventing beverage manufacturer from terminating exclusive distributorship contracts pending trial on agreements when, absent preliminary injunction, there was no assurance that distributor would be able to stay in business pending trial); *U.S. Ice Cream Corp. v. Carvel Corp.*, 136 A.D.2d 626, 628 (2nd Dep't 1988) (granting preliminary injunction preventing termination of franchise agreement in order to maintain status quo pending trial).

In contrast to Marriott's showing of irreparable harm, Owner will not suffer significant hardship if Marriott is permitted to resume management of the Hotel.  Owner will merely be obligated to perform the contract for which it bargained.  While Owner may contend that the Hotel has suffered operating losses in its first eight months, that is not part of the equities equation.  The parties agreed in their contract that Owner was not owed any particular amount of profit and that projected results were not guaranteed.  (MA at 47, § 11.10.  Indeed, many hotel owners suffer operating losses in the first year of operation, and even well-established hotels can suffer such losses during an economic downturn.  Owner suffered the misfortune of opening its new luxury hotel in a global economic recession.  But that is not Marriott's fault, it and certainly does not entitle Owner to terminate the Management Agreement not even a year after the Hotel first opened.

While Marriott cannot control the global economy, it can control the quality of its guest experience, and under Marriott's management, the Hotel has been extraordinarily successful, garnering uniformly positive reviews.  (*See* Rehmann Aff. ¶ 12.)  That performance is in keeping with Marriott's strong reputation for successfully managing luxury hotels, unlike the Owner's

*M Waikiki LLC v. Marriott Hotel Services, Inc.,*
*I.S. International, LLC and Ian Schrager*

Index No. 61457/2011
Page 20 of 20

new manager, Aqua, which has no experience managing a high-end lifestyle hotel like the

Waikiki property.  (*See id.* ¶ 15.)

Accordingly, if Marriott's request for injunctive relief is granted, the Hotel will continue

to operate well and the Owner will suffer only the hardship of being held to its contractual

bargain.  By contrast, the severe and irreparable harm Marriott will suffer weighs far more

heavily and warrants the relief Marriott seeks.

## **CONCLUSION**

For the foregoing reasons, Marriott's motion for a temporary restraining order and

preliminary injunction should be granted.

Respectfully submitted,

Dated: New York, New York
      August 30, 2011

JENNER & BLOCK LLP

By: _____
Richard F. Ziegler
Brian J. Fischer
Colleen A. Harrison
919 Third Avenue, 37th Floor
New York, New York 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699

David A. Handzo (pro hac application
    forthcoming)
Michael B. DeSanctis
Lindsay C. Harrison (pro hac application
    forthcoming)
Kelly D. Gardner
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 661-4956

*Attorneys for Marriott Hotel Services, Inc.*