# Exhibit O

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK:   TRIAL TERM PART 3
3  - - - - - - - - - - - - - - - - - - - - X

4  M WAIKIKI LLC,

5                         Plaintiff,
                                            INDEX NO.
6        - against -                        651457/11

7  MARRIOTT HOTEL SERVICES, INC.,
   I.S. INTERNATIONAL, LLC and IAN SCHRAGER,
8
                          Defendant.
9
   - - - - - - - - - - - - - - - - - - - - X
10 MARRIOTT HOTEL SERVICES, INC.,

11                        Counterclaim-Plaintiff,

12       - against -

13 M WAIKIKI LLC,

14                        Counterclaim-Defendant.
   - - - - - - - - - - - - - - - - - - - - X
15                       60 Centre Street
                         New York, New York
16                       August 30, 2011
                         PROCEEDINGS
17

18 BEFORE:

19        HONORABLE EILEEN BRANSTEN,
                                   Justice
20
   APPEARANCES:
21
      BICKEL & BREWER
22    Attorneys  for the Plaintiff
      767 Fifth Avenue
23    New York, New York   10153
      BY:  ALEXANDER D. WIDELL, ESQ.
24         JAMES S. RENARD, ESQ.
           ANAND SAMBHWANI, ESQ.
25         4800 Bank One Center
           1717 Main Street
26         Dallas, Texas   75201

           BONNIE PICCIRILLO - OFFICIAL COURT REPORTER

```
 1                      Appearances - continued

 2

 3           JENNER & BLOCK
             Attorneys for Defendant Marriott
 4           919 Third Avenue - 27th Floor
             New York, New York  10022-3908
 5           BY:   BRIAN J. FISCHER, ESQ.
                         - and -
 6                   DAVID A. HANDZO, ESQ.
                     MICHAEL B. DeSANCTIS, ESQ.
 7                   1099 New York Avenue, NW
                     Suite 900
 8                   Washington, DC   20001

 9
             McDERMOTT WILL & EMERY
10           Attorneys for Defendant I.S. International LLC
             and Ian Schrager
11           340 Madison Avenue
             New York, New York   10017-4613
12           BY:  ROBERT A. WEINER, ESQ.

13

14

15

16

17

18

19

20

21

22

23
                              Bonnie Piccirillo
24                       Official Court Reporter

25

26
```

1          Proceedings

2                THE COURT:  All right, for the plaintiff, we

3          have from Bickel & Brewer, we have Mr. Widell.

4                MR. WIDELL:  That would be me.

5                THE COURT:  We also have Mr. Sambhwani.

6                MR. SAMBHWANI:  Yes, your Honor.

7                THE COURT:  And then we have Mr. Renard.

8                MR. RENARD:  Yes, your Honor.

9                THE COURT:  And then for the defendant,

10         Marriott, and also counter-plaintiff, we have

11         Mr. DeSanctis.

12               MR. DeSANCTIS:  Michael DeSanctis.

13               THE COURT:  Mr. Fischer.

14               MR. FISCHER:  Brian Fischer, your Honor.

15               THE COURT:  Mr. Handzo.

16               MR. HANDZO:  Handzo, thank you, your Honor.

17               THE COURT:  And, also, for defendants

18         International LLC and Ian Schrager, and so we have Mr.

19         Weiner?

20               MR. WEINER:  Right.

21               THE COURT:  This is, basically, I believe --

22         and I can't say that I have read the papers with care.

23         I really have not.  But my understanding is that this

24         is a motion by the defendants, Marriott Hotel Service

25         for injunctive relief to stop what I believe -- if I

26         understand this right -- to stop the

Proceedings

1

2    Waikiki LLC, which I think belongs to a hotel, Waikiki

3    Hotel -- I don't know why I think that, I'll give you a

4    reason why in a minute -- from terminating Marriott

5    Services Incorporated from terminating them and

6    terminating their ability to, I believe, sell condos.

7              Do I have it right?

8              MR. HANDZO:  Well, you're getting there, but

9    let me if I may explain a little bit.  First of all,

10   for the record, I'm David Handzo.

11             Basically, your Honor --

12             THE COURT:  You can sit down.

13             MR. HANDZO:  If I may?

14             THE COURT:  Sure, please.

15             MR. HANDZO:  The situation here, your Honor,

16   is that the plaintiff, M Waikiki, owns a hotel in

17   Waikiki.  However, it does not operate the hotel.  As

18   is common in the hotel industry, they hire a manager to

19   come in and operate the hotel for them; and in that

20   case that manager is my client, Marriott.

21             And we are here because at 2:00 a.m., Sunday

22   morning, just a little over 48 hours ago, plaintiff and

23   now counter-defendants, M Waikiki, showed up at the

24   hotel operated by Marriott and evicted Marriott from

25   the hotel; and we are asking for a TRO restraining

26   order to remedy that.

1        Proceedings

2            While Waikiki owns the hotel, Marriott has a

3        30-year plus extensions contract to operate the hotel,

4        which still has 29-years plus extensions to go.  And

5        pursuant to that contract, the Marriott personnel are

6        in the hotel, returning the hotel.  They run the

7        reservations, the guests, they do everything.  Until

8        two o'clock in the morning on Sunday when M Waikiki

9        showed up at two a.m. and kicked all the Marriott

10       people out.

11           THE COURT:  Just to get my little sense of

12       perspective, Waikiki is what, about 12 hours ahead of

13       us or how many hours ahead of us?

14           MR. DeSANCTIS:  Six behind us.

15           MR. WEINER:  Behind.

16           THE COURT:  Six behind, is that all?  Because

17       isn't it -- no three to California and three more.  Six

18       behind.  So if it's two o'clock our time --

19           MR. HANDZO:  Two o'clock in Hawaii.

20           THE COURT:  Okay.

21           MR. HANDZO:  So they showed up in what was the

22       middle of the night for Hawaii.

23           THE COURT:  Okay.

24           MR. HANDZO:  And they, basically, took over

25       the hotel through a combination of force, stealth and

26       subterfuge.  They showed up in the middle of the night

1  Proceedings

2  with approximately fifty security guards.  They

3  apparently had previously co-opted Marriott's head of

4  security who, uncharacteristically, arranged for

5  himself to be on duty that night and promptly turned

6  over all the keys and misrepresented to other Marriott

7  personnel that M Waikiki had a court order authorizing

8  this

9  takeover when, in fact, of course, they did not.

10  And so, essentially, they show up with all of

11  these security people, middle of the night, kick

12  everybody out; and they take over and they install a

13  new management company called Aqua Hotel and Resorts.

14  Now, in doing that, M Waikiki has flagrantly

15  breached its long-term contract with Marriott to

16  operate the hotel.  But, in addition to that, they have

17  misappropriated Marriott's proprietary information.

18  They have damaged Marriott's reputation with its

19  guests, travel agents and group planners.

20  They are threatening an investment of hundreds

21  of millions of dollars that Marriott has made to

22  develop a new brand of hotels, and they have left

23  Marriott with only the recourse of a claim for damages

24  which to a large degree cannot be calculated; but to

25  the extent that they can be calculated, it seems pretty

26  clear that M Waikiki doesn't have the wherewithal to

1          Proceedings

2     pay.

3              And M Waikiki did all of this in a really

4     obvious quite calculated and preplanned effort to

5     circumvent this Court and the legal process that has

6     been initiated here by M Waikiki itself.

7              Back in May, M Waikiki filed a complaint with

8     this Court; and in that complaint, they asked this

9     Court to determine that M Waikiki had grounds to

10    terminate the Management Agreement with Marriott.

11             So now we've got the complaint where they are

12    asking this Court to decide whether it can be

13    terminated.  While it's going on, Marriott is in

14    position of running the hotel.  And now Sunday, in the

15    middle of the night, they show up effectively through

16    self-help, give themselves the remedy that they were

17    asking for, for this Court before Marriott could defend

18    itself in this court, before this Court could decide

19    whether there's any grounds to terminate the agreement.

20             Now, obviously, if there had been some

21    emergency, M Waikiki could have come to this Court, and

22    they could have asked this Court for preliminary relief

23    requiring Marriott to leave, giving them the property

24    and allowing them to install a new operator.  But, they

25    didn't do that.

26             I would submit to you that they did not do

1       Proceedings

2   that because they knew perfectly well if they came here

3   and asked for that, they would lose.  They knew they'd

4   have no basis to terminate the Management Agreement.

5   They knew that they would not be able to show

6   irreparable harm.

7           There was no emergency that required this.

8   They just I think saw the handwriting on the wall on

9   the motion to dismiss and decided to take matters in

10  their own hands to get through extrajudicial means what

11  they had originally filed this complaint to do.  They

12  had no grounds to short circuit the litigation process

13  and terminate the Management Agreement before this

14  Court had an opportunity to consider whether there was

15  legal grounds to do so.

16          THE COURT:  Not to interrupt, but could you

17  let me know, the motion to dismiss is exactly where?

18  Is it submitted?

19          MR. HANDZO:  No, your Honor.  We had filed our

20  papers.  I believe then Waikiki asked for an extension

21  of time to submit theirs and they have not submitted

22  theirs, yet.  I don't recall the date.

23          THE COURT:  Done by notice of motion, and it's

24  downstairs?

25          MR. HANDZO:  I believe so, your Honor.

26          Now, we're, basically, asking for immediate

1        Proceedings

2    preliminary and permanent injunctive relief to prevent

3    Waikiki from reaping the benefits of this course of

4    conduct, to Marriott's irreparable injury.

5             Now, let me give you a little more background.

6    This is a hotel that was renovated recently, extensive

7    renovations, and reopened in late 2010.  And Waikiki,

8    when it reopened or actually prior to it reopening,

9    entered into a contract with Marriott to manage it.

10            And, generally speaking, Marriott does not own

11   the hotels.  Marriott just operates as manager for

12   other people who own it.

13            When the hotel was reopened with Marriott as

14   the manager, it was reopened as a new brand of hotel

15   that Marriott just created, called the Edition brand.

16   The Edition brand was created by Marriott in late 2008

17   to compete with upscale boutique hotels like the W

18   Hotels, which the Court might be familiar with.  And

19   Waikiki Hotel was the first Edition branded hotel to

20   the open; and it was the first Edition brand of hotel

21   to open because the owners of the Waikiki property

22   wanted to be the first.

23            So, the hotel opens in late 2010.  It's been

24   opened for less than a year, and Waikiki is unhappy

25   with the financial results; and it claims that Marriott

26   has not done enough to develop the Edition brand of

1              Proceedings

2    hotels; and that's basically the reason for their

3    lawsuit.

4              So they filed a lawsuit here.  They asked for

5    damages, and they asked for a judicial declaration that

6    a material event of default had occurred under the

7    Management Agreement entitling Waikiki to terminate the

8    Management Agreement.  They did not ask for any

9    preliminary injunctive relief to evict Marriott from

10   the property.

11             So after the lawsuit was filed, Marriott

12   continued to operate the property business as usual.

13   As I said before, Marriott has filed a motion to

14   dismiss the complaint, which is still pending, and

15   that's how things stood until Sunday at two a.m. when

16   representatives of Waikiki and representatives of a

17   brand new management company called Aqua Hotels and

18   Resorts, a competitor of Marriott, and cadres of

19   security guards, about fifty in all, showed up at the

20   hotel and took over.

21             When Marriott employees showed up the next

22   morning for work, they were told to sign up with this

23   new management company, Aqua, or they would be fired.

24             Now, these are Marriott employees.  So Aqua

25   and Waikiki had no business telling them that they

26   would be fired.  They are our employees; but,

1                              Proceedings

2         nevertheless, that's what the employees were told in

3         order to get them to sign on with the new management

4         company.  Aqua and Waikiki took the keys away from

5         Marriott employees.  They began changing the hotel

6         logo.  Took down the logo on the bathrobes.

7                They immediately commenced accessing

8         Marriott's proprietary software, proprietary guest

9         lists, confidential information all of which resides in

10        the hotel.  They began printing out information from

11        Marriott's computers in the hotel.

12               It is clear to us that this event was long in

13        the plan.  You don't just go out and hire a new

14        management company on the spur of the moment.  That

15        takes some time.  And we, also, are now sort of piecing

16        this together and realizing that a month or two ago,

17        the owner asked to send representatives of Bickel &

18        Brewer to the property to look through the records of

19        the property in what now seems to us in an attempt to

20        get their hands on information, which would assist them

21        in taking over.

22               So, the last month, as a matter of fact

23        settlement discussions with the plaintiff, thinking we

24        were having settlement negotiations when in fact

25        Waikiki was planning an evasion.

26               Now, the purported justification for this

| | |
|---|---|
| 1 | Proceedings |
| 2 | surprise two a.m. attack according to letters that |
| 3 | Waikiki sent to us on Sunday, was that Waikiki has a |
| 4 | purported common-law right to terminate the Management |
| 5 | Agreement at whit. |
| 6 | The letter that Waikiki sent to Marriott's |
| 7 | president claims that Waikiki, quote, "Pursuant to its |
| 8 | common-law rights and powers, hereby terminates the |
| 9 | above-referenced Management Agreement and its principal |
| 10 | agent relationship with manager effective immediately," |
| 11 | unquote. |
| 12 | Now, that's nonsense.  There is no such |
| 13 | common-law rights.  There is no such agency |
| 14 | relationship.  M Waikiki has no common-law right to |
| 15 | terminate. |
| 16 | Now they have filed papers recently, and I |
| 17 | only had a chance to skim them.  But it appears to me |
| 18 | that they're principally hanging their defense on our |
| 19 | request for injunctive relief on the notion, yes, |
| 20 | indeed, they do have an agency relationship and, |
| 21 | therefore, a common-law right to terminate. |
| 22 | THE COURT:  Don't you have a contract with |
| 23 | them? |
| 24 | MR. HANDZO:  We do, exactly. |
| 25 | THE COURT:  Where is that contract? |
| 26 | MR. HANDZO:  The contract, I believe, was |

1                          Proceedings

2          attached to our pleadings.

3                    MR. FISCHER:  Your Honor, it's exhibit A to

4          the counterclaim complaint.

5                    THE COURT:  To the complaint.  And is there a

6          termination clause?

7                    MR. HANDZO:  Nothing that applies here.

8          Basically, there's a couple of ways that they can

9          terminate under the contract.  But, first of all, let

10         me just say, the fact they are now saying we have a

11         common-law right to terminate, I think is a tacit

12         admission that they agree they don't have any right

13         under the contract.

14                   Just to give the Court the background.  The

15         contract has a performance, financial performance test

16         that Marriott has to meet; but that test doesn't kick

17         in for five years.  So recognition of the fact the

18         hotel just opened in late 2010, it takes a while for

19         business to ramp up.  So Marriott in the contract

20         agreed there would be financial performance tests they

21         would have to meet or Waikiki, if Marriott did not meet

22         those tests, would have a right to terminate.  But that

23         test doesn't kick in for at least another four years,

24         so they clearly have no right there.

25                   The other right they might have is they can

26         claim that there was even a material event of default,

1          Proceedings

2     and they have alleged that in their complaint in this

3     case.  But the Management Agreement also says that

4     where they allege material event of default and

5     Marriott defeats it, which it does, then there can be

6     no determination until a Court has resolved that

7     dispute.  So they can't just declare a default and

8     terminate.  It has to be resolved by the Court which,

9     obviously, has to happen.

10          So, they just don't have any contractual right

11    at this point to terminate, which is why they're coming

12    up with this so-called common-law duty.  And,

13    basically, what that argument is, is an argument that

14    Marriott, as the operator of the property, is their

15    agent and, therefore, there's a principal agent

16    relationship and you can always terminate a principal

17    agent relationship.

18          The problem with that argument is that the

19    Management Agreement that the parties signed expressly

20    disclaims any agency relationship.

21          Section 11.03 of the Management Agreement

22    states, quote, "Neither this agreement nor any

23    agreements, instruments, documents, or transactions

24    contemplated hereby shall in any respect be

25    interpreted, deemed or construed as making manager a

26    partner, joint venturer with, or agent of, owner."

1                          Proceedings

2              So, we've expressly disclaimed any agency

3       relationship; and beyond that, the Management Agreement

4       goes on to say, quote, "Owner and manager agree that

5       neither party will make any contrary assertion, claim

6       or counterclaim in any action, suit, expert resolution

7       proceeding pursuant to Section 11.20, arbitration or

8       other legal proceedings involving owner and manager."

9              So here they are having agreed there's no

10      agency relationship, having expressly agreed that that

11      they won't argue that there is; and now here they are

12      in this Court arguing that there's an agency

13      relationship, and that's their basis for midnight raid.

14             If the agreement isn't enough, this exact

15      issue was litigated before Justice Kapnick of this

16      court just last year.  In a case called Madison 92nd

17      Street Associates versus Courtyard Management

18      Corporation -- and I can provide the Court with a

19      courtesy copy of that if you'd like -- but, basically,

20      another Marriott Management Agreement.  So as you might

21      expect, it was almost identical language to the ones I

22      just quoted here, and Justice Kapnick found that no,

23      there's no agency relationship; and, therefore, no

24      fiduciary duty.

25             One of the arguments that I understand and

26      Waikiki to be making in its papers that are just filed

1

2      is, well, you have to look beyond the language of the

3      contract and the actual functioning of the relationship

4      between the parties.

5             In fact, Justice Kapnick considered exactly

6      that argument in the Madison 92nd Street Associates

7      case and rejected it.  What she said was, I've looked

8      at the contract.  It's absolutely clear.  You have

9      sophisticated parties who negotiated it.  They should

10     be held to their bargain.

11            I should also say that the cases that Waikiki

12     relies on to claim that there's an agency relationship

13     are all quite old.  They're all from the nineties; and

14     every single one of them, the Management Agreement at

15     issue in those cases expressly said that there was an

16     agency relationship.  So the Management Agreement in

17     all of those cases were exactly the opposite of the

18     Management Agreement in our cases.

19            In fact, what happened was, that line of cases

20     was decided twenty years ago.  Management companies

21     started changing the contracts and the cases all now go

22     the other way.  So those cases are outdated and the

23     facts are totally different.

24            So lack of any contractual basis to terminate

25     Marriott, lacking any common-law right to terminate

26     Marriott; Waikiki went and did it anyway in the most

1                          Proceedings

2      practical, real world sense.  They are preventing

3      Marriott from operating the hotel by bringing in a

4      different operator, supported by a whole cadres of

5      security guards to make sure that the new manager,

6      Aqua, is in and Marriott is out.

7              So, we think there is no doubt that we have

8      shown a likelihood of success on the merits here.  I

9      also want to talk about the damages, the irreparable

10     harm Marriott is suffering from this situation; and I

11     want to start with the damage to the Edition brand.

12             Remember, this is a new brand.  Marriott just

13     started this brand a couple of years ago, and it wanted

14     to compete with boutique hotels.

15             Now, as I said, Marriott generally speaking

16     does not own the hotel.  So you're going to create a

17     new brand, what they have got to do is go out and find

18     owners of hotels who want to either build a new hotel

19     and brand it as an Edition property; or want to

20     renovate an old hotel and brand it as an Edition

21     property.  But you've got to do deals with other owners

22     to make this happen.

23             THE COURT:  What makes the Edition hotel

24     different from the regular hotel?

25             MR. HANDZO:  Your Honor, there's a whole

26     series of Marriott brands, sort of top of the line is

1                          Proceedings

2    Ritz Carlton, which is most luxurious.  JW Marriott is

3    the next.  I think the notion of Edition was to have

4    the level of luxury that you generally get at a Ritz

5    Carlton, but more informal, and with each one being

6    different which actually where Mr. Weiner's client

7    comes in.

8              Ian Schrager is sort of the artistic genius of

9    the hotel industry who partnered with Marriott to

10   create these properties, each would be very distinctive

11   and very sort of cutting edge.  In fact, this hotel,

12   the Waikiki property, has gotten rave reviews from the

13   media once it opened.  So, that was the notion.  We're

14   going to create this new brand.  It's going to be

15   luxurious, but it's going to be different from the top

16   of the line Ritz Carlton in that way.

17             As I said, what you've got to do is you've got

18   to deals with other owners to create that brand.  Now

19   you can imagine, Judge, how hard it is going to be to

20   persuade other hotel owners to invest in a new Edition

21   brand hotel when Waikiki has just forcibly terminated

22   Marriott from operating the first Edition hotel.  And

23   Waikiki not only took that dramatic step in the middle

24   of the night, it then issued a press release, which was

25   saying things like, quote, "The owner believes that

26   Marriott has failed in its management of this resort as

| | |
|---|---|
| 1 | Proceedings |
| 2 | well as the delivery of the Edition brand concept," |
| 3 | unquote. |
| 4 | And that press release then quoted Waikiki |
| 5 | lawyers, as saying, quote, "As a result, our clients |
| 6 | brought in new management in the belief that doing so |
| 7 | would better protect their investment," unquote. |
| 8 | Now, if Waikiki's actions are permitted to |
| 9 | stand here, other owners will assume that the eviction |
| 10 | was justified, that the allegations are correct, and it |
| 11 | is going to be immensely hard to persuade other owners |
| 12 | to invest in other new Edition hotels; and we will have |
| 13 | a very difficult time ever proving why it was that |
| 14 | certain deals failed.  They'll know why we didn't get |
| 15 | the deals done; but the why, will be very hard to prove |
| 16 | so we'll never be able to quantify those damages. |
| 17 | But to make matters even worse, I told you at |
| 18 | the outset, Judge, generally speaking, Marriott does |
| 19 | not own hotels and that is generally true.  But in |
| 20 | order to try and get this brand going, Marriott made an |
| 21 | exception.  It bought two hotels.  One in South Beach, |
| 22 | Florida, and one in London and it is -- |
| 23 | THE COURT:  Where? |
| 24 | MR. HANDZO:  In London.  And it is pouring |
| 25 | $400 million into renovating these two new hotels as |
| 26 | Edition brand hotels in an effort to get this brand |

going.

　　　　　Waikiki's actions, which undercut the Edition
brand, will have a serious adverse impact on this
investment.  I mean, basically, Judge, through its
actions Sunday morning and the press releases, Waikiki
has done everything it can to say to the world that
nobody should invest in this brand; and if Waikiki's
actions are not reversed, the world is going to assume
that those allegations are correct even though Marriott
has not had the opportunity to defend itself against
those allegations in this Court, and this Court has not
had the opportunity to decide whether those allegations
have merit, which they don't.

　　　　　Now, in addition to the irreparable injury to
the brand, Waikiki has now also misappropriated
Marriott's confidential and proprietary information.
When they took over the hotel, they took over all the
documents, all the computers, everything that was
there.  They didn't allow anybody to leave and take
anything with them.  In fact, they made sure they
prevented anybody from carrying a laptop out or
anything else.

　　　　　Not only does Waikiki now have all that
proprietary information, but a competing hotel company,
Aqua, now also has that information and here's what

1        Proceedings

2        they got among other things.  They brought laptops to

3        the hotel Sunday morning, and immediately began getting

4        into Marriott's servers to download information onto

5        the laptops they have brought with them, tried to

6        access Marriott's confidential and proprietary systems.

7               They now have access to all of our employee

8        personnel files, which contain employees salaries,

9        Social Security, private family and beneficiary

10       information, medical history, the whole nine yards and

11       these are Marriott's employees.  Not theirs.

12              They have Marriott's standard operating

13       procedures and other business processes, which contain

14       operational strategy and trade secrets.  They have

15       proprietary information about Edition's brand strategy

16       for operation, marketing and developing.  They have

17       Marriott's confidential guest lists and customer

18       information.

19              They even have access to attorney-client

20       privileged communications between lawyers and the

21       Marriott personnel on the property who were involved in

22       this lawsuit.

23              Now, Waikiki cannot possibly claim that that

24       information is not proprietary and confidential;

25       because, among other things, in the Management

26       Agreement they expressly agreed that it is.  Twice, in

Proceedings

2        fact.

3                In Section 11.09 of the Agreement --

4                THE COURT:  What's the page number on that?

5                MR. FISCHER:  47, your Honor.

6                THE COURT:  Okay.  09, confidentiality, is

7        that what you're talking about?

8                MR. HANDZO:  Yes.  I don't have it in front of

9        me, but I think it's close to the bottom of that

10       section.

11               THE COURT:  No, it's in the middle.  11.09,

12       small paragraph in the middle of the page, or the top

13       of the page.

14               MR. HANDZO:  But it says the "Competitive

15       information regarding brands, customers, marketing,

16       operating and other strategies is confidential and

17       proprietary to the manager -- that's Marriott -- and

18       shall not be disclosed to owner,".  That's Waikiki.

19       While they have just helped themselves to all of that,

20       and a little down further in the agreement --

21               THE COURT:  Excuse me a second.  Let me just

22       read that.

23               Yes, it's the last sentence of that paragraph.

24               MR. HANDZO:  Right, right.

25               THE COURT:  Go ahead.

26               MR. HANDZO:  And then I think a few paragraphs

1                        Proceedings

2      later, your Honor, you have Section 11.12(C).

3                  MR. WEINER:  Page 51.

4                  MR. HANDZO:  In which Waikiki agreed that it

5      had no rights to Marriott's intellectual property and

6      would not disclose it to third parties.

7                  And later on in the Agreement, your Honor,

8      there's a definition of intellectual property, which

9      includes all software including data and information

10     stored on it, all manuals and policies used in the

11     operation of the hotel, customer information, and all

12     other trade secret information such as sales and

13     marketing plans.

14                 It is precisely that information that they

15     agreed is confidential that now sits in the hands of

16     Waikiki and Marriott's competitor, Aqua.

17                 Now that information is not just proprietary

18     in some technical sense.  It's really actually quite

19     critical to Marriott's business; because since Marriott

20     doesn't own hotels, it's not a company that owns bricks

21     and mortar.  What it owns is its brands, its

22     reputation, and its intellectual property.  Those are

23     its assets, and that's what they're taking.

24                 We have an affidavit of Ken Rehmann submitted

25     with our you papers, your Honor, that kind of explains

26     all of that and, basically, points out that Marriott

Proceedings

has been running hotels, lots of hotels, for a long
time.  Over that time, it has developed very detailed
standards of procedures that govern every aspect of how
you successfully operate a hotel, particularly a luxury
hotel.  Operations, guest services, human resources,
financial controls, revenue forecasting, everything.

Everything that Marriott has been doing
successfully, is embodied in those standard operating
procedures.  It is a very valuable asset, and they just
took it.

Now, M Waikiki did send us a letter on Sunday
saying, well, we're willing to discuss how we can give
you your proprietary information back to you; but I
would submit to the Court that at some point, if too
much time passes, you can't unring the bell.  It
doesn't help to get our standard operating procedures
back after our competitors have had lots of time to
study and learn them.

The more time they have, and the more people
who have had the opportunity to review confidential
information, the more irreparable the harm becomes.

And I have to say, I mean, somebody comes and
steals your property, you shouldn't have to negotiate
about the return.  Especially, for the periods they are
using it in the interim; and it certainly appears to us

1                       Proceedings

2     that they are contacting our customers, for example.

3           The remedy is to require Waikiki to turn the

4     property back to Marriott and require Aqua to leave and

5     require Aqua to return any proprietary information that

6     they have.

7           The irreparable injury doesn't even end there,

8     because there's also damage to Marriott's customer

9     relationships.  When customers come to a Marriott

10     branded hotel, they hold Marriott responsible for the

11     experience.  And that's especially true with groups.

12     Most hotels depend on having group business to make

13     money so, you know, some organization wants to have

14     their annual meeting, they took a lot of rooms at the

15     property and there are group planners who organized

16     that.

17           Those people are very risk adverse.  If they

18     tell their group we're going to this hotel operated by

19     Marriott and it doesn't happen, the group planner is in

20     trouble.  And the next time around the group planner is

21     going to go to the Hilton or the Four Seasons and not

22     to Marriott.

23           The problem is nobody knows who owns this

24     hotel.  They just know that Marriott operates it.  They

25     thought were coming to a Marriott hotel.  Now they're

26     not.  And that's not just going to hurt just this

1                          Proceedings

2          hotel.  That hurts Marriott, in general, because again,

3          they wind up not going to other Marriott branded

4          properties.

5                  And last, your Honor, but certainly not least,

6          with respect to irreparable injury, Waikiki appears

7          unable to pay a damages judgment even to the extent

8          that there are damages that can be quantified.  As I

9          said before, we don't think that the injuries to

10         reputation, to brand, to the loss of proprietary

11         information, we don't think those are quantifiable in

12         damages in any truly reliable way; but some damages

13         actually can be quantified.

14                 Waikiki has purported to terminate the

15         Management Agreement; and if that stands, Marriott will

16         lose a more than 30-year stream of revenues from the

17         management fees that it earns under those agreements.

18         And we believe actually that the present value of that

19         stream of revenues exceeds $60 million, and that

20         appears in the affidavit of Cathy Young, which we've

21         attached to our papers.

22                 THE COURT:  60 million over a term of the

23         thirty years?

24                 MR. HANDZO:  It is over the term of

25         thirty years, but there is also renewals, your Honor;

26         and the renewals are automatic and that's then, so it's

1    Proceedings

2    that revenue stream, which I believe extends beyond

3    30 years, and it's discounted back to present value.

4         So it's 60 million dollars and for the reasons

5    we set forth in the affidavit of Mr. Rehmann, we don't

6    believe that Waikiki would have the ability to satisfy

7    a judgment like that.  Especially because for most of

8    this year, Waikiki has failed and refused to provide

9    working capital for the hotel.

10        Marriott, instead, has been funding the

11   operations of the hotel out of its own pocket, even

12   though the Management Agreement requires Waikiki.  So

13   in effect, Marriott has been loaning money to the hotel

14   to fund operations; and as of now, Waikiki owes

15   Marriott over $5 million for that.

16        So it appears that, first of all, they could

17   not possibly satisfy a judgment.  They don't appear to

18   be paying now, and looks like their plan is, in effect,

19   to take over the hotel, get what they want and leave

20   Marriott holding the bag; because Marriott is not ever

21   likely to recover the damages that it would suffer even

22   to the extent that those can be quantified.

23        By the way, there's actually one thing on the

24   legality of the termination that I should have

25   mentioned, but I apologize I neglected it.  There's

26   actually another provision of the Agreement, Section

Proceedings

2.03, which says that even if they have a right to
terminate, they cannot terminate so long as there are
outstanding loans that they owe to Marriott.  Right now
they owe us $5 million.  Again, that's in one of the
affidavits.  I believe it's Mr. Rehmann.

So even if they had some rights, they can't
terminate because they owe us money; but I'm not sure
you even get there, because they just don't have the
right.

The bottom line, your Honor, is that there is
a tremendous amount of irreparable injury here.

So the last thing I want to address is the
equities of this situation.  We're asking for an
equitable remedy, and the equities here to not favor
Waikiki.  Waikiki created the situation that we are in
today and made a very purposeful, planned and really
quite cynical way.  It purposely did an end run around
this Court to get what it is not legally entitled to.

And if the Court restores us to the situation
that existed at 1:00 a.m. on Sunday morning, all that
happens is that Waikiki has to allow Marriott to
perform the contract that Waikiki voluntarily and
knowingly executed.  There's no harm to them in that.

Now, I expect Mr. Renard to stand up and
protest, well, the hotel was losing money.  Right now

Proceedings

1

2    it is; but it opened less than a year ago, and it takes

3    time for a hotel to ramp up.  Especially, a luxury

4    hotel in this economy.

5         But, in any event, as I mentioned before,

6    Waikiki bargained for a financial performance test in

7    the Management Agreement with Marriott.  Waikiki agreed

8    in the contract that it would have the right to

9    terminate Marriott if Marriott did not meet certain

10   financial performance tests; but it also agreed that

11   those performance tests would not kick in until five

12   years after the hotel opened.

13        And, again, that's a recognition of how long

14   it takes to build up a business.

15        So, now despite having bargained for a

16   specific performance test that becomes enforceable at a

17   specific time, Waikiki is saying that it is justified

18   in essentially rewriting the contract to apply a

19   different test at a much earlier time, contrary to what

20   the parties actually bargained for.  That is hardly an

21   argument that can tilt the equities in M Waikiki's

22   favor.

23        Lastly, your Honor, I think when you think

24   about the equities in this case, I would respectfully

25   submit that you might ask yourself why did Waikiki do

26   what it did?  Why not instead come to this Court and

| | Proceedings |
|---|---|
| 1 | |

1   Proceedings

2   ask for relief if Waikiki really and truly believed

3   that they are legally entitled?

4           THE COURT:  That's a good question, and I'm

5   going to allow Waikiki to answer.

6           MR. HANDZO:  Okay.

7           THE COURT:  I do have to cautious on time.

8           MR. HANDZO:  Your Honor, one last thing, and

9   this is, obviously, we've asked the Court for specific

10  relief that would require essentially Marriott to

11  operate the property pursuant to its contract.

12          Strictly as an alternative, and this would not

13  remedy the situation; but if we were not returned the

14  property, at a minimum we would argue that Waikiki

15  would have to post a very substantial bond.

16          In effect, what they did was come in here

17  themselves, a preliminary injunction which would

18  ordinarily require a posting of the bond, and would

19  have to be substantial because our damages are very

20  substantially.

21          Having said, the real remedy here is to put us

22  back to where we were at one in the morning on Sunday.

23  Unless the Court has questions for me, I will turn it

24  over to Mr. Reason.

25          THE COURT:  Yes, thank you very much.

26          Go ahead, Mr. Renard.

                          Proceedings

1

2        MR. RENARD:  Thank you, your Honor.

3        THE COURT:  Mr. Renard, do we have a contract

4    here?  What happened to the contract that was signed by

5    both sides as Exhibit A?  Management Agreement, by and

6    between Marriott Hotel Services, Inc. and M Waikiki LLC

7    dated July 9, 2008, and signed by Waikiki and Marriott?

8        MR. RENARD:  Yes, your Honor.

9        THE COURT:  What happened to that contract?

10        MR. RENARD:  Your Honor, that contract created

11    an agency relationship between --

12        THE COURT:  Well, I don't know about that.  I

13    mean, that's your theory.

14        MR. RENARD:  Yes.

15        THE COURT:  I don't see any language in here.

16    Point it out to me where you're entering into an agency

17    relationship.

18        MR. RENARD:  Your Honor --

19        THE COURT:  That you can undo at your whim,

20    because it's an agency.

21        MR. RENARD:  Yes, your Honor.  Well, if I may

22    and, your Honor, following the conference with the Law

23    Clerk yesterday, I immediately started to work on this

24    brief that we submitted to the Court this afternoon

25    from about four in the afternoon to about two in the

26    morning, and I caught the first flight out so I could

1              Proceedings

2    get to the court.

3         Your Honor, if I may preface this, because I

4    think it's important.  For about twenty years, I've

5    been working in the vineyard, among other areas of the

6    law, of hotel management agreements.

7         THE COURT:  You have to speak up.

8         MR. RENARD:  I've been working, your Honor,

9    the past twenty years in the vineyard of hotel

10   management agreements.  And, your Honor, the fact of

11   the matter is -- and I'll be glad to point out to the

12   Court the various provisions.  In fact, we do so in our

13   brief.

14        But, what else do we call it when we give to

15   another the power and authority to enter into contracts

16   on our behalf, to purchase goods and services using our

17   credit and our money, to write checks on accounts that

18   contain our funds, to book business and make

19   reservations on our behalf, all of those things, your

20   Honor, are set forth in this management contract

21   because that's what hotel managers do.  They act on

22   behalf of owners in terms of handling money, in terms

23   of making reservations, in terms of making purchases.

24   When someone, your Honor, acts on another person's

25   behalf with the legal power to bind that other person,

26   by definition, that is an agency.

1        Proceedings

2              THE COURT:  Yes, but if, indeed -- I don't

3        care if you call it agency or not.  If two

4        sophisticated business people enter into a 75-page

5        single-space document called Management Agreement,

6        which has in it very specific ways to terminate, or it

7        could have been anything you decided to put in,

8        whatever; but you have agreed on a certain course of

9        conduct.  And then, what really is bothersome, you then

10       decide that you want to terminate this Management

11       Agreement.

12             MR. RENARD:  Yes, your Honor.

13             THE COURT:  And you come to the State of New

14       York, Commercial Division, New York State Supreme

15       Court.  You happened to come to Part 3, lucky you.  And

16       you're here saying to me, I want to terminate this

17       contract.  That's your complaint.  Your complaint is I

18       want --

19             MR. RENARD:  Yes, your Honor.  It was one

20       claim we asserted.  It wasn't by any means --

21             THE COURT:  Whatever reason you decide, that's

22       what you wanted to do.

23             MR. RENARD:  Yes, your Honor.

24             THE COURT:  And then beyond that, because not

25       by order to show cause as is this Court's desire; but,

26       nonetheless, a motion to dismiss is made, and it's

1        Proceedings

2        still pending down in the bows of this courthouse.  One

3        day it will be fully submitted.  It will come by powers

4        that be, freight elevator, because it will be so thick

5        and big and it will arrive in my courtroom, and we will

6        schedule it for oral argument.  That will be the next

7        step.

8              And then I will hear extremely good argument

9        on one side and extremely good argument on the other.

10       We will then put it over for a week or so, so we can

11       get the minutes, and it will be fully submitted; and

12       the Court will determine whether or not the motion to

13       dismiss is correct or whether or not your complaint is

14       correct.  In other words, there will be a process.

15             MR. RENARD:  Yes, your Honor.

16             THE COURT:  Right.  Then assuming that there

17       is a mechanism of something happens in between this

18       lengthy process -- and I'm not saying it's not --

19       there's always the ability to come in by order to show

20       cause for remedy.

21             And what can the remedy be?  Judge, what

22       Marriott is doing since we started this lawsuit, steal

23       mutual money me, steal my reputation, look into get my

24       internal affairs.  Judge, you have to do something,

25       terminate them as immediately; otherwise we, M Waikiki

26       Hotels or M Waikiki LLC will be irreparable harmed if

Proceedings

you don't do something about it.

And then the Court would have excellent
argument.  In this case you would be first, and then
I'd hear excellent argument on the other side; and I
would ponder this great problem and I would do
something one way or the other which, if you didn't
like what I did, you never know, you could immediately
go to Madison Avenue and say, Judge, judges, Judge
Bransten got it completely wrong, and she is still in
irreparable harm situation.  You've got to give the
remedy I'm asking for.  And then the Appellate Division
confers with itself and does what it wants and you
would have whatever.

The point I'm making, is that no one has
forced you to bring this lawsuit in the beginning.
This is motion sequence number 4, so I can only suspect
that motion sequence number 3 is a motion to dismiss.
Motion sequence number 1 and 2, more likely than not,
admissions pro hac vice.  I don't know why I think
that, but it usually happens that way.  Probably
somebody is being asked to be admitted from Hawaii and
can't wait to come to New York; but, anyway, that kind
of motion, whatever it is.  So you already were before
me.

You already had the opportunity to be heard in

1          Proceedings

2    an orderly manner.  I can't understand and what bothers

3    me most is the two o'clock raid.  What happened that

4    caused anyone to get out and think that was an

5    appropriate action?

6             MR. RENARD:  Your Honor, most transitions of

7    hotel management take place in the wee hours of the

8    morning when there's less guest activity around a

9    hotel.  That has nothing to do with an invasion, middle

10   of the night grab this kind of stuff.  That's when

11   transitions are made.

12            But if I may, your Honor, the point and it's

13   fundamental to what we're talking about here.  First of

14   all, let's talk about the merits; and the merits, your

15   Honor, is the fact that if this contract have all the

16   indicia of agency, like I mentioned, and it does, and

17   labels don't matter, disclaimers of agency and the

18   like; I tried this very issue against Marriott and Ritz

19   Carlton two years ago in Federal District Court in

20   Maryland.  It was the same argument.

21            We have a provision in our contract that says

22   we're only an independent contractor, and we disclaim

23   any other kind of relationship that could potentially

24   give rise to damages.

25            THE COURT:  That's true, sir, if that is

26   exactly the argument that you made in Maryland, why is

1                          Proceedings

2       it that your contract with Marriott today did not have

3       an amended contract saying, I want you to realize this

4       is an agency relationship terminable at my leisure and

5       always at two o'clock in the morning, because that's

6       when we terminate things?

7               MR. RENARD:  It was not the same contract, and

8       I wasn't involved in negotiating it.

9               With that said, the law in New York and law of

10      restatement of agency, respectfully, is if there is an

11      agency relationship, notwithstanding the terms of what

12      the contract says, that the principal owner always has

13      the power to revoke the agency even if it might be a

14      breach of contract, which we respectfully suggest isn't

15      the case here.  But, your Honor, that was the case in

16      Woolley versus Embassy Suites, and Pacific Landmark

17      versus Marriott, and Government Guaranty Fund versus

18      Hyatt, and Woodley Road versus Sheraton Corp.

19              All of those contracts, your Honor, were for a

20      term of years; and they essentially said that this

21      contract is not revocable or is only revocable under

22      certain circumstances, and the courts in each of those

23      cases found that notwithstanding those provisions, if

24      the principal wanted to cut off the relationship, it

25      could do so and the rationale, your Honor, is clear.

26              Do you want someone out there who has the

1          Proceedings

2          power to spend your money, who can commit you to legal

3          liabilities and obligations if you've lost trust and

4          confident in them?  That's why the law including --

5                    THE COURT:  Then why -- if that were true, you

6          know, your argument would be I think a great deal

7          stronger, sir, if, indeed, you did do the midnight or

8          two o'clock in the morning raid.  We're now here

9          without any -- all the papers being the same, but your

10         argument that this was an agency relationship and so,

11         therefore, we had a right to do that, would have been

12         stronger if you had not brought the lawsuit to begin

13         with asking this Court for the dissolution of this

14         agreement.

15                   And so, so, what I'm saying, sir, is that once

16         you in a sense avail yourself of the legal process,

17         which I think is the appropriate way of acting by the

18         way.  I'm not saying you were wrong doing that.  On the

19         contrary.  You did the right thing.  You decided that I

20         want to terminate this contract that I have with

21         Marriott.  It is not working out.  I believe I have an

22         agency right to do it.  I believe this, I believe that.

23         All right, great, great.

24                   But, once you do that, you can't again

25         self-help yourself.  You're in a different position,

26         because you already have a vote, the imprimatur of the

1              Proceedings

2    Court and you already have available to you the ability

3    of the Court to give remedy; and once you start the

4    process, you can't then turn around and say, well, you

5    know, the Court's going to take so long.  I'm going to

6    go and do it myself.  You can't do that.  I don't see

7    how you can do that.  I don't understand the

8    explanation.

9              I mean, it mind boggles me that it happened.

10   I'm not saying it has nothing to do with you,

11   personally; but whoever decided that this was an

12   appropriate way of handling things has got to -- I

13   don't know.  How can anybody explain that?

14             MR. RENARD:  Your Honor, first of all, the set

15   of claims that were asserted in the lawsuit,

16   preponderance of those are claims for money damages.

17   We also asked the Court to determine whether or not

18   there was an event of default under the contract, which

19   might give rise to a claim for termination.

20             In addition to a event of default, which would

21   be a right to terminate under the contract, there is

22   this power which exists as a matter of common-law to

23   revoke an agency.

24             Your Honor, I understand the Court's

25   observations, but I, respectfully, don't believe that

26   necessarily follows that one can't exercise a right to

1    Proceedings

2    say, for instance, to an employee, you're fired.

3              THE COURT:  Not when you come to Court to find

4    out whether the contract allows you to fire him because

5    of for no reason whatsoever, certainly not because of

6    the terms that are usually within the employment

7    contract; theft, malfeasance or whatever, right?

8              No, no, not when you will come to Court and

9    ask the Court, Court, you help me in determining my

10   remedy.  Help me in my desire to get rid of this

11   contract, help me with that.  And, then become a

12   self-help individual.  No, you can't.

13             I really, honestly, I mean, I'll let you do

14   another memoranda of law on what exactly, how can an

15   organization that starts a lawsuit in the County of New

16   York, in the Commercial Division of the County of New

17   York, based on the whole premise that Marriott has

18   failed to perform under my management contract; and so,

19   therefore, help me terminate this management contract.

20   I want to end it.

21             How can you then switch and become a self-help

22   agency?

23             MR. RENARD:  Your Honor, because I really

24   don't see the conflict.  It is not as if we had the

25   Court in the middle of adjudicating that particular

26   issue.

1                                                    

2         THE COURT:  But, sir, by coming to Court, you

3 are asking the Court to adjudicate; and, frankly, the

4 Court is available even 24/7, if you knew that you

5 could get Supreme Court action in Criminal Court in

6 arraignment part middle of the night.  So long as

7 there's some place open, you can get an injunctive

8 relief signed by a Supreme Court justice in the State

9 of New York.  It may be returnable to me the next

10 morning saying I don't know what you would do about

11 this, but for the time being, you got it.

12         MR. RENARD:  Your Honor, the unfortunate thing

13 about that puts the burden upon us with respect to a

14 power that we possess inherently as being one who has

15 someone out there binding us.

16         THE COURT:  That's going to be an issue of

17 law, sir, and that is exactly what you're asking me to

18 do.  You're asking -- you're saying to me, Look, I have

19 an inherent power of agency.  Never mind, I came to

20 Court before and asked you to determine things.  Never

21 mind that I could have come to Court and asked by order

22 to show cause for remedy.  Never mind that.  Because I

23 have the right to terminate, I have the right to step

24 in and self-help myself; and then, I think there is

25 good argument to be made.  What is this?  You come in

26 and you have another agency, another competing agency.

1          Proceedings

2     You do two more things, and you take all the

3     information and let them take all the information.

4               MR. RENARD:  No, your Honor.

5               THE COURT:  Well, we don't know about that.

6     That's going to be interesting.  You put out a press

7     release.

8               MR. RENARD:  Yes, your Honor, because we're an

9     ongoing business with customers and, your Honor, we

10    did.  We have a new --

11              THE COURT:  No, sir, you're not an ongoing

12    business with customers.  You're an ongoing business

13    that hires another business to run it.  That's even

14    your argument.  Your argument is, I'm an ongoing

15    business that hires somebody else to get me the

16    contracts, to get me the groups, to get me the -- I was

17    going to say patients, I suppose their guests -- get me

18    the guests, get me to have all the maids come and clean

19    the rooms.  That's what I hired done.

20              MR. RENARD:  Yes, your Honor.

21              THE COURT:  Right.  And I sit back and I say

22    to myself, well, I expect a good return on my

23    investment, and I don't think I'm getting quite the

24    good return on this investment so, therefore, I can

25    terminate?  Well, maybe you can, sir.  Maybe you can

26    terminate.  But in this manner, in this manner -- I

| | |
|---|---|
| 1 | Proceedings |
| 2 | have to give everybody a head's up, we're exactly nine |
| 3 | minutes away from closing the courtroom door, much less |
| 4 | getting out of here. |
| 5 | So the question I have for both of you for the |
| 6 | time being is this:  Frankly, I may have to continue |
| 7 | this tomorrow; but, frankly, I really would like you, |
| 8 | sir, to seriously consider putting back the status quo |
| 9 | ante, doing appropriate papers beyond the very short |
| 10 | memoranda of law that I'm an agent and, therefore, I |
| 11 | have all rights.  Addressing the other issues and with |
| 12 | the status quo ante in place, let's litigate this and |
| 13 | you may very well prevail.  Because I'm not saying |
| 14 | you're not right.  I'm just saying I'm appalled that |
| 15 | this happened. |
| 16 | MR. RENARD:  Your Honor, I would very much |
| 17 | appreciate the opportunity to address the Court |
| 18 | tomorrow. |
| 19 | THE COURT:  You know, we'll have to see what |
| 20 | time. |
| 21 | On the other hand, see, my problem is that I |
| 22 | have to give remedy, and I honestly think that what has |
| 23 | happened here is, is really -- to put it mildly -- |
| 24 | something that shouldn't have happened. |
| 25 | MR. RENARD:  Your Honor, I respectfully |
| 26 | request that if we could have a preliminary injunction |

1          Proceedings

2     hearing before the status quo changes, again,

3     because --

4          THE COURT:  No, sir.  See, you're taking the

5     benefit of that and that's the problem.  The problem is

6     that because you self-helped yourself without the

7     benefit of giving this Court the opportunity to rule on

8     something, you are now enjoying the very juicy fruits

9     of your bad actions.  Talk about poisonous trees, you

10    know the fruit of the poisonous tree.  This is sort of

11    like the apple tree.  Not good, not good at all.

12         MR. RENARD:  Your Honor, please, understand my

13    role as the lawyer for my client.

14         THE COURT:  I understand.

15         MR. RENARD:  I don't think anything bad

16    happened in terms of bad acts.  I do understand the

17    Court's observations about one of the claims that we

18    brought for declaratory relief that would ask whether

19    or not there was a right to terminate; but, your Honor,

20    whether or not that's a bad act and all of a sudden

21    puts the burden upon us in terms of trying to fight off

22    an injunction, where there is --

23         THE COURT:  Sir, Mr. Renard, I'm sorry, Mr.

24    Renard, forgive me, Mr. Renard, your own desire is that

25    you put back the status quo ante and that we litigate

26    this in an appropriate way where I say to you, you may

<br>

| | |
|---|---|
| 1 | Proceedings |
| 2 | very well prevail.  But, right now, what has happened |
| 3 | is not appropriate. |
| 4 | I don't care that management, hotel management |
| 5 | ends always at two o'clock in the morning.  I didn't |
| 6 | know that that was the witching hour for changes. |
| 7 | Never mind.  So I'm not commenting on that. |
| 8 | I'm just saying that taking self-help is an |
| 9 | inappropriate thing to have done, and I suggest that |
| 10 | you sit down with Mr. Handzo, come up with an agreement |
| 11 | that for the time being, this is going to be status quo |
| 12 | ante until litigation is appropriately done. |
| 13 | That's my suggestion.  Otherwise, I, honestly, |
| 14 | I don't know what to do.  I'll have you back here.  I |
| 15 | can't start before 9:30, but you'll be my first thing |
| 16 | on at 9:30. |
| 17 | What I really expect is some sort of status |
| 18 | quo ante, and with that, I have to say good night, |
| 19 | because my court officer is chomping at me and I have |
| 20 | to close it up.  I'm sorry.  Usually, I'd go to |
| 21 | six o'clock arguing this, but think about it.  Let's |
| 22 | try to get this to a more reasonable position. |

---
CERTIFIED TO BE A TRUE
AND CORRECT TRANSCRIPT

_____
BONNIE PICCIRILLO
OFFICIAL COURT REPORTER

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK:   TRIAL TERM PART 3
3  - - - - - - - - - - - - - - - - - - - - X

4  M WAIKIKI LLC,

5                          Plaintiff,
                                              INDEX NO.
6          - against -                        651457/11

7  MARRIOTT HOTEL SERVICES, INC.,
   I.S. INTERNATIONAL, LLC and IAN SCHRAGER,
8
                           Defendant.
9
   - - - - - - - - - - - - - - - - - - - - X
10 MARRIOTT HOTEL SERVICES, INC.,

11                         Counterclaim-Plaintiff,

12         - against -

13 M WAIKIKI LLC,

14                         Counterclaim-Defendant.
   - - - - - - - - - - - - - - - - - - - - X
15                    60 Centre Street
                      New York, New York
16                    August 31, 2011
                      PROCEEDINGS
17

18 BEFORE:
        HONORABLE EILEEN BRANSTEN,
19                                    Justice

20 APPEARANCES:

21     BICKEL & BREWER
       Attorneys  for the Plaintiff
22     767 Fifth Avenue
       New York, New York   10153
23     BY:   ALEXANDER D. WIDELL, ESQ.
             JAMES S. RENARD, ESQ.
24           ANAND SAMBHWANI, ESQ.
       4800 Bank One Center
25     1717 Main Street
       Dallas, Texas   75201
26

```
 1

 2           JENNER & BLOCK
             Attorneys for Defendant Marriott
 3           919 Third Avenue - 27th Floor
             New York, New York  10022-3908
 4           BY:   BRIAN J. FISCHER, ESQ.
                       - and -
 5                 DAVID A. HANDZO, ESQ.
                   MICHAEL B. DeSANCTIS, ESQ.
 6                 1099 New York Avenue, NW
                   Suite 900
 7                 Washington, DC   20001

 8

             McDERMOTT WILL & EMERY
 9           Attorneys for Defendant I.S. International LLC
             and Ian Schrager
10           340 Madison Avenue
             New York, New York   10017-4613
11           BY:  ROBERT A. WEINER, ESQ.

12

13

14

15

16

17

18

19

20

21

22
                            Bonnie Piccirillo
23                       Official Court Reporter

24

25

26
```

1                        Proceedings

2              THE COURT:  All right, good morning, everyone.

3        Please set up.

4              MR. RENARD:  Good morning, your Honor.

5              MR. HANDZO:  Good morning, your Honor.

6              THE COURT:  And, Mr. Renard, what's the good

7        word?

8              MR. RENARD:  Your Honor, unfortunately, after

9        prolonged discussions with our clients into the wee

10       hours of the morning, our clients are not able to

11       agree, your Honor, to simply reinstate Marriott as

12       manager of the hotel for a number of reasons, your

13       Honor, if I may.  This hotel under Marriott management

14       was losing $800,000 a month?  Could not even meet its

15       normal expenses and, certainly, can't meet --

16             THE COURT:  You have to speak up.

17             MR. RENARD:  Can't meet its debt service or

18       even its normal costs.  It's losing $800,000 a month.

19             Your Honor, we're on the verge of losing this

20       hotel unless we can get control of management, and

21       that's certainly one of the key reasons that our

22       clients at least believed in good faith that they

23       exercised their right to revoke Marriott's agency, and,

24       your Honor --

25             THE COURT:  You have to point to me, Mr.

26       Renard, you're going to have to show me where in the

```
 1                        Proceedings
 2        agreement there is any language allowing you to take
 3        this action?
 4                   MR. RENARD:  Your Honor, it's not a
 5        contractual right.  It's common-law right, your Honor,
 6        and I don't know if the Court had the time to review
 7        the brief that we put in yesterday, your Honor; but
 8        that brief I think shows very clearly a principal's
 9        common-law right to revoke an agent's authority, even
10        if their exercise of that right is in derogation of a
11        contractual provision.
12                   Your Honor, the case law, the New York Court
13        of Appeals has held this.  This is in the restatement
14        of agency, that if in fact the revocation and
15        termination of an agent might be a breach of contract,
16        that gives the terminated party a claim for breach of
17        contract.
18                   We don't believe and, your Honor, we'll show
19        at a preliminary injunction hearing, at a trial and
20        certainly, your Honor, we would agree to an accelerated
21        trial; we'll certainly agree to bring in live witnesses
22        at a preliminary injunction hearing that this power was
23        properly exercised, your Honor.
24                   And, your Honor, I really do respectfully
25        request that the Court take a look at that brief,
26        because I think it shows, without doubt, that this was
```

1                        Proceedings

2       an agency contract merely because of the powers that

3       were given Marriott to act on the owner's behalf.  And

4       under New York law and the law, frankly, of practically

5       every jurisdiction in the United States, the power to

6       revoke that agency was properly exercised Sunday

7       morning.  And at that point in time, Marriott ceased

8       being our agent and operator of our hotel.

9             We changed the status quo drastically by

10      bringing in a new management company hiring 215

11      employees --

12            THE COURT:  From the Marriott employees.

13            MR. RENARD:  Yes, your Honor, people who

14      willingly signed up, and they were not threatened they

15      were going to be fired.  These were people who signed

16      up.

17            THE COURT:  I'd love to hear some testimony on

18      that.

19            MR. RENARD:  Absolutely, your Honor, we'd be

20      glad to provide it to the Court.  Except we found out

21      yesterday that Marriott has been calling the hotel

22      vendors requesting and encouraging the vendors not to

23      do business with the hotel.  They're encouraging

24      setting up across the street from the hotel,

25      encouraging hotel employees not to come to work.  These

26      are people who signed up to work at the new modern

| | |
|---|---|
| 1 | Proceedings |
| 2 | hotel. |
| 3 | THE COURT:  Let me ask you this question, Mr. |
| 4 | Renard. |
| 5 | Where in the agreement are the words "this is |
| 6 | an agency?" |
| 7 | MR. RENARD:  It's not there, your Honor, but |
| 8 | that's not controlling. |
| 9 | And, in fact, your Honor, if I may point to |
| 10 | the Court in our brief yesterday, your Honor, Section |
| 11 | A, which is on pages 1 through 6, speaks |
| 12 | comprehensively about the inherent power to revoke an |
| 13 | agency. |
| 14 | Section B, your Honor, which is on pages 7 |
| 15 | through 10, talks about the powers and cites specific |
| 16 | provisions in the Management Agreement that show in |
| 17 | numerous respects that Marriott had the power to bind |
| 18 | the owner, to spend the owner's money, to commit the |
| 19 | owner to business relationships.  All the things are |
| 20 | classic indicia of agency manager. |
| 21 | And, your Honor, then we point out -- |
| 22 | THE COURT:  Of all the classic indicia of a |
| 23 | contract. |
| 24 | MR. RENARD:  Of an agency contract. |
| 25 | THE COURT:  Of a contract. |
| 26 | MR. RENARD:  Yes. |

1                          Proceedings

2              THE COURT:  And, therefore -- see, my problem

3      still remains that you come to court and you filed by

4      summons and complaint an action in this Court.  My

5      issue is not whether or not you prevail.  That's not

6      the issue here.

7              The issue is you come to court and you file a

8      complaint, and that complaint, in a sense, opens you up

9      to the jurisdiction of this court.

10             You asked, in fact, you say, I want to be in

11     the Commercial Division of this grand court, and you

12     are assigned to the Commercial Division.  And you come

13     and you never again, in a sense, appear.  They appear

14     in motion sequence number 2 and 3 with motions to

15     dismiss the complaint, right?

16             MR. RENARD:  Yes, your Honor.

17             THE COURT:  And I presume you're going to

18     answer those motions, you've proposed that, and I

19     assume reply and one day it will get up to me and we'll

20     have argument on it.

21             My problem is that by coming in with the

22     complaint -- where is it?  My problem is that the

23     complaint -- there's a number of causes of action.  One

24     is breach of the agreement.

25             Two, is -- and by the way there is one, as far

26     as I see -- I may be wrong, I have to find it again --

1          Proceedings

2          there is one statement that as a result of the action

3          that was undertaken, they entered into an agency

4          relationship in the complaint.  There is one that I see

5          as of now.  I'm not saying there isn't others.

6                 It's just that I'm taking a very quick perusal

7          of it, but what point I'm making is that there is

8          twenty, nineteen-and-a-half pages of recitation of

9          facts leading to count one, a breach of the TSA; count

10         two, a breach of the Management Agreement; count three,

11         breach of fiduciary duty; count four, negligent

12         misrepresentation; count five, request for judicial

13         declaration regarding the occurrence of an event of

14         default and the owner's right to terminate the

15         Management Agreement.

16                 Now, that last count could very well have been

17         a basis for you, your client --

18                 MR. RENARD:  I understand.

19                 THE COURT:  To come to court to ask for

20         extraordinary relief on the grounds that, first place,

21         what has happened is irreparable harm; two, we have the

22         likelihood of success; three the equities go in your

23         favor and et cetera and et cetera; right?

24                 MR. RENARD:  Yes, your Honor.

25                 THE COURT:  And by doing so, you would be in

26         the position today of either being granted your request

| | |
|---|---|
| 1 | Proceedings |
| 2 | for relief or not, but certainly you'd be on the basis |
| 3 | of having come to court and done it in a, quote, legal |
| 4 | manner versus taking self-help. |
| 5 | Now, self-help is something that is not |
| 6 | condoned in the legal system; because if we believed in |
| 7 | self-help, we'd be back at the club days.  We'd have a |
| 8 | big club and you'd have a big club, and whoever clubs |
| 9 | first does better.  All right. |
| 10 | MR. RENARD:  Your Honor, the notion of |
| 11 | self-help -- and we did a considerable amount of |
| 12 | research last night.  The notion of self-help has, and |
| 13 | I think the Court pointed out, embedded in it a notion |
| 14 | of some wrongdoing or doing something you weren't |
| 15 | allowed to do. |
| 16 | Your Honor, again, respectfully, as pointed |
| 17 | out in the brief that we filed yesterday, we had the |
| 18 | right to do this.  And, your Honor, we can find no |
| 19 | authority for the fact -- and I tried to distinguish |
| 20 | this yesterday and, perhaps, I didn't do a good job of |
| 21 | it. |
| 22 | Count five, your Honor, was coming to Court |
| 23 | and saying we believe there's an event of default; |
| 24 | that's a clearly defined term under the contract.  And |
| 25 | a result of that, we would like a declaration that if |
| 26 | we terminate because of that, we do so impunity.  That |

1                          Proceedings

2      means without having a counterclaim for wrongful

3      termination.  That's separate and apart, your Honor,

4      from the power to terminate.

5            Our client made the decision.  Now, the Court

6      may think it imprudent, but we believed it was allowed

7      by law to exercise that power to terminate the agency

8      and leave open for later consideration whether that was

9      wrongful in which case they might have a claim for

10     damages, or whether it was for cause, in which case we

11     would be able to recover damages against them for the

12     harm that they caused us prior to the termination.

13           But, your Honor, those are two separate

14     things.  But, respectfully, your Honor, the point is is

15     that if the right was appropriately exercised and we

16     could find no authority for the exercise of power

17     that's given to us as a matter of law within or outside

18     the context of litigation or whether or not litigation

19     even exists, that that power be rightfully and

20     effectively be exercised.

21           The problem then, your Honor -- and one of the

22     things -- we have to step back, if I may do this.

23           We have a request for a preliminary

24     injunction, but we also have a request for a TRO, which

25     under CPLR Section 6301 which requires a showing of

26     immediate and irreparable injury.

1                         Proceedings

2              Your Honor, the relief that they seek, and I

3      compared the proposed order that they gave the Court

4      and it's been modified slightly to add one thing; but

5      if I may, the proposed order given on the TRO, 6301

6      TRO, is among other things an order that owner must

7      allow Marriott to fully perform its role as the hotel's

8      manager in accordance with the Management Agreement.

9              In other words, a mandatory affirmative

10     temporary restraining order that changes the status

11     quo, forces us to fire our current manager Aqua, cancel

12     contracts with vendors that Aqua has entered into,

13     change the signage, change the computer systems that

14     have been put in by Aqua on a temporary restraining

15     order which is a mandatory and affirmative in nature.

16             THE COURT:  I know, but the problem -- I

17     understand your argument, but the problem I face is

18     that because of your client's actions, it is squarely

19     in the self-help category.

20             Had you come to court on an order to show

21     cause saying, We need immediate relief and a complete

22     turnover right now based on my complaint, based on

23     what's happening now, whatever new facts, whatever new

24     affidavits you come in with; then you would be in the

25     position of asking this Court for permission to do what

26     you ultimately did, by just doing it.  And that my

2     problem is not whether or not you're going to prevail;

3     but rather that, indeed, the argument now is, Oh, we

4     went and did the self-help, and look what happened.  It

5     would be irreparable harm to us, because we changed the

6     signage.  We put our computers in, we did this, without

7     legal proceeding.

8          MR. RENARD:  But, your Honor, the presumption

9     in that is that we didn't have the power, and it was

10    somehow wrongful to exercise that power, your Honor.

11    And that's just not the case.

12         And, your Honor, if -- on a merits related --

13    and there ought to be some consideration on merits on a

14    TRO.  If they had no right to be reinstated and if we

15    had the right and power to do what we did; then the

16    underlying notion that there's some wrongdoing that

17    needs to be restrained or some status quo that needs to

18    be undone, your Honor, is just incorrect.

19         THE COURT:  But, I don't know, maybe I'm too

20    much of a judge.  Maybe, maybe, it just so appalls me

21    that all I have to do in life, is put out a complaint

22    and then I can do whatever I want all because I have

23    the right, I have the right.  I say it's an agency, so

24    never mind that the Court hasn't ruled on that.  Never

25    mind that we have a contract.  Never mind all of that.

26    But, since I say that it's an agency, I have the right

1           Proceedings

2    to do whatever I want.  Come in with the big club, club

3    people to death and then say, you know, if I have to go

4    back to what it was before, Gee, I would be humiliated

5    ed.

6               You shouldn't have done it to begin with.

7               MR. RENARD:  But, your Honor, and that's

8    why -- and I'm sorry if I do this, but when I talk

9    about what's in that brief, it's of critical

10   importance.

11              THE COURT:  I read the brief.

12              MR. RENARD:  Well, your Honor, the notion that

13   self-help and clubbing people, that's a little

14   different than when the New York Court of Appeals says,

15   you know, there is a policy of this state that if a

16   principal has lost trust and confidence or otherwise

17   doesn't want an agent out there, even if it's a 30-year

18   airtight, 70-year, 100-year contract, doesn't want that

19   agent out there binding that principal to legal and

20   financial responsibility; we're going to give that

21   principal the power, the unfettered power subject to a

22   potential claim for breach of contract to terminate

23   that agent.  And, you know, your Honor, that's not only

24   the policy of New York, but it's everywhere in this

25   country.

26              THE COURT:  You know, I know you have a number

1          Proceedings

2     of citations here.  One of them is interesting.  A Slip

3     opinion.  This is, I think, cited to GK Alan Associates

4     versus Lazzari at 44 A.D.3d 95, cited to page 102.

5               A Second Department 2007 case and says here:

6               "A principal is always free to terminate the

7     agency relationship subject to a claim of damages by

8     the agent.  The disloyalty of the agent entitles the

9     principal to avoid such claims, at least to the extent

10    that the claims involve future compensation."

11              Here, we talk about disloyalty.  I mean, none

12    of these cases mean anything without the facts.

13              MR. RENARD:  Your Honor, in fact, as the cases

14    we cite point out -- and we had cause here, your Honor,

15    but that's a separate thing to be adjudicated later.

16              The cases point out, your Honor, it's not a

17    cause right.  It's not a cause power.  A principal can

18    terminate and revoke an agent's authority at any time

19    and for any reason or no reason at all.

20              THE COURT:  You cite Smith versus Conway, 1950

21    Supreme Court case and cited in 198 Misc.886, which and

22    I have no idea who wrote this.  It doesn't say who

23    wrote it.

24              Quote:  "A principal, at least, generally is

25    permitted to revoke an agency when he pleases, even

26    though he has a contracted with agent for a definite

1             Proceedings

2     period of time."

3           All of this is interesting, but you talk to

4     the Court of Appeals case.  Is that the Wilson case,

5     you're talking about?

6           MR. RENARD:  Yes, your Honor, yes.

7           THE COURT:  You have a copy of it, right?

8           MR. RENARD:  No.  Yes, your Honor, we do, we

9     do.

10          THE COURT:  Yes, you've been very silent for

11    very long.

12          MR. HANDZO:  If I can just take a moment to

13    respond, your Honor.

14          THE COURT:  I don't think he's quite through.

15          MR. HANDZO:  If we're handing up cases, your

16    Honor, we have one, as well.

17          THE COURT:  Yes, you have Barbara Kapnick's

18    case?

19          MR. HANDZO:  Yes, your Honor.

20          THE COURT:  And that one was issued on

21    July 13, 2010, on a case Madison 92nd Street Associates

22    versus Courtyard Management Corp..

23          Let me ask you a question.  At what stage of

24    the appeal is it at?

25          MR. HANDZO:  That I do not know, your Honor.

26          MR. RENARD:  Your Honor, I'll also point out

| | |
|---|---|
| 1 | Proceedings |
| 2 | that in that case, the Court dealt with a claim -- and |
| 3 | this is what appears on the face of that opinion.  A |
| 4 | claim that there was some general fiduciary |
| 5 | relationship of trust and confidence.  It doesn't even |
| 6 | appear from that opinion that an argument of agency was |
| 7 | even brought to the Court, that the owner went through |
| 8 | the contract, argued that there was an agency by virtue |
| 9 | of the provisions in the contract and, therefore, that |
| 10 | there is -- it's not a termination question.  Its |
| 11 | whether or not a fiduciary relationship was created. |
| 12 | That's not even a termination case and doesn't apply to |
| 13 | this notion of revocation of agency. |
| 14 | Now, Marriott will say, well, there's a |
| 15 | disclaimer of fiduciary duty in that case, just as |
| 16 | there is in ours, your Honor.  We've pointed out, your |
| 17 | Honor, in Section B of our brief, that labels, such as |
| 18 | there is or there is not a fiduciary relationship, |
| 19 | labels such as there is an agency relationship or |
| 20 | disclaimers of an agency are not controlling. |
| 21 | And, your Honor, we also had a case that we |
| 22 | had before Justice Gammerman involving, by the way, Mr. |
| 23 | Schrager, who's also one of the defendants in this |
| 24 | case, where the Court went on at length and talked |
| 25 | about how labels disclaiming agency and disclaiming |
| 26 | fiduciary duty are not binding, your Honor.  And if I |

| | |
|---|---|
| 1 | Proceedings |
| 2 | may present the Court with a copy of that case, as |
| 3 | well. |
| 4 | (Handed up to the Court) |
| 5 | THE COURT: Yes, let me read this case. Let |
| 6 | me read the Court of Appeals case, which I just want to |
| 7 | point out is 1954. |
| 8 | Well, I don't know, Mr. Renard, I don't know |
| 9 | if I agree with your interpretation of this case. |
| 10 | Let's go over it a little bit. |
| 11 | This is the Wilson Sullivan Company, Inc. |
| 12 | versus The International Paper Makers Realty Corp. It |
| 13 | is cited at 307 NY 20. It was argued on March 12th, |
| 14 | 1954. Decided on April 23rd1954. |
| 15 | And just for interest sake, I wonder who was |
| 16 | our bench. I don't know. It was, the opinion was |
| 17 | written by Judge Froessel, and there is a dissent. And |
| 18 | the bench was, the Chair was Judge Lewis, Conway, Fuld, |
| 19 | Froessel, and the dissent was Judge Dye. And Judges |
| 20 | Desmond, Van Voorhis joined in Judge Dye's dissent. |
| 21 | But, taking the majority, first place, the |
| 22 | contract that you're dealing with -- and I think you |
| 23 | have to begin with -- is a contract that -- and the |
| 24 | issue that was there, is whether or not the trial judge |
| 25 | erred when he did not grant summary judgment and did |
| 26 | not say that there wasn't a cause for damages in this |

1

2      particular instance.

3              And it goes on, first place, to explain that

4      the plaintiff had an exclusive, as exclusive renting

5      and managing agent for the building owned by the

6      defendant, was to receive a compensation for its

7      services at five percent of the total amount of rental

8      collections.

9              The duration and provisions for termination of

10     this agreement were provided for in the is 7th

11     paragraph which reads in part, and, of course, that's

12     the key element in this particular agreement, because

13     you don't have that.

14             "The agreement shall continue in full force

15     and effect until the last day of February 1948 and if

16     not terminated by either party, giving the other party

17     thirty days prior notice in writing, shall continue

18     from year to year until terminated by either party at

19     the end of an extended yearly term by the giving of a

20     like notice."

21             So it turns out that the defendant herein

22     wants to sell the building, and the issue that is

23     before the Court is whether or not they had the right

24     to terminate the plaintiff's right to collect the rent,

25     five percent of the rentals by just deciding to sell

26     the building unilaterally.  Because nowhere in the

1          Proceedings

2     contract or the agreement was there any provision made

3     for the defendants, the owner's right to sell the

4     building.

5          So, as a result, the conclusion that the

6     majority came to, "We are, therefore, of the opinion

7     that the trial court erred in dismissing plaintiff's

8     complaint for legal insufficiency.  We are further of

9     the opinion that on the record before us, defendant has

10    failed to raise any triable issues of fact, except as

11    to the amount of damages.  Indeed, the parties agreed

12    that as a special term, that the problem is purely one

13    of law.  Consequently, plaintiff's motion for summary

14    judgment should have been granted."

15         Now, you point -- you outline for me a

16    section -- well, first place, you outline a very

17    interesting section, but we have to do the sentence

18    that precedes it.

19         "At the outset, we should sharply distinguish

20    between the parties' powers, rights and duties arising

21    out of the contract itself, and those arising under the

22    agency relationship created by the contract."

23         So, you do have a distinction that has to be

24    made here.

25         "It is well settled that with but a few

26    exceptions not pertinent to the facts of this case, a

1           Proceedings

2       principal has the power to revoke at any time his

3       agent's authority to represent him.  This is not to

4       say, however, that in doing so, he is immune from

5       liability to the agent for the breach of the contract.

6       Thus, while defendant has the power to terminate at

7       will his agency relationship with the plaintiff; if in

8       so doing it violated his obligations under the

9       contract, it must respond to the plaintiff in damages."

10          So, that's what you're holding on, and that is

11      what you're saying to the Court allows you to take this

12      unilateral action.

13          MR. RENARD:  If I may, your Honor?  This case,

14      I think, proves the point that I've tried to articulate

15      to the Court.

16          That in this case, which is interesting

17      because it wasn't a hotel manager, but it was a manager

18      of a building who not only had property management

19      agency responsibilities, but also to enter into leases

20      on behalf of the owner's building so a classic agency.

21          The Court recognizes that when the owner of

22      the building said agent, you're no longer my agent,

23      that's effective immediately.

24          The question that arises was that revocation a

25      breach of contract?  Which I acknowledged yesterday and

26      I acknowledge today, that is an issue that remains to

1                        Proceedings

2      be determined in this case; and if they're able to say

3      oh, it was a wrongful termination because of X, Y and

4      Z, then I'm entitled to all my future compensation

5      under this agreement, I acknowledge that.  I think

6      we'll be able to defeat that claim and, in fact, have a

7      claim for damages back against them; but the underlying

8      principal, your Honor, and I think it's articulated

9      throughout here is that, yes, and you were right to

10     point out there's a difference between the common-law

11     power to revoke and terminate an agent's authority.

12             You can do that.  You might be rightful in

13     doing that in which case you can deal with impunity and

14     not be subject to a counterclaim for damages; or in

15     doing that in terminating your agent, you might have

16     violated the contract and subject yourself to a claim

17     for damages.

18             This Court acknowledged that the revocation

19     was effective, but it was incorrect to dismiss the

20     terminated agent's claim for damages because there was

21     a possibility that it had a claim because it was a

22     possibility of a wrongful termination.

23             And, your Honor, that's precisely the point.

24             And if I may, your Honor, go back to something

25     I had said before.  When I was reading to the Court the

26     relief that is requested here, not only to reinstate

                              Proceedings

Marriott's so it can perform in accordance with the

contract which we believe was terminated or agency was

revoked under; to undo the harm and damage that

resulted from owner's purported ouster of Marriott,

whatever that means, to unilaterally -- not to

unilaterally install another hotel manager which, of

course, has already been done.

        Your Honor, the reason I go through this, if

you go to the counterclaim that they filed yesterday,

the final and permanent injunctive relief that they ask

for is identical to what they ask for in a TRO; which

means not only in a preliminary injunction, which has

its own rules regarding affirmative mandatory

injunctions, at a TRO stage when they have to show

immediate and irreparable injury pending a hearing

which could happen next week subject to the Court's

availability or the week after, that they want to

reinstate and effectively get the final relief that

they seek which the courts are pretty clear, you can't

get by way of preliminary injunction, let alone a

temporary restraining order, the relief that they seek.

And here's the problem, your Honor.

        If the Court were to enter a TRO staying

reinstate Marriott, then what are we really litigating

once we come to the preliminary injunction stage?

1       Proceedings

2    Because Marriott is already in.  There's nothing -- the

3    Court can say, oh, preliminary injunction denied.

4    Well, if it was denied, then where are we?  The status

5    quo has changed.  Marriott is back in business

6    operating our hotel against our will.

7           My point is, forgetting whether or not they

8    could even get this relief by way of a preliminary

9    injunction after a hearing and full opportunity on our

10    part to respond with the factual affidavits, they want

11    their final relief by way of a temporary restraining

12    order.

13           THE COURT:  Well, they're attempting to get

14    back to where they were.

15           Let me hear from Mr. Handzo.

16           MR. RENARD:  Your Honor, one last point I need

17    to say this.

18           Wholly apart from this power to revoke an

19    agent's authority -- and we do address this in our

20    brief and I won't belabor it -- there's a separate and

21    independent reason why in hotel management contracts

22    that there should not be injunctive orders requiring

23    the two parties to continue to do business with one

24    another.

25           The courts have held that hotel management

26    agreements constitute --

1          Proceedings

2               THE COURT:  You know what, I don't have any

3          disagreement with you.  Mr. Renard, it comes down to

4          the same thing.

5               You were already before this Court.  You

6          already had -- you already had the power of this Court

7          behind you, in a sense, by coming and filing a

8          complaint.  You now avail yourself of rather plenary

9          powers that the Court has; but not to come to this

10         Court and ask for such relief is really -- not only are

11         you kicking the Court's teeth, but really self-help

12         involvement that is, frankly, mind boggling.  And all

13         you had to do is, indeed, ask this court For that

14         power.

15              All you had to do is bring by order to show

16         cause an immediate declaration that you had the right

17         to take over the future -- the management and the

18         control of the this building, this hotel, sorry, based

19         on your agency relationship.  And putting aside whether

20         or not they had damages, all you had to do is come to

21         this Court and ask for it.  And that is the problem;

22         the problem is the self-help.  Not the problem that you

23         point out that we have a right to do it.

24              I don't know, once you come to the Court you,

25         in a sense, subject yourself to a different plane.  You

26         subject yourself to the magistery of this Court.  You

1          Proceedings

2     don't go around, I mean, you know, you come to Court

3     and you say, he's about to hit me and I'm asking this

4     Court to protect me.  And you come up with proper

5     things and you say, well, you know what, I'll hit him

6     first.  Instead of coming into Court and saying you

7     know, can I have the right to hit him, because he's

8     about to hit me?

9          MR. RENARD:  Your Honor, if I may address

10    that, because it's an observation the Court had

11    yesterday, and I do appreciate what your Honor is

12    saying.

13         I want to make sure, your Honor, in invoking

14    this right and power, we certainly didn't mean to

15    offend the Court.  I speak on behalf of my client --

16         THE COURT:  You're not offending me

17    personally.

18         MR. RENARD:  I speak to your Honor and I speak

19    to the Court as a system.  We weren't meaning to kick

20    the system in the teeth.  We didn't believe we were

21    doing something that, in effect, was a derogation of

22    the Court's authority or I think language used

23    yesterday was doing an end around the Court.  Your

24    Honor, I would never certainly do anything to offend

25    the Court or that I believe was an end around or doing

26    something that somehow meant to escape the Court's

1                           Proceedings

2      powers and things like that.  I find that abhorrent,

3      and at least I can say this.  That wasn't the intention

4      of either my client or this law firm in my client in

5      pursuing this action or my law firm in making the

6      arguments we make, your Honor.

7                 With that said, and I think our client even

8      says that, your Honor, in an affidavit that we prepared

9      last night.  I'm not sure if the Court received it.  We

10     have copies.

11                THE COURT:  No, I haven't read it, but I did

12     receive it.

13                MR. RENARD:  I just wanted to say that, your

14     Honor, because I understand the Court's observations

15     and I, certainly, don't want the record to reflect

16     anything other than if we offended the Court or the

17     powers of the Court, we apologize for that.  And,

18     certainly, your Honor, our actions and the actions of

19     our client were done in a good-faith belief that we had

20     the right and the power to exercise what we believe the

21     law gave us in that regard.

22                And so, your Honor, because this is really a

23     personal services contract, it's sought to be

24     specifically enforced; and given the fact that they

25     seek the final relief that they asked for in their

26     counterclaim yesterday; your Honor, at a minimum, we

1              Proceedings

2      would ask that we could roll this up and present all

3      the evidence and all the arguments in a preliminary

4      injunction hearing just as soon as the Court would have

5      us do so.  But I just believe that this temporary

6      restraining order, even given the Court's observation

7      about what has happened, is just inappropriate to do

8      this given the requirements of 6301 and I would say

9      this, your Honor, too, and I did mention this

10     yesterday.

11              Mr. Ken Rehmann, who did an affidavit, talks

12     about all this parade of horribles, that the damage to

13     the reputation of Marriott and the damage to the

14     Edition brand; it's very interesting, your Honor,

15     because Mr. Rehmann defines Marriott to be the parent

16     company, Marriott International, which we believe is

17     the one who owns the Edition brand, which we believe is

18     the one that owns all the intellectual property that

19     they so complained about.

20              Marriott International, your Honor, isn't even

21     a party to this lawsuit.  Catherine Young, another

22     person who did an affidavit for them, talks about all

23     the harm to Marriott, defined as Marriott

24     International.  They don't even have the right party in

25     here to complain about irreparable harm, that they

26     haven't even proved is immediate in the sense that this

1            Proceedings

2      case wait till preliminary injunction hearing.

3            And furthermore, your Honor, the mandatory

4      injunctive relief that they request, reinstatement of

5      Marriott as manager would require us to fire Aqua -- I

6      understand what the Court says, perhaps that's an issue

7      of your own making.  But, your Honor, that implicates

8      contractual rights of a party that isn't even before

9      the Court, Aqua.  So we have a party, Marriott

10     International who's claiming the irreparable injury,

11     and one of the things they seek by way of temporary

12     restraining order is, essentially, to terminate

13     contractual rights of Aqua who's not before this Court.

14           There are all sorts of procedural problems

15     and they should --

16           THE COURT:  Would you say that Aqua is an

17     agent of yours?

18           MR. RENARD:  It is, your Honor, but that

19     doesn't mean -- I mean, they are an agent pursuant to a

20     contractual relationship which we have with them.  We

21     have an interest in that contract, and they have a

22     separate interest in that contract.

23           So, my point, your Honor, is --

24           THE COURT:  Yes, but if, indeed, I decide to

25     restrain you, then you, as the parent to Aqua, the

26     agent, the mere agent, can be dealt with in the same

Proceedings

1

2     way as you dealt with as the mere agent of Marriott.

3              MR. RENARD:  Well, your Honor, my only point

4     is Aqua is not before the Court.  You're talking about

5     terminating the contractual rights of a party.  We're a

6     counterparty to an agreement with Aqua.

7              The point being, your Honor, the relief that

8     they seek by way of -- again we're not at a preliminary

9     injunction stage.  We're at a temporary restraining

10    order stage.

11             THE COURT:  I think we are and I'm going to

12    have to close it up so I'm going to have to ask

13    Mr. Handzo to speak.

14             MR. RENARD:  Thank you for your time.

15             MR. HANDZO:  Thank you, your Honor.

16             Let me just take the points in the order that

17    Mr. Renard addressed; and first of all, he started off

18    talking about how the hotel was losing money.

19             I want to be clear about one thing.  To the

20    extent the hotel has operating losses, my client is

21    paying them, not them.  The contract requires them to

22    pay the operating expenses of the hotel.  However, they

23    have refused to fund working capital requests so

24    actually it's Marriott paying the money right now.

25             This claim of due and owing money, now it's

26    actually Marriott that's paying.

1                        Proceedings

2                    The contract has a couple of places where it

3           says you can't terminate without a judicial finding.

4           In the provisions that deal with termination for

5           default, for example, it says, If one party claims a

6           default and the other party contests it, there cannot

7           be a termination until a Court has resolved that

8           dispute.

9                    THE COURT:  Where is that?

10                   MR. HANDZO:  That it 9.02, I believe, your

11          Honor.

12                   MR. FISCHER:  9.03.

13                   THE COURT:  Can you give me the page number?

14                   MR. HANDZO:  Page 38.

15                   It's at the bottom of page 38, your Honor.

16                   Your Honor, we also quote it and deal with it

17          on pages 9 and 10 of our brief.

18                   THE COURT:  Okay.  Good.

19                   MR. HANDZO:  And the point here, your Honor,

20          is why in the world would we put a provision like that

21          in a contract that says it can't be terminated for

22          default without a judicial ruling if it could be

23          terminated at any time for any reason?  That just

24          doesn't make any sense.

25                   Likewise, there's another provision in the

26          contract that I mentioned yesterday, 2.03, that says:

| | |
|---|---|
| 1 | Proceedings |
| 2 | Even if you have a basis to terminate, you can't |
| 3 | terminate where there is money owed to Marriott which |
| 4 | there currently is. |
| 5 | So, again, we've got all these provisions that |
| 6 | deal specifically with termination and make it clear |
| 7 | that there's simply no right to just decide that I want |
| 8 | to terminate.  You have to have a judicial |
| 9 | determination, and there are certain requirements |
| 10 | beyond that like making sure there's no money |
| 11 | outstanding which there is. |
| 12 | And I'm sort of glossing over maybe the most |
| 13 | important feature of the contract, which is that it |
| 14 | expressly says that Marriott is not the agent of |
| 15 | M Waikiki. |
| 16 | THE COURT:  Where is that? |
| 17 | MR. HANDZO:  That is in -- |
| 18 | MR. FISCHER:  Pages 43 and 44, 11.03 |
| 19 | Relationship. |
| 20 | THE COURT:  What I like is the people back |
| 21 | there that really know what they're talking about. |
| 22 | MR. FISCHER:  I'm just a spectator. |
| 23 | MR. HANDZO:  Further away from counsel table |
| 24 | they are, your Honor, the more they know, generally. |
| 25 | But, yes, it's pages 43 and 44, Section 11.03. |
| 26 | THE COURT:  All right, let me read that. |

1          Proceedings

2                    MR. HANDZO:  Sure.

3                    THE COURT:  Okay.

4                    MR. HANDZO:  So as you can see, your Honor,

5          the parties, two sophisticated parties got together,

6          drafted a very complex and comprehensive agreement and

7          expressly agreed that Marriott is not the agent of the

8          owner; and, indeed, went further and expressly agreed

9          that M Waikiki would not make that argument in Court

10         which, of course, Mr. Renard has now spent about an

11         hour doing exactly that, completely in contradiction to

12         what the contract expressly binds his client not to do.

13                   THE COURT:  Well, what he's saying and

14         actually and produce a case to support his saying, is

15         that, yes, we had a contract; however, our entire

16         relationship was one of principal versus agent; and,

17         therefore based on agency rules, separate and apart

18         from the contract which could lead to you, Marriott,

19         receiving damages, substantial amount of damages, if

20         you, indeed, can prove that you fulfilled your portions

21         of the contract and they didn't and they, in fact,

22         impeded you from doing that.  But, separate and apart

23         from that, they have a principal and agency

24         relationship.

25                   Now, I know it says in the contract you won't

26         mention agency, and Mr. Renard says to me it doesn't

1    Proceedings

2    matter what it says in the contract.  In fact, the

3    relationship between Marriott and M Waikiki LLC was one

4    principal, being Waikiki, versus agent.  And so,

5    therefore, while maybe our actions are despicable, we

6    never had the right to do it because of the agency

7    relationship.

8         MR. HANDZO:  And, your Honor, that argument

9    that Mr. Renard is making is exactly what was argued to

10   Justice Kapnick in the 92nd Street decision that we've

11   given to you.  They said exactly the same thing.

12        The Court in that case had a contract with

13   virtually identical language.

14        THE COURT:  But was this decision and order

15   made on a motion to dismiss?  Was it made on a -- see,

16   my problem now and, frankly, this is something you have

17   to address.  My problem is whether or not the plaintiff

18   acted in an appropriate manner.

19        Certain actions have occurred, and what Mr.

20   Renard is telling me is that if I, in the sense

21   eradicated those actions, that it would eradicate the

22   principal's ability to do what it has the right because

23   they're the principal and you're the agent.

24        MR. HANDZO:  No, I don't think it would.  What

25   it would do is it would preserve the status quo until

26   they could come back into Court and make the case to

1               Proceedings

2     you that they really do have a right to terminate.

3               I mean, that's what we're really saying here.

4     I mean that's what, despite Mr. Renard arguing that

5     we're really asking for some final irrevocable relief;

6     the reality what we want here is to have what we had at

7     one o'clock Sunday morning until somebody has a chance

8     to just come into this Court and have this all out and

9     have the Court make a decision, which is what the

10    contract, obviously, contemplates.

11              And Mr. Renard's argument on that point really

12    smacks us saying, you know, I shot my parents, and you

13    should have leniency on me, because I'm an orphan.

14              I mean --

15              THE COURT:  Hutzpah?

16              MR. HANDZO:  Yes, Mr. Renard is from Texas, so

17    we might have to translate that, but, exactly --

18              MR. RENARD:  I got it, David.  Thank you.

19              MR. HANDZO:  They have a New York office.  I

20    forgot.

21              You know, they put us in this situation; and

22    then to come in and say, oh, you have to overcome all

23    of these legal hurdles because we took this extra

24    judicial action without coming to Court and now you

25    have to, you know, overcome this huge legal burden;

26    he's completely got it backwards.

1                        Proceedings

2            They put us in this situation.  They have

3      nothing to complain about if we go back to where we

4      were a very short time ago.  And the status quo really

5      is that from the perspective of guests, people coming

6      to the hotel, people book parties.  This is a Marriott

7      property.  The guests who are coming in the future are

8      still expecting the Marriott property.  That's what

9      they're expecting.

10           The other thing I want to highlight, because

11     it is something that really concerns my client.  We do

12     have a lot of proprietary information on that property,

13     and we're getting reports that computers are -- they're

14     yanking out the hard drives.  There are post-it notes

15     on computers which say cracked, which in the computer

16     lingo means -- as I understand it -- that they have

17     broken the passwords.  They're circumventing security

18     devices.  That's ongoing now, and we need to stop that.

19           So, the equities here are clearly in favor of

20     putting Marriott back where we were just a little while

21     ago.  If they want to then come to Court and argue this

22     agency issue we think they're totally wrong.  We think

23     Justice Kapnick got it exactly right.  They are

24     basically saying if you look at the contract as a

25     whole, we have certain rights and responsibilities to

26     make us an agent.  That exact argument was made to

1               Proceedings

2        Justice Kapnick.  She expressly rejected it.  If you

3        look at that decision she says, I'm looking at the

4        whole contract.  I'm seeing what you're saying, but I

5        don't buy it, and that's the best law we have and most

6        on-point law we have.

7               In fact, the cases that they cited yesterday,

8        that they principally relied on, Woolley case from

9        California, is a case where the contract said exactly

10       the opposite.  It says, we are an agent and so on that

11       basis the Court found that they are an agent.

12              This case is exactly the opposite.  Justice

13       Kapnick just says you have to follow that.

14              MR. WEINER:  Your Honor, may I just add a

15       word?  I'm sitting her patiently.  I represent Ian

16       Schrager, the defendant.

17              THE COURT:  This is Mr. Weiner.

18              MR. WEINER:   My name is Robert Weiner.

19              What has happened has had significant impact

20       on my client, as well.  There was a press release that

21       was issued by the plaintiff.  It was covered worldwide

22       in all the press, in particularly, the hospitality

23       press.  My client is already getting significant

24       questions from the press what happened, and my client's

25       reputation is very much involved here.

26              So from our prospective, we think this needs

1    Proceedings

2    to be resolved very, very quickly, because we have

3    significant reputational issues that, again, I haven't

4    joined in because it's not my Management Agreement, but

5    I think your Honor should be aware of that.

6              THE COURT:  All right, thank you.  I want to

7    take a break.

8              (Short recess taken.)

9

10

11

12

13

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

26

| | |
|---|---|
| 1 | Proceedings |
| 2 | |
| 3 | |
| 4 | |
| 5 | THE COURT: First place, I want to |
| 6 | thank both sides, everyone for their excellent |
| 7 | presentation. This is a very serious issue, without a |
| 8 | doubt, and I think that both sides have articulated |
| 9 | their positions very clearly and very expertly. |
| 10 | So, for that I commend both sides. |
| 11 | However, in the balancing of everything, the |
| 12 | Court has decided as follows: |
| 13 | The Court is going to grant the temporary |
| 14 | restraining order. The Court understands that this is |
| 15 | obviously -- well, the Court believes -- I think I'll |
| 16 | put it this way. |
| 17 | The Court believes that in the balance of |
| 18 | everything, that the Waikiki actions by coming in at |
| 19 | two o'clock on a Sunday morning when there was no |
| 20 | preliminary attempt to give any kind of notice |
| 21 | whatsoever, has caused irreparable harm to the |
| 22 | defendants. And the reason why it has caused |
| 23 | irreparable harm to the defendants is that, first |
| 24 | place, they were displaced as the manager of the hotel. |
| 25 | Second, their reputation has been harmed in |
| 26 | the hotel community. |

1                          Proceedings

2              Third, that their trade secrets have been put

3         in tremendous jeopardy by putting in a competitor of

4         Marriott's, competitor as the person in charge of

5         running the organization, it allows the competitor to

6         have access to all of Marriott's secrets in terms of

7         who they're trying to sell their rooms to, all the

8         future sales that are going on, all their past sales,

9         their current hotel guest lists.  Everything that is

10        proprietary interest of Marriott has been disturbed by

11        the actions that Waikiki undertook.

12             The equities also favor Marriott.  The

13        argument that this is an agency relationship, so well

14        put forward by Mr. Renard on behalf of the Waikiki --

15        and I have to commend him, certainly excellent attorney

16        -- are counteracted by the expressed agreement in a

17        contract that was entered into -- I assume between two

18        very sophisticated business people, with the help of, I

19        assume, excellent attorneys on both sides -- with I'm

20        sure a very careful deliberation as to the terms of

21        this contract, that this contract was entered into

22        where expressed provisions were made that Waikiki would

23        not, would not invoke the issue of agency relationship

24        at any time in any argument if they tried to displace

25        Marriott.  The agency issue was removed by contractual

26        agreement between the parties.

1                    Proceedings

2            Third, another point is, is third, the parties

3       had entered into a very specific mechanism on how to

4       terminate this agreement.  And the most important part

5       of this specific outline about how to terminate this

6       agreement was the statement made in the contract that

7       the two parties freely entered into, that the only way

8       that you could terminate this agreement was to come to

9       Court and get judiciously determined by a Court in New

10      York State as to whether or not the agreement should be

11      terminated.

12            The fact that -- which, in fact, Waikiki began

13      doing, by bringing the complaint and summoning Marriott

14      to this courthouse.

15            But, instead of allowing a judge to

16      judiciously determine whether or not the agreement

17      should be terminated or not, Waikiki then went forward

18      and took it upon themselves to achieve the final remedy

19      by, by self-helping themselves and throwing Marriott

20      out.  That was a direct contradiction of the mechanism

21      that was set up between the parties as to the ways of

22      going about to terminate this agreement.

23            Indeed, because of the way the contract is

24      written, the Court finds that the -- that first place,

25      the balance of the equities go in favor of the

26      Marriott; that the possibility of ultimate success also

1          Proceedings

2     weigh heavily in terms of Marriott -- although, of

3     course I have not heard the final case in this matter

4     -- but the possibility that the statements made in the

5     contract might, indeed, go to Marriott's argument that,

6     indeed, they have protection under the contract to such

7     a way that they cannot be disturbed by just unilateral

8     actions.

9          Mr. Renard's argument that the agency

10    relationship overrides anything to do with the

11    contract, I think is clearly answered in language in

12    the contract, in which both parties agreed, where it

13    said, says at 11.03 at page 44 of the contract:

14         "Neither this agreement nor any agreements,

15    instruments, documents, or transactions contemplated

16    hereby, shall in any respect be interpreted, deemed or

17    construed as making manager a partner, joint venturer

18    with, or agent of, the owner."

19         "Owner and manager agree that neither party

20    will make any contrary assertions, claim or

21    counterclaim in any action, suit, expert resolution

22    pursuant to Section 11.20, arbitration or any other

23    legal proceeding involving the owner and the manager."

24         That forbids the agency argument.

25         Now, Mr. Renard goes on to tell me, well, but

26    that doesn't matter.  That doesn't matter, because it's

1                              Proceedings

2          still an agency relationship; but I believe that,

3          indeed, you can, if you so wish, contract away any

4          agency relationship in a valid contract.

5                    And so, therefore, the arguments made by

6          Waikiki is a direct contradiction of the argument

7          that -- of the agreement that was freely and openly

8          entered into by the parties in the contract, in the

9          agreement that set forth their relationship.

10                   The Court, also, finds that there were

11         other -- I don't think I have to reach each and

12         everything -- but, also, wants to point out that the

13         issue about the remedies of 9.02 of the contract, it's

14         remedy is 9.02(A)(iii), it says that in order to

15         terminate this agreement, the Court -- the parties have

16         to come to Court and get a judicial resolution.

17                   Which is, as I stated just a few seconds ago,

18         indeed, Waikiki LLC has begun that process.  But

19         instead of waiting or even coming to Court saying

20         there's an emergency, Judge, there's an emergency that

21         we need to have this issue resolved immediately;

22         instead of doing that by appropriate means, which would

23         have been by order to show cause, they just went in at

24         two o'clock on Sunday morning to, indeed, self-help

25         themselves to the final resolution.

26                   And, as such, not only are they in breach of

Proceedings

1

2      the agreement and in breach of their specific statement

3      that their disagreements will be resolved by a judicial

4      court, their actions have caused, as I stated a second

5      ago, irreparable harm to the defendants, Marriott Hotel

6      Services, Inc., I.S. International LLC, and Mr.

7      Schrager, himself, Ian Schrager.

8                And so, therefore, the Court is going to grant

9      for the reasons already stated a temporary restraining

10     order; and I'm going to order that, indeed, as part of

11     this temporary restraining order that the Marriott be

12     restored to the hotel as its manager with full duties

13     and full -- the panoply of everything that is stated in

14     the agreement until a preliminary injunction hearing is

15     held and a final resolution of this matter is

16     determined.  Because the Court is not ruling on the

17     ultimate merits, but the Court is ruling on the order

18     to show cause for a TRO.

19               And in terms of the preliminary injunction

20     hearing, we can be off the record right now.

21               (Whereupon, a discussion was then held off the

22     record.)

23               THE COURT:  Let me ask you a question.  In

24     terms of your estimate amount of time you're going to

25     need to present your various arguments in the

26     preliminary injunction hearing, what is your estimate?

1              Proceedings

2      Do you think can you get it done in a day, or do you

3      think you have too many witnesses for a day?  Do you

4      need two days?  What is your estimate?

5              MR. RENARD:  Your Honor, if the Court would

6      indulge us, it's probably a question we could answer

7      today, but I'm not sure right now.  It depends, for

8      instance, if you'd be interested in live witnesses or

9      you just want testimony by affidavit; but I wouldn't

10     mind conferring with clients and co-counsel.

11             THE COURT:  All right, so let's give it a day.

12     All right, let's give it Wednesday, so that we would

13     just delay it one day, the beginning of the Harch trial

14     and that means it's going to go -- who knows.  That

15     trial is taking up ten days of my life, but we'll put

16     it over one day.

17             I'd like you to meet and confer about exactly

18     who you're going to be -- how you're going to be

19     presenting it.

20             MR. RENARD:  Your Honor, we'll do that at the

21     appropriate time.  I just have some questions about the

22     form of the order that the Marriott has presented.

23             First of all, your Honor, as the Court well

24     knows, any injunction, including the TRO, has the

25     possibility of contempt of court for its violation even

26     if it's an inadvertent violation.  And, your Honor, a

1    Proceedings

2    couple of things about that.

3         Number one, as you well know, because we've

4    described it to you, we have another company in there

5    presently executing contracts, new vendor

6    relationships, employees, signage, computer systems,

7    all of that.  Is there a timeframe that we can put

8    on --

9         THE COURT:  Yes, the same timeframe that you

10   gave Marriott.  Since we're going to think about it as

11   eight hours ahead of us, we've got right now we're

12   practically at eight o'clock at night.  So I tell you

13   what, since two o'clock in the morning there was that

14   transfer, you have till two o'clock Thursday morning,

15   right?

16        MR. HANDZO:  Your Honor, it goes the other

17   way.

18        MR. DeSANCTIS:  It's five o'clock in the

19   morning there.

20        THE COURT:  All right, so we're already

21   three o'clock on Wednesday morning, am I correct?

22        MR. WEINER:  Three a.m..

23        MR. DeSANCTIS:  They're six hours behind us.

24   It's 5:20 a.m..

25        THE COURT:  It's 5:20 a.m. right now in

26   Waikiki.

1    Proceedings

2         MR. FISCHER:  Sunrise.

3         MR. RENARD:  So, your Honor, by five in the

4    morning Thursday morning?

5         THE COURT:  No, I really don't -- I really

6    want it to be quicker than that.  I really honestly

7    want the transfer back, to be done in what I would

8    consider to be reasonable in six hours.  Because why

9    I'm saying something so quick is that, indeed, that is

10   exactly what happened in the Marriott; and since now

11   I've learned that transfers are easily done by just

12   transferring the security personnel and stepping into

13   the major desks that they have at the hotel, the

14   signage should come down and the Marriott signage I

15   hope hasn't been destroyed can go up and we can get

16   going with this TRO right away.

17        MR. RENARD:  Your Honor, second point.  And

18   there's a reference in the paragraph to we must undo

19   the harm and damage that resulted from owner's

20   purported ouster of Marriott.

21        I don't think, your Honor, that that would

22   meet muster in terms of a definitive obligation.  That

23   could amount to so much satellite litigation and

24   disputes back and forth.  I'm not sure it's needed.

25        MR. HANDZO:  Your Honor, may I just address

26   this, because I think Mr. Renard is not reading that

1          Proceedings

2     correctly or it's not the way we intended it.

3          What we meant is they should not interfere

4     with Marriott's attempts to undo the damage.  We're not

5     asking them to do something affirmatively.  We're just

6     asking them to stay out of the way.

7          MR. RENARD:  I'm not sure what that means when

8     you're talking about someone who's operating in our

9     hotel.  It is so vague, is my point, what's there --

10         THE COURT:  No, what's going to happen is

11    Marriott is going to go back into the hotel and, also,

12    is asking for Marriott's ability to undo the harm and

13    damage that resulted from the owner's purported ouster

14    of Marriott.

15         So, I would think that that would mean another

16    press release going out the same way as Waikiki put out

17    a press release saying that we have put in new people

18    there.  We ousted Marriott for good reason.  Marriott

19    upon their return to the hotel, will probably put out a

20    press release equal to that.

21         I would make sure that it's equal, not more;

22    and I, also, would make sure that the, that the

23    relationships with the press, particularly in the

24    internal press.  We're not talking the New York Times.

25    We're talking the hotel management press situation.

26    That's what I'm talking about.  Whatever belongs there,

| | |
|---|---|
| 1 | Proceedings |
| 2 | et cetera, et cetera. |
| 3 | I would wish that, indeed, accusations don't |
| 4 | go forth.  I would wish it to be very kind of like |
| 5 | neutral in that sense, because we don't know the final |
| 6 | outcome of this. |
| 7 | So, it's just, it's really a statement that |
| 8 | Marriott is reinstated as Waikiki's manager pursuant to |
| 9 | the agreement.  And that really in the grand or extent |
| 10 | of things could be what it should be. |
| 11 | MR. RENARD:  Your Honor, third point, if I |
| 12 | may.  Because we have a reinstatement by a TRO, and |
| 13 | this raises the problem I mentioned earlier.  That |
| 14 | makes them the manager until there's some court order |
| 15 | saying they're not the manager. |
| 16 | THE COURT:  As it says in the agreement. |
| 17 | MR. RENARD:  I understand, your Honor.  I'm |
| 18 | not -- all I'm saying is that I'm not sure what is to |
| 19 | be accomplished at a preliminary injunction stage, |
| 20 | because it seems then incumbent upon us -- I know I'm |
| 21 | talking out loud -- to come to the Court with some |
| 22 | motion saying throwing them off, because essentially |
| 23 | they have changed the status quo.  They're back in, and |
| 24 | it's not then as if losing at a preliminary injunction |
| 25 | stage necessarily means they're out. |
| 26 | And my problem with that is -- you've heard |

1                           Proceedings

2          the argument, I think it's final relief; but

3          respectfully, apart from that, I think we need a bond

4          or undertaking here, your Honor, because 6313 of the

5          CPLR provides for potential of a bond and certainly --

6                    THE COURT:  Let me just say this.

7                    If you agree that this particular argument

8          that we've had now for a series of hours and my

9          decision to grant the TRO; if you agree that, indeed,

10         this TRO will be in the same nature as a preliminary

11         injunction and that we will not go to a preliminary

12         injunction hearing, but rather that this will remain in

13         full force until it is properly litigated -- I'll grant

14         you, I will do my best to make this an expedited

15         undertaking on the part of the Court -- then, you're

16         entitled to a bond.  Because then, they will remain --

17         they being Marriott, the defendants -- will remain at

18         the place, at the hotel until there is a new

19         determination by the Court one way or the other.

20                   And, so, if that is a preliminary injunction,

21         then we don't need to go to a hearing and, indeed, then

22         you're entitled to a bond because you may have been

23         hurt, and the bond has to be commensurate with that.  I

24         have to think about that for a second or two, but I'll

25         hear people on the bond.

26                   First place, would you be agreeable that this

1                          Proceedings

2        is transformed into a preliminary injunction?

3                MR. HANDZO:  I believe so, your Honor.  I'm

4        just trying to think on my feet, something I don't

5        always do very well; but, yes.  I mean, if we want to

6        do this as a preliminary injunction and do it

7        expedited, we will do that as quickly as we can.

8                On the bond, let me just say that I don't

9        think a bond should be required because, essentially,

10       we're -- now, we're just getting back to where we

11       should have been, where we were Sunday morning.

12               I mean, we're now in a position where they're

13       saying we have to post a bond because they did

14       something they shouldn't have done.  It doesn't really

15       make a lot of sense to require us to post a bond under

16       those circumstances, and I think it's safe to say that

17       Marriott is good for whatever damages could be assessed

18       in this case.

19               MR. RENARD:  Your Honor, if it's a preliminary

20       injunction, certainly an undertaking is required; and

21       we can argue the merits, but the standard there is

22       enough to cover the potential damages if in fact it's

23       ultimately determined that the TRO or if we convert to

24       a preliminary injunction should not have been granted.

25       I mean, that's the standard, and those damages are

26       considerable; but if we can do this, your Honor,

1                          Proceedings

2      perhaps this, too, is something we can inform the Court

3      very quickly, whether we have an agreement to convert

4      this to a preliminary injunction.

5            THE COURT:  Right.  Otherwise, we're still

6      under the TRO.

7            MR. WEINER:  I think, as your Honor knows, the

8      bonds typically set by this Court are not set at a very

9      high amount, unless there is an actual showing of what

10     the damage is.  And I've reviewed the affidavits and

11     they have not made an actual showing of any real

12     immediate economic injury; and I think in order for you

13     to give a high bond, you would have to have that

14     information before you.

15           MR. RENARD:  Well, we have Mr. --

16           MR. WEINER:   The affidavit you submit simply

17     says they spent a lot of money on the property.

18     Doesn't say operating losses, those losses being

19     incurred by Marriott.  There has to be some real

20     showing of out-of-pocket, actual out-of-pocket loss

21     that will occur as a result from the injunction.

22           MR. RENARD:  Marriott is not making our debt

23     service, your Honor.  We've been declared in default

24     just this past week.

25           THE COURT:  Wait one second.  I am not going

26     to get into that, and you're not going to have a bond

1           Proceedings

2      equal to debt services.  The only kind of bond that you

3      could possibly ask this Court for is the kind of bond

4      that if, indeed, there was -- and I think, I think

5      that, indeed, it's well pointed out -- that in this

6      case, all we're doing is restoring the status quo ante

7      from really what was illegal actions done by your

8      client.

9           And, so, therefore, whether or not this

10     actually has the same quality as having the need to

11     have a bond, I'm not so sure.  And if I, indeed, I do

12     go with the CPLR and grant a bond, it's going to be

13     something much more reasonable, because the issue is

14     not the ultimate damages.  That we're going to have to

15     litigate.  But, rather, that during this interim period

16     that, indeed, the Marriott is restored as the manager

17     pursuant to the contract.

18          So, with that, and maybe that's something you

19     could meet and confer on.  I think that this should be

20     transferred into a preliminary injunction.  I think

21     that you should have a bond, but you can give me

22     respective letters I think the bond should be

23     $5 million, or I think the bond should be $20, and I'll

24     take it under consideration.

25          All right, I can have letters from everyone.

26          MR. RENARD:  So, your Honor, we will let the

1                    Proceedings

2     Court know later today, certainly, whether we're in

3     agreement and we'll confer.  If we are, we'll confer

4     with Mr. Handzo; and if we have an agreement, we can

5     then present that to your Honor.

6               THE COURT:  Good.

7               MR. HANDZO:  Your Honor, may I just hand up an

8     order to the Court?  It's a little different than the

9     one we filed with our papers.  That's been presented to

10    Mr. Renard.  And if I can hand it up, and I can point

11    out where the one change that was made.  There was one

12    paragraph added, Paragraph 3, on page 2.

13               (Handed up to the Court.)

14               THE COURT:  First place, have you seen this?

15               MR. RENARD:  Mr. Handzo did hand it to me,

16    your Honor, before the hearing today.

17               THE COURT:  Which one am I looking at?

18               MR. HANDZO:  It should be the same, your

19    Honor.  There's two copies of the same thing.

20               THE COURT:  Paragraph 3?

21               MR. HANDZO:  On page 2, you'll see a

22    Subparagraph 3.

23               THE COURT:  Right.

24               MR. HANDZO:  And that is what we added,

25    addressing --

26               THE COURT:  The potential theft of property.

|     |                                                          |
| --- | -------------------------------------------------------- |
| 1   | Proceedings                                              |
| 2   | MR. HANDZO:  Right.                                       |
| 3   | THE COURT:  I do not see a problem with that,            |
| 4   | sir.                                                     |
| 5   | I think that that actually is one of the                |
| 6   | reasons that the TRO is being granted, and that is of   |
| 7   | all the potential harm done to the Marriott, in         |
| 8   | addition to name and recognition and reputation, is the |
| 9   | issue of the proprietary confidential information that  |
| 10  | was on the property when it was so abruptly taken over  |
| 11  | by your new managing agent.                             |
| 12  | So, with that, I think that I have to grant             |
| 13  | that.                                                    |
| 14  | MR. RENARD:  Your Honor, can we also have --            |
| 15  | I'm not sure how we resolved it in terms of the time to |
| 16  | make sure we don't have a dispute in terms of the       |
| 17  | actual transition in order to comply with all this.     |
| 18  | Can we have that delineated within the order?           |
| 19  | THE COURT:  I think it can be delineated.  I            |
| 20  | think that's a good thing.  I think we can add another  |
| 21  | paragraph.                                               |
| 22  | Let me just -- and I suggest you may want to            |
| 23  | confer on this, another paragraph saying something      |
| 24  | along the lines of the Marriott will return to its      |
| 25  | managing capacity on or about whatever time and date,   |
| 26  | which you'll calculate, because don't ask me to.        |

1                          Proceedings

2              I may get it a couple years wrong.  I'm not

3      very good at these things.

4              So, anyway, I suggest you do add that.  So I'm

5      going to give it back to you.

6              (Handed back)

7              MR. WEINER:  Your Honor, I think that simply

8      would be 2:30 p.m. Hawaii time using the difference in

9      times.  Six hours from now, well, three o'clock, but --

10             THE COURT:  Okay, 3:30.

11             MR. WEINER:  3:30.

12             THE COURT:  That would be sort of a good time,

13     because I understand all good hotel transitions should

14     happen around two o'clock in the morning.

15             MR. WEINER:  That would be in the afternoon.

16             MR. RENARD:  He said p.m. so maybe people are

17     at the beach at that time.  I'm not sure.

18             MR. WEINER:   They won't be in the hotel, so.

19             THE COURT:  If it's done appropriately, there

20     will be no knowledge of any guests that anything has

21     happened, and I'm sure it will be done appropriately.

22             MR. RENARD:  Your Honor, if we do decide to

23     agree to convert this to a preliminary injunction,

24     we'll need then to address the bond at some point.

25             THE COURT:  Yes, what you'll do is you'll put

26     down the language in an agreed-upon order.  You'll

1                          Proceedings

2       leave blank, and then let me have it in writing, your

3       views of what it should be; and, remember, reasonable,

4       you know, is a good idea, and then I'll have his views

5       and I will make a decision.

6              MR. HANDZO:  Your Honor, if I may hand this

7       up.  We've agreed on the language to be delineated.

8              THE COURT:  All right.

9              (Handed up to the Court.)

10             MR. RENARD:  Just so I play my role

11      appropriately, that's agreed to in form, but not in

12      substance, I think they say.

13             THE COURT:  Well, service I think is not

14      needed because it's already handed in court.  Okay?

15             MR. RENARD:  Yes.

16             MR. HANDZO:  Yes.

17             THE COURT:  So that's taken care of.

18             All right, I have -- I'm putting down

19      September 7, 9:30 in the morning.  That will be for the

20      preliminary injunction hearing, unless we can come to

21      the other resolution that we talked about because I do

22      think that that's a better resolution.

23             Now, my question is, I do think I have

24      everybody's papers in hand already.  I don't think I

25      need anything new for a preliminary injunction hearing,

26      but do you think that you want --

<br>

                    Proceedings

1

2          MR. RENARD:  Your Honor, we'll certainly -- I

3      mean, it was a middle of the night to get that brief

4      done, which isn't nearly a full explanation of our

5      position; and the affidavits, as well, it's what we

6      could get together in the time we had.  So we

7      definitely would like an opportunity to say by Monday,

8      to put in --

9          THE COURT:  Well, Monday is a holiday.  I

10     realize that you're not going to be involved in

11     holidays; but, nevertheless, I do think if we get it by

12     the 6th, I'll have a chance to read it.  But, please,

13     get it to me no later than one o'clock on the 6th or

14     actually 12:30 that way I can begin reading it over

15     lunch.

16          So, again, if that's true, if you can give, in

17     a sense, rolling copies so that they know what you're

18     doing, maybe a preliminary preliminary, and that way if

19     you want to do a reply, you can do so.

20          MR. HANDZO:  Yes, I was just going to suggest

21     that that may be one of the things that Mr. Renard and

22     I should just confer about and come up with a schedule

23     for both sides to commit anything extra that they want

24     to submit.

25          THE COURT:  Right.

26          MR. WEINER:  Your Honor, I think defendants

1        Proceedings

2    may want to put a supplemental brief in because they

3    raised new authorities in their brief.

4            THE COURT:  Well, that's what I mean, about --

5    it's going to be a very expedited event, all right.

6    And I think it's only right that if I do a preliminary

7    injunction hearing, I do it an expedited manner because

8    I think that we'll hear a lot of what we already did.

9    But, nevertheless, it may be new issues that I have to

10   consider, and I don't want to in any way prohibit a

11   proper briefing.

12           So, if you tell me there's another way of

13   handling it and that is, that if you tell me I don't

14   want to do it on the 7th, but we'd like to do it in a

15   couple weeks from now, you know, et cetera, I am

16   occupied -- if I start this trial, I'm occupied all of

17   that week and all of the following week.  It's supposed

18   to end on that Friday, September 16th.

19           I know I'm not in court, I'm at conference on

20   the 19th, 20th and 21st.

21           So, now you're facing that kind of deadline.

22   I won't interrupt the trial once I start it.  I'll put

23   over the beginning of the trial; but, otherwise, I have

24   to go beyond it.  So all of that should be a part of

25   your consideration.

26           Signed and sealed.  All right, I want to thank

```
1                          Proceedings
2        you, again, for certainly very interesting arguments.
3                 MR. HANDZO:  Thank you, your Honor.
4                 MR. RENARD:  Thank you.
5                      -  -  -  -
6                          CERTIFIED TO BE A TRUE
                           AND CORRECT TRANSCRIPT
7
8
                           _____
9                          BONNIE PICCIRILLO
                           OFFICIAL COURT REPORTER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

## $

**$20** [1] - 98:23
**$800,000** [2] - 48:14, 48:18

## 1

**1** [1] - 51:11
**10** [2] - 51:15, 76:17
**100-year** [1] - 58:18
**10017-4613** [1] - 47:10
**10022-3908** [1] - 47:3
**10153** [1] - 46:22
**102** [1] - 59:4
**1099** [1] - 47:6
**11.03** [3] - 77:18, 77:25, 87:13
**11.20** [1] - 87:22
**12:30** [1] - 103:14
**12th** [1] - 62:13
**13** [1] - 60:21
**16th** [1] - 104:18
**1717** [1] - 46:25
**1948** [1] - 63:15
**1950** [1] - 59:20
**1954** [2] - 62:7, 62:14
**198** [1] - 59:21
**19th** [1] - 104:20

## 2

**2** [3] - 52:14, 99:12, 99:21
**2.03** [1] - 76:26
**20** [1] - 62:13
**20001** [1] - 47:7
**2007** [1] - 59:5
**2010** [1] - 60:21
**2011** [1] - 46:16
**20th** [1] - 104:20
**215** [1] - 50:10
**21st** [1] - 104:20
**23rd1954** [1] - 62:14
**27th** [1] - 47:3
**2:30** [1] - 101:8

## 3

**3** [5] - 46:2, 52:14, 99:12, 99:20, 99:22
**30-year** [1] - 58:17
**307** [1] - 62:13
**31** [1] - 46:16
**340** [1] - 47:10
**38** [2] - 76:14, 76:15
**3:30** [2] - 101:10, 101:11

## 4

**43** [2] - 77:18, 77:25

**44** [4] - 59:4, 77:18, 77:25, 87:13
**4800** [1] - 46:24

## 5

**5** [1] - 98:23
**5:20** [2] - 91:24, 91:25

## 6

**6** [1] - 51:11
**60** [1] - 46:15
**6301** [3] - 55:25, 56:5, 72:8
**6313** [1] - 95:4
**651457/11** [1] - 46:6
**6th** [2] - 103:12, 103:13

## 7

**7** [2] - 51:14, 102:19
**70-year** [1] - 58:18
**75201** [1] - 46:25
**767** [1] - 46:22
**7th** [2] - 63:10, 104:14

## 9

**9** [1] - 76:17
**9.02** [2] - 76:10, 88:13
**9.02(A)(ii)** [1] - 88:14
**9.03** [1] - 76:12
**900** [1] - 47:6
**919** [1] - 47:3
**92nd** [2] - 60:21, 79:10
**95** [1] - 59:4
**9:30** [1] - 102:19

## A

**A.D.3d** [1] - 59:4
**a.m** [1] - 91:25
**a.m.** [2] - 91:22, 91:24
**abhorrent** [1] - 71:2
**ability** [2] - 79:22, 93:12
**able** [4] - 48:10, 55:11, 66:2, 66:6
**abruptly** [1] - 100:10
**absolutely** [1] - 50:19
**accelerated** [1] - 49:20
**access** [1] - 85:6
**accomplished** [1] - 94:19
**accordance** [2] - 56:8, 67:2
**accusations** [1] - 94:3
**achieve** [1] - 86:18
**acknowledge** [2] - 65:26, 66:5
**acknowledged** [2] - 65:25, 66:18

**act** [1] - 50:3
**acted** [1] - 79:18
**action** [8] - 49:3, 52:4, 52:23, 53:2, 65:12, 71:5, 80:24, 87:21
**actions** [11] - 56:18, 71:18, 79:5, 79:19, 79:21, 84:18, 85:11, 87:8, 89:4, 98:7
**actual** [4] - 97:9, 97:11, 97:20, 100:17
**add** [4] - 56:4, 82:14, 100:20, 101:4
**added** [2] - 99:12, 99:24
**addition** [1] - 100:8
**address** [6] - 68:19, 70:9, 75:10, 79:17, 92:25, 101:24
**addressed** [2] - 74:17, 75:7
**addresses** [1] - 75:4
**addressing** [1] - 99:25
**adjudicated** [1] - 59:15
**affidavit** [5] - 71:8, 72:11, 72:22, 90:9, 97:16
**affidavits** [4] - 56:24, 68:10, 97:10, 103:5
**affirmatively** [1] - 93:5
**afternoon** [1] - 101:15
**agency** [43] - 48:23, 49:14, 50:2, 50:6, 51:6, 51:13, 51:20, 51:24, 53:3, 55:7, 57:23, 57:26, 59:7, 59:25, 61:6, 61:8, 61:13, 61:19, 61:20, 61:25, 64:22, 65:7, 65:19, 65:20, 67:3, 69:19, 75:2, 75:4, 75:16, 75:17, 75:20, 78:17, 78:23, 78:26, 79:6, 81:22, 85:13, 85:23, 85:25, 87:9, 87:24, 88:2, 88:4
**agent** [28] - 49:15, 50:8, 58:17, 58:19, 58:23, 59:8, 59:26, 63:5, 65:5, 65:22, 66:15, 73:17, 73:19, 73:26, 74:2, 77:14, 78:7, 78:16, 79:4, 79:23, 81:26, 82:10, 82:11, 87:18, 100:11
**agent's** [4] - 49:9, 59:18, 65:3, 66:11, 66:20, 68:19
**ago** [4] - 81:4, 81:21, 88:17, 89:5
**agree** [8] - 48:11, 49:20, 49:21, 62:9, 87:19, 95:7, 95:9, 101:23
**agreeable** [1] - 95:26
**agreed** [7] - 64:11, 78:7, 78:8, 87:12, 101:26, 102:7, 102:11
**agreed-upon** [1] - 101:26
**agreement** [29] - 49:2, 51:5, 52:24, 63:10, 63:12, 63:14, 64:2, 66:5, 74:6, 78:6, 85:16, 85:26, 86:4, 86:6, 86:8, 86:10, 86:16, 86:22, 87:14, 88:7, 88:9, 88:15, 89:2,

89:14, 94:9, 94:16, 97:3, 99:3, 99:4
**Agreement** [5] - 51:16, 53:10, 53:15, 56:8, 83:4
**agreements** [2] - 68:26, 87:14
**ahead** [1] - 91:11
**airtight** [1] - 58:18
**Alan** [1] - 59:3
**ALEXANDER** [1] - 46:23
**allow** [2] - 54:15, 55:6
**allowed** [2] - 49:2, 86:15
**allowing** [2] - 65:11, 85:5
**allows** [2] - 65:11, 85:5
**alone** [1] - 67:21
**amount** [7] - 54:11, 63:7, 64:11, 78:19, 89:24, 92:23, 97:9
**ANAND** [1] - 46:24
**AND** [1] - 105:6
**answer** [2] - 52:18, 90:6
**answered** [1] - 87:11
**ante** [1] - 98:6
**anyway** [1] - 101:4
**apart** [5] - 55:3, 68:18, 78:17, 78:22, 95:3
**apologize** [1] - 71:17
**appalls** [1] - 57:20
**appeal** [1] - 60:24
**Appeals** [4] - 49:13, 58:14, 60:4, 62:6
**appear** [3] - 52:13, 61:6
**APPEARANCES** [1] - 46:20
**apply** [1] - 61:12
**appreciate** [1] - 70:11
**appropriate** [3] - 79:18, 88:22, 90:21
**appropriately** [4] - 55:15, 101:19, 101:21, 102:11
**April** [1] - 62:14
**Aqua** [10] - 56:11, 56:12, 56:14, 73:5, 73:9, 73:13, 73:16, 73:25, 74:4, 74:6
**arbitration** [1] - 87:22
**argue** [2] - 81:21, 96:21
**argued** [3] - 61:8, 62:13, 79:9
**arguing** [1] - 80:4
**argument** [18] - 52:20, 56:17, 57:3, 61:6, 75:4, 75:13, 78:9, 79:8, 80:11, 81:26, 85:13, 85:24, 87:5, 87:9, 87:24, 88:6, 95:2, 95:7
**arguments** [5] - 71:6, 72:3, 88:5, 89:25, 105:2
**arises** [1] - 65:24
**arising** [2] - 64:20, 64:21
**articulate** [1] - 65:14
**articulated** [2] - 66:8, 84:8
**aside** [1] - 69:19
**assertions** [1] - 87:20
**assessed** [1] - 96:17

**assigned** [1] - 52:12
**Associates** [2] - 59:3, 60:21
**assume** [3] - 52:19, 85:17, 85:19
**assumes** [1] - 75:14
**assuming** [1] - 75:19
**attempt** [1] - 84:20
**attempting** [1] - 68:13
**attempts** [1] - 93:4
**attorney** [1] - 85:15
**Attorneys** [3] - 46:21, 47:2, 47:9
**attorneys** [1] - 85:19
**August** [1] - 46:16
**authorities** [1] - 104:3
**authority** [4] - 49:9, 54:19, 55:16, 59:18, 65:3, 66:11, 68:19, 70:22
**avail** [1] - 69:8
**availability** [1] - 67:18
**Avenue** [4] - 46:22, 47:3, 47:6, 47:10
**avoid** [1] - 59:9
**aware** [1] - 83:5

## B

**backwards** [1] - 80:26
**balance** [2] - 84:17, 86:25
**balancing** [1] - 84:11
**Bank** [1] - 46:24
**Barbara** [1] - 60:17
**based** [4] - 56:22, 69:18, 78:17
**basis** [3] - 53:17, 54:2, 77:2, 82:11
**BE** [1] - 105:6
**beach** [1] - 101:17
**bear** [1] - 75:26
**BEFORE** [1] - 46:18
**began** [1] - 86:12
**begin** [4] - 58:6, 62:23, 75:20, 103:14
**beginning** [2] - 90:13, 104:23
**begun** [1] - 88:18
**behalf** [4] - 50:3, 65:20, 70:15, 85:14
**behind** [2] - 69:7, 91:23
**belabor** [1] - 68:20
**belief** [1] - 71:19
**believes** [2] - 84:15, 84:17
**belongs** [1] - 93:26
**bench** [2] - 62:16, 62:18
**best** [2] - 82:5, 95:14
**better** [2] - 54:9, 102:22
**between** [6] - 64:20, 66:10, 79:3, 85:17, 85:26, 86:21
**beyond** [2] - 77:10, 104:24
**BICKEL** [1] - 46:21
**big** [3] - 54:8, 58:2

**bind** [1] - 51:17
**binding** [2] - 58:19, 61:26
**binds** [1] - 78:12
**bit** [1] - 62:10
**blank** [1] - 102:2
**BLOCK** [1] - 47:2
**boggling** [1] - 69:12
**bond** [20] - 95:3, 95:5, 95:16, 95:22, 95:23, 95:25, 96:8, 96:9, 96:13, 96:15, 97:13, 97:26, 98:2, 98:3, 98:11, 98:12, 98:21, 98:22, 98:23, 101:24
**bonds** [1] - 97:8
**Bonnie** [1] - 47:22
**BONNIE** [1] - 105:9
**book** [1] - 81:6
**bottom** [1] - 76:15
**brand** [2] - 72:14, 72:17
**BRANSTEN** [1] - 46:18
**breach** [9] - 49:15, 49:16, 52:24, 53:9, 53:10, 53:11, 58:22, 65:5, 65:25, 88:26, 89:2
**break** [1] - 83:7
**BREWER** [1] - 46:21
**BRIAN** [1] - 47:4
**brief** [14] - 49:7, 49:8, 49:25, 51:10, 54:17, 58:9, 58:11, 61:17, 68:20, 75:6, 76:17, 103:3, 104:2, 104:3
**briefing** [1] - 104:11
**bring** [2] - 49:21, 69:15
**bringing** [2] - 50:10, 86:13
**broken** [1] - 81:17
**brought** [1] - 61:7
**building** [8] - 63:5, 63:22, 63:26, 64:4, 65:18, 65:20, 65:22, 69:18
**burden** [1] - 80:25
**business** [5] - 50:23, 51:19, 68:5, 68:23, 85:18
**buy** [1] - 82:5
**BY** [3] - 46:23, 47:4, 47:11

## C

**calculate** [1] - 100:26
**California** [1] - 82:9
**cancel** [1] - 56:11
**cannot** [2] - 76:6, 87:7
**capacity** [1] - 100:25
**capital** [1] - 74:23
**care** [1] - 102:17
**careful** [1] - 85:20
**case** [35] - 49:12, 55:9, 55:10, 57:11, 59:5, 59:21, 60:4, 60:18, 60:21, 61:2, 61:12, 61:15, 61:21, 61:24, 62:2, 62:5, 62:6, 62:9, 64:26, 65:13, 65:16, 66:2, 66:13, 73:2, 75:19, 78:14, 79:12,

79:26, 82:8, 82:9, 82:12, 87:3, 96:18, 98:6
**cases** [6] - 59:12, 59:13, 59:16, 60:15, 75:15, 82:7
**category** [1] - 56:19
**Catherine** [1] - 72:21
**caused** [4] - 55:12, 84:21, 84:22, 89:4
**causes** [1] - 52:23
**ceased** [1] - 50:7
**Center** [1] - 46:24
**Centre** [1] - 46:15
**certain** [3] - 77:9, 79:19, 81:25
**certainly** [15] - 48:15, 48:21, 49:20, 49:21, 54:2, 70:14, 70:24, 71:15, 71:18, 85:15, 95:5, 96:20, 99:2, 103:2, 105:2
**CERTIFIED** [1] - 105:6
**cetera** [5] - 53:23, 94:2, 104:15
**Chair** [1] - 62:18
**chance** [2] - 80:7, 103:12
**change** [3] - 56:13, 99:11
**changed** [4] - 50:9, 57:5, 68:5, 94:23
**changes** [1] - 56:10
**charge** [1] - 85:4
**circumstances** [1] - 96:16
**circumventing** [1] - 81:17
**citations** [1] - 59:2
**cite** [2] - 59:14, 59:20
**cited** [5] - 59:3, 59:4, 59:21, 62:13, 82:7
**cites** [1] - 51:15
**claim** [13] - 49:16, 55:9, 58:22, 59:7, 61:2, 61:4, 66:6, 66:7, 66:16, 66:20, 66:21, 74:25, 87:20
**claiming** [1] - 73:10
**claims** [3] - 59:9, 59:10, 76:5
**classic** [3] - 51:20, 51:22, 65:20
**clear** [3] - 67:20, 74:19, 77:6
**clearly** [5] - 49:8, 54:24, 81:19, 84:9, 87:11
**client** [13] - 53:17, 55:5, 70:15, 71:4, 71:7, 71:19, 74:20, 78:12, 81:11, 82:20, 82:23, 98:8
**client's** [2] - 56:18, 82:24
**clients** [4] - 48:9, 48:10, 48:22, 90:10
**close** [1] - 74:12
**club** [5] - 54:7, 54:8, 58:2
**clubbing** [1] - 58:13
**clubs** [1] - 54:8
**co** [1] - 90:10
**co-counsel** [1] - 90:10

**collect** [1] - 63:24
**collections** [1] - 63:8
**coming** [9] - 52:21, 54:22, 69:7, 70:6, 80:24, 81:5, 81:7, 84:18, 88:19
**commend** [2] - 84:10, 85:15
**commensurate** [1] - 95:23
**Commercial** [2] - 52:11, 52:12
**commit** [2] - 51:18, 103:23
**common** [3] - 49:5, 49:9, 66:10
**common-law** [3] - 49:5, 49:9, 66:10
**community** [1] - 84:26
**company** [3] - 50:10, 72:16, 91:4
**Company** [1] - 62:11
**compared** [1] - 56:3
**compensation** [3] - 59:10, 63:6, 66:4
**competitor** [3] - 85:3, 85:4, 85:5
**complain** [2] - 72:25, 81:3
**complained** [1] - 72:19
**complaint** [14] - 52:4, 52:8, 52:15, 52:22, 52:23, 53:4, 56:22, 57:21, 64:8, 69:8, 75:9, 75:10, 86:13
**complete** [1] - 56:21
**completely** [2] - 78:11, 80:26
**complex** [1] - 78:6
**comply** [1] - 100:17
**comprehensive** [1] - 78:6
**comprehensively** [1] - 51:12
**computer** [3] - 56:13, 81:15, 91:6
**computers** [3] - 57:6, 81:13, 81:15
**concerns** [1] - 81:11
**conclusion** [2] - 64:5, 75:14
**condoned** [1] - 54:6
**confer** [6] - 90:17, 98:19, 99:3, 100:23, 103:22
**conference** [1] - 104:19
**conferring** [1] - 90:10
**confidence** [2] - 58:16, 61:5
**confidential** [1] - 100:9
**consequences** [1] - 75:17
**consequently** [1] - 64:13
**consider** [2] - 92:8, 104:10
**considerable** [2] - 54:11, 96:26
**consideration** [4] - 55:8, 57:13, 98:24, 104:25
**constitute** [1] - 68:26
**construed** [1] - 87:17

**contemplated** [1] - 87:15
**contemplates** [1] - 80:10
**contempt** [1] - 90:25
**contests** [1] - 76:6
**context** [1] - 55:18
**continue** [3] - 63:14, 63:17, 68:23
**Continued** [1] - 83:14
**contract** [58] - 49:15, 49:17, 50:2, 51:23, 51:24, 51:25, 54:24, 57:25, 58:18, 58:22, 61:8, 61:9, 62:22, 62:23, 64:2, 64:21, 64:22, 65:5, 65:9, 65:25, 66:16, 67:3, 71:3, 73:21, 73:22, 74:21, 75:23, 75:25, 76:2, 76:21, 76:26, 77:13, 78:12, 78:15, 78:18, 78:21, 78:25, 79:2, 79:12, 80:10, 81:24, 82:4, 82:9, 85:17, 85:21, 86:6, 86:23, 87:5, 87:6, 87:11, 87:12, 87:13, 88:3, 88:4, 88:8, 88:13, 98:17
**contracted** [1] - 59:26
**contracts** [3] - 56:12, 68:21, 91:5
**contractual** [7] - 49:5, 49:11, 73:8, 73:13, 73:20, 74:5, 85:25
**contradiction** [3] - 78:11, 86:20, 88:6
**contrary** [1] - 87:20
**control** [2] - 48:20, 69:18
**controlling** [2] - 51:8, 61:20
**convert** [3] - 96:23, 97:3, 101:23
**Conway** [2] - 59:20, 62:18
**copies** [3] - 71:10, 99:19, 103:17
**copy** [1] - 60:7, 62:2
**Corp** [1] - 62:12
**Corp.** [1] - 60:22
**CORRECT** [1] - 105:6
**correct** [1] - 91:21
**correctly** [1] - 93:2
**costs** [1] - 48:18
**counsel** [2] - 77:23, 90:10
**count** [7] - 53:9, 53:10, 53:11, 53:12, 53:16, 54:22
**counteracted** [1] - 85:16
**counterclaim** [5] - 55:2, 66:14, 67:10, 71:26, 87:21
**Counterclaim** [2] - 46:11, 46:14
**Counterclaim-Defendant** [1] - 46:14
**Counterclaim-Plaintiff** [1] - 46:11
**counterparty** [1] - 74:6
**country** [1] - 58:25
**COUNTY** [1] - 46:2
**couple** [5] - 75:24, 76:2,

91:2, 101:2, 104:15
**course** [4] - 63:11, 67:8, 78:10, 87:3
**Court** [92] - 47:23, 49:6, 49:12, 49:25, 50:20, 51:10, 52:4, 54:13, 54:22, 55:5, 56:3, 56:25, 57:24, 58:14, 59:21, 60:4, 61:2, 61:7, 61:24, 62:2, 62:4, 62:6, 63:23, 65:11, 65:15, 65:21, 66:18, 66:25, 67:24, 68:3, 69:5, 69:6, 69:9, 69:10, 69:21, 69:24, 69:26, 70:2, 70:4, 70:6, 70:10, 70:15, 70:19, 70:23, 70:25, 71:9, 71:16, 71:17, 72:4, 73:6, 73:9, 73:13, 74:4, 75:6, 75:12, 75:26, 76:7, 78:9, 79:12, 79:26, 80:8, 80:9, 80:24, 81:21, 82:11, 84:12, 84:13, 84:14, 84:15, 84:17, 86:9, 86:24, 88:10, 88:15, 88:16, 88:19, 89:8, 89:16, 89:17, 90:5, 90:23, 94:21, 95:15, 95:19, 97:2, 97:8, 98:3, 99:2, 99:8, 99:13, 102:9
**court** [14] - 52:3, 52:7, 52:9, 52:11, 53:19, 54:3, 56:20, 64:7, 69:13, 89:4, 90:25, 94:14, 102:14, 104:19
**COURT** [75] - 46:2, 48:2, 48:6, 48:16, 48:25, 50:12, 50:17, 51:3, 51:22, 51:25, 52:2, 52:17, 53:19, 53:25, 56:16, 57:19, 58:11, 58:26, 59:20, 60:7, 60:10, 60:14, 60:17, 60:20, 62:5, 68:13, 69:2, 70:16, 71:11, 73:16, 73:24, 74:11, 76:9, 76:13, 76:18, 77:16, 77:20, 77:26, 78:3, 78:13, 79:14, 80:15, 82:17, 83:6, 84:5, 89:23, 90:11, 91:9, 91:20, 91:25, 92:5, 93:10, 94:16, 95:6, 97:5, 97:25, 99:6, 99:14, 99:17, 99:20, 99:23, 99:26, 100:3, 100:19, 101:10, 101:12, 101:19, 101:25, 102:8, 102:13, 102:17, 103:9, 103:25, 104:4, 105:9
**Court's** [6] - 67:17, 69:11, 70:22, 70:26, 71:14, 72:6
**courthouse** [1] - 86:14
**courts** [2] - 67:20, 68:25
**Courtyard** [1] - 60:22
**cover** [1] - 96:22
**covered** [1] - 82:21
**CPLR** [3] - 55:25, 95:5, 98:12
**cracked** [1] - 81:15
**created** [2] - 61:11, 64:22
**critical** [1] - 58:9

**current** [2] - 56:11, 85:9

**D**

**Dallas** [1] - 46:25
**damage** [7] - 67:4, 72:12, 72:13, 92:19, 93:4, 93:13, 97:10
**damages** [17] - 55:10, 55:11, 59:7, 62:26, 64:11, 65:9, 66:7, 66:14, 66:17, 66:20, 69:20, 78:19, 96:17, 96:22, 96:25, 98:14
**date** [1] - 100:25
**David** [1] - 80:18
**DAVID** [1] - 47:5
**days** [4] - 54:7, 63:17, 90:4, 90:15
**DC** [1] - 47:7
**deadline** [1] - 104:21
**deal** [4] - 66:13, 76:4, 76:16, 77:6
**dealing** [1] - 62:22
**dealt** [3] - 61:2, 73:26, 74:2
**death** [1] - 58:3
**debated** [1] - 75:3
**debt** [3] - 48:17, 97:22, 98:9
**decide** [3] - 73:24, 77:7, 101:22
**decided** [2] - 62:14, 84:12
**deciding** [1] - 63:25
**decision** [7] - 55:5, 79:10, 79:14, 80:9, 82:3, 95:9, 102:5
**declaration** [3] - 53:13, 54:25, 69:16
**declared** [1] - 97:23
**deemed** [1] - 87:16
**default** [6] - 53:14, 54:23, 76:5, 76:6, 76:22, 97:23
**defeat** [1] - 66:6
**defendant** [5] - 63:6, 63:21, 64:9, 65:6, 82:16
**Defendant** [4] - 46:8, 46:14, 47:2, 47:9
**defendants** [7] - 61:23, 64:3, 84:22, 84:23, 89:5, 95:17, 103:26
**defined** [2] - 54:24, 72:23
**defines** [2] - 72:15
**definite** [1] - 59:26
**definitely** [1] - 103:7
**definitive** [1] - 92:22
**delay** [1] - 90:13
**deliberation** [1] - 85:20
**delineated** [3] - 100:18, 100:19, 102:7
**denied** [2] - 68:3, 68:4
**Department** [1] - 59:5
**derogation** [2] - 49:10, 70:21
**DeSANCTIS** [3] - 47:5,

91:18, 91:23
**described** [1] - 91:4
**desks** [1] - 92:13
**Desmond** [1] - 62:20
**despicable** [1] - 79:5
**despite** [1] - 80:4
**destroyed** [1] - 92:15
**determination** [2] - 77:9, 95:19
**determine** [1] - 86:16
**determined** [4] - 66:2, 86:9, 89:16, 96:23
**devices** [1] - 81:18
**difference** [2] - 66:10, 101:8
**different** [5] - 58:14, 69:25, 99:8
**direct** [2] - 86:20, 88:6
**disagreement** [1] - 59:8
**disagreements** [1] - 89:3
**disclaimer** [1] - 61:15
**disclaimers** [1] - 61:20
**disclaiming** [1] - 61:25
**discussion** [2] - 75:11, 89:21
**discussions** [1] - 48:9
**disloyalty** [2] - 59:8, 59:11
**dismiss** [6] - 52:15, 66:19, 75:3, 75:8, 75:11, 79:15
**dismissing** [1] - 64:7
**displace** [1] - 85:24
**displaced** [1] - 84:24
**dispute** [2] - 76:8, 100:16
**disputes** [1] - 92:24
**dissent** [3] - 62:17, 62:19, 62:20
**distinction** [1] - 64:23
**distinguish** [2] - 54:19, 64:19
**disturbed** [2] - 85:10, 87:7
**Division** [2] - 52:11, 52:12
**documents** [1] - 87:15
**done** [13] - 54:3, 58:6, 67:8, 71:19, 90:2, 92:7, 92:11, 96:14, 98:7, 100:7, 101:19, 101:21, 103:4
**doubt** [2] - 49:26, 84:8
**down** [4] - 69:3, 92:14, 101:26, 102:18
**drafted** [1] - 78:6
**drastically** [1] - 50:9
**drives** [1] - 81:14
**due** [1] - 74:25
**duration** [1] - 63:9
**during** [1] - 98:15
**duties** [2] - 64:20, 89:12
**duty** [3] - 53:11, 61:15, 61:26
**Dye** [1] - 62:19
**Dye's** [1] - 62:20

# E

**easily** [1] - 92:11
**economic** [1] - 97:12
**ed** [1] - 58:5
**Edition** [2] - 72:14, 72:17
**effect** [2] - 63:15, 70:21
**effective** [2] - 65:23, 66:19
**effectively** [2] - 55:20, 67:19
**eight** [2] - 91:11, 91:12
**EILEEN** [1] - 46:18
**either** [4] - 53:26, 63:16, 63:18, 71:4
**element** [1] - 63:12
**embedded** [1] - 54:13
**emergency** [2] - 88:20
**EMERY** [1] - 47:8
**employees** [4] - 50:11, 50:12, 50:25, 91:6
**encouraging** [3] - 50:22, 50:23, 50:25
**end** [4] - 63:19, 70:23, 70:25, 104:18
**enforced** [1] - 71:24
**enter** [2] - 65:19, 67:24
**entered** [7] - 53:3, 56:12, 85:17, 85:21, 86:3, 86:7, 88:8
**entire** [1] - 78:15
**entitled** [3] - 66:4, 95:16, 95:22
**entitles** [1] - 59:8
**equal** [3] - 93:20, 93:21, 98:2
**equities** [4] - 53:22, 81:19, 85:12, 86:25
**eradicate** [1] - 79:21
**eradicated** [1] - 79:21
**erred** [2] - 62:25, 64:7
**escape** [1] - 70:26
**ESQ** [7] - 46:23, 46:23, 46:24, 47:4, 47:5, 47:5, 47:11
**essentially** [3] - 73:12, 94:22, 96:9
**estimate** [3] - 89:24, 89:26, 90:4
**et** [5] - 53:23, 94:2, 104:15
**event** [3] - 53:13, 54:23, 104:5
**everywhere** [1] - 58:24
**evidence** [1] - 72:3
**exact** [1] - 81:26
**exactly** [9] - 78:11, 79:9, 79:11, 80:17, 81:23, 82:9, 82:12, 90:17, 92:10
**example** [1] - 76:5
**excellent** [3] - 84:6, 85:15, 85:19
**except** [2] - 50:20, 64:10

**exceptions** [1] - 64:26
**exclusive** [2] - 63:4
**executing** [1] - 91:5
**exercise** [5] - 49:10, 55:7, 55:16, 57:10, 71:20
**exercised** [5] - 48:23, 49:23, 50:6, 55:15, 55:20
**exists** [2] - 55:19, 75:16
**expecting** [1] - 81:8, 81:9
**expedited** [4] - 95:14, 96:7, 104:5, 104:7
**expenses** [2] - 48:15, 74:22
**expert** [1] - 87:21
**expertly** [1] - 84:9
**explain** [1] - 63:3
**explanation** [1] - 64:26
**expressed** [2] - 85:16, 85:22
**expressly** [5] - 77:14, 78:7, 78:8, 78:12, 82:2
**extended** [1] - 63:19
**extent** [3] - 59:9, 74:20, 94:9
**extra** [2] - 80:23, 103:23
**extraordinary** [1] - 53:20

# F

**face** [2] - 56:17, 61:3
**facing** [1] - 104:21
**fact** [14] - 49:14, 51:9, 52:10, 54:19, 59:13, 64:10, 66:6, 71:24, 78:21, 79:2, 82:7, 86:12, 96:22
**facts** [4] - 53:9, 56:23, 59:12, 64:26
**factual** [1] - 68:10
**failed** [1] - 64:10
**faith** [2] - 48:22, 71:19
**far** [1] - 52:25
**favor** [5] - 53:23, 81:19, 85:12, 86:25
**feature** [1] - 77:13
**February** [1] - 63:15
**feet** [1] - 96:4
**few** [2] - 64:25, 88:17
**fiduciary** [6] - 53:11, 61:4, 61:11, 61:15, 61:18, 61:26
**Fifth** [1] - 46:22
**file** [2] - 52:7, 75:3
**filed** [4] - 52:3, 54:17, 67:10, 99:9
**filing** [1] - 69:7
**final** [11] - 67:11, 67:19, 68:11, 71:25, 80:5, 86:18, 87:3, 88:25, 89:15, 94:5, 95:2
**financial** [1] - 58:20
**fire** [2] - 56:11, 73:5
**fired** [1] - 50:15
**firm** [2] - 71:4, 71:5
**first** [14] - 53:20, 54:9,

62:21, 63:3, 64:16, 70:6, 74:17, 75:23, 84:5, 84:23, 86:24, 90:23, 95:26, 99:14
**FISCHER** [5] - 47:4, 76:12, 77:18, 77:22, 92:2
**five** [6] - 53:12, 54:22, 63:7, 63:25, 91:18, 92:3
**Floor** [1] - 47:3
**flow** [1] - 75:17
**follow** [1] - 82:13
**following** [2] - 75:17, 104:17
**follows** [1] - 84:12
**forbids** [1] - 87:24
**force** [2] - 63:14, 95:13
**forces** [1] - 56:11
**forgetting** [1] - 68:7
**forgot** [1] - 80:20
**form** [2] - 90:22, 102:11
**forth** [3] - 88:9, 92:24, 94:4
**forward** [2] - 85:14, 86:17
**four** [1] - 53:11
**frankly** [3] - 50:4, 69:12, 79:16
**free** [1] - 59:6
**freely** [2] - 86:7, 88:7
**Friday** [1] - 104:18
**Froessel** [2] - 62:17, 62:19
**Fuld** [1] - 62:18
**fulfilled** [1] - 78:20
**full** [6] - 63:14, 68:9, 89:12, 89:13, 95:13, 103:4
**fully** [1] - 56:7
**fulsome** [1] - 75:11
**fund** [1] - 74:23
**furthermore** [1] - 73:3
**future** [5] - 59:10, 66:4, 69:17, 81:7, 85:8

# G

**Gammerman** [1] - 61:22
**Gee** [1] - 58:4
**general** [1] - 61:4
**generally** [2] - 59:24, 77:24
**given** [7] - 50:3, 55:17, 56:5, 71:24, 72:6, 72:8, 79:11
**GK** [1] - 59:3
**glad** [1] - 50:20
**glossing** [1] - 77:12
**good-faith** [1] - 71:19
**grand** [2] - 52:11, 94:9
**grant** [7] - 62:25, 84:13, 89:8, 95:9, 95:13, 98:12, 100:12
**granted** [4] - 53:26, 64:14, 96:24, 100:6
**grounds** [1] - 53:20
**guest** [1] - 85:9
**guests** [3] - 81:5, 81:7, 101:20

# H

**half** [1] - 53:8
**hand** [5] - 99:7, 99:10, 99:15, 102:6, 102:24
**Handed** [1] - 62:4
**handed** [4] - 99:13, 101:6, 102:9, 102:14
**handing** [1] - 60:15
**handling** [1] - 104:13
**HANDZO** [30] - 47:5, 48:5, 60:12, 60:15, 60:19, 60:25, 74:15, 76:10, 76:14, 76:19, 77:17, 77:23, 78:2, 78:4, 79:8, 79:24, 80:16, 80:19, 91:16, 92:25, 96:3, 99:7, 99:18, 99:21, 99:24, 100:2, 102:6, 102:16, 103:20, 105:3
**Handzo** [4] - 68:15, 74:13, 99:4, 99:15
**happy** [1] - 75:6
**Harch** [1] - 90:13
**hard** [1] - 81:14
**harm** [12] - 53:21, 55:12, 57:5, 67:4, 72:23, 72:25, 84:21, 84:23, 89:5, 92:19, 93:12, 100:7
**harmed** [1] - 84:25
**Hawaii** [1] - 101:8
**hear** [4] - 50:17, 68:15, 95:25, 104:8
**heard** [2] - 87:3, 94:26
**hearing** [15] - 49:19, 49:22, 67:16, 68:9, 72:4, 73:2, 89:14, 89:20, 89:26, 95:12, 95:21, 99:16, 102:20, 102:25, 104:7
**heavily** [1] - 87:2
**held** [4] - 49:13, 68:25, 89:15, 89:21
**help** [12] - 54:4, 54:5, 54:7, 54:11, 54:12, 56:19, 57:4, 58:13, 69:11, 69:22, 85:18, 88:24
**helping** [1] - 86:19
**hereby** [1] - 87:16
**herein** [1] - 63:21
**high** [2] - 97:9, 97:13
**highlight** [1] - 81:10
**himself** [1] - 89:7
**hiring** [1] - 50:10
**hit** [4] - 70:3, 70:5, 70:7, 70:8
**holding** [1] - 65:10
**holiday** [1] - 103:9
**holidays** [1] - 103:11
**honestly** [1] - 92:6
**Honor** [120] - 48:4, 48:5, 48:8, 48:11, 48:13, 48:19, 48:24, 49:4, 49:5, 49:7, 49:12, 49:18, 49:20, 49:23, 49:24, 50:13, 50:19, 51:7,

51:9, 51:10, 51:14, 51:21, 52:16, 53:24, 54:10, 54:16, 54:18, 54:22, 55:3, 55:13, 55:14, 55:21, 56:2, 57:8, 57:10, 57:12, 57:18, 58:7, 58:12, 58:23, 59:13, 59:14, 59:16, 60:6, 60:8, 60:13, 60:16, 60:19, 60:25, 60:26, 61:16, 61:17, 61:21, 61:26, 65:13, 66:8, 66:23, 66:24, 67:9, 67:23, 68:16, 70:9, 70:11, 70:13, 70:18, 70:24, 71:6, 71:8, 71:14, 71:18, 71:22, 71:26, 72:9, 72:14, 72:20, 73:3, 73:7, 73:18, 73:23, 74:3, 74:7, 74:15, 76:11, 76:15, 76:16, 76:19, 77:24, 78:4, 79:8, 82:14, 83:5, 90:5, 90:20, 90:23, 90:26, 91:16, 92:3, 92:17, 92:21, 92:25, 94:11, 94:17, 95:4, 96:3, 96:19, 96:26, 97:7, 97:23, 98:26, 99:5, 99:7, 99:16, 99:19, 100:14, 101:7, 101:22, 102:6, 103:2, 103:26, 105:3

**HONORABLE** [1] - 46:18
**hope** [1] - 92:15
**horribles** [1] - 72:12
**hospitality** [1] - 82:22
**hotel** [31] - 48:12, 48:13, 48:20, 50:8, 50:21, 50:23, 50:24, 50:25, 51:2, 65:17, 67:7, 68:6, 68:21, 68:25, 69:18, 74:18, 74:20, 74:22, 81:6, 84:24, 84:26, 85:9, 89:12, 92:13, 93:9, 93:11, 93:19, 93:25, 95:18, 101:13, 101:18
**HOTEL** [2] - 46:7, 46:10
**Hotel** [1] - 89:5
**hotel's** [1] - 56:7
**hour** [1] - 78:11
**hours** [6] - 48:10, 91:11, 91:23, 92:8, 95:8, 101:9
**huge** [1] - 80:25
**humiliated** [1] - 58:4
**hurdles** [1] - 80:23
**hurt** [1] - 95:23
**hutzpah** [1] - 80:15

## I

**I.S** [3] - 46:7, 47:9, 89:6
**Ian** [3] - 47:9, 82:15, 89:7
**IAN** [1] - 46:7
**idea** [2] - 59:22, 102:4
**identical** [2] - 67:12, 79:13
**illegal** [1] - 98:7
**immediate** [5] - 55:26, 56:21, 67:16, 69:16, 72:26, 97:12

**immediately** [2] - 65:23, 88:21
**immune** [1] - 65:4
**impact** [1] - 82:19
**impeded** [1] - 78:22
**implicates** [1] - 73:7
**importance** [1] - 58:10
**important** [2] - 77:13, 86:4
**imprudent** [1] - 55:6
**impunity** [2] - 54:26, 66:13
**inadvertent** [1] - 90:26
**inappropriate** [1] - 72:7
**Inc** [2] - 62:11, 89:6
**INC** [2] - 46:7, 46:10
**including** [1] - 90:24
**incorrect** [2] - 57:18, 66:19
**incumbent** [1] - 94:20
**incurred** [1] - 97:19
**indeed** [21] - 57:3, 64:11, 69:13, 73:24, 78:8, 78:20, 86:23, 87:5, 87:6, 88:3, 88:18, 88:24, 89:10, 92:9, 94:3, 95:9, 95:21, 98:4, 98:5, 98:11, 98:16
**independent** [1] - 68:21
**INDEX** [1] - 46:5
**indicia** [2] - 51:20, 51:22
**indulge** [1] - 90:6
**inform** [1] - 97:2
**information** [3] - 81:12, 97:14, 100:9
**inherent** [1] - 51:12
**injunction** [31] - 49:19, 49:22, 55:24, 67:13, 67:21, 67:26, 68:3, 68:9, 72:4, 73:2, 74:9, 89:14, 89:19, 89:26, 90:24, 94:19, 94:24, 95:11, 95:12, 95:20, 96:2, 96:6, 96:20, 96:24, 97:4, 97:21, 98:20, 101:23, 102:20, 102:25, 104:7
**injunctions** [1] - 67:15
**injunctive** [3] - 67:11, 68:22, 73:4
**injury** [4] - 55:26, 67:16, 73:10, 97:12
**install** [1] - 67:7
**instance** [1] - 63:2, 90:8
**instead** [4] - 70:6, 86:15, 88:19, 88:22
**instruments** [1] - 87:15
**insufficiency** [1] - 64:8
**intellectual** [1] - 72:18
**intended** [1] - 93:2
**intention** [1] - 71:3
**interest** [4] - 62:15, 73:21, 73:22, 85:10
**interested** [1] - 90:8
**interesting** [1] - 59:2, 60:3, 64:17, 65:16, 72:14, 75:25, 105:2
**interfere** [1] - 93:3

**interim** [1] - 98:15
**internal** [1] - 93:24
**International** [7] - 47:9, 62:12, 72:16, 72:20, 72:24, 73:10, 89:6
**INTERNATIONAL** [1] - 46:7
**interpretation** [1] - 62:9
**interpreted** [1] - 87:16
**interrupt** [1] - 104:22
**invoke** [1] - 85:23
**invoking** [1] - 70:13
**involve** [1] - 59:10
**involved** [2] - 82:25, 103:10
**involvement** [1] - 69:12
**involving** [2] - 61:22, 87:23
**irreparable** [9] - 53:21, 55:26, 57:5, 67:16, 72:25, 73:10, 84:21, 84:23, 89:5
**irrevocable** [1] - 80:5
**issue** [18] - 52:5, 52:6, 52:7, 62:24, 63:22, 65:26, 73:6, 75:2, 75:5, 75:8, 81:22, 84:7, 85:23, 85:25, 88:13, 88:21, 98:13, 100:9
**issued** [2] - 60:20, 82:21
**issues** [3] - 64:10, 83:3, 104:9
**itself** [1] - 64:21

## J

**JAMES** [1] - 46:23
**JENNER** [1] - 47:2
**jeopardy** [1] - 85:3
**job** [1] - 54:20
**joined** [2] - 62:20, 83:4
**joint** [1] - 87:17
**judge** [3] - 57:20, 62:24, 86:15
**Judge** [5] - 62:17, 62:18, 62:19, 62:20, 88:20
**Judges** [1] - 62:19
**judgment** [2] - 62:25, 64:14
**judicial** [7] - 53:12, 76:3, 76:22, 77:8, 80:24, 88:16, 89:3
**judiciously** [2] - 86:9, 86:16
**July** [1] - 60:21
**jurisdiction** [2] - 50:5, 52:9
**justice** [1] - 82:12
**Justice** [5] - 46:19, 61:22, 79:10, 81:23, 82:2

## K

**Kapnick** [4] - 79:10, 81:23, 82:2, 82:13
**Kapnick's** [1] - 60:17
**Ken** [1] - 72:11
**key** [2] - 48:21, 63:12
**kick** [1] - 70:19

**kicking** [1] - 69:11
**kind** [5] - 84:20, 94:4, 98:2, 98:3, 104:21
**knowledge** [1] - 101:20
**knows** [3] - 90:14, 90:24, 97:7

## L

**labels** [3] - 61:17, 61:19, 61:25
**language** [6] - 49:2, 70:22, 79:13, 87:11, 101:26, 102:7
**last** [5] - 53:16, 54:12, 63:15, 68:16, 71:9
**law** [14] - 49:5, 49:9, 49:12, 50:4, 55:7, 55:17, 64:13, 66:10, 71:4, 71:5, 71:21, 82:5, 82:6
**lawsuit** [1] - 72:21
**Lazzari** [1] - 59:4
**lead** [1] - 78:18
**leading** [1] - 53:9
**learned** [1] - 92:11
**leases** [1] - 65:19
**least** [4] - 48:22, 59:9, 59:24, 71:3
**leave** [2] - 55:8, 102:2
**legal** [9] - 54:3, 54:6, 57:7, 58:19, 64:8, 75:13, 80:23, 80:25, 87:23
**length** [1] - 61:24
**leniency** [1] - 80:13
**letters** [2] - 98:22, 98:25
**Lewis** [1] - 62:18
**liability** [1] - 65:5
**life** [2] - 57:21, 90:15
**likelihood** [1] - 53:22
**likewise** [1] - 76:25
**lines** [1] - 100:24
**lingo** [1] - 81:16
**lists** [1] - 85:9
**litigate** [1] - 98:15
**litigated** [1] - 95:13
**litigating** [1] - 67:25
**litigation** [3] - 55:18, 92:23
**live** [2] - 49:21, 90:18
**LLC** [7] - 46:4, 46:7, 46:13, 47:9, 79:3, 88:18, 89:6
**look** [4] - 49:25, 57:4, 81:24, 82:3
**looking** [2] - 82:3, 99:17
**losing** [5] - 48:14, 48:18, 48:19, 74:18, 94:24
**loss** [1] - 97:20
**losses** [3] - 74:20, 97:18
**lost** [1] - 58:16
**loud** [1] - 94:21
**love** [1] - 50:17
**lunch** [1] - 103:15

## M

**Madison** [2] - 47:10, 60:21
**magistery** [1] - 69:26
**Main** [1] - 46:25
**major** [1] - 92:13
**majority** [2] - 62:21, 64:6
**Makers** [1] - 62:12
**Management** [6] - 51:16, 53:10, 53:15, 56:8, 60:22, 83:4
**management** [8] - 48:13, 48:20, 50:10, 65:18, 68:21, 68:25, 69:17, 93:25
**manager** [17] - 48:12, 51:20, 56:8, 56:11, 65:17, 67:7, 73:5, 84:24, 87:17, 87:19, 87:23, 89:12, 94:8, 94:14, 94:15, 98:16
**managing** [3] - 63:5, 100:11, 100:25
**mandatory** [4] - 56:9, 56:15, 67:14, 73:3
**manner** [3] - 54:4, 79:18, 104:7
**March** [1] - 62:13
**MARRIOTT** [2] - 46:7, 46:10
**Marriott** [59] - 47:2, 48:11, 48:13, 50:3, 50:7, 50:12, 50:21, 51:17, 56:7, 61:14, 67:5, 67:25, 68:2, 68:5, 72:13, 72:15, 72:16, 72:20, 72:23, 73:5, 73:9, 74:2, 74:24, 74:26, 77:3, 77:14, 78:7, 78:18, 79:3, 81:6, 81:8, 81:20, 85:10, 85:12, 85:25, 86:13, 86:19, 86:26, 87:2, 89:5, 89:11, 90:22, 91:10, 92:10, 92:14, 92:20, 93:11, 93:14, 93:18, 94:8, 95:17, 96:17, 97:19, 97:22, 98:16, 100:7, 100:24
**Marriott's** [7] - 48:23, 67:2, 85:4, 85:6, 87:5, 93:4, 93:12
**matter** [6] - 55:17, 79:2, 87:3, 87:26, 89:15
**McDERMOTT** [1] - 47:8
**mean** [15] - 59:11, 59:12, 70:2, 70:14, 73:19, 80:3, 80:4, 80:14, 93:15, 96:5, 96:12, 96:25, 103:3, 104:4
**meaning** [1] - 70:19
**means** [8] - 55:2, 67:6, 67:13, 81:16, 88:22, 90:14, 93:7, 94:25
**meant** [2] - 70:26, 93:3
**mechanism** [2] - 86:3, 86:20
**meet** [6] - 48:14, 48:15, 48:17, 90:17, 92:22, 98:19
**mention** [2] - 72:9, 78:26
**mentioned** [3] - 75:26,
76:26, 94:13
**mere** [2] - 73:26, 74:2
**merely** [1] - 50:2
**merits** [4] - 57:12, 57:13, 89:17, 96:21
**MICHAEL** [1] - 47:5
**middle** [1] - 103:3
**might** [6] - 49:15, 55:9, 66:12, 66:15, 80:17, 87:5
**million** [1] - 98:23
**mind** [5] - 57:24, 57:25, 69:12, 90:10
**minimum** [1] - 71:26
**Misc.886** [1] - 59:21
**misrepresentation** [1] - 53:12
**modern** [1] - 50:26
**modified** [1] - 56:4
**moment** [1] - 60:12
**Monday** [1] - 103:7, 103:9
**money** [7] - 51:18, 74:18, 74:24, 74:26, 77:3, 77:10, 97:17
**month** [2] - 48:14, 48:18
**morning** [17] - 48:2, 48:4, 48:5, 48:10, 50:7, 80:7, 84:19, 88:24, 91:13, 91:14, 91:19, 91:21, 92:4, 96:11, 101:14, 102:19
**most** [4] - 75:13, 77:12, 82:5, 86:4
**motion** [7] - 52:14, 64:13, 75:3, 75:8, 75:10, 79:15, 94:22
**motions** [2] - 52:14, 52:18
**MR** [93] - 48:4, 48:5, 48:8, 48:17, 49:4, 50:13, 50:19, 51:7, 51:24, 51:26, 52:16, 53:18, 53:24, 54:10, 57:8, 58:7, 58:12, 59:13, 60:6, 60:8, 60:12, 60:15, 60:19, 60:25, 60:26, 65:13, 68:16, 70:9, 70:18, 71:13, 73:18, 74:3, 74:14, 74:15, 76:10, 76:12, 76:14, 76:19, 77:17, 77:18, 77:22, 77:23, 78:2, 78:4, 79:8, 79:24, 80:16, 80:18, 80:19, 82:14, 82:18, 90:5, 90:20, 91:16, 91:18, 91:22, 91:23, 92:2, 92:3, 92:17, 92:25, 93:7, 94:11, 94:17, 96:3, 96:19, 97:7, 97:15, 97:16, 97:22, 98:26, 99:7, 99:15, 99:18, 99:21, 99:24, 100:2, 100:14, 101:7, 101:11, 101:15, 101:16, 101:18, 101:22, 102:6, 102:10, 102:15, 102:16, 103:2, 103:20, 103:26, 105:3, 105:4
**must** [3] - 56:6, 65:9, 92:18
**muster** [1] - 92:22

## N

**name** [2] - 82:18, 100:8
**nature** [2] - 56:15, 95:10
**nearly** [1] - 103:4
**necessarily** [1] - 94:25
**need** [11] - 56:21, 68:16, 81:18, 88:21, 89:25, 90:4, 95:3, 95:21, 98:10, 101:24, 102:25
**needed** [2] - 92:24, 102:14
**needs** [3] - 57:17, 82:26
**negligent** [1] - 53:11
**neutral** [1] - 94:5
**never** [5] - 52:13, 57:24, 57:25, 70:24, 79:6
**nevertheless** [2] - 103:11, 104:9
**new** [5] - 50:10, 50:26, 56:23, 91:5, 93:17, 95:18, 100:11, 102:25, 104:3, 104:9
**NEW** [2] - 46:2, 46:2
**New** [16] - 46:15, 46:22, 47:3, 47:6, 47:10, 49:12, 50:4, 58:14, 58:24, 80:19, 86:9, 93:24
**next** [2] - 67:17, 83:14
**night** [4] - 54:12, 71:9, 91:12, 103:3
**nineteen** [1] - 53:8
**nineteen-and-a-half** [1] - 53:8
**NO** [1] - 46:5
**none** [1] - 59:11
**normal** [2] - 48:15, 48:18
**notes** [1] - 81:14
**nothing** [2] - 68:2, 81:3
**notice** [3] - 63:17, 63:20, 84:20
**notion** [6] - 54:10, 54:12, 54:13, 57:16, 58:12, 61:13
**nowhere** [1] - 63:26
**number** [12] - 48:2, 52:14, 52:23, 58:26, 75:21, 76:13, 91:3
**numerous** [1] - 51:17
**NW** [1] - 47:6
**NY** [1] - 62:13

## O

**o'clock** [11] - 80:7, 84:19, 88:24, 91:12, 91:13, 91:14, 91:18, 91:21, 101:9, 101:14, 103:13
**obligation** [1] - 92:22
**obligations** [1] - 65:8
**observation** [2] - 70:10, 72:6
**observations** [1] - 71:14
**obviously** [4] - 75:7, 75:24,
80:10, 84:15
**occupied** [2] - 104:16
**occur** [1] - 97:21
**occurred** [1] - 70:19
**occurrence** [1] - 53:13
**OF** [2] - 46:2, 46:2
**offend** [2] - 70:15, 70:24
**offended** [1] - 71:16
**offending** [1] - 70:16
**office** [1] - 80:19
**Official** [1] - 47:23
**OFFICIAL** [1] - 105:9
**on-point** [1] - 82:6
**once** [3] - 67:26, 69:24, 104:22
**one** [36] - 48:21, 52:19, 52:23, 52:25, 53:2, 53:4, 53:9, 55:21, 56:4, 59:2, 60:16, 60:20, 61:23, 64:12, 68:16, 68:23, 72:17, 72:18, 73:11, 74:19, 76:5, 78:16, 79:3, 80:7, 90:13, 90:16, 91:3, 95:19, 97:25, 99:9, 99:11, 99:17, 100:5, 103:13, 103:21
**One** [1] - 46:24
**ongoing** [1] - 81:18
**open** [1] - 55:8
**openly** [1] - 88:7
**opens** [1] - 52:8
**operating** [5] - 68:6, 74:20, 74:22, 93:8, 97:18
**operator** [1] - 50:8
**opinion** [6] - 59:3, 61:3, 61:6, 62:16, 64:6, 64:9
**opportunity** [2] - 68:9, 103:7
**opposite** [2] - 82:10, 82:12
**order** [28] - 56:3, 56:5, 56:6, 56:10, 56:15, 56:20, 67:22, 68:12, 69:15, 72:6, 73:12, 74:10, 74:16, 79:14, 84:14, 88:14, 88:23, 89:10, 89:11, 89:17, 90:22, 94:14, 97:12, 99:8, 100:17, 100:18, 101:26
**orders** [1] - 68:22
**organization** [1] - 85:5
**orphan** [1] - 80:13
**otherwise** [3] - 58:16, 97:5, 104:23
**ought** [1] - 57:13
**ousted** [1] - 93:18
**ouster** [3] - 67:5, 92:20, 93:13
**out-of-pocket** [2] - 97:20
**outcome** [1] - 94:6
**outline** [3] - 64:15, 64:16, 86:5
**outset** [1] - 64:19
**outside** [1] - 55:17
**outstanding** [1] - 77:11
**overcome** [1] - 80:22,

80:25
**overrides** [1] - 87:10
**owed** [1] - 77:3
**owing** [1] - 74:25
**own** [2] - 67:14, 73:7
**owned** [1] - 63:5
**owner** [9] - 51:18, 51:19, 56:6, 61:7, 65:21, 78:8, 87:18, 87:19, 87:23
**owner's** [8] - 50:3, 51:18, 53:14, 64:3, 65:20, 67:5, 92:19, 93:13
**owns** [2] - 72:17, 72:18

## P

**p.m** [2] - 101:8, 101:16
**page** [8] - 59:4, 76:13, 76:14, 76:15, 83:14, 87:13, 99:12, 99:21
**pages** [6] - 51:11, 51:14, 53:8, 76:17, 77:18, 77:25
**panoply** [1] - 89:13
**Paper** [1] - 62:12
**papers** [2] - 99:9, 102:24
**parade** [1] - 72:12
**Paragraph** [1] - 99:12
**paragraph** [6] - 63:11, 92:18, 99:12, 99:20, 100:21, 100:23
**parent** [2] - 72:15, 73:25
**parents** [1] - 80:12
**PART** [1] - 46:2
**part** [8] - 63:11, 68:10, 75:9, 75:14, 86:4, 89:10, 95:15, 104:24
**particular** [3] - 63:2, 63:12, 95:7
**particularly** [2] - 82:22, 93:23
**parties** [12] - 64:11, 68:23, 78:5, 81:6, 85:26, 86:2, 86:7, 86:21, 87:12, 88:8, 88:15
**parties'** [1] - 64:20
**partner** [1] - 87:17
**party** [12] - 49:16, 63:16, 63:18, 72:21, 72:24, 73:8, 73:9, 74:5, 76:5, 76:6, 87:19
**passwords** [1] - 81:17
**past** [2] - 85:8, 97:24
**patiently** [1] - 82:15
**pay** [1] - 74:22
**paying** [3] - 74:21, 74:24, 74:26
**pending** [1] - 67:16
**people** [12] - 50:13, 50:15, 50:26, 58:3, 58:13, 77:20, 81:5, 81:6, 85:18, 93:17, 95:25, 101:16
**percent** [2] - 63:7, 63:25
**perform** [2] - 56:7, 67:2
**perhaps** [3] - 54:20, 73:6,

97:2
**period** [2] - 60:2, 98:15
**permanent** [1] - 67:11
**permission** [1] - 56:25
**permitted** [1] - 59:25
**person** [2] - 72:22, 85:4
**personal** [1] - 71:23
**personally** [1] - 70:17
**personnel** [1] - 92:12
**perspective** [1] - 81:5
**pertinent** [1] - 64:26
**perusal** [1] - 53:6
**PICCIRILLO** [1] - 105:9
**Piccirillo** [1] - 47:22
**place** [11] - 53:20, 62:21, 63:3, 64:16, 75:24, 84:5, 84:24, 86:24, 95:18, 95:26, 99:14
**places** [1] - 76:2
**Plaintiff** [3] - 46:5, 46:11, 46:21
**plaintiff** [5] - 63:4, 65:7, 65:9, 79:17, 82:21
**plaintiff's** [3] - 63:24, 64:7, 64:13
**plane** [1] - 69:25
**play** [1] - 102:10
**pleases** [1] - 59:25
**plenary** [1] - 69:8
**pocket** [1] - 97:20
**point** [30] - 48:25, 50:7, 51:9, 51:21, 53:7, 55:14, 59:14, 59:16, 60:26, 62:7, 64:15, 65:14, 66:10, 66:23, 68:7, 68:16, 69:23, 73:23, 74:3, 74:7, 76:19, 80:11, 82:6, 86:2, 88:12, 92:17, 93:9, 94:11, 99:10, 101:24
**pointed** [4] - 54:13, 54:16, 61:16, 98:5
**points** [1] - 74:16
**policy** [2] - 58:15, 58:24
**portions** [1] - 78:20
**position** [4] - 53:26, 56:25, 96:12, 103:5
**positions** [1] - 84:9
**possibility** [5] - 66:21, 66:22, 86:26, 87:4, 90:25
**possibly** [1] - 98:3
**post** [3] - 81:14, 96:13, 96:15
**post-it** [1] - 81:14
**potential** [5] - 58:22, 95:5, 96:22, 99:26, 100:7
**power** [22] - 49:22, 50:5, 51:12, 51:17, 55:4, 55:7, 55:16, 55:19, 57:9, 57:10, 57:15, 58:21, 59:17, 65:2, 65:6, 66:11, 68:18, 69:6, 69:14, 70:14, 71:20
**powers** [6] - 50:2, 51:15, 64:20, 69:9, 71:2, 71:17

**practically** [2] - 50:4, 91:12
**precedes** [1] - 64:18
**precisely** [1] - 66:23
**preliminary** [32] - 49:19, 49:22, 55:23, 67:13, 67:21, 67:26, 68:3, 68:8, 72:3, 73:2, 74:8, 84:20, 89:14, 89:19, 89:26, 94:19, 94:24, 95:10, 95:11, 95:20, 96:2, 96:6, 96:19, 96:24, 97:4, 98:20, 101:23, 102:20, 102:25, 103:18, 104:6
**prepared** [1] - 71:8
**present** [4] - 62:2, 72:2, 89:25, 99:5
**presentation** [1] - 84:7
**presented** [2] - 90:22, 99:9
**presenting** [1] - 90:19
**presently** [1] - 91:5
**preserve** [1] - 79:25
**press** [10] - 82:20, 82:22, 82:23, 82:24, 93:16, 93:17, 93:20, 93:23, 93:24, 93:25
**presume** [1] - 52:17
**presumption** [1] - 57:8
**pretty** [1] - 67:20
**prevail** [2] - 52:5, 57:2
**principal** [13] - 58:16, 58:19, 58:21, 59:6, 59:9, 59:17, 59:24, 65:2, 66:8, 78:16, 78:23, 79:4, 79:23
**principal's** [2] - 49:8, 79:22
**principally** [1] - 82:8
**problem** [18] - 52:2, 52:21, 52:22, 55:21, 56:16, 56:17, 57:2, 64:12, 67:23, 69:21, 69:22, 75:19, 79:16, 79:17, 94:13, 94:26, 100:3
**problems** [1] - 73:14
**procedural** [1] - 73:14
**proceeding** [2] - 57:7, 87:23
**PROCEEDINGS** [1] - 46:16
**process** [1] - 88:18
**produce** [1] - 78:14
**prohibit** [1] - 104:10
**prolonged** [1] - 48:9
**proper** [2] - 70:4, 104:11
**properly** [3] - 49:23, 50:6, 95:13
**property** [8] - 65:18, 72:18, 81:7, 81:8, 81:12, 97:17, 99:26, 100:10
**proposed** [3] - 52:18, 56:3, 56:5
**proprietary** [3] - 81:12, 85:10, 100:9
**prospective** [1] - 82:26
**protect** [1] - 70:4
**protection** [1] - 87:6
**prove** [1] - 78:20
**proved** [1] - 72:26

**proves** [1] - 65:14
**provide** [2] - 50:20, 75:6
**provided** [1] - 63:10
**provides** [1] - 95:5
**provision** [4] - 49:11, 64:2, 76:20, 76:25
**provisions** [6] - 51:16, 61:9, 63:9, 76:4, 77:5, 85:22
**purely** [1] - 64:12
**purported** [3] - 67:5, 92:20, 93:13
**pursuant** [4] - 73:19, 87:22, 94:8, 98:17
**pursuing** [1] - 71:5
**put** [19] - 49:7, 56:14, 57:6, 57:21, 76:20, 80:21, 81:2, 84:16, 85:2, 85:14, 90:15, 91:7, 93:16, 93:17, 93:19, 101:25, 103:8, 104:2, 104:22
**putting** [4] - 69:19, 81:20, 85:3, 102:18

## Q

**quality** [1] - 98:10
**questions** [2] - 82:24, 90:21
**quick** [2] - 53:6, 92:9
**quicker** [1] - 92:6
**quickly** [3] - 83:2, 96:7, 97:3
**quite** [1] - 60:14
**quo** [8] - 50:9, 56:11, 57:17, 68:5, 79:25, 81:4, 94:23, 98:6
**quote** [3] - 54:3, 59:24, 76:16

## R

**raise** [1] - 64:10
**raised** [2] - 75:9, 104:3
**raises** [1] - 94:13
**rather** [4] - 57:3, 69:8, 95:12, 98:15
**reach** [2] - 75:14, 88:11
**read** [6] - 58:11, 62:5, 62:6, 71:11, 77:26, 103:14
**reading** [3] - 66:25, 92:26, 103:14
**reads** [1] - 63:11
**real** [2] - 97:11, 97:19
**reality** [1] - 80:6
**realize** [1] - 103:10
**really** [19] - 49:24, 67:25, 69:10, 69:11, 71:22, 77:21, 80:2, 80:3, 80:5, 80:11, 81:4, 81:11, 92:5, 92:6, 94:7, 94:9, 96:14, 98:7
**Realty** [1] - 62:12
**reason** [8] - 59:19, 67:9,

68:21, 75:7, 76:23, 84:22, 93:18
**reasonable** [3] - 92:8, 98:13, 102:3
**reasons** [5] - 48:12, 48:21, 75:22, 89:9, 100:6
**receive** [2] - 63:6, 71:12
**received** [1] - 71:9
**receiving** [1] - 78:19
**recess** [1] - 83:8
**recitation** [1] - 53:8
**recognition** [1] - 100:8
**recognizes** [1] - 65:21
**record** [4] - 64:9, 71:15, 89:20, 89:22
**recover** [1] - 55:11
**reference** [1] - 92:18
**reflect** [1] - 71:15
**refused** [1] - 74:23
**regard** [1] - 71:21
**regarding** [2] - 53:13, 67:14
**Rehmann** [2] - 72:11, 72:15
**reinstate** [4] - 48:11, 66:26, 67:19, 67:25
**reinstated** [1] - 57:14, 94:8
**reinstatement** [2] - 73:4, 94:12
**rejected** [1] - 82:2
**related** [1] - 57:12
**Relationship** [1] - 77:19
**relationship** [23] - 53:4, 59:7, 61:5, 61:11, 61:18, 61:19, 64:22, 65:7, 69:19, 73:20, 75:16, 75:18, 75:20, 78:16, 78:24, 79:3, 79:7, 85:13, 85:23, 87:10, 88:2, 88:4, 88:9
**relationships** [3] - 51:19, 91:6, 93:23
**release** [4] - 82:20, 93:16, 93:17, 93:20
**relied** [1] - 82:8
**relief** [16] - 53:20, 54:2, 56:2, 56:21, 66:26, 67:11, 67:19, 67:22, 68:8, 68:11, 69:10, 71:25, 73:4, 74:7, 80:5, 95:2
**remain** [3] - 95:12, 95:16, 95:17
**remains** [2] - 52:3, 65:26
**remedies** [1] - 88:13
**remedy** [2] - 86:18, 88:14
**remember** [1] - 102:3
**removed** [1] - 85:25
**RENARD** [49] - 46:23, 48:4, 48:8, 48:17, 49:4, 50:13, 50:19, 51:7, 51:24, 51:26, 52:16, 53:18, 53:24, 54:10, 57:8, 58:7, 58:12, 59:13, 60:6, 60:8, 60:26, 65:13, 68:16, 70:9, 70:18, 71:13, 73:18, 74:3, 74:14, 80:18,

90:5, 90:20, 92:3, 92:17, 93:7, 94:11, 94:17, 96:19, 97:15, 97:22, 98:26, 99:15, 100:14, 101:16, 101:22, 102:10, 102:15, 103:2, 105:4
**Renard** [17] - 48:6, 48:26, 51:4, 62:8, 69:3, 74:17, 78:10, 78:26, 79:9, 79:20, 80:4, 80:16, 85:14, 87:25, 92:26, 99:10, 103:21
**Renard's** [3] - 75:13, 80:11, 87:9
**rent** [1] - 63:24
**rental** [1] - 63:7
**rentals** [1] - 63:25
**renting** [1] - 63:4
**repeating** [1] - 75:26
**reply** [2] - 52:19, 103:19
**REPORTER** [1] - 105:9
**Reporter** [1] - 47:23
**reports** [1] - 81:13
**represent** [2] - 65:3, 82:15
**reputation** [4] - 72:13, 82:25, 84:25, 100:8
**reputational** [1] - 83:3
**request** [6] - 49:25, 53:12, 53:26, 55:23, 55:24, 73:4
**requested** [1] - 66:26
**requesting** [1] - 50:22
**requests** [1] - 74:23
**require** [2] - 73:5, 96:15
**required** [2] - 96:9, 96:20
**requirements** [2] - 72:8, 77:9
**requires** [1] - 55:25, 74:21
**requiring** [1] - 68:22
**research** [1] - 54:12
**resolution** [6] - 87:21, 88:16, 88:25, 89:15, 102:21, 102:22
**resolved** [6] - 76:7, 83:2, 88:21, 89:3, 100:15
**respect** [2] - 75:2, 87:16
**respectfully** [4] - 49:24, 54:16, 55:14, 95:3
**respective** [1] - 98:22
**respects** [1] - 51:17
**respond** [2] - 60:13, 65:9, 68:10
**responsibilities** [2] - 65:19, 81:25
**responsibility** [1] - 58:20
**restatement** [1] - 49:13
**restored** [2] - 89:12, 98:16
**restoring** [1] - 98:6
**restrain** [1] - 73:25
**restrained** [1] - 57:17
**restraining** [10] - 56:10, 56:14, 67:22, 68:11, 72:6, 73:12, 74:9, 84:14, 89:9, 89:11
**result** [4] - 53:2, 54:25,

64:5, 97:21
**resulted** [3] - 67:5, 92:19, 93:13
**return** [2] - 93:19, 100:24
**review** [1] - 49:6
**reviewed** [1] - 97:10
**revocation** [4] - 49:14, 61:13, 65:24, 66:18
**revoke** [9] - 48:23, 49:9, 50:6, 51:12, 59:18, 59:25, 65:2, 66:11, 68:18
**revoked** [1] - 67:4
**rightful** [1] - 66:12
**rightfully** [1] - 55:19
**rights** [5] - 64:20, 73:8, 73:13, 74:5, 81:25
**ROBERT** [1] - 47:11
**Robert** [1] - 82:18
**role** [2] - 96:7, 102:10
**roll** [1] - 72:2
**rolling** [1] - 103:17
**rooms** [1] - 85:7
**ruled** [1] - 57:24
**rules** [2] - 67:14, 78:17
**ruling** [3] - 76:22, 89:16, 89:17
**running** [1] - 85:5

## S

**safe** [1] - 96:16
**sake** [1] - 62:15
**sales** [1] - 85:8
**SAMBHWANI** [1] - 46:24
**satellite** [1] - 92:23
**schedule** [1] - 103:22
**Schrager** [5] - 47:9, 61:23, 82:16, 89:7
**SCHRAGER** [1] - 46:7
**sealed** [1] - 104:26
**Second** [1] - 59:5
**second** [5] - 84:25, 89:4, 92:17, 95:24, 97:25
**seconds** [1] - 88:17
**secrets** [2] - 85:2, 85:6
**Section** [5] - 51:10, 55:25, 61:17, 77:25, 87:22
**section** [3] - 51:14, 64:16, 64:17
**security** [2] - 81:17, 92:12
**see** [8] - 52:2, 52:26, 53:4, 75:12, 78:4, 79:15, 99:21, 100:3
**seeing** [1] - 82:4
**seek** [6] - 56:2, 67:20, 67:22, 71:25, 73:11, 74:8
**self** [12] - 54:4, 54:5, 54:7, 54:11, 54:12, 56:19, 57:4, 58:13, 69:11, 69:22, 86:19, 88:24
**self-help** [1] - 54:4, 54:5, 54:7, 54:11, 54:12, 56:19,

57:4, 58:13, 69:11, 69:22, 88:24
**self-helping** [1] - 86:19
**sell** [4] - 63:22, 63:25, 64:3, 85:7
**sense** [10] - 52:8, 52:13, 69:7, 69:25, 72:26, 76:24, 79:20, 94:5, 96:15, 103:17
**sentence** [1] - 64:17
**separate** [7] - 55:3, 55:13, 59:15, 68:20, 73:22, 78:17, 78:22
**September** [2] - 102:19, 104:18
**sequence** [1] - 52:14
**series** [1] - 95:8
**serious** [1] - 84:7
**service** [3] - 48:17, 97:23, 102:13
**Services** [1] - 89:6
**services** [3] - 63:7, 71:23, 98:2
**SERVICES** [2] - 46:7, 46:10
**set** [5] - 48:3, 86:21, 88:9, 97:8
**setting** [1] - 50:24
**settled** [1] - 64:25
**shall** [3] - 63:14, 63:17, 87:16
**sharply** [1] - 64:19
**short** [2] - 81:4, 83:8
**shot** [1] - 80:12
**show** [8] - 48:26, 49:18, 51:16, 56:20, 67:15, 69:15, 88:23, 89:18
**showing** [4] - 55:25, 97:9, 97:11, 97:20
**shows** [2] - 49:8, 49:26
**sides** [5] - 84:6, 84:8, 84:10, 85:19, 103:23
**signage** [5] - 56:13, 57:6, 91:6, 92:14
**signed** [4] - 50:14, 50:15, 50:26, 104:26
**significant** [3] - 82:19, 82:23, 83:3
**silent** [1] - 60:10
**simply** [4] - 48:11, 77:7, 97:16, 101:7
**sitting** [1] - 82:15
**situation** [3] - 80:21, 81:2, 93:25
**six** [3] - 91:23, 92:8, 101:9
**slightly** [1] - 56:4
**Slip** [1] - 59:2
**smacks** [1] - 80:12
**Smith** [1] - 59:20
**someone** [1] - 93:8
**soon** [1] - 72:4
**sophisticated** [2] - 78:5, 85:18
**sorry** [2] - 58:8, 69:18

sort [2] - 77:12, 101:12
sorts [1] - 73:14
sought [1] - 71:23
speaks [1] - 51:11
special [1] - 64:12
specific [4] - 51:15, 86:3, 86:5, 89:2
specifically [2] - 71:24, 77:6
spectator [1] - 77:22
spend [1] - 51:18
spent [2] - 78:10, 97:17
squarely [1] - 56:18
stage [7] - 60:23, 67:15, 67:26, 74:9, 74:10, 94:19, 94:25
standard [2] - 96:21, 96:25
start [3] - 75:24, 104:16, 104:22
started [1] - 74:17
state [1] - 58:15
State [1] - 86:10
STATE [1] - 46:2
statement [4] - 53:2, 86:6, 89:2, 94:7
statements [1] - 87:4
States [1] - 50:5
status [8] - 50:9, 56:10, 57:17, 68:4, 79:25, 81:4, 94:23, 98:6
stay [1] - 93:6
staying [1] - 67:24
step [1] - 55:22
stepping [1] - 92:12
still [4] - 52:3, 81:8, 88:2, 97:5
stop [1] - 81:18
street [1] - 50:24
Street [4] - 46:15, 46:25, 60:21, 79:10
subject [7] - 58:21, 59:7, 66:14, 66:16, 67:17, 69:25, 69:26
submit [2] - 97:16, 103:24
Subparagraph [1] - 99:22
substance [1] - 102:12
substantial [1] - 78:19
success [2] - 53:22, 86:26
suggest [3] - 100:22, 101:4, 103:20
suit [1] - 87:21
Suite [1] - 47:6
Sullivan [1] - 62:11
summary [2] - 62:25, 64:13
summoning [1] - 86:13
summons [1] - 52:4
Sunday [5] - 50:6, 80:7, 84:19, 88:24, 96:11
Sunrise [1] - 92:2
supplemental [1] - 104:2
support [1] - 78:14
supposed [1] - 104:17

Supreme [1] - 59:21
SUPREME [1] - 46:2
system [3] - 54:6, 70:19, 70:20
systems [2] - 56:13, 91:6

**T**

table [1] - 77:23
talks [3] - 51:15, 72:11, 72:22
teeth [2] - 69:11, 70:20
temporary [10] - 56:10, 56:14, 67:22, 68:11, 72:5, 73:11, 74:9, 84:13, 89:9, 89:11
ten [1] - 90:15
TERM [1] - 46:2
term [3] - 54:24, 63:19, 64:12
terminate [21] - 53:14, 54:26, 55:4, 55:7, 58:22, 59:6, 59:18, 63:24, 65:6, 66:11, 73:12, 76:3, 77:2, 77:3, 77:8, 80:2, 86:4, 86:5, 86:8, 86:22, 88:15
terminated [9] - 49:16, 63:16, 63:18, 66:20, 67:3, 76:21, 76:23, 86:11, 86:17
terminating [2] - 66:15, 74:5
termination [11] - 49:15, 55:3, 55:12, 61:10, 61:12, 63:9, 66:3, 66:22, 76:4, 76:7, 77:6
terms [8] - 85:6, 85:20, 87:2, 89:19, 89:24, 92:22, 100:15, 100:16
testimony [2] - 50:17, 90:9
Texas [4] - 46:25, 80:16
THE [74] - 46:2, 48:2, 48:6, 48:16, 48:25, 50:12, 50:17, 51:3, 51:22, 51:25, 52:2, 52:17, 53:19, 53:25, 56:16, 57:19, 58:11, 58:26, 59:20, 60:7, 60:10, 60:14, 60:17, 60:20, 62:5, 68:13, 69:2, 70:16, 71:11, 73:16, 73:24, 74:11, 76:9, 76:13, 76:18, 77:16, 77:20, 77:26, 78:3, 78:13, 79:14, 80:15, 82:17, 83:6, 84:5, 89:23, 90:11, 91:9, 91:20, 91:25, 92:5, 93:10, 94:16, 95:6, 97:5, 97:25, 99:6, 99:14, 99:17, 99:20, 99:23, 99:26, 100:3, 100:19, 101:10, 101:12, 101:19, 101:25, 102:8, 102:13, 102:17, 103:9, 103:25, 104:4
theft [1] - 99:26
themselves [3] - 86:18,

86:19, 88:25
therefore [8] - 52:2, 61:9, 64:6, 78:17, 79:5, 88:5, 89:8, 98:9
Third [1] - 47:3
third [4] - 85:2, 86:2, 94:11
thirty [1] - 63:17
threatened [1] - 50:14
three [5] - 53:10, 53:22, 91:21, 91:22, 101:9
throughout [1] - 66:9
throwing [2] - 86:19, 94:22
Thursday [2] - 91:14, 92:4
timeframe [2] - 91:7, 91:9
TO [1] - 105:6
today [5] - 53:26, 65:26, 90:7, 99:2, 99:16
together [2] - 78:5, 103:6
took [2] - 80:23, 86:18
total [1] - 63:7
totally [1] - 81:22
trade [1] - 85:2
transactions [1] - 87:15
TRANSCRIPT [1] - 105:6
transfer [2] - 91:14, 92:7
transferred [1] - 98:20
transferring [1] - 92:12
transfers [1] - 92:11
transformed [1] - 96:2
transition [1] - 100:17
transitions [1] - 101:13
translate [1] - 80:17
tremendous [1] - 85:3
triable [1] - 64:10
trial [9] - 49:19, 49:21, 62:24, 64:7, 90:13, 90:15, 104:16, 104:22, 104:23
TRIAL [1] - 46:2
tried [3] - 54:19, 65:14, 85:24
TRO [16] - 55:24, 56:5, 56:6, 57:14, 67:12, 67:15, 67:24, 89:18, 90:24, 92:16, 94:12, 95:9, 95:10, 96:23, 97:6, 100:6
true [1] - 103:16
TRUE [1] - 105:6
trust [2] - 58:16, 61:5
trying [2] - 85:7, 96:4
TSA [1] - 53:9
turnover [1] - 56:22
turns [1] - 63:21
twenty [1] - 53:8
two [16] - 52:25, 53:10, 53:21, 55:13, 68:23, 78:5, 84:19, 85:17, 86:7, 88:24, 90:4, 91:13, 91:14, 95:24, 99:19, 101:14
typically [1] - 97:8

**U**

ultimate [3] - 86:26, 89:17, 98:14
ultimately [2] - 56:26, 96:23
under [12] - 48:13, 50:4, 54:24, 55:25, 64:21, 65:8, 66:5, 67:4, 87:6, 96:15, 97:6, 98:24
underlying [2] - 57:16, 66:7
undertaken [1] - 53:3
undertaking [3] - 95:4, 95:15, 96:20
undertook [1] - 85:11
undo [4] - 67:4, 92:18, 93:4, 93:12
undone [1] - 57:18
unfettered [1] - 58:21
unfortunately [1] - 48:8
unilateral [2] - 65:12, 87:7
unilaterally [3] - 63:26, 67:6, 67:7
United [1] - 50:5
unless [3] - 48:20, 97:9, 102:20
up [22] - 48:3, 48:16, 50:14, 50:16, 50:24, 50:26, 52:8, 52:19, 60:15, 62:4, 70:4, 72:2, 74:12, 86:21, 90:15, 92:15, 99:7, 99:10, 99:13, 102:7, 102:9, 103:22

**V**

vague [1] - 93:9
valid [1] - 88:4
Van [1] - 62:20
various [1] - 89:25
vendor [1] - 91:5
vendors [3] - 50:22, 56:12
venturer [1] - 87:17
verge [1] - 48:19
versus [7] - 54:4, 59:4, 59:20, 60:22, 62:12, 78:16, 79:4
views [2] - 102:3, 102:4
violated [2] - 65:8, 66:16
violation [2] - 90:25, 90:26
virtually [1] - 79:13
virtue [1] - 61:8
Voorhis [1] - 62:20

**W**

Waikiki [14] - 77:15, 78:9, 79:3, 79:4, 84:18, 85:11, 85:14, 85:22, 86:12, 86:17, 88:6, 88:18, 91:26, 93:16
WAIKIKI [2] - 46:4, 46:13
Waikiki's [1] - 94:8

**wait** [2] - 73:2, 97:25
**waiting** [1] - 88:19
**wants** [4] - 63:22, 75:12, 75:14, 88:12
**Washington** [1] - 47:7
**ways** [1] - 86:21
**Wednesday** [2] - 90:12, 91:21
**wee** [1] - 48:9
**week** [5] - 67:17, 67:18, 97:24, 104:17
**weeks** [1] - 104:15
**weigh** [1] - 87:2
**Weiner** [2] - 82:17, 82:18
**WEINER** [11] - 47:11, 82:14, 82:18, 91:22, 97:7, 97:16, 101:7, 101:11, 101:15, 101:18, 103:26
**whatsoever** [1] - 84:21
**whole** [2] - 81:25, 82:4
**wholly** [1] - 68:18
**WIDELL** [1] - 46:23
**WILL** [1] - 47:8
**willingly** [1] - 50:14
**Wilson** [2] - 60:4, 62:11
**wish** [3] - 88:3, 94:3, 94:4
**witnesses** [3] - 49:21, 90:3, 90:8
**wonder** [1] - 62:15
**Woolley** [1] - 82:8
**word** [2] - 48:7, 82:15
**words** [2] - 51:5, 56:9
**world** [1] - 76:20
**worldwide** [1] - 82:21
**writing** [2] - 63:17, 102:2
**written** [2] - 62:17, 86:24
**wrongdoing** [2] - 54:14, 57:16
**wrongful** [5] - 55:2, 55:9, 57:10, 66:3, 66:22
**wrote** [2] - 59:22, 59:23

## Y

**yanking** [1] - 81:14
**year** [2] - 63:18
**yearly** [1] - 63:19
**years** [1] - 101:2
**yesterday** [14] - 49:7, 50:21, 51:10, 54:17, 54:20, 65:25, 67:10, 70:11, 70:23, 71:26, 72:10, 75:26, 76:26, 82:7
**YORK** [2] - 46:2, 46:2
**York** [16] - 46:15, 46:22, 47:3, 47:6, 47:10, 49:12, 50:4, 58:14, 58:24, 80:19, 86:10, 93:24
**Young** [1] - 72:21
**yourself** [4] - 66:16, 69:8, 69:25, 69:26

1

2  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK:  TRIAL TERM PART 3
3  - - - - - - - - - - - - - - - - - - - - - X

4  M WAIKIKI LLC,

5                 Plaintiff,
                               INDEX NO.
6      - against -          651457/11

7  MARRIOTT HOTEL SERVICES, INC.,
    I.S. INTERNATIONAL, LLC and IAN SCHRAGER,
8
                 Defendant.
9
    - - - - - - - - - - - - - - - - - - - - - X
10  MARRIOTT HOTEL SERVICES, INC.,

11              Counterclaim-Plaintiff,

12     - against -

13  M WAIKIKI LLC,

14             Counterclaim-Defendant.
    - - - - - - - - - - - - - - - - - - - - - X
15          60 Centre Street
          New York, New York
16         August 31, 2011
          <u>PROCEEDINGS</u>
17

18  BEFORE:
      HONORABLE EILEEN BRANSTEN,
19                   Justice

20  APPEARANCES:

21    BICKEL & BREWER
    Attorneys  for the Plaintiff
22    767 Fifth Avenue
    New York, New York  10153
23    BY:  ALEXANDER D. WIDELL, ESQ.
        JAMES S. RENARD, ESQ.
24        ANAND SAMBHWANI, ESQ.
        4800 Bank One Center
25        1717 Main Street
        Dallas, Texas  75201
26

```
 1

 2          JENNER & BLOCK
            Attorneys for Defendant Marriott
 3          919 Third Avenue - 27th Floor
            New York, New York  10022-3908
 4          BY:   BRIAN J. FISCHER, ESQ.
                      - and -
 5                DAVID A. HANDZO, ESQ.
                  MICHAEL B. DeSANCTIS, ESQ.
 6                1099 New York Avenue, NW
                  Suite 900
 7                Washington, DC   20001

 8

 9          McDERMOTT WILL & EMERY
            Attorneys for Defendant I.S. International LLC
            and Ian Schrager
10          340 Madison Avenue
            New York, New York   10017-4613
11          BY:  ROBERT A. WEINER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24                         Bonnie Piccirillo
                         Official Court Reporter
25

26
```

1

2          (Recall)

3          THE COURT:  Present is Mr. DeSanctis and

4     Mr. Fischer.  On telephone is Mr. Renard.

5          THE COURT:  Okay, Mr. Renard?

6          MR. RENARD:  Yes, your Honor.

7          THE COURT:  How are you?

8          MR. RENARD:  Fine.

9          THE COURT:  I have before me, I have

10    Mr. DeSanctis.

11         MR. DeSANCTIS:  That's right.

12         THE COURT:  And Mr. Fischer.

13         MR. FISCHER:  Correct.  Thank you, your Honor.

14         THE COURT:  Since we're going to be on the

15    telephone, you can come to the front of the table.

16         Mr. Renard, what's going on?

17         MR. RENARD:  Your Honor, when I got back to

18    the office here on phone calls, obviously, with respect

19    to the order in moving to get the order complied with,

20    I got an e-mail from Mr. DeSanctis saying that, Our

21    folks showed up today or this morning and were told

22    that he couldn't come in and, your Honor, I was unaware

23    of that; but I wasn't even sure what he meant by his

24    folks and what the intention was.

25         Our head client representative, Mr. Damien

26    McKinney, and the present general manager of the hotel

1

2      with the Aqua group reached out to Mr. Rock, who was

3      the general manager of Marriott when the hotel was an

4      Edition and offered to meet at noon with the high-level

5      representatives so they could get a game plan for the

6      transition at 2:30.  And I've told this to

7      Mr. DeSanctis now twice, and he's suggesting there's

8      some bad faith going on here.

9             Your Honor, that's the reason that I asked for

10     a specific time so we wouldn't get into these

11     accusations and finger pointing of, well, you haven't

12     done this by a certain time or you haven't done that by

13     a certain time.  There is a lot that went on this

14     morning before we could even get a position to meet

15     with Marriott with respect to this.  That's why they

16     offered to meet at noon.

17            I don't even know whether or not Marriott has

18     accepted that offer for a noon meeting in Hawaii with

19     the executive committee to discuss the transition

20     issues; but, your Honor, that's where we stand.  We

21     have a 2:30 transition time --

22            THE COURT:  Which is 8:30 p.m.

23            MR. RENARD:  I should be clear about my times.

24     Yes, your Honor, that's 8:30 p.m. our time.  And a

25     meeting two and a half hours before that which is what,

26     six, so in two hours, among the executive committees to

1

2          talk about transition issues.  Your Honor, again,

3          that's why I thought it prudent to even have a

4          timeframe so we wouldn't be where we are now.

5                    THE COURT:  Mr. Renard, just one second, all

6          right.

7                    MR. RENARD:  Sure.

8                    THE COURT:  All right.  Mr. DeSanctis, what is

9          going on?  You're next, why are you here?

10                   MR. DeSANCTIS:  Sure, and I'm sorry to be

11         bothering, your Honor.  I really am.

12                   THE COURT:  Speak up so he hear.

13                   MR. DeSANCTIS:  Sure.  I'm sorry to be

14         bothering your Honor.  When we left the court, the

15         small core management team for the hotel out in Hawaii,

16         which is six people, went to the hotel to begin an

17         orderly transition.  They were met with literally lines

18         of security guards who, as we speak, still are

19         physically preventing them from getting too close to

20         the building.

21                   THE COURT:  Okay, wait a second.  We have here

22         that, ordered that the Marriott shall be allowed to

23         return to its management role at its hotel by 2:30 p.m.

24         in Hawaii time.

25                   Would it have been nicer that at -- I'm so

26         good at these times -- that at our time, four o'clock

1

2          or three o'clock or two o'clock our time, they would

3          immediately open the doors to the Marriott people?  The

4          answer is, of course, it would have been nice, but they

5          didn't; and they're not in violation of this order

6          until 2:30 p.m..

7                     And at that point, in Hawaii time -- so,

8          8:30 p.m. eastern standard time.  We can't presume it's

9          not going to happen.  That's something that, because we

10         don't know what's going to happen, I don't really know

11         what's going to happen ten minutes from now.  Who

12         knows.  I may not be around.  It would be good for Mr.

13         Renard.

14                     MR. RENARD:  Not at all, your Honor.

15                     THE COURT:  Anyway, I just don't know.  What

16         I'm saying to you is this.  That you have to let things

17         play out.  Mr. Renard tells me, look, we tried to do an

18         orderly transition.  We want to have a meeting with the

19         executives and everything else two hours before the

20         time becomes.  So noon, that would be at sixth,

21         six-thirty this afternoon.  That's reasonable in my

22         book, all right.

23                     MR. DeSANCTIS:  I understand.  My concern is

24         this:  First of all, we've gotten reports from the

25         property that people are frantically boxing up

26         documents back in the accounting offices.  Now, perhaps

1

2      it's their documents, but we're very concerned about

3      that.  And your Honor gave, essentially, a six and a

4      half hour smooth transition time, and they're sort of

5      running out the clock, not even talking to our people

6      on the ground until only two and a half hours remain.

7              And by that time, your Honor is off the bench

8      at 6:00 p.m. here, and I'm just very concerned that we

9      haven't seen enough from them to -- for us to have

10     assurances that this six and a half transition period

11     is actually going to be put to good use.

12             THE COURT:  Well, look.  Again, I can't

13     presume anything.  I happen to be a judge.  I am a

14     judge 24/7, all right.  I may not be here, but I'm

15     still available.  In fact, people have always been able

16     to find me before, if necessary.

17             I don't want to be presuming that I am going

18     to have to sign a motion to hold the plaintiffs in

19     contempt.  I don't presume that.  I'm of the other

20     mind.  I am of a mind that people obey court orders,

21     and I think that Mr. Renard is definitively in good

22     faith, and I'm sure that he's giving very good advice

23     to his clients.

24             MR. RENARD:  Your Honor, if I may along those

25     lines, and the Court, I think, you hit upon it, can

26     safely presume that as good lawyers, we're trying to

1

2      give the best advice to our client.  And in that

3      interest, your Honor, of good faith and fair

4      disclosure, you know, unfortunately, potential

5      bankruptcy is something that has to be considered here.

6              But I will say this, short of that drastic

7      action -- and I have no idea whether that will come,

8      although, it would have to come very quickly.  You

9      know, we intend to comply with the Court's order,

10     because, obviously, we have to.  And if the client,

11     ultimately, determines to avail himself a bankruptcy

12     protection, that will have to happen quickly; or else,

13     you know, the transition will take place as it's

14     presently scheduled, and I don't know for sure.

15             THE COURT:  All right, well, that's

16     interesting.  I mean, there's always -- I thought that

17     your first move was to get your subway token out and go

18     up to Madison Avenue.  That's where I thought you were

19     going; but, obviously, you didn't.  You decided to go

20     downtown instead.

21             MR. RENARD:  You know, TROs are not

22     appealable.  Believe me, any seeking energy of your

23     Honor's -- you know, again, the time you spent today

24     and but, sure, we considered and evaluated all things

25     as we are now.  But, you know, short of something like

26     a bankruptcy, you know, there will be that conversion

1

2      at 2:30.

3              THE COURT:  All right, so with that, Hawaii

4      time.

5              MR. RENARD:  Yes, thank you.  Close to one

6      hour -- or about one and a half hours -- no, it's four

7      and a half hours from now.

8              THE COURT:  All right, look, Mr. DeSanctis,

9      I'm glad that you're concerned.  Indeed, you probably

10     picked up a little piece of information just then, that

11     maybe it would concern you.  If I were you, it would

12     concern me.

13             MR. DeSANCTIS:  It does.

14             THE COURT:  But that's the scheme of things.

15     I mean, it's a very complicated issue here, and all I

16     can tell you is that you have to let it at least play

17     out in terms of the time.

18             And if, indeed, as you suspect or you fear it

19     doesn't turn out the way you hope it will, then you do

20     have remedy and you have to get on the remedy as

21     quickly as possible.

22             If, on the other hand, as Mr. Renard has

23     intimated, there is a filing of the bankruptcy; then

24     remedy is not with me.  Because there's an absolute

25     stay, and I couldn't give you remedy.  So, we shall see

26     what happens, but all this is very interesting.

1

2          MR. RENARD:  Thank you, your Honor.  I'll get

3     back on the telephone lines again.

4          MR. DeSANCTIS:  If I could ask for some

5     clarification, if possible.

6          It sounds like absent the bankruptcy filing,

7     we have a commitment that we will be let in by 2:30?

8          THE COURT:  Mr. DeSanctis, you have the signed

9     order.  You're not getting a commitment from Mr. Renard

10     that everything is going to go well.  I mean, he has a

11     job of making sure that all the way over in Hawaii that

12     they understand that this order is a very important

13     order, and that it came as a result of a very vigorous

14     and lengthy argument.  And so that's his job, to try to

15     make sure that, indeed, this order is carried out as

16     it's supposed to be.

17          There's no assurances that can be given.  All

18     I can tell you is that the order is signed; and if,

19     indeed, the plaintiff M Waikiki LLC does not abide by

20     this order, then there is the next steps, and, you

21     know, again, as far as I know, I'm not going anywhere.

22     So I shall be here.

23          Now, what are the next steps?  Obviously, it's

24     to hold somebody in contempt if they don't obey the

25     order, and that has to be dealt with in it's own

26     inimical way.  You have to make sure it's done right,

1

2      and you have to personally serve and all the other

3      things that happen.  But, let's not presume.

4              Instead, let's dream of positively that

5      everything will go well.  All right?

6              MR. DeSANCTIS:  I'm a fan of positive

7      thinking.

8              THE COURT:  Okay.

9              MR. RENARD:  Same on this end, your Honor.

10             THE COURT:  All right, so, that's it.  This

11     was on the record, again.  So, Ms. Piccirillo is

12     available for new transcription.

13             MR. RENARD:  The third.  All right, thank you,

14     your Honor.

15             THE COURT:  All right, goodbye.

16             MR. RENARD:  Goodbye.

17             THE COURT:  All right.

18             MR. DeSANCTIS:  Thank you, your Honor.

19             MR. FISCHER:  Thank you.

20                              ---

21

22                      CERTIFIED TO BE A TRUE
                        AND CORRECT TRANSCRIPT
23

24

25                      _____
                        BONNIE PICCIRILLO
26                      OFFICIAL COURT REPORTER