# Exhibit S

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| IN RE | ) | Case No. 11-02371 |
| | ) | (Chapter 11) |
| | ) | |
| M WAIKIKI LLC, | ) | |
| | ) | September 7, 2011 |
| Debtor. | ) | 2:19 p.m. |
| ______________________________ | ) | |

TRANSCRIPT OF HEARING ON MOTION FOR RELIEF FROM AUTOMATIC STAY; MOTION TO REJECT MANAGEMENT AGREEMENT WITH MARRIOTT HOTEL SERVICES, INC., MOTION TO QUASH SUBPOENAS AND REQUEST FOR PROTECTIVE ORDER; MOTION QUASH SUBPOENAS OF BENJAMIN RAFTER AND CHRISTIAN OLES
BEFORE THE HONORABLE ROBERT J. FARIS
UNITED STATE BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For DEBTOR: | KLEVANSKY PIPER, LLP<br>By: SIMON KLEVANSKY, ESQ.<br>841 Bishop Street, Suite 17097<br>Honolulu, Hawaii 96813 |
| | NELIGAN FOLEY LLP<br>By: PATRICK J. NELIGAN, ESQ.<br>JAMES P. MUENKER, ESQ.<br>325 N. St. Paul, Suite 3600<br>Dallas, Texas 75201 |
| For MODERN MANAGEMENT SERVICES, LLC: | MOSELEY BIEHL TSUGAWA LAU & MUZZI<br>By: CHRISTOPHER J. MUZZI, ESQ.<br>1100 Alakea Street, 23rd Floor<br>Honolulu, Hawaii 96813 |
| Transcriber: | Jessica B. Cahill<br>P.O. Box 1652<br>Wailuku, Maui, Hawaii 96793<br>Telephone: (808)244-0776 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service

APPEARANCES CONTINUED:

| | |
|---|---|
| For MARRIOTT INTERNATIONAL, INC. and MARRIOTT HOTEL SERVICES, INC.: | RUSH MOORE LLP<br>By: SUSAN TIUS, ESQ.<br>737 Bishop Street, Suite 2400<br>Honolulu, Hawaii 96813 |
| | SHEPPARD MULLIN RICHTER & HAMPTON<br>By: ALAN M. FELD, ESQ.<br>333 South Hope Street, 43rd Floor<br>Los Angeles, California 90071 |
| | JENNER BLOCK LLP<br>By: LINDSAY C. HARRISON, ESQ.<br>1099 New York Avenue, N.W.<br>Suite 900<br>Washington, D.C. 20001 |
| For ROBERT M. DAVISON and JANICE G. DAVIDSON, as Trustees of the Davidson Family Trust dated December 22, 1999, as amended: | ARNOLD & PORTER LLP<br>By: LISA HILL FENNING<br>777 South Figueroa Street<br>44th Floor<br>Los Angeles, California 90017<br>**Appearing telephonically** |
| | CARLSMITH BALL LLP<br>By: TOM E. ROESSER, ESQ.<br>WILLIAM M. HARSTAD, ESQ.<br>1001 Bishop Street, Suite 2200<br>Honolulu, Hawaii 96813 |
| For WELL FARGO BANK, NA: | STARN O'TOOLE MARCUS & FISHER<br>By: SHARON V. LOVEJOY, ESQ.<br>733 Bishop Street, Suite 1900<br>Honolulu, Hawaii 96813 |
| For U.S. TRUSTEE: | OFFICE OF THE U.S. TRUSTEE<br>By: CURTIS CHING, ESQ.<br>TERRI DIDION, ESQ.<br>1132 Bishop Street, Suite 602<br>Honolulu, Hawaii 96813 |

SEPTEMBER 7, 2011 2:19 P.M.

THE CLERK: Case 11-02371, M Waikiki LLC. This case is called for hearing on various matters. And, Your Honor, we have counsel on line. Please, Ms. Fenning.

MS. FENNING: Yes, Your Honor, Lisa Fenning of Arnold and Porter representing the Davidson Group as agent for the Robert M. Davidson and Janice G. Davidson, as Trustees of the Davidson Family Trust. It is the prospective DIP Lender.

THE COURT: Okay.

THE CLERK: Thank you.

THE COURT: Any other telephone participants?

THE CLERK: Not attorneys, Your Honor.

THE COURT: Okay. All right. Let's start with Mr. Roesser.

MR. ROESSER: Good afternoon, Your Honor, Tom Roesser and William Harstad appearing on behalf of Robert and Janice Davidson, as Trustees of the Davidson Trust.

THE COURT: Okay.

MR. KLEVANSKY: Good afternoon, Your Honor, Simon Klevansky, Patrick Neligan, and James Muenker appearing on behalf of the Debtor M Waikiki.

THE COURT: Okay.

MR. MUZZI: Good afternoon, Your Honor, Christopher Muzzi on behalf of Modern Management Services, LLC.

MS. DIDION: Good afternoon, Your Honor, Terri Didion

for the U.S. Trustee's Office.

MR. CHING: Curtis Ching for the U.S. Trustee's Office.

THE COURT: Okay.

MR. NELIGAN: Your Honor, I'm Pat Neligan. I was previously introduced.

THE COURT: Okay. Thank you. Thank you.

MS. TIUS: Good afternoon, Susan Tius, Rush Moore LLP, Hawaii counsel for Marriott International, Inc., and Marriott Hotel Services, Inc.

MR. FELD: Good afternoon, Your Honor, Alan Feld of Sheppard Mullin Richter and Hampton, bankruptcy counsel for Marriott as well.

MS. HARRISON: Lindsay Harrison of Jenner and Block, litigation counsel for Marriott.

THE COURT: All right.

MS. TIUS: Your Honor, if I may --

THE COURT: Oh, one more behind you.

MS. TIUS: -- my understanding is --

THE COURT: Hold on a second.

MS. TIUS: I apologize.

THE COURT: Sharon Lovejoy on behalf of Wells Fargo Bank NA, as Trustee.

THE COURT: Okay. Go ahead, Ms. Tius.

MS. TIUS: Just -- Your Honor, our understanding was

that Carren Shulman of Sheppard and Mullin in New York City had arranged for a telephonic appearance this afternoon.

THE COURT: Okay. Is Ms. Shulman on the phone?

THE CLERK: No, Your Honor. Operator?

THE OPERATOR: Yes, Ms. Shulman is not connected. She has not made a reservation for this afternoon.

THE CLERK: Thank you.

THE COURT: Okay.

MS. TIUS: Thank you.

THE COURT: Well, let me -- let me tell you what I -- what I think tentatively, and I'm sure you'll all have plenty to say, but let me tell you where I am based on the papers so far.

I understand, from a communication through the Clerk, that the Debtor wishes to continue the motion to reject the management agreement. That sounds like a good idea. It's very early in the case to make such a dramatic decision, and I think the -- there's also a pending discovery request.

With regard to the motion for relief from automatic stay, my inclination is to set that over for a final hearing also. It seems to me there are questions of fact that have to get sorted out about what property is Marriott's and what property is property of the Estate.

We have the state court's TRO, which directs the Debtor to turn over confidential information, but I would make two points about that. Number one, it doesn't say what

confidential information is. It simply seems to carry forward the terms in the agreement. And, number two, although I want to be careful how I say this, the TRO, unless New York law is peculiar, is not a final judgment and therefore does not have preclusive effect, but in saying that I'm not, by any means, inviting anybody to relitigate any of those issues and there are many other doctrines such as comity that may make it inappropriate to deviate from that order.

But, in any event, it seems to me it doesn't really answer the question of what is Marriott's and what is -- is the Estate's. It also does seem that there is progress, although there is disputes about how much progress, that's been made in getting the matter sorted out consensually. So I -- I don't think I can grant that motion today. I think that ought to be set for a final hearing.

That I think also takes the pressure off the motions to quash the subpoenas, because it would give some more time for these depositions to be scheduled. It looks to me like the objection is really to the scheduling and not to the -- the entitlement of Marriott to take the discovery.

So with a little more time on the motion schedule, perhaps that matter can be worked out. That leaves the -- the, I think, less controversial first day motions.

As far as the two applications to retain counsel, I'm inclined, subject to hearing from especially the U.S. Trustee,

but others, to approve that strictly on an interim basis subject to final approval once the requisite period under the rules has passed. The same would go, essentially for the utilities motion.

The cash management motion, I have more concerns about. I want to give the U.S. Trustee an opportunity to look at that more carefully. I suppose that could be granted on an interim basis subject to something being worked out at a final hearing.

And the other comment I wanted to make -- well, another comment I wanted to make is I'm surprised by the absence of the cash collateral motion. I'll just say that and leave it there.

So that's -- those are sort of a summary of my thoughts based on the papers and let me start with -- with Marriott.

MR. FELD: Yes, thank you very much, Your Honor, Alan Feld again for Marriott. Your Honor, would it be best if I address your -- your tentative, as you've expressed, in -- in order?

THE COURT: Sure.

MR. FELD: On the rejection motion, Your Honor, we -- we very much agree that it's premature, particularly since the relief requested is retroactive in nature anyway to the -- to the petition date. We -- we especially feel it's premature

without the formation of a Creditors' Committee, because the unsecureds would be the ones who were -- who were most greatly affected. We also would want to see the Secured Lender be able to -- to weigh in on this as well because a rejection damages claim would be so large given the -- the -- I believe its 28 years left of a 30 year term under the management agreement. It's a -- it's a very consequential decision.

And, finally, while -- while Marriott hasn't made a decision on this yet, it's very possible that -- that they are considering internally the possibility of a motion to dismiss which would impact this as well in light of the circumstances of the filing. And that -- that's something we sort of reserve and were considering internally, but we're -- we're very supportive of a continuance under the circumstances with an opportunity, at least, for some discovery.

On -- on the stay relief motion, Your Honor, I -- we understand your concerns, but there are some extenuating circumstances and most importantly, I think, a solution which might enable us to move forward today with the Court's understanding, and I'd like to give you just a little bit of background on this to start with.

I mean this -- first of all, it's -- it's a highly unusual circumstance. Typically, when a management agreement is, I don't want to use the word terminated, because there's -- there's controversy over that, but typically when there's a

transition in management companies in a hotel there will -- there will be some notice, and there will be a transition period, and there will be cooperation on both sides. Without -- without pointing any fingers or anything today, this was a very abrupt change that occurred 2:30 a.m. on -- on a Sunday morning and, unfortunately, there was no time for any transition.

There's -- you know, as you've probably heard in the press, Your Honor, there was substantial job losses from this. I think a net loss of 75 to 100 jobs at this point and that's -- that's the side effect, and it's a very unfortunate circumstance, and I -- I understand your -- your concern about the TRO in the state court, and I -- what -- what we come back to, Your Honor, while there certainly was a recognition by the state court that there is significant proprietary and confidential material, we certainly have no issue with a definition, a clear definition of those materials. And in the end it's the management agreement which clearly spells that out.

The -- there has been some cooperation. It's been -- the results of it have been limited in nature, unfortunately, because the majority of the most significant materials have been labeled as disputed, and they're still at the hotel. Some are in locked areas, some are open. Some of the most important materials are on computers that are being used in every day functions such as the front desk, accounting purposes, things --

things like that, but that -- that's a concern that I'm going to come back to in a moment.

I'm -- I'm going to skip ahead for a moment to a solution that we have, which is we've -- we've been working with Debtor's counsel on a proposed form of order granting the motion that would do several things. It would -- it would track the items in the management agreement, and the management agreement, again, was a very heavily negotiated agreement by both the -- the Debtor and Marriott in which there's very, very specific delineation of what's proprietary, what's confidential, and what belongs to who, and it -- it covers documents, it covers tangible and intangible, it covers computer files and software.

The management agreement itself would probably be enough in a normal transition. What we've tried to do, because of the circumstances in this one, is to craft an order that goes -- gives a little more detail. It builds in some industry standards and some explanations. It's an order that both the Debtor and Marriott would be able to reserve their rights under, so that if there are any disputes, and I'll come to disputes in a minute, nobody's -- under this order nobody is -- is waiving any -- any substantive rights, but it's an order that in effect spells out what is confidential and proprietary and should be turned over to Marriott, and where -- where there are disputes there's -- there's a reservation of rights, and this is still a work in process, but there is a draft that we're working on,

we're not quite there yet.

But most importantly, the -- the order would provide for two key provisions once you get past the items in the management agreement.

One provision would be having the materials, whether disputed or not -- well, the ones that are not disputed would be turned over, but the materials that are disputed would be in effect safeguarded, locked down in some -- at some neutral site, whether it would be with a third party, but something that would give, short of critical information which the Debtor needs to continue operating, and we certainly don't want to negatively impact their operations.

We -- as a matter of fact, over the weekend -- we've provided the Debtor with a comprehensive list of accounts payable. We've provided them with lists, from what I understand, of all future reservations, and we're -- we're continuing to work with them to provide them with -- with what we understand they need. A lot of that they have on site already, and it's -- it's mixed in with this -- this information which is -- which is problematic.

But the idea here would be that Marriott and the Debtor would agree on a neutral third party decision maker to resolve disputes going forward. Our -- our -- our preference would be, but I suspect Your Honor doesn't have the time yourself, to -- to see the Court do it. We -- we understand

there's a sitting retired judge that might be available for something like this. I -- I -- Marriott would certainly be willing to pay its share of the costs of any kind of task like that. We assume the Debtor would be as well, hopefully.

But securing the information, securing the materials, and having a decision made in a reasonable amount of time with the input of both parties seems like a practical solution that -- that would allow us to either carry the motion or maybe even have it granted under the circumstances of this order and -- and take it off calendar.

And just to -- to give you -- to give the Court a little more background on the -- on the nature of some of the materials, I'll give you an example of one, I think, hotly disputed category which is customer data.

I -- I think it's worthwhile to go into a little bit of detail about the sensitivity of that. On a basic level, for example, there's future reservations which we've already provided on an individual basis, somebody that -- individuals that book on a travel website, or directly with Marriott, or directly with the hotel. Then you get into more complicated categories such as group bookings, and you get -- that's where things get a little -- a little fuzzy, because a lot of the group bookings were specific events, or -- or special event bookings, or similar to this.

There's subcategories of -- of definite confirmed

bookings. There's tentative bookings. There's expressions of interest, but this -- this is where one gets into sort of a Marriott global marketing machine. It becomes inextricably intertwined with the Guest Loyalty Program, for example, the -- the records, all the data, the trends of the Marriott Rewards Program.

There's a tremendous amount of work. There's a tremendous amount of -- of machinery in place at -- at -- at the Marriott global level that goes into attracting groups, and to attracting event bookings, and that -- that data is not necessarily easily -- easily separated as far as data for imminent reservations or imminent bookings.

While this dispute resolution process is proceeding, I think we'd have -- we'd have no problem making sure that the Debtor has copies or sufficient information of everything that's coming up while this process is pending, but we -- we think this is a practical solution that -- that safeguards the -- the proprietary information, the data, and allows for a thoughtful resolution of any disputes without prejudicing the rights of -- of any parties.

One -- one thing as an example that -- that is -- is a major concern is if one looks at the Debtor as a business, it's -- it's -- the Debtor is an entity that has ownership of the hotel, but it's not truly running the business on a day to day basis. It's the management company in which they made the

sudden transition back about ten days ago, and it's really the management company running the day to day operations.

So, in effect, and this is what creates the urgency here, because of the switch in management companies the people who really have this proprietary information and proprietary data is not only the Debtor, but it's really a competing management company and that's what -- what creates a very unstable, a very dangerous situation.

I mean we don't want to be back here asserting infringement claims and -- and conversion claims based on trade secrets, and -- and proprietary intellectual property, and other things, and we want to -- I don't know damage has occurred. Hopefully, it could be minimized, but we certainly think time is of the essence to -- to get this kind of protective structure in place to -- to minimize anything further from happening, and it's -- right now -- I mean the Debtor has -- has made efforts and told us things are -- are locked down. Some are; some are not in the Debtor's offices.

I think we submitted an affidavit where there are pictures of a computer that shows -- a post that indicated that program may have been cracked. We -- we submitted a picture of an empty file drawer showing that things were to be copied. It's -- it's particularly alarming. And we -- we don't know what happened. We just know what we saw when we were allowed on site, but it's particularly alarming for this to be in the hands

of a competing management company, and we -- we would feel that it's for something to be done to -- to protect all parties.

So that's -- I can answer any questions, Your Honor, but I think that's the -- that's our position, and with a little time with the Debtor's counsel I think we can work on the form of order that hopefully would be acceptable, and we'd -- we'd -- with the Court's indulgence, we'd be -- we'd be glad to go through it item by item, line by line, and hopefully arrive at something that's in a workable form.

As far as the -- the discovery disputes and the motions to quash, I think those could be easily resolved. We have been talking with the Debtors, and I think that if we had a reasonable schedule to -- even as holding dates, assuming that the depositions are necessary for each of the -- of the four witnesses that -- that they can live with, and they can commit to as holding dates, I think that would really resolve it.

Like the Court said, I don't think the issue is the entitlement to it or the scope of it, I think it's just scheduling and more practical matters and that would be -- that would be a resolution of that.

As far as the other first day motions, Your Honor, we don't really have a position on them with the exception of one, which I'll come back to other than to say that we haven't had a chance to really read or digest them, and we would just reserve our rights until a final hearing on those.

The one first day motion which we do have some concerns about is the cash management motion. We've had some difficulty understanding how the accounts work, structurally, and they don't seem to be consistent with what Marriott's understanding of the accounts was, but there were certain accounts up until now that were controlled by Marriott that are effectively frozen at this point, but the -- in -- in speaking with Debtor's counsel and counsel for the Secured Lender, there seems to be some confusion, and there's probably going to be some discussion in -- in what accounts exist, what -- what's structured, and it may be premature even on an interim basis until that's -- that's ironed out and that -- that structure's confirmed.

But certainly once that's ironed out we -- we have no objection, on an interim basis, to -- to allowing that structure to continue pending a final hearing and reservation of rights. Give me just one second, Your Honor.

THE COURT: Sure, of course.

MR. FELD: On -- on the motions, Your Honor, that's -- that's about -- that's about it. We may reserve some time to come back in response to anything the Debtor or other parties say.

The -- the other concern -- to expand on a concern that -- that the Court expressed. We are also very concerned about how the Debtor is operating the funding operations without

either a DIP facility or a cash collateral agreement. There -- like I said there is cash frozen in the -- in the Marriott control -- the controlled accounts. We're not quite sure under what authority they're operating. We -- we -- we would have hoped to see that as a -- as a true first day emergency matter, but hopefully that -- there will be an explanation and that's something that will be resolved. But -- and, Your Honor, I could address any questions.

THE COURT: I don't have any at this point. Thank you.

MR. FELD: Okay. Thank you very much.

THE COURT: Okay. Before we go on, I meant to mention that the Marshal Service tells us they've basically run out of money for security guards over time. So at 4:00 o'clock we have to be done unless there's some dire emergency. So let me now turn to the Debtor.

MR. MUENKER: Good afternoon, Your Honor, James Muenker of Neligan Foley on behalf of the Debtor. If the Court doesn't mind, I'll take up some of the initial less controversial matters first --

THE COURT: Sure.

MR. MUENKER: -- and state that, obviously, as the -- as the Court was advised earlier we do agree to continue the hearing on the motion to reject. So that issue is -- is not one that the Court needs to deal with today.

With respect to the other routine first day motions we're certainly more than happy to have those approved today on an interim basis and set for a later final hearing. We have had a discussion with the U.S. Trustee's Office, or at least our local counsel, with respect to the bank account motion. I know Your Honor, you know, raised an issue about giving the U.S. Trustee some time to review that.

One of the issues that they, of course, had raised was that they would like the Debtor to designate those accounts that they're going to continue in places -- Debtor-in-possession accounts, and that's something that we were willing to work with them on.

We do understand the concern and the questions that Mr. Feld raised to the Court about how the bank -- bank accounts work. We actually had an opportunity to talk about that right before we walked into the hearing today, and we certainly have no objection, again, as long we're permitted, on an interim basis, to continue to operate those accounts and don't run afoul of any provisions of the Bankruptcy Code or the Bankruptcy Rules. We can reserve the final determination of that for a later date. We're more than happy to do that.

With respect to the -- what seems to be the question of the day, which is, you know, how the Debtor has continued to operate its business given that there is no current cash collateral motion on file.

I can report that we anticipate having a motion to not only authorize the use of cash collateral, but approve Debtor-in-possession financing on file in the very near future. We hope to have it on file today. If it's not on file today I -- I can't imagine that it wouldn't be on file tomorrow.

With respect to the specific issue about funding right now, and this will be spelled out in the motion, the proposed DIP Lender actually advanced, on a post-petition basis, $250,000 to the Debtor on an emergency basis in advance of the holiday weekend, so that the Debtor would have sufficient cash to purchase supplies and basically operate the hotel until we could get to an interim hearing and get that motion on file. And the hope, and -- and of course what we're asking -- will be asking in the motion, is that that interim advance will be treated as part of the DIP and rolled into the interim financing.

So, you know, the -- the Debtor has been provided post-petition financing from a third party source and -- and those are the funds that are being used to operate the hotel.

With respect to the --

THE COURT: And that's the existing Junior Secured Creditors?

MR. MUENKER: That is correct, Your Honor.

THE COURT: All right.

MR. MUENKER: With respect to the remaining matter that's in dispute, which is the motion to lift the stay, I think

Your Honor was absolutely correct at the beginning of the hearing when you identified kind of the critical issue here, which is that there is a fundamental dispute over what information is at the hotel that constitutes proprietary and confidential information that belongs to Marriott and what information, at the hotel, is -- is property of the Bankruptcy Estate, and the Debtor needs in order to operate its business.

And that -- you know, certainly at the outset, I want to make absolutely clear, to the extent that we haven't already done so multiple times in the pleadings we filed, it is not our intention to try to misappropriate any truly confidential or proprietary information. We obviously have an interest in making sure that that information is returned to them as quickly as possible for the very reasons that Mr. Feld was just talking about, which is that regardless of what happens today, tomorrow, or next week with respect to the return of that information, they have made it quite clear that because of the way this transition has been done, and because of the fact that a competitor was brought in, the cat is out of the bag, so to speak.

And so, I do think that goes to the issue about the timing of the consideration of the motion. It militates a little bit against the urgency because, you know, I think it's quite fair to say, although we will dispute it, of course, that Mr. Feld and his client will be pursuing whatever claims they

have as a result of what has happened regardless of whether that information is turned over today or tomorrow, that's still in dispute. So that's the point I want to make about that.

There -- there is also a -- Mr. Feld is correct that we have had a number of discussions. Obviously, the parties have been working very hard over the last couple of days trying to resolve as many of these issues as possible.

They have removed approximately 154 boxes of material from the hotel since the bankruptcy filing. They've removed all of the computer laptop hard drives from all the lap tops that were maintained at the property. We've provided access to their IT people to come in and remove a lot of the software, and they've also deleted a lot of things from the -- from the -- from the computers. The computers are unquestionably the property of the Debtors. And quite obviously, the Debtors have to have the computers and any other systems that are in place at the hotel in order to operate the business.

And so, the -- the issue then becomes what -- what to do with what is left. And much of that information has been secured. There are ongoing discussions about how we can kind of secure the rest of that information. It's complicated because a lot of the information, and when Mr. Feld talks about how they think the overwhelming majority of the information is still at the hotel, what he's really referring to is not physical documents, but information that may still remain either on

backup hard drives or -- or other kind of computer systems.

And so, there were both physical files and there are electronic data that are -- that are stored on those computers. The difficulty, as Your Honor might imagine is, you know, it's not as simple as taking those computers and hauling them off to a third party, because we have no way to operate the business.

And so, those are issues along with a host of other issues which the Court really has only had the chance to hear a little bit about, but I think you could probably imagine all the issues just listening to Mr. Feld talk about some of the specifics.

In fact, we spent about an hour and a half in a conference at the hotel last night, very late at night, just with the lawyers, not even with the business people walking through various specific issues.

And so, the devil here -- I mean the devil here is in the detail and that is -- that is necessarily going to require some time for the parties to be able to work -- work through.

Mr. Feld is correct that we had a conversation last night and this morning about trying to resolve this motion and -- and agreeing to some form of order. The order was provided to us about an hour and a half before the hearing started and as you heard Mr. Feld talk about, when he was describing the order, one of the things that they did in the order was not only put provisions from the management agreement in the order, but they

actually went well beyond what the management agreement says and attempted to describe, in more detail, you know, what their view of proprietary and confidential information is.

The practical effect of the order that they provided to us is that they've effectively rewritten the management agreement. And -- and the reason why they indicated that they had done that --

THE COURT: Well, if I get an agreed order great. I don't -- I don't -- I'm not going to function as a settlement judge. So if there's no agreement on the order, then I think you probably ought to -- I mean I'd like to see an agreed order.

MR. MUENKER: Certainly, Your Honor.

THE COURT: And if there's disputes about specific issues I'd be happy to resolve those if I could do that in a sort of judicial context, but I don't want to get involved in your settlement negotiations.

MR. MUENKER: I -- I understand that, Your Honor. The only reason I raise that is because we are happy to do what we said we would do, which is announce to the Court that there are some discussions and that we're willing to go out into the hall and see if we can resolve them, and then advise the Court if we can resolve that. The reason why I -- I raise that issue is because I think the order that they provided to us is so far from what we expected to get, based on our discussions last night, I'm not overly optimistic we're going to be able to do

that by the time that Your Honor just indicated the Court would no longer be available today.

And so, you know, again, we committed to do that, I'm willing to go do that in the hall right now, but at the end of the day I think where we're probably going to be is that, you know, we're going to need to set this for a hearing at a later time and really give the parties some more time to talk about the order and the other issues.

THE COURT: Okay.

MR. MUENKER: Thank you, Your Honor.

THE COURT: All right. Thank you. Let's see, who would like to go next? I'll come back to you. Mr. Muzzi.

MR. MUZZI: Your Honor, Christopher Muzzi on behalf of Modern Management Services. Just real briefly, Marriot brought up about their concern about Modern being in there and managing the company, and we understand their position, but Modern is not opposing their motion for relief from stay. The Debtor's making the call as to what property they believe is the Debtor's and what is Marriott's. Modern is assisting with the transition to them as the manager and has no intent or desire to obtain Marriott's intellectual property.

And I think based on what's been announced to the Court today with respect to the motion to quash that we filed that, you know, setting the matter out for hearing and a reasonable discovery schedule will address many of the concerns

that were raised in the motion to quash. Thank you.

THE COURT: Okay. Thank you. Ms. Didion.

MR. KLEVANSKY: Your Honor, excuse me.

THE COURT: Yes.

MR. KLEVANSKY: May we have just a couple more minutes to -- to comment on the opening of the case, and then we can resume giving counsel a chance to speak to the existing motions?

THE COURT: Sure.

MR. NELIGAN: Your Honor, Pat Neligan for the Debtors. And I just wanted to address at least one aspect of your comments that -- when you talked about the -- the lack of the cash collateral motion and -- and general first day pleadings.

In mere respects, this is a very straightforward case. We have two Lenders, we have defaults to both Lenders, we have operating losses that hopefully we'll be able to -- to turn around during the Chapter 11, we have contracts we're going to need to reject, not just Marriott's.

That said, where this is different from almost any Chapter 11 I've had is that with the transition, and again I'm not here to ascribe blame, you know, bank accounts were frozen, the computers were frozen, the mail, we learned today, has not been coming to us, because it had been frozen, supposedly pursuant to Marriott's instructions, but, you know, we had tried to work with Marriott and -- and their counsel, and we have gotten some information from them, and -- and hopefully we can

just work this through.

There was a temptation to try to come in on the first day, but we -- we were hoping that we could just have the lawyers work through these issues. Nonetheless, without that information, it became very difficult to get typical first day pleadings.

For instance, on utilities, we've literally had to call utility companies and -- and, you know, find out who was providing utilities, what our average billing was, so we could come up with the -- the deposits.

And -- and with respect to cash collateral and DIP financing, as the Court can imagine, without financial records coming up with a budget going forward is challenging, at best. We had gotten a lot of that financial information, or at least some of it, as I understand, and we have been able to come up with budgets, and -- and we're in the process of completing the first stage.

As Mr. Muenker mentioned, when this case started there was literally no cash collateral with the bank accounts having been closed. The Davidson Family Trust, which is the second lien holder, advanced $250,000 subject to the Debtor's and -- and Davidson requesting that the 250,000 be part of the initial interim financing. They advanced that money in good faith.

I will tell you I had hoped to file the cash collateral motion and DIP financing motion yesterday. We held

it up, frankly, because I wanted to work through with the first lien holder, Wells Fargo, some of the issues on cash collateral. They had just hired counsel late Friday, and so we've been working with them over the weekend and even this morning.

I was hoping to file the motion today, and we have several other pleadings like an employee motion that will also be getting filed. There has been a delay that you would not otherwise see, but as I think the Court understands in any kind of transition without the information, financial information, it becomes much more difficult. Hopefully, we get all the financial information, we resolve the issues with Marriott and proprietary information, and this case can -- can move forward in what I hope is a consensual or at least hopefully consensual approach.

In any event, I -- I did want to explain that because the Court's concern, I think, is valid, and certainly if I were other side I would wonder where those pleadings were.

THE COURT: Okay. All right. Thank you. Ms. Didion.

MS. DIDION: Good afternoon, Your Honor. In terms of just the overall case administration and where we are with things, the 20 largest lists finally got filed last night. The U.S. Trustee was able to send out its solicitation letters this morning and hopefully we will be able to form an Official Unsecured Creditors' Committee in this case.

We have yet to set a date for the initial Debtor

interview. We are hoping to wrap that up here in the next few days. People that we need to have at the initial Debtor interview are unfortunately on the mainland right now. So we're hoping to have a date here set quickly.

In addition, I have not set the 341 meeting yet and hopefully at the initial Debtor interview we will be able to get that date worked out with counsel, so we can get that set and a notice out to Creditors.

In terms of the employment applications, the U.S. Trustee has no objection to the employment of counsel both in Dallas and local, and I did have a conversation with Mr. Klevansky about the orders and the orders for employment are going to be pursuant to 327(a). And so, just to clarify that on the record.

THE COURT: Okay. Good.

MS. DIDION: Lastly, with regard to the cash management system and the bank account, the U.S. Trustee does need to spend a little bit more time reviewing this motion. We've got eight bank accounts that had been disclosed pursuant to this motion. I don't know if there's other bank accounts that we need to be concerned with that may be controlled by Marriott or perhaps another entity. Nine times out of ten, normally these -- these large cases we have a prefiling meeting and these kinds of issues are vetted before the case is even filed, so we know exactly which accounts need to be Debtor-in-

possession accounts.

We're not sure, right now, which accounts need to be converted to Debtor-in-possession accounts, which accounts may have funds in them that may not be property of the Estate. So, again, those are things that we need to have some time and have a conversation with Debtor's counsel about.

So the U.S. Trustee would like to have some more time with this motion. To the extent that the Court enters any sort of order today, I would request that it just be an interim order subject to a final hearing.

THE COURT: Okay. What I -- what I had in mind was basically the interim order would say for the time being no accounts have to be changed, not that I'm really even approving what they are, but they don't have to be changed right now.

MS. DIDION: And -- and that would be fine with the U.S. Trustee's Office. To the extent that we have any dispute over any of the accounts that we deem need to be changed and the Debtor opposes doing so, then we can bring those issues back before the Court at a final hearing.

THE COURT: Right. Right.

MS. DIDION: All right. Thank you.

THE COURT: Okay. All right. Thank you. Let's see, who's -- who's next? I guess I haven't heard from the -- from Ms. Fenning's group. Anything from the Davidson Trust?

MS. FENNING: Your Honor, we just want to confirm that

we are ready, and willing, and in a position to fund the Debtor-in-possession financing. We've been working closely with the Debtor and will continue to do so, but obviously we were expecting and are intending that that initial advance that has been tiding over the operation of the hotel be folded into the DIP financing.

THE COURT: Okay. All right. Before I go back to Mr. Feld, is there anybody else I have missed? Okay. Apparently not. Go ahead.

MR. FELD: Okay. Thank you, Your Honor. I'll be very brief. Just to respond to a small number of things on the stay relief motion and the subject of cash collateral as well.

Mr. Muenker made the statement that the cat was already out of the bag, so there was no urgency. Not a direct analogy, but if someone is robbed I don't think it's a reason not to call the police because the loss was already suffered. The -- the problem is that the -- despite maybe the purest intentions of the -- of the new management company, the proprietary materials are there in the hands of the new management company, and we feel it's -- it's urgent that something be done to secure it, and we will -- we're committed to working with them on an order.

Hopefully, we will arrive at an understanding with them tonight, if not by the -- by the time the Court closes tonight we'll -- we'll continue working with them and maybe

provide the Court with something first thing in the morning, but we hope to tonight.

On some of the additional comments Mr. Muenker made, he referred to quite a large volume of boxes that were taken out during the walk through. The vast majority of those boxes were t-shirts and souvenir logo items. They weren't books and records, they weren't financial data, they weren't the proprietary materials other than having the logo of the -- of the name of the hotel on them.

Finally, the -- there was a -- he made a statement that computer files were deleted and hard drives were retained. What -- what he didn't say is everything that was deleted and everything that was retained were copied, because they were disputed items, and there are copies remaining with the Debtor and with the new management company of everything that was either copied, or removed, or deleted.

And, again, we -- we understand that the Debtor doesn't agree on the exact wording of the order. It's not a particularly longer detailed order, but we'll work with them to stick as closely as we can to the management agreement, but I -- I need to emphasize again that because of the uniqueness of this so-called transition or we'll call it the -- the 2:30 a.m. lockout, there really does need to be some guidance here even if there's not l00 percent agreement on -- on what the management agreement -- how the management agreement is interpreted. Those

-- those -- those rights can be reserved to have that neutral third party look at it and make determinations.

And, finally, there were some comments that Mr. Neligan made on cash collateral where I -- I believe he implicated that they haven't been able to file any kind of cash collateral agreement, or motion, or request for use of it, because they're in need of financial records.

Your Honor, they have everything for two reasons. I mean, Marriott, as the management company, was the party that was put out on the street at 2:30 a.m. Every -- all the records, all the financials were left behind and that's what we're trying -- as far as the portion of that that's proprietary that's what we're trying to recover, but they have everything. It's sitting in the hotel. And to the extent they had trouble finding anything we came back, and we provided them with -- with hard copies, multiple boxes of payables, information, accounting information, multiple boxes of future reservations. So they have that.

And another thing to point out, Your Honor, is that about a month prior to the bankruptcy filing and the management transition, at the request of Debtor's litigation counsel there was a very comprehensive books and records review that was conducted and notably this was after the time that the special purpose entity that was formed for the new management company was already formed.

So, as we learned after the fact, when that books and records review is being conducted this -- this strategy for the -- the early morning transition was probably already in place, at least there was a -- there was a decision at that point to transition to a new management because the -- the management company vehicle was already formed.

So we'll -- we'll continue to cooperate, and we certainly don't want to deprive them of anything they need to run their business, but it's somewhat -- they're turning things on its head to say that they are -- they've been deprived of anything or don't have anything they need.

THE COURT: Okay. All right. We'll let's -- let's do this. It's -- it's just about exactly 3:00 o'clock now. If you'd like we could take a recess and see if you can work something out between now and 4:00 o'clock, and it sounds like that may be ambitious, but if you can do it, so much the better. If not, you can come back tomorrow morning. Perhaps you can just submit a proposed order tomorrow morning. That would be fine. Just -- let's take a recess, and you can work it out in the anteroom for a while and at about 3:45 we'll check back with you and see where things stand.

The one thing I did want to mention, in terms of the neutral third party, if you want to -- if you want to bring things in and have a sort of judicial resolution even on a short fuse basis, I'm happy to do that.

I'm -- I'm reluctant even with the consent of all parties to serve as the settlement judge in the case where I'm also the trial judge. If there's something sort of in between I would be willing to think about what you have in mind. If you'd like me to discuss the matter with Judge King, see if he's willing and available to act in another role I'd be happy to do that.

So I guess those are the range of possibilities you might want to think about if you're looking for a short forum decision maker.

MR. FELD: Okay. Thank you very much. We would very much appreciate that, Your Honor. We'll discuss that.

THE COURT: Okay. So let's just take a recess now until 3:45, and we'll see where you are.

THE CLERK: All rise. This Court stands in recess until 3:45.

(At which time a recess was taken until 3:40 p.m.)

THE CLERK: All rise. Bankruptcy Court is once again in session. Please be seated.

THE COURT: All right. Mr. Feld.

MR. FELD: Thank you, Your Honor, Alan Feld again for Marriott. Unfortunately, Your Honor, the Debtor has decided not to engage with us in any further discussions on this. They -- they do not want to reach resolution on a consensual order right now.

THE COURT: I'll give you a chance. Have a seat.

MR. FELD: Your Honor, in light of that there is a great concern that if this is put over to a final hearing for everything to be resolved that we're materially prejudiced every day, every hour by that. What we would suggest and, of course, the Debtor will have an opportunity to respond to this, is a very basic interim order.

If the Court would be willing to entertain it, just acknowledging that -- just referring to the management agreement by name, acknowledging that what's identified and agreed to in the management agreement as proprietary and confidential shall be turned over, what's disputed shall be secured pending a final hearing, and we would even stipulate to the provision of certain key information that we acknowledge the Debtor needs to operate, such as accounts receivable, accounts payable, future individual reservations, immediate group and event reservations pending between now and the time of a final hearing, anything else that we -- we -- that -- that the Debtor reasonably requests is -- is necessary to operate, and then we -- we would take the Court's direction whether a third party would be appointed to resolve any disputes or disputes would simply be resolved at a final hearing.

And, of course, we would be willing to come back at the earliest opportunity that the Court could accommodate us, but we're extremely concerned about is that if we don't leave

here with at least some interim protection today, we -- we lose by the clock running. And that -- there's tremendous urgency in that, because as things stand now it's very easy for the Debtors to say, no, they can't reach a deal with us, we're not going to have a consensual order because when the clock hits 4:00 o'clock they win by default because the information is with them. The information is with the new management company notwithstanding the -- the -- the purity of their intentions and everything.

And it's -- it's -- what I think would be extremely unfair, even if that isn't the intended result, would be for -- would be for -- for us to walk away and have to come back in several days, several weeks, however long it might take without any kind of safeguards imposed.

So we -- we would -- we would be willing to come up with a one page order. We'd be willing for the Court -- we'd be delighted if the Court preferred to craft its own order, but something along these lines just to safeguard disputed information on an interim basis, and then we'll -- we'll come back and proceed as however Your Honor would desire.

THE COURT: Okay. All right. Mr. Muenker.

MR. MUENKER: Thank you, Your Honor. Obviously, you could tell by my reaction that I had a problem with something that Mr. Feld said, and I'm not normally shocked when opposing counsel makes their argument, but we were actively negotiating with Mr. Feld. We were prepared to continue talking with him

until 3:45 as the Court had indicated.

Mr. Feld said if we didn't make a decision within five minutes he wanted to come back and -- and get the Court on the bench, so that he could continue making his arguments. So that was just -- couldn't have been further from the truth.

The issue -- Your Honor, we certainly don't have a problem with the Court setting a final hearing and -- and think that probably makes the most sense.

The issue with respect to the interim order is, of course, like the issues that we've had with Mr. Feld about his proposed order, what would that order say, because there is a fundamental question here as to, you know, what is their property. And ultimately that is something that this Court, you know, will have to decide. That is something that really isn't appropriate for a motion for relief from stay. It really procedurally has to be brought in a different way.

And so, I -- you know, I -- I suspect that there may be further arguments on that issue in the future when this is continued.

My hope is that the parties are going to continue doing what they're doing and work this out consensually. The problem is because -- and I understand why they did it, but because they've sought this emergency relief, and we've been set on short notice, we haven't been provided much opportunity at this point, although we've made, I think, the most of the

opportunity and the time that we've had and will continue to do that.

But going back to the point, you know, whatever order that I can envision that the Court would craft that would satisfy what Mr. Feld really wants is simply going to refer to a category of -- of information. It will not define whether a specific piece of information, and there's really no ability to do that this afternoon or probably tomorrow morning, you know, to go through all of the various permeantations of -- of -- of, you know, what types of information might fall within a specific category and, therefore, whether or not it would fall within the definition that Mr. Feld, you know, would argue is proprietary and confidential.

And what Mr. Feld wants the Debtor to do, and the reason why we're having such a hard time agreeing on how to safeguard that information, is he wants all of that stuff taken off the property and that obviously he's going to have a huge disruptive effect on the Debtor's ability to continue to operate its hotel and service its guests.

And so, you know, I'm certainly willing -- if the Court has specific concerns to talk about specific issues and -- and try to work through a way that we can address those -- those concerns, but practically speaking I think it's going to be very difficult to do that.

THE COURT: Okay. All right. Okay. Mr. Feld.

MR. FELD: Your Honor, again, we -- we would be willing to work with the Debtor in any practical solution. If the Court believes it’s the best way to proceed we could be back here first thing tomorrow morning to work through all the categories. We have witnesses. Albeit we don't -- we didn’t have the ability to take depositions prior to this we'd be willing to present evidence on all of the categories we're talking about.

A suggested road map for that might be the -- the form of the order that we drafted where each of the -- Marriott and the Debtor can go through category by category, and make their arguments to the Court of why this should apply or shouldn't apply. We -- we could -- if the Court has the time to accommodate us, we could through line by line.

We -- we don't think there is a practical problem -- I mean what I'm suggesting as a fall back with the hearing tomorrow is in effect advancing the final hearing until tomorrow morning. We do think an interim solution is something that is workable, and we're committed to working with the Debtor. We've never been unreasonable in this. We -- we -- we -- the last thing we want to do is disrupt their operations. To the extent there's urgent need for certain types of information, and I'm glad to go into more detail right now of what we'd be willing to provide them which we think is -- is more than the entire universe of everything they need, we would -- we would be very,

very willing work with them.

There's five categories of information we've offered, and I -- I don't want to get into an argument with the Debtor about the five minute comment and accusing Marriott of -- of lying, but the truth is we were back here about 3:45 after -- after having some discussions that just didn't go anywhere. There was no material difference in the time.

But the categories of information, Your Honor, that we'd be willing to provide to the Debtor that -- that Marriott, through its experiences believes that are necessary to operate the hotel, is all future individual reservations is the first category.

The second category would be all accounts payable, excluding only Marriott internal billing, which -- which does have proprietary Marriott and Loyalty Program information in it. So all outside external accounts payable, that is.

The third category would be a complete list -- complete list of all hotel vendors of all kinds, all suppliers, and all vendors.

The fourth category would be a complete list of all accounts receivable, of all kinds and all sources.

The fifth item would be contracted group and event bookings that are confirmed for the interim period between this hearing, and the entry of an interim order, and the final hearing or even some reasonable period beyond that final

hearing, so that the -- the Debtor is able to conduct its business. A suggested timeframe might be 30 days for that, to provide all that information for the next 30 days.

And an accommodation to try to get something simple and straightforward accomplished, Your Honor, we -- Marriott would even agree to a catchall of all non-proprietary information of all kinds.

So if we -- if we could get a very simple order fashioned to protect what -- what is agreed as protected under the management agreement, with the parties coming back for a final hearing and, hopefully, Your Honor, with some time in between that maybe that we work through all these issues. There's -- despite some of the words we've had today, there has been a lot of effort on both sides, and I think Mr. Muenker just expressed in continuing to work with us. We're absolutely committed to working with them, nights, weekends, whatever time we need to work through this, so we could hopefully get this completely resolved and -- and take it off Your Honor's calendar. I think we have much bigger issues to deal with once this is resolved.

And if we could get the piece of mind of this interim protection that we think is so -- so critical and so urgent, it allows us and our client to sleep at night while this is being sorted out first consensually, hopefully; and, secondly, back before Your Honor at a final hearing if need be, but it's what

we -- the result our client can't really bear is -- is seeing this put off and to see all the confidential information remaining in the hands of the Debtor and the -- and the new management company to the exclusion of Marriott.

THE COURT: Okay. Okay. Well, here's -- here's what I think should happen. I don't think having an evidentiary hearing at some time tomorrow would -- would be a good idea. You know, it's not a matter of -- of my schedule or my work, it's a matter of having a hearing that everybody's prepared for and is likely to result in -- in an intelligible result.

And just one example, the management agreement itself, I don't think is part of the record in the case yet. There have been portions of it quoted, but the agreement itself isn't -- isn't really before me. So I don't think it would be particularly productive to have a full-on hearing tomorrow, or the next day, or in the next few days.

I do think that it is appropriate to have some kind of a interim order providing adequate protection of Marriott's claimed interest in these items. And in the absence of adequate protection, the Debtor doesn't get to use the property, the property of the Estate let alone property of somebody else. So I think Marriott has a reasonable point in needing some kind of -- of order to get us from now to a final hearing.

Now, there's a further question of whether a final hearing on a motion for relief from stay could once and for all

resolve the ownership issues, but I have a feeling there's enough clever people around here you'll find a way to -- to tee the issues up properly, as rapidly as they could be -- be teed up.

So I do think there has to be some kind of interim order put in place. And what I'd like you to do is work on it this evening and -- and come back tomorrow. And if you want give me two competing proposals for an order, if you can't agree on something, I'll pick one or come up with my own, but I don't think we should go beyond, you know, say tomorrow unless both people agree that we should go beyond tomorrow without something in the nature of an interim order.

And then also tomorrow we could talk about the schedule for the final hearing, the hearing on the motion to project the contract, whatever issues there are about discovery, and so forth.

And I -- I think we should all be prepared for the reality that the interim order is not going to define everything with -- with great precision. There will be -- there will be categories, there may be catchalls, one way or the other or both ways. It's more of an effort to get some basic principals down that we can all live with over the next period of time.

And I think also this needs to be looked at in -- in context. I remain -- I understand that we do have the potential DIP Lender at least willing and the cash collaterals in the

works and so forth, but we really are behind where we ought to be in a Chapter 11 case at this point, and I think to be fair that's largely because the Debtor chose to do what it did about ten days ago. I'm not saying whether that was right or wrong, or smart or not, but that is the event that has put us into this situation where events are running faster than anybody seems to be able to keep up with them.

And I think to be fair; the Debtor has to recognize that that was a risky decision, even if it turns out to be a right decision.

So tomorrow the only thing in court is we have videoconference hearings at 1:30 in Guam. Well, I'll be here. The hearings will be in Guam. You want to come back at 9:30? You want a little more time in the morning? What's your preference?

MR. KLEVANSKY: Can we take a moment and let them confer, Your Honor?

THE COURT: Of course.

MR. MUENKER: Would 11:00 o'clock be okay, Your Honor?

THE COURT: I think so. Madam Clerk, is that --

MR. FELD: Your Honor, if we could have just one moment?

THE COURT: Sure. Of course, yes.

MR. FELD: Your Honor, the only concern, excuse me; let me come to the microphone. Your Honor, the only concern is

that the parties are clearly going to use their best efforts to try to come with a fully consensual order tomorrow. The only concern is if we're unable to do that, and we have to fashion something together in -- in court at Your Honor's suggestion. Would an 11:00 o'clock hearing allow enough time for that before -- given the lunch hour and given your afternoon hearings, or would it be better to start a little bit earlier?

We'll certainly -- we're going to work on this tonight late into the evening there's no question. The Debtor's counsel thought that we might want a little time tomorrow morning as well, but we're -- we're very sensitive to the Court's time and having enough time in front of you to --

THE COURT: Well, see I get to eat up here if I want. So maybe that's the way to get you guys to agree to something. I could sit here and eat, and you guys won't be.

MR. MUENKER: We're happy with 9:30, we're happy with 10, we're happy with 10:30, we're happy with 11.

THE COURT: Let's make it 10:30. Let's make it 10:30 and that way you've got, you know, tonight, a few hours in the morning, an hour and a half or two hours before the normal lunch hour, and we'll see where we are.

MR. FELD: Okay. That's -- that's perfect, Your Honor. Thank you very much for accommodating us.

THE COURT: Okay. 10:30 tomorrow then. Okay. And that -- by the way just to confirm that will be non-evidentiary

hearing, simply to work on an interim order, and to set a schedule for the remaining matters.

MR. KLEVANSKY: Your Honor -- oh, sorry.

THE COURT: Yes.

MR. KLEVANSKY: May we submit interim orders on the matters that the Court, I think, viewed as either uncontested or determined on an interim basis?

THE COURT: The -- the only hesitation I have is those need final hearings also and perhaps -- let's just talk about an overall schedule tomorrow. I mean I think you can -- you can continue to operate overnight without a written order. You know, so -- so let's -- let's -- since we'd have a blank in those orders in any event let's take those up tomorrow.

MR. KLEVANSKY: That would be fine, Your Honor. Thank you.

MR. FELD: Your Honor, just one last question on process.

THE COURT: Yes.

MR. FELD: If -- hopefully we are able to reach an agreement, but if we're not would -- Your Honor mentioned that we -- the Court would take a look at two competing orders. Would it be okay just to bring that with us to hearing and -- as opposed to filing them and just --

THE COURT: Yeah, that's -- that's fine. We could take a break if I need some time to read it. And, you know, if

we end up that way it ought to be something short. You said a page. I'm not going to hold you to that literally because the caption's half a page, but -- but if it turns out to be something that I'm basically coming up with it probably needs to be shorter rather than longer in any event. So that would be fine.

MR. FELD: Yeah, we -- we -- we take that -- we certainly take that to heart, and our -- our preference is to go very short as well. Thank you again.

THE COURT: Okay. Thank you. Court's in recess.

THE CLERK: All rise. Court stands in recess subject to call.

(At which time the above-entitled proceedings were concluded 4:00 p.m.)

CERTIFICATE

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated this 13th day of September, 2011.

/s/ Jessica B. Cahill

Jessica B. Cahill