# Exhibit T

```
 1                     UNITED STATES BANKRUPTCY COURT
                        FOR THE DISTRICT OF HAWAII
 2
       IN RE                          )    Case No.  11-02371
 3                                    )    (Chapter 11)
                                      )
 4     M WAIKIKI LLC,                 )
                                      )    September 26, 2011
 5                  Debtor.           )    10:48 a.m.
       _____)
 6
       TRANSCRIPT OF CONTINUED HEARING MOTION FOR AUTHORITY TO MAINTAIN
 7       EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS; MOTION TO
          PROHIBIT UTILITIES FROM ALTERING OR DISCONTINUING SERVICE;
 8         APPLICATION TO AUTHORIZE EMPLOYMENT OF DIP COUNSEL AND
       CO-COUNSEL; HEARING ON CASH COLLATERAL; MOTION AUTHORIZE DEBTOR
 9       TO HONOR PRE-PETITION CUSTOMER OBLIGATIONS NUNC PRO TUNC;
       MOTION FOR AUTHORITY TO PAY PRE-PETITION GE TAXES AND TRANSIENT
10     ACCOMMODATION TAXES; MOTION TO ESTABLISH COMPENSATION PROCEDURE
                      BEFORE THE HONORABLE ROBERT J. FARIS
11                    UNITED STATES BANKRUPTCY JUDGE

12

13     APPEARANCES:

14     For DEBTOR:                    KLEVANSKY PIPER, LLP
                                      By:  SIMON KLEVANSKY, ESQ.
15                                    841 Bishop Street, Suite 17097
                                      Honolulu, Hawaii 96813
16
                                      NELIGAN FOLEY LLP
17                                    By:  PATRICK J. NELIGAN, ESQ.
                                           JAMES P. MUENKER, ESQ.
18                                    325 N. St. Paul, Suite 3600
                                      Dallas, Texas 75201
19
       For MODERN MANAGEMENT          MOSELEY BIEHL TSUGAWA LAU & MUZZI
20     SERVICES, LLC:                 By:  CHRISTOPHER J. MUZZI, ESQ.
                                      1100 Alakea Street, 23rd Floor
21                                    Honolulu, Hawaii 96813

22     Transcriber:                   Jessica B. Cahill
                                      P.O. Box 1652
23                                    Wailuku, Maui, Hawaii 96793
                                      Telephone: (808)244-0776
24
       Proceedings recorded by electronic sound recording, transcript
25     produced by transcription service
26
```

```
 1   APPEARANCES CONTINUED:

 2   For MARRIOTT INTERNATIONAL,      RUSH MOORE LLP
     INC. and MARRIOTT HOTEL         By:  SUSAN TIUS, ESQ.
 3   SERVICES, INC.:                 737 Bishop Street, Suite 2400
                                     Honolulu, Hawaii 96813
 4
                                     SHEPPARD MULLIN RICHTER & HAMPTON
 5                                   By:  ALAN M. FELD, ESQ.
                                     333 South Hope Street, 43rd Floor
 6                                   Los Angeles, California 90071

 7   Appearing telephonically        JENNER BLOCK LLP
                                     By:  LINDSAY C. HARRISON, ESQ.
 8                                   1099 New York Avenue, N.W.
                                     Suite 900
 9                                   Washington, D.C. 20001

10   For ROBERT M. DAVISON and       ARNOLD & PORTER LLP
     JANICE G. DAVIDSON, as          By:  LISA HILL FENNING
11   Trustees of the Davidson        777 South Figueroa Street
     Family Trust dated              44th Floor
12   December 22, 1999, as           Los Angeles, California 90017
     amended:                        Appearing telephonically
13
                                     CARLSMITH BALL LLP
14                                   By:  TOM E. ROESSER, ESQ.
                                          WILLIAM M. HARSTAD, ESQ.
15                                   1001 Bishop Street, Suite 2200
                                     Honolulu, Hawaii 96813
16
     For WELL FARGO BANK, NA:        STARN O'TOOLE MARCUS & FISHER
17                                   By:  SHARON V. LOVEJOY, ESQ.
                                     733 Bishop Street, Suite 1900
18                                   Honolulu, Hawaii 96813

19   For U.S. TRUSTEE:               OFFICE OF THE U.S. TRUSTEE
                                     By:  TERRI DIDION, ESQ.
20                                   1132 Bishop Street, Suite 602
                                     Honolulu, Hawaii 96813
21
     For OFFICIAL COMMITTEE OF       WAGNER CHOI & VERBRUGGE
22   UNSECURED CREDITORS:            By:  JAMES A. WAGNER, ESQ.
                                          CHUCK C. CHOI, ESQ.
23                                   745 Fort Street, Suite 1900
                                     Honolulu, Hawaii 96813
24

25
26
```

```
 1   APPEARANCES CONTINUED:

 2   For R.D. OLSON CONSTRUCTION     GOODSILL ANDERSON QUINN & STIFEL
     AND THE ROBERT D. OLSON         By:  WALTER C. DAVISON, ESQ.
 3   CORPORATION:                    Alii Place, Suite 1800
                                     1099 Alakea Street
 4                                   Honolulu, Hawaii 96813

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  SEPTEMBER 26, 2011                            10:48 A.M.

 2           THE CLERK:  All rise.  Bankruptcy Court is now in

 3  session.  Please be seated.

 4           Case 11-02371, M Waikiki LLC.  This case is called for

 5  a hearing on various matters.  And, Your Honor, there's counsel

 6  on line.  We'll start with Ms. Fenning.

 7           MS. FENNING:  Yes, Your Honor, Lisa Fenning, Arnold

 8  and Porter, on behalf of the Davidson Trust, the DIP Lender.

 9           THE CLERK:  Thank you.  Ms. Harrison.

10           MS. HARRISON:  Yes, Your Honor, thank you.  This is

11  Lindsey Harrison from Jenner and Block, litigation counsel for

12  Marriott Hotel Services and Marriott International, Inc.

13           THE CLERK:  Thank you.  Mr. Herron.  Is there a Mark

14  Herron on line?

15           MS. FENNING:  Mr. Herron is on listen only, he is the

16  DIP Lender.

17           THE CLERK:  Thank you.  Mr. MacCoby.

18           MS. FENNING:  Mr. MacCoby is also with my office, and

19  he is also representing the DIP Lender.

20           THE CLERK:  Thank you.  And, Your Honor, those are the

21  telephone participants.

22           THE COURT:  Okay.

23           MR. MUENKER:  Good morning, Your Honor, James Muenker

24  of Neligan Foley on behalf of the Debtor.

25           MR. KLEVANSKY:  Good morning, Your Honor, Simon
```

1   Klevansky and Alika Piper appearing on behalf of the Debtor.

2          MR. ROESSER:  Good morning, Your Honor, Tom Roesser

3   appearing on behalf of the Davidson Trust, the DIP Lender.

4          MR. MUZZI:  Good morning, Your Honor, Christopher

5   Muzzi on behalf of Modern Management Services LLC.

6          THE COURT:  All right.

7          MR. DAVISON:  Good morning, Your Honor, Walter Davison

8   for Secured Creditor R.D. Olson Construction Incorporated and

9   Robert D. Olson Corporation.

10         MR. WAGNER:  Your Honor, James Wagner and Chuck Choi

11   appearing for the Creditors' Committee.

12         MS. TIUS:  Good morning, Susan Tius, Hawaii counsel

13   for Marriott International, Inc., and Marriott Hotel Services,

14   Inc.

15         MR. FELD:  Good morning, Your Honor, Alan Feld and

16   Gina Giang of Sheppard Mullin as bankruptcy counsel for the

17   Marriott entities as well.

18         THE COURT:  All right.

19         MS. DIDION:  Good morning, Your Honor, Terri Didion

20   for the U.S. Trustee's Office.

21         MS. LOVEJOY:  Good morning, Your Honor, Sharon Lovejoy

22   for Wells Fargo, NA, as Trustee.

23         THE COURT:  All right.  Okay.  Go ahead.

24         MR. MUENKER:  Thank you, Your Honor.  Notwithstanding

25   the flurry of filings this morning, I think we actually have a

1    consensus, or agreement, or at least no objection on a large

2    portion of the matters that are set for hearing this morning.

3            We had filed an agenda with the Court this morning,

4    and if the Court would permit, I'll just kind of take them up

5    one at a time --

6            THE COURT:  Go ahead.

7            MR. MUENKER:  -- and maybe we'll be able to cross off

8    the first six of these without too much discussion.

9            THE COURT:  All right.

10           MR. MUENKER:  The first one is the application for an

11   order authorizing the retention and employment of my firms as

12   counsel to the Debtor.

13           We had an interim hearing on that, I believe, on

14   September 7th.  There's been no objection filed to that

15   application, so we would ask that the Court enter a final order

16   authorizing our retention.

17           THE COURT:  Okay.  Anybody wish to be heard on the

18   application to retain Neligan Foley?  Apparently not.  I'll

19   grant that on a final basis.

20           MR. MUENKER:  Thank you, Your Honor.  The second

21   matter on the agenda this morning is the application for an

22   order authorizing the retention of Mr. Klevansky's firm as co-

23   counsel to the Debtor.

24           Also, there's been no objection to that application,

25   and we'd ask the Court to enter an order approving that on a

1   final basis.

2           THE COURT:  All right.  Anybody wish to be heard on

3   the application to retain Klevansky Piper?  Apparently not.

4   That will be granted on a final basis.

5           MR. MUENKER:  Thank you, Your Honor.  The third matter

6   on the agenda is a motion for an order establishing procedures

7   for interim compensation and reimbursement of expenses of

8   professionals.

9           There was one limited objection that was filed this

10  morning by the Committee on that.  The procedures that were

11  proposed contemplated upon circulation of the billing statements

12  on a monthly basis and, absent an objection, the Debtor would be

13  authorized to pay up to 85 percent of fees and 100 percent of

14  expenses.

15          The Committee has suggested that that ratio be changed

16  to 80 percent of fees and 100 percent of expenses.  That change

17  is acceptable to the Debtor.  And so, with that change we're

18  certainly happy to move forward on that motion.

19          There was one other minor issue that was raised in

20  their limited objection and that was whether or not the expenses

21  of committee -- individual Committee Members would also be

22  subject to reimbursement under these procedures.

23          That issue is going to be raised in connection with

24  some discussions that we're going to have on the DIP financing

25  motion, and I think in my discussions with Committee counsel,

```
 1    what we agreed to do is, you know, however that's ultimately
 2    resolved when we have that later discussion we'll agree to treat
 3    it that way in connection with this application as well.
 4           THE COURT:  Okay.  Anybody wish to be heard on the
 5    compensation procedures application?
 6           Okay.  I'll grant that with the Committee's agreed
 7    upon adjustment.  I would point out, which I don't think needs
 8    to be put in an order, that this procedure is generally okay as
 9    long as people are reasonably confident that the case is
10    administratively solvent.  And if anybody gets concerned the
11    case is not administratively solvent, then it's the
12    responsibility of everybody to stop taking the interim draws.
13           MR. MUENKER:  I understand, Your Honor.
14           THE COURT:  Okay.  Thank you.  So with that the order
15    -- the motion is granted.
16           MR. MUENKER:  Thank you, Your Honor.  The fourth
17    matter is a motion by the Debtor, authorizing the Debtor to
18    honor pre-petition customer obligations nunc pro tunc to the
19    petition date.
20           This relates to the ability, at the Debtor's
21    discretion, to honor its pre-petition guest reservations and
22    deposits that -- that customers or perspective guests may have
23    posted with the Debtor.
24           There was a limited objection that was filed by
25    Marriott to this motion.  I'll certainly let Mr. Feld speak for
```

1    their position, but my understanding of their -- of that

2    objection is that they just wanted to clarify that they have

3    made a proposal to the Debtor with respect to the turnover of

4    funds that were in the Hotel management accounts that they

5    previously maintained.

6            Those funds haven't been turned over yet, but we hope

7    to be able to work through those issues with them and get those

8    funds turned over.  And I think the objection was primarily

9    limited to some characterizations of facts in our motion and

10   bringing the Court's attention to that fact.  Otherwise,

11   substantively, I don't believe they have an objection to the

12   relief that we were seeking.

13           THE COURT:  Okay.  Mr. Feld.

14           MR. FELD:  Yeah, thank you, Your Honor, Alan Feld for

15   the Marriott entities.  That -- that characterization is largely

16   correct.  Mainly we wanted to point out, Your Honor, that the

17   way the management agreement works and the accounts maintained

18   by Marriott were functioning is that there -- there is no

19   segregation of specific deposits, but there is -- there is money

20   in and money out on a daily basis.

21           For example, the -- the large deposit for the Russian

22   Delegation.  When it came in, all of those dollars may have been

23   paid out within a few days to pay down operating expenses, but

24   new money came back in.

25           And the -- the practical reality is that there's

1  money, fortunately, in the accounts that Marriott is holding to

2  cover that -- that particular expense, and -- and some others,

3  and we -- we have, just late last week, provided a proposal to

4  the -- to the -- to Mr. Muenker, as well as the Committee, and

5  the two Secured Lenders for turnover of that.

6       It would involve some reservation of rights, but we --

7  we're putting in front of everything the -- the Debtor's need to

8  have the cash and as long as rights can be preserved, to some

9  extent, and the Committee and the two Secured Lenders sign off

10 on it, we're -- we're competent we'll have an arrangement where

11 -- where all the money in the accounts that Marriott is -- is

12 holding would be turned over to the Debtor, and they -- they

13 would sort out -- sort it out as they see fit from there.

14       THE COURT:  Okay.

15       MR. FELD:  But we don't -- we don't object

16 substantively to the granting of the motion.

17       THE COURT:  Okay.  All right.  Anybody else wish to be

18 heard on the motion concerning the pre-petition customer

19 obligations?  Okay.  So I'll grant that motion.

20       MR. MUENKER:  Thank you, Your Honor.  The next matter

21 on the agenda is the motion for interim and final orders

22 prohibiting utilities from altering, refusing, or disconnecting

23 service, and determining adequate assurance of payment for

24 utility services.

25       No objection has been filed to this motion, Your

 1  Honor.  I can report that we've been in discussions with a

 2  number of utilities, have reached an agreement, I think, with

 3  substantially all of them in terms of what the amount of the

 4  adequate assurance deposit is going to be.

 5          And so, with no objection being filed we'd ask that

 6  the Court approve that application as well on a final basis.

 7          THE COURT:  All right.  Anybody else wish to be heard

 8  on the utilities motion?  Apparently not.  That's granted.

 9          MR. MUENKER:  Thank you, Your Honor.  The next matter

10  is the emergency motion for authority to maintain existing cash

11  management system and bank accounts.

12          There were a couple of questions that the U.S. Trustee

13  had had about how some of these bank accounts operated.  I'm

14  pleased to report that we've worked through all the issues with

15  them.  We've reached an agreement with the U.S. Trustee,

16  pursuant to which I think some of these accounts are going to be

17  closed, and then the other ones will be designated as DIP

18  accounts, but that agreement will be reflected in -- in the form

19  of an order that will submitted that -- that incorporates the

20  agreement that we've reached with the U.S. Trustee's Office.

21          Aside from those issues, I don't think there's been

22  any objection or -- or any other concern expressed, and so we'd

23  ask the Court to enter a final order on that motion as well.

24          THE COURT:  Okay.  Anybody else wish to be heard on

25  the cash management motion?  Okay.  So I'll grant that on the

 1   basis that the Debtor and the U.S. Trustee have agreed upon.

 2          MR. MUENKER:  Thank you, Your Honor.  There was one

 3   other matter that was set for hearing today.  That was a motion

 4   for authority to pay pre-petition general excise taxes and

 5   transient accommodation taxes.

 6          The Committee did file an objection to that this

 7   morning.  We had had conversations and communications with the

 8   Committee about that motion last week and over the weekend, and

 9   we had previously agreed to continue that to a later date while

10   we work through some issues and -- and determine whether or not

11   those -- those taxes really need to be paid now or not.

12          So what we would propose is to adjourn the hearing or

13   continue the hearing on that motion until October 13th, when I

14   think we've got another number of matters set, and then we'll be

15   in a position at that point to, you know, potentially withdraw

16   it, or -- or continue it further, or move forward.  We'll see.

17          THE COURT:  Okay.  Any objection to that request for a

18   continuance?  Mr. Choi.

19          MR. CHOI:  Your Honor, did Mr. Muenker say the 18th of

20   October?

21          MR. MUENKER:  The 13th.

22          MR. CHOI:  The 13th.

23          THE COURT:  The 13th.  Okay.  All right.  So that

24   matter's continued to October 13th, at what time, Madam Clerk?

25          THE CLERK:  Yes, Your Honor, it's at 2:00 o'clock.

1            THE COURT:  Two o'clock.  Okay.  Well, shall we stop
2   while we're ahead or --
3            MR. MUENKER:  Now, we get to the interesting part.
4   The next matter, Your Honor, is, of course, the final hearing on
5   the Debtor's motion to obtain post petition financing.
6            Again, there have been a number of objections, but I
7   think, if I understand correctly, kind of where we stand on --
8   on those objections with -- with all of the parties is that
9   there's really, at this point, kind of two critical issues,
10  really one of them that's critical and one of them is a smaller
11  -- smaller point that has been unresolved.
12           The -- the large issue that is unresolved is the
13  treatment of the $250,000 initial advance that was made on the
14  very first day of the -- of the bankruptcy, and by first day I
15  mean the first full day, because obviously the bankruptcy filing
16  occurred, I think, half way through the day on October [sic]
17  31st and the -- and the $250,000 was advanced on the following
18  day, September 1st.
19           There is a smaller issue about whether or not the
20  proceeds of the DIP loan can be used to, you know, pay certain
21  expenses and this includes the payment of -- of Committee Member
22  expenses.
23           It's our understanding that, based on discussions
24  we've had with the Committee, that what this -- these expenses
25  really go to the expenses of Marriott serving on the Committee

1    and not really other -- other members on the Committee, and we

2    do have some concerns about the Debtor's obligation and the

3    Estate's obligation to reimburse Marriott's expenses in this

4    case given, you know, who they are, and their -- their

5    relationship to the Debtor in the bigger context of this case

6    and that's something that we'll discuss a little bit later.  I

7    know there's other people that -- that will want to be heard on

8    that.

9            There are, kind of at the end, I think, there were a

10   couple of provisions also in the interim order that Your Honor

11   struck that nobody had objected to, and I think nobody is still

12   objecting to those provisions.  So I did want to take the

13   opportunity to maybe highlight those for the Court and give the

14   parties, obviously, the opportunity to be heard on that and

15   address any questions that the Court may have had, but I did

16   want to raise those specifically.

17           But to begin with, I think it's important to start,

18   you know, with the $250,000 issue since that's obviously the

19   largest issue that's unresolved between the parties and remind

20   the Court exactly why, you know, that came to be, and there's

21   been some discussion about it again this morning.

22           And that's that when the Debtor filed for bankruptcy

23   on August 31st, there had been a recent management change at the

24   Hotel, and as a result of that recent management change there

25   was literally no cash at the Hotel for the Debtor to be able to

1    utilize.  All that cash was maintained in bank accounts that

2    were controlled by Marriott.  Those funds are still there today.

3            And so, there was no ability for the Debtor to use

4    cash collateral and, obviously, with the upcoming holiday

5    weekend there was an urgent and critical need to get funds into

6    the Hotel so that the -- the Debtor would be able to continue to

7    operate its hotel during the holiday weekend until we can get

8    before Your Honor on an interim hearing on cash collateral.

9            And as the Court and the record -- you know, the Court

10   is aware, and the record reflects, within a week of filing the

11   case we did file a motion seeking authority to use cash

12   collateral and to approve the DIP financing, and we had a

13   hearing on that less than, or approximately two weeks into the

14   case.

15           And so, I think the Committee has filed an objection

16   and Marriott has also objected to this provision, and they have,

17   at least in the Committee's objection, they have accurately set

18   forth the standard by which the Ninth Circuit requires courts to

19   determine whether or not they're going to authorize on a

20   retroactive basis the granting of a lien to secure post petition

21   financing, and there's four parts to that standard, and I'd just

22   like to read them again to the Court, but they're contained in

23   the briefing.

24           The first part of that standard is whether the

25   financing transaction benefits the Bankruptcy Estate, and I

1   don't think there's going to be any dispute here today that, in

2   fact, this -- this stand -- or this element of the standard is

3   satisfied.

4           The 250,000 came in to the Debtor.  It was used to

5   fund and purchase supplies, and fund operations, and payroll

6   expenses until we could get in on an interim hearing.  And so,

7   they were critical expenses that had to be paid.

8           The second component of that is whether the Creditor

9   has adequately explained its failure to seek prior authorization

10  or otherwise establish that it acted in good faith why it failed

11  to seek such prior authorization.  And this is an area where we

12  obviously disagree with the Committee as to whether that

13  standard is met here.

14          But given the unique factual circumstances surrounding

15  this bankruptcy case, the fact that the Debtor had no funds in

16  -- in -- in its account, I don't think there's really any -- any

17  -- there could be any real honest debate about whether this

18  standard is satisfied.  The Debtor required funds, the funds

19  were advanced with the understanding, at the time, that they

20  would be treated as part of the interim advance.  That fact is

21  set forth in the declaration of Damian McKinney that was filed

22  with the Court.

23          And so, there's an evidentiary basis, you know, to --

24  to set -- to establish why these funds came in the way they did,

25  as well as what they were used for.  And I would respectfully

1  suggest, I think some people are trying to take advantage of --

2  you know, of the -- the willingness of the DIP Lender in this

3  case to advance those funds.

4        Had we been in -- had the ability to get in early in

5  the case before those funds were needed to be advanced, I don't

6  think anybody would have argued that those funds should not have

7  been advanced or that they would have been treated as a secured

8  loan at that time. And so, Your Honor, I would -- I would

9  respectfully submit that that element of the standard is also

10  satisfied.

11        The third requirement is whether there's full

12  compliance with the requirements of Section 364C. Again, I

13  think that the declaration that was filed by Damian McKinney

14  clearly demonstrates that there were efforts both pre-petition

15  and post-petition to identify alternative sources of -- of

16  financing for this Debtor.

17        There can be really no credible argument that there's

18  a better deal out there for this Debtor. I think experienced

19  bankruptcy practitioners, as well as this -- this Court, I'm

20  sure, is aware of the difficulties in obtaining subordinated

21  Debtor-In-Possession financing. And that's what the DIP Lender

22  has agreed to do in this case, subordinate the loan at a very --

23  at a market interest rate with absolutely no fees whatsoever, no

24  commitment fee, no exit fee, no unused line fees.

25        You know, those are extremely favorable terms, and

1   they were -- they were willing to do so on short notice without

2   really any due diligence into what the current asset value of

3   this property is and no one is seeking to prime the Senior

4   Lender which has asserted a claim of over $100 million.

5          So under those facts, I think, again, clearly the

6   record demonstrates that that element is satisfied in this case.

7          The fourth is whether the circumstances of the case

8   present one of those rare situations in which retroactive

9   authorization is appropriate.  And, again, for all the reasons

10  that I've already said, I think this is one of those rare and

11  unique cases where authorization is appropriate.

12         The Debtor had no funds when it filed.  The funds --

13  all the cash collateral of the Debtor were in the hands of a

14  third party, and there was -- you know, we immediately came in a

15  week later on a -- on a motion to use cash collateral and for

16  DIP financing.

17         So I think, again, that standard or that element of

18  this standard is clearly satisfied, and I -- and I know there's

19  going to be some other people that -- that want to be heard on

20  this issue as well as the DIP Lender, but from the Debtor's

21  perspective, you know, clearly that was the understanding is

22  that these funds would be treated as a DIP Loan.

23         We think it's entirely reasonable, and appropriate,

24  and would unfairly prejudice the DIP Lender in this case were

25  they not to be granted that -- that treatment with respect to

1   those funds that were advanced.

2           And I can also say that because there was some

3   question raised in the objection as to the timing of the funds,

4   a copy of the wire transfer record with respect to the wiring of

5   the funds to the Debtor was previously provided to the

6   Committee.  I believe it was also provided to -- to counsel for

7   Marriott.  I have a copy of it with me in the court if anybody

8   would like to see it, but there's no question that those funds

9   were advanced post-petition and not pre-petition.

10          THE COURT:  Okay.  Why don't you cover all of your

11  points on the DIP financing, if there's any other points you

12  wanted to argue on that, then we can take all the points of

13  everybody else?

14          MR. MUENKER:  I think that's all the points I wanted

15  to make on the $250,000 advance and whether that should be

16  included.

17          THE COURT:  Okay.

18          MR. MUENKER:  I don't -- again, I don't think anyone

19  is objecting to the rest of the -- the loan.

20          I did note that this morning, and I only had a chance

21  to read it quickly, because it was filed late in the morning,

22  but I noted that Marriott seemed to be suggesting that maybe

23  this hearing should not go forward on a final basis today and

24  maybe they would be asking the Court for a continued --

25  continuation of the hearing based on their need to do some

1    discovery on the 364C issue.

2         I don't know if that is a position that they're really

3    taking this morning, because I did have a conversation with Mr.

4    Feld over the weekend and that wasn't raised as one of the

5    outstanding issues on the DIP Loan.  It's possible they are

6    going to be taking that position.

7         To the extent they do, I'd merely like to respond and

8    say I don't believe there's any basis, at this point, to

9    continue the hearing.  The motion has been on file for over

10   three weeks now.  The declaration of Damian McKinney was on file

11   since, I believe, September 14th.  Prior to today, there's been

12   no request whatsoever of Marriott for a deposition of Mr.

13   McKinney.  There's been no request for any discovery from the

14   Debtor on that issue.

15        And so, to argue as the basis for continuance of the

16   hearing that they believe they need some time for discovery, I

17   think, is belied by their -- their actions since the filing of

18   the -- of the application, and the objections, and the -- and

19   the affidavit.  And so, obviously, we would very much like to

20   move past this part of the case, so we can get on to the next

21   part of the case and avoid the need for any unnecessary

22   discovery on an issue that I think ultimately is really not in

23   -- in question.

24        THE COURT:  Okay.

25        MR. MUENKER:  If -- if the Court would like me to

```
 1  discuss, briefly, the two provisions that I mentioned --
 2            THE COURT:  Sure.  Yeah, uh-huh.
 3            MR. MUENKER:  -- I'd raise that, and I don't know if
 4  the Court has a copy of the --
 5            THE COURT:  I do.
 6            MR. MUENKER:  -- interim order that was submitted last
 7  night, but I believe the provisions are contained on Page 55 of
 8  the -- of the final order, and it's 56 of the submission,
 9  because there was a cover page.
10            THE COURT:  I have it, yeah.
11            MR. MUENKER:  Right.  And there's a highlighted
12  portion there that deals with the DIP Liens not being
13  subordinate to any lien or security interest that is avoided
14  under Section 551 of the Bankruptcy Code.  Again, I don't
15  believe any of the parties are objecting to that, and it's my
16  understanding and experience that that is a fairly standard
17  provision to be -- be contained in -- in DIP financing orders,
18  but I'll certainly be --
19            THE COURT:  So the -- the -- there's no roll-up in
20  this; right?   The DIP Lien --
21            MR. MUENKER:  There's no roll-up, that's correct.
22            THE COURT:  Okay.
23            MR. MUENKER:  That's correct.
24            THE COURT:  And this would only really be triggered in
25  this case if the first mortgage were somehow avoided; right?
```

1          MR. MUENKER:  Yes, although I guess it's possible that

2    there -- there are other liens that could be avoided in the

3    first mortgage.  For example --

4          THE COURT:  Maybe a mechanic's lien or something like

5    that.

6          MR. MUENKER:  Yeah, there's been some mechanic's lien

7    filings in this case.

8          THE COURT:  Okay.  Okay.  All right.  And the other

9    provision was?

10         MR. MUENKER:  And then the other provision is

11   contained on Page 59, and it's a restriction on the use of DIP

12   Loans.  There is a carve-out in the amount of, I believe, of

13   $10,000 for the Committee that allows them to investigate loans,

14   but it does not allow the Committee to use the proceeds of the

15   DIP financing to actually prosecute claims against the -- the

16   DIP Lender.

17         And, again, you know, from the Debtor's perspective, I

18   mean, that's something that I think we see in every DIP that we

19   do.  DIP Lenders quite understandably don't want to fund money

20   to -- to -- to enable the Debtor or anyone else to pursue claims

21   against them, and -- and I don't think there's --

22         THE COURT:  I mean it caught -- it caught my eye,

23   because the -- the -- the DIP Lender here is so obviously an

24   insider.

25         MR. MUENKER:  That's correct, Your Honor.

1          THE COURT:  That's -- that's why it's -- I got a

2     problem with it, at least for the interim order.

3          MR. MUENKER:  And -- and I understand that.  But for

4     the final, again, I don't think anyone has objected to it.  And

5     so, certainly, we have no objection to that provision.

6          THE COURT:  Okay.

7          MR. MUENKER:  If I can touch base quickly on just the

8     last issue, I think that was -- that was outstanding and that's

9     the -- the issue about the reimbursement of Committee expenses.

10    And the reason why this also relates to the DIP is there, I

11    think, is a request to make clear that the carve-out also extend

12    to the expenses of Committee Members.

13         Our concern -- obviously, you know, it's -- it's

14    expected and appropriate for there to be a Creditors' Committee

15    in this case, and they have a very important role to fill, and

16    we certainly support that, and -- and had made provisions for

17    the professionals that are employed by the Creditors' Committee

18    to be compensated in this case.  They're going to get the

19    benefit of the interim compensation order, and they're also

20    getting the benefit of really what's a very large carve-out

21    given the size of the DIP Loan.  It's a $500,000 carve-out, and

22    we're talking about a $2.5 million DIP Loan.

23         There is a concern, given the fact that Marriott is on

24    the Committee about, you know, making sure that the Committee's

25    business is the Committee's business, and they are not advancing

1   positions that Marriott, as an individual Creditor, would be

2   expected to advance on their own behalf, and that the Committee

3   expenses, you know, are limited to those expenses that are truly

4   necessary and representing the Creditor body as a whole as

5   opposed to advancing interests that would benefit primarily

6   Marriott.

7          Our concern is -- has been evidenced in a number of --

8   of situations that have already arisen in this case, one of

9   which is that the Committee has recently filed an application to

10  appoint special litigation counsel on the mainland, and the

11  Committee, of course, is not involved in any litigation.  The

12  only litigation that is ongoing right now on the mainland is

13  between the Debtor and Marriott, and it relates uniquely to

14  those two parties.

15         It's difficult to understand, you know, why the

16  Committee would need to get involved in that litigation in what

17  is essentially claims litigation certainly this early in the

18  case, and we don't even know, really at this point in the case,

19  the timing that that -- that that kind of litigation as we go

20  forward in the forum that that litigation is going to go

21  forward.

22         So, we do have some very real concerns about, you

23  know, given the limited amount of the -- the DIP Loan, it's a

24  relatively small amount at his point in time, and the ability of

25  -- of -- the potential ability for Marriott to try to use its

1   position on the Committee to force the Debtor to incur and pay

2   for expenses that really have nothing to do with Committee

3   business.

4          And based on our discussions, it's our understanding

5   that, you know, most of -- both the firm that was -- that was

6   suggested to be retained by the Committee was suggested by

7   Marriott.  I think they have a prior relationship with Marriott,

8   I think they represent them in other matters, or at least work

9   with them -- Marriott's counsel in other matters, and that

10  they're really the ones that are advancing that interest as well

11  as -- as well as the request for reimbursement of Committee

12  expenses.

13         All the other Creditors are local.  We wouldn't expect

14  there would be many expenses, but Marriott, of course, is not

15  local, and I think right now they're currently staffing on the

16  Committee side this matter with representative from the mainland

17  that could be flying in, and so there's concern about, you know,

18  costs on that -- on that respect.

19         So from the Debtor's perspective, you know, we do

20  joint, and, I think the DIP Lender's going to have a few things

21  that they're going to want to say about the use of their -- of

22  their DIP Loan proceeds for those types of expenses, but we do

23  share that concern, and -- and we do believe that that, you

24  know, would be inappropriate to include that, for now, into the

25  carve-out and into the interim compensation of expenses.

1              It doesn't necessarily mean that they wouldn't have

2    the ability to file an application later to have those paid, but

3    for right now we would respectfully request that they be

4    excluded from those two -- those two orders.

5              THE COURT:  Okay.

6              MR. MUENKER:  And unless the Court has any other

7    questions, that's --

8              THE COURT:  Not at the moment.

9              MR. MUENKER:  -- all I have for my opening.  Thank

10   you, Your Honor.

11             THE COURT:  Thank you.

12             MS. FENNING:  Your Honor, this is Lisa Fenning.  If I

13   may address a few points?

14             THE COURT:  Sure.

15             MS. FENNING:  I would like to note that although we

16   received an opposition from the Committee this morning that

17   raised a number of issues, most of those issues in fact were

18   resolved in discussions over the last few days, and were already

19   embodied in the proposed final DIP order that I circulated to

20   all the parties on Saturday.  So most of them are not at issue,

21   in case you had any concern.

22             For example, they had -- the Committee had asked that

23   a provision relating to set-off rights of other Creditors be

24   deleted.  That is out.  We had agreed to that.  They asked for

25   modification of language with respect to transfers and sales,

1    and we already modified the order to address that.  They asked

2    that there be no limitation on avoidance action proceeds that

3    parallels that sale and transfer provision.  We've already

4    agreed to modification on that.  And then they also asked for

5    review of the adequate protection to the Indenture Trustee on

6    the part of the Committee, in other words, the Indenture Trustee

7    fees.  That's in the order as well.

8            So most of the issues that they've raised had already

9    been addressed by a proposed form of order that we submitted on

10   Saturday even though they're still pulled forward into their

11   objection this morning.  So I just wanted you to be aware that

12   those issues have in fact been resolved, as far as we know,

13   because we had no further feedback on the proposed form of

14   order.

15           I would like just to reiterate that with respect to

16   the $250,000 advance, we received -- my client received a very

17   urgent request from the Debtor to provide some funds so they

18   could buy supplies for the Labor Day weekend.  As you may

19   recall, Your Honor, the filing actually was an emergency filing.

20   I was -- I only found out about the situation myself on the

21   31st.  I believe that the Mulligan firm only found out about it

22   perhaps 12 hours before I did.  So it wasn't a situation where

23   we could document or prepare a DIP order or a proposed

24   application for approval before the Labor Day weekend, and

25   that's why we made the advance that we did.

1          The Debtor had originally asked for a lot more money

2     to cover a lot more expenses, and we said let's just cover

3     what's absolutely essential at the moment.  They said that was

4     250, but they didn't have very good financial records, because

5     of the issues with Marriott with which you are well familiar.

6          And so, we accepted that estimate because we didn't

7     want them not to be able to buy supplies to -- for room service

8     or whatever else they needed and that money was advanced.  It

9     was advanced with the understanding that it will be part of the

10    DIP advance.

11         The terms, I think, of the DIP order -- of the DIP

12    financing cannot be met in this marketplace at this time.  The

13    situation with the Hotel, at the time of the filing, was fought

14    with all sorts of the kinds of challenges that most lenders

15    wouldn't touch with a 300-foot pole.  The management dispute,

16    the fact that there were no funds available in the Estate, that

17    there is $100 million plus senior and so forth.

18         And so, the fact that we were prepared to do

19    subordinate lending with no fees was the kind of a financing

20    proposal that could not be matched in the marketplace.  The

21    McKinney declaration indicates an effort to try and sound the

22    market out, but nothing remotely close was under discussion,

23    even though the Committee says, well, we didn't -- the Debtor

24    didn't pursue discussions with the one nibble that it got.

25         The terms of that nibble were a senior priming lien

 1   ahead of everybody else which -- and with a lot of diligence,

 2   not to mention a lot of fees, and that was simply not remotely

 3   the same kind of terms that we were offering, which were really

 4   just intended to reimburse the DIP Lender for risk in the costs

 5   funds that are being advanced so that this enterprise can more

 6   forward.

 7          So, under the circumstances, it seems to me that the

 8   record before you, undisputed record before you, unobjected to

 9   record before you, provides sufficient evidence from which the

10   Court can find that the showing has been made of necessity, both

11   with respect to the timing and circumstances of the advance, and

12   the -- the availability of other loans, and the appropriateness

13   of this loan.

14          I'd be happy to address any other questions that you

15   may have for the DIP Lender, and I reserve the opportunity to

16   respond if other things come up in the hearing.

17          THE COURT:  Okay.  Thanks.  I don't have any questions

18   at the moment.  Perhaps I should turn to the Committee now.  Mr.

19   Choi.

20          MR. CHOI:  Thank you, Your Honor.  This is indeed a

21   very unfortunate situation that surrounded the filing of the

22   case, but as -- as the Court noted the Davidson Trust is in

23   control of this Debtor, and funded the pre-petition litigation

24   against Marriott, and undoubtedly was involved in the decision

25   to lock Marriott out.

1           The Committee is not taking a position as to whether

2    that was right or wrong.   We -- we haven't investigated the

3    claims that are being litigated in New York, but these wounds

4    are self-inflicted, Your Honor.   It -- it strikes me that if you

5    lock out your Hotel management company that is holding a million

6    dollars of your operating funds a few days before a big holiday

7    weekend, you will have to advance funds to the Hotel for

8    operations, especially one that's been losing $800,000 a month.

9    It was foreseeable.

10          August 30 was a Monday, Labor Day.   August 31 was a

11   Tuesday, a working day.   September 1 was a Wednesday, a working

12   day.   The Debtor didn't bother to file a cash collateral motion

13   or a DIP financing motion until September 7th.

14          Your Honor, I -- I think in the big context of this

15   case, when you have a Lender that is into this deal for $123

16   million pre-petition, not giving them a super priority Junior

17   Lien status on a $250,000 advance, that should have been

18   accompanied by a DIP financing motion.   It's not going to hurt

19   the Lender.

20          Your Honor, I -- I disagree with counsel that the

21   Ninth Circuit standard has been met.   I think we've briefed the

22   issue.   I don't believe there's anything in the McKinney

23   declaration that justifies the -- the -- the -- sets out the

24   circumstances, the extraordinary circumstances that need to be

25   shown to grant retroactive nunc pro tunc relief as requested.

1   Your Honor, that's all I have to say on -- on the $250,000.

2            Now, Committee expenses, reasonable expenses of

3   Committee Members.  We're -- we're not talking about Committee

4   counsel fees.  I would be the first to tell Sheppard Mullin

5   they're not going to get any piece of that carve-out.  But we

6   have a Committee Member that's based in --

7            THE COURT:  You mean -- you mean counsel for Committee

8   Members not Committee counsel.

9            MR. CHOI:  Yes, I apologize, Your Honor.  I -- I --

10           THE COURT:  I'm trying to help you here.

11           MR. CHOI:  Committee --

12           MR. MUENKER:  Your Honor, we'd like to revise the

13   order that we submitted to the Court.

14           MR. CHOI:  -- Committee -- they're not getting

15   anything, counsel for Committee Members, and really only one

16   member of the Committee has counsel independently representing

17   it.

18           We're talking about any expenses that may be incurred

19   by a Marriott business person who lives in Maryland or who works

20   in Maryland.  That person may have to come to Hawaii for

21   Committee business.  To the extent this individual comes to

22   Hawaii for Marriott business, they shouldn't be compensated, but

23   I've never seen a case where the Debtor and the DIP Lender say,

24   no, we don't like one of your Committee Members and, therefore,

25   no one on the Committee is going to be able to participate in

1  the -- in the carve-out, Your Honor.

2         So, on that point I think we pointed out in our

3  opposition where in the DIP Loan documents reasonable expenses

4  for the Committee Members ought to be added.  We still don't

5  believe that the Debtor has satisfied its evidentiary burden

6  under 364C.  However, I think the Court has enough today to make

7  a decision on that point.

8         Counsel for the Trust is correct that almost all of

9  the other issues raised in our objection were resolved over the

10  weekend, and we -- we appreciate the Trust's willingness to

11  engage and -- and make reasonable concessions.

12         I think there's one error in the findings of fact that

13  were lodged last night which, by the way, also need to be

14  revised to include some additional comments from the Senior

15  Lender.  The -- the -- if you look at Page 35 of the proposed

16  DIP order, there's a reference to -- and really it's -- it's

17  right above Paragraph 19.  It says:  "The Debtor shall not sell,

18  pledge, hypothecate, or otherwise encumber any avoidance claim

19  proceeds."

20         Your Honor, the Debtor should be able to do anything

21  it wants with its avoidance action or proceeds, because the

22  Davidson Trust is not going to have a lien or super-priority as

23  to that asset.

24         Your Honor, finally, I'd -- I'd like to just note that

25  we haven't reached agreement on the form of a budget.  Right now

1    the -- the budget that's circulating is missing numbers from my

2    favorite line item which is professional's fees.  And so, once

3    -- once that's done I'm sure we'll be able to submit a budget to

4    go along with -- with the -- the order and -- and the other loan

5    documents.  Thank you.

6            THE COURT:  Okay.  Thank you.  I guess Marriott next,

7    please.  Mr. Feld.

8            MR. FELD:  Yes, Your Honor, thank you.  I'll be brief.

9    Marriott's position, Your Honor, is substantially aligned with

10   that of the Committee on the $250,000 pre-petition -- I'm sorry,

11   post-petition advance.  We -- we adopt the same position as the

12   Committee, and I won't belabor that point, but we agree very

13   much with Mr. Choi's comments on that.

14           On the 364C evidentiary issues, Your Honor, also I

15   don't want to belabor that, but we do feel relatively strongly

16   that the evidentiary burden has not been met.  Only to the

17   extent the Court thought that anything further is necessary on

18   that, we'd be willing to participate in -- in discovery, but our

19   -- our concern there is that there's a large lending market.

20           It may be more limited on a subordinated basis, of

21   course, but we're -- we're not convinced from the declaration

22   that traditional and non-traditional sources of financing were

23   -- were tapped or -- or even spoken to, in addition to the banks

24   that might have been spoken to, whether -- whether it's finance

25   companies, or hedge funds, or -- or real estate investors of

1   other types.

2          There -- there's quite a large universe out there, and

3   it's -- we would have liked to see more on what efforts were

4   made, given that there -- there seems to be some advanced

5   planning that went into the change over in management and the

6   circumstances that, as Mr. Choi said, in part, were at least

7   self-inflicted, but if -- again, we don't want to belabor the

8   point and, of course, we'll defer to the Judge's -- to the

9   Court's inclination on that.

10          One point, Your Honor, which is the last point we make

11   in our papers is more of a reservation of rights issue.  Because

12   the order is so lengthy and there's some complex provisions that

13   don't necessarily seem to fit with other provisions in the

14   order, we -- we would be more comfortable if -- if there were

15   some simple clarification on the issue of both replacement liens

16   and pre-petition liens.  Something clarifying on replacement

17   liens that it's -- they would be just to the extent of cash

18   collateral actually used and just to the extent of diminution in

19   value.

20          And on pre-petition liens, I think, as Your Honor

21   pointed out or asked for a clarification that it's not a roll-

22   up.  That's the -- the same issue we'd like to see clarification

23   on as well that -- that there's no effect.  Any of the treatment

24   in the proposed DIP facility has no effect on pre-petition liens

25   and that the rights of all parties are reserved on -- on those

1    issues on pre-petition liens.

2            The only other issue that's not in our objection, Your

3    Honor, is regarding some comments that were made regarding

4    Marriott.  We just want to give the Court some comfort and

5    assurance on that.

6            I -- I think the Debtor has made abundantly clear that

7    they're not an enormous fan of Marriott at this point.  They

8    have their reservations about -- about us.  The -- I think it's

9    safe to say, as Mr. Choi said, that we're one of -- of five

10   Committee Members at this point.  I think we're the only one

11   that's not local.  I -- I would point out that none of the

12   Marriott business people that that provision would cover have

13   come to any proceedings so far or have traveled to Hawaii.  They

14   may need to in the future if it's on Committee business.  I

15   could assure the Court that if they travel here on Marriott

16   business, which is not related to the Committee, it's something

17   that we -- we would never seek reimbursement for.

18           I think it's the reasonable standard in which such

19   reimbursement is looked at.  I think, gives all parties

20   sufficient protection and I don't think there should be any

21   doubt or concern.  And, as Mr. Choi said, I could also assure

22   the Court that we won't be seeking, as a Committee expense, any

23   legal fees incurred from -- on behalf of Marriott.

24           The -- the other issue that Mr. Muenker brought up

25   related to, I believe, the -- the -- and I'm not as up to speed,

```
 1   admittedly on this, as the Committee counsel is, the potential

 2   retention of special litigation counsel.

 3            I mean, Your Honor, from what I understand that's

 4   affirmative.  I don't believe Marriott or our firm has had a

 5   relationship, but I think we faced them adversely and worked

 6   well with them in an adverse sense and, from what I understand,

 7   Your Honor, it is -- I'll let the Committee speak to this, they

 8   are just special litigation counsel in -- in a somewhat limited

 9   role.

10            But I would also want to point out to the Court that

11   Marriott is just one of five Committee Members.  We're not the

12   Committee Chair.  There is a Subcommittee without Marriott to

13   handle issues in which Marriott and the Committee feel they

14   should not be part of the discussion or part of the decision

15   making.  And the retention -- I believe the retention of special

16   litigation counsel was -- was voted on and approved unanimously

17   by all the Committee Members.  Marriott was just one vote.

18            So, again, all of this is subject to reasonableness

19   and the -- and the Court's discretion, but we wanted to at least

20   address any -- any kind of accusations or concerns that were

21   raised in that matter.

22            THE COURT:  Okay.  All right.  Thank you.

23            MR. FELD:  Thank you.

24            THE COURT:  All right.  Who would like to go next, if

25   anybody?  Yes, Ms. Lovejoy.
```

1          MS. LOVEJOY:  Your Honor, just briefly.  To the extent

2    the issues I raised in the Committee's supplemental opposition

3    would affect the adequate protection of Wells Fargo, then we

4    object to that, because Wells Fargo's position relative to the

5    order is based on that adequate protection.  So anything that

6    would remove or denigrate the priority of the liens, as

7    contemplated, we object to that.

8          THE COURT:  Okay.  All right.  Thank you.  Anybody

9    else?  Okay.  I guess I have two questions for the Debtor and

10   the Lender.  One would be Mr. Feld's point about clarifying the

11   replacement liens that they would only secure any diminution in

12   the value of cash collateral.  Is that covered, not covered?  If

13   so, shouldn't it be?

14         MR. MUENKER:  Your Honor, I thought that was covered,

15   but it would -- it would take me a minute to go through the

16   order.  I mean I -- I think we certainly, and perhaps Ms.

17   Fenning would like the opportunity to respond to this

18   specifically, but I think there has been some discussion about

19   -- it is certainly my understanding that nothing in this order

20   enhances the position of any of the pre-petition Secured

21   Lenders, which is I think the second -- the second point.

22         Yeah, right.  If you look at Paragraph 19, Your Honor,

23   of the order, this relates directly to the replacement lien that

24   is granted to the Indenture Trustee, which is Wells Fargo in

25   this case.  Towards the bottom, on the Page of 35 it says:  The

1    Indenture Trustee is granted a replacement lien to the extent

2    (1) its cash collateral was actually used by the Debtor; and,

3    (2) to the extent that such cash constitutes the Indenture

4    Trustee's collateral; and, (3) to the extent that the Indenture

5    Trustee's collateral actually diminishes in value.

6           So I think it's -- I think that's clearly there.  I

7    think there's --

8           THE COURT:  Is there a comparable provision for the

9    Subordinated Lender?

10          MR. MUENKER:  I thought there was.  Let's go to the

11   next one.

12          THE COURT:  Can you help us out on that, Ms. Fenning?

13   Did you follow the question?

14          MS. FENNING:  I -- I did, Your Honor.  Let me get -- I

15   need to get the order in front of me.

16          THE COURT:  Okay.

17          MR. MUENKER:  I don't see it in Paragraph 20, although

18   in Paragraph 20 it does have the -- the other language that we

19   were talking about, which is that the replacement and continuing

20   liens of the Indenture Trustee shall have the same validity,

21   extent, and priority as the Senior Liens as of the petition

22   date, and then the Subordinated Lender replacement lien shall

23   also have the same validity, extent, priority as the liens the

24   Subordinating Lender possessed on the petition date.

25          So that -- that issue is also addressed.  I don't see

1    that exact language regarding cash collateral.  It may be in

2    another portion, but that was certainly the intent and --

3              MS. FENNING:  I agree, Your Honor.  It was the intent.

4    I believe it's there.  I can't put my finger on it this minute,

5    but if not's there we'll add it.

6              THE COURT:  Okay.  Okay.  Good.

7              MS. FENNING:  But I -- I think it would just be

8    parallel language to that provided for Wells Fargo, and

9    certainly the language of the order does indicate our intensions

10   to so provide.

11             THE COURT:  Okay.  All right.  My second question is,

12   I'd like to have someone either refresh or refute my

13   recollection.  And that is that the management change at the

14   Hotel was precipitated by the fact that the Davidson Trust said

15   it would not continue to fund the operations of the Hotel with

16   Marriott as the manager.  Am I remembering that right or not?

17             MS. FENNING:  Your Honor, the losses were running at

18   the rate of $800,000 a month and the Davidson Trust took the

19   position that was unsustainable, and it was not willing to

20   continue funding on a capital contribution basis, so long as

21   that was the case, there is no indication that there would be

22   any change although the Debtor had had discussions or attempted

23   to have discussions, as I understand it, because I wasn't

24   involved at the time, with Marriott for months beforehand about

25   trying to reign in expenses and to bring the -- the negative

1    cash flow within bounds and to meet the projections that it --

2    that Marriott was providing.

3            In each case, I understand the projections were not

4    met and, indeed, a new budget had been proposed that showed

5    further reduction of revenues or increase of -- relative

6    increase expenses and, therefore, a greater loss for the rest of

7    the year, as the estimate, and the Davidson Trust was not

8    willing to fund that on a capital contribution basis.  So that

9    led to the process by which Marriott was replaced.

10           I would like to address the comment that Mr. Feld made

11   -- that the Committee made.  Mr. Choi is not technically correct

12   that the Trust is in control of Waikiki.  Obviously, it plays a

13   major role.  There is an advisory committee that reflects all of

14   the interests in the Debtor entity that makes the substantive

15   decision making, and the Trust has no role in the day to day

16   operation of the Hotel or the management company that's running

17   the Hotel.  So it is not correct to say that we are in control.

18   This is not a subsidiary of the Davidson Trust.

19           THE COURT:  Okay.  So, basically, it wasn't -- I

20   probably am oversimplifying here, but it wasn't Davidson Trust

21   that precipitated the termination of -- of Marriott, per se.

22           MS. FENNING:  Well, I'm sure that was the logical

23   outcome of saying we wouldn't continue to fund with the kind of

24   projections that Marriott was providing us and that some change

25   needed to be made.

1          The Davidson Trust did play a role in discussions

2   about the filing that I know of.  I am not fully aware of the

3   degree to which it participated in the discussions about the

4   removal, but I'm sure that it was informed about the intention

5   to remove.

6          THE COURT:  Well, the reason I ask that question is

7   the Committee's argument about self-inflicted, I think,

8   resonates with me, because, you know, the -- the Debtor

9   apparently made the decision with or without Davidson Trust

10  input or direction to implement the management change after the

11  Debtor had commenced litigation in New York to confirm that it

12  could terminate the management agreement, but without getting

13  that court's permission.

14         And then, not surprisingly at all to my mind, Marriott

15  reacted by going back to the court in New York, and also not

16  surprising at all in my mind, the Court said don't do that until

17  -- you don't have the right to do that unilaterally without

18  going through the steps provided for under the agreement, and

19  then the Debtor was left sort of with no option but to file the

20  bankruptcy.

21         So it seems like we've had a bunch of dominoes fall

22  that -- that should have been foreseen, and it left the Debtors

23  in a crisis situation on the first day of bankruptcy, which --

24  which I have -- I have concerns about.

25         MR. MUENKER:  Your Honor, may I address a couple of

 1 | those concerns.

 2 |             THE COURT:  Yes, uh-huh.

 3 |             MR. MUENKER:  Just on the timing thing, I think --

 4 | because I think Your Honor has a slight misimpression of -- of

 5 | -- of how some of the stuff played out.

 6 |             The management change occurred on the 28th of August.

 7 | Obviously, the -- the filing was three days later on the 31st,

 8 | and that followed a preliminary -- actually it wasn't even a

 9 | preliminary hearing.  I think it was a hearing on a TRO to get

10 | to the preliminary hearing.

11 |             THE COURT:  Right.  So they went to Court -- Marriott

12 | went to court on Monday, if I remember correctly.

13 |             MR. MUENKER:  That's right, and then they came back on

14 | Wednesday for the continuation of that -- of that hearing.

15 |             What the Court did, because I -- I think this is an

16 | important distinction, the Court did not say that it was

17 | improper.  What the Court did was grant the TRO in order to get

18 | to a preliminary hearing on the request for an injunction to

19 | "preserve the status quo" until it got to that point, and it

20 | could actually consider the merits of the issue as to whether or

21 | not the removal of Marriott was appropriate or not.

22 |             Of course, you know, we have very different views than

23 | Marriott does as to whether the Court was correct in that

24 | decision, but I think it is a key distinction that the Court did

25 | not make any finding about that.  What, instead, the Court was

1    trying to do was -- was what it, in its view, was preserving the

2    status quo.  I think it wasn't really preserving the status quo,

3    because it actually ordered a little bit of relief to get us

4    back to that point.

5          THE COURT:  And I'm not really saying whether the

6    Court was right or wrong.  I'm just saying that Marriott's

7    reaction by going to the court was far from unforeseeable and

8    the court's decision, right or wrong, was also not unforeseeable

9    in -- in the circumstances.

10          MR. MUENKER:  I understand that, Your Honor, but I

11   guess I would say, when we're talking about the foreseeability

12   we're still talking about a couple of days, because the -- the

13   transfer occurred over the weekend, which was the 28th.  The

14   first business day was the 29th, that Monday.  The filing

15   occurred on the 31st, at 2:30 in the afternoon.  And, of course,

16   the advance came in the next day, which was a Thursday.

17          So that's not a lot of time, obviously, and -- and no

18   one could -- you know, although there might have been a concern,

19   no one could predict what the judge was going to do with respect

20   to the TRO on Wednesday morning until it happened.

21          THE COURT:  Yes.

22          MR. FELD:  Your Honor, if I could just suggest.  Ms.

23   Harrison of Jenner and Block who is litigation counsel to the

24   Marriott was directly involved in the -- in the New York State

25   litigation, including the TRO, she is on the phone and, to the

1 | extent that that -- she sees the need to make any clarification

2 | on the timing, she could probably convey the -- the events very

3 | precisely, exactly what happened just to clarify for the Court.

4 |         THE COURT:  I think -- I think I'm okay for the -- the

5 | large purposes that I'm -- I raise the question.  I mean, I'm

6 | not trying to say whether the Debtor did or didn't do the right

7 | thing, or Marriott did or didn't, or the New York Court did or

8 | didn't.

9 |         I'm just saying that there was a domino pushed over,

10 | as I put it a minute ago, that had a bunch of consequences that

11 | were, you know, maybe not certain, but probably not outside of

12 | the realm of possibility in which I think the Debtor probably

13 | now has to realize it didn't plan adequately for it, but maybe

14 | that's neither here nor there.

15 |         Well, this is what I'm going to do.  In the first

16 | place, I would like somebody to send me a redline version of the

17 | final order.  If there's further changes to be made I'd like to

18 | see those.  You don't have to redline the changes I made in

19 | handwriting on the prior ones.  I just would like to see the

20 | differences between the interim order, as it was sent to me, and

21 | the final order that -- that you would like me to enter.

22 |         And while I'm doing that, I did have a couple of very

23 | small points I noticed that I wanted to make.  I'm looking at

24 | Page 18 of the final order that was filed yesterday, the

25 | subparagraph, I guess it's 5C, in the third line, I think the

1  word "of" is missing after "consent".  I'm sorry, I can't help

2  myself.

3           The next point was made by the Committee.  This is

4  Paragraph 18, the end of that paragraph on Page 35.  I forgot to

5  ask about it as we were going along, but I think it's probably

6  correct to delete the phrase "any avoidance action proceeds",

7  because they're not part of the collateral for the DIP Loan.

8  There ought not to be any restrictions on what can be done with

9  them particularly where, under the view of our Bankruptcy

10  Appellate Panel, a settlement is a sale.

11           So I don't think the Debtor's ability to settle

12  avoidance claims ought to be transferred to the DIP Lender.

13           MS. FENNING:  Your Honor.

14           THE COURT:  Yes.

15           MS. FENNING:  If I may be heard on that point?

16           THE COURT:  Yes.

17           MS. FENNING:  The argument was made by the Committee

18  and Marriott that since we don't have a security interest in the

19  avoidance, therefore, the Debtor should be able to do anything

20  it pleases with it, I think ignores the fact that we are looking

21  to that as part of -- as an administrative claimant, and we

22  should have some rights to protect the value of those proceeds.

23           A settlement is one thing, but a transfer or an -- an

24  encumbrance of the avoidance action would take value out of the

25  Estate that would be otherwise available for the administrative

```
 1    claims that we would have pari passu for that purpose.  So I
 2    would request that you consider that before you rule.
 3            THE COURT:  Well, my -- my view on that is that I
 4    think the protection there for any Administrative Creditor is
 5    that any such transfer, or pledge, or whatever of an avoidance
 6    claim, I think, would certainly be out of the ordinary course of
 7    business, would therefore be subject to court approval, and any
 8    party-in-interest would have the right to say you're not getting
 9    enough for it and, therefore, deluding the right of recovery of
10    all administrative and other claimants.
11            So my -- my point is not that the DIP Lender shouldn't
12    have the right to comment on that, I just don't think the DIP
13    Lender ought to have a veto over those kinds of transactions.
14            Okay.  My next point is in the next paragraph,
15    Paragraph 19, towards the bottom of paragraph -- Page 35,
16    there's a section number with a blank there.  I could probably
17    figure it out for myself, but I'd rather somebody else pick the
18    wrong paragraph than me.  And I think that was my last drafting
19    point.
20            Oh, on the -- the highlighted provisions that I took
21    out of the interim order in which the DIP Lender wants to
22    reinsert, I think for purposes of a final order both of those
23    provisions are acceptable.  The first one had to do with whether
24    the priority of the DIP Liens would effectively step up if a
25    Senior Lien got avoided.  Given that there probably is really
```

1  only one Senior Lien of any significant size, I think that's

2  acceptable in the circumstance of this case.

3         And the provision in Paragraph 28, on use of funds to

4  pay for litigating against the DIP Lender, I -- I think if

5  that's acceptable with the Committee, that's acceptable to me.

6         All right.  Now, going over the other points that were

7  raised, probably in the reverse order that they were raised, I

8  think that as far as Committee expenses go, I think that

9  legitimate, allowable, reasonable Committee Member out-of-pocket

10  expenses probably got to be treated on a par with the

11  professional claims just so the -- the Committee counsel has a

12  client that they can deal with appropriately.

13         Now, I -- I want to make clear that the expenses that

14  should be reimbursed here are strictly for Committee business

15  and that may -- may raise particular problems for Marriott,

16  because I think if a Marriott person travels to Hawaii somebody

17  could reasonably ask, and I think the Marriott person should

18  answer, what else did you do while you were here?

19         You know, did you go down the street to see another

20  hotel and make an appropriate allocation of those expenses, and

21  that may -- I mean it makes more sense for Marriott just to eat

22  those expenses rather than have to expose other information that

23  it might not otherwise want to expose.  But subject to that, I

24  think that those expenses, if reasonable, should be -- should

25  be included, so the Committee can function properly.

1           As far as the evidentiary point, I think the

2    declaration in the circumstances of this case is barely

3    sufficient.  I mean I think there -- there could be more that

4    could be done, because in the modern world there's pretty much

5    an infinite number of lenders out there, and I'm certain there's

6    more people that the Debtor could have approached to try and get

7    this money, but I think given the time restraints we're working

8    under, the evidentiary showing is sufficient.

9           And I think the last point has to do with the

10   inclusion of the $250,000 initial advance in the -- in the DIP

11   Lender -- DIP -- excuse me, the DIP Liens and the DIP Loan.  And

12   this is a tough one for me for the reasons I think I basically

13   laid out.

14           I -- I think that, you know, once the decision was

15   made to make the management change somebody could have started

16   thinking about what's going to happen next, and what's going to

17   happen after that, and what could happen after that, and the

18   prospects of a bankruptcy filing certainly would be in one of

19   those -- one of those categories.

20           I'm struck by the fact that the Debtor apparently

21   spent, if I remember the record correctly, something like a

22   month dealing with Modern Management to get the management

23   situation set up before the bankruptcy, but evidently made,

24   basically, no preparations for a bankruptcy filing, which does

25   seem to me to be one, maybe not inevitable, but certainly

1  possible outcome.

2          But I -- I will let the $250,000 be approved and

3  included in the DIP Lien, because -- and the reason is that if

4  -- if a timely request had been made I think that that certainly

5  would have been granted this DIP priority on the same basis that

6  were -- were granted here.  It's a fairly close call form.  I'm

7  sort of struggling with it it still as I -- as I say that, and I

8  think in the circumstances that's the -- the best thing to do.

9          It's not an amount of money that's going to make or

10 break this case, one way or the other, in any event.  And I

11 think that the four-part has been met, although I will say it's

12 been barely met.

13         So subject to that and subject to review of the final

14 form of the DIP order with the blackline [sic] that I mentioned

15 I will grant final approval.

16         MR. MUENKER:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. FELD:  Thank you, Your Honor.

19         THE COURT:  All right.  Anything else for today?  Mr.

20 Feld.

21         MR. FELD:  Your Honor, there is a couple of

22 housekeeping matters that weren't on the agenda.  One is on the

23 Marriott's stay relief motion, our request for a brief status

24 conference; and one regarding scheduling issues, which will

25 even be more brief on the issue of the upcoming rejection

1  motion.

2         THE COURT:  Okay.  All right.

3         MR. FELD:  Your Honor, as Mr. Muenker mentioned we --

4  we have had some fairly extensive conversations over the last

5  few days and over the weekend.

6         As we've indicated in the status report one -- one of

7  the issues that we haven't had any success in -- in resolving so

8  far, although we're still in discussions over it, is the -- what

9  I'll call the gap period representation between the time of our

10 -- our first day of hearings on the case on September 7th, and

11 the conclusion on September 8th, when an interim order was

12 agreed on, and it was signed by Your Honor and entered.

13        We were here several weeks ago talking about the

14 comfort we're seeking on that.  We're still seeking that

15 comfort.  We -- we have concerns that -- that things did happen

16 during that gap period.  We're working with Mr. Muenker to try

17 to address that, but we'd at least like to keep the Court

18 informed on where things are and -- and Marriott's view of the

19 need for getting -- getting that comfort.

20        I think if the representation is not made it will

21 almost definitely come out -- it will almost definitely be

22 addressed in the discovery process, which we're still working on

23 limiting and streamlining, and I'll come to that in a moment,

24 but that's just an update on -- on the issue and the unfortunate

25 difficulty we're having in getting that representation.

1           As far as discovery itself, Your Honor, we're working,

2     and I believe attached to our status report was a preliminary

3     proposal on scheduling.  We're working in order to maintain the

4     schedule for the final hearing on the October 13th -- the

5     afternoon of October 13th, on the -- on the stay relief motion.

6           And, again, we're working hard with Mr. Muenker and

7     his client to try to resolve as many issues as we can so that

8     it's -- everything's either resolved or substantially narrowed

9     by that point, but we -- there's been a discussion and a

10    specific proposal by us.  We're trying to schedule all the

11    depositions and this -- this schedule actually contemplates a,

12    if I recall, a deal for a reduced streamline discovery schedule

13    instead of the 19 or 20 witnesses combined on both sides that

14    were originally contemplated.  This -- this would size it down

15    to, I believe, eight -- eight or nine, at most, and it would

16    make it much more manageable, and I think doable all in one

17    week, next week.

18          So we're -- we're still -- I don't think we got a

19    response yet on that schedule, but we'd like to, given the --

20    the final stay relief hearing coming up quickly, we'd like to

21    get that resolved soon, and I'll give Mr. Muenker an opportunity

22    to -- to respond to that in a moment.

23          I think we're close on that and this is the type of

24    scheduling we've discussed that includes Marriott's witnesses

25    sitting for their depositions first to accommodate, I believe,

```
 1   Mr. Muenker's co-counsel, litigation counsel for the Debtor who
 2   had some conflicts towards the middle of the week.  So I think
 3   this is a schedule that tries to accommodate everybody as much
 4   as possible, but hopefully we'll get that finalized.

 5           And then on the -- finally, Your Honor, we continue to
 6   work on the electronic data issue that the -- the Court was good
 7   enough to take quite some time with us and letters were
 8   submitted.  I believe we're making some progress on that.  One
 9   question -- one issue on scheduling that came up is because
10   various counsel for Marriott who will be coming in for the
11   depositions may be traveling on the 3rd, or at least part of the
12   day on the 3rd.  I don't think the Debtor has an objection to
13   moving that hearing if the Court's calendar could accommodate it
14   by a day or two.  One of the suggestions that we had is that it
15   might make sense having that in the middle of the week, if -- if
16   the Court has some time available on the 5th, and we would -- if
17   the Court's amenable to moving the filing deadlines by a
18   corresponding amount of time.

19           THE COURT:  Okay.  Mr. Muenker.

20           MR. MUENKER:  Your Honor, certainly no objection to
21   moving the hearing that's currently scheduled for October 3rd to
22   a later date that week for the Debtor.

23           THE COURT:  Okay.  How about the 5th, Madam Clerk?

24           THE CLERK:  I'm sorry, there's supposed to be
25   something on October 3rd?
```

```
 1              THE COURT:  Yeah, there's a -- I guess it was -- I set
 2   it up as an interim hearing on the stay relief motion; is that
 3   what I said in the order?
 4              MR. MUENKER:  It's a further interim hearing, yes, on
 5   the stay relief motion.
 6              MR. FELD:  Limited, Your Honor, just to the issue of
 7   the electronic data.
 8              THE COURT:  Right.  Right.  Okay.  So that's -- I had
 9   set that up for Monday.  Let's put it Wednesday at, what, 2:00
10   o'clock, Madam Clerk?
11              THE CLERK:  It's going to have be, because you have
12   HMC in the morning.
13              THE COURT:  Right.  Okay.  Two o'clock in the
14   afternoon.  Does that work on Wednesday, the 5th?
15              MR. FELD:  Yeah, that will be -- that will be fine for
16   us, and if -- if we could ask that the filing deadlines for each
17   party would be moved two days -- corresponding two days as well.
18              THE COURT:  That's fine.
19              MR. FELD:  That will also give us some time to try to
20   continue to work through the issues.  We're going to be meeting
21   tonight and trying to work on that as well.
22              THE COURT:  Okay.  Okay.
23              THE CLERK:  So -- excuse me.  So there's nothing then
24   on October 3 now, then?
25              THE COURT:  Correct.
```

```
 1              THE CLERK:  Okay.  Thank you.

 2              THE COURT:  All right.  How about the discovery

 3   schedule?  Anything I can do to help on that, Mr. Muenker?

 4              MR. MUENKER:  Your Honor, no, I don't think there's

 5   anything that you can do to help today.  You know, obviously,

 6   this status conference was not on the calendar today, and we

 7   didn't see the filing until just shortly before the other

 8   matters that were appropriately set for calendar today.

 9              I can report that we've had a number of conversations.

10   We'll continue to talk to them.  Our special -- the firm that

11   we've filed an application to retain as special litigation

12   counsel is involved in those discussions.  They're not in the

13   courtroom today.  They're not appearing telephonically.

14              So I have nothing further to add to the Court on the

15   scheduling issue, but we'll -- we'll continue to work through

16   it, and I'm confident that we'll -- that we'll reach an

17   agreement without having to involve the Court as to when

18   deposition will need to be scheduled.

19              THE COURT:  Okay.  Well, if those discussions reach an

20   impasse I'm -- I'm certainly here, and I understand you've got a

21   hearing coming up, so I'll be available on short notice.

22              And I guess the last thing about the -- the

23   representation.  I did -- I did say that I could understand why

24   Marriott would want something along those lines, and I think --

25   I'm hopeful that something can be worked out.  I hate to offer
```

1   this, but if somebody wants me to get further involved, I would.

2   Not being as versed in the details of what is at stake it would

3   be better if you could work something out, but if you can't that

4   would be better.  Yes, go ahead.

5          MR. MUENKER:  Thank you.  The issue on the

6   representation and warranty, Your Honor, or the representation

7   that they've asked for, and we've had a number of conversations,

8   and I'd -- I'd prefer not to do this like this, because I -- I

9   don't think this is the way matters should be brought before the

10  Court, and we should engage in, basically, a he said/she said at

11  last minute arranged status conferences, but the -- but the

12  issue is if the Court would go back and look at the transcripts

13  of the previous hearings, you know, there's a couple of things

14  that stand out.

15         One is that there was no relief granted on the -- on

16  the 8th leading into the 9th, but that's really not the biggest

17  issue.

18         The issue is that the reason for the representation

19  that was offered up to the Court and to the Debtor was that

20  essentially Marriott, you know, was nervous that something might

21  have happened, and because they didn't know what was going on

22  they wanted us to make some type of a representation.

23         And given that we didn't know that there was anything

24  going on and had -- had undertaken some diligence to find out if

25  anything improper had happened we were willing to try to give

 1   them that representation to avoid the issue and hopefully enable

 2   the parties to move on.

 3          What became very clear just recently is that isn't

 4   really happened.  It isn't a question that they didn't know what

 5   was going on, and they wanted us to give a representation, it

 6   was that -- it was that they actually believe, although they

 7   have not shared it with us yet the basis for that belief, they

 8   have reason to believe that something did happen, and they won't

 9   -- they haven't yet told us exactly what it is.

10          Well, understandably, Your Honor, we had asked them

11   before we gave a representation to them for them to tell us if

12   they weren't aware of anything that had actually happened,

13   because quite obviously if they're aware of something or they

14   think that something happened, any representation that we give

15   will not in fact provide them with any comfort, because they'll

16   have information to the contrary.

17          And instead of playing this game of asking for blanket

18   representation and withholding information that you may be

19   holding, what we encouraged Marriot's counsel to do was to tell

20   us specifically what it was that they were concerned about, and

21   for the first time in three weeks in this case, over the

22   weekend, Mr. Feld provided a little information that gave us a

23   clue as to what really they're concerned about.

24          And so, what we've committed to do is follow-up on

25   that, and see if we can get to the bottom of that, and see if

1    anything did or didn't happen.  But I really, you know, object

2    to this entire process, the way it's been brought to the Court,

3    and I think the way that, I think, the Court and the Debtor has

4    been misled into why this representation was sought in the first

5    place.

6            THE COURT:  Let me hear from Mr. Muzzi first.  I think

7    he stood up a minute ago.

8            MR. MUZZI:  Yes, Your Honor, two things.  The first,

9    with respect to the representation, Modern did make a

10   representation.  Marriott was not satisfied with that

11   representation.  I asked Mr. Feld if he'd communicate directly

12   with me on any matters that affected management -- Modern

13   Management, and I haven't received any further communications.

14   I understand communications had been made to the Debtor, and

15   we're working to -- to provide representation, but we have made

16   representations.  They just haven't been satisfactory to

17   Marriott and part of that deals with the dispute as to what they

18   consider to be confidential information.

19           Just with respect to the status conference, I

20   similarly object.  I had no clue it was on calendar for today.

21   The proposed deposition schedule was sent out September 22nd, at

22   7:09 p.m.  So essentially, there's been one business day.  I was

23   traveling.  I did ask my client, one, to identify who on here is

24   -- is someone that I represent so that I could check my

25   schedule.  Modern also has other attorneys that they use, so I

 1    need to find out if I'm going to be the one that's the

 2    deposition or whether it's someone else.

 3              So we are, in fact, trying to respond to this and, you

 4    know, on one business day's notice to come into court and

 5    essentially trying to get the Court's assistance just isn't

 6    justified.  Thank you.

 7              THE COURT:  Okay.  Mr. Feld.

 8              MR. FELD:  Yes, Your Honor, just -- just to address a

 9    couple things that were said.  I know that -- that both Modern

10    and the Debtor objected to having the status conference.  That

11    they might recall that when we had the last status conference

12    before Your Honor, I believe it was on -- it might have been

13    September 16th, that -- that it was specifically discussed

14    having a holding date for a further status conference with --

15    concurrent with today's hearing.

16              So this was not something that -- that should have

17    been a surprise and Your Honor actually suggested filing

18    something in advance to provide the Court with a little

19    guidance.  That's the only reason we filed the status report in

20    response to that request.

21              As far as the scheduling of depositions, it is correct

22    that that was just sent Thursday evening, but this was something

23    that -- summarized discussions that have been going on for

24    almost a week, late in the prior weekend, and since then it

25    really -- and we -- we made the move of sending something in a

1    proposed calendar just to try to advance the discussions and see

2    if we can nail down a calendar that we can agree on.

3            Finally, Your Honor, as far as the representation,

4    Marriott's position, I think, has always been relatively clear

5    that we are concerned.  I will remind the Court, Your Honor,

6    that there have been several dates prior to and after the

7    interim order was issued -- was entered, that Marriott personnel

8    were onsite at the Hotel and observed things that may have been

9    in different conditions.  I mean there were certain agreements

10   that certain rooms, and certain boxes, and certain file cabinets

11   were to be isolated, and segregated, and locked down, and

12   concerns were expressed.

13           And we're -- we're asking for something relatively

14   simple.  We're just asking for the Hotel's current general

15   manager or somebody in a similar position of authority to do a

16   little diligence just to do some asking around, or look at a

17   security surveillance tape, or see if there's codes, electronic

18   codes that need to be accessed to get into certain secure areas

19   in the executive offices.

20           We're -- we're talking about just a very limited area

21   of the Hotel.  We're talking about the executive offices, the

22   real -- the real management area in the basement of the Hotel;

23   the sales office, the accounting office.  We're not talking

24   about the entire Hotel.  And if we -- all we're looking for is

25   some comfort that that -- those areas weren't improperly

1   accessed, and we'll -- we'll -- we'll continue to work with --
2   with Mr. Muenker and, obviously, we want to try to get this
3   resolved.
4           We do appreciate the Court's offer to -- to intervene
5   if necessary, but we hope to get it resolved without that need,
6   and we're -- you know, as I said we're meeting on a number of
7   issues with -- with the Debtor later this afternoon or evening
8   and hopefully the scheduling will -- will be an issue we can get
9   resolved as well.  I think it's in everybody's interest not to
10  belabor the entire stay relief motion and to -- to move it
11  forward and -- and get things resolved.
12          There -- there -- there is one other issue, Your
13  Honor, that wasn't in our status report that I wanted to bring
14  to the Court's attention, because it might -- it might require
15  some kind of briefing or some kind of further hearing, whether
16  by telephone or not.
17          In addition to the depositions scheduled on the -- on
18  the exhibit to the status report there was a deposition that was
19  noticed for an employee of the Debtor's special litigation
20  counsel in Texas to be held in Dallas, and there -- there's very
21  specific reasons for that.
22          We understand that the Debtor or the Debtor's special
23  litigation counsel will file a motion to quash, and it's -- it's
24  -- the only urgency of it is that the deposition was scheduled,
25  I believe, for this upcoming Friday, and the -- among other

1   things this -- this individual was a person that was involved in

2   a forensic audit subsequent to the formation of the new

3   management company, but -- but quite a few weeks -- several

4   weeks or close to a month prior to the change in management, and

5   we understand he's been intimately involved in -- in the books

6   and records issues, and things like that.

7          And we just wanted to let the Court know that to the

8   extent the -- given this time sensitivity and to the extent that

9   a motion to quash is coming that -- that Marriott would be

10  willing to respond to that on extremely short notice.  We -- we

11  will turn something around in less than 24 hours and work to

12  meet any deadline the Court sets if the Court is able to

13  accommodate us in -- in advance of Friday's scheduled date for

14  that.

15         Otherwise, we -- we don't think there's going to be

16  any objections or controversy over the -- the depositions that

17  we're discussing.  We -- we've reduced it to those names that

18  appear on the schedule after a fair amount of discussion about

19  who would be appropriate for each side, and we'll -- we'll

20  hopefully reach resolution on that.  Give me just one -- one

21  second, Your Honor.  I'm sorry, Your Honor, thank you.

22         THE COURT:  Okay.

23         MR. FELD:  The -- the only other issue which does not

24  relate to the stay relief motion is something else that the

25  Debtor and we are going to be discussing later this afternoon or

1   tonight as well and there -- there's nothing that needs to be

2   done now, but we just wanted to give the Court more of a heads

3   up than anything, is that there -- there may be some

4   rescheduling on the hearing on the rejection motion.

5            I know, I think, the Committee has expressed a concern

6   or a preference to -- to push it out, but more -- more directly

7   relevant is there's a bit of a time crunch on discovery that

8   would be required for that, because we have a July 30th -- I'm

9   sorry, September 30th objection deadline and depositions that

10  are not going to start, until the earliest, October 3rd.  There

11  -- there almost certainly will be some agreement on a -- on some

12  kind of a continuance.  The question is if it will be a short

13  one or -- or a longer one, and I -- I think we'll be -- we'll be

14  in touch with the Court with some kind of filing after further

15  discussions on that.

16           THE COURT:  Okay.  Okay.  All right.  Thank you very

17  much.

18           THE CLERK:  All rise.  Court stands in recess subject

19  to call.

20           (At which time the above-entitled proceedings were

21  concluded at 12:08 p.m.)

22

23

24

25

1

2                          CERTIFICATE

3          I, court approved transcriber, certify that the

4   foregoing is a correct transcript from the official electronic

5   sound recording of the proceedings in the above-entitled matter.

6          Dated this 29th day of September, 2011.

7

8                          /s/ Jessica B. Cahill

9                       Jessica B. Cahill

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25