# EXHIBIT L

FINAL

**WAIKIKI EDITION**
**HONOLULU, HAWAII**

**DESIGN AND TECHNICAL SERVICES AND PRE-OPENING AGREEMENT**

between

**M WAIKIKI LLC**

("Owner")

and

**MARRIOTT HOTEL SERVICES, INC.**

("Manager")

and

**I.S. INTERNATIONAL, LLC**

("Schrager")

Dated as of July 9, 2008

407850v7



**ARTICLE 1    DEFINITIONS AND GENERAL MATTERS**

1.1    DEFINITIONS.................................................................................................1
1.2    PROJECT SCHEDULE, OWNER REPRESENTATIVE, MANAGER/SCHRAGER
       REPRESENTATIVE AND APPROVAL OF CONSULTANTS ...............................7

**ARTICLE 2        DESIGN AND TECHNICAL SERVICES**

2.1    CONCEPTUAL AND SCHEMATIC DESIGN PHASES .......................................8
       2.1.1    PRELIMINARY INFORMATION...............................................8
       2.1.2    RESPONSE TO PRELIMINARY INFORMATION............................8
       2.1.3    DESIGNERS AND CONSULTANTS ...........................................9
       2.1.4    SCHRAGER AND MANAGER OVERSIGHT..................................9
       2.1.5    SCHEMATIC DESIGN PHASE.................................................9
       2.1.6    PROJECT MILESTONES........................................................9
2.2    DESIGN DEVELOPMENT PHASE....................................................10
       2.2.1    DESIGN DEVELOPMENT PHASE..........................................10
       2.2.2    INTERIOR DESIGN............................................................10
       2.2.3    APPROVAL OF DESIGN DEVELOPMENT PACKAGE....................10
       2.2.4    APPROVAL OF FF&E PACKAGE...........................................11
       2.2.5    APPROVAL OF THIRD-PARTY OPERATORS.............................11
2.3    CONSTRUCTION DOCUMENT PHASE ..............................................11
       2.3.1    FINAL DESIGN PHASE.......................................................11
       2.3.2    SYSTEMS.......................................................................11
       2.3.3    DECORATIVE ITEMS ........................................................12
       2.3.4    APPROVALS....................................................................12
2.4    CONSTRUCTION PHASE ............................................................12
       2.4.1    CONSTRUCTION OF HOTEL, OBSERVATIONS ...........................12
       2.4.2    PERMITS.......................................................................13
       2.4.3    DOCUMENTS UPON COMPLETION OF CONSTRUCTION ............13
       2.4.4    BUDGET ........................................................................13
2.5    POST-COMPLETION PERIOD.......................................................14
       2.5.1    DOCUMENTATION ...........................................................14
       2.5.2    PUNCHLIST....................................................................15
       2.5.3    DEFAULTS ....................................................................15
       2.5.4    EDITION FLAGGING .........................................................15

**ARTICLE 3    FIXED ASSET SUPPLIES, INVENTORIES AND EQUIPMENT
                LEASES**

3.1    FIXED ASSET SUPPLIES AND INVENTORIES .................................................15



## TABLE OF CONTENTS

**Page**

**ARTICLE 4    TIMETABLE; TECHNICAL SERVICES FEE**

| | | |
|---|---|---|
| 4.1 | CONSTRUCTION OF HOTEL AND PROJECT AREAS | 16 |
| 4.2 | TECHNICAL SERVICES FEE | 17 |
| 4.3 | CONCEPT DEVELOPMENT FEE | 18 |
| 4.4 | REIMBURSABLE EXPENSES | 18 |
| 4.5 | FUNDING TECHNICAL SERVICES | 19 |

**ARTICLE 5    PRE-OPENING ACTIVITIES**

| | | |
|---|---|---|
| 5.1 | PROJECTED OPENING DATE; TURNOVER SCHEDULE | 19 |
| 5.2 | PRE-OPENING ACTIVITIES | 19 |
| 5.3 | PRE-OPENING EXPENSES | 20 |
| 5.4 | FUNDING OF PRE-OPENING EXPENSES | 20 |
| 5.5 | USE OF FUNDS IN PRE-OPENING ACCOUNT; ACCOUNTING | 21 |

**ARTICLE 6    OPENING DATE**

| | | |
|---|---|---|
| 6.1 | OPENING DATE | 21 |
| 6.2 | NOTIFICATION | 21 |
| 6.3 | CONDITIONS FOR OPENING HOTEL | 22 |
| 6.4 | INITIAL FUNDING OF WORKING CAPITAL; FIXED ASSET SUPPLIES | 22 |
| 6.5 | HOTEL ACCESS | 22 |

**ARTICLE 7    INTERIM INSURANCE**

| | | |
|---|---|---|
| 7.1 | INSURANCE REQUIRED | 22 |
| 7.2 | GENERAL PROVISIONS | 24 |

**ARTICLE 8    REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER**

| | | | |
|---|---|---|---|
| 8.1 | REPRESENTATIONS AND WARRANTIES OF OWNER | | 24 |
| | 8.1.1 | TITLE | 24 |
| | 8.1.2 | NO BREACH | 25 |
| | 8.1.3 | LITIGATION | 25 |
| | 8.1.4 | ACCESS AND UTILITIES | 25 |
| 8.2 | COVENANTS OF OWNER | | 25 |

ii



## TABLE OF CONTENTS

<strong>Page</strong>

|       |       |                                                                 |     |
| ----- | ----- | --------------------------------------------------------------- | --- |
| 8.2.1 |       | CONSTRUCTION                                                    | 25  |
| 8.2.2 |       | PUBLICITY                                                       | 25  |
| 8.2.3 |       | USE OF LOGOS                                                    | 25  |
| 8.2.4 |       | ENVIRONMENTAL                                                   | 25  |
| 8.3   |       | SURVIVAL; INDEMNITY                                             | 26  |

## ARTICLE 9   MISCELLANEOUS

| 9.1  | DEFAULTS                                                             | 26 |
| ---- | ------------------------------------------------------------------- | -- |
| 9.2  | TERM                                                                | 26 |
| 9.3  | SUCCESSORS AND ASSIGNS                                              | 26 |
| 9.4  | RELATIONSHIP                                                         | 27 |
| 9.5  | DOCUMENTS                                                            | 27 |
| 9.6  | THIRD-PARTY RIGHTS                                                   | 27 |
| 9.7  | HEADINGS                                                             | 27 |
| 9.8  | COUNTERPARTS                                                         | 27 |
| 9.9  | EFFECT OF APPROVAL OF PLANS AND SPECIFICATIONS                       | 27 |
| 9.10 | APPLICABLE LAW                                                       | 28 |
| 9.11 | NOTICES                                                              | 28 |
| 9.12 | CONFIDENTIALITY                                                      | 29 |
| 9.13 | WAIVER OF JURY TRIAL AND CONSEQUENTIAL AND PUNITIVE DAMAGES          | 30 |
| 9.14 | INDEMNIFICATION                                                      | 30 |
| 9.15 | ENTIRE AGREEMENT                                                     | 30 |
| 9.16 | CONSENTS AND APPROVALS                                               | 30 |

Exhibit 1   -   Milestone Events
Exhibit 2   -   Pre-Opening Budget & Initial Working Capital



## DESIGN AND TECHNICAL SERVICES AND PRE-OPENING AGREEMENT

**THIS DESIGN AND TECHNICAL SERVICES AND PRE-OPENING AGREEMENT** ("Agreement") is entered into this 9th day of July, 2008 ("Effective Date"), by and among **M WAIKIKI LLC** ("Owner"); **MARRIOTT HOTEL SERVICES, INC.** ("Manager"); and **I.S. INTERNATIONAL, LLC** ("Schrager").

### RECITALS

A.      Owner and Manager have entered into and executed that certain management agreement dated as of the date hereof (the "Management Agreement") pursuant to which Owner has engaged Manager as the manager of an EDITION hotel containing approximately three hundred fifty-three (353) Guest Rooms in an existing hotel currently under renovation in Waikiki, Honolulu, Hawaii;

B.      Owner acknowledges that an EDITION hotel will be a first-class, boutique hotel as to (i) design, appearance and quality of the Hotel and related improvements, (ii) the appearance, quality and function of the furniture, fixtures, systems and equipment, and (iii) the staffing and operation of the Hotel itself;

C.      Owner, Manager and Schrager have agreed upon certain design services and technical services to be provided by Manager and/or Schrager with regard to: (i) the design and construction of the renovation of the Hotel by Owner; and (ii) the design and procurement of the furniture, fixtures, systems and equipment for the Hotel by Owner so that the Hotel, when open for business, shall in all respects meet the requirements and standards of an EDITION hotel; and

D.      Owner, Manager and Schrager have agreed upon certain pre-opening services to be provided by Manager and/or Schrager with regard to Manager's and Schrager's recruiting and training of the initial operating staff and the provision of other pre-opening services so that the Hotel, when opened for business on the Flagging Date, shall in all respects meet the requirements and standards of an EDITION hotel.

NOW, THEREFORE, Owner, Manager and Schrager, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

### ARTICLE 1
### DEFINITIONS AND GENERAL MATTERS

1.1      <u>Definitions</u>.  All terms not defined in this Agreement shall have the meanings ascribed to them in the Management Agreement.



"Agreement" shall mean this Design and Technical Services and Pre-Opening Agreement, including the exhibits attached hereto, as it may be amended, restated or supplemented from time to time.

"Audio/Video Systems" shall include, but not be limited to, the following Hotel systems: general audio and video systems (audio/video) for the Hotel, entertainment audio/video systems, video information systems, public address systems and the master antenna television distribution system.

"Case Goods" shall mean furniture and furnishings used in the Hotel, including, without limitation: chairs, beds, chests, headboards, desks, tables, decorative lighting fixtures, and similar items.

"Concept Development Fee" shall have the meaning ascribed to it in Section 4.3.

"Conceptual Plans" shall mean, collectively, the plans and specifications and other materials set forth in Sections 2.1.5, 2.2.1, 2.2.2, 2.2.3 and 2.2.4.

"Decorative Items" shall include, but not be limited to, artifacts, artwork, banquettes, carpeting, decorative lighting fixtures, etched glass, furniture, graphics, interior landscaping, radios, interior signage, televisions and window treatments.

"Designer" shall have the meaning ascribed to it in Section 1.02(a).

"Design Schedule" shall have the meaning ascribed to it in Section 1.02(b).

"EDITION Technical Standards" shall mean, as of the Effective Date, the "JW Marriott Hotels & Resorts Design Standards" dated January 2005, as revised from time to time, published by Manager's Architecture and Construction Division. The parties acknowledge that the EDITION Technical Standards are preliminary in nature and under revision and refinement by Manger and Schrager, which revisions and refinements shall, at the request of Manager, be incorporated into the Hotel.

"EDITION Hotel System" shall mean the chain of full-service boutique hotels operated and managed by Marriott (or one or more of its Affiliates) that is, as of the Effective Date, operated under the Trade Name or mark "EDITION Hotels."

"Effective Date" shall have the meaning ascribed to it in the Preamble.

2



"Exterior Identity Signage" shall mean exterior illuminated or non-illuminated signs for identification of the Hotel, such as wall-mounted building signs, pylon signs and ground-mounted monument signs.

"Extraordinary Event" shall mean any of the following events, regardless of where it occurs or its duration: acts of nature (including hurricanes, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war or armed conflict; riots or other civil commotion; terrorism; strikes or similar labor disturbances; embargoes or blockades; shortage of critical materials or supplies; action or inaction of governmental authorities which have an impact upon the Hotel; the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused for reasons of the Extraordinary Event; and any other events beyond the reasonable control of Owner, Manager or Schrager, as appropriate.

"Facilities Program" shall have the meaning ascribed to it in Section 2.1.1.

"FF&E" shall mean furniture, furnishings, fixtures, Soft Goods, Case Goods, Decorative Items, signage, Audio/Video Systems, kitchen appliances, refrigerators, minibars and equipment, including front desk and back-of-the-house computer equipment, but shall not include Fixed Asset Supplies or Software.

"Fixed Asset Supplies" shall mean items included within "Property and Equipment" under the Uniform System of Accounts which may be consumed in the operation of the Hotel or are not capitalized including, but not limited to, linen, china, glassware, tableware, uniforms, and similar items, used in the operation of the Hotel.

"Flagging Renovation" shall have the meaning ascribed to it in Section 2.5.4.

"Food/Kitchen Equipment" shall mean all food preparation, cooking and holding equipment; exhaust hoods and hood fire protection systems; general storage layout, refrigerators and freezers (including coils, condensers and compressors); ice-making, beverage dispensing and other food and beverage equipment; dishwashing equipment (except any glass washer included in Housekeeping Equipment); and all other similar items required for a complete food and beverage service of the Hotel.

"Graphics" shall mean food and beverage logos; name signs for suites, meeting rooms, board rooms, conference suites, and ballrooms; Guest Room numbers; all directional signs; exterior signs except Exterior Identity Signage; Guest Room evacuation signs; elevator, handicapped, fire stair, and elevator restriction signs; miscellaneous directional and loss prevention/safety signs; and all signs required by or for municipal, department of transportation, fire safety, or other jurisdictional authority for the operation of the Hotel.

3



"Guest Room" shall mean a separately-keyed lodging unit in the Hotel.

"Hotel Systems" shall include, but not be limited to, software, hardware, cabling and all other items necessary for a computer; rooms management systems; front office, back office and accounting management systems; sales and reservations systems; timekeeping and Manager's automated payroll systems; point-of-sale systems, including food, beverage and retail functions; food and beverage inventories systems; engineering software; and word processing and other personal computer applications.

"Housekeeping Equipment" shall mean equipment items (including glass washer) to be used by Hotel employees for cleaning the Hotel on a regular basis.

"Inventories" shall mean "Inventories" as defined in the Uniform System of Accounts, such as, but not limited to, provisions in storerooms, refrigerators, pantries and kitchens; beverages in wine cellars and bars; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"Laundry Equipment" shall mean washers, washer/extractors, dryers, chest-type ironers, steam boiler, thermal fluid heater for ironer, lint control devices, linen folders, linen carts, dry cleaning equipment (if required), laundry sinks, air compressors, laundry scales and all other similar items required for a complete laundry with ironing capacity.

"Management Agreement" shall have the meaning ascribed to it in the Recitals.

"Manager" shall have the meaning ascribed to it in the Preamble.

"Manager/Schrager Rep" shall have the meaning ascribed to it in Section 1.2(c).

"Opening Date" shall mean the first (1st) day on which the Hotel is open for business to paying overnight guests.

"Owner" shall have the meaning ascribed to it in the Preamble.

"Owner Rep" shall have the meaning ascribed to it in Section 1.2(c).

"Plans" shall have the meaning ascribed to it in Section 2.3.1.

"Pre-Opening Account" shall mean a special account or accounts, bearing the name of the Hotel, established by Manager in a bank or trust company designated by Manager.

4



"Pre-Opening Expenses" shall mean those expenses incurred prior to and after the Opening Date pursuant to Section 5.3 that are necessary for the preparation of the Hotel for operation, including, but not limited to, salaries and wages, costs of interim office space, furniture, equipmen and systems, professional fees, telephone expenses, staff hiring and training costs, travel and moving expenses, costs of entertainment, opening celebrations and functions (including food, beverage, labor and room accounts of invitees), the cost of heat, light, power and clean-up expenses not chargeable to the cost of acquiring or constructing the Hotel, advertising, public relations and promotion expenses, employee benefits and meals prior to opening, classified advertising, agency fees and recruitment costs, pro rata costs of Manager or its Affiliates in performing such services including personnel costs and expenses allocated in a reasonable manner, and other associated and miscellaneous expenses.

"Project" shall mean an existing three hundred fifty three room hotel and related meeting and public spaces and support facilities and shall include the design, construction, furnishing and equipping of the Hotel, including, without limitation, the design, construction, furnishing and equipping of the porte cochere, lobby, elevator interiors, ballroom and meeting spaces, pool decks, public areas, guest rooms and corridors and other interior areas of the Hotel as may be agreed upo between Owner, Manager and Schrager (the "Project Areas") and all related infrastructure that is used in connection with the Hotel or is incidental to the use thereof.

"Project Areas" shall have the meaning ascribed to it in the definition of Project.

"Punchlist Items" shall have the meaning ascribed to it in Section 2.5.2.

"Reimbursable Expenses" shall mean the reasonable actual expenses incurred by Manager, Schrager or their respective Affiliates, directly or indirectly, in connection with providing design and technical services pursuant to Article 2 and Article 3, whether before or after the execution of this Agreement, including, but not limited to: transportation (including airfare) and lodging and meals incidental thereto; telephone calls, telegrams, facsimile transmissions, computer line charges, postage and use of courier services; photocopying and reproduction by other means of reports, drawings, specifications and similar Project-related documents; the use of highly specialized equipment; and fees paid by Manager and/or Schrager to independent consultants for their services and expenses.

"Schrager" shall have the meaning ascribed to it in the Preamble.

"Security Systems" shall mean video surveillance equipment; two way radio systems; inspection tour recording systems; security alarm systems; access control systems (pedestrian and vehicular); and other special security systems required for the Project.

"Soft Goods" shall mean all fabric, textile and flexible plastic products (not including items which are classified as "Fixed Asset Supplies") which are used in furnishing the Hotel, including,

5



without limitation: corner guards, carpet, carpet base, fabric or vinyl wall covering, graphics, lamps, window treatments, artwork, upholstered furniture, task chairs, bed skirts, bed scarfs, shower curtain/liner, shower rod, artifacts, bedspreads, mirrors and similar items.

"Software" shall mean all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is generally commercially available, which are used by Manager in connection with operating or otherwise providing services to the Hotel and/or the EDITION Hotel System, including without limitation the property management system, the reservation system and the other electronic systems used by Manager in connection with operating or otherwise providing services to the Hotel and/or the EDITION Hotel System.

"Substantial Completion" shall mean (i) substantial completion of the Project in conformance, in all material respects, with the Plans, the EDITION Technical Standards, the System Standards and the requirements of this Agreement (other than minor Punchlist Items, which will not individually or in the aggregate impair the use of the Hotel for its intended purpose, or impair the guest experience at the Hotel) and free of all liens; (ii) making available to Manager all Fixed Asset Supplies and Inventories, and installing all FF&E and Hotel Systems, as required for the operation of the Hotel in accordance with the Management Agreement and this Agreement and for the Hotel to conform with clause (i) above; (iii) Owner and Manager, as applicable, have obtained required permits as set forth in Section 2.4.2 required for the opening of the Hotel; and (iv) Owner has funded the initial Working Capital described in Section 6.4.

"System Standards" shall mean any one or more (as the context requires) of the following three (3) categories of standards: (i) operational standards (for example, services offered to guests, quality of food and beverages, cleanliness, staffing and employee compensation and benefits, Chain Services, frequent traveler programs such as the Marriott Rewards Program and other similar programs, etc.); (ii) physical standards (for example, quality of the Hotel Improvements, FF&E, and Fixed Asset Supplies, frequency of FF&E replacements, etc.); and (iii) technology standards (for example, those relating to software, hardware, telecommunications, high speed internet access, systems security and information technology); each of such standards shall be the standard which is generally prevailing or in the process of being implemented at all or substantially all other hotels in the EDITION Hotel System, including all services and facilities in connection therewith that are customary and usual at all or substantially all hotels in the EDITION Hotel System.

"Technical Services Fee" shall have the meaning ascribed to it in Section 4.2.

"Telecommunications Systems" shall mean PBX, phone systems, and call accounting and pocket paging systems, and high speed Internet access.

"Termination" shall mean the expiration or sooner cessation of this Agreement.

6



1.2    Project Schedule, Owner Representative, Manager/Schrager Representative and Approval of Consultants.

(a)    Manager and Schrager have proposed that Owner engage Calvin Tsao and Tsao & McKown Architects ("Designer") as the designer for the Project Areas. Owner has agreed to engage Designer, subject to the negotiation and execution of a design services agreement between Owner and Designer acceptable to Owner in all respects including a scope of work, fees and payment structure.

(b)    As soon as reasonably possible after the Effective Date, but in no event later than thirty (30) days after the Effective Date, Manager and Schrager shall provide Owner with a schedule (the "Design Schedule") for the completion of the design of the Project Areas, including an estimate of the time necessary for the preparation of all related construction drawings and the issuance of related permits by the local building authority; provided, however, Owner acknowledges that Manager, Schrager and Designer shall not be responsible for obtaining such permits. On a monthly basis during the course of the design development process, Manager and Schrager shall, and Schrager shall cause Designer to, update such schedule and present the revised design schedule to Owner for its review and approval.

(c)    Owner shall designate a representative (the "Owner Rep") through whom Manager and Schrager may coordinate their activities pursuant to this Agreement, which representative may be changed by Owner upon written notice to Manager. Manager and Schrager shall designate a joint representative (the "Manager/Schrager Rep") through whom Owner may coordinate its activities pursuant to this Agreement, which representative may be changed by Manager and Schrager with written notice to Owner.

(d)    Manager and Schrager shall provide Owner with the names of, and other information reasonably requested by Owner with respect to other Project consultants proposed by Manager and Schrager for Owner's reasonable review and approval.

(e)    Owner shall provide Manager with the names of, and other information reasonably requested by Manager and Schrager with respect to Owner's architect of record and existing Project consultants, in each case for Manager and Schrager's review and approval. In the event Owner desires to replace the architect of record or existing Project consultants, or to engage additional Project consultants, Owner shall first obtain Manager's and Schrager's review and approval with respect to such persons. In the event Owner desires to replace the architect of record or existing Project consultants, or to engage additional Project consultants, Owner shall first obtain Manager's and Schrager's review and approval with respect to the proposed new persons. Manager and Schrager hereby approve the existing Project consultants set forth on Exhibit 3.

**ARTICLE 2**

7

## DESIGN AND TECHNICAL SERVICES

2.1     Conceptual and Schematic Design Phases.

2.1.1    Preliminary Information.  Owner has previously delivered to Manager and Schrager a complete set of architectural and design drawings and specifications, including a detailed facilities program reflecting Owner's architectural and design plans for the Hotel and the existing conditions of the Hotel.  Manager has provided to Owner the preliminary EDITION Technical Standards and is currently working with Schrager to develop the final EDITION Technical Standards.  Until the completion and issuance of the final EDITION Technical Standards, Manager and Schrager shall provide to Owner such information as may be necessary with respect to Manager's requirements for the design, specification, scheduling and installation of the Hotel Systems to assist Owner in the completion of the procurement of the Hotel Systems as soon as practicable after such request by Owner.  Owner has previously worked with Manager to develop and assemble information about the Hotel and the Waikiki market including: (i) a competitive set analysis, containing such information as is available regarding occupancy, average daily rate, room sizes, facilities, services and amenities of competitive hotels in the market; and (ii) other general information about the market.

Schrager, in conjunction with Designer and based upon the detailed facilities program reflecting Owner's existing architectural and design plans for the Hotel, shall prepare for Owners' approval, a proposed new detailed facilities program (the "Facilities Program") describing the space requirements for the Project Areas which shall take into account the EDITION Technical Standards and the System Standards.

The parties acknowledge and agree that with respect to the redevelopment, repositioning, renovation, design and construction of the Hotel as contemplated by this Agreement, the parties shall work together in good faith to resolve any disputes regarding such matters and to reach a resolution acceptable to all parties.  In the event that, despite such good faith efforts, the parties are unable to reach a mutually acceptable resolution (a) Schrager shall have final approval, in its reasonable discretion, over the interior design of the Hotel and the overall theme and feel of the Hotel, notwithstanding any Owner approval rights set forth in this Agreement; (b) Owner shall have final approval, in its reasonable discretion, over structural matters, the uses of the Project Areas, and the configuration of all other areas of the Hotel, notwithstanding any approval rights of Manager or Schrager set forth in this Agreement; and (c) Manager shall have final approval, in its reasonable discretion, over all matters concerning EDITION Technical Standards and Hotel Systems notwithstanding any approval rights of Owner or Schrager set forth in this Agreement; provided, however, that Manager's approval rights with respect to fire and life safety matters shall be in Manager's sole discretion.

2.1.2    Response to Preliminary Information.  Within the timeframe set forth in the Design Schedule Schrager will (i) meet with Designer to present Schrager's preliminary design

8



vision and concept for the Hotel, (ii) in conjunction with Designer provide feedback to Owner o the Facilities Program and proposed layouts for the public areas of the Hotel provided by Owner, (iii) discuss and provide input to Owner with respect to the food and beverage concepts for the Hotel, and (iv) discuss and provide input to Owner with respect to the design schedule and key construction and development milestones.

2.1.3   <u>Designers and Consultants</u>.  Owner shall be solely responsible to pay all costs and expenses of the architects, engineers, designers and consultants retained in connection with the design and development of the Project, all of whom shall be subject to the approval of Manager and Schrager.

2.1.4   <u>Schrager and Manager Oversight</u>.  Schrager shall direct all of the design consultants and the artwork consultant throughout the term of this Agreement.  The Hotel shall comply with Manager's fire and life safety standards.  Manager shall review and approve the operational, fire and life-safety and back-of-house plans as necessary throughout the term of this Agreement.

2.1.5   <u>Schematic Design Phase</u>.  Schrager shall cause Designer, with input from Manager and Schrager, and based upon and incorporating the information provided in the materials described in Sections 2.1.1 and 2.1.2, to prepare or cause to be prepared for delivery to Owner: (i) a detailed listing of each operating function of the Hotel and the as-designed areas, and any other documents required to describe the size, layout and quality of the Hotel; (ii) colored floor plans, showing all spaces listed in the Facilities Program (at a scale of 1/8"=1'); and (iii) Guest Room layouts, indicating all bath fixtures, kitchen equipment, closets, balconies and other major features (at a scale in ¼" scale).  Such materials shall also include a rendering and preliminary architectural plans of the Project Areas, if any.

2.1.6   <u>Project Milestones</u>.  Owner, Designer, Manager and Schrager shall prepare a milestone schedule that will include, without limitation, the following:

     (a)     conceptual design review

     (b)     fire and life safety review(s)

     (c)     schematic design review

     (d)     design development reviews - as agreed upon between Owner, Manager and Schrager

     (e)     construction document review - as agreed upon between Owner, Manager and Schrager

9



(f)      value engineering review(s)

(g)      FF&E review(s)

(h)      signage review(s)

(i)      graphics review(s)

(j)      web site review(s)

(k)      Fixed Asset Supplies and Inventories review(s)

(l)      Any change in the agreed milestone schedule must be approved by Owner, Manager and Schrager.

2.2      <u>Design Development Phase</u>.

2.2.1      <u>Design Development Phase</u>.  Schrager shall cause Designer, with direction from Manager and Schrager, based upon the approvals described in Section 2.1, to prepare or cause to be prepared: (i) the detailed development of plans and specifications for each of the Project Areas; (ii) furniture layouts, reflected ceiling plans, interior elevations, wall sections, materials, lighting and color schemes; (iii) design of HVAC distribution – coordinated with mechanical engineer and other consultants as appropriate;  (iv) design for lighting and emergency lighting and alarm systems; (v) review of lighting layouts for all such areas including specific fixture selection in catalog reference or design form, and recommendations on and specifications of dimmer equipment.

2.2.2      <u>Interior Design</u>.  Prior to submission, or as part of the plans submitted pursuant to Section 2.2.1 to Owner, Designer, Manager and Schrager shall submit to Owner for review and approval (i) interior design plans, including color-rendered floor plans, reflected ceiling plans, elevations, sections and renderings that are reasonably necessary, in Designer's or Schrager's opinion, to adequately explain the design intent for the Hotel's public areas and Guest Room and Guest Room corridors (which, upon approval, shall become part of the Plans); and (ii) display boards of fabrics, carpets, furnishings, finishes, paints, lighting design guidelines (e.g., fixtures, chandeliers, sconces, etc.) and other materials for each Project Area designated by Schrager.  Schrager shall cause Designer, with direction from Manager and Schrager as appropriate, to revise and amend such presentation materials as required to obtain final approval of the interior design by Owner.

2.2.3      <u>Approval of Design Development Package</u>.  Owner, Manager and Schrager shall review and approve the design development package at interim levels of completion to be

10



agreed upon between Manager, Schrager and Owner and at one hundred percent (100%) completion.

2.2.4   Approval of FF&E Package.  Schrager shall cause Designer, with input and oversight from Schrager and Manager to prepare the proposed FF&E package for presentation to Owner. The final FF&E package shall meet the quality standards set forth in the specification book provided to Owner by Manager and Schrager  and shall be subject to approval by Manager, Schrager and Owner from durability, aesthetic and cost perspectives.

2.2.5   Approval of Third-Party Operators.  Owner, Manager and Schrager shall mutually approve all third-party operators of food and beverage outlets, the spa, and any other amenities at the Hotel. Owner has engaged Morimoto as the operator of the primary restaurant space and Manager and Schrager agree to work together with Owner and Morimoto to maximize the operation of the restaurant and integrate the primary restaurant space with the rest of the Hotel.

2.3   Construction Document Phase.

2.3.1   Final Design Phase.  Upon the approval of Owner, Manager and Schrager of the items detailed in Section 2.2, and based upon the designs therein approved by Owner, Manager and Schrager, Owner shall cause Owner's architect to produce final plans, specifications and complete construction drawings (including, without limitation, architectural, electrical, plumbing, HVAC, structural, civil engineering, life safety, and landscape drawings for the Project) (collectively, the "Plans") which shall be properly sealed by Owner's architect.  The Plans shall (i) adapt the standards and specifications approved by Manager and Schrager to the Hotel and to the legal requirements applicable to the design, construction and operation of the Hotel, and (ii) incorporate the Conceptual Plans, EDITION Technical Standards and the System Standards.  The Plans shall be submitted to Manager and Schrager for approval at intervals to be agreed upon by Owner, Manager and Schrager,  which shall be at least thirty (30) days prior to commencement of construction of the Project.  The Plans shall clearly indicate items which vary from or are inconsistent with the Conceptual Plans previously approved by the parties.  Following Manager's and Schrager's approval of each stage of the Plans, no change in such Plans shall be made that materially affects the design, construction, operation, cost or aesthetics of the Hotel or any of the Project Areas without the prior approval of Manager and Schrager.

2.3.2   Systems.  In accordance with the approved schedule for the Project, Manager and Schrager shall provide to Owner:  (i) on background drawings provided by Owner, the locations of security devices, and their specifications, installation details, cable distribution, power and space requirements; (ii) on background drawings provided by Owner, the locations and types of telephone equipment, paging and call accounting equipment; (iii) a cabling document and general information for the Hotel Systems; and (iv) guidelines for conduit sizing, cable distribution, power and space requirements for Telecommunications Systems.

11



2.3.3   <u>Decorative Items</u>.  Upon Owner's approval  of the interior design materials submitted pursuant to Section 2.2.2, Manager and Schrager shall prepare or cause to be prepared for Owner's review and approval documents reasonably describing the Decorative Items to be installed in the Hotel and the installation locations or details therefore.  Such information shall include the description, quantity, recommended manufacturer and model number, product specification, photograph (when appropriate), installed location and other pertinent information about the Decorative Items.

2.3.4   <u>Approvals</u>.  Manager and Schrager shall provide to Owner for review and approval documents specifying the Audio/Video Systems, Exterior Identity Signage, Food/Kitchen Equipment, Graphics, Housekeeping Equipment, Laundry Equipment, Security Systems and Telecommunications Systems to be installed in the Hotel.  Such information shall include the description, quantity, recommended manufacturer and model number, product specification, photograph (when appropriate), installed location and other pertinent information about the FF&E and other equipment and systems.  Upon approval by Owner, such documents shall become part of the Plans.

2.4   <u>Construction Phase</u>.

2.4.1   <u>Construction of Hotel, Observations</u>.  Owner shall construct, furnish and fully equip the Hotel and the Project Areas in accordance with the Plans that have been previously approved by Owner, Manager and Schrager and the EDITION Technical Standards and Systems Standards in existence as of the commencement of construction (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3).  During the course of construction, Owner shall cooperate with Manager and Schrager for the purpose of permitting Manager and Schrager to observe from time to time the construction of the renovations to the Project as construction proceeds, and to determine whether construction is proceeding in accordance with the approved Plans.  In particular, Owner shall permit Manager and Schrager to visit the Site at such intervals as they deem reasonably necessary (which intervals shall include, without limitation, the milestone events described on <u>Exhibit 1</u> attached hereto as agreed upon by Owner, Manager and Schrager).  Owner shall give Manager and Schrager at least fifteen (15) days' notice prior to each of the events described in <u>Exhibit 1</u> in order to enable Manager and Schrager to schedule their visit(s).  However, the parties agree that despite their right to observe the construction pursuant to this Section 2.4.1, neither Manager nor Schrager shall be obligated to observe the construction of the Project.  It is understood and agreed that neither Manager nor Schrager is providing construction management services, and that construction management shall be the sole responsibility of Owner.  To the extent that Manager or Schrager reasonably determines that the Project, as constructed, furnished or equipped do not conform to the approved Plans, Owner shall promptly correct such nonconforming work.  Any nonconforming work discovered prior to the opening of the Hotel shall be corrected by Owner prior to the Opening Date.



2.4.2   <u>Permits</u>.  Owner shall be responsible for obtaining all permits and other approvals required for construction and opening of the Hotel, such as the building permit, occupancy permit and elevator permits for the Hotel.  Manager shall be responsible for obtaining all permits and licenses required for the operation of the Hotel, such as the hotel operating license, liquor licenses and other miscellaneous licenses.  In connection therewith, Owner agrees to sign promptly and without charge applications for any such licenses, permits and other documents pertaining to the initial operation of the Hotel as may be required by the applicable authority.

2.4.3   <u>Documents Upon Completion of Construction</u>.  Upon completion of the Hotel, Owner shall submit to Manager and Schrager (i) an architect's certification that the Plans comply with all applicable legal requirements and that the Hotel has been constructed and completed materially in accordance with the Plans approved by Manager and Schrager, and (ii) a copy of the temporary or, if available, permanent certificate of occupancy for the Hotel.  Owner shall use reasonable efforts to provide to Manager a copy of the permanent certificate of occupanc for the Hotel by no later than sixty (60) days after the date of Substantial Completion.

2.4.4   <u>Budget</u>.  No later than fifteen (15) days after the Effective Date Owner shall prepare and furnish a master budget to Manager and Schrager for their approval, which approval shall be limited to determining that such master budget contemplates sufficient funds for all of its intended purposes.  Such budget may be amended and refined within fifteen (15) days after the beginning of each design phase and the start of construction.  The master budget for the Project shall specify dollar amounts for at least the following items:

(a)   Predevelopment costs with reasonable specificity;

(b)   Design fees, including special design presentations scheduled by Manager and Schrager;

(c)   Construction costs, specifically identifying but not limited to:

(i)   Landscaping, hardscaping and site amenities;

(ii)   Public space marble;

(iii)   Guest Room marble;

(iv)   Public space millwork; and

(v)   Guest Room millwork;

(d)   FF&E specifically identifying arts and antiques, kitchen and laundry;

13



(e)     Costs related to interior design;

(f)     Interior and exterior signage;

(g)     Warehouse staging for FF&E;

(h)     Art allowances, antique allowances and decorative lighting for Guest Rooms, Guest Room corridors, public areas, restaurant(s), bar(s), ballroom(s), meeting rooms and boardrooms, and private dining room(s);

(i)     Administrative offices furnishings;

(j)     Equipment and furnishings for main kitchen, remote kitchens, food and beverage outlets, main laundry facility, housekeeping offices, and central and remote shelving;

(k)     Equipment for plant maintenance and groundskeeping;

(l)     Equipment and supplies for recreational facilities;

(m)     Supplies for Guest Rooms, public areas, food and beverage facilities, and front desk;

(n)     Uniforms;

(o)     Other Development Fees and Costs; and

(p)     Contingency.

2.5     Post-Completion Period.

2.5.1     Documentation. Upon Substantial Completion, Owner shall provide to Manager: (i) all documents, including an electronic copy (AutoCAD.dwg format) and two (2) full size print sets of record drawings and specifications prepared with respect to the Hotel and the Project Areas for Owner by its architects, engineers, interior designers, electrical engineering consultants, plumbing consultants, mechanical consultants, lighting consultants, graphic designers, and all other design team consultants, as the case may be, with the inclusion therein of all documented changes (including the architect's supplemental instructions, requests for information (RFIs), submittal revisions, etc.) and all "as-built" information; and (ii) all management manuals, drawings, technical information, warranties and guaranties relating to the equipment and systems installed in the Hotel or the Project Areas.

14



2.5.2   Punchlist.  Within thirty (30) days after the Opening Date, Manager shall furnish to Owner (with a copy to Schrager) the completed punchlist ("Punchlist Items") delineating the specific areas of the Project disapproved or rejected by Manager and/or Schrager and setting forth the grounds for such disapproval or rejection.  Owner shall use commercially reasonable efforts to complete any of the Punchlist Items within one hundred twenty (120) days after Owner's receipt of the list of Punchlist Items pursuant to this Section 2.5.2., and in the event Owner fails to do so, Manager shall be entitled to complete the remaining Punchlist Items at the sole cost and expense of Owner.  If, following one hundred twenty (120) days after the Opening Date, Owner has failed to reimburse Manager for any amounts for which Owner is liable pursuant to this Section 2.5.2, Manager shall have the option to reimburse itself such amounts from distributions otherwise payable to Owner pursuant to the Management Agreement.

2.5.3   Defaults.  Notwithstanding any other provisions of this Agreement, to the extent that Manager reasonably determines that the Hotel as constructed, furnished or equipped, does not conform to the approved Plans in any material respect, Manager shall provide written notice thereof to Owner in accordance with Section 9.11.  Owner shall use commercially reasonable efforts to correct such nonconforming work within thirty (30) days after receipt of written notice from Manager, and in the event Owner fails to do so, Manager shall be entitled to correct such non-conforming work at the sole cost and expense of Owner.  If, following one hundred twenty (120) days after the Opening Date, Owner has failed to reimburse Manager for any amounts for which Owner is liable pursuant to this Section 2.5.3, Manager shall have the option to reimburse itself such amounts from distributions otherwise payable to Owner pursuant to the Management Agreement.

2.5.4   EDITION Flagging.  The parties have agreed that the  Hotel will initially open without the EDITION brand name.  The parties agree that the Conceptual Plans will set forth those items that are required for the Opening Date to occur and those additional items that are required solely for the Flagging Date to occur.  Based upon the Conceptual Plans, Manager shall prepare a schedule specifying those items within the Conceptual Plans (the "Flagging Renovation") that must be completed in order for the Flagging Date to occur.  Owner shall complete those items required for the Opening Date to occur and those items required for the Flagging Date to occur.  Manager shall advise Owner as early as possible as to the date Manager desires the Hotel to open as an EDITION Hotel so that the Flagging Date may be achieved in a timely manner and to minimize any delays associated with the completion of construction or other work required for the Hotel to operate within the EDITION Hotel System.

## ARTICLE 3
### FIXED ASSET SUPPLIES, INVENTORIES AND EQUIPMENT LEASES

3.1   Fixed Asset Supplies and Inventories.  Owner shall ensure that, on or prior to the date of Substantial Completion, the Hotel is equipped with the required Fixed Asset Supplies, Inventories and Hotel Systems required for the operation of the Hotel and Project Areas in

15



accordance with System Standards and Section 6.3 and Section 6.4. Manager shall provide guidance to Owner relating to the quantities of Fixed Asset Supplies and Inventories, and the specifications of the Hotel Systems, necessary for the operation of the Hotel. Manager shall provide Owner with documents identifying such Fixed Asset Supplies, Inventories and Hotel Systems (which documents shall be in a form suitable for bidding the procurement of the Fixed Asset Supplies and Inventories, but which may not specify the prices or quantities of such items). In the event that Owner desires to substitute another item for one specified by Manager, each such substitution must be submitted to and approved by Manager.

### ARTICLE 4
### TIMETABLE; TECHNICAL SERVICES FEE

4.1     <u>Construction of Hotel and Project Areas</u>. Owner agrees that construction, furnishing and equipping of the Hotel and Project Areas shall be completed materially in accordance with the Plans approved by Owner, Manager and Schrager pursuant to Article 2, the EDITION Technical Standards and Systems Standards in existence as of the commencement of construction (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3). Owner shall be solely responsible for any cost over-runs arising from the design, construction, equipping or furnishing of the Hotel and the Project Areas. Owner shall comply with the following obligations:

(a)     within thirty (30) days after the Effective Date, Owner shall submit to Manager evidence reasonably satisfactory to Manager that debt and other financing required to construct the Hotel and Project Areas has been obtained by Owner. Upon request of Manager, Owner shall promptly provide to Manager updates of the Project budget and Owner's sources of Project funds;

(b)     within thirty (30) days after the Effective Date, Schrager shall cause Designer, Manager and Schrager to submit to Owner the Design Schedule described in Section 1.2(b) hereof;

(c)     commence construction of the Project in accordance with the Design Schedule approved by the parties pursuant to Section 1.2(b), with construction being deemed to have commenced upon the issuance of a building permit;

(d)     construction of the Project, having commenced, shall not be interrupted or stopped for a period in excess of thirty (30) days for reasons other than an Extraordinary Event;

(e)     Owner shall complete construction and other renovation activities related to the Project materially in accordance with the Plans approved by Manager and Schrager, the EDITION Technical Standards and Systems Standards in existence as of the commencement of

16



construction (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3), such that the date of Substantial Completion occurs no later than May 31, 2009. Owner shall provide Manager written notice as soon as reasonably practicable if Owner determines that the date of Substantial Completion is not projected to occur by such date; and

        (f)    provide Manager written confirmation of the projected date of Substantial Completion in accordance with Section 5.1 and Section 6.2 so that Manager and Schrager may undertake their pre-opening activities based on such projected date.

        The foregoing deadlines shall be extended for delays caused by an Extraordinary Event, provided, however, for any such Extraordinary Event, no such extension shall exceed 365 days.

        It shall be a Default by Owner hereunder if Owner fails to meet the foregoing deadlines set forth in Section 4.1(c) through Section 4.1(f) (as may be extended by an Extraordinary Event pursuant to the previous paragraph); provided, however, that if Owner's failure to meet the foregoing deadlines (as extended by an Extraordinary Event pursuant to the previous paragraph) is caused solely by reasons of an Extraordinary Event, then (i) such failure shall not be considered a Default by Owner under the Management Agreement, (ii) Manager may terminate the Management Agreement and this Agreement upon written notice to Owner, and (iii) Manager shall only be entitled to payment of those portions of the Technical Services Fee, Reimbursable Expenses and Pre-Opening Expenses to which Manager is entitled pursuant to the terms of this Agreement and Schrager shall only be entitled to payment of that portion of the Concept Development Fee to which Schrager is entitled pursuant to the terms of this Agreement through the date of such Termination, plus reasonable post-Termination expenses.

    4.2    <u>Technical Services Fee</u>. Owner shall pay to Manager and Schrager a fee for services rendered pursuant to Article 2 and Article 3 (including, without limitation, the services of Aaron Richter, Debra French and a project manager) (the "Technical Services Fee"). The services to be provided by Schrager hereunder shall be provided by an executive vice president of architecture and design, an executive vice president of interior design and FF&E, a brand manager-visual and a project manager who will not be responsible for more than a total four (4) projects. Ian Schrager shall be personally involved in the design, concepting and direction of the Hotel and shall be available for key design meetings in connection therewith. The Technical Services Fee shall be Fifty-Five Thousand Five Hundred Fifty-Six Dollars ($55,556) per month with the first such monthly payment to be paid on July 20, 2008, and subsequent monthly payments to be paid on the twentieth (20th) day of each calendar month thereafter until the Opening Date. Manager shall pay to Schrager such portion of the Technical Services Fee as they shall mutually agree. Manager and Schrager shall not earn a profit with respect to the Technical Services Fee. Any portion of the Technical Services Fee which relates to services rendered by Schrager shall include only the actual costs incurred by Schrager for any person employed or engaged by Schrager

17



who devotes his or her full time and attention to the Hotel (or the allocable portion of such costs, if such person performs work on behalf of more than one EDITION hotel), such costs to include compensation of such person (but not out-of-pocket expenses incurred by such person, which shall be paid as Reimbursable Expenses).

    4.3    Concept Development Fee. Owner shall pay to Schrager a fee for services rendered pursuant to this Agreement and in connection with the design of the Hotel equal to Two Million Nine Hundred Thirty Eight Thousand Dollars ($2,938,000) (the "Concept Development Fee"). Eighty percent (80%) of the Concept Development Fee shall be paid in monthly installments of One Hundred Thirty Thousand Six Hundred Thirteen Dollars ($130,613), with the first installmen to be paid within five (5) Business Days after the Effective Date, subsequent monthly installment to be paid on the twentieth (20th) day of each calendar month thereafter, and the balance to be pai within thirty (30) days after Substantial Completion as set forth in Section 4.1(f). Promptly following the date of Substantial Completion, Owner, Manager and Schrager shall determine the final, total development costs for the Project. If the actual total hard costs for the room and common area improvements, exterior, and capital improvements for the Project (the "Actual Hard Costs") exceed Thirty Five Million Two Hundred Thirty One Thousand Dollars ($35,231,000) (which represents the hard costs for the Project upon which the above Concept Development Fee was calculated) (the "Budgeted Hard Costs") by more than Five Million Dollars ($5,000,000), then the Concept Development Fee shall be increased by an amount equal to two percent (2%) of the difference between the Actual Hard Costs and the Budgeted Hard Costs, and Owner shall pay such amount to Schrager within fifteen (15) days after such determination. If either party disputes the determination of the Actual Hard Costs and the parties are unable to resolve the dispute, either party may refer the matter to a panel of Experts in accordance with the provisions of Section 11.20 of the Management Agreement.

    4.4    Reimbursable Expenses. In addition to the Technical Services Fee and the Concept Development Fee, Owner shall pay to each of Manager and Schrager their respective Reimbursable Expenses within thirty (30) days of the date of Manager's and Schrager's invoices therefor. Manager shall invoice Owner for the Reimbursable Expenses incurred by Manager, and Schrager shall invoice Owner for the Reimbursable Expenses incurred by Schrager on a monthly basis and Owner shall pay such invoices on the paid on the twentieth (20th) day of each calendar month thereafter. Manager shall provide Owner with system-generated information from Manager's automated expense reporting system to substantiate Manager's Reimbursable Expenses and Schrager shall provide Owner with reasonable written substantiation for Schrager's Reimbursable Expenses. Manager and Schrager shall, within fifteen (15) days after the Effective Date, each provide Owner with a good faith estimate of their respective total Reimbursable Expenses for Owner's review and approval and each of Manager and Schrager shall use commercially reasonable efforts not to exceed the amounts set forth in such estimates. Manager and Schrager shall notify Owner if at any time actual their respective Reimbursable Expenses are projected to exceed such estimated amount and the reasons there for, and in no event shall



Reimbursable Expenses in the aggregate exceed the aggregate amount approved by Owner without the prior approval of Owner, provided, however, that such advance approval shall not be required with respect to non-budgeted travel expenses which are otherwise reasonably required.

     4.5    Funding Technical Services. If, following one hundred twenty (120) days after the Opening Date, Owner has failed to make payment on account of the Technical Services Fee, the Concept Development Fee or Reimbursable Expenses detailed in Sections 4.2, 4.3 and 4.4, Manager shall have the option to pay itself and Schrager such amounts from distributions otherwise payable to Owner pursuant to the Management Agreement.

**ARTICLE 5**
**PRE-OPENING ACTIVITIES**

     5.1    Projected Opening Date; Turnover Schedule. Owner and Manager agree that the Opening Date is projected to occur on July 1, 2009. However, the Opening Date shall not occur sooner than fifteen (15) days after Substantial Completion and in accordance with the provisions of Section 6.1. Owner, Schrager and Manager each agree to direct their actions hereunder in a manner that is intended to achieve the Opening Date on such date. Owner acknowledges that based upon Owner's commitment to work toward such Opening Date, Manager shall begin hiring and training staff and booking reservations for the Hotel, unless Manager is otherwise notified pursuant to Section 4.1(f) that the date of Substantial Completion has been modified. Owner, Manager and Schrager shall agree on a turnover schedule for the Hotel based on the projected Opening Date.

     5.2    Pre-Opening Activities. Owner, Schrager and Manager recognize that Manager must undertake certain activities in advance of the Opening Date so that the Hotel can function in an appropriate and orderly manner on the Opening Date and during the first (1st) Fiscal Year. Accordingly, Manager shall, subject in each instance to the limitations and constraints set forth in the Management Agreement:

          (a)    In consultation and collaboration with Schrager, recruit, train and employ the staff required for the Hotel;

          (b)    In consultation and collaboration with Schrager, undertake pre-opening promotion and advertising, including opening celebrations and related activities;

          (c)    Test and, if necessary, implement modifications of the Hotel operations;

          (d)    For a period ending not later than sixty (60) days after the Opening Date, make provisions to provide a task force of personnel to supervise and assist the pre-opening and opening operations;

19



(e) Apply for the initial licenses and permits required for the operation of the Hotel as contemplated by the Management Agreement and Section 2.4.2;

(f) In consultation and collaboration with Schrager, design and implement a marketing, public-relations and sales strategy for the Hotel; and

(g) In general, render such other miscellaneous services incidental to the preparation and organization of the Hotel's operations as may be reasonably required for the Hotel to be adequately staffed and capable of management on the Opening Date and during the first (1st) Fiscal Year, including development and implementation of marketing and sales programs, accounting and budgeting controls and similar operational items.

5.3    <u>Pre-Opening Expenses</u>. Attached hereto as <u>Exhibit 2</u> is a budget containing an estimate of the total Pre-Opening Expenses. Proposed increases to the Pre-Opening Expenses shall require the approval of Owner if such increases shall, individually exceed the line item in question by greater than ten percent (10%) of such line item, or if in the aggregate, such modifications increase the aggregate of such budget by greater than five percent (5%). In the event the Opening Date is delayed or postponed from the original date established therefor, such estimates shall be subject to revision to reflect any increases in Pre-Opening Expenses occasioned by such delay or postponement. Owner shall notify Manager in advance of any impending delay or postponement of the date of Substantial Completion as required by Section 4.1(f) to enable Manager (to the extent reasonably practicable) to reduce the increases in Pre-Opening Expenses occasioned thereby. It is understood, however, that to the extent that any delay or postponement of the Opening Date causes increased Pre-Opening Expenses that cannot reasonably be avoided, Owner shall promptly pay such increased Pre-Opening Expenses pursuant to Section 5.4, regardless of the fact that such delay or postponement may be the result of an Extraordinary Event. For purposes of the preceding sentence, the term "increased Pre-Opening Expenses" shall include all out-of-pocket cancellation penalties and the cost of other contractual obligations, as well as all relocation costs and expenses, in the event Manager reasonably determines that it must cancel reservations made for Guest Rooms, meeting rooms and other Hotel facilities as a result of any delay or postponement of the Opening Date. Manager shall use reasonable efforts to implement all pre-opening activities in an efficient, business-like manner so as to maximize the effectiveness of such activities and the spending of the budget for the Pre-Opening Expenses.

5.4    <u>Funding of Pre-Opening Expenses</u>. Pre-Opening Expenses shall be borne solely by Owner. Owner shall furnish Manager with funds required by Manager for Pre-Opening Expenses (i) in the amounts and on the dates required, as shown in the projections contained in or furnished by Manager in conjunction with the Pre-Opening Expenses budget, and (ii) in such other amounts and on such other dates as may be specified by Manager in any amendments to the Pre-Opening Expenses budget. Such amounts shall be deposited in the Pre-Opening Account. In order to ensure the timely payment of Pre-Opening Expenses when they are incurred, Owner acknowledges and agrees that Manager may bill Owner for Pre-Opening Expenses, and that Owner shall be required



to pay such Pre-Opening Expenses before Manager actually incurs the costs for such Pre-Opening Expenses.

     5.5    Use of Funds in Pre-Opening Account; Accounting. Manager shall use the funds in the Pre-Opening Account to pay subsequent Pre-Opening Expenses and to reimburse itself for previously incurred Pre-Opening Expenses. At the time of delivering to Owner any revised estimate of Pre-Opening Expenses, Manager shall also deliver an accounting of any funds expended to date for Pre-Opening Expenses. Within one hundred twenty (120) days after the final expenditure of funds for Pre-Opening Expenses, Manager shall deliver to Owner an itemized accounting of funds so expended along with payment to Owner of all remaining amounts in the Pre-Opening Account that have not been spent by Manager. If, following one hundred twenty (120) days after the Opening Date, Owner has failed to make payment on account of the Pre-Opening Expenses, Manager shall have the option to reimburse itself such amounts together with interest at the Prime Rate plus three percent (3%) from distributions otherwise payable to Owner pursuant to the Management Agreement.

## ARTICLE 6
## OPENING DATE

     6.1    Opening Date. The projected Opening Date shall be as set forth in Section 5.1. However, the actual Opening Date shall be agreed upon by Manager and shall in no event be earlier than the date upon which (i) all elements of the Hotel and Project Areas have been substantially completed materially in accordance with the approved Plans and the EDITION Technical Standards and System Standards that were not incorporated in the approved Plans (unless such EDITION Technical Standards and System Standards were not incorporated in the approved Plans by the agreement of the parties pursuant to Section 2.3) and in compliance with the provisions of Section 6.3, and are ready for their intended use and occupancy, other than minor Punchlist Items, which will not individually or in the aggregate impair the operation and use of the Hotel for its intended purpose, or impair the guest experience at the Hotel; and (ii) all licenses, permits and other approvals and instruments necessary for operation of the Hotel by Manager have been obtained. Any decision by Manager to delay the Opening Date based on failure of the Hotel or Project Areas to satisfy the requirements set forth in the preceding sentence shall not prejudice Manager's rights under Section 4.1. Owner shall promptly notify Manager of any changes in the projected Opening Date.

     6.2    Notification. Owner shall use reasonable efforts to give Manager notice of the approximate anticipated date of Substantial Completion for the Hotel no later than three (3) months before the date thereof, and to advise Manager from time to time of changes to such anticipated date. Owner shall give Manager written notice at least six (6) weeks in advance before the Substantial Completion date for the Hotel if such date is anticipated to move by more than five (5) days of the last date of Substantial Completion of which Owner advised Manager.



6.3    Conditions for Opening Hotel. Consistent with Section 6.1, Owner agrees that on the Opening Date, there will be no ongoing construction on any portion of the Hotel that would materially adversely affect access to the Hotel or that would otherwise materially adversely limit, restrict, disturb or interfere with Manager's management and operation of the Hotel in accordance with System Standards or that would adversely affect the guest experience at the Hotel. If, as of the Opening Date, there remain to be completed minor unfinished Punchlist Items or installation of incidental FF&E and Fixed Asset Supplies in the common areas, lobby, administrative offices or any Guest Rooms to be opened on the Opening Date, none of which preclude Manager, in Manager's judgment, from operating the Hotel in accordance with System Standards, the Opening Date shall not be delayed for such reasons; however, Owner shall be obligated to promptly finish such items.

6.4    Initial Funding of Working Capital; Fixed Asset Supplies. At least thirty (30) days prior to the projected Opening Date, Owner shall provide to Manager the initial Working Capital (cash component) for the Hotel in the amount set forth on Exhibit 2. Additionally, Owner shall ensure that the Hotel is equipped by the date of Substantial Completion with the initial Fixed Asset Supplies and Inventories for the Hotel (or that Owner has provided to Manager the funds necessary to supply the Hotel with the initial Fixed Asset Supplies and Inventories) in accordance with Section 3.1.

6.5    Hotel Access. The parties acknowledge that certain areas of the Hotel will need to be made available to Manager and Schrager prior to Substantial Completion in order to allow Manager and Schrager to undertake certain activities in anticipation of the Opening Date. The parties agree to work together in good faith to identify such areas and determine a schedule for making such areas available to Manager and Schrager.

## ARTICLE 7
## INTERIM INSURANCE

7.1    Insurance Required. At all times during the construction of the Project through the Opening Date, Owner shall, at its expense, procure and maintain (or cause its general contractor to procure and maintain) insurance fully protecting Owner, Manager and Schrager against all loss or damage arising out of or in connection with the construction of the Project. Such insurance shall, at minimum include:

(a)    Commercial general liability insurance with combined single limits for bodily injury or property damage in an amount not less than One Million Dollars ($1,000,000) per each occurrence with a general aggregate limit of not less than Two Million Dollars ($2,000,000) and such aggregate shall apply, in total, to the Hotel. Such insurance shall include, but is not limited to, the following coverages or endorsements:

- Independent Contractors Liability

22



- Products/Completed Operations Liability (construction defect) to be maintained for (i) ten (10) years after the date of Substantial Completion of the Project or close of escrow date, or (ii) such greater time frame as may be required to cover the statutory time frame for construction defects in the state where the project is developed. If such coverage is provided by the general contractor, evidence of insurance shall be provided for the entire statutory time frame
- Explosion, Collapse and Underground Coverage
- Broad Form Property Damage Liability, including Completed Operations

(b)     Business auto liability including owned, non-owned and hired vehicles, with combined single limits for bodily injury and property damage in an amount not less than One Million Dollars ($1,000,000) per each occurrence.

(c)     Umbrella excess liability, on a following form, in an amount not less than:

(i)     Twenty-Five Million Dollars ($25,000,000) per occurrence for projects where the total Project construction costs are valued at Fifty Million Dollars ($50,000,000) or less,

(ii)     Fifty Million Dollars ($50,000,000) per occurrence for projects where the total Project construction costs are greater than Fifty Million Dollars ($50,000,000) but less than or equal to One Hundred Million Dollars ($100,000,000),

(iii)     One Hundred Million Dollars ($100,000,000) per occurrence for projects where the total Project construction costs are greater than One Hundred Million Dollars ($100,000,000) but less than or equal to One Hundred Fifty Million Dollars ($150,000,000), or

(iv)     such greater amount as reasonably determined by an insurance consultant and agreed to in writing by Manager for projects where the total Project construction costs are greater than One Hundred Fifty Million Dollars ($150,000,000).

Such coverage shall be in excess of the insurance required under Section 7.1(a), Section 7.1(b), and the employers liability coverage required under 7.1(e). The general aggregate shall apply in total to the Hotel only and shall be reinstated annually during construction. Upon the close of escrow or Substantial Completion of the Hotel, the coverage shall specifically include the completed operations liability (construction defects) coverage in the amounts required under this Section and the general aggregate shall apply in total to the Hotel only for the timeframe required in Section 7.1(a).

23



(d)     Builders risk insuring such risks as commonly covered by an "all risk of physical loss" form on a replacement cost basis covering equipment and the Hotel and Project Areas, including contractors' supplies, tools and equipment.  Such coverage shall include business interruption insurance covering at least 18 months of loss of profits, including Manager's management fees, other amounts due to Manager under the Management Agreement, necessary continuing expenses, and if applicable, rent, for interruptions at the Project insured under said builders risk policy.

(e)     Workers' compensation insurance covering all of Owner's, its general contractors', its subcontractors' and its consultants' employees, in statutory amounts and employers' liability of not less than One Million Dollars ($1,000,000) each accident.

(f)     Professional liability insurance in an amount not less than the greater of Two Million Dollars ($2,000,000) or five percent (5%) of the total construction cost of the renovation of the Project, covering claims resulting from negligent errors, omissions, or acts of th architect and any and all engineers and other consultants hired by the architect.  Any deductible shall be subject to Manager's prior approval.  For purposes of this Agreement, the architect shall maintain professional liability insurance for at least three (3) years from the date of receipt of the final certificate of occupancy for the Project.

7.2     General Provisions.  All insurance policies required under Section 7.1 (excluding workers compensation) shall include Manager and Schrager as an additional insured thereunder. Owner shall deliver to Manager and Schrager, upon execution of this Agreement, certificates of insurance, and if requested, copies of the insurance policies, with respect to all policies required pursuant to Section 7.1 and, in the case of insurance policies about to expire, shall deliver certificates with respect to renewals thereof.  All such certificates of insurance shall state that the insurance shall not be canceled or materially reduced without at least thirty (30) days' prior written notice to the certificate holder or other comparable industry acceptable language.  For all the above coverages, Owner shall, and shall cause the general contractor and all subcontractors to, waive their respective rights of recover and its insurers' rights of subrogation against Manager and Schrager and such coverage shall be primary and non-contributory to any other coverages Manager and/or Schrager may carry.

## ARTICLE 8
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF OWNER

8.1     Representations and Warranties of Owner.  Owner hereby represents and warrants to Manager and Schrager as follows:

8.1.1   Title.  Owner has good, indefeasible and merchantable title to and ownership of the Hotel and the Project (including without limitation the Site) subject to no liens o

24



encumbrances which might materially adversely affect the construction or operation of the Hotel or Manager's rights hereunder or under the Management Agreement.

8.1.2   No Breach.  The execution, delivery and/or performance by Owner of this Agreement and the Management Agreement will not result in a breach of any provision contained in any agreement, instrument, document, order, judgment, decree or other material arrangement which Owner is a party or by which it or any of its assets is bound.

8.1.3   Litigation.  There is no pending or threatened suit, action or litigation or administrative, arbitration or other proceeding relating to Owner or the Hotel or the Project which might materially adversely affect the construction or operation of the Hotel or Manager's or Schrager's rights hereunder or Manager's rights under the Management Agreement.

8.1.4   Access and Utilities.  Suitable vehicular and pedestrian access and complete utility services (including water, sewer, storm drainage electricity, gas, telephone and cable television) are available to the Hotel for its intended purposes or can be made available without extraordinary expense.

8.2   Covenants of Owner.  Owner covenants and agrees, in addition to the other covenants of Owner herein and in the Management Agreement, to:

8.2.1   Construction.  Construct, furnish and equip the Hotel so that same may open for business on or prior to the projected Opening Date as set forth in Section 5.1 (subject to delays caused by Extraordinary Events) in full compliance with this Agreement and the Management Agreement, at Owner's sole expense, free of liens for labor, services or materials and in full compliance with the requirements of all governmental authorities.

8.2.2   Publicity.  To furnish to Manager and Schrager for their prior approval all announcements to news media regarding the Hotel and to cooperate with Schrager and Manager to obtain such publicity in connection with the Hotel as Manager and Schrager desire.

8.2.3   Use of Logos.  Owner shall request Manager's approval, which Manager may withhold in its sole discretion, for any use of the "EDITION" name and logos in all publications, announcements or articles, and Owner shall not permit and shall use all available means to prevent its vendors and Contractors from advertising their contracts in connection with the Hotel and from making any unauthorized use of the EDITION trademarks.

8.2.4   Environmental.  Owner agrees to provide to Manager evidence satisfactory to Manager that no Hazardous Materials are present on the Site of the Hotel and that no Hazardous Materials will be incorporated into the construction of the Hotel, and that any Hazardous Materials previously located on the Site have been completely removed to the satisfaction, and in compliance with the rules, regulations and orders, of all governmental authorities having jurisdiction thereof.

25



8.3     Survival; Indemnity.  The provisions of this Agreement shall survive the Opening Date.  Owner shall indemnify and hold each of Manager and Schrager harmless from and against any and all loss, cost, damage or expense (including, without limitation, reasonable attorney's fees and litigation expenses) arising from, occurring by virtue of or resulting from, any breach of any representation or warranty made by Owner herein or from any failure by Owner to perform or observe any covenant or agreement of Owner contained herein.

## ARTICLE 9
## MISCELLANEOUS

9.1     Defaults.  Any default by any of the parties to this Agreement shall entitle the non-defaulting party or parties to pursue all remedies as are available to them at law or in equity.

9.2     Term.  The term of this Agreement shall commence upon the Effective Date and, unless terminated on an earlier date as provided in this Agreement, shall expire upon the date of final completion of the Hotel (which shall not occur until, among other things, completion of all Punchlist Items) in accordance with this Agreement, which date may be subsequent to the Opening Date.  This Agreement shall be terminated in the event that the Management Agreement is terminated.  Termination shall not in any way relieve Owner of its obligation to pay or reimburse Manager and/or Schrager for all amounts owing or to be reimbursed to Manager and/or Schrager pursuant to the terms of this Agreement, and all such amounts shall become immediately due and payable, and such liability shall continue until such amounts are paid in full, notwithstanding Termination.

9.3     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.  No party shall assign or transfer any rights hereunder or interest herein (including, without limitation, monies due or that may become due hereunder) unless, in the case of (a) Owner and Manager, such assignment or transfer complies with the provisions of Article X of the Management Agreement; and (b) in the case of Schrager, such assignment or transfer shall be to (i) any entity in which Ian Schrager owns and holds, directly or indirectly, at least twenty percent (20%) of the ultimate beneficial ownership of the transferee, or (ii) a trust, family partnership or other similar entity established by or for the benefit of immediate family members of Ian Schrager or the ultimate beneficial owners of Schrager, provided that with respect to both (i) and (ii), Ian Schrager shall at all times control the day-to-day operations and management of the transferee.  Unless specifically stated to the contrary in any written consent to an assignment, no assignment will release or discharge the assignor from any duty or responsibility hereunder.  Nothing contained in this Section 9.3 shall prevent Manager from employing such independent consultants, associates and subcontractors as Manager may deem appropriate to assist it in the performance of services hereunder.



9.4   Relationship. In the performance of this Agreement, Manager and Schrager shall each act solely as an independent contractor. Neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted, deemed or construed as making any party a partner, joint venturer with, or agent of, any other party. The parties agree that none of them will make any contrary assertion, claim or counterclaim in any action, suit, arbitration or other legal proceedings involving the parties.

9.5   Documents. All drawings, specifications, notes on drawings and other documents or correspondence produced by Manager pursuant to this Agreement shall be the property of Manager, and Owner shall have no right to use such documents with regard to any other project without Manager's consent, which consent shall be granted, conditioned or denied at Manager's sole and absolute discretion.

9.6   Third-Party Rights. Nothing herein shall be construed to give any rights or benefits hereunder to any person or entity, other than Owner, Manager or Schrager, and the rights of third-party beneficiaries are hereby expressly negated.

9.7   Headings. The headings of Sections herein are inserted for convenience only and are in no way intended to describe, interpret, define or limit the scope or content of this Agreement or any provision hereof.

9.8   Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument. Such executed counterparts may be delivered by facsimile which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart. The submission of an unsigned copy of the Agreement or an electronic instrument with or without electronic signature to either party shall not constitute an offer or acceptance. This Agreement shall become effective and binding only upon execution and delivery of the Agreement in non-electronic form by both parties in accordance with this Section 9.8.

9.9   Effect of Approval of Plans and Specifications. Owner, Manager and Schrager agree that in each instance in this Agreement or elsewhere wherein Manager or Schrager is required to give its approval of plans, specifications, budgets and/or changes thereto, no such approval shall imply or be deemed to constitute an opinion of Manager or Schrager, nor impose upon Manager or Schrager any responsibility or liability for the design or construction of the Hotel, including but not limited to, structural integrity or life-safety requirements, adequacy of any budgets, or the means, methods, techniques, sequences or procedures of construction. Manager, Schrager and their respective Affiliates shall not be responsible or liable for: (i) the design or construction of the Hotel, including but not limited to, structural integrity or life-safety requirements; (ii) the acts or omissions of Owner or any third party consultants or contractors (including, but not limited to, the performance by design professionals, construction contractors, subcontractors or other consultants or third parties); (iii) the failure of any contractor or consultant

27



to carry out any portion of any work on the Hotel; (iv) any costs or expenses associated with, related to, or resulting from the design and construction of the Hotel; (v) the means, methods, techniques, sequences or procedures of construction; or (vi) any safety precautions and programs in connection with the Hotel.  Owner acknowledges that Manager and Schrager will, in their review process, provide comments on the plans and specifications.  Such reviews do not relieve Owner and its consultants of their responsibility to determine the completeness and coordination of their documents and to ensure that the design and construction of the Project comply with applicable Legal Requirements.

9.10     Applicable Law.  This Agreement shall be construed under and shall be governed by the laws of the State of New York.

9.11     Notices.  Notices, statements and other communications to be given under the terms of the Agreement shall be in writing and delivered by hand against receipt or sent by certified or registered mail, postage prepaid, return receipt requested or by nationally utilized overnight delivery service, addressed to the parties as follows:

<table>
<tr><td>To Owner:</td><td>M Waikiki LLC<br>c/o ERealty Fund LLC<br>12780 High Bluff Drive, Suite 160<br>San Diego, California 92130<br>Attn:  Ed Bushor and Gary Stougaard<br>Phone: (858) 350-5599<br>Fax:    (858) 350-5585</td></tr>
<tr><td>with copy to:</td><td>Michael S. Kosmas<br>Squire, Sanders & Dempsey, LLP<br>1201 Pennsylvania Avenue, N. W. Suite 500<br>Washington, D.C. 20004<br>Phone:  (202) 626-6600<br>Fax:  (202) 626-6780</td></tr>
<tr><td>To Manager:</td><td>Marriott Hotel Services, Inc.<br>c/o Marriott International, Inc.<br>10400 Fernwood Road<br>Bethesda, Maryland  20817<br>Attn:   Department 70/100.03 – Mike Campbell<br>Phone: (301) 380-5532<br>Fax:    (301) 644-7753</td></tr>
</table>



with copy to:               Marriott Hotel Services, Inc.
                            c/o Marriott International, Inc.
                            10400 Fernwood Road
                            Bethesda, Maryland 20817
                            Attn:  Law Department 52/923 – A&C Attorney
                            Phone: (301) 380-9555
                            Fax:   (301) 380-6727

To Schrager:                c/o Ian Schrager Company
                            818 Greenwich Street
                            New York, New York 10014
                            Attn:  Mr. Ian Schrager
                            Phone: (212) 796-8401
                            Fax:   (212) 898-0331

with copy to:               Skadden, Arps, Slate Meagher & Flom LLP
                            Four Times Square
                            New York, New York  10036
                            Attn:  Benjamin F. Needell, Esq.
                            Phone: (212) 735-2600
                            Fax:   (917) 777-2600

To Manager/
Schrager Rep:               c/o Ian Schrager Company
                            818 Greenwich Street
                            New York, New York 10014
                            Attn:  Mr. Aaron Richter
                            Phone: (212) 796-8401
                            Fax:   (212) 898-0331

or at such other address as is from time to time designated by the party receiving the notice.  Any
such notice that is mailed in accordance herewith shall be deemed received when delivery is
received or refused, as the case may be.  Additionally, notices may be given by telephone facsimil:
transmission, provided that an original copy of said transmission shall be delivered to the
addressee by nationally utilized overnight delivery service by no later than the second (2nd)
business day following such transmission.  Telephone facsimiles shall be deemed delivered on the
date of such transmission, if received during the receiving party's normal business hours or, if not
received during the receiving party's normal business hours, then on the next succeeding business
date on which the receiving party is open for normal business.

   9.12   Confidentiality.  The parties agree that the terms of this Agreement are strictly
confidential and will use their reasonable efforts to ensure that such matters and information are

29



not disclosed to any outside person or entities without the prior consent of the other party, except as required by law or, to the extent necessary, (i) to obtain licenses, permits and other public approvals, (ii) in connection with a Sale of the Hotel or a financing (debt or equity) of the Hotel, or (iii) in connection with a financing or sale of Manager or Schrager or their Affiliates, or their corporate assets. Owner acknowledges that competitive information regarding brands, customers, marketing, operating or other strategies (including information related to other hotels) is confidential and proprietary to Manager and/or Schrager and shall not be disclosed to Owner.

9.13    Waiver of Jury Trial and Consequential and Punitive Damages. Owner, Manager and Schrager each hereby absolutely, irrevocably and unconditionally waive trial by jury and the right to claim or receive consequential, incidental, special or punitive damages in any litigation, action, claim, suit or proceeding, at law or in equity, arising out of, pertaining to or in any way associated with the covenants, undertakings, representations or warranties set forth herein, the relationships of the parties hereto, this Agreement or any other agreement, instrument or document entered into in connection herewith, or any actions or omissions in connection with any of the foregoing.

9.14    Indemnification. Owner shall indemnify and hold harmless Manager, Schrager and their respective agents and employees from and against all claims, damages, losses and expenses (including, but not limited to, reasonable attorneys' fees) arising out of or resulting from the design, construction and furnishing of the Hotel brought by third parties, except to the extent such claim, damage, loss or expense is the result of the gross negligence or willful misconduct of Manager, Schrager or their respective Affiliates, employees and agents.

9.15    Entire Agreement. The Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to the Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a written non-electronic instrument that has been duly executed by the non-electronic signature of an authorized representative of the parties hereto.

9.16    Consents and Approvals. Wherever in this Agreement the consent or approval of a party is required, such consent or approval unless otherwise noted shall be given or withheld in the reasonable discretion of such party, as applicable, shall be in writing, and shall be executed by a duly authorized officer or agent of such party. If a party fails to respond within ten (10) Business Days to a written request for a consent or approval, and thereafter fails to respond within five (5) Business days to a second written request for such consent or approval, such failure to respond shall be deemed to be a grant of consent or approval. Whenever in this Agreement a party is entitled to exercise discretion, such discretion shall be exercised in a reasonable manner. The Manager/Schrager Rep shall have the power and authority to respond to requests for the consents and approvals; provided, however, that Owner shall send all requests for consents and approvals, all submission packages and any other written communications to Schrager or Manager to both

30



Schrager and Manager (but not to their respective attorneys) in accordance with the notice provisions of Section 9.11. The Owner Rep shall have the power and authority to submit all requests for consents and approvals under this Agreement and to respond to requests for consents and approvals on behalf of Owner.

[SIGNATURES FOLLOW ON NEXT PAGE]



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first written above.

**OWNER:**
M WAIKIKI, LLC,
a Hawaii limited liability company

By: eKealey Fund, LLC, a California
limited liability company, its
Manager

By: _____
Print Name: _____
Title: _____

**MANAGER:**
MARRIOTT HOTEL SERVICES, INC.,
a Delaware corporation

By: _____
Yoav K. Gery
Authorized Signatory

**SCHRAGER:**
I.S. INTERNATIONAL, LLC,
a Delaware limited liability company

By: _____
Print Name:   Ian Schrager
Title:        President

SIGNATURE PAGE TO TSA

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first written above.

**OWNER:**
M WAIKIKI, LLC,
a Hawaii limited liability company

By: _____
Print Name: _____
Title: _____

**MANAGER:**
MARRIOTT HOTEL SERVICES, INC.,
a Delaware corporation

By: _____
Yoav K. Gery
Authorized Signatory

**SCHRAGER:**
I.S. INTERNATIONAL, LLC,
a Delaware limited liability company

By: _____
Print Name:   Ian Schrager
Title:             President

## EXHIBIT 1

### MILESTONE EVENTS

Manager and Schrager will visit the Site for the purpose of performing their obligations under the Agreement at approximately the following times:

Commencement of public space finishes.

Commencement of FF&E installation.

Final Acceptance.

In addition to the above-described milestone events, Manager and Schrager may visit the Site to observe the construction of the Hotel and Project Areas at such intervals as Manager and Schrager deem reasonably necessary (including, without limitation, the review of special systems such as life safety, kitchen, telecommunications and other hotel systems).



**EXHIBIT 2**

**PRE-OPENING EXPENSES & INITIAL WORKING CAPITAL**

**Waikiki Edition Hotel**
**Preopening**
**Budget**
**June 9, 2008**

| Dept # | Description | $ |
|--------|-------------|---|
| 61 | Front Desk and Housekeeping | $ 290,462 |
| 65 | Executive Office/ Admin | 545,091 |
| 67 | Sales & Marketing | 1,709,277 |
| 68 | Licenses | 100,000 |
| 69 | Engineering | 121,638 |
|  | Task Force - OFS | 72,000 |
|  | Bar Task Force | 68,250 |
|  | Relocation | 530,000 |
|  | Contingency @ 5% (on all costs except relocation) | 141,923 |

| | |
|---|---|
| **Total Preopening Budget** | **$3,578,641** |
| **Total CPAR** | $ 10,138 |
| **Total Preopening Budget (with inflation factor)** @ *5.00%* | $ 3,757,573 |

| | |
|---|---|
| **Opening Working Capital** [Includes 2 weeks of Payroll, Opening F&B Inventories] | $ 519,417 |
| **Total CPAR** | $ 1,471 |
| **Opening Working Capital** [with inflation factor] @ *5.00%* | $ 545,387 |



**Key Assumptions:**

* Assumes staffing levels for management and hourly as outlined in Edition Brand staffing model
* Assumes wages consistent with pro forma and Zone 4 compensation
* F&B staffing not detailed for Pre-opening expense purposes but covered in margins per pro forma
* Relocation assumed for GM, 2 Exec and 5 Manager positions
* Assumes no Shared Service costs or Sales Force One related allocations
* Assumes no Spa related pre-opening costs
* Assumes Task Force related costs consistent with NALO full service opening on a CPAR basis

**Pre-opening Staffing (excluding F&B staff)**

| | |
|---|---|
| Number of Managers | 31 |
| Number of Hourly Associates | 111 |
| **Total Estimated FTEs** | *142* |
| **Number of Guest Rooms** | 353 |



# EXHIBIT 3

## APPROVED CONSULTANTS

| Entity License Number | Company Name & Address | Contact Name Position / Title | Phone Fax E-Mail |
|---|---|---|---|
| **HOTEL** | | | |
| General Contractor CT-25292 | **Skye Construction, LLC** 3375 Koapaka Street, Suite D-185 Honolulu, HI 96819 | Stanley A. Salcedo | 808.839.0909 808.838.7927 val-ssm@hawaii.rr.com |
| Executive Project Director | **E-Realty Companies Hawaii, Inc.** 1775 Ala Moana Blvd., Ste. 262 Honolulu, HI 96815 | Eric Hamaguchi | 808.983.3804 808.983.3801 eric@erealtycompanies.com |
| Construction Management | **E-Realty Construction & Management Hawaii, Inc.** 1775 Ala Moana Blvd., Ste. 262 Honolulu, HI 96815 | Aaron Molinar Project Manager | 808.983.3800/ 3804 808.983.3801 aaron@erealtycmhawaii.com |
| Architect | **Solomon Ferguson Architecture** 143 South Cedros Avenue, Ste. C-101 Soloana Beach, CA 92075 | Riccardo Ferguson Jan Solomon | 858.509.2123 858.509.2127 Riccardo@solomonferguson.com |
| Structural Engineer | **Robert Englekirk Consulting** 239 Merchant Street #200 Honolulu, HI 96813-2923 | Michael K. Kawaharada, S.E. Principal | 808.521.6958 808.538.6701 relhi@hawaii.rr.com |
| Mechanical Engineer Guestrooms | **Amel Technologies, Inc.** 1164 Bishop Street, Suite 124-302 Honolulu, HI 96813 | Melek Yalcintas President | 808.590.2340 808.590.2340 melekyalcintas@hawaii.rr.com |
| Mechanical Engineer Public Areas | **Lance Uchida Mechanical Engineers, LTD** 1446 Lalamilo Place Honolulu, HI 96819 | Lance Uchida Principal | 808.836.0396 808.839.6081 luchida@aol.com |
| Electrical Engineer | **Albert Chong Associates, Inc.** 1117 Kapahulu Ave. Honolulu, HI 96816 | Rick Chong Vice President | 808.738.5355 808.738.5468 |
| ADA Consultant | **Paul Sheriff Incorporated** 1000 Bishop Street Honolulu, HI 96813 | Paul Stanley Sheriff | 808.792.7285 808.792.7620 www.paulsheriff.com |
| Food Service / Kitchen Consultant | **Global Restaurant Design** 31368 Via Colinas Westlake Village, CA 91362 | Jerry N. Stein | 818.707.7778 818.706.7701 jerrys@grdcorp.com |
| Purchasing - China | **LF International Trading** 2855 Kaihikapu Street Honolulu, HI 96816 | Valarie Chang | 808.83338.25 808.735.7114 |
| Land Use & Zoning Consultant | **Patrick Seguirant Architect** 90-1030 kaihi Street Ewa Beach, HI 96706 | Patrick Seguirant Principal | 808.683.4477 808.689.3663 |
| Water Feature Design | **Pacific Aquascapes** | Wendell Lee | 808.682.1020 808.682.7288 |



| | | | wendell@pacificaquagroup.com |
|---|---|---|---|
| Permit Processing | **Frank Pacarro Permit Service** | Frank Pacarro | |
| IT Consultant | **Innovative Business Solutions** | Chris Berner | 808.294.9190 |
| Liquor License | **Wayne Luke - Attorney at Law**<br>1441 Kapiolani Blvd, Ste. 1214<br>Honolulu, HI 96814 | Wayne Luke | -<br>808.946.3151<br>808.941.3673 |
| Environmental Consultant | **Elite Environmental Consultants, Inc.**<br>2220 Eva Beach, Hawaii<br>96706 | Jay Clayton | 808.206.8221 |
| Architect | **Next Design, LLC**<br>1132 Bishop Street, Suite 145<br>Honolulu, HI 96813 | Gary Nishioku<br>Karen Sakanto | 808.440.2788<br>808.440.2790<br>gnishioku@nextdesignllc.com |
| **MORIMOTOS RESTAURANT** | | | |
| Construction Management | **E-Realty Construction & Management Hawaii, Inc.**<br>1775 Ala Moana Blvd., Ste. 262<br>Honolulu, HI 96815 | Aaron Molinar<br>Project Manager | 808.983.3800/ 3804<br>808.983.3801<br>aaron@erealtycmhawaii.com |
| Executive Project Director | **E-Realty Companies Hawaii, Inc.**<br>1775 Ala Moana Blvd., Ste. 262<br>Honolulu, HI 96815 | Eric Hamaguchi | 808.983.3804<br>808.983.3801<br>eric@erealtycompanies.com |
| Architect | **Solomon Ferguson Architecture**<br>143 South Cedros Avenue C-101<br>Solana Beach, CA 92075 | Jan Solomon<br>Amy Small<br>Riccardo Ferguson | 858.509.2123<br>858.509.2127 |
| Interior Designer | **Thomas Schoos**<br>8271 Santa Monica Street #200<br>West Hollywood, CA 90046 | Michael Berman<br>President<br>Konrad Hrehorowicz | 323.822.2800<br>323.822.2808<br>konrad@schoos.com |
| Structural Engineer | **Englekirk Partners**<br>2116 Arlington Ave.<br>Los Angeles, CA 90018 | Chris Rosien<br>Principal | 323.733.6673<br>323.733.8882 |
| Mechanical Engineer | **Lance Uchida Mechanical Engineers, LTD**<br>1446 Lalamilo Place<br>Honolulu, HI 96819 | Lance Uchida<br>Principal | 808.836.0396<br>808.839.6081<br>luchida@aol.com |
| Electrical Engineer | **Albert Chong Associates, Inc.**<br>1117 Kapahulu Ave.<br>Honolulu, HI 96816 | Rick Chong<br>Vice President | 808.738.5355<br>808.738.5456 |
| Kitchen Design | **Yui Design**<br>702 Sligo Creek Parkway<br>Takoma Park, MD 20912 | Jimi Yui | 301.270.8950<br>301.270.8673 |

